**No. 26-6166**

# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC. et al.,

*Plaintiffs-Appellees*,

v.

BRIAN T. SHELLEM, in his official capacity as Chairman of the Oklahoma Statewide Charter School Board, et al.,

*Defendants-Appellants*.

and

RABBI DANIEL KAIMAN et al.,

*Intervenors-Defendants-Appellees*.

and

CRICKET MOORE et al.,

*Intervenors-Defendants-Appellees*.

On Appeal from the United States District Court for the Western District of Oklahoma
Case No. 5:26-CV-00582-R — Hon. David L. Russell

**Motion to Dismiss Appeal for Lack of Appellate Jurisdiction by Intervenors-Defendants-Appellees Rabbi Daniel Kaiman, Bradley Archer, Erika DuBose, Sydney Gebhardt, Kara Joy McKee, Michele Medley, and Gene Perry**

Brent Rowland
OKLAHOMA APPLESEED CENTER FOR LAW & JUSTICE
624 S. Denver Ave., Suite 400
Tulsa, OK 74119
(918) 519-5750
*brent@okappleseed.org*

Alex J. Luchenitser
Lauren Schoen*
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7306
*luchenitser@au.org*
*schoen@au.org*
*Admitted in Texas, not D.C.

(Additional counsel listed on signature page.)

# TABLE OF CONTENTS

INTRODUCTION ........ 1
10TH CIR. R. 27.1 STATEMENT ........ 2
FACTS ........ 3
A. Charter schools are public schools that must be secular and open to all ........ 3
B. Ben Gamla applies to operate a religious charter school ........ 5
C. Litigation ensues ........ 7
D. The Board denies Ben Gamla's application for nonreligious reasons ........ 12
ARGUMENT ........ 16
I. This appeal is moot because the Board rejected Ben Gamla's application on nonreligious grounds and Ben Gamla promised to withdraw the application ........ 16
II. The Board has no right to appeal a preliminary injunction to which it consented and for which it vigorously advocated ........ 18
CONCLUSION ........ 26
CERTIFICATIONS OF COUNSEL ........ 28
APPENDIX OF EXHIBITS

## INTRODUCTION

Plaintiffs-appellees National Ben Gamla Jewish Charter School Foundation and Peter Deutsch (collectively, "Ben Gamla") applied to open a virtual public charter school in Oklahoma that would teach a religious curriculum. An Oklahoma statute bars charter schools from doing so. Challenging that statute, Ben Gamla filed suit against the members of the Oklahoma Statewide Charter School Board (collectively, "the Board"). Ben Gamla successfully moved for a preliminary injunction against enforcement of the statute. The district court also ruled that an appeal of the injunction would stay discovery.

The Board consented to and vigorously advocated in favor of the injunction. The Board then denied Ben Gamla's charter-school application based on grounds unrelated to Ben Gamla's religious nature. Ben Gamla told the Board that it would withdraw the application if the Board did not reverse that denial. Ben Gamla also urged the Board to appeal the preliminary injunction. The Board declined to reverse its denial of the charter application. Yet, at Ben Gamla's request, the Board concurrently appealed the preliminary injunction that it had passionately supported.

This appeal has been rendered moot by the Board's denial of Ben Gamla's application and by Ben Gamla's pledge to withdraw it. And, in any event, the Board has no right to appeal a preliminary injunction that it consented to and intensely supported.

Accordingly, under Tenth Circuit Rule 27.3(A)(1), intervenors-defendants-appellees Rabbi Daniel Kaiman et al. ("Kaiman Intervenors") move to dismiss this appeal for lack of appellate jurisdiction. Kaiman Intervenors seek to protect the secular nature of public schools, including charter schools. They oppose this appeal as an improper attempt by the Board and Ben Gamla to (1) obtain appellate precedent legalizing religious public charter schools in the absence of a live and genuine controversy and (2) avoid discovery.

## 10TH CIR. R. 27.1 STATEMENT

The Board and Ben Gamla oppose this motion to dismiss. Another group of intervenors-defendants-appellees ("Moore Intervenors") supports dismissal of this appeal. Oklahoma Attorney General Gentner Drummond—who was dismissed as a defendant below and has moved for leave to appear before this Court—also supports dismissal of this appeal.

## FACTS

### A. Charter schools are public schools that must be secular and open to all.

In Oklahoma, charter schools are "public school[s] established by contract" with certain kinds of governmental and educational entities. Okla. Stat. tit. 70, § 3-132.2(C)(1)(b). Charter schools are statutorily prohibited from discriminating against students on any basis and from discriminating in employment based on religion. *Id.* §§ 3-136(A)(2), 3-136(A)(6), 3-136(A)(9), 3-140, 1210.201. An Oklahoma statute also bars charter schools from teaching a religious curriculum. *Id.* § 3-136(A)(2).

The Board has exclusive authority to approve virtual charter schools. *Id.* § 3-132.1(A). The Board must "[a]pprove quality charter applications that meet identified educational needs" and must "[d]ecline to approve weak or inadequate charter applications." *Id.* § 3-134(I)(3)–(4). To ensure that "only high-quality applications are approved" (Okla. Admin. Code § 777:10-3-3(b)), proposed charter schools must submit applications complying with numerous statutory and regulatory requirements, including provision of detailed budgets and cash-flow projections, descriptions of the minimum and maximum enrollment intended, plans for student recruitment, and "[i]nformation related to

the proposed school's community, including the importance of the educational model to the community and its support" (*id.* § 777:10-3-3(b)(4); Okla. Stat. tit. 70, § 3-134(B)).

In 2023, the Board's predecessor entity (the Statewide Virtual Charter School Board, whose duties and obligations the current Board inherited (Okla. Stat. tit. 70, § 3-132.1)), approved a virtual charter school—St. Isidore of Seville Catholic Virtual School—that planned to teach a religious curriculum. *Drummond ex rel. State v. Okla. Statewide Virtual Charter Sch. Bd.*, 558 P.3d 1, 6–7 (Okla. 2024). Oklahoma Attorney General Gentner Drummond sued, and the Oklahoma Supreme Court held that the proposed school was barred by Oklahoma's statutory prohibition against religious charter schools, by the Oklahoma Constitution, and by the Establishment Clause of the U.S. Constitution's First Amendment. *Id.* at 15. The Court also rejected an argument that the First Amendment's Free Exercise Clause requires the Board to authorize religious charter schools. *Id.* at 14–15. The U.S. Supreme Court granted certiorari and in May 2025 affirmed the Oklahoma Supreme Court's judgment by a 4–4 vote, without issuing an

opinion, after Justice Barrett recused herself. *Okla. Statewide Charter Sch. Bd. v. Drummond ex rel. Oklahoma*, 605 U.S. 165, 166 (2025).

**B. Ben Gamla applies to operate a religious charter school.**

In November 2025, Ben Gamla sent the Board a letter of intent to apply for authorization to establish a virtual charter school that would teach a Jewish religious curriculum, serve grades nine through twelve, and have a projected initial enrollment of approximately forty students. (A134.[1]) In December 2025, Ben Gamla sent the Board its application for approval to operate its religious charter school. (A26, A39–110.) Contradicting the letter of intent, the application represented that Ben Gamla would be a K–12 school with an initial enrollment of 400 to 500 students, and the application based its financial projections on that enrollment level. (A40, A237, A333–34.)

At a February 9, 2026 meeting, the Board unanimously rejected Ben Gamla's application due to ten deficiencies, nine of which were unrelated to the proposed school's religious curriculum. (A115–16.) These deficiencies included the discrepancies concerning projected

[1] Fact citations herein are to an attached consecutively paginated appendix.

enrollment and grade levels, as well as a failure to commit to complying with antidiscrimination requirements. (A115–16, A203–04.) Additionally, a Board member expressed concern about lack of community support for the proposed school, noting that the Oklahoma Jewish community was opposed to it. (A206.)

During and contemporaneously with its February 9 meeting, a majority of the Board's members indicated disagreement with the Oklahoma Supreme Court's decision in *Drummond*. (A112–13, A204–07, A209–11.) In a press release issued after the meeting, the Board's Chair stated that "he hopes" that the question of whether religious charter schools are constitutional "makes it back to the U.S. Supreme Court." (A113.) Ben Gamla's representatives echoed that sentiment.[2]

On February 27, 2026, in an attempt to address the deficiencies that the Board had identified, Ben Gamla submitted an addendum to its application. (A118–35.) At a March 9, 2026 meeting, the Board again rejected the application, this time identifying only the school's religious

[2] *See* Interview with Peter Deutsch, *Should the Supreme Court Permit Public Funding for Jewish Charter Schools? Yes*, Moment (Apr. 8, 2026), https://perma.cc/V5UK-9TW5; Mark Walsh, *Religious Charter Schools Push New Cases Toward Supreme Court*, EducationWeek (Feb. 6, 2026), https://perma.cc/U897-W84Z.

nature as a reason for rejection. (A137, A218–19.) The Board's legal counsel, however, opined that the addendum had failed to cure other defects in the application, including the inconsistencies in enrollment projections and the lack of community support. (A215–16.) The Board then hired a non-profit organization that had consistently advocated in favor of legalization of religious charter schools to represent it in expected litigation concerning Ben Gamla. (A219–26, A230–31, A234–35.[3])

**C. Litigation ensues.**

On March 11, 2026, Attorney General Drummond filed a lawsuit against the Board in state court, alleging that the Board had unlawfully omitted deficiencies that were unrelated to Ben Gamla's religious nature—among them, the substantial discrepancies in enrollment

---

[3] *See also* Brief of Amici Curiae Ryan Walters et al. in Support of Petitioners, *Drummond*, 605 U.S. 165 (No. 24-394) (filed Mar. 12, 2025), https://perma.cc/MQV2-SD7Y; Brief of Amici Curiae Ryan Walters et al. in Support of Petitioners, *Drummond*, 605 U.S. 165 (No. 24-394) (filed Nov. 8, 2024), https://perma.cc/39DC-MZPK; Brief of Amici Curiae in Support of Respondents and Intervenor-Respondents, *Drummond*, 558 P.3d 1 (No. MA-121694), https://perma.cc/F8WF-X78J; Defendant Oklahoma State Department of Education and Defendant State Superintendent of Public Instruction Ryan Walters' Motion to Dismiss, *OKPLAC, Inc. v. Statewide Virtual Charter Sch. Bd.*, No. CV-2023-1857 (Okla. Dist. Ct. Sept. 20, 2023), https://perma.cc/469K-AZX6.

projections—from the Board's explanation of its second denial of Ben Gamla's application. (A2–3.) He further alleged that the Board did so to "improperly engineer[ ] a record that omits independent bases for rejection," "for the applicant's benefit—or for the Board's own litigation strategy," in "a deliberate decision designed to avoid issues of state law when Ben Gamla files a lawsuit" over the rejection of its application. (A3, A10.)

Ben Gamla filed that lawsuit—this case—on March 24, 2026, naming the Board and Drummond as defendants. (A16.) The suit alleges that Oklahoma's statutory requirement that charter schools be secular violates the Free Exercise Clause and the Fourteenth Amendment's Equal Protection Clause. (A33–37.) The complaint seeks declaratory and injunctive relief, as well as attorneys' fees and costs. (A37–38.) On March 27, 2026, Ben Gamla filed a motion for a preliminary injunction against enforcement of the challenged statute. (A138–72.)

On April 16, 2026, the Board answered the complaint, agreeing with virtually all of Ben Gamla's factual and legal contentions (A276–93) and consenting to all of the relief that Ben Gamla requested except

for attorneys' fees and costs (A291). The next day, in its response to Ben Gamla's preliminary-injunction motion, the Board "respectfully request[ed]" that the district court "grant the Motion for Preliminary Injunction" (A341) and presented vigorous and detailed argument in favor of the injunction (A348–57). The Board stated, "Until a federal court rules on the unconstitutionality of the religious exclusion under the Free Exercise Clause, the Board must comply with the *Drummond* decision and regrettably continue its discrimination against religious applicants." (A357.)

Meanwhile, Attorney General Drummond filed a motion to be dismissed from the case on the basis that he was an improper defendant (A265–75), which the district court ultimately granted (A531), and a response to the preliminary-injunction motion, in which he declined to take a position on the constitutionality of the challenged statute (A363 n.4). Kaiman Intervenors—a predominantly Jewish group composed of Oklahoma public-school parents, taxpayers, a rabbi, and a public-school teacher—moved to intervene to defend Oklahoma's requirements that public charter schools be secular and open to all. (A173–201, A239–64.) Moore Intervenors—a group of charter-school parents—likewise moved

to intervene to defend the constitutionality of the challenged statute. (A366–424.) Both the Board and Ben Gamla opposed the motions to intervene (A425–507), even though denial of intervention would have resulted in there being no party in the case willing to defend the constitutionality of the challenged statute. The district court granted both intervention motions. (A521.)

Both groups of intervenors filed oppositions to Ben Gamla's preliminary-injunction motion. (A294–329, A532–62.) In their opposition, Kaiman Intervenors argued that Ben Gamla lacks standing because its application evinces multiple disqualifying deficiencies unrelated to the school's religious curriculum, including discriminatory policies and practices and the discrepancies in enrollment projections. (A306–10 (citing A6–7, A10–12, A42, A77, A93, A98, A102, A237, A330–35).) On the merits, Kaiman Intervenors argued that Oklahoma charter schools are governmental entities and state actors, that they thus lack federal constitutional rights to challenge the statute prohibiting them from having a religious curriculum, and that the Establishment Clause bars religious charter schools in any event. (A310–28.)

Kaiman Intervenors then served comprehensive discovery requests against Ben Gamla and the Board, seeking information relevant to the standing, state-action, and Establishment Clause issues. (A607–09, A623–66, A695–705.) In response, Ben Gamla and the Board both filed motions to stay discovery (A563–94) and never produced any documents or information (A849).

On August 5, 2026, the district court heard oral argument on Ben Gamla's preliminary-injunction motion and the discovery-stay motions. (A667–745.) Both Ben Gamla and the Board zealously argued in favor of the motions. (A671–95, A739–44.) Kaiman Intervenors and Moore Intervenors argued against the motions. (A695–739.)

On September 24, 2026, the district court granted Ben Gamla's preliminary-injunction motion, barring the Board "from enforcing the nonsectarian requirement or otherwise excluding [Ben Gamla] from participating in the charter school program on account of [its] religious character." (A776.) The district court also ruled that "a stay of discovery pending the resolution of any appeal of this order is warranted," but that "[i]f an appeal is not taken, the Court sees no reason why

discovery, subject to the usual limits on relevance and proportionality, cannot proceed in the ordinary course." (A777.)

**D. The Board denies Ben Gamla's application for nonreligious reasons.**

Six days after the district court entered the preliminary injunction, Ben Gamla founder Deutsch sent an email to intervenor Rabbi Daniel Kaiman—as well as other Jewish leaders in Oklahoma—asking for assistance in recruiting students to attend Ben Gamla and finding a principal for the school. (A779–81, A783.) Deutsch stated in the email, "Our aspirational enrollment goal for the first year [of the school's operation] is intentionally modest: 10 students." (A780.) He also stated that Ben Gamla would be "an online high school." (A780.)

As these disclosures diametrically contradicted the representations in Ben Gamla's application that the school expected an initial enrollment of 400 to 500 students and would serve grades K–12, Kaiman Intervenors' counsel sent a letter to the Board's counsel urging the Board to deny Ben Gamla's application. (A782–90.) The letter explained that Deutsch's disclosures showed that Ben Gamla lacks community support, cannot be financially or operationally viable, and lacks credibility, and that the disclosures rendered meaningless the

budget projections in Ben Gamla's application, which were based on the enrollment projection of 400 to 500. (A784–86.)

Subsequently, at an October 12, 2026 meeting, the Board discussed Ben Gamla's application in executive session and then voted on the application in open session. (A792, A797–800.) The Board has nine seats, and five votes are needed to approve an action. Okla. Stat. tit. 70, § 3-132.1(A), (H). Seven Board members were present at the meeting; four voted in favor of the application; and three voted against. (A799–800.) The application was thus denied. (A800–01.)

Though the Board members who voted against the application did not state the reasons for their votes in open session (A799–801), one of them publicly explained after the meeting that his vote was based on the lack of community support for the proposed school. (A806–07, A818 n.5.) Relatedly, while the Board Chair was disappointed by the vote's result, he acknowledged after the vote that "regardless of the religious aspects . . . people can have difference of opinions" regarding Ben Gamla's application. (A800.) And, in an October 15, 2026 notice dismissing his state-court lawsuit as moot, Attorney General Drummond explained that "Ben Gamla's application has now been

rejected on grounds that have nothing to do with religion," as the October 12 rejection "necessarily rest[ed] on grounds other than the nonsectarian requirement." (A806–07, A809); *see also WildEarth Guardians v. Conner*, 920 F.3d 1245, 1261 (10th Cir. 2019) (government officials are legally presumed to act in compliance with the law, including court orders).

On October 20, 2026, Ben Gamla founder Deutsch sent an "open letter" to the Board. (A811–13.) Deutsch first complained in the letter about the Board's October 12 denial of Ben Gamla's application. (A812.) But "[e]ven more troubling," wrote Deutsch, was "the Board's recent statement to Ben Gamla that it ha[d] no intent to seek appellate review" of the preliminary injunction in this case. (A812.) Deutsch asserted that an appeal was needed to shield Ben Gamla from further "civil litigation—including extensive discovery." (A813.) Deutsch "plead[ed]" that the Board appeal and warned that "if—at its next meeting—the Board fails to *both* grant Ben Gamla's charter and authorize an appeal . . . those decisions would effectively force Ben Gamla to withdraw its application." (A813 (emphasis added).)

The Board then posted an agenda for its next meeting—a special meeting set for October 23, 2026—listing as potential action items further action on Ben Gamla's application and a potential appeal of the preliminary injunction. (A826–27.) But on October 22, Attorney General Drummond issued a formal opinion concluding that the Board lacks statutory authority to take another vote on Ben Gamla's application. (A815, A824.) As the opinion itself explains, because it is an official opinion of the Attorney General construing state statutes and regulations, it "binds the Board and its members" under state law. (A824 n.9 (citing state cases).)

At its October 23 meeting, the Board did not vote on Ben Gamla's application. (A831–32.) The Board's Chair acknowledged, "we are bound not to be able to take a vote based on the Attorney General's opinion." (A832.) Another Board member then moved "that we direct counsel to file a notice of appeal with the U.S. Court of Appeals for the Tenth Circuit by the [applicable] deadline in order to preserve all of our options and that we have further discussion with counsel at a future meeting to determine how and whether to pursue the appeal further." (A832.) The motion passed. (A832–33.) The Board filed its notice of

appeal later that day (A836–38), and the appeal was docketed on October 26. Thereafter, at a November 5 meeting, the Board voted to pursue the appeal. (A845–46.)

## ARGUMENT

### I. This appeal is moot because the Board rejected Ben Gamla's application on nonreligious grounds and Ben Gamla promised to withdraw the application.

This Court "ha[s] no subject-matter jurisdiction if a case is moot." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010). "Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction." *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996). "In considering mootness, [this Court] ask[s] 'whether granting a *present* determination of the issues offered will have some effect in the real world.' " *Fleming v. Gutierrez*, 785 F.3d 442, 444–45 (10th Cir. 2015) (quoting *Rio Grande*, 601 F.3d at 1110). If not, "[this Court] must dismiss the case, rather than issue an advisory opinion." *Id.* at 445 (quoting *Stevenson v. Blytheville Sch. Dist. No. 5,* 762 F.3d 765, 768 (8th Cir. 2014)). "In the case of an interlocutory appeal taken from the grant of a preliminary injunction, the appeal is

moot 'where the effective time period of the injunction has passed,' or where the 'act sought to be enjoined has occurred.' " *Id.* (quoting *Stevenson*, 762 F.3d at 768, and *Thournir v. Buchanan*, 710 F.2d 1461, 1463 (10th Cir. 1983)).

Here, the district court preliminarily enjoined the Board "from enforcing the nonsectarian requirement or otherwise excluding [Ben Gamla] from participating in the charter school program on account of [its] religious character." (A776.) But the Board then rejected Ben Gamla's application for nonreligious reasons. (A800, A806–07, A809, A818 n.5.) And the Board is prohibited from voting on the application again by the Attorney General's opinion, which binds the Board under Oklahoma law. (A815, A824 n.9, A831–32.) Moreover, Ben Gamla founder Deutsch pledged to withdraw the application if the Board did not approve it at the Board's October 23 meeting (A813), and the Board did not vote on the application again at that meeting (A831–32).

Adjudicating this appeal on the merits thus would have no "effect in the real world." *Fleming*, 785 F.3d at 444–45 (quoting *Rio Grande*, 601 F.3d at 1110). The Board complied with the preliminary injunction by voting on Ben Gamla's application and rejecting it for nonreligious

reasons. Whether the injunction is affirmed or reversed would make no difference going forward, as the Board is barred from voting on the application again, and in any event Deutsch has pledged to withdraw it. The event to which the injunction related—the Board's vote—"has occurred," and the "time period" to which the injunction related "has passed." *Id.* at 445 (quoting *Thournir*, 710 F.2d at 1463, and *Stevenson*, 762 F.3d at 768). The appeal should therefore be dismissed on mootness grounds. *See id.*

What is more, because the events that rendered the matter moot occurred before the notice of appeal was filed, those events also support dismissing the appeal on standing grounds. *See Lewis v. Becerra*, 111 F.4th 65, 70 n.1 (D.C. Cir. 2024), *cert. denied sub nom. Lewis v. Kennedy*, 146 S. Ct. 100 (2025). For "any appellant must invoke and establish the jurisdiction of an appellate court *at the outset* of any appeal, regardless of whether the plaintiff had properly invoked the jurisdiction of the trial court below." *Id.* (emphasis added).

## II. The Board has no right to appeal a preliminary injunction to which it consented and for which it vigorously advocated.

Even if the matter were not moot, the Board lacks standing to bring this appeal because the Board agreed to and zealously argued for

the preliminary injunction at issue. "The standing Article III requires must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 64 (1997). "It is usually only parties who are sufficiently aggrieved by a district court's decision that . . . possess Article III and prudential standing to be able to pursue an appeal of it." *Raley v. Hyundai Motor Co.*, 642 F.3d 1271, 1274 (10th Cir. 2011); *accord United States v. Carter*, 995 F.3d 1222, 1225 (10th Cir. 2021). Thus, a "party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it." *Miami Tribe of Okla. v. United States*, 656 F.3d 1129, 1137–38 (10th Cir. 2011) (quoting *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 333 (1980)).

A party therefore normally has no right to appeal a decision to which they consented. This Court has explained that " 'an appeal ordinarily may not be taken from a consent judgment' because 'a party to a consent judgment is thereby deemed to waive any objections it has to matters within the scope of the judgment.' " *Montez v. Hickenlooper*, 640 F.3d 1126, 1131 (10th Cir. 2011) (quoting *Mock v. T.G. & Y. Stores*

*Co.,* 971 F.2d 522, 526 (10th Cir.1992)). For example, in *Brown v. Farmers Insurance Co.*, 308 F. App'x 303, 306 (10th Cir. 2009), this Court held that a party's agreement to a settlement "divest[ed] [the Court] of jurisdiction to hear th[e party's] appeal" of matters that the settlement covered, and the Court dismissed the appeal. *Accord, e.g.*, *Perez v. Owl, Inc.*, 110 F.4th 1296, 1303 (11th Cir. 2024); *Bly v. Shulkin*, 883 F.3d 1374, 1376 (Fed. Cir. 2018); *Scanlon v. M.V. SUPER SERVANT 3*, 429 F.3d 6, 8 (1st Cir. 2005); *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1137 (5th Cir. 1992); *Knoepfler v. Guardian Life Ins. Co. of Am.*, 487 F. App'x 756, 757–58 (3d Cir. 2012).

A defendant who consents to a preliminary or other injunction consequently loses the right to appeal it. For instance, in *Haitian Refugee Center v. Civiletti*, 614 F.2d 92, 93 (5th Cir. 1980), the court dismissed an appeal of a preliminary injunction in such circumstances, emphasizing, "[t]he defendants cannot appeal from an injunction to which they agreed." Likewise, in *Cox v. Community Loans of America Inc.*, No. 12-11599, 2013 WL 7861816, at *1 (11th Cir. Jan. 18, 2013) (unpublished), the court dismissed a preliminary-injunction appeal, explaining that the defendants "essentially consented to the

preliminary injunction" and thereby "waived their right to appeal that injunction." And in *Drywall Tapers & Pointers Local Union 1974 v. Nastasi & Associates*, 488 F.3d 88, 92, 94 (2d Cir. 2007), the court dismissed "[a]n appeal from a consent injunction . . . since the parties are held to have waived any objection to issues included in the injunction."

Here, from the commencement of this controversy, the Board has unreservedly advocated for injunctive relief against Oklahoma's prohibition on religious charter schools. A majority of the Board's members made clear that they disagreed with the prohibition when they first denied Ben Gamla's application. (A204–07, A209–11.) The Board purposefully retained to represent it in this case a non-profit organization that likewise has long opposed the prohibition. (A219–26, A230–31, A234–35.) The Board's answer to Ben Gamla's complaint agreed with virtually all of Ben Gamla's contentions (A277–91) and consented to the injunctive relief that Ben Gamla sought (A291). The Board's response to Ben Gamla's preliminary-injunction motion presented comprehensive arguments in favor of the motion (A348–57) and "respectfully request[ed]" that the district court "grant the Motion"

(A341). The Board opposed the motions to intervene below even though denying them would have resulted in there being no party in the case willing to defend the constitutionality of the challenged statute. (A425–45, A496–507.) And the Board passionately argued against the challenged statute at the hearing on the injunction motion. (A684–89.) The Board has no right to now appeal the injunction that it wanted so badly.

Indeed, before ultimately deciding to proceed with the appeal at its November 5 meeting (A845–46), even the Board seemed wary as to whether appealing was proper. The Board had initially told Ben Gamla that it did not plan to appeal, and the Board appealed only after Ben Gamla "plead[ed]" to the Board to do so. (A812–13.) Moreover, the October 23 motion that initially authorized the Board to file a notice of appeal explained that the notice's purpose was to "preserve all of [the Board's] options" so that the Board could "have further discussion with counsel at a future meeting to determine how and whether to pursue the appeal further." (A832.)

The district court relied on *United States v. Windsor*, 570 U.S. 744 (2013), to conclude that there was a justiciable dispute notwithstanding

the Board's and Ben Gamla's complete agreement on the merits of the case. (A753 n.7.) But *Windsor* does not support allowing a party who consented to a preliminary injunction to appeal it, especially in the circumstances here. *Windsor* held that defendants seeking to appeal a judgment with which they agree must establish both Article III and prudential standing. *See* 570 U.S. at 756–61. The Board cannot demonstrate either.

The Court ruled in *Windsor* that the federal government had demonstrated Article III standing to appeal a final judgment invalidating the Defense of Marriage Act ("DOMA")—even though the government agreed that DOMA was unconstitutional—because the government continued despite the entry of judgment to withhold a tax refund which the opposing party would have been entitled to receive but for DOMA. *Id.* at 753–55, 757–59; *see also INS v. Chadha*, 462 U.S. 919, 929–31 (1983) (federal agency allowed to appeal ruling that statute was unconstitutional despite agreeing with ruling because it was committed to continuing to enforce statute). Here, on the other hand, the Board represented that it would only "continue" to enforce the challenged statute "[u]ntil a federal court rules on the unconstitutionality of [it]."

(A357.) The Board received that ruling when the district court issued the preliminary injunction. And the Board then stopped enforcing the challenged statute by voting on Ben Gamla's application and denying it for nonreligious reasons. (A800, A806–07, A809, A818 n.5.)

The *Windsor* Court further concluded that the government had demonstrated prudential standing to appeal for two reasons. 570 U.S. at 759–63. First, cautioning that appeals by prevailing governmental defendants should not be "a common practice" or occur "as a matter of course," the Court explained that *Windsor* was not an "ordinary case[ ]" and involved "unusual and urgent circumstances," as a final resolution of DOMA's constitutionality would resolve the "[r]ights and privileges of hundreds of thousands of persons" and avoid "immense" "cost in judicial resources and expenses of litigation." *Id.* at 761–63. By contrast, at issue here is a state statute, a single charter application that is no longer live, and a preliminary-injunction appeal that cannot result in a final adjudication of the statute's constitutionality, since a preliminary-injunction ruling is not binding at the merits stage. *See Lackey v. Stinnie*, 604 U.S. 192, 200–01 (2025); *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009). Second, the *Windsor* Court

emphasized that an intervenor supporting DOMA's constitutionality had also appealed and had provided "sharp adversarial presentation of the issues." 570 U.S. at 754–55, 761. Here, on the other hand, neither group of intervenors who defended the challenged statute below has appealed, and the intervenors' ability to fully defend the statute is significantly hampered by the case's preliminary-injunction posture because they have not yet been able to obtain any discovery. (A777, A849.)

Finally, because the Board lacks both Article III and prudential standing to bring this appeal, the situation at bar is unlike the one in *Mock*, 971 F.2d at 526 & n.5, where this Court analyzed an attempt to appeal rulings that were within the scope of a consent judgment through waiver, not standing, and affirmed the judgment instead of dismissing the appeal. Indeed, though that mode of addressing an attempt to appeal a consented-to order may fit well when there is an issue about the validity or scope of consent and the appealing party actually wants the order to be overturned, it would be perverse to extend that reasoning to a situation such as the one here, where the

appealing party does not contest their consent and instead *wants* the consented-to ruling to be *affirmed*.

## CONCLUSION

For the foregoing reasons, Kaiman Intervenors respectfully ask that this appeal be dismissed.

Respectfully submitted,

Brent Rowland
OKLAHOMA APPLESEED CENTER
FOR LAW & JUSTICE
624 S. Denver Ave., Suite 400
Tulsa, OK 74119
(918) 519-5750
*brent@okappleseed.org*

Daniel Mach
Heather L. Weaver
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 675-2330
*dmach@aclu.org*
*hweaver@aclu.org*

Samuel T. Grover
FREEDOM FROM RELIGION
FOUNDATION
PO Box 750
Madison, WI 53701
(608) 256-8900
*sgrover@ffrf.org*

s/ *Alex J. Luchenitser*
Alex J. Luchenitser
Lauren Schoen*
AMERICANS UNITED FOR
SEPARATION OF CHURCH AND
STATE
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7306
*luchenitser@au.org*
*schoen@au.org*
*Admitted in Texas, not D.C.

Jessica Levin
EDUCATION LAW CENTER
60 Park Place, Suite 300
Newark, NJ 07102
(973) 624-1815
*JLevin@edlawcenter.org*

*Counsel for* Intervenors-Defendants-Appellees Daniel Kaiman et al.

Date: November 8, 2026.

## CERTIFICATIONS OF COUNSEL

1. **Word Count.** This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts exempted by Rule 32(f), it contains 4,891 words.

2. **Typeface/Type-style.** This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word Office 16 in Century Schoolbook, a proportionally spaced font, in a size measuring 14 points or larger.

3. **Privacy Redactions.** All privacy redactions have been made in compliance with Tenth Circuit Rule 25.5.

4. **Hard Copies.** This electronic filing is identical to any hard copies of this motion that may need to be submitted.

Date: November 8, 2026.

s/ *Alex J. Luchenitser*
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7306
*luchenitser@au.org*

# APPENDIX OF EXHIBITS

## APPENDIX TABLE OF CONTENTS

Petition for Writ of Mandamus, *Drummond v. Oklahoma Statewide Charter School Board* (Okla. Dist. Ct. Mar. 11, 2026) ........ A1

Complaint, filed below on March 24, 2026, as ECF No. 1 ........ A15

Ben Gamla's application for initial authorization, filed below on March 24, 2026, as ECF No. 1-2 (Exhibit 2 to Complaint) ........ A39

Board press release: "SCSB Cites State Supreme Court Decision in Rejecting Jewish Charter Proposal," filed below on March 24, 2026, as ECF No. 1-3 (Exhibit 3 to Complaint) ........ A111

Board notice of first rejection of Ben Gamla's application for initial authorization, filed below on March 24, 2026, as ECF No. 1-4 (Exhibit 4 to Complaint) ........ A114

Ben Gamla's addendum to application for initial authorization, filed below on March 24, 2026, as ECF No. 1-5 (Exhibit 5 to Complaint) ........ A118

Board notice of second rejection of Ben Gamla's application for initial authorization, filed below on March 24, 2026, as ECF No. 1-6 (Exhibit 6 to Complaint) ........ A136

Ben Gamla's Motion for Preliminary Injunction, filed below on March 27, 2026, as ECF No. 10 ........ A138

Ben Gamla's Brief in Support of Motion for Preliminary Injunction, filed below on March 27, 2026, as ECF No. 11 ........ A142

Kaiman Intervenors' Motion to Intervene and Brief in Support, filed below on April 1, 2026, as ECF No. 15 ........ A173

Transcript of portions of Board meeting held on February 9, 2026, filed below on April 1, 2026, as ECF No. 15-1 (Exhibit 1 to Kaiman Intervenors' Motion to Intervene) ........ A202

Transcript of portions of Board meeting held on March 9, 2026, filed below on April 1, 2026, as ECF No. 15-2 (Exhibit 2 to Kaiman Intervenors' Motion to Intervene)............. A214

Press release issued by First Liberty Institute on May 23, 2025, filed below on April 1, 2026, as ECF No. 15-3 (Exhibit 3 to Kaiman Intervenors' Motion to Intervene)............. A228

Press release issued by First Liberty Institute on March 24, 2026, filed below on April 1, 2026, as ECF No. 15-4 (Exhibit 4 to Kaiman Intervenors' Motion to Intervene)............. A233

Five-year budget attached to Ben Gamla's application for initial authorization, filed below on April 1, 2026, as ECF No. 15-5 (Exhibit 5 to Kaiman Intervenors' Motion to Intervene)................................................................................. A236

Declaration of Rabbi Daniel Kaiman, filed below on April 1, 2026, as ECF No. 15-6 (Exhibit 6 to Kaiman Intervenors' Motion to Intervene) ............................................................... A239

Declaration of Bradley Archer, filed below on April 1, 2026, as ECF No. 15-7 (Exhibit 7 to Kaiman Intervenors' Motion to Intervene) ............................................................... A242

Declaration of Erika DuBose, filed below on April 1, 2026, as ECF No. 15-8 (Exhibit 8 to Kaiman Intervenors' Motion to Intervene)................................................................................. A246

Declaration of Sydney Gebhardt, filed below on April 1, 2026, as ECF No. 15-9 (Exhibit 9 to Kaiman Intervenors' Motion to Intervene) ............................................................... A250

Declaration of Kara Joy McKee, filed below on April 1, 2026, as ECF No. 15-10 (Exhibit 10 to Kaiman Intervenors' Motion to Intervene) ............................................................... A254

Declaration of Gene Perry, filed below on April 1, 2026, as ECF No. 15-11 (Exhibit 11 to Kaiman Intervenors' Motion to Intervene)........................................................................... A258

Declaration of Michele Medley, filed below on April 1, 2026, as ECF No. 15-12 (Exhibit 12 to Kaiman Intervenors' Motion to Intervene) .......... A261

Attorney General Drummond's Motion to Dismiss, filed below on April 14, 2026, as ECF No. 52 .......... A265

Board Answer to Complaint, filed below on April 16, 2026, as ECF No. 59 .......... A276

Kaiman Intervenors' Brief in Opposition to Ben Gamla's Motion for Preliminary Injunction, filed below on April 17, 2026, as ECF No. 62-1 .......... A294

Document regarding training certificate, attached to Ben Gamla's application for initial authorization, filed below on April 17, 2026, as ECF No. 62-2 (Exhibit 1 to Brief in Opposition to Motion for Preliminary Injunction) .......... A330

Enrollment-projection documents attached to Ben Gamla's application for initial authorization, filed below on April 17, 2026, as ECF No. 62-3 (Exhibit 2 to Brief in Opposition to Motion for Preliminary Injunction) .......... A332

Board's Response to Ben Gamla's Motion for Preliminary Injunction, filed below on April 17, 2026, as ECF No. 63 .......... A335

Attorney General Drummond's Response to Ben Gamla's Motion for Preliminary Injunction, filed below on April 17, 2026, as ECF No. 64 .......... A359

Moore Intervenors' Motion to Intervene, filed below on April 17, 2026, as ECF No. 66 .......... A366

Declaration of Cricket Debra Ann Moore, filed below on April 17, 2026, as ECF No. 66-1 (Exhibit 1 to Moore Intervenors' Motion to Intervene) .......... A397

Declaration of Cathleen Tichenor, filed below on April 17, 2026, as ECF No. 66-2 (Exhibit 2 to Moore Intervenors' Motion to Intervene) .......... A402

Declaration of Daniel Hensley, filed below on April 17, 2026, as ECF No. 66-3 (Exhibit 3 to Moore Intervenors' Motion to Intervene) ........ A407

Declaration of Luz M. Cruz, filed below on April 17, 2026, as ECF No. 66-4 (Exhibit 4 to Moore Intervenors' Motion to Intervene) ........ A413

Declaration of Larissa Port, filed below on April 17, 2026, as ECF No. 66-5 (Exhibit 5 to Moore Intervenors' Motion to Intervene) ........ A418

Board's Opposition to Kaiman Intervenors' Motion to Intervene, filed below on April 22, 2026, as ECF No. 76 ........ A425

Ben Gamla's Opposition to Kaiman Intervenors' Motion to Intervene, filed below on April 22, 2026, as ECF No. 77 ........ A446

Ben Gamla's Opposition to Moore Intervenors' Motion to Intervene, filed below on May 7, 2026, as ECF No. 85 ........ A472

Board's Opposition to Moore Intervenors' Motion to Intervene, filed below on May 7, 2026, as ECF No. 86 ........ A496

District Court Order granting Kaiman Intervenors' and Moore Intervenors' Motions to Intervene, filed below on June 3, 2026, as ECF No. 89 ........ A508

District Court Order granting Attorney General Drummond's Motion to Dismiss, filed below on June 9, 2026, as ECF No. 90 ........ A522

Moore Intervenors' Opposition to Motion for Preliminary Injunction, filed below on June 17, 2026, as ECF No. 94 ........ A532

District Court Order granting Kaiman Intervenors' Motion for Leave to File Opposition to Motion for Preliminary Injunction, filed below on July 7, 2026, as ECF No. 103 ........ A561

Board's Motion to Stay Discovery, filed below on July 24, 2026, as ECF No. 110 ........ A563

Ben Gamla's Motion to Stay Discovery, filed below on July 24, 2026, as ECF No. 111 ........ A575

Kaiman Intervenors' Opposition to Ben Gamla's and the Board's Motions to Stay Discovery, filed below on July 31, 2026, as ECF No. 113 .......... A595

Kaiman Intervenors' First Set of Requests for Production of Documents to Ben Gamla, filed below on July 31, 2026, as ECF No. 113-1 (Exhibit 1 to Kaiman Intervenors' Opposition to Ben Gamla's and the Board's Motions to Stay Discovery) .......... A623

Kaiman Intervenors' First Set of Interrogatories to Ben Gamla, filed below on July 31, 2026, as ECF No. 113-2 (Exhibit 2 to Kaiman Intervenors' Opposition to Ben Gamla's and the Board's Motions to Stay Discovery) .......... A634

Kaiman Intervenors' First Set of Requests for Production of Documents to the Board, filed below on July 31, 2026, as ECF No. 113-3 (Exhibit 3 to Kaiman Intervenors' Opposition to Ben Gamla's and the Board's Motions to Stay Discovery) .......... A641

Kaiman Intervenors' First Set of Interrogatories to the Board, filed below on July 31, 2026, as ECF No. 113-4 (Exhibit 4 to Kaiman Intervenors' Opposition to Ben Gamla's and the Board's Motions to Stay Discovery) .......... A650

Kaiman Intervenors' Subpoena for Production of Documents to the Board and its Executive Director, filed below on July 31, 2026, as ECF No. 113-5 (Exhibit 5 to Kaiman Intervenors' Opposition to Ben Gamla's and the Board's Motions to Stay Discovery) .......... A657

Transcript of District Court oral argument regarding Motion for Preliminary Injunction and Motions to Stay Discovery, held on August 5, 2026 .......... A667

District Court Order granting Ben Gamla's Motion for Preliminary Injunction, filed below on September 24, 2026, as ECF No. 121 .......... A746

Peter Deutsch email to Intervenor Rabbi Daniel Kaiman, sent on September 30, 2026.......... A779

Kaiman Intervenors' letter to the Board regarding Deutsch email, sent on October 8, 2026 .................................................... A782

Board meeting agenda for October 12, 2026 .................................... A791

Transcript of portions of Board meeting held on October 12, 2026 ........................................................................................... A796

Attorney General Drummond's Notice of Dismissal of state-court Petition, *Drummond v. Oklahoma Statewide Charter School Board* (Okla. Dist. Ct. Oct. 15, 2026) .................. A803

Peter Deutsch letter to the Board, sent on October 20, 2026........... A811

Oklahoma Attorney General Opinion 2026-17, filed on October 22, 2026 ............................................................................ A814

Special Board meeting agenda for October 23, 2026........................ A826

Transcript of portions of special Board meeting held on October 23, 2026 ............................................................................ A828

Board Notice of Appeal, filed below on October 23, 2026, as ECF No. 125.............................................................................. A836

Special Board meeting agenda for November 5, 2026...................... A839

Transcript of portions of special Board meeting held on November 5, 2026 .......................................................................... A842

Declaration of Alex J. Luchenitser .................................................. A848

Petition for Writ of Mandamus, *Drummond v. Oklahoma Statewide Charter School Board* (Okla. Dist. Ct. Mar. 11, 2026)

*1064685570*

FILED IN DISTRICT COURT
OKLAHOMA COUNTY
MAR 11 2026
RICK WARREN
COURT CLERK
41

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

GENTNER DRUMMOND, in his official capacity as ATTORNEY GENERAL OF THE STATE OF OKLAHOMA,

Petitioner,

v.

OKLAHOMA STATEWIDE CHARTER SCHOOL BOARD; BRIAN T. SHELLEM, in his official capacity as Chairman of the Oklahoma Statewide Charter School Board; BRITNI TOMCHO; AMBER HIDY; DAMON GARDENHIRE; WILLIAM PEARSON; JARED BUSWELL; DAVID RUTKAUSKAS; LINDEL FIELDS; and DR. KITTY CAMPBELL, in their official capacities as members of the Oklahoma Statewide Charter School Board,

Respondents.

Case No. CV- 2026 - 649

**PETITION FOR WRIT OF MANDAMUS**

Petitioner Gentner Drummond, Attorney General of the State of Oklahoma, petitions this Court for a writ of mandamus directing Respondents—the Oklahoma Statewide Charter School Board ("Board") and its members—to perform a clear legal duty that they failed to discharge: identifying and incorporating into the record all valid, independent, non-constitutional grounds for rejection of the Ben Gamla Jewish Charter School Foundation, Inc.'s ("Applicant" or "Ben Gamla") revised application for initial authorization. The Attorney General takes **no position** in this proceeding on the constitutional or statutory questions resolved by the Oklahoma Supreme Court in *Drummond v. Oklahoma Statewide Virtual Charter School Board*, 2024 OK 53, 558 P.3d 1, and affirmed by the Supreme Court of the United States in *Oklahoma Statewide Charter School Board v. Drummond*, Nos. 24-394 & 24-396, 605 U.S. 165 (2025). This Petition concerns only the Board's refusal to discharge its independent statutory obligation to decline weak or inadequate charter

applications, 70 O.S. § 3-134(I)(4), and its deliberate election to suppress from the record non-constitutional grounds for rejection that were fully developed, uncontested, and plainly supported by the evidence before the Board at its March 9, 2026 meeting.

By deliberately limiting its rejection to the nonsectarian requirement, the Board has improperly engineered a record that omits independent bases for rejection. To be clear, the Board's refusal to list all of the reasons for rejecting the revised application is not coincidental. It is a deliberate decision designed to avoid issues of state law when Ben Gamla files a lawsuit seeking to overturn the Oklahoma Supreme Court's decision in *Drummond v. Oklahoma Statewide Virtual Charter School Board*. The Board's intentional selective omission thus frustrates the integrity of the administrative record, undermines the statutory framework governing charter school applications, and threatens the State's ability to enforce its independent regulatory interests. Oklahoma law does not permit the Board to strategically withhold valid grounds for rejection, and this Court should compel it to fulfill its duty.

## PARTIES

1. Petitioner Gentner Drummond is the duly elected Attorney General of the State of Oklahoma. The Attorney General is the chief law officer of the State and is charged with enforcing Oklahoma's laws and protecting the public interest. The Attorney General has standing to seek mandamus to compel state agencies to comply with their statutory obligations. *See* 74 O.S. § 18b.

2. Respondent Oklahoma Statewide Charter School Board is a state agency created by and subject to the Oklahoma Charter Schools Act, 70 O.S. §§ 3-130–3-169. The Board is responsible for sponsoring, reviewing, and acting on charter school applications in accordance with that Act and applicable administrative rules.

3. Respondent Brian T. Shellem is the Chairman of the Board and is sued in his official capacity.

4. Respondents Britni Tomcho, Amber Hidy, Damon Gardenhire, William Pearson, Jared Buswell, David Rutkauskas, Lindel Fields, and Dr. Kitty Campbell are members of the Board and are sued in their official capacities.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this original proceeding pursuant to OKLA. CONST. art. VII, § 7(a) and 12 O.S. §§ 1451–1462, which authorize district courts to issue writs of mandamus to compel the performance of any act that the law specially enjoins as a duty resulting from an office, trust, or station.

6. Venue is proper in Oklahoma County because the Board maintains its principal offices at 2501 North Lincoln Boulevard, Suite 201, Oklahoma City, Oklahoma 73105, and the acts and omissions complained of occurred there.

## FACTUAL BACKGROUND

### A. The Initial Application and February 13, 2026 Rejection.

7. On November 3, 2025, Ben Gamla submitted a letter of intent to the Board, indicating that it would apply to the Board to establish a public charter school to serve forty (40) students in grades 9–12.

8. On December 30, 2025, Ben Gamla submitted a formal application for initial authorization to the Board ("Initial Application"). The Initial Application materially expanded the proposed school: it indicated the school would serve grades K–12—adding nine additional grades—and projected a target enrollment of three hundred and thirty-five (335) students on one page and then four hundred (400) students on the next page. As though the inconsistency were not enough to sound the Board's alarms as the Board has in the past, the changes amounted to a

ten-fold enrollment increase in less than sixty days. For grades 9–12 alone, the projected enrollment was one hundred sixty (160) students, four times the amount stated in the letter of intent.

9. On February 9, 2026, the Board met and voted 8-0 to reject the Initial Application. By letter dated February 13, 2026 ("Initial Rejection Letter"), Ex. 1, the Board notified Ben Gamla of its rejection and enumerated *all* of the reasons for rejection, as required by 70 O.S. § 3-134(E)(3). Those reasons included, among others:

a. The Initial Application referenced virtual board meetings in non-compliance with the Open Meeting Act, 25 O.S. §§ 301–314, as required under 70 O.S. § 3-136(A)(15);

b. Two governing board members resided outside of Oklahoma, in violation of 70 O.S. § 3-136(A)(7);

c. Ben Gamla's governing board comprised only three members, none of whom demonstrated that a child or grandchild would attend the school, in violation of OAC § 777:10-1-3(c)(3);

d. The relationship between the proposed school and its associated foundation reflected concerning overlap indicative of an Educational Management Organization operating and managing the school without clear separation, as required under OAC § 777:10-1-4(1);

e. No formal disciplinary policy was adopted or included in the application, as required by 70 O.S. § 3-134(B)(18);

f. Ben Gamla's board members' statements of assurance were modified to qualify compliance obligations and afford legal latitude, in violation of OAC § 777:10-3-3(b)(8)(L);

g. The special education component of the application conditioned compliance with federal law on religious tenets, in violation of 70 O.S. § 3-136(A)(6); and

h. Material discrepancies existed between the letter of intent and the application with respect to grades served and projected enrollment, specifically the ten-fold increase in projected enrollment and the nine-grade expansion of the school's scope.

**B. The Revised Application and March 9, 2026 Board Meeting.**

10. On February 17, 2026, Ben Gamla submitted a revised application for initial authorization (the "Revised Application"). Pursuant to 70 O.S. § 3-134(E)(3)—which governs virtual charter school applications and requires the Board to notify the applicant in writing of the reasons for rejection—the Board was required to accept or reject the Revised Application within thirty days of receipt.

11. On March 9, 2026, the Board convened its regular meeting to consider, among other matters, Ben Gamla's Revised Application. The Board's Director of School Performance presented a staff report indicating that Ben Gamla had remedied all grounds for rejection in the Initial Rejection Letter except for the requirement under 70 O.S. § 3-136(A)(2) that charter schools be nonsectarian.

12. During the public meeting, a representative of the Attorney General's office raised and articulated that the enrollment discrepancies between the November 3, 2025 letter of intent and the December 30, 2025 application constituted a material and unresolved deficiency warranting rejection under the Board's duty to decline weak or inadequate charter applications. Specifically, the Attorney General's representative emphasized that:

a. The letter of intent indicated the school would initially serve grades 9–12 with anticipated enrollment of 40 students;

b. The Revised Application indicated the school would serve grades K–12 with a target enrollment of 400 students—a ten-fold increase over the letter of intent;

c. Even for grades 9–12 alone, the projected enrollment was 160—four times the letter of intent figure; and

d. The Revised Application failed to adequately address or explain these discrepancies, particularly in light of Ben Gamla's founder's own acknowledgment during the January 2026 Board presentation that he had spoken with only approximately 15–20 people in Oklahoma's Jewish community, with both the Oklahoma City and Tulsa Jewish communities on record opposing the school.

13. Additionally, Board Member Buswell raised unresolved concerns regarding the relationship between the proposed school and its associated foundation, expressing that he was not fully satisfied that the Revised Application adequately addressed the Educational Management Organization overlap issues identified in the Initial Rejection Letter.

14. Chairman Shellem dismissed the enrollment discrepancy ground. He characterized the discrepancy as neither material nor a genuine basis for denial, contending that enrollment numbers were not a proper ground for rejecting a charter application and that new information on "demand" could account for the change between the letter of intent and the application. Chairman Shellem further indicated that the Board had a sufficient existing basis for rejection before it—namely, the sectarian ground.

15. Board Member Pearson initially moved to reject the Revised Application on the grounds provided by both Board staff and the Attorney General's office. Board Member Gardenhire seconded the motion. Chairman Shellem then declined to support the motion as framed because it included the enrollment discrepancy ground identified by the Attorney General's representative. Gardenhire thereupon withdrew his second, and Pearson amended his motion to

limit the grounds for rejection solely to the nonsectarian requirement under 70 O.S. § 3-136(A)(2), citing the Oklahoma Supreme Court's decision in *Drummond v. Oklahoma Statewide Virtual Charter School Board*, 2024 OK 53, 558 P.3d 1, and the United States Supreme Court's opinion affirming that judgment in *Oklahoma Statewide Charter School Board v. Drummond*, Nos. 24-394 & 24-396, 605 U.S. 165 (2025).

16. The amended motion passed on a unanimous vote of the quorum present. The Board's formal rejection letter, dated March 10, 2026, Ex. 2, recited only the nonsectarian ground—omitting all other bases for rejection that remained supported by the record.

17. Further, as a separate and independent basis for rejection, Brett Anthony Farley—the Executive Director of the Catholic Conference of Oklahoma—is listed as the "parent member" of the Ben Gamla governing board, purportedly to satisfy the requirement of OAC § 777:10-1-3(c)(3) that at least one governing board member be a "parent, grandparent, or guardian of currently or previously enrolled student(s)." Mr. Farley is the head of a Roman Catholic advocacy organization and, to the Attorney General's knowledge, has no child, grandchild, or ward who intends to enroll at Ben Gamla Jewish Charter School. The Revised Application therefore failed to remedy the governing board composition deficiency originally identified in the February 13, 2026 rejection letter. The Board had an independent, non-constitutional, non-sectarian basis on this ground alone to reject the Revised Application—a basis it failed to include in its March 10, 2026 rejection letter.

## ARGUMENTS

### A. Legal Standard for Writ of Mandamus.

18. A writ of mandamus will issue to compel an inferior tribunal, board, corporation, or person to perform any act that the law specially enjoins as a duty resulting from an office, trust, or station. 12 O.S. § 1451. To obtain mandamus, a petitioner must establish that "(1) The party

seeking the writ has no plain and adequate remedy in the ordinary course of the law, (2) The party seeking the writ possesses a clear legal right to the relief sought, (3) The respondent (defendant) has a plain legal duty regarding the relief sought, (4) The respondent has refused to perform that duty, and (5) The respondent's duty does not involve the exercise of discretion." *Chandler (U.S.A.), Inc. v. Tyree*, 2004 OK 16, ¶ 24, 87 P.3d 598, 604.

19. Where the duty to act is clear and the respondent has refused to perform that duty, mandamus is appropriate even where the respondent has exercised some discretion in the manner of its refusal. The writ does not control discretion, but it does compel the exercise of discretion in a lawful manner—meaning the respondent cannot simply decline to consider or record valid grounds for action. *See id.* ¶ 24, 87 P.3d at 604–05 ("a writ of mandamus may be used to correct an official's arbitrary abuse of discretion").

**B. The Board Had a Clear Statutory Duty to Identify and State All Valid Grounds for Rejection.**

20. Title 70, section 3-134(E)(3) of the Oklahoma Statutes mandates that when the Board rejects an application for a virtual charter school, it shall notify the applicant in writing of the reasons for the rejection. This provision does not authorize the Board to provide only those reasons it deems strategically convenient. The plain statutory text requires a complete and accurate statement of the basis for rejection.

21. Further, 70 O.S. § 3-134(I)(4) expressly imposes on the Board the duty to "[d]ecline to approve weak or inadequate charter applications." This is not a permissive standard but an affirmative obligation codified in the powers and duties of the Board under the Oklahoma Charter Schools Act. Where an application fails to satisfy multiple independent statutory or regulatory requirements, the Board's duty to decline extends to each such deficiency. Section 3-134(I)(4), read in conjunction with the Board's own administrative rules at OAC § 777:10-3-3,

does not permit the Board to identify one ground while silently warehousing others for the applicant's benefit—or for the Board's own litigation strategy.

22. The Board's deliberate decision to narrow its grounds for rejection to a single reason—over the documented objection of the Attorney General's representative, who raised an additional valid ground at the public meeting—constitutes a failure to perform the duty imposed by § 3-134(E)(3). A rejection letter that is incomplete by design is not a lawful exercise of the Board's rejection authority; it is an abuse of administrative power that undermines the statutory framework.

### C. The Enrollment Discrepancies Constituted a Material Deficiency Independent of the Sectarian Ground.

23. The discrepancies between Ben Gamla's November 3, 2025 letter of intent and its December 30, 2025 application with regard to enrollment and grades served are not trivial. A projected enrollment that increased from 40 to 400 students, and a proposed scope that expanded from four grades to thirteen, represent changes of such magnitude that the letter of intent and the application cannot reasonably be reconciled as referring to the same proposed school. These discrepancies were not incidental; they went to the heart of the school's demonstrated capacity, community demand, and fiscal viability.

24. Oklahoma's charter school statutes require applicants to demonstrate, among other things, the educational need for the proposed school and the school's financial viability. *See* 70 O.S. § 3-134(B). Where enrollment projections are unsupported and internally inconsistent—and where the founder acknowledged direct community contact with fewer than twenty individuals, with both major Oklahoma Jewish community organizations opposing the school—the application cannot demonstrate the requisite demand or viability. The Board's own Initial Rejection Letter acknowledged these discrepancies as a basis for rejection under reason number nine. And nothing in the Revised Application cured or adequately explained those discrepancies.

25. Chairman Shellem's conclusory dismissal of the enrollment discrepancy ground—his statement that enrollment numbers are simply "not really a reason to deny an application"—is legally incorrect and contrary to the Board's own prior actions. The Board's February 13, 2026 rejection letter expressly identified the enrollment discrepancies as one of ten stated grounds for rejection. The Board cannot take the position in March 2026 that the same discrepancies are legally irrelevant when they were deemed sufficient to constitute a ground for rejection in February 2026. An administrative body may not inconsistently apply its own criteria to achieve a predetermined outcome.

**D. The Revised Application Failed to Cure the Governing Board Composition Deficiency, Providing an Additional Independent Ground for Rejection.**

26. The February 13, 2026 rejection letter identified as reason three that the governing board lacked the required parent or grandparent member under OAC § 777:10-1-3(c)(3). Ben Gamla's Revised Application purported to cure this deficiency by naming Brett Anthony Farley as the "parent member" of its governing board. Mr. Farley is the Executive Director of the Catholic Conference of Oklahoma, the public policy advocacy arm of the Roman Catholic Church in this State. There is no indication in the Revised Application that Mr. Farley is a parent, grandparent, or guardian of any student who intends to enroll at Ben Gamla Jewish Charter School. The plain text of OAC § 777:10-1-3(c)(3) requires the qualifying board member to be a "parent, grandparent, or guardian of currently or previously enrolled student(s)." The Revised Application therefore did not cure this deficiency and the ground remained valid at the time of the March 9, 2026 Board meeting.

27. The Farley appointment also warrants attention independent of the OAC § 777:10-1-3(c)(3) deficiency. The Board's February 13, 2026 rejection letter separately cited that governing board members' statements of assurance had been modified to qualify full compliance with applicable law, in violation of OAC § 777:10-3-3(b)(8)(L). OAC § 777:10-3-3(b)(8)(L) requires a

signed and notarized statement of assurance from each governing board member guaranteeing full compliance with all statutes and requirements of the United States, the State of Oklahoma, and the Board. Naming an official of an organization whose institutional mission may be in tension with the stated purposes of a Jewish charter school as a governing board member, without any explanation in the Revised Application, raises unresolved questions about whether the statements of assurance provided by Ben Gamla's revised governing board are accurate and free of the sort of qualified compliance language that originally warranted rejection. The Board's failure to examine or address this issue at the March 9, 2026 meeting is an additional component of its incomplete discharge of the duty to decline a weak or inadequate application under 70 O.S. § 3-134(I)(4).

**E. The Board's Selective Omission Was Not a Lawful Exercise of Discretion.**

28. The Board's decision to exclude valid grounds for rejection was not the product of a good-faith determination that those grounds lacked merit. The sequence of events at the March 9, 2026 meeting demonstrates the opposite. When Board Member Pearson initially moved to reject on all grounds, including those identified by the Attorney General, Chairman Shellem declined to support the motion specifically because it included the enrollment discrepancy ground. The motion was then narrowed, and the second was withdrawn, solely to exclude the Attorney General's ground. This was not the exercise of neutral administrative judgment. Rather, it was the deliberate suppression of valid bases for rejection to set up a constitutional challenge.

29. The Attorney General does not speculate as to the Board's ultimate motivations beyond what the public record reflects. What is clear is that the effect of the Board's action—limiting its stated rejection grounds to the constitutional/statutory sectarian question—is to create a record that appears to leave open the question whether the application was otherwise approvable. The Attorney General has a clear legal interest in ensuring that the administrative

record accurately reflects all valid, independent grounds for rejection, so that the public interest in the integrity of Oklahoma's charter school authorization process is not compromised by a strategically incomplete administrative record.

### F. The Attorney General Has Standing to Seek This Writ.

30. The Attorney General of Oklahoma has both statutory and common-law authority to bring this action. Under 74 O.S. § 18b, the Attorney General is charged with representing the interests of the State in all legal proceedings and with enforcing compliance with Oklahoma statutes. The integrity of the charter school application process and the completeness of the administrative record in this matter are squarely within that statutory mandate.

31. Furthermore, the Attorney General—as Petitioner in the original mandamus action that produced *Drummond v. Oklahoma Statewide Virtual Charter School Board*, 2024 OK 53, 558 P.3d 1—has a direct and cognizable interest in ensuring that the Board complies with all facets of its statutory obligations in administering the charter school authorization framework, including obligations entirely independent of the constitutional questions resolved in that prior action.

### G. No Adequate Remedy at Law Exists.

32. There is no plain, speedy, or adequate remedy at law available to cure the harm caused by the Board's incomplete discharge of its statutory duty. The Board has taken final action on the Revised Application. The March 10, 2026 rejection letter is the official administrative record of that action. Only a writ of mandamus directing the Board to supplement or amend its stated grounds for rejection—or to issue a new rejection letter that includes all valid grounds—can correct the deficiency in the administrative record.

33. The absence of adequate administrative remedies is underscored by the fact that the Board's Chairman publicly rejected the enrollment discrepancy ground at the Board's own

meeting, over the objection of the Attorney General's representative. Further administrative proceedings before the Board would be futile.

**RELIEF REQUESTED**

WHEREFORE, Petitioner Gentner Drummond, Attorney General of the State of Oklahoma, respectfully requests that this Court:

1. Issue an alternative writ of mandamus directing Respondents to show cause why a peremptory writ should not issue;
2. Upon consideration, issue a peremptory writ of mandamus directing the Board to amend its March 10, 2026 rejection letter—or to issue a new and complete rejection letter—that incorporates all valid, independent, non-constitutional grounds for rejection of the Ben Gamla Jewish Charter School's Revised Application for initial authorization that were before the Board at its March 9, 2026 meeting, including without limitation the material enrollment discrepancies identified in reason nine of the February 13, 2026 rejection letter;
3. Direct the Board to conduct additional proceedings or supplement the administrative record of the March 9, 2026 meeting to accurately reflect all grounds for rejection that were raised and supported by the evidence before the Board;
4. Award Petitioner such other and further relief as this Court deems just and proper.

Respectfully submitted,

GENTNER F. DRUMMOND, OBA NO. 16645
*Attorney General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Main: (405) 521-3921
Gentner.Drummond@oag.ok.gov

Complaint, filed below on March 24, 2026, as ECF No. 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

1) THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., and
2) PETER DEUTSCH,

*Plaintiffs*,

v.

1) GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma,
2) REBECCA WILKINSON, in her official capacity as Executive Director,
3) BRIAN T. SHELLEM, in his official capacity as Chairman,
4) AMBER HIDY, in her official capacity as member of the Statewide Charter School Board,
5) BRITNI TOMCHO, in her official capacity as member of the Statewide Charter School Board,
6) DAMON GARDENHIRE, in his official capacity as member of the Statewide Charter School Board,
7) DAVID RUTKAUSKAS, in his official capacity as member of the Statewide Charter School Board,
8) DR. KITTY CAMPBELL, in her official capacity as member of the Statewide Charter School Board,
9) JARED BUSWELL, in his official capacity as member of the Statewide Charter School Board,
10) LINDEL FIELDS, in his official capacity as member of the Statewide Charter School Board,
11) WILLIAM PEARSON, in his official capacity as member of the Statewide Charter School Board, and
12) SKYLER H. LUSNIA, in his official capacity as Director of School Performance for the Statewide Charter School Board,

*Defendants*.

Case No. __________

**COMPLAINT**

**JURY DEMAND**

## INTRODUCTION

1. The Oklahoma Charter Schools Act, Okla. Stat. Ann. tit. 70, §§ 3-130 to 3-169 ("OCSA" or the "Act"), provides families with educational opportunities by empowering individuals and institutions to create new state-funded but privately-owned and -operated schools that educate Oklahoman children facing a variety of circumstances across the state.

2. Charter schools thus come in all shapes and sizes, with some focused on science, the fine arts, language immersion, cultural awareness, or classical education. And unsurprisingly in Oklahoma, there are also tribally-authorized charter schools like the bilingual Comanche Academy Charter School in Lawton, which was authorized under the Act by the Comanche Nation of Oklahoma.

3. But there is one glaring exception to this all-comers policy: religious charter schools. Under the express terms of the Act, each charter school "shall be nonsectarian in its programs, admission policies, employment practices, and all other operations." Okla. Stat. Ann. tit. 70 § 3-136(A)(2). Nor may any charter school be authorized if it is "affiliated with a nonpublic sectarian school or religious institution." *Id.*

4. That discriminatory exclusion of religious charter schools violates the Constitution several times over.

5. Under the Free Exercise Clause, governments are not allowed to discriminate against religious institutions in the provision of public benefits.

6. Similarly, if a government's policies are not scrupulously neutral and generally applicable, then those policies must be subjected to strict scrutiny.

7. And discriminating on the basis of religion also violates the Equal Protection Clause of the Fourteenth Amendment.

8. These violations directly affect Plaintiffs the National Ben Gamla Jewish Charter School Foundation, Inc. and Peter Deutsch.

9. Plaintiffs seek to create a vibrant virtual charter school built on academic excellence and the millennia-old Jewish ethical, cultural, and religious tradition. But Ben Gamla's application was denied by Defendants on the sole basis that Ben Gamla proposes a charter school that is religious.

10. This is therefore a simple case—can Oklahoma arbitrarily exclude religious people from the charter school program? The Constitution says no.

11. For relief from these constitutional violations, Plaintiffs seek a declaration and injunction against Oklahoma's unlawful policy and nominal damages, so they can open their school and serve Oklahoman children.

## THE PARTIES

12. Plaintiff National Ben Gamla Jewish Charter School Foundation, Inc. ("Ben Gamla") is an Oklahoma non-profit corporation.

13. Plaintiff Peter Deutsch is an individual resident in Florida. He is the founder of the National Ben Gamla Jewish Charter School Foundation, Inc.

14. Defendant Gentner Drummond is the Attorney General of Oklahoma with responsibility for enforcing the OCSA. He is sued in his official capacity only.

15. Defendant Rebecca Wilkinson is Executive Director of the Oklahoma Statewide Charter School Board. She is sued in her official capacity only.

16. Defendant Brian T. Shellem is the Chairman of the Oklahoma Statewide Charter School Board. He is sued in his official capacity only.

17. Defendant Britni Tomcho is a voting member of the Oklahoma Statewide Charter School Board. She is sued in her official capacity only.

18. Defendant Amber Hidy is a voting member of the Oklahoma Statewide Charter School Board. She is sued in her official capacity only.

19. Defendant Damon Gardenhire is a voting member of the Oklahoma Statewide Charter School Board. He is sued in his official capacity only.

20. Defendant William Pearson is a voting member of the Oklahoma Statewide Charter School Board. He is sued in his official capacity only.

21. Defendant Jared Buswell is a voting member of the Oklahoma Statewide Charter School Board. He is sued in his official capacity only.

22. Defendant David Rutkauskas is a voting member of the Oklahoma Statewide Charter School Board. He is sued in his official capacity only.

23. Defendant Lindel Fields is a voting member of the Oklahoma Statewide Charter School Board. He is sued in his official capacity only.

24. Defendant Dr. Kitty Campbell is a voting member of the Oklahoma Statewide Charter School Board. She is sued in her official capacity only.

25. Defendant Skyler H. Lusnia is the Director of School Performance for the Oklahoma Statewide Charter School Board. Defendant Lusnia signed the formal letters denying Ben Gamla's application. He is sued in his official capacity only.

## JURISDICTION AND VENUE

26. This action arises under the Constitution and laws of the United States. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

27. The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202. Venue also lies in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in the Western District of Oklahoma.

## FACTUAL ALLEGATIONS

### *The Oklahoma Charter Schools Act*

28. In 1999, the Oklahoma Legislature passed the Oklahoma Charter Schools Act ("the OCSA" or "the Act"). Okla. Stat. Ann. tit. 70, § 3-130 to § 3-169. The Act invites any qualified "private college or university, private person, or private organization" to apply for state funding to operate a charter or virtual charter school. *Id.* § 3-134(C).

29. The OCSA's stated purposes are to "[e]ncourage the use of different and innovative teaching methods," "[p]rovide additional academic choices for parents and students," and "[e]stablish new forms of accountability for schools." *Id.* § 3-131.

30. Oklahoma allows private institutions substantial flexibility to run charter schools. *Id.* § 3-136(A)(1), (3). Indeed, subject to some exceptions, "a charter school and virtual charter school shall be exempt from all statutes and rules relating to schools, boards of education, and school districts." *Id.* § 3-136(A)(1).

31. Charter schools need not follow Oklahoma's core curriculum requirements and may instead craft "a curriculum which emphasizes a specific learning philosophy or style or certain subject areas." *Id.* § 3-136(A)(3).

32. A charter school is run by a private "governing board" "which shall be responsible for the policies and operational decisions of the charter school." *Id.* § 3-136(A)(7). Charter schools may adopt their own "personnel policies, personnel qualifications, and method of school governance." *Id.* § 3-136(C).

33. State funding of charter schools is directly tied to enrollment. *Id.* § 3-142(A), (C). A charter school "receive[s] the State Aid allocation … and any other state-appropriated revenue generated by its students for the applicable year." *Id.* § 3-142(A).

34. The OCSA states that charter schools are "public," "free" to all students, and "supported by public taxation." *Id.* § 3-136(A)(9); *id.* § 1-106.

35. Charter schools are not however, "public" in the sense that the government owns and operates them, as it does with traditional public schools.

36. Instead, charter schools are owned and operated by private parties with the goal of providing alternatives to traditional government-owned and -operated public schools. *Id.* § 3-131.

37. The OCSA has resulted in innovation and expansion of parental choice by funding a diverse range of private institutions.

38. The OCSA provides that charter schools may be sponsored only by public school districts, higher education institutions, federally recognized Indian tribes, or by the

Statewide Charter School Board. All virtual charter schools must be sponsored by the Board.

39. Publicly-funded charter schools owned and operated by private entities include those focused on science, the fine arts, language immersion, cultural awareness, tribal identity, classical education, and more.

40. For example, there are tribally-authorized charter schools, like Comanche Academy Charter School located in Lawton, Academy of Seminole in Seminole, and Academy of Okmulgee in Okmulgee.

41. However, the OCSA categorically forbids one type of private entity from participating in the charter school program: religious groups. The OCSA expressly requires that a charter school be "nonsectarian in its programs, admission policies, employment practices, and all other operations." § 3-136(A)(2). This "nonsectarian" requirement means that "[a] sponsor may not authorize a charter school or program that is affiliated with a nonpublic sectarian school or religious institution." *Id.*

***The St. Isidore Case***

42. Recently, this nonsectarian requirement became the subject of litigation. *Drummond ex rel. State v. Okla. Statewide Virtual Charter Sch. Bd.*, 558 P.3d 1 (Okla. 2024).

43. In 2023, the Charter School Board approved the charter application of a Catholic school, St. Isidore of Seville Catholic Virtual School. *Id.* at 6 ¶ 5.

44. Though the previous Oklahoma Attorney General issued guidance that the state's exclusion of religious charter schools violated the federal Constitution, Attorney

General Drummond, upon taking office, sought a writ of mandamus from the Oklahoma Supreme Court to bar St. Isidore's charter, claiming the contract with and chartering of St. Isidore violated the OCSA, the Oklahoma Constitution, and the federal Constitution. *Id.* at 7 ¶ 8.

45. Drummond, as the Attorney General for the State of Oklahoma and "chief law officer of the State," Okla. Stat. Ann. tit. 74 § 18, sought a writ of mandamus because the Oklahoma Attorney General has the authority to initiate "any action in which the interests of the state or the people of the state are at issue." *Id.* § 18b(A)(3).

46. In other words, the Attorney General is the "proper party to maintain litigation to enforce a matter of public interest." *Howard v. Okla. Corp. Comm'n*, 614 P.2d 45, 52 (Okla. 1980).

47. In filings in the lawsuit, the Attorney General made clear his hostility toward minority faiths, especially Muslims.

48. For example, the Attorney General's brief before the Oklahoma Supreme Court stated that granting religious institutions equal footing in Oklahoma's charter school program would "require the State to permit extreme sects of the Muslim faith to establish a taxpayer funded public charter school teaching Sharia Law" and that those religious "tenets are diametrically opposed by most Oklahomans." *See* Pet'rs Br., *Drummond ex rel. State v. Okla. Statewide Virtual Charter Sch. Bd.*, No. 121694, 2023 WL 11915548, *1 (Okla. Oct. 20, 2023).

49. Based on the Attorney General's lawsuit, the Oklahoma Supreme Court issued a split decision, agreeing with the Attorney General and ruling against St. Isidore and the Board. *Drummond*, 558 P.3d at 7 ¶ 8.

50. St. Isidore and the Board sought writs of certiorari from the United States Supreme Court. *St. Isidore of Seville Catholic Virtual Sch. v. Drummond*, 145 S. Ct. 1134 (2025); *Okla. Statewide Charter Sch. Bd. v. Drummond*, 145 S. Ct. 1134 (2025).

51. The Supreme Court granted certiorari and consolidated the cases, but after a recusal from Justice Barrett, affirmed the Oklahoma Supreme Court in a split 4-4 *per curiam* decision. *Okla. Statewide Charter Sch. Bd. v. Drummond*, 605 U.S. 165 (2025).

52. Following the Supreme Court's decision, the Oklahoma Attorney General again singled out Muslim schools in public comments.

53. The Oklahoma Attorney General issued a press release stating that the Supreme Court's "ruling ensures that Oklahoma taxpayers will not be forced to fund radical Islamic schools." A true and correct copy of that press release, published on May 22, 2025 on the Oklahoma Attorney General's website and available at https://perma.cc/6HJ6-K6F3, is attached as **Exhibit 1.**

54. National Ben Gamla Jewish Charter School Foundation

55. Plaintiff Peter Deutsch is the founder of Ben Gamla. Deutsch served for 12 years as a member of Congress for a House district in Florida.

56. After his Congressional career ended, Deutsch took on the issues of education. To that end, Deutsch founded a Florida non-profit corporation, the National Ben Gamla Charter School Foundation, Inc. ("Ben Gamla Florida"), in 2006.

57. Ben Gamla Florida opened its first charter school in Hollywood, Florida, in 2007 and now operates a network of four charter schools across Florida. *Ben Gamla Strategic Plan for 2019-2025*, Ben Gamla Charter School Foundation, https://perma.cc/X8BJ-3DU6.

58. These schools were "the first English-Hebrew Charter School[s] in the United States" and "integrate[ ] Hebrew instruction" into learning to give their students "a useful tool in our global society." *Misson & Vision*, Ben Gamla Charter School Foundation, https://perma.cc/TLR4-FAV5.

59. When Ben Gamla Florida opened its first charter school, some in the Jewish community, such as the Jewish Federation, expressed concerns over starting a Jewish charter school.

60. Despite opposition from some in the Florida Jewish community, Ben Gamla schools experienced remarkable success because of their educational model.

61. Ben Gamla Florida has educated thousands of students and now must waitlist students because there are not enough spots to accommodate everyone.

62. Ben Gamla Florida's schools are dedicated to the driving principle of charter schools: to exercise "autonomy and choice to set many of their own policies related to such things as curriculum delivery, parent involvement, discipline, and special programs" and to achieve "maximum student achievement and personal growth." *FAQS*, Ben Gamla Charter School Foundation, https://perma.cc/H8D8-SBWW.

63. Deutsch also founded Plaintiff National Ben Gamla Jewish Charter School Foundation, Inc. ("Ben Gamla") as an Oklahoma non-profit corporation in 2025.

64. Both Plaintiff Ben Gamla and Ben Gamla Florida are named after Yehoshua Ben Gamla, a first-century Jewish leader and high priest who established the first formal system of Jewish education.

65. In December 2025, Plaintiff Ben Gamla submitted a charter school application to the Board. A true and correct copy of that application is attached to this Complaint as **Exhibit 2**.

66. Plaintiff Ben Gamla aims to create a charter school in Oklahoma where students receive a rigorous academic education alongside a deep cultural and ethical grounding derived from the Jewish faith, heritage, and tradition. Ex. 2 at 4.

67. For many Jewish parents, and especially Orthodox Jewish parents, it is an important religious obligation to send their children to Jewish schools, where they will receive an education in secular subjects as well as the Jewish faith.

68. This belief concerning the importance of religious education comes straight for the Torah, the Talmud, and the Jewish Code of Law, which explain that Jewish parents have a solemn responsibility to transmit the Jewish faith to their children.

69. Unfortunately, a Jewish education is not widely available in many parts of the United States. Where it is available, it can often be prohibitively expensive and beyond the reach of many Jewish families.

70. Plaintiff Ben Gamla thus seeks to fill a gap by partnering with Jewish parents in upholding their religious beliefs and obligation to provide a Jewish education to their children.

71. Indeed, the transmission of Jewish religious beliefs and practices to children is a core aspect of Ben Gamla's religious mission. Ex. 2 at 4.

72. In following its Jewish heritage and tradition, Ben Gamla "seeks to provide outstanding academic and co-curricular programs infused with a Jewish understanding of the human person and grounded in the enduring Jewish values of truth (*emet*), beauty (*yofi*), and goodness (*tov*), as expressed in Jewish thought and tradition." Ex. 2 at 5.

73. In December 2025, Ben Gamla applied to charter Ben Gamla Jewish Charter School in Oklahoma ("Ben Gamla School" or "the School").

74. Ben Gamla School's mission is "to educate the entire child: soul, heart, intellect, and body of each child enrolled through a curriculum that will reach students at an individual level, with an interactive learning environment that is rooted in virtue, rigor and innovation." Ex. 2 at 1.

75. As part of that distinctive religious mission, students will receive instruction in Jewish religion, culture, values, rituals, texts, holidays, and practices. Ex. 2 at 4. This includes "[t]he study of mitzvot (commandments)," Ex. 2 at 4, the call of tikkun olam ("shaping the world toward justice, compassion, and g-dliness"), Ex. 2 at 3, and other Jewish traditions and religious practices. Ex. 2 at 4.

76. Ben Gamla believes that because G-d created the universe and orders all within it, a Jewish perspective permeates all subjects, including academics, and unifies all knowledge. Ex. 2 at 3.

77. Ben Gamla's application explained that while also furthering its religious mission, Ben Gamla School will promote academic excellence using best practices in

general and virtual education. Ex. 2 at 4. Ben Gamla answered all questions posed by the Board-provided application form.

78. After Ben Gamla submitted its application, a Board representative, Defendant Skyler Lusnia, reached out to Ben Gamla on January 27, 2026, for a "capacity interview" to discuss various compliance issues.

79. Defendant Lusnia explained that, under the OCSA, the Board for the Ben Gamla School must be comprised exclusively of Oklahoma residents. Ben Gamla affirmed that the Board of the School, once formed, will comply in all respects with Oklahoma law.

80. Defendant Lusnia also explained that the application process proceeds in two phases, and that the Board of the School need not be formed until the "ready-to-open" phase post-approval.

81. The Board denies Ben Gamla's application

82. The Board held a hearing on January 12, 2026, where Deutsch made an oral presentation in support of Ben Gamla's charter school application. Oklahoma Statewide Charter School Board, OKSCSB Meeting: 01/12/26, at 1:42:38-1:59:22 (YouTube, Jan. 12, 2026), https://www.youtube.com/live/AknrUunlTIY.

83. On February 9, 2026, the Board discussed and voted on Ben Gamla's application. Oklahoma Statewide Charter School Board, OKSCSB Meeting: 02/09/26, at 2:10:26-2:31:04 (YouTube, Feb. 9, 2026), https://www.youtube.com/watch?v=_CxrYka29tY.

84. During the discussion, Defendant Lusnia noted some discrepancies with Ben Gamla's application, but it also noted that "for the most part, these concerns were alleviated in

the applicant's capacity interview, with clear statements of assurance that they would fully comply with federal, state, and local applicable laws and regulations." *Id.* at 2:13:17-31. Other concerns, he explained, could be addressed if the application moved forward. *Id.* at 2:13:53-56.

85. Defendant Lusnia also noted that Ben Gamla committed "to fully align and exceed, actually, Oklahoma's academic standards." *Id.* at 2:11:33-40. He also explained that the Ben Gamla Florida's schools have a "demonstrated record of educational success." *Id.* at 2:12:33-37.

86. Nonetheless, the Board voted unanimously to reject Ben Gamla's application.

87. Mr. Gardenhire remarked that the Board's "hands are tied" by the "writ of mandamus from the state Supreme Court," so any other potential issues with Ben Gamla's application were "immaterial to the discussion." *Id.* at 2:20:03-18.

88. Mr. Gardenhire also noted that other publicly-funded schools, specifically one focused on Native American culture, "[also] had essentially a cultural-spiritual component embedded within it to honor the culture and spirituality of Native Americans, and the school operated that way, and nobody raised any concerns at that point." He explained that he didn't think Ben Gamla was "materially different," and he was "troubled" by that unequal treatment. *Id.* at 2:20:51-2:21:39.

89. Other Board members agreed with Mr. Gardenhire.

90. Mr. Rutkauskas or another Board member stated that even though "the Ben Gamla Jewish Charter School has an excellent reputation in Florida" and "do[es] a fantastic

job," "our hands are tied most definitely." "The decision today won't be because they are not a good candidate or qualified or a school that I think would bring tremendous assets to the State of Oklahoma." *Id.* at 2:21:49-2:22:18.

91. Mr. Pearson or another Board member remarked that he "would love to vote for a school of this type, but because of the rule of law that we have in Oklahoma, … it has a rippling effect down to our statute … [and] our own administrative rules." He then stated that "I don't think we can approve this application today." *Id.* at 2:24:56-2:25:33; 2:26:32-2:26:37.

92. Board Chairman Shellem or another Board member also stated disappointedly that "we are bound by the Oklahoma Supreme Court" in explaining his no vote. *Id.* at 2:28:31-35.

93. Ms. Tomcho or another Board member similarly said, "Regardless of this school's reputation or whatever strengths that it has, we have to follow the law and right now the law says no." *Id.* at 2:29:44-52.

94. The Board then unanimously denied the application, citing the reasons stated on the record, namely the Oklahoma's Supreme Court's decision in *Drummond*. *Id.* at 2:30:20-2:31:03.

95. Following the denial of Ben Gamla's application, the Board issued a press release concerning its vote. A true and correct copy of that press release, published on February 9, 2026 on the Board's website and available at https://perma.cc/HSQ9-VFN9, is attached as **Exhibit 3.**

96. The Board's press release stated that the Board's "decision primarily was based on binding legal precedent established by the Oklahoma Supreme Court in 2024, which held that a religious charter school would be unlawful under the state's Constitution." Ex. 3 at 1.

97. Board Chairman Shellem commented, "I believe the Board was placed in a difficult position. … While we value innovation, parental choice, and high-quality educational opportunities for families, we are unfortunately bound by the Oklahoma Supreme Court ruling from 2024, even if we disagree with it." *Id.*

98. Board Chairman Shellem continued, "Merit should be the deciding factor if a charter is awarded to an applicant. Families deserve more high-quality, publicly funded schools from which to choose and our nation's collective future depends on improving its education system. … Alienating proven, successful partners runs contrary to us achieving that goal, which is why this deserves resolution at the highest level with the U.S. Supreme Court." *Id.* at 2.

99. On February 13, the Board sent a formal rejection letter to Ben Gamla, claiming nine additional reasons why it denied Ben Gamla's application. A true and correct copy of the formal letter is attached as **Exhibit 4.**

100. On February 27, Ben Gamla submitted an addendum to its application, curing all defects noted by the Board—except for compliance with the nonsectarian requirement. Ben Gamla filed its revised application well within the thirty-day deadline. Okla. Stat. Ann. tit. 70 § 3-134(E)(2). A true and correct copy of Ben Gamla's addendum to its application is attached as **Exhibit 5**.

101. On March 9, the Board met and discussed Ben Gamla's revised application.

102. Defendant Lusnia explained that "[u]pon agency staff review of the revised application, the applicant was found to have sufficiently resolved nine out of the Board's ten concerns." Oklahoma Statewide Charter School Board, OKSCSB Meeting: 03/09/26, at 1:10:08-18 (YouTube, Mar. 9, 2026) https://www.youtube.com/watch?v=6hd17f_KoIw. "That being said, the religious tenets of the application are still present. So there is one item—the requirement to be nonsectarian—that the revised application does not resolve. As the Board is aware, the Oklahoma Charter School Act states that a charter school shall be nonsectarian. Further, the Supreme Court of Oklahoma concluded that under Oklahoma law, a charter school is a public school and as such, must be nonsectarian. Finally, the Supreme Court of the United States ordered that the judgment of the Supreme Court of Oklahoma is affirmed." *Id.* at 1:10:51-1:11:26.

103. Following a brief discussion, the Board voted unanimously to deny Ben Gamla's application based solely on its religious character and Oklahoma's nonsectarian requirement. *Id.* at 1:16:20-1:19:20.

104. On March 10, Defendant Lusnia sent an official letter formally denying Ben Gamla's application due to its religious character. A true and correct copy of the formal letter is attached as **Exhibit 6**.

105. On March 11, Defendant Drummond filed a petition for writ of mandamus in Oklahoma state district court. The petition requests that the court compel the Board to deny Ben Gamla's application on other grounds.

106. The petition explains that "[t]he Attorney General takes **no position** in this proceeding on the constitutional or statutory questions resolved by the Oklahoma Supreme Court" in the *St. Isidore* case.

## CLAIMS FOR RELIEF

## COUNT I

### 42 U.S.C. § 1983
### FREE EXERCISE CLAUSE VIOLATION
### CATEGORICAL EXCLUSION FROM OTHERWISE-AVAILABLE GOVERNMENT BENEFITS

107. All preceding paragraphs are realleged and incorporated herein by reference.

108. The Free Exercise Clause of the First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

109. The Free Exercise Clause applies to states and their subdivisions and instrumentalities through the Fourteenth Amendment to the U.S. Constitution.

110. Under the Free Exercise Clause, imposing "special disabilities on the basis of religious views or religious status" triggers strict scrutiny. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 460-61 (2017) (quoting *Employment Division v. Smith*, 494 U.S. 872, 877 (1990)).

111. Thus, a system that precludes religious entities from obtaining generally available state benefits solely because of an organization's religious character or conduct is unconstitutional unless the government can satisfy strict scrutiny. *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 484 (2020).

112. Plaintiffs' Jewish beliefs and identity are their motivation for seeking to own and operate a publicly-funded charter school. Offering education from a Jewish perspective is a core part of their religious exercise.

113. Oklahoma offers a public benefit through the OCSA, providing funding for privately-run charter schools to provide students with an education.

114. Okla. Stat. Ann. tit. 70, § 3-136(A)(2) discriminates against religious institutions on its face by excluding them from the charter school program entirely.

115. The OCSA thus requires Plaintiffs to choose between maintaining their Jewish religious identity and receiving an otherwise available benefit.

116. Plaintiffs are thus "disqualified from this generally available benefit 'solely because of their religious character.'" *Carson v. Makin*, 596 U.S. 767, 780 (2022) (quoting *Trinity Lutheran*, 582 U.S. at 462).

117. "By condition[ing] the availability of benefits in that manner," the OCSA "effectively penalizes the free exercise of religion." *Id.* (internal quotations omitted).

118. The exclusion of Plaintiffs serves no compelling, substantial, or legitimate government interest.

119. The exclusion of Plaintiffs is not narrowly tailored to achieve any government interest.

120. Defendants are persons within the meaning of 42 U.S.C. § 1983.

121. Plaintiffs are not state actors or otherwise engaged in state action.

122. Plaintiffs have suffered, are suffering, and will suffer irreparable harm and other forms of harm absent relief.

## COUNT II

### 42 U.S.C. § 1983
### Free Exercise Clause Violation
### Not Generally Applicable

123. All preceding paragraphs are realleged and incorporated herein by reference.

124. State action "burdening religious practice must be of general applicability." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993).

125. A law is not generally applicable if it treats "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021); *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021); *Lukumi*, 508 U.S. at 542-46.

126. Under this rule, the OCSA is not generally applicable on its face or in its application. The exclusion of religious applicants like Plaintiffs because they are religious is not generally applicable.

127. Defendants must therefore satisfy strict scrutiny.

128. Discriminating against religious applicants is not the least restrictive means of furthering a compelling governmental interest.

129. Defendants are persons within the meaning of 42 U.S.C. § 1983.

130. Plaintiffs are not state actors or otherwise engaged in state action.

131. Plaintiffs have suffered, are suffering, and will suffer irreparable harm and other forms of harm absent relief.

## COUNT III

### 42 U.S.C. § 1983
### FREE EXERCISE CLAUSE VIOLATION
### NOT NEUTRAL

132. All preceding paragraphs are realleged and incorporated herein by reference.

133. "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532.

134. "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533.

135. The OCSA is not neutral on its face. The exclusion of religious applicants like Plaintiffs because they are religious is not neutral.

136. The inconsistent treatment of different religious groups is not neutral.

137. Hostility toward religious groups is not neutral.

138. Defendants must therefore satisfy strict scrutiny.

139. Discriminating against religious applicants is not the least restrictive means of furthering a compelling governmental interest.

140. Defendants are persons within the meaning of 42 U.S.C. § 1983.

141. Plaintiffs are not state actors or otherwise engaged in state action.

142. Plaintiffs have suffered, are suffering, and will suffer irreparable harm and other forms of harm absent relief.

## COUNT IV

### 42 U.S.C. § 1983
### EQUAL PROTECTION VIOLATION
### DISCRIMINATION BASED ON RELIGION

143. All preceding paragraphs are realleged and incorporated herein by reference.

144. The Equal Protection Clause prohibits discrimination on the basis of religion.

145. Okla. Stat. Ann. tit. 70, § 3-136(A)(2) discriminates against religion on its face because it excludes applicants seeking to run religious charter schools from the charter school program.

146. Defendants must therefore satisfy strict scrutiny.

147. Defendants do not have a compelling interest in discriminating on the basis of religion and denying religious people equal protection.

148. Defendants' religious discrimination is not the least restrictive means of furthering a compelling governmental interest.

149. Defendants are persons within the meaning of 42 U.S.C. § 1983.

150. Plaintiffs are not state actors or otherwise engaged in state action.

151. Plaintiffs have suffered, are suffering, and will suffer irreparable harm and other forms of harm absent relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a. Declare that Okla. Stat. Ann. tit. 70, § 3-136(A)(2) violates the Free Exercise Clause of the First Amendment to the United States Constitution;

b. Declare that Okla. Stat. Ann. tit. 70, § 3-136(A)(2) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

c. Issue preliminary and permanent injunctive relief prohibiting Defendants from enforcing Okla. Stat. Ann. tit. 70, § 3-136(A)(2) or otherwise denying Plaintiffs eligibility to obtain a charter on the basis of their religious identity, beliefs, or practices;

d. Award reasonable attorneys' fees and costs; and

e. Award all such other relief as the Court may deem proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury of all issues so triable.

Dated: March 24, 2026

Respectfully submitted,

/s/ *Robert G. McCampbell*

ROBERT G. MCCAMPBELL, OBA No. 10390
DAVID R. HERBER, OBA No. 33527
**GABLEGOTWALS**
499 W. Sheridan Ave., Suite 2200
Oklahoma City, OK 73102
Tel 405-235-5500 | Fax 405-235-2875
RMcCampbell@Gablelaw.com
DHerber@Gablelaw.com

- and -

ERIC S. BAXTER, DC Bar No. 479221
ERIC C. RASSBACH, TX Bar No. 24013375
DANIEL L. CHEN, DC Bar No. 1781783
**The Becket Fund for Religious Liberty**
1919 Pennsylvania Ave, N.W., Suite 400
Washington, D.C. 20006
(202) 955-0095
EBaxter@becketfund.org
ERassbach@Becketfund.org
DChen@Becketfund.org

# Ben Gamla's application for initial authorization, filed below on March 24, 2026, as ECF No. 1-2 (Exhibit 2 to Complaint)

## ORIGINAL CHARTER SCHOOL APPLICATION

**Provide a two (2) or three (3) page cover letter that includes an overview of the proposed school and the community it would serve.**

We find ourselves in a day and age that learning options are needed for a variety of reasons. Students need the ability to learn from anywhere to facilitate the work requirements of their parents, fulfill their achievement ability in a particular skill or talent, for medical reasons, or simply a desire to attend a quality school outside the boundaries assigned by the local school district.

The mission of The Ben Gamla Jewish Charter School is to educate the entire child: soul, heart, intellect, and body of each child enrolled through a curriculum that will reach students at an individual level, with an interactive learning environment that is rooted in virtue, rigor and innovation. We are dedicated to academic excellence that empowers and prepares students for a world of opportunity and a lifetime of learning.

The Ben Gamla Jewish Charter School envisions a learning experience that combines the best of online instruction with its capacity for individualized flexible learning. Our statewide Jewish virtual school, serving all K-12 grades, will feature an innovative and interactive curriculum, that meets or exceeds the Oklahoma Academic Standards, and taught by talented certified teachers. Teacher-led instruction will include synchronous and asynchronous learning opportunities, one-to-one tutoring, organized peer interaction, and a focus on critical skills for success in college or trade school, the workforce, and life.

The Ben Gamla Jewish Charter School will seek partnerships with higher education institutions to permit students to participate in AP Courses, early enrollment, dual credit/concurrent enrollment and internships. Each student will have a grade level appropriate College/Career Plan and the school will support students in pursuing their post-secondary goals, whether that includes college enrollment, entering the workforce, military enlistment, or other pathways. At the K-8 level, the focus is on building skill and background in the key subjects of the curriculum to allow for advancement to the next level and to develop a strong moral character in the child that will serve them well in life. The key elements of the Ben Gamla Jewish Charter School program are to ensure success at the next level. This is done in the following ways:

1. Integrated Curriculum- Teacher will integrate the humanities and teach across the curriculum in Literature, English, History/Soc. Studies, and Religion to create a cohesive understanding of the material to build background knowledge for future courses and paths of study. Teachers will utilize discovery-based approaches and integrate science with math, music, architecture, and religion.
2. Rigorous Academics with a wide array of course offerings that span the liberal art spectrum for all abilities. Course work will meet or exceed Oklahoma and national standards. Students will use the current Foundation curriculum standards and benchmarks as well as

strategies and methodologies that are suitable for virtual learning such as Socratic method for discussion; reading, interpreting, recitation and memory work literature and other genres for reading; writing for purpose and writing creatively, and project-based learning based on unit themes. Each year the National Ben Gamla Jewish Charter School Foundation reviews a subject area and makes the necessary changes for best practice and to keep in alignment with state and national standards.

3. Differentiated Instruction – The proposed Learning Management System allows teachers to personalize assignments and content for differentiated instruction. The School teachers will be trained to effectively use student data to inform the small group and one-on-one instruction and customize course content for individual students.

4. Progress Monitoring – Teachers will monitor student progress using short-cycle formative assessments, NWEA MAP, iReady or Renaissance Reading, Math and Early Learning assessments etc. Students will also take a spring norm based national achievement test such as, the CLT, Iowa Assessments or Terra Nova. Other recommended or required testing will be considered and/or implemented.

5. Whole Student Supports – The Student Services Team (SST) will empower students to overcome academic, social, emotional, mental health challenges to succeed in school and their community. Testing arrangements, parent information meetings, accommodations, and modifications, if necessary, will be created, documented and implemented within a Student Service Plan.

6. Student Engagement and participation – Teachers have multiple data sources to monitor student engagement and participation. They will use that data to understand how students spend their time in the system and offline. With this data, teachers can help get students back on track if they struggle or need academic challenges.

In summary, The Ben Gamla Jewish Charter School is designed to meet the diverse needs of today's students by offering a flexible, high-quality virtual learning environment grounded in academic rigor, moral development, and individualized support. Through an integrated and challenging curriculum aligned with state and national standards, personalized instruction, ongoing progress monitoring, and comprehensive whole-student services, the school prepares students for success at every stage of their educational journey. By combining innovative online instruction with strong teacher engagement, postsecondary planning, and meaningful partnerships, The Ben Gamla Jewish Charter School equips students with the knowledge, skills, character, and adaptability needed to thrive in college, careers, and life.

**Vision and mission are the cornerstones of a charter school or virtual charter school seeking to fill an educational need within Oklahoma. The development of program design and performance metrics create the roadmap toward fulfillment of the vision and mission. Describe the proposed charter school's vision and mission.**

Jewish people understand that every human being as bearing the divine image and being called to help bring holiness into the world through their daily actions. Jewish tradition teaches that each person has a share in the ongoing work of tikkun olam — shaping the world toward justice, compassion, and godliness. The strength and vitality of the community, and the transmission of sacred teachings, rely on those who devote themselves to this work with integrity and devotion. Every individual who serves in the name of the community is called to stand before the world as a bearer of our values, our history, and our hope. Accordingly, all who work within these institutions are expected to uphold and support the principles, teachings, and commitments of the Jewish community they represent.

Employees who are Jewish are expected to be faithful to the Jewish community and adhere to the teachings of the people and to the Torah in their lives. Recognizing that non-Jewish employees are called to serve, they too are expected to have an understanding of Judaism and to refrain from actions that are contrary to the teachings of the community. Opportunities for staff education and development on the social and moral teachings of Judaism will be made available. Opportunities are available for employees to participate in spiritual enrichment and education programs for their personal faith development.

All employees are to uphold the standards of the Jewish tradition in their day-to-day work and personal lives. Employees are expected to be persons of integrity and must conduct themselves in an honest and open way, free from deception or corruption and in a manner consistent with the discipline and teachings of the Torah. Employees are expected to follow rules of conduct that will protect the interests and safety of all, including the standards and policies set forth in the School Code of Conduct and other Foundation and School policies and guidelines.

Every employee of a Jewish school is a servant of the Jewish faith by providing a living witness of the tradition and community's love and for school patrons and others, especially the children entrusted to the school's care by parents and guardians. Since God created the universe and orders all within it, a Jewish perspective permeates all subjects informing the student of the unity of all knowledge.

The School is organized and will be operated exclusively for educational, charitable, and religious purposes. The School is an Oklahoma virtual charter school established pursuant to the Oklahoma Charter School Act, 70 O.S. § 3-130 et. seq. Subject to the foregoing and other limitations set forth in the Certificate of Incorporation, the School shall have and exercise all the powers of nonprofit corporations under Oklahoma law.

Without limiting the generality of the foregoing, to the extent permissible under the Oklahoma Charter Schools Act, the School's purposes, activities, programs, and affairs shall include the following:

The Foundation's mission is to promote academic excellence using best practices in both general and virtual education, while providing students with meaningful, substantive instruction in Jewish culture, values, holidays, rituals, texts, and practices as permitted under applicable constitutional and statutory requirements. The Foundation aims to create a school where students receive a rigorous academic education alongside a deep cultural and ethical grounding derived from Jewish heritage and tradition.

**Description of Current and Planned Activities**

1. Operation of a Virtual Public Charter High School in Oklahoma

The Foundation will oversee the establishment and ongoing operation of a virtual public charter school ("the School").

The School will:

- Implement best practices for virtual instruction, including structured schedules, synchronous and asynchronous learning, interactive digital platforms, and ongoing academic monitoring.
- Deliver a rigorous general academic curriculum aligned with Oklahoma state standards. - Employ certified educators trained in virtual pedagogy.
- Provide full student services, including academic advising, tutoring, special education, counseling, and accommodations as required by law.

2. Curriculum Including Jewish Religion, Culture, Values, Texts, Holidays, Rituals, and Practices

As part of the School's distinctive mission, students will receive instruction in Jewish religion, culture, values, rituals, texts, holidays, and practices. Examples of instructional content include: - Jewish religious beliefs, principles, and ethical frameworks. - Jewish religious texts, including Torah and post-Torah writings, studied in their religious, historical, literary, and ethical dimensions. - Jewish holidays and the religious rituals, practices, and traditions associated with them. - The study of mitzvot (commandments), Jewish law, and traditional religious practices in a descriptive and educational manner. - Hebrew language instruction. - Exploration of Jewish history, culture, and the lived experience of Jewish religious practice. All instruction regarding Jewish religion will be delivered in a constitutionally permissible educational manner appropriate for a public charter school context.

1. Student Activities and Enrichment

The School will offer a variety of enrichment programs, including:

- Virtual clubs and extracurricular programs.
- Community service projects grounded in Jewish ethical values. - Guest speakers, cultural programs, and experiential learning.
- In-person meetups or events as permitted.

2. Governance and Management

The Foundation will:

- Establish the governing policies and oversight structures for its schools.
- Ensure compliance with all applicable laws and charter requirements.
- Select and supervise qualified administrators and educators.
- Oversee financial operations, budgeting, grant writing, and fundraising.
- Conduct continual review and improvement of academic and cultural programming.

In sum, the School and its Foundation are grounded in the Jewish understanding of human dignity, moral responsibility, and the call to tikkun olam, integrating these enduring values into every aspect of institutional life. Through faithful stewardship, ethical conduct, and a commitment to integrity, employees serve as living representatives of Jewish tradition while supporting an inclusive educational environment consistent with public charter school requirements. By delivering rigorous, standards-aligned virtual instruction alongside meaningful, constitutionally permissible education in Jewish culture, values, history, and texts, the School seeks to cultivate academically accomplished, ethically grounded students. Guided by sound governance, legal compliance, and continuous improvement, the Foundation is committed to sustaining a vibrant learning community that honors Jewish heritage while preparing students to contribute thoughtfully and responsibly to the broader world.

**Describe the criteria that the proposed school will use to measure its effectiveness in meeting its vision and mission.**

The National Ben Gamla Jewish Charter School Foundation seeks to provide outstanding academic and co-curricular programs infused with a Jewish understanding of the human person and grounded in the enduring Jewish values of truth (emet), beauty (yofi), and goodness (tov), as expressed in Jewish thought and tradition. The School is committed to preparing students to engage thoughtfully and confidently in contemporary society. Now more than ever, these two dimensions of Jewish education—academic excellence and Jewish identity—are inseparable.

Young people of the twenty-first century must emerge as sources of leadership, creativity, and responsibility within the Jewish community and the broader society. To that end, students must be offered an education that is both intellectually rigorous and deeply rooted in Jewish knowledge, values, and lived tradition. An effective Jewish educational program requires a curriculum that is challenging, relevant, research-based, and meaningfully infused with Jewish history, culture, ethics, and practice, and in alignment with state and national standards.

The curriculum developed by the National Ben Gamla Jewish Charter School Foundation reflects this vision. Created in collaboration with principals, teachers, and Jewish educators, it is the result of the collective work of PK–12 classroom teachers, curriculum specialists, and educational leaders from the Foundation, all dedicated to advancing excellence in Jewish education.

Effective teaching begins with thorough planning and preparation for one's classes. Teachers display their professionalism and commitment to student learning by keeping regularly updated lesson plan records shared with the principal and instructional leaders. In these lesson plans, teachers demonstrate how their content and pedagogical knowledge is bringing the Foundation curriculum to life, and the kinds of lesson components selected reflect the students' needs, skills and abilities. Teachers document the specific objectives of each lesson and how students will be formatively or summatively assessed in the lesson, making sure that the content of the lesson scaffolds and supports the objective. The teacher should also include the variety of resources used in the lesson, linking media used as an archive for later years and so that it is easily accessible by administrators. The structure of the lesson should support authentic student learning, should integrate Jewish social teachings and traditions, and should allow students to engage in moral and ethical decision-making in the light of these teachings.

All teachers are required to document lesson planning and preparation using the Foundation lesson plan template. Lesson plans should be accessible and comprehensible to administrators and substitute teachers alike. Fully documented lesson plans for the year are required for a teacher to complete end-of-year check-out.

The environment of a classroom can have a significant impact on a child's ability to learn. Teachers are expected to foster classrooms that enable learning by creating respectful environments, establishing a classroom culture for learning, creating a space that is conducive to prayer and reflection, by effectively managing classroom procedures and student behavior, and organizing the physical space in a way that is safe, accessible, and appropriate to learning activities

Quality instruction is at the heart of what we do as educators. Teachers are encouraged to provide students with quality instructional practices by implementing the following research-backed best practices in their classrooms. Teachers communicate clearly with students, using spoken and written language, about directions and procedures, and learning goals and expectations. Teachers provide students with opportunities to construct their understandings of concepts socially, through self-discovery, and using authentic moral and ethical problem solving. Teachers ask questions of their students and have them justify their responses, engaging everyone in the room. The instructional activities should be engaging and pertinent to the lesson's objective, and the teacher adjusts the lesson based on the needs of the students in the class during the lesson. Teachers are expected to incorporate a variety of pedagogical techniques into their instruction to support the diverse learning needs of the variety of students in their classrooms. Teaching is an active profession, and during instructional times, the teacher should be interacting with the corpus of his/her classroom.

Teachers are expected to view assessments as a continuous conversation about a student's performance in an overall course rather than as just a mark showing how a student performed on a specific assignment. Teachers design a variety of assessments to formatively and summatively assess student progress with respect to lesson objectives, unit goals, or course outcomes. These assessments help the teacher monitor a student's progress and make adjustments to the individual student's instructional plan. When it becomes age-appropriate, teachers help students learn to track their own progress and set their own learning goals using their assessment data. Teachers regularly review and analyze student performance data sets, consulting with peers when possible to develop appropriate strategies to respond to student achievement gaps. Teachers are expected to provide students with feedback about their performance that is timely and helps students understand their areas of weakness so that they can improve in the future.

Teachers have an obligation to engage in their school and professional communities by participating in the following actions. Teachers understand and advocate for the school, its mission and its students. Teachers embrace the Jewish identity of the school. Teachers engage in reflective practices aimed at helping them become better educators. Teachers maintain accurate records and communicate with families and stakeholders. Teachers participate in a professional community where they have positive relationships with colleagues in other schools, and they attend relevant professional development opportunities. Finally, they are consistently professional, ethical, responsible and maintain appropriate licensures.

Homework planned to meet the needs of students has an essential place in the educational program. Homework is a supplement to the lessons taught in school. Teachers are responsible for giving a reasonable amount of homework. Students' individual needs and abilities should be taken into consideration when assigning work for the class or group. Homework should be assigned with the purpose of reinforcing the day's lessons and fostering habits of independent study. Homework should be the natural outgrowth of a concept ALREADY presented in class. Written homework should be checked and returned in a timely manner. Homework assignments are noted in the teacher's lesson plans.

**Describe how the school's vision and mission will be realized in the school's culture.**

The School is organized and will be operated exclusively for educational, charitable, and religious purposes. The School is an Oklahoma virtual charter school established pursuant to the Oklahoma Charter School Act, 70 O.S. § 3-130 et. seq. Subject to the foregoing and other limitations set forth in the Certificate of Incorporation, the School shall have and exercise all the powers of nonprofit corporations under Oklahoma law. Without limiting the generality of the foregoing, to the extent permissible under the Oklahoma Charter Schools Act, the School's purposes, activities, programs, and affairs shall include the following:

The Foundation's mission is to promote academic excellence using best practices in both general and virtual education, while providing students with meaningful, substantive instruction in Jewish culture, values, holidays, rituals, texts, and practices as permitted under applicable constitutional

and statutory requirements. The Foundation aims to create schools where students receive a rigorous academic education alongside a deep cultural and ethical grounding derived from Jewish heritage and tradition.

**Description of Current and Planned Activities**

- Operation of a Virtual Public Charter High School in Oklahoma

The Foundation will oversee the establishment and ongoing operation of a virtual public charter high school ("the School"). The School will:

- Implement best practices for virtual instruction, including structured schedules, synchronous and asynchronous learning, interactive digital platforms, and ongoing academic monitoring.
- Deliver a rigorous general academic curriculum aligned with Oklahoma state standards. – Employ certified educators trained in virtual pedagogy. - Provide full student services, including academic advising, tutoring, special education, counseling, and accommodations as required by law.
- Curriculum Including Jewish Religion, Culture, Values, Texts, Holidays, Rituals, and Practices.

As part of the School's distinctive mission, students will receive instruction in Jewish religion, culture, values, rituals, texts, holidays, and practices.

Examples of instructional content include:

- Jewish religious beliefs, principles, and ethical frameworks.
- Jewish religious texts, including Biblical and post-Biblical writings, studied in their religious, historical, literary, and ethical dimensions.
- Jewish holidays and the religious rituals, practices, and traditions associated with them.
- The study of mitzvot (commandments), Jewish law, and traditional religious practices in a descriptive and educational manner.
- Hebrew language instruction.
- Exploration of Jewish history, culture, and the lived experience of Jewish religious practice. All instruction regarding Jewish religion will be delivered in a constitutionally permissible educational manner appropriate for a public charter school context.

**Student Activities and Enrichment**

The School will offer a variety of enrichment programs, including:

- Virtual clubs and extracurricular programs.
- Community service projects grounded in Jewish ethical values.
- Guest speakers, cultural programs, and experiential learning.

- In-person meetups or events as permitted.

The School's vision and mission will be realized through a school culture that consistently integrates academic excellence, ethical development, and meaningful community engagement. This culture will be shaped by high expectations for learning, respectful relationships, and intentional use of best practices in virtual education, ensuring students are supported academically and socially. By embedding Jewish culture, values, history, and ethical frameworks into curriculum, enrichment activities, and service opportunities—while maintaining constitutional compliance—the School will foster a learning environment that honors heritage, promotes character, and encourages responsibility to others. Through committed educators, comprehensive student supports, and engaging instructional and extracurricular experiences, the School's daily practices will reflect its mission, cultivating students who are intellectually capable, ethically grounded, and prepared to contribute positively to their communities.

**Describe how the school's leadership team, including board members, will ensure that the school's vision and mission are central components of school academic, financial, and organizational decisions.**

The Ben Gamla Jewish Charter School believes that a quality school must be governed by individuals who are responsible stewards of public funding while upholding the charter's mission. The Governing Board of Directors will be professional and ethical at all times, supporting the school's mission and vision. They will provide oversight for the operations, leadership, and policies of the school. Specifically, their duties will include responsibility for ensuring legal compliance, evaluating the school leadership, setting goals for measuring academic success, allocating resources appropriately and approving an annual budget, and approving school policies and procedures.

As an initial matter, the Board of Directors has assessed the Ben Gamla Jewish Charter School program and services to ensure alignment with its priorities. It is negotiating the management agreement so that the Board of Directors, the Ben Gamla Jewish Charter School and the National Ben Gamla Jewish Charter School Foundation, Inc., have a clear understanding of each other's responsibilities as supporters of the school. The Ben Gamla Jewish Charter School will contract with an independent School Treasurer from a firm approved by the Oklahoma Department of Education. The Board of Directors will hold all responsible parties accountable for its students' academic results, including the administration, the teachers, the parents/guardians. The National Ben Gamla Jewish Charter School Foundation is responsible for initiating the support for The Ben Gamla Jewish Charter School under the Board of Directors direction and pursuant to the terms of the services agreement negotiated by the parties until the school is operational and on solid financial footing. The National Ben Gamla Jewish Charter School Foundation is a non-profit organization.

As cited in 70 O.S. § 5-110 (OSCN 2022), the Ben Gamla Jewish Charter School Board is committed to being knowledgeable about laws and regulations governing the school and will seek guidance from board counsel and participate in the required training requirements within 15 months of appointment/election and annually to remain in good standing. Primary training will occur within the first three years of school operations in the areas of Ethics, Open Meetings/Records and Finance by the Oklahoma State School Board Association.

Throughout the year, meetings will take place monthly. Meetings may take place virtually or in person in either Oklahoma City with some meetings based on member availability and agenda topics. Prior to the opening of the school, the Board of Directors will identify and recruit additional Board members in line with its bylaws.

The Board of Directors is fully aware of their fiduciary responsibilities and oversight for Ben Gamla Jewish Charter School. Upon the application being approved, the Board of Directors will assign education management services to be provided initially by the National Ben Gamla Jewish Charter School Foundation with the option to transfer to an outside vendor if needed in future years. This function of the board is contained within the bylaws

Ben Gamla Jewish Charter School Board of Directors looks forward to a collaborative and transparent relationship with the Statewide Virtual Charter School Board. It will ensure staff will fulfill all pre-opening requirements so that the school is in a position to be successful upon opening. Once operating, the Principal/Director will provide a monthly report on the academic progress of students and any required operational matters. The Board of Directors will work with the School Treasurer to review the school's monthly and budget-to-actual financial position, among other key finance metrics.

The School Board of Directors is committed to being knowledgeable about laws and regulations governing the school and will seek guidance from board counsel and participate in annual training as required by Oklahoma state law. They are prioritizing diversity within their members, transparency to their stakeholders, and accountability to the Oklahoma State Virtual Charter Board as their authorizer. They will also seek to avoid conflicts of interests and keep students' academic success as a foremost priority. Like all charter schools in the state, the Ben Gamla Jewish Charter School Board understands that the school may be issued a school report card against state and federal accountability indicators and will also be accountable to the authorizer using the Performance Framework. Annually, the school leadership, the student education support team, and the Board will review state testing results for ways to improve student learning resulting in a board approved school improvement plan for the following school year.

The Principal/Director will provide monthly reports to the Board of Directors on student academic progress and operations. The Board of Directors with guidance from the National Ben Gamla Jewish Charter School Foundation will provide a compliance oversight role to ensure state and authorizer data reporting is done accurately and on time. The Ben Gamla Jewish Charter School Board of Directors will adhere to the authorizer's requirements for data and evidence collection,

site visits, school website compliance checks, annual reviews, and performance reports. Sometime after the school's first year of operation, the school will seek external accreditation, as well as cooperate with the approved accreditation entity in the state of Oklahoma.

The Ben Gamla Jewish Charter School Board of Directors understands its responsibility to adhere to all state and federal laws and regulations when managing school's finances. The School Board of Directors has amended their by-laws to reflect their roles and responsibilities related to school finance. Finally, the School Board of Directors understands that there are specific indicators the school will be held accountable for in the Performance Framework including:

**Audit findings**

- Quarterly financial reports
- Record of financial reporting compliance

The School Board of Directors is committed to academic excellence and will have an unwavering commitment to achieving the school academic goals. Each year, the School Board of Directors, in collaboration with the Principal/ Director and administrative team will create a school improvement plan based on the annual data analysis of state assessments, review of the year's benchmark assessments, and feedback from the School Improvement Team. The Continuous Improvement Plan (CIP) will contain the required components as defined by §70-5-117.4., including strategies for improving instruction. In a virtual school, that often includes discussions on the content of synchronous instructional sessions, strategies to improve student engagement, and the use of supplemental curriculum to support student learning gaps. The Board of Directors will approve the CIP and will review progress towards the academic goals at its monthly board meetings.

The School recognizes that parents/guardians are most engaged when they have meaningful opportunities to shape school programs and provide input. Parents/guardians will have the ability to participate in town hall type dialogue or question and answer sessions, either by grade level or as a school, with school administration periodically.

Parent/guardian input will be collected through surveying multiple times per year. The School Services Team will reach out to state and local health and family services agencies to assist families who need these services. The School Board of Directors and Principal/Director will work closely to develop strategic partnerships, and to define what those strategic partnerships will involve. The school may seek partnerships with higher education institutions for teacher recruitment, and collaboration on educational research. The school may seek partnerships with high quality youth organizations. One means of stakeholder involvement is participation in the Board's regular meetings. When a board meeting notice is posted, the School draft agenda will be included so that stakeholders – as well as the public - can attend and offer public comment either generally or on a specific agenda item. The Board of Directors may also seek stakeholder comments on proposed board initiatives via a request for written comment or an invitation to provide oral comment at a

board or committee meeting. Although not yet formally addressed by the School Board of Directors, the Board of Directors may choose to include stakeholders on standing or ad hoc board committees. The Board is committed to continuously evaluating its efforts to promote stakeholder involvement and ensuring that stakeholders have a voice.

While the School model is based on a virtual learning experience, the Ben Gamla Jewish Charter School fully acknowledges that in-person engagement is essential for reaching students and families who may not have access to online services and/or digital media. After approval, the School will hold frequent, publicly available community meetings, information sessions throughout the year, as well as using the email list serve to continue to communicate news, progress, and school achievements to interested parties in the community. Our goal is to create a network of regional support where families can support one another, identify local tutoring and mentoring opportunities, and feel affiliated with a school community.

Lastly, an integral part of supporting the school's vision and mission is preparing students for success in career and college endeavors and to build relationships and foster early opportunities for the transition after high school. Studies have shown that connection with a college and participation in dual enrollment programs increase the likelihood that students will not only graduate from high school but enroll and successfully complete undergrad and graduate programs in college. In order to cement the opportunity for future success, the Ben Gamla Jewish Charter School will seek collaborations with available local college and university campuses within Oklahoma.

**Describe the proposed school's instructional design, including the type of learning environment that will be created, class size and structure, curriculum overview, and teaching methods.**

The student-centered instructional method used puts students' needs at the forefront of the instructional design, allowing for them to take charge and be wholly involved in each aspect of their learning. Students can progress through their lessons at different paces based on their rate of mastery, yet the school has grading and progress expectations that all students must meet for each term. In the virtual setting, the benefit rests within the flexibility and fluidity for each student's schedule. The daily experience of a Ben Gamla Jewish Charter School student includes scheduled live instructional sessions, scheduled small group targeted sessions, participation in Socratic discussions to improve a respect for dialogue and the improvement of oral language and critical thinking skills, and 24/7 access to asynchronous course work and supplemental curriculum resources, aligned to meet or exceed state standards. This student-centered learning approach allows for more active learning, increased comprehension, and responsibility which fosters independence, accountability, and time-management - all critical skills for higher education, the job force of today, and everyday life. Students will also have personalized learning opportunities to help them develop their own learning strategies and be engaged in the learning process by having a voice in the process.

An important addition to individualizing instruction according to student needs is that as students' progress through the digital curriculum asynchronously, the Learning Management System within captures the results of short cycle assessments in a color-coded mastery dashboard against state standards, equipping teachers with the immediate data needed to provide targeted synchronous instruction. The Ben Gamla Jewish Charter School instructional model plans synchronous instruction as a chance to add instructional value above and beyond what is already available in the asynchronous model. Teachers use data to determine which students need one-on-one direct instruction or small learning groups in order to both differentiate and tailor instruction to students' real-time needs. This is especially effective in remediation situations. In order to support student engagement, peer interactions will be hosted within small and large virtual classroom settings, to ensure individual attention, increased participation, and better communication.

Lastly, instruction is embedded within a Multi-Tiered System of Supports (MTSS/RtII). MTSS/RtII uses assessment, intervention, and targeted instruction to ensure the academic, social, and emotional growth of each child within three tiers - whole group, small group interventions, and individualized support.

The Ben Gamla Jewish Charter School envisions a learning opportunity for students who want and desire a quality Jewish education, but for reasons of accessibility to a brick-and-mortar location or due to cost cannot currently make it a reality. The Jewish education system has routinely matriculated students prepared not only for the next stage in life but prepared to be successful in life itself as good members of the community who take an active role in caring for others, being innovative in the development of new products and services, and serve as leaders in local, state, and global corporations, small business, government, and military. The ability to teach from a faith and reason perspective opens up for the student the best of the Jewish intellectual tradition, much of what the public educational system in the United States is modeled after in its design and course requirements. A liberal arts education prepares students to think critically and to be well read and well written individuals who care about their generation and those to follow. It is the desire of the school to reach those students wherever they may be in Oklahoma.

The School envisions the ability to offer to students who wish to supplement their current school program the option of various accelerated courses or courses that will accelerate the student beyond their current status, such as in the areas of foreign language, computer programing courses of various types, mathematics, and special interest electives. Credit recovery for core subject areas would also be available for students to enroll in order to fulfill their grade level requirements.

The School envisions an experience that combines the best of online instruction with its capacity for individualized flexible learning. Our statewide virtual charter school, serving all K-12 grades, will feature an innovative and interactive curriculum, fully aligned to the National Ben Gamla Jewish Charter School Foundation standards and benchmarks which meet or exceed the Oklahoma Academic Standards and the national standards, and will taught by talented, certified teachers. Teacher-led instruction will include synchronous and asynchronous learning opportunities, one-

to-one tutoring, organized peer interaction, and a focus on critical skills for success in learning, which will lead to success at the next level of education, college, trade school, and in life.

The School will establish key institutional partners in the state, to further technical and trade opportunities to permit students to pursue workplace learning opportunities either during their time at Ben Gamla's or upon graduation. The school will seek partnerships with higher education institutions to permit students to participate in Oklahoma's Promise program to enable students to take advantage of post-secondary college and career opportunities. Each student will have a College and Career Readiness Plan and the school will support students in pursuing their post-secondary goals, whether that includes entering the workforce, college enrollment, military enlistment, or other pathways. We will partner with our families to ensure they have the appropriate resources to support their student's engagement and learning. This includes comprehensive student and parent onboarding programs to ensure students are ready to learn and parents are ready to support.

The School will implement policies to address the Social Emotional Learning of all our students. Clear expectations of behavior for the staff and students which is outlined in our handbooks. Our primary way of addressing the Social Emotional needs of our students is by first establishing a school climate where students, families, and staff feel loved, respected as a child of God, safe and supported. Staffing around Social Emotional Learning differs based on the needs of the school. For our current schools in Oklahoma City, local charities can be utilized by the local school district to take advantage of Title funds for counseling services. Social workers, family liaisons, and/or contract to outside experts can also be leverage with Title funds.

The School will purchase supplemental curriculum like Virtues in Practice, Ruah Woods, Friendzy, Responsive Classroom, Class Dojo and the FACTS SIS parent connection capability to ensure expectation, content and communications are available to students and families. Professional development in these programs will assist staff in implementing the programs to make a positive impact on student emotional well-being and academic achievement. Training allows staff to make a positive impact on student emotional well-being and academic achievement. Because positive school climate and SEL is a schoolwide focus, all staff receive professional development. Responsive Classroom is a student-centered approach to teaching and discipline that comprises a set of research- and evidence-based practices designed to create safe, joyful, and engaging classroom communities for both students and teachers. Schools and teachers who adopt the Responsive Classroom approach focus on creating optimal learning conditions for students to develop their academic, social, and emotional skills and building positive school and classroom community where students learn, behave, hope, and set and achieve goals.

Professional development is used to assist staff in implementing the programs to make a positive impact on student emotional well-being and academic achievement. After receiving training, teachers are able to advocate for their students, provide them with the tools and resources to develop positive relationships, make good decisions, solve problems, and communicate

appropriately within the school community. The expectation is that the program will reduce student conflict, reduce referrals, and help create a positive and collaborative school climate.

The School's educational approach features an innovative curriculum, a high degree of connectivity and personalized attention, intensive teacher training and inquiry-based student-centered learning. Its program focuses on practical application of knowledge and strong parent and community involvement with the School. Through effective use of technology, it enables teachers to custom-tailor academic programs to students' unique skills and interests – all aimed at optimizing our students' learning experience.

Personalized instruction and continuous assessment are cornerstones of the Ben Gamla Jewish Charter School model. All staff will receive professional development in online student engagement, boosting achievement in the online environment, SEL in the online environment, working with subgroups in the online environment, testing data analysis, developing student writers, and other topics. Teachers will have both in person and online modalities offered. Along with participation in online professional learning communities, staff will be trained in techniques of differentiated instruction, enabling them to identify students' learning styles and to create learning activities compatible with the students' needs. At the same time, the staff will use varied assessments to enable students to demonstrate their understanding of concepts and skills. These assessments will also be used to develop further lessons that address individual student needs.

The National Ben Gamla Jewish Charter School Foundation evaluates professional development needs by using surveys, interviews and observation; and the experience of the personnel, who remain up-to-date on new as well as tried and-true teaching methods and strategies. Staff will receive up to two weeks of training which will take place before the school year begins, and ongoing training will continue throughout the school year, based on detailed assessments of staff needs. Keeping great school leaders and teachers is an ongoing effort.

All students will receive a loaned laptop computer at no additional cost. Student technological fees will be applied to the technology needs of the school. Supplied equipment will be configured, imaged, and have required software needed to assure that students are able to fully participate in the educational program.

Students and families must have regular, reliable access to the internet for successful participation in the school. As of December 2020, the Federal Communications Commission estimated that approximately 99% of Oklahoma residences had broadband Internet access of 25 Mbps or greater with at least a choice of two providers. The school will have a limited supply of WiFi hotspots to loan families, based on need. While not required, it is helpful if the parent/guardian of the student has a device separate from the student computer to check email and to check parent accessible reports and information within the platform. This device could be a smartphone, an iPad, a Chromebook, laptop, etc. If the parent/guardian does not have his/her own device, the school-issued Chromebook can be used by the parent/guardian to check email and when the student is not

engaged in schoolwork. Acceptable use guidelines apply to all who use the equipment and access the platform.

The School administration will contract with and secure competent IT Support and Services including acquisition of appropriate technical devices, programs, and infrastructure support systems. They will seek and secure competitive pricing and centralized purchase discounts for computers, monitors, printers, software and other peripherals ("Computer Equipment") for the School.

Related services include:

- Provide loaned student laptop computers
- Provide repair and replacement of student computers
- Carry out imaging or reimaging of student computers
- Carry out reclamation of student computers

The Foundation will oversee the establishment and ongoing operation of a virtual public charter high school ("the School").

The School will:

- Implement best practices for virtual instruction, including structured schedules, synchronous and asynchronous learning, interactive digital platforms, and ongoing academic monitoring.
- Deliver a rigorous general academic curriculum aligned with Oklahoma state standards
- Employ certified educators trained in virtual pedagogy
- Provide full student services, including academic advising, tutoring, special education, counseling, and accommodations as required by law

As part of the School's distinctive mission, students will receive instruction in Jewish religion, culture, values, rituals, texts, holidays, and practices.

Examples of instructional content include:

- Jewish religious beliefs, principles, and ethical frameworks
- Jewish religious texts, including Torah writings, studied in their religious, historical, literary, and ethical dimensions
- Jewish holidays and the religious rituals, practices, and traditions associated with them
- The study of mitzvot (commandments), Jewish law, and traditional religious practices in a descriptive and educational manner
- Hebrew language instruction
- Exploration of Jewish history, culture, and the lived experience of Jewish religious practice

All instruction regarding Jewish religion will be delivered in a constitutionally permissible educational manner appropriate for a public charter school context.

The School will offer a variety of enrichment programs, including:

- Virtual clubs and extracurricular programs
- Community service projects grounded in Jewish ethical values
- Guest speakers, cultural programs, and experiential learning
- In-person meetups or events as permitted

The key elements of the School program are to ensure success at the next level of education and life. This is done in the following ways:

- Integrated Curriculum- Teachers will integrate the humanities and teach across the curriculum in Literature, English, History/Soc. Studies, and Theology to create a cohesive understanding of the material to build background knowledge for future courses and paths of study. Teachers will utilize discovery-based approaches and integrate science with math, music, architecture, and religion.
- Rigorous Academics with a wide array of course offerings that span the liberal art spectrum for all abilities. Course work will meet or exceed the Oklahoma and national standards. Students will use the Foundation's curriculum standards and benchmarks as well as strategies and methodologies that are suitable for virtual learning such as Socratic method for discussion; reading, interpreting, recitation, memory work, literature and other genres for reading; writing for purpose and writing creatively, and project-based learning based on unit themes. Routinely, the National Ben Gamla Jewish Charter School Foundation reviews a subject area and makes the necessary changes for best practice and to keep in alignment with state and national standards.
- Differentiated Instruction – The proposed Learning Management System allows teachers to personalize assignments and content for differentiated instruction. Ben Gamla teachers will be trained to effectively use student data to inform the small group and one-on-one instruction and customize course content for individual students.
- Progress Monitoring – Teachers will monitor student progress using short-cycle assessments, NWEA MAP, i Ready or Renaissance Reading, Math and Early Learning assessments etc. Students will take a spring norm based national achievement test such as, the CLT, Iowa Assessments or Terra Nova. Other recommended or required testing will be considered and/or implemented.
- Whole Student Supports – The Student Services Team (SST) will empower students to overcome academic, social, emotional, mental health challenges to succeed in school and their community. Testing arrangements, accommodations, and modifications, if necessary, will be made and implemented within a Student Service Plan.
- Student Engagement and participation – Teachers have multiple data sources to monitor student engagement and participation. They will use that data to understand how students

spend their time in the system and offline. With this data, teachers can help get students back on track if they struggle or need academic challenges.

Student performance and progress towards standards mastery will be continually monitored at the school level through a defined cycle of data review and data meetings. Each year the Principal will work with teachers and the assessment team to create the Instruction Plan based on the school's data. This plan will be created once the school Assessment Plan has been finalized and will take into consideration the points at which data will be available from each assessment. The Instruction Plan will detail in what groups teachers and school leaders will meet to discuss data, and how often. The plan will define a school-wide data protocol to be utilized to guide review of the data, interpretation of the data, and determination of follow up actions. Specific data to be reviewed in a timely fashion as dictated by the assessment calendar. September reviews are focused on diagnostic data, short cycle data would be reviewed during the 2nd and 3rd testing periods to determine growth and intervention needs.

During these conversations data will be reviewed through multiple lenses:

- Proficiency and growth data
- Individual student level data
- Grade level or grade band data trends
- Subject area trends
- Data by teacher
- Data disaggregated by student subgroup
- Item level analysis
- Standards level analysis

Minutes, team notes and action plans, and needed resources will be captured during each meeting, shared with the school faculty, and placed in a shared digital space for relevant stakeholders to access.

This plan monitors student performance on short cycle assessments and looks at supplemental curriculum usage to identify curriculum gaps/needs, areas of instructional need, and patterns of supplemental usage as it relates to student performance. Particular attention to teaching methods and resources are to be used.

As stated previously, the School Board is committed to academic excellence and will have an unwavering commitment to achieving the school academic goals. Each year, the School Board in collaboration with the administrative team will create a school improvement plan based on the annual data analysis of state assessments, review of the year's benchmark assessments, and feedback from the School Improvement Team. The Continuous Improvement Plan (CIP) will contain the required components as defined by §70-5- 117.4., including strategies for improving instruction. In a virtual school, that often includes discussions on the content of synchronous instructional sessions, strategies to improve student engagement, and the use of supplemental

curriculum to support student learning gaps. The Board of Directors will approve the CIP and will review progress towards the academic goals at its monthly board meetings.

**Describe the plan for using internal and external assessments to measure and report student progress. Include how the proposed school will use formative and summative assessments to measure program effectiveness.**

A strong assessment plan is the cornerstone of any successful instructional program. Each Jewish school implements numerous assessment tools for students and would propose the following for Ben Gamla Jewish Charter School. In order to verify curricular alignment to mission, standards and benchmarks, ensure instructional efficacy, and monitor student learning, schools must employ a balanced assessment system that includes several types of testing methods to determine what students are learning, how teachers are teaching, and what instructional and curricular decisions must be made with regard to scaffolding, alignment, adjustments, and interventions. In a balanced assessment program, school leaders plan for diagnostic, formative, interim and summative assessments. In this way, assessment results provide identification of students in need of intervention, feedback to teachers about instructional practice, and verification of curricular strengths and weaknesses.

**The Ben Gamla Jewish Charter School Assessment System**

- Incoming Assessment – All new students will be assessed for learning readiness using Curriculum Based Measure, a computer adaptive, or a nationally normed test. The results from this initial assessment will assist teachers in developing a personalized plan for each student using The National Ben Gamla Jewish Charter School Foundation Standards and Benchmarks and Oklahoma State standards.
- Ongoing Assessments – Once a student is enrolled and has finalized his/her personalized plan with an advisor, the student will participate in a variety of performance assessments over to time to monitor their progress and modify their academic program keeping them on track for academic success. These assessments include:
- Short Cycle Assessments
- Course level Assessments
- Computer-adaptive Nationally Normed Assessments: The assessments are taken three times per school year by all students. Baselines (incoming assessment) are established the first month of the school Once a baseline has been established, performance is also measured in the winter and spring.
- State tests: Summative assessments to measure student achievement in learning the standards, if required.
- Local Benchmark/Diagnostic (Computer Adaptive Nationally Normed)- iReady, NWEA MAP
- Incoming Assessment- iReady, NWEA MAP, WRAT
- Short Cycle Assessments- iReady (K-8) and MasteryConnect (K-12)

- Reading Fluency- DIBELS, STAR Early Learning Literacy (K-2, Reading A-Z)
- Classroom Assessments- iReady Standards Mastery, MasteryConnect, Course assessments

Benchmarks for student learning

- Local Benchmark/Diagnostic (Computer Adaptive Nationally Normed)- iReady
- Incoming Assessment- iReady, NWEA MAP, WRAT
- Short Cycle Assessments- iReady (K-8) and MasteryConnect (K-12)
- Reading Fluency- DIBELS, STAR Early Learning Literacy (K-2, Reading A-Z)
- Classroom Assessments- iReady Standards Mastery, MasteryConnect, Course assessments

District/school assessments

The specific school assessments are contained in the assessment plan above.

Oklahoma School Testing Program (OSTP), if required

State Assessments-

Oklahoma Core Curriculum Test for Grades 3-8 and 11 in Mathematics, English Language Arts and Science.

Oklahoma Core Curriculum Test for U.S. History administered in Grade 11.

**Program evaluation**

Student performance and progress towards standards mastery will be continually monitored at the school level through a defined cycle of data review and data meetings. Each year the Principal will work with teachers and the assessment team to create the Instruction Plan based on the school's data. This plan will be created once the school Assessment Plan has been finalized and will take into consideration the points at which data will be available from each assessment. The Instruction Plan will detail in what groups teachers and school leaders will meet to discuss data, and how often. The plan will define a school-wide data protocol to be utilized to guide review of the data, interpretation of the data, and determination of follow up actions. Specific data to be reviewed in a timely fashion as dictated by the assessment calendar. September reviews are focused on diagnostic data, short cycle data would be reviewed during the 2nd and 3rd testing periods to determine growth and intervention needs.

During these conversations data will be reviewed through multiple lenses:

- Proficiency and growth data
- Individual student level data
- Grade level or grade band data trends
- Subject area trends

- Data by teacher
- Data disaggregated by student subgroup
- Item level analysis
- Standards level analysis

Minutes, team notes and action plans, and needed resources will be captured during each meeting, shared with the school faculty, and placed in a shared digital space for relevant stakeholders to access.

This plan monitors student performance on short cycle assessments and looks at supplemental curriculum usage to identify curriculum gaps/needs, areas of instructional need, and patterns of supplemental usage as it relates to student performance. Particular attention to teaching methods and resources are to be used.

As stated previously, the School Board is committed to academic excellence and will have an unwavering commitment to achieving the school academic goals. Each year, the School Board in collaboration with the administrative team will create a school improvement plan based on the annual data analysis of state assessments, review of the year's benchmark assessments, and feedback from the School Improvement Team. The Continuous Improvement Plan (CIP) will contain the required components as defined by §70-5- 117.4., including strategies for improving instruction. In a virtual school, that often includes discussions on the content of synchronous instructional sessions, strategies to improve student engagement, and the use of supplemental curriculum to support student learning gaps. The Board of Directors will approve the CIP and will review progress towards the academic goals at its monthly board meetings.

The curriculum offered also meets the standards of the National Ben Gamla Jewish Charter School Foundation national standards, and Oklahoma standards. The School Board will obtain accreditation through the state of Oklahoma for the required period of time and with a national accrediting agency after year two if needed.

Plan for support structures (e.g. online tutoring, home mentors, and technical support services in place 24x7) in addition to teacher support.

Teacher-led and teacher created instruction will include synchronous and asynchronous learning opportunities, one-to-one tutoring, organized peer interaction, and a focus on critical skills for success in college and the workforce. All parents/guardians have access to an initial orientation program so they are prepared to support their student's learning. There are also ongoing parent/guardian support sessions provided in addition to the one-on-one conversations with their student's teacher(s).

Summer School and Tutoring Program: The School Board has budgeted for a supplemental tutoring program for those students who need extra support. The focus will be on English Language

Arts and Mathematics initially but may expand to other subjects. Summer School is optional and budget dependent.

## Supports for diverse learners

### Remediation/Response to Intervention (RtI) Plan

Students enrolled in the School will receive a Free and Appropriate Public Education in the Least Restrictive Environment to the maximum extent possible.

Students may be referred for special education evaluation by their parent/guardian, teacher, or the Student Support Team (SST). The team, consisting of general education teachers, special education staff, and school administrators will regularly review data on students that are not progressing as expected. The SST will consult with the parent/guardians and address struggling students' needs through the MTSS/RtII process. The teacher will implement and document interventions and the student's response to interventions. If a student is referred for an evaluation, the students' response to MTSS/RtII efforts are used as one data metric in the determination of special education eligibility. These interventions will not be used to delay or deny a parent/guardian- requested special education evaluation. A student's eligibility for special education and related services will be determined through assessments administered by a school psychologist, classroom data, review of records and parent and teacher input.

Students determined in need of itinerant or supplemental level of support will access the general education curriculum with adaptations and modifications as outlined in their IEP in the general education classroom with their typical peers. Special education and general education teachers will collaborate to make necessary adaptations and modifications. Students may receive more intense instruction in small groups (with or without general education peers) or one-on-one sessions, depending on the specific needs of the student and as described in the student's IEP. Students that qualify for the alternative state assessment, Oklahoma Alternative Assessment Program (OAAP), will utilize a comprehensive program using an alternative curriculum which will include core content, social skills instruction and daily living skills based on individual needs.

Alternative placements are considered when current educational environment is no longer meeting the needs of the student and the IEP team determines that a student needs more intensive supports and programming. Alternative placements can include center-based programs, approved private placements and/or home and hospital instruction.

### Individualized Disability Education Act (IDEA) & Section 504 Rehabilitation Act

The School Board estimates that 20% of the student population will require special education support and services. This estimate is based on currently available data for statewide virtual charter schools taken from the 2021 Virtual funding report conducted by the National Association of Charter School Authorizers.

The School Board will comply with all applicable State and Federal Laws in serving students with disabilities, including, but not limited to, Section 504 of the Rehabilitation Act ("Section 504"), the Americans with Disabilities Act ("ADA"), the Individuals with Disabilities Education Act ("IDEA"), as well as Oklahoma Special Education Rules to the extent that it does not compromise the religious tenets of the school and the instructional model of the school. The proposed school administrative office will be ADA compliant.

After a student's application for enrollment has been confirmed, families will be given the opportunity to inform the School if their child has an IEP or 504 Plan. The parent/guardian/adult student may provide a copy of the documents, or the School will request the documents from the previous school.

Upon enrollment, the special education team will review the evaluation report and IEP from the previous school district. After consultation with the parent/guardian/adult student, the school will offer comparable services as outlined in the student's existing IEP. An IEP Team will be convened within 10 instructional days of obtainment of the IEP to adopt or amend the existing IEP. For a student with an existing 504 Plan, we will convene a 504-team meeting with the parent/guardian/adult student in a reasonable amount of time, but no later than 30 days after the obtainment of the 504 plan. In addition to being active participants in the IEP Team and 504 team meetings, the parent/guardian/adult student will be provided with a copy of the Procedural Safeguards Notice on a yearly basis at minimum.

**English Learner support**

Evaluations must consider the child's English language skills and ethnic background to ensure that the testing and evaluation will be equitable for children of any race or culture. Tests will be given in the native language or mode of communication that is most likely to give accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is clearly not feasible. Upon enrollment in School, the parent/guardian will complete a Language Preference Form to ensure communication and assessments are delivered in the student/family's native language.

The School will meet the needs of English Language Learners as required by State and Federal law by increasing the English language proficiency (ELP) and academic language proficiency in content-area subject matter. The school will seek to employ teachers with the teaching ESL endorsement will serve as the English learners' Teacher of Record. The EL teacher-to-student ratio is set at 1:35 in the school budget.

All English Learners in the Ben Gamla Jewish Charter School will have an English Language Acquisition Plan (ELAP) per state guidance, and the ELAP will be implemented with fidelity by all teachers and staff who work with the student. The ELAP will detail strategies, instructional and assessment accommodations, modifications, goals for the student, and results on the state and local

assessment data. The ELAP will be updated annually or earlier if needed to reflect the student's language proficiency growth.

The ELAP will:

- Be aligned to Oklahoma academic standards for the appropriate grade level of the ELs;
- Include EL instruction delivered by properly certified teachers who hold a Oklahoma ESL endorsement certificate or who are working in conjunction with ESL endorsed teachers;
- Provide equitable access to content for ELs at all language proficiency levels by providing research- based bilingual or sheltered instruction with fidelity; and
- Not limit the enrollment of ELs in any course or academic program for which they would otherwise be eligible.

EL students will be monitored for their progress throughout the school year and assessed annually using assessments that are recognized by World-Class Instructional Design and Assessment (WIDA). Students who meet Oklahoma's exit criteria on that assessment will be reclassified and exit EL services but be constantly monitored.

The EL program will be reviewed annually based on local and state data of English Learners and the general student population and other overlapping subgroups such as special education and free and reduced lunch eligible students. The annual review will include looking at data regarding equitable representation, academic achievement, elementary and secondary programming, professional learning and teacher capacity, family engagement, and resource allocation.

Language Instruction Educational Programs, or LIEPs, are district-level plans for supporting students who qualify as English learners. The descriptions below provide a general overview of common interventions.

Transitional Bilingual Students are taught core content and language fluency in their native language for varying periods of the day with the remainder of time focused on English language acquisition. The goal is to transition students to native English instruction within two to five years with no loss of content instruction. Classes may be self-contained or combined.

Dual Language or Two-way Immersion Students are taught content and language fluency in two languages. The goal is fluency in two languages, and programs can last the duration of enrollment.

English as a Second Language (ESL) or English Language Development (ELD) Students are provided supplemental individual or small-group instruction outside the general education classroom (e.g. "pullout" or ESL classes) with no native language support in either Supplemental instruction can target language fluency and core content. The goal is to increase student success in mainstream, non- ESL supported general education classes which ELs should transition to in a reasonable amount of time.

Newcomer Programs Students new to the U.S. are placed in classes that primarily emphasize English language acquisition. Instruction can be in English or can utilize a student's native language. The goal is to move the student toward English language proficiency as quickly as possible.

Content Classes with Integrated ESL Support Students are provided core content instruction with no native language support in mainstream classes utilizing integrated ESL strategies (i.e. teachers trained in EL methods, use of EL paraprofessionals, ). The goal is to provide appropriate EL supports in the general education classroom to the level appropriate for student success.

**Gifted and Talented program**

Gifted and high ability students will thrive at the School. Through the placement process, these learners will be provided the most appropriate curriculum, pacing and teaching approaches from day one. Teachers will work closely with the parent/guardian and the School team to ensure a steady flow of enrichment activities for students working above grade level. Students will further benefit from the advantages of virtual gifted education as they will be able to work at their own pace without the restraints of traditional school classroom pacing.

**Neurodiverse Learners- Dylexia, Dysgraphia, Dyscalculia**

According to the statistics below taken from the National Center for Education Statistic's website, the most common form of disability falls in areas of specific learning disability.

"15% of students fell into IDEA category and of that group, 33% had specific learning disability. A specific learning disability is a disorder in one or more of the basic psychological processes involved in understanding or using spoken or written language that may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations. Thirty-three percent of all students who received special education services had specific learning disabilities,19 percent had speech or language impairments, 2and 15 percent had other health impairments (including having limited strength, vitality, or alertness due to chronic or acute health problems such as a heart condition, tuberculosis, rheumatic fever, nephritis, asthma, sickle cell anemia, hemophilia, epilepsy, lead poisoning, leukemia, or diabetes). Students with autism, developmental delays, intellectual disabilities, and emotional disturbances each accounted for between 5 and 12 percent of students served under IDEA. Students with multiple disabilities, hearing impairments, orthopedic impairments, visual impairments, traumatic brain injuries, and deaf-blindness each accounted for 2 percent or less of those served under IDEA." COE - Students With Disabilities (ed.gov)

"In fall 2020, the percentage of students served under IDEA who spent 80 percent or more of the school day in general classes was highest for students with speech or language impairments (88 percent). Approximately two-thirds to three-quarters of students with specific learning disabilities (75 percent), developmental delays (69 percent), other health impairments (69 percent), and visual impairments (69 percent) spent 80 percent or more of the school day in general classes. Less than

one-third of students with deaf-blindness (28 percent), intellectual disabilities (19 percent), and multiple disabilities (15 percent) spent 80 percent or more of the school day in general classes." COE - Students With Disabilities (ed.gov)

Jewish schools address this on a regular basis by utilizing strong research based programs incorporating strong early literacy, phonics, and writing based elements. The school will utilize Orton Gilliham based products that are able to address those students who fall outside the normal range of specific learning disability. In reviewing the reading proficiency for all Oklahoma students taking any reading assessment, the 2021-22 proficiency rate is 27.19%. This appears to be an area that the School could help in the overall education of Oklahoma children. Training teachers for the expectation of having these common learning differences and addressing them with strong training programs is the intent of the School.

**At-risk/academically behind learners**

According to the Oklahoma Department of Education, Oklahoma children rank 5th in the nation for Adverse Childhood Experiences. Nearly half of all Oklahoma students have an ACE score of 2 or higher, compared to less than 40% nationwide. More than half of all students in the state are at an economical disadvantage, with 56% of the population in poverty. Over 23 thousand students are homeless, 2,505 students come from foster care, and 199 are labeled as migrants. Over 11% of Oklahoma students have incarcerated parents, compared to just over 7% nationwide.

According to the American Psychological Association, all of these factors, and especially socio-economic status (SES) impacts quality of life, mental and physical health, as well as academic readiness and success. In fact, research tells us that a student's SES is "a statistically significant and strong predictor of learning-related behavior problems" and that these same children enter school with "fewer reading or mathematics skills and less well- developed learning-related behaviors" (Morgan, 2011). According to Aikens & Barbarin (2008), the schools in low- SES communities may not have the necessary resources, and as such, the academic growth of students is impacted. Upon entrance to high school, research has also found that low-SES students enter with as much as a 5- year gap in literacy skills compared to their peers (Reardon, Valentino, Kalogrides, Shores, & Greenberg, 2013).

Virtual schools have an opportunity to serve more at-risk students, and the Ben Gamla Jewish Charter School meets this challenge head-on by providing the flexibility of pacing and schedule to meet their needs. The Changing Landscape of K-12 Education in the US states that virtual schooling is an effective tool for "providing at-risk students with additional remediation," as well as "verifying whether or not they are accessing those materials regularly and effectively." Using the system, Oklahoma certified teachers will be able to do just that- deliver a remarkably individualized instruction customized to the student's needs in real time.

**Describe the plan for identifying and successfully serving students with disabilities, students who are English language learners, students who are academically behind, and students who are gifted and/or talented.**

Teacher-led and teacher created instruction will include synchronous and asynchronous learning opportunities, one-to-one tutoring, organized peer interaction, and a focus on critical skills for success in college and the workforce. All parents/guardians have access to an initial orientation program so they are prepared to support their student's learning. There are also ongoing parent/guardian support sessions provided in addition to the one-on-one conversations with their student's teacher(s).

Summer School and Tutoring Program: The Ben Gamla Jewish Charter School Board has budgeted for a supplemental tutoring program for those students who need extra support. The focus will be on English Language Arts and Mathematics initially but may expand to other subjects. Summer School is optional and budget dependent.

**Supports for diverse learners**

**Remediation/Response to Intervention (RtI) Plan**

Students enrolled in the Ben Gamla Jewish Charter School Board will receive a Free and Appropriate Public Education in the Least Restrictive Environment to the maximum extent possible.

Students may be referred for special education evaluation by their parent/guardian, teacher, or the Student Support Team (SST). The team, consisting of general education teachers, special education staff, and school administrators will regularly review data on students that are not progressing as expected. The SST will consult with the parent/guardians and address struggling students' needs through the MTSS/RtII process. The teacher will implement and document interventions and the student's response to interventions. If a student is referred for an evaluation, the students' response to MTSS/RtII efforts are used as one data metric in the determination of special education eligibility. These interventions will not be used to delay or deny a parent/guardian- requested special education evaluation. A student's eligibility for special education and related services will be determined through assessments administered by a school psychologist, classroom data, review of records and parent and teacher input.

Students determined in need of itinerant or supplemental level of support will access the general education curriculum with adaptations and modifications as outlined in their IEP in the general education classroom with their typical peers. Special education and general education teachers will collaborate to make necessary adaptations and modifications. Students may receive more intense instruction in small groups (with or without general education peers) or one-on-one sessions, depending on the specific needs of the student and as described in the student's IEP. Students that qualify for the alternative state assessment, Oklahoma Alternative Assessment Program (OAAP),

will utilize a comprehensive program using an alternative curriculum which will include core content, social skills instruction and daily living skills based on individual needs.

Alternative placements are considered when current educational environment is no longer meeting the needs of the student and the IEP team determines that a student needs more intensive supports and programming. Alternative placements can include center-based programs, approved private placements and/or home and hospital instruction.

**Individualized Disability Education Act (IDEA) & Section 504 Rehabilitation Act**

The Ben Gamla Jewish Charter School Board estimates that 20% of the student population will require special education support and services. This estimate is based on currently available data for statewide virtual charter schools taken from the 2021 Virtual funding report conducted by the National Association of Charter School Authorizers.

The School Board will comply with all applicable State and Federal Laws in serving students with disabilities, including, but not limited to, Section 504 of the Rehabilitation Act ("Section 504"), the Americans with Disabilities Act ("ADA"), the Individuals with Disabilities Education Act ("IDEA"), as well as Oklahoma Special Education Rules to the extent that it does not compromise the religious tenets of the school and the instructional model of the school. The proposed school administrative office will be ADA compliant.

After a student's application for enrollment has been confirmed, families will be given the opportunity to inform the School if their child has an IEP or 504 Plan. The parent/guardian/adult student may provide a copy of the documents, or the School will request the documents from the previous school.

Upon enrollment, the special education team will review the evaluation report and IEP from the previous school district. After consultation with the parent/guardian/adult student, the school will offer comparable services as outlined in the student's existing IEP. An IEP Team will be convened within 10 instructional days of obtainment of the IEP to adopt or amend the existing IEP. For a student with an existing 504 Plan, we will convene a 504-team meeting with the parent/guardian/adult student in a reasonable amount of time, but no later than 30 days after the obtainment of the 504 plan. In addition to being active participants in the IEP Team and 504 team meetings, the parent/guardian/adult student will be provided with a copy of the Procedural Safeguards Notice on a yearly basis at minimum.

**Gifted and Talented program**

Gifted and high ability students will thrive at the Ben Gamla Jewish Charter School. Through the placement process, these learners will be provided the most appropriate curriculum, pacing and teaching approaches from day one. Teachers will work closely with the parent/guardian and the School team to ensure a steady flow of enrichment activities for students working above grade

level. Students will further benefit from the advantages of virtual gifted education as they will be able to work at their own pace without the restraints of traditional school classroom pacing.

**Neurodiverse Learners- Dylexia, Dysgraphia, Dyscalculia**

According to the statistics below taken from the National Center for Education Statistic's website, the most common form of disability falls in areas of specific learning disability. 15% of students fell into IDEA category and of that group, 33% had specific learning disability. A specific learning disability is a disorder in one or more of the basic psychological processes involved in understanding or using spoken or written language that may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations. Thirty-three percent of all students who received special education services had specific learning disabilities,19 percent had speech or language impairments 2 and 15 percent had other health impairments (including having limited strength, vitality, or alertness due to chronic or acute health problems such as a heart condition, tuberculosis, rheumatic fever, nephritis, asthma, sickle cell anemia, hemophilia, epilepsy, lead poisoning, leukemia, or diabetes). Students with autism, developmental delays, intellectual disabilities, and emotional disturbances each accounted for between 5 and 12 percent of students served under IDEA. Students with multiple disabilities, hearing impairments, orthopedic impairments, visual impairments, traumatic brain injuries, and deaf-blindness each accounted for 2 percent or less of those served under IDEA." COE - Students With Disabilities (ed.gov)

"In fall 2020, the percentage of students served under IDEA who spent 80 percent or more of the school day in general classes was highest for students with speech or language impairments (88 percent). Approximately two-thirds to three-quarters of students with specific learning disabilities (75 percent), developmental delays (69 percent), other health impairments (69 percent), and visual impairments (69 percent) spent 80 percent or more of the school day in general classes. Less than one-third of students with deaf-blindness (28 percent), intellectual disabilities (19 percent), and multiple disabilities (15 percent) spent 80 percent or more of the school day in general classes." COE - Students With Disabilities (ed.gov)

Jewish schools address this on a regular basis by utilizing strong research based programs incorporating strong early literacy, phonics, and writing based elements. The school will utilize Orton Gilliham based products that are able to address those students who fall outside the normal range of specific learning disability. In reviewing the reading proficiency for all Oklahoma students taking any reading assessment, the 2021-22 proficiency rate is 27.19%. This appears to be an area that The Ben Gamla Jewish Charter School could help in the overall education of Oklahoma children. Training teachers for the expectation of having these common learning differences and addressing them with strong training programs is the intent of Ben Gamla Jewish Charter School.

**At-risk/academically behind learners**

According to the Oklahoma Department of Education, Oklahoma children rank 5th in the nation for Adverse Childhood Experiences. Nearly half of all Oklahoma students have an ACE score of 2 or higher, compared to less than 40% nationwide. More than half of all students in the state are at an economical disadvantage, with 56% of the population in poverty. Over 23 thousand students are homeless, 2,505 students come from foster care, and 199 are labeled as migrants. Over 11% of Oklahoma students have incarcerated parents, compared to just over 7% nationwide.

According to the American Psychological Association, all of these factors, and especially socio-economic status (SES) impacts quality of life, mental and physical health, as well as academic readiness and success. In fact, research tells us that a student's SES is "a statistically significant and strong predictor of learning-related behavior problems" and that these same children enter school with "fewer reading or mathematics skills and less well- developed learning-related behaviors" (Morgan, 2011). According to Aikens & Barbarin (2008), the schools in low- SES communities may not have the necessary resources, and as such, the academic growth of students is impacted. Upon entrance to high school, research has also found that low-SES students enter with as much as a 5- year gap in literacy skills compared to their peers (Reardon, Valentino, Kalogrides, Shores, & Greenberg, 2013).

Virtual schools have an opportunity to serve more at-risk students, and the Ben Gamla Jewish Charter School meets this challenge head-on by providing the flexibility of pacing and schedule to meet their needs. The Changing Landscape of K-12 Education in the US states that virtual schooling is an effective tool for "providing at-risk students with additional remediation," as well as "verifying whether or not they are accessing those materials regularly and effectively." Using the system, Oklahoma certified teachers will be able to do just that- deliver a remarkably individualized instruction customized to the student's needs in real time.

The National Ben Gamla Jewish Charter School Foundation is committed to providing support for students or staff who require the assistance of a service animal to aid with their major daily living activities that are substantially limited by a physical or mental impairment. It is the intent of these procedures that Administration, Principal and school staff work in partnership with parents/guardians should a student or staff member with a disability require a service animal. However, there is no right of universal access to all service animals. The allowance of a service animal may be denied based upon an individualized, objective assessment of the associated hazards and risks. (*See infra* for a list of the main factors that will be included in such an assessment.)

**Service Animal Defined by Title II and Title III of the ADA**

A service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. Tasks performed can include, among other things, pulling a wheelchair,

retrieving dropped items, alerting a person to a sound, reminding a person to take medication, or pressing an elevator button.

Emotional support animals, comfort animals, and therapy dogs are NOT service animals under Title II and Title III of the ADA.

Other species of animals, whether wild or domestic, trained or untrained, are not considered service animals either. The work or tasks performed by a service animal must be directly related to the individual's disability. It does not matter if a person has a note from a doctor that states that the person has a disability and needs to have the animal for emotional support. A doctor's letter does not turn an animal into a service animal.

Examples of animals that fit the ADA's definition of "service animal" because they have been specifically trained to perform a task for the person with a disability:

- Guide Dog or Seeing Eye® Dog1is a carefully trained dog that serves as a travel tool for persons who have severe visual impairments or are blind.
- Hearing or Signal Dog is a dog that has been trained to alert a person who has a significant hearing loss or is deaf when a sound occurs, such as a knock on the door.
- Psychiatric Service Dog is a dog that has been trained to perform tasks that assist individuals with disabilities to detect the onset of psychiatric episodes and lessen their effects. Tasks performed by psychiatric service animals may include reminding the handler to take medicine, providing safety checks or room searches, or turning on lights for persons with Post Traumatic Stress Disorder, interrupting self-mutilation by persons with dissociative identity disorders, and keeping disoriented individuals from danger.
- SSigDOG (sensory signal dogs or social signal dog) is a dog trained to assist a person with autism. The dog alerts the handler to distracting repetitive movements common among those with autism, allowing the person to stop the movement (e.g., hand flapping).
- Seizure Response Dog is a dog trained to assist a person with a seizure disorder. How the dog serves the person depends on the person's needs. The dog may stand guard over the person during a seizure or the dog may go for help. A few dogs have learned to predict a seizure and warn the person in advance to sit down or move to a safe place.
- Diabetic Alert Dogs that are trained to alert diabetic owners in advance of low (hypoglycemia) or high (hyperglycemia) blood sugar events before they become dangerous.

Procedures:

Decisions regarding the implementation of the use of a service animal into the school environment are made on a case by case basis in consultation with all Stakeholders (e.g. Principal, Classroom teachers, and parents/guardians). A protocol will be developed at the school level to address the

staff, student's, school's, and the service animal's needs. Issues to be addressed would include the responsibility for handling, toileting and clean up, feeding, and transportation of the service animal to and from school. The protocol will also address the integration of the animal into the school system, the education of the staff and student body as to the role and expectation of the service animal and balancing the needs of the student or staff seeking the use of the service animal and the needs of students or staff who have animal hair allergies or who exhibit fears of animals. A service animal will be excluded if it is a breed of animal prohibited by law.

Responsibilities:

1. The provision of a certified professionally trained animal is the financial responsibility of the parents/guardians.
2. The provision of a fully trained animal handler is the financial responsibility of the parent if an animal handler is required.
3. The provision of all food, water, and waste clean-up/disposal materials is the responsibility of the parent/guardians.
4. The immunization of the animal against diseases is the financial responsibility of the parent/guardians. Parents/guardians must provide to the Board/school proof that the personal assistant animal's vaccinations are current.
5. The parents/guardians will provide the school with up-to-date vaccination and health records.

The school can require the removal of the service animal if the animal is out of control and the animal's handler does not take effective action to control it, the animal is not housebroken, or the presence of the animal poses a direct threat to the health or safety of others. A non-exhaustive list of factors that may be considered under this element are that the service animal:

- is unclean, not well-groomed or has an offensive odor.
- urinates or defecates in inappropriate locations.
- solicits attention, visits or annoys students or school personnel.
- vocalizes unnecessarily; i.e., barking, growling, or whining.
- shows aggression towards people or other animals.
- solicits or steal food or other items from the students or school personnel.
- interferes with the educational program of any student.

If the service animal is removed, the individual with a disability shall be provided with the opportunity to participate in the service, program, or activity without the service animal.

The owner or handler of the service animal is responsible for any damage to school property or injury to personnel, students, or others caused by the animal.

**English Learner support**

Evaluations must consider the child's English language skills and ethnic background to ensure that the testing and evaluation will be equitable for children of any race or culture. Tests will be given in the native language or mode of communication that is most likely to give accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is clearly not feasible. Upon enrollment in Ben Gamla Jewish Charter School, the parent/guardian will complete a Language Preference Form to ensure communication and assessments are delivered in the student/family's native language.

The Ben Gamla Jewish Charter School will meet the needs of English Language Learners as required by State and Federal law by increasing the English language proficiency (ELP) and academic language proficiency in content-area subject matter. The school will seek to employ teachers with the teaching ESL endorsement will serve as the English learners' Teacher of Record. The EL teacher-to-student ratio is set at 1:35 in the school budget.

All English Learners in the Ben Gamla Jewish Charter School will have an English Language Acquisition Plan (ELAP) per state guidance, and the ELAP will be implemented with fidelity by all teachers and staff who work with the student. The ELAP will detail strategies, instructional and assessment accommodations, modifications, goals for the student, and results on the state and local assessment data. The ELAP will be updated annually or earlier if needed to reflect the student's language proficiency growth.

The ELAP will:

- Be aligned to Oklahoma academic standards for the appropriate grade level of the ELs;
- Include EL instruction delivered by properly certified teachers who hold a Oklahoma ESL endorsement certificate or who are working in conjunction with ESL endorsed teachers;
- Provide equitable access to content for ELs at all language proficiency levels by providing research- based bilingual or sheltered instruction with fidelity; and
- Not limit the enrollment of ELs in any course or academic program for which they would otherwise be eligible.

EL students will be monitored for their progress throughout the school year and assessed annually using assessments that are recognized by World-Class Instructional Design and Assessment (WIDA). Students who meet Oklahoma's exit criteria on that assessment will be reclassified and exit EL services but be constantly monitored.

The EL program will be reviewed annually based on local and state data of English Learners and the general student population and other overlapping subgroups such as special education and free

and reduced lunch eligible students. The annual review will include looking at data regarding equitable representation, academic achievement, elementary and secondary programming, professional learning and teacher capacity, family engagement, and resource allocation.

Language Instruction Educational Programs, or LIEPs, are district- level plans for supporting students who qualify as English learners. The descriptions below provide a general overview of common interventions.

- **Transitional Bilingual Students** are taught core content and language fluency in their native language for varying periods of the day with the remainder of time focused on English language acquisition. The goal is to transition students to native English instruction within two to five years with no loss of content instruction. Classes may be self-contained or combined.
- **Dual Language or Two-way Immersion** Students are taught content and language fluency in two languages. The goal is fluency in two languages, and programs can last the duration of enrollment.
- **English as a Second Language (ESL) or English Language Development (ELD)** Students are provided supplemental individual or small-group instruction outside the general education classroom (e.g. "pullout" or ESL classes) with no native language support in either Supplemental instruction can target language fluency and core content. The goal is to increase student success in mainstream, non- ESL supported general education classes which ELs should transition to in a reasonable amount of time.
- **Newcomer Programs** Students new to the U.S. are placed in classes that primarily emphasize English language acquisition. Instruction can be in English or can utilize a student's native language. The goal is to move the student toward English language proficiency as quickly as possible.
- **Content Classes with Integrated ESL Support** Students are provided core content instruction with no native language support in mainstream classes utilizing integrated ESL strategies (i.e. teachers trained in EL methods, use of EL paraprofessionals, ). The goal is to provide appropriate EL supports in the general education classroom to the level appropriate for student success.

**Describe the policies that will determine the requirements for student grade placement, promotion, and retention.**

The most successful retention plan begins by succeeding with the students that are already enrolled. By providing a high-quality, personalized educational program, sustaining relationships and connection, and meeting the needs of all students, the Ben Gamla Jewish Charter School will create an offering that will ensure students want to continue their success in our virtual seats. The School will track in-year and year-over-year withdrawn students. This data is not only required per

Oklahoma charter school law, but it also provides the school with valuable information each year on how to better serve students and their families.

Students must successfully meet the academic and/or development requirements to be promoted to the next grade. Retention is a serious matter and should be considered only when there are adequate reasons to believe that the student would benefit from retention. Possible retention should be discussed with the principal first and permission given before discussing with a parent/guardian.

Academically successful students tend to want to stay in the school they are currently enrolled in. The Learning Management System provides a tremendous amount of data on where students spend their time in their courses and this information is valuable to get students unstuck in their learning process. We believe this, coupled with talented teachers specifically trained to serve students in this educational model, provides the best opportunity for students to be successful.

While course grades are an important component of retention and promotion decisions teachers and school leaders will be trained to utilize a multi-faceted decision-making approach, to ensure that each student's unique characteristics are considered in conjunction with all available student level data to inform retention and promotion decisions. During the Spring of each school year, teachers will create a list of students for whom retention may be necessary, based upon available data. Multiple stakeholders involved with the student will be included in the decision-making team (teachers, parents, administrators, school counselors, interventionists).

For any student who undergoes the Retention/Promotion review, the team will create an individualized plan to note what additional supports and interventions will be provided to the student in the course of the next school year to ensure continued progress towards mastery of grade level standards, regardless of whether the decision is to retain or to promote. Considerations for the retention and promotion decision process may include course grades, assessment data, student attendance, student motivation, student learning style and pace, chronological age, developmental characteristics/maturity, prior retention, student learning exceptionalities, and student transiency.

For High School level students, progress from one grade level to another will be based on credits earned. Teachers and administrators will work to ensure that all students have access to any state allowable alternative pathways to graduation, and that any existing credit flexibility and dual enrollment options are utilized. Students who experience course failure and become credit deficient will have access to additional opportunities to recoup credits via programs such as summer school or credit recovery course work. Students (and parents) are expected to regularly consult and follow course pacing guides to ensure that all assignments and assessments are completed by the established due dates. Extensions are handled at the course level teacher's discretion. Early interventions will occur by the teacher and/or school leader when students fall behind their pacing guides, not logging in to the system or consistently failing. Contact with the parent and students will occur in various manners including electronic (email), verbal (phone/video) and in-person meetings.

The school's teachers maintain an electronic grade book within the System that displays the student's progress. Parents and students have view only access to view grade reports itemizing each grade for students. Grades are posted and reported quarterly. Semester grades will be comprised of the average of two quarters. Final grades will be the average of the two semesters. School administration will have a final review of grades and credits earned to be sure that all credits earned are properly credited in the student's records.

NWEA MAP Testing occurs in all grade levels three times per year as a benchmark assessment guide. The Iowa Assessment, Terra Nova or CLT is administered to students in grades 3, 5, 7 and 9. All 8th grade students take the HSPT (high school placement test.) Students in 9th grade take the PSAT and 10th grade students take the pre-ACT.

**For high schools, provide graduation requirements and highlight any expectations that will go above or beyond the state requirements. For non-high schools, please type "NA."**

For High School level students, progress from one grade level to another will be based on credits earned. Teachers and administrators will work to ensure that all students have access to any state allowable alternative pathways to graduation, and that any existing credit flexibility and dual enrollment options are utilized. Students who experience course failure and become credit deficient will have access to additional opportunities to recoup credits via programs such as summer school or credit recovery course work. Students (and parents) are expected to regularly consult and follow course pacing guides to ensure that all assignments and assessments are completed by the established due dates. Extensions are handled at the course level teacher's discretion. Early interventions will occur by the teacher and/or school leader when students fall behind their pacing guides, not logging in to the system or consistently failing. Contact with the parent and students will occur in various manners including electronic (email), verbal (phone/video) and in-person meetings.

The school's teachers maintain an electronic grade book within the System that displays the student's progress. Parents and students have view only access to view grade reports itemizing each grade for students. Grades are posted and reported quarterly. Semester grades will be comprised of the average of two quarters. Final grades will be the average of the two semesters. School administration will have a final review of grades and credits earned to be sure that all credits earned are properly credited in the student's records.

**Grading Scale – High School**

| | |
|---|---|
| A | 90-100 |
| B | 80-89 |
| C | 70-79 |
| D | 60-69 |

F 59-Below

Progress Reports:

Progress reports will be sent home approximately the fifth week of each quarter. The progress report should reflect a student's grade to date, so all grading should be up-to-date before progress reports are available to families.

**Report Cards:**

Report cards are issued quarterly. Comments on the report card are to be objective in nature with comments made on all report cards.

**Standardized Testing:**

NWEA MAP Testing occurs in all grade levels three time per year as a benchmark assessment guide. The Iowa Assessment, Terra Nova or CLT is administered to students in grades 3, 5, 7 and 9. All 8th grade students take the HSPT (high school placement test.) Students in 9th grade take the PSAT and 10th grade students take the pre-ACT.

Besides helping students have a successful start to the school year, success coaches will leverage data and teacher referrals to proactively identify students who are struggling to meet engagement and academic expectations. Coaches then meet with these students and their parents to identify barriers to success and create a plan to get the student successfully re-engaged in learning and back on track academically. Coaches and School Counselors partner to provide students with social emotional learning content, grade band transition support, college/career readiness programming, and graduation planning.

The School Counselor will also be responsible for ensuring that students are progressing appropriately towards a high school diploma. The school counseling department will communicate directly with students and parents about academic and graduation requirements and will assist students who need help navigating college and career pathways. The School Counselor will also be available to connect students to community resources, as needed. The School will host in-person baccalaureate with award recognition and graduation ceremonies including caps/gowns for students.

**Describe the plan for offering co-curricular and extracurricular programs and how the offered programs will be funded and delivered.**

The National Ben Gamla Jewish Charter School Foundation seeks to offer excellent academic and co-curricular programs permeated by a Jewish anthropology and rooted in Truth, Beauty, and Goodness as understood in the Jewish tradition. The School is committed to preparing students for life in today's society. Now more than ever, these two aspects of Jewish schools go hand in hand. The essential elements of the academically rigorous and doctrinally sound program require a curriculum that is rigorous, relevant, research-based, and infused with Jewish faith and traditions.

The Ben Gamla Jewish Charter School ('the School') is a Jewish community of learning committed to providing students with a rich foundation in Jewish knowledge, culture, and values. Rooted in the Jewish understanding of the human being as created b'tzelem Elohim—reflecting the Divine image—and bound in responsibility to both God and fellow human beings, the School strives to weave Jewish teachings and tradition into every dimension of its life, from curriculum to co-curricular experiences.

The School will have reminders of the Jewish calendar, and times set aside for prayer, reflection, and celebration of sacred time. In this way, the daily life of the School nudges students, parents, faculty, and staff to engage Jewish teachings thoughtfully and to consider how those teachings shape character, choice, and community.

This policy is not intended to conflict with the values or commitments of the broader Jewish community. It encompasses core Jewish teachings related to modesty, the sanctity of life, the sanctity of marriage, human dignity, and the ethical guidance our tradition offers regarding sexuality and gender. In implementing this policy, the School will look to appropriate Jewish authorities and teachings, and nothing herein is meant to contradict those foundations.

Extra or co-curricular activities will be provided by teachers in partnership with parents every school year, yet the frequency will increase after the first year of operating. These may include educational field trips and school community social events that allow students and families to come together. Examples of such events might be ice cream socials, roller skating, museum field trips, sporting events, etc. These events are to hold at least one biannual event in each quadrant of the state in the first year. As the school grows in enrollment and staff, the frequency of field trips will increase with a goal of one per month in each of the largest population hubs around the state.

Interaction on a personal level outside of academic courses is very important for students. The School administration and staff will support the creation of school clubs so students can engage with each other and pursue their individual interests in person. Some examples include an art club, chess club, yearbook, math, coding, and gaming club. The School will apply for a chapter of the National Honor Society and Junior National Honor Society so exceptional student scholars will be recognized. The School will host in-person baccalaureate with award recognition and graduation ceremonies including caps/gowns for students.

There will be some shared costs for extra or co-curricular activities. Parents will pay their student's entrance fees for access to museums, applicable educational events such as movies, museum visits, field trip admission to parks, and drinks and snacks etc. Parents will attend all school sponsored events and provide transportation for their student. The School will also offer field trips to in-state colleges and universities for high school students to explore and prepare for post- secondary learning. Teachers may collaborate with a local business to explore career options.

**Submit the curriculum guides for each core academic area and aligned with the Oklahoma Academic Standards; in the absence of curriculum guides, submit a narrative detailing the**

**curriculum development process and timeline to achieve this goal prior to the school opening.**

## Curriculum and Instructional Model

Learning environment

The Ben Gamla Jewish Charter School will provide live instruction within the system and accessed via the students' Course Dashboard. This synchronous instructional tool is used for one-on-one sessions between teacher and students as well as for collaboration among students. A teacher's virtual office houses a whiteboard, chat room, and webcams to promote collaboration. Additionally, share screen features are controlled by the teacher, and shared documents can be edited simultaneously. Within these meetings, teachers can create "breakout" rooms where collaborative groups can meet to discuss a project or work on content. Guidance for families on establishing conducive work and learning spaces at home will be shared by the classroom teacher.

Curriculum overview

The Ben Gamla Jewish Charter School proposed curriculum is innovative, rigorous, research-based, and can be custom-tailored to students' unique skills and interests. It includes world class content and college preparatory skill-building, as well as access to fine arts, world languages, and career-focused electives. The school's curriculum and instructional framework is guided by national best practices in K-12 online learning models. The curriculum design methodology uses principles of Universal Design for Learning, ensuring that both the curriculum and the instructors provide multiple opportunities for engagement, representation, as well as action and expression to ensure that students will repeat their encounters with the same topics throughout their career, each time increasing the complexity in order to reinforce previous learning, and also to reteach concepts one-on-one and in small groups to ensure mastery. Some of the proposed vendors are listed below, this list is expected to grow as research continues to be done in preparation of a virtual program:

- Core Knowledge Foundation Curriculum & Electives- Grades K-5: Accelerate Education, Grades 6-8: StrongMind and eDynamic Learning; Grades 9-12: StrongMind and eDynamic Learning;
- AP Courses- Accelerate Education
- CTE Courses- eDynamic Learning
- Credit Recovery Courses- Accelerate Education
- Supplemental Curricular Resources-iReady, Brain Pop, DIBELS, IXL, NewsELA, and Reading A-Z

The curricular offerings were selected as a curated holistic approach to instruction, and all providers have mapped the offered courses to state standards. All the selected vendors have data available to support the effectiveness of their offerings, and the school's choice of the vendors is

based on extensive evaluative information reviewed by the National Ben Gamla Jewish Charter School Foundation in proposing the education program to be offered to the Ben Gamla Jewish Charter School Board.

Each vendor aligns with the instructional methodology of the school by embedding the pedagogy of personalized learning and backward design principles in all courses. These methods are research-based and imperative for the leaders of tomorrow. Small group and individual instruction when warranted builds strong learners.

<u>Curriculum materials</u>

To address the wide range of learners at the School, a variety of standard-aligned additional resources are utilized by teachers:

- iReady- an assessment and instruction program for Math and English Language Arts that provides a diagnostic, aligned instruction, and teacher resources to help accelerate students toward grade level proficiency and beyond.
- BrainPop – an online animated curriculum-based content that is aligned to state standards. It includes videos, games, quizzes, and activities for science, health, writing, reading, social studies, and math.
- DIBELS – provides a battery of short (one minute) fluency measures that can be used for universal screening, benchmark assessment, and progress monitoring in kindergarten –3rd grade.
- IXL – an interactive online learning solution aligned to state standards that helps teachers personalize instruction through comprehensive curriculum, continuous diagnostics, and guidance for skill building.
- NewsELA – an instructional content platform that provides teachers and students with access to 20+ genres of content to support core instruction, like primary sources, reference texts, essays, fiction, issue overviews, and more at 5 reading levels.
- Reading A-Z – an instructional content platform that provides thousands of downloadable, projectable, printable teacher materials, covering all the skills necessary for effective reading instruction.
- IEW-Institute for Excellence in Writing. Using the four language arts—listening, speaking, reading, and writing—IEW methods have been proven to be effective for students of all ages and levels of ability, including those who are gifted, have special needs, or are English language learners.

Instructional strategies

The student-centered instructional method used puts students' needs at the forefront of the instructional design, allowing for them to take charge and be wholly involved in each aspect of their learning. Students can progress through their lessons at different paces based on their rate of mastery, yet the school has grading and progress expectations that all students must meet for each term. In the virtual setting, the benefit rests within the flexibility and fluidity for each student's schedule. The daily experience of a Ben Gamla School student includes scheduled live instructional sessions, scheduled small group targeted sessions, participation in Socratic discussions to improve a respect for dialogue and the improvement of oral language and critical thinking skills, and 24/7 access to asynchronous course work and supplemental curriculum resources, aligned to meet or exceed state standards. This student-centered learning approach allows for more active learning, increased comprehension, and responsibility which fosters independence, accountability, and time-management - all critical skills for higher education, the job force of today, and everyday life. Students will also have personalized learning opportunities to help them develop their own learning strategies and be engaged in the learning process by having a voice in the process.

An important addition to individualizing instruction according to student needs is that as students' progress through the digital curriculum asynchronously, the Learning Management System within captures the results of short cycle assessments in a color-coded mastery dashboard against state standards, equipping teachers with the immediate data needed to provide targeted synchronous instruction. The School instructional model plans synchronous instruction as a chance to add instructional value above and beyond what is already available in the asynchronous model. Teachers use data to determine which students need one-on-one direct instruction or small learning groups in order to both differentiate and tailor instruction to students' real-time needs. This is especially effective in remediation situations. In order to support student engagement, peer interactions will be hosted within small and large virtual classroom settings, to ensure individual attention, increased participation, and better communication.

Lastly, instruction is embedded within a Multi-Tiered System of Supports (MTSS/RtII). MTSS/RtII uses assessment, intervention, and targeted instruction to ensure the academic, social, and emotional growth of each child within three tiers - whole group, small group interventions, and individualized support.

Career Readiness and Workforce Development Program:

Oklahoma faces a critical shortage of qualified employees with the skills and training needed to fill available jobs. In February 2021, ACTE reported that 55% of jobs in Oklahoma require skills training – more education than high school but less than a four-year degree; however, only 47% of Oklahoma workers are trained at this level. The Ben Gamla Jewish Charter School career readiness program aims to help to fill these gaps. One way will be by allowing students to participate in professional online certificate programs that build real life skills that transfer to work opportunities

after graduation. These skills can help a student to continue their education while working at the same time.

The School will offer a comprehensive career readiness program that is an integrated and inclusive approach to student learning that is designed to close the skills, interest, and equity gaps in this evolving, global society. Our process will parallel the vision and goal of the Oklahoma Department of Education's Individual Career Academic Plan (ICAP) and House Bill 2155.

In order to achieve this goal, a Career Tech Education (CTE) Coordinator will be hired to formulate and administer a comprehensive CTE program across grades K-12. This includes working collaboratively with families, school leadership, student services personnel, and teachers to ensure the delivery of career development services for all students.

The CTE coordinator and school counselor will work together to develop and strengthen student's postsecondary goals; however, their roles are differentiated through the support and services provided. The school counselor provides all students with counseling that facilitates academic, career and social/emotional development, helping all students develop plans for choosing a career. The school counselor will coordinate with the CTE coordinator to advocate for career readiness opportunities, which are designed to guide students to success in their chosen careers.

The specific CTE programs of study established will be informed by input from the industry needs of the community, as well as the career interests and the location of students in the program.

The CTE coordinator will build partnerships with local industries, postsecondary institutions, and community and student organizations to foster college and career readiness. Partnering with several of the 29 career tech centers around the state, as well as Jobs for America's Graduates, will increase the total CareerTech enrollments and workforce pipeline for the state of Oklahoma.

Students will have opportunities to work together in real time using digital collaboration tools that are intentionally integrated into the curriculum in order to support both cognitive and non-cognitive skills. The School will specialize in the simulation of and/or real world, authentic learning experiences to help students develop key competencies that will allow them to thrive in the workforce. Students will have the opportunity to graduate with workplace experiences, industry recognized credentials and certificates, and/or college credits.

<u>Equipment and technology requirements</u>

All students will be provided with:

- Hardware
    - Chromebooks
    - Earbuds
    - Cellular Hot Spots (upon request/financial need/approval according to school policy)

- Software
    - Chrome OS
- GoGuardian

All school staff will be provided with:

- Hardware
    - Windows Laptop
    - External Monitor (upon request/approval)
    - Keyboard (upon request/approval)
    - Mouse (upon request/approval)
    - Headset (upon request/approval)
- Software
    - Microsoft 365 Suite
    - One Drive storage space
    - Business Intelligence (BI) Tools (One or more of the following)
        - Domo
        - PowerBI
    - High Speed Internet Connectivity (School Office Only)
    - Cisco Meraki Hardware (School Office Only)
        - Switches
        - Wireless Access Points
        - Content Filtering
    - Ring Central Telephones (School Office Only)

Students and staff are provided with:

- Software
- Google G-Suite
- Kami
- Learning Management System (LMS)

    - Instructure Canvas
- Student Information Systems (SIS) – FACTS SIS
- Web Conferencing (One or more of the following)
    - Big Blue Button
    - Zoom
- Communications – FACTS SIS
- Curriculum (One or more of the following)
- Accelerate Education
- StrongMind
- eDynamic Learning
- IXL Learning
- Raz Kids
- Brain Pop
- Moby Max
- Pear Deck
- Newsela
- Gizmos
- Overdrive
- Voyager Sopris (Dibels)
- n2y Unique
- Amplify
- Core Knowledge Foundation
- HMH, McGraw Hill
- Assessments (One or more of the following)
    - Instructure Mastery Connect
    - NWEA
    - iReady

The School will ensure that all students have access to broadband Internet to participate in the school program. This may include providing a limited number of Wi-Fi Hotspots to students that live in rural areas with no broadband providers.

Alignment with Oklahoma academic standards

As previously stated, the system includes state-of-the-art technology with state-specific reporting components, and full curriculum alignment to state standards. Curriculum vendor coursework is embedded seamlessly within the system. The School curriculum team first verifies alignment to the state standards, cross referencing with other vendors to ensure effective coverage. When the verification of alignment is completed, any gaps are identified immediately, and the School team procures supplementary materials to support mastery of each standard.

**Provide a narrative describing how financial decisions will be made which support the school's vision and mission and the academic program.**

Schools must not only have a rigorous academic program with strong leaders and teachers, they must also have a supportive culture and strong family involvement. With that in mind, we understand that one of the primary reasons why schools fail is they are not financially sound. The partnership between the Board, the school financial officer, the National Ben Gamla Jewish Charter School Foundation and the Ben Gamla Jewish Charter School is strong to ensure that the school thrives financially. The Board, the School financial officer, and the Foundation will work closely on a monthly basis to analyze financial information so the Board can make policy decisions that will both improve academic achievement and maintain the fiduciary responsibility for the school. Both the School and the Foundation have financial controls in place and are on solid footing both in cash and investment management.

The School Board of Directors is the governing body that would have oversights of the Principal/Director of the school who will work closely with the Education Management Office assigned by the Board of Directors. This will initially be the Foundation which will assist the Principal/Director of the School to manage policy, procedure, curriculum requirements, digital platform, and human resource oversight. The Principal/Director will operate the school, collaborate with the board finance chair, bookkeeper, independent School Treasurer and Encumbrance Clerk, and work with the already contracted counsel. The School Board of Directors will hold all parties accountable for the academic, operational, and financial outcomes of the School.

The School Board of Directors will provide input on the Principal/Director evaluation and the Principal/Director would evaluate the junior administrative staff and faculty of the School. The Principal/Director, working within the parameters defined by the Board of Directors and within the guidelines set by the Foundation is responsible for the overall day-to-day management of the School. The Principal/Director will preferably have master's degrees in both Education and Business and will have previously served as the principal of a similarly sized school in Oklahoma.

Prior online learning program experience is also preferred, but not required. The principal/director will be responsible for the general education program at the school, which includes, but is not limited to, ensuring that the defined instructional model is successfully implemented at the school, and supervising and evaluating the teaching staff. The principal will have prior experience as a school principal or assistant principal, preferably within the state of Oklahoma. The Business Director will be responsible for managing the non-academic operations and state reporting at the school. This person will be responsible for ensuring that students are properly enrolled in the school and that all learning and financial platforms are successfully implemented and maintained at the school. The Business Director is also responsible for ensuring that school reporting requirements are met in an accurate and timely fashion.

Other Foundation shared service positions such as a business/financial analyst, a technology manager, an HR/payroll manager, and a community/marketing manager will be assigned to the school to help with business, technology, HR, and marketing functions for the School. The primary responsibility of the School Treasurer is to receive and disburse monies of the school as provided by law and to maintain an accurate accounting of such receipts/disbursements. The School Treasurer must adhere to the principles and procedures defined in the Oklahoma Cost Accounting System (OCAS). The Encumbrance Clerk's overall responsibility is to maintain the Appropriation and Encumbrance Ledger and ensure that encumbrances do not exceed appropriations, and are for the purpose of the appropriation charged. As defined in the by-laws, The School Board of Directors Finance Director will work closely with the School Treasurer and with the School administration.

The Foundation's financial support will come from: Public charter school funding, grants from public and private sources, individual donations, corporate sponsorships where appropriate. All funds will be used exclusively to support the Foundation's educational and charitable activities.

The School will establish key institutional partners in the state, to further technical and trade opportunities to permit students to pursue workplace learning opportunities either during their time at Ben Gamla or upon graduation. The School will seek partnerships with higher education institutions to permit students to participate in Oklahoma's Promise program to enable students to take advantage of post-secondary college and career opportunities, AP Courses, early enrollment, dual credit and internships. Each student will have a College and Career Readiness Plan and the school will support students in pursuing their post-secondary goals, whether that includes entering the workforce, college enrollment, military enlistment, or other pathways. At the K-8 level, the focus is on building skill and background in the key subjects of the curriculum to allow for advancement to the next level and to develop a strong moral character in the child that will serve them well in life. We will partner with our families to ensure they have the appropriate resources to support their student's engagement and learning. This includes comprehensive student and parent onboarding programs to ensure students are ready to learn and parents are ready to support.

**Provide a financial plan for the first five (5) years of operation and a description of the treasurer, encumbrance clerk, and other financial officers or persons who have primary**

**responsibility for the finances of the proposed school. Include a description of financial controls and audit requirements.**

**Financial Management Structure, Controls, and Audit Requirements**

Financial Officers and Roles

Treasurer

The Treasurer will serve as the chief financial officer of the school and will be responsible for the overall financial integrity and stewardship of public funds. The Treasurer will oversee budgeting, financial planning, cash flow management, financial reporting, and compliance with all applicable federal, state, and local financial regulations governing charter schools.

Specific responsibilities include:

- Development and monitoring of the annual operating budget
- Oversight of all revenues and expenditures
- Review and approval of financial statements and reports
- Ensuring compliance with Generally Accepted Accounting Principles (GAAP)
- Regular financial reporting to the governing board
- Coordination with external auditors and oversight of the annual audit process

The Treasurer will work closely with school leadership and the governing board to ensure fiscal sustainability and transparency.

Encumbrance Clerk / Accounts Payable Officer

The Encumbrance Clerk will be responsible for processing purchase orders, encumbrances, invoices, and vendor payments in accordance with board-approved policies and internal controls. This role ensures that all expenditures are properly authorized, documented, and recorded prior to payment.

Responsibilities include:

- Verifying availability of funds prior to encumbering expenditures
- Maintaining accurate and timely records of encumbrances and payments
- Ensuring that expenditures align with the approved budget
- Processing vendor payments only after receipt of goods or services and appropriate approval
- Maintaining organized financial documentation for audit and compliance purposes
- Other Financial Personnel / Support Services

Depending on operational needs, the school may utilize additional financial support through:

- A part-time or contracted Business Manager

- A third-party accounting or charter support organization
- Payroll and benefits services provided by an external vendor

These individuals or firms will operate under the direction of the Treasurer and governing board and will be required to adhere to all school financial policies and internal control procedures.

Financial Controls

The proposed school will implement strong internal financial controls designed to safeguard public funds, prevent fraud or misuse, and ensure accurate financial reporting.

Key controls include:

Segregation of Duties: Financial responsibilities will be divided among multiple individuals so that no single person has control over authorization, processing, and reconciliation of financial transactions.

Board Oversight: The governing board will approve the annual budget, major contracts, and significant expenditures, and will receive regular financial reports for review.

Purchasing and Approval Processes: All expenditures will require prior approval and proper documentation, including purchase orders and invoices.

Bank Reconciliations: Monthly bank reconciliations will be performed and reviewed by an individual independent of day-to-day transaction processing.

Financial Reporting: Monthly or quarterly financial statements will be prepared and presented to the governing board, including budget-to-actual comparisons.

Written Financial Policies: The school will maintain written policies covering budgeting, purchasing, cash management, payroll, and conflict of interest.

Audit Requirements

The school will comply with all state and federal audit requirements applicable to charter schools. An independent external auditor, approved by the governing board, will conduct an annual financial audit in accordance with Generally Accepted Auditing Standards (GAAS).

Audit requirements include:

Submission of the annual audit to the governing board, authorizing agency, and other required entities

Review of audit findings and management responses by the governing board

Implementation of corrective action plans, if necessary, to address any audit findings

Ongoing cooperation with any state or authorizer-initiated financial reviews

The governing board is committed to maintaining the highest standards of financial accountability, transparency, and stewardship of public funds to ensure the long-term sustainability and mission success of the proposed charter school.

**See also attached financial plan for the first (5) years of operation and start up.*

**Provide evidence of anticipated fundraising contributions, if applicable.**

The Foundation's financial support will come from:

- Public charter school funding.
- Grants from public and private sources.
- Individual donations.
- Corporate sponsorships where appropriate.

All funds will be used exclusively to support the Foundation's educational and charitable activities.

**Describe any plans to acquire start-up funding through agreements, donations, loans, and/or long-term debt.**

See above question. There are no additional plans outside what is stated on the above question.

**Provide a description of the insurance coverage the proposed school will obtain.**

**Insurance coverage/plan**

The types and amounts of insurance coverage for the Ben Gamla Jewish Charter School will include liability, property loss, and personal injury, at a minimum.

- General Liability Insurance- $1M each occurrence, $2M Aggregate
- Directors & Officers Coverage- $1M limit
- Employment Practices Liability Coverage- $1M limit
- Umbrella Coverage- no less than $3M
- Third Party Liability Coverage
- Non-Owned/Commercial Auto Coverage
- Educators Professional Liability Insurance
- Improper Sexual Conduct Liability Supplemental coverage
- Crime Insurance- $300k limit
- Worker's Compensation
- Cyber Security Coverage

**The charter contract is between the proposed charter school's governing board and the SCSB. Governing boards are ultimately responsible for all aspects of the charter contract, school success, and timely intervention upon identifying signs of distress. Strong, independent governing boards support school leaders by providing the resources necessary to meet the needs of students. Provide a narrative describing the proposed school's governing board's capacity to achieve this expectation.**

The Ben Gamla Jewish Charter School believes that a quality school must be governed by individuals who are responsible stewards of public funding while upholding the charter's mission. The Governing Board of Directors will be professional and ethical at all times, supporting the school's mission and vision. They will provide oversight for the operations, leadership, and policies of the school. Specifically, their duties will include responsibility for ensuring legal compliance, evaluating the school leadership, setting goals for measuring academic success, allocating resources appropriately and approving an annual budget, and approving school policies and procedures. As an initial matter, the Board of Directors has assessed the School program and services to ensure alignment with its priorities. It is negotiating the management agreement so that the Board of Directors, the School and the National Ben Gamla Jewish Charter School Foundation have a clear understanding of each other's responsibilities as supporters of the school. The School will contract with an independent School Treasurer from a firm approved by the Oklahoma Department of Education. The Board of Directors will hold all responsible parties accountable for its students' academic results, including the administration, the teachers, the parents/guardians. The Foundation is responsible for initiating the support for the School under the Board of Directors direction and pursuant to the terms of the services agreement negotiated by the parties until the school is operational and on solid financial footing. The Foundation is a non-profit organization.

As cited in 70 O.S. § 5-110 (OSCN 2022), the Ben Gamla Jewish Charter School Board is committed to being knowledgeable about laws and regulations governing the school and will seek guidance from board counsel and participate in the required training requirements within 15 months of appointment/election and annually to remain in good standing. Primary training will occur within the first three years of school operations in the areas of Ethics, Open Meetings/Records and Finance by the Oklahoma State School Board Association.

Throughout the year, meetings will take place monthly. Meetings may take place virtually or in person in either Oklahoma City with some meetings based on member availability and agenda topics. Prior to the opening of the school, the Board of Directors will identify and recruit additional Board members in line with its bylaws.

The Board of Directors is fully aware of their fiduciary responsibilities and oversight for the School. Upon the application being approved, the Board of Directors will assign education management services to be provided initially by the Foundation with the option to transfer to the Ben Gamla Jewish Charter School or an outside vendor if needed in future years. This function of the board is contained within the bylaws.

Ben Gamla Jewish Charter School Board of Directors looks forward to a collaborative and transparent relationship with the Statewide Virtual Charter School Board. It will ensure staff will fulfill all pre-opening requirements so that the School is in a position to be successful upon opening. Once operating, the Principal/Director will provide a monthly report on the academic progress of students and any required operational matters. The Board of Directors will work with the School Treasurer to review the school's monthly and budget-to-actual financial position, among other key finance metrics.

The School Board of Directors is committed to being knowledgeable about laws and regulations governing the school and will seek guidance from board counsel and participate in annual training as required by Oklahoma state law. They are prioritizing diversity within their members, transparency to their stakeholders, and accountability to the Oklahoma State Virtual Charter Board as their authorizer. They will also seek to avoid conflicts of interests and keep students' academic success as a foremost priority. Like all charter schools in the state, the School Board understands that the school may be issued a school report card against state and federal accountability indicators and will also be accountable to the authorizer using the Performance Framework. Annually, the school leadership, the student education support team, and the Board will review state testing results for ways to improve student learning resulting in a board approved school improvement plan for the following school year.

The Principal/Director will provide monthly reports to the Board of Directors on student academic progress and operations. The Board of Directors with guidance from the Foundation will provide a compliance oversight role to ensure state and authorizer data reporting is done accurately and on time. The School Board of Directors will adhere to the authorizer's requirements for data and evidence collection, site visits, school website compliance checks, annual reviews, and performance reports. Sometime after the school's first year of operation, the school will seek external accreditation, as well as cooperate with the approved accreditation entity in the state of Oklahoma.

The Board of Directors understands its responsibility to adhere to all state and federal laws and regulations when managing school's finances. The Board of Directors has amended their by-laws to reflect their roles and responsibilities related to school finance. Finally, the Board of Directors understands that there are specific indicators the school will be held accountable for in the Performance Framework including:

- Audit findings
- Quarterly financial reports
- Record of financial reporting compliance

The Board of Directors is committed to academic excellence and will have an unwavering commitment to achieving the school academic goals. Each year, the Board of Directors, in collaboration with the Principal/ Director and administrative team will create a school

improvement plan based on the annual data analysis of state assessments, review of the year's benchmark assessments, and feedback from the School Improvement Team. The Continuous Improvement Plan (CIP) will contain the required components as defined by §70-5-117.4., including strategies for improving instruction. In a virtual school, that often includes discussions on the content of synchronous instructional sessions, strategies to improve student engagement, and the use of supplemental curriculum to support student learning gaps. The Board of Directors will approve the CIP and will review progress towards the academic goals at its monthly board meetings.

**Describe the proposed school's plans for providing transportation, food service, and all other significant operational or ancillary services.**

There will be some shared costs for extra or co-curricular activities. Parents will pay their student's entrance fees for access to museums, applicable educational events such as movies, museum visits, field trip admission to parks, and drinks and snacks etc. Parents will attend all school sponsored events and provide transportation for their student. The School will also offer field trips to in-state colleges and universities for high school students to explore and prepare for post-secondary learning. Teachers may collaborate with a local business to explore career options.

All field trips must have the prior approval of the principal. Field trips are a privilege afforded to students in order to extend and to supplement the curriculum and are educational in nature. They are not a right, and students may be denied participation in a field trip if they fail to meet academic or behavioral standards in the class participating in the field trip or in any other class that would be missed. Students will not be permitted to leave school for a field trip unless the School field trip permission form has been completed, signed by parent/guardian and returned to the school prior to the trip. Permission to take part in a field trip cannot be given over the telephone; only written permission via the official field trip permission form suffices.

The fee involved should be reasonable and the trip should be appropriate to the age level involved. An appropriate number of chaperones must accompany each trip, which will vary depending upon the age of the students and the nature of the trip.

The use of a school bus is the first choice for field trip transportation. If the bus is not available, parents/guardians are asked to drive vehicles and should only be assigned as many students as they have seat belts. Fifteen passenger vans may not be used. Drivers must give a copy of their valid state-issued driver's license and proof of insurance card to the school office. The School will call to verify the insurance is in effect. Drivers and chaperones must have completed the volunteer screening process and be an approved volunteer. Teachers are responsible for the collection of all fees and permission slip forms. If parents/guardians state that they cannot afford to pay, refer them to the principal.

Unscheduled stops on field trips are not permitted. Permission slips are taken on the trip and are returned to the school office after the trip. School employees are not permitted to be drivers for

the field trip and transport students in a personal vehicle. Teachers should take a first aid kit, and a student's medication with them on the trip, and then return medication to the office or parent after the trip.

**Describe the leadership and teacher employment and hiring policies expected for the proposed school.**

Many employees of the School will be employed "at-will," which means that the terms of employment may be changed with or without notice, with or without cause, including, but not limited to termination, demotion, promotion, transfer, compensation, benefits, duties, and location of work. There is no agreement expressed or implied between the School and its employees for continuing or long-term employment. At-will employees may terminate employment with the School at any time, with or without notice, and with or without cause. Likewise, the School has the right to terminate employment of an at-will employee at any time, with or without notice, and with or without cause, so long as there is no applicable violation of federal, state, or local law.

Many teachers and school administrators will be offered and accept contracts. To the extent that such contracts are consistent with the School Handbook, the Code of Conduct, and other School policies and procedures, they are binding on the relationship between employer and employee. No employment contract carries with it an expectation of continued employment beyond the contract period, and there is no agreement expressed or implied between the School and these employees for continuing or long-term employment.

**Nature of Employment Relationship**

The policies and procedures set forth in the Handbook are not intended to create an express or implied contract of employment between the School and any of its employees, nor does acceptance of the Handbook imply that an employment contract for a specific duration exists between the School and the employee.

**Hiring of Personnel**

The School makes employment decisions based upon factors such as performance, abilities, talent, effort, credentials, education, and results. The School is committed to the utilization of the capabilities and productivity of all employees without unlawful consideration of personal characteristics.

**Equal Employment Opportunity**

The School is an Equal Opportunity Employer. The School complies with all applicable local, state, and federal laws and regulations governing fair employment practices that are not inconsistent with the faith or moral teaching of the Jewish community. To the extent that local, state, and federal laws and regulations are inconsistent with the faith and moral teaching of the Jewish community, the School claims a religious exemption to such laws pursuant to the First

Amendment to the U.S. Constitution and other applicable local, state, and federal laws and regulations.

Recruitment, employment, transfer, promotion and administration of personnel policies will be done without regard to race, sex, color, national origin, citizenship, age, veteran status or mental or physical ability where the individual with a disability, with reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. The School retains its right to consider religion as a factor in employment-related decisions.

**Non-Discrimination on Basis of Disabilities**

It is the policy of the School to comply with all applicable provisions of the Americans with Disabilities Act (ADA) and state law. This act protects "qualified" individuals who have (or are perceived to have) a physical or mental impairment that substantially limits one or more major life activities. To comply with applicable laws ensuring equal employment opportunities to qualified individuals with a disability, the School will make reasonable accommodations pursuant to federal and state law for the known physical or mental limitations of an otherwise qualified individual with a disability unless "undue hardship" as defined by federal or state law would result. Applicants or employees who require accommodations in order to perform the essential functions of the job should contact their immediate supervisor to request such an accommodation. Equal employment opportunity will be extended to qualified persons with disabilities in all aspects of the employer-employee relationship, including recruitment, hiring, training, promotion, transfer, discipline, reduction in force, and termination of employment.

**Discrimination Complaints / Non-Retaliation**

Any employee who believes that he/she has been subjected to any form of discrimination should immediately advise the appropriate supervisor, who will take the report and encourage the employee to make a written statement. The employee's statement should include the specific complaint, including the name(s) of the individual(s) involved, and the name(s) of witnesses, if any, so a meaningful response may be provided. Supervisors receiving discrimination complaints are required to notify the Superintendent and Foundation Director within one working day.

A timely and thorough investigation will be conducted to attempt to resolve the situation. If it is determined that inappropriate conduct has occurred, effective remedial action will be taken commensurate with the severity of the offense. If an employee does not believe the supervisor has taken appropriate action, he/she is to contact the Foundation director directly. The Foundation strictly prohibits retaliation by management, employees or co-workers against an employee for filing a discrimination complaint. Every effort will be made to maintain confidentiality; however, in the course of the investigation some individuals may be involved on a "need-to-know" basis.

Information obtained in the course of employment (that is not generally available to the public) is considered confidential and should not be disclosed to anyone who does not have an actual "need-

to-know." Access, authorized or not, does not confer any right to disclose information. The confidentiality policy is motivated by concern and respect for an individual's right to privacy. The School acts to protect the privacy of information about employees, students, and volunteers to the best of its ability, in accordance with prevailing legal requirements.

Pursuant to the requirements of the safety policy of the Foundation, three references will be checked on all prospective employees. A written record of all reference checks will be maintained in the personnel file of each employee. The School will honor the request of referents regarding confidentiality, and employees will not have access to the written record of reference checks. A written release (given on the application for employment) will be obtained from the applicant prior to checking references. If written references are provided, additional clarification may be sought via personal or telephone interviews upon completion of a signed release from the applicant.

**Credential Review and Verification**

The candidate, at the time of application, is responsible for making available to the School verification of education and professional licenses and certifications, as well as a copy of their current driver's license and car insurance verification where it is an occupational requirement.

It is the teacher's responsibility to maintain a current license/certification for the area he/she is teaching. The latest certification must be submitted to the principal.

**Employment Forms**

Prior to employment, the applicant must complete the background check form required by the Foundation as well as forms required by licensing or accrediting agencies. Failure to complete the requisite forms may result in disqualification or termination of employment. Falsification of information on the application or other employment forms is grounds for immediate termination or disqualification from employment consideration.

**Criminal Background Reports**

Criminal background checks are required and will be run on all prospective employees and volunteers of the School. Persons convicted of crimes, including but not limited to, crimes against children or other vulnerable populations, crimes of violence, use of weapons, illegal possession of weapons, distribution of illegal drugs, or alcohol or drug related convictions may not be hired as employees or approved for volunteer service.

Employees and volunteers have a duty to self-report arrests or convictions occurring after the initial criminal background check for crimes, including but not limited to, crimes against children or other vulnerable populations, crimes of violence, use of weapons, illegal possession of weapons, distribution of illegal drugs, or alcohol or drug related convictions. Failure to self-report in and of itself is grounds for discipline, including termination of employment or discontinuance as a volunteer.

The Foundation automatically runs criminal background checks every three years on current employees and volunteers without notification to them. If the new background check indicates that an employee or volunteer has been convicted of crimes against children or other vulnerable populations, crimes of violence, use of weapons, illegal possession of weapons, illegal distribution of drugs, or alcohol or drug related crimes, the conviction or the failure to disclose such conviction will be grounds for discipline, including termination of employment or volunteer service.

**Employment of Relatives / Nepotism**

In the interest of maintaining the professionalism and integrity of relationships among staff and others, any situations in which actual or perceived conflicts of interest may exist are to be avoided. Therefore, the School will attempt to refrain from any assignments of relatives or others that may potentially lead to problems of supervision, safety, security, conflict of interest, or employee morale. For the purpose of this policy, relatives include spouses, children, parents, in-laws, grandparents, grandchildren, siblings, aunts/uncles, nieces/nephews, cousins, and step relationships. The policy is not limited exclusively to relatives and it also applies to other situations or personal relationships, including living in the same household, in which the School, in its sole discretion, believes may result in an actual or perceived nepotism or conflict of interest.

The School reserves the right to take whatever action it deems appropriate where it believes such a situation exists, including transfer, reassignment, or termination of employment. All situations involving the employment of related persons are to be approved in advance by the Foundation Director; under no circumstances can an offer of employment be extended by a relative to a related party as defined above. This Policy does not apply to temporary positions. Any questions regarding nepotism should be directed to the Principal or Foundation.

**Employment of Minors**

The School fully complies with the child labor provisions of the Fair Labor Standards Act and applicable state law which govern the employment of minors. The school will not employ youths younger than age 16.

**Probationary Period**

Per the Lay Teacher Contract during the first three (3) months of employment, the new employee is in a probationary period. The purpose of this period is to allow the employer to evaluate the employee's performance and to provide an opportunity for the employee to assess whether the School provides a suitable setting for his/her professional interests.

Notwithstanding during the probationary period, employees may terminate employment with the School at any time, with or without notice, and with or without cause. Likewise, the School has the right to terminate employment at any time with or without notice, and with or without cause.

If the School determines that the probationary period is not enough to allow a thorough evaluation of the employee's performance, the probationary period may be extended by the supervisor for a specified period.

**Posting of Employment Opportunities**

When practical, employment opportunities may be posted internally and on the School website or newspaper.

**Verification of Employment**

It is the policy of the School to verify only dates of employment and position held. Any request for salary information must be in writing with the employee's signed authorization to release such information.

**Rehire**

Former employees may be considered for rehire if the employee's record indicates good performance, behavior and attendance during their prior employment and if their termination/resignation occurred under favorable circumstances.

If an employee has terminated his/her employment with the School and is rehired, and the duration of the separation is fewer than 60 days, the employee shall retain his/her original anniversary date, and the accrual rate for vacation and sick leave (if applicable) will remain at the rate in effect upon termination of employment. Employees rehired after a separation in excess of 60 days will establish a new anniversary and benefit-eligibility date unless the separation was an approved leave of fewer than 120 days. Exceptions to this policy requires the approval of the Foundation.

**Approval for Rehire**

All transfers or rehires at a new location requires the advance approval of the superintendent.

**Outside Employment**

Employment by the School generally does not prevent employees from engaging in additional lawful employment or volunteer service. However, an employee may not engage in any employment or volunteer activity that would result in a conflict of interest with the employee's position or the policies of the Foundation or School; that would in any manner bring disrepute upon the Jewish community; constitute scandal, or otherwise conflict with the moral and theological teachings of the Judaism; or that detrimentally impacts the employee's job performance. Employees are asked to report any external employment and volunteer activity to their supervisor to determine whether a conflict of interest exists.

**Regular Full-Time**

Employees are regularly scheduled to work 30 or more hours per workweek. Regular full-time employees are entitled to School employee medical benefits, subject to the eligibility and waiting period requirements for any plan or program.

**Part-Time**

Employees are regularly scheduled to work at least 20, but fewer than 30 hours per workweek. Part-time employees are not eligible for medical benefits. Sick leave and vacation, if applicable, accrue on a prorated basis.

**Temporary Full-Time**

Employees are regularly scheduled to work 35 or more hours per week; however, the length of employment cannot extend beyond 180 days. Temporary full-time employees are not eligible for benefits other than government mandated benefits.

**Occasional Part-Time**

Employees have work schedules that change from week to week based on the needs of the School with no guarantee of a certain number of hours to be worked each week. Other than government mandated benefits, no benefits are extended to this employee classification.

**Fair Labor Standards Act**

In addition to the above-listed categories, employees are also classified, per the Fair Labor Standards Act Classification, as either non-exempt or exempt for the purpose of overtime compensation.

**Non-Exempt Employees**

Non-exempt employees include all those who are covered by the overtime provisions of state and federal law. Employees in this category are entitled to overtime pay for work in excess of 40 hours in a workweek.

**Exempt Employees**

Exempt employees include all those who are classified by the School as exempt from overtime pay under the federal Fair Labor Standards Act and related regulations, the Oklahoma Department of Labor, and the executive, administrative, or professional exemptions set forth in the above referenced legislation. Each position classified as exempt will be reviewed to assure compliance with the Fair Labor Standards Act.

**Promotions, Transfers, and Demotions**

When an employee changes positions, his/her salary may or may not be adjusted depending on the employee's current salary in relation to the responsibilities of the new position. The factors

considered in an employee's eligibility for promotions and transfers include, but are not limited to, the requirements of the new position, and the employee's education, experience, attendance, and performance history.

**Describe the proposed school's facilities plan, including backup or contingency plans if appropriate.**

The school will be virtual. It will not have physical school facilities. There will be administrative offices located in Oklahoma City (physical address to be determined at a future date) approximately 3,000 square feet.

**Describe the plans and timelines for student recruitment and enrollment, including lottery procedures.**

**Student Recruitment Policies and Procedures (including lottery procedures)**

Each year, the Ben Gamla Jewish Charter School will announce its open enrollment period for any Oklahoma parents or guardians who would like to submit an application for their student(s). These outreach activities will be conducted statewide via multiple marketing pathways. If the number of applicants exceeds the capacity of the school or grade level, the School will conduct a random selection lottery after first granting enrollment preferences for prior year students and then for a sibling of a current student enrolled in the school. As a statewide school, the School will admit any and all students who reside in the state, provided there is capacity to serve that student's grade level per the annual enrollment goals for each year. All students are welcome, those of different faiths or no faith. Admission assumes the student and family willingness to adhere with respect to the beliefs, expectations, policies, and procedures of the school as presented in the Handbook.

**Enrollment Process:**

- A parent or legal guardian should complete the digital or paper Application for Admission to the
- School to be considered in the lottery process.
- Open enrollment occurs each year in February and March of the first year and January and February in subsequent years.
- Applications submitted up to the announced enrollment decision date will be reviewed by a designee for completeness, legal residence, and age/grade of student. Incomplete application forms will not be considered.
- A child must be five (5) years of age on or before September 1 in the school year enrollment is being applied for kindergarten.
- Notification of the lottery will serve as public notice of an official meeting, even if no action(s) are anticipated to be taken by members of the Board at the time of the lottery.
- If an enrollment lottery is required, it will be conducted based on the previously described guidelines.

- Once the lottery is complete, applicants will be notified by the designee of their status.
- Digital registration will be made accessible to applicants who received enrollment offers in the lottery process. If a family requires a paper enrollment form, they will be provided one. Families will have two weeks to complete the registration accurately and thoroughly, including the submission of all compliance related documentation.
- Registrations that are not completed within the designated time, or applicants that cannot produce appropriate priority information, will forfeit enrollment offers.
- Seat placement determinations are made following receipt of the completed, compliant registration.
- If the number of lottery applications does NOT exceed seats available, parents/guardians that have submitted a lottery application have 1 week to complete registration. At the end of that week, the registration opens to the public and school enrolls until capacity.
- As openings occur post lottery, applicants on the grade level waitlist will be contacted in the established order. Registration process access will be provided. Completion of the registration process is expected in two weeks order to prompt a seat placement determination.
- The School will continue to enroll students using this process until the established enrollment number is met and maintained.
- A provision shall be made for the children with a sibling enrolled at the School. If a child must be placed on a waitlist due to capacity issues, the child with an enrolled sibling will be granted priority.

**Waitlist:**

The waitlist is the ordered list of applicant students without enrollment offers. The waitlist for each school year is initiated through the lottery process. Once all available enrollment opportunities are offered, the remaining applicant students will be added to the waitlist in the order drawn. The waitlist remains active through the academic year. The waitlist for a given year is not carried over to the next school year. A new enrollment application is required for each school year for which a student is seeking a new enrollment.

Students who wish to transfer to the School mid-school year may do so if the school has capacity to serve that student in that grade level. Otherwise, the student will be added to a waitlist for that grade level. The most successful retention plan begins by succeeding with the students that are already enrolled. By providing a high-quality, personalized educational program, sustaining relationships and connection, and meeting the needs of all students, the School will create an offering that will ensure students want to continue their success in our virtual seats. The School will track in-year and year-over-year withdrawn students. This data is not only required per Oklahoma charter school law, but it also provides the school with valuable information each year on how to better serve students and their families.

Academically successful students tend to want to stay in the school they are currently enrolled in. The Learning Management System provides a tremendous amount of data on where students spend their time in their courses and this information is valuable to get students unstuck in their learning process. We believe this, coupled with talented teachers specifically trained to serve students in this educational model, provides the best opportunity for students to be successful.

Admission/Enrollment Policies and Procedures

- Including minimum and maximum enrollment planned per year for the term of the charter contract
- Including proposed calendar and sample daily schedule as applicable to online learning at proposed school. Additional time has been added to the daily schedule to account for the religion/theology classes taught as a requirement of the school.

Instruction is delivered by the teacher via synchronous and asynchronous teacher created lessons utilizing The Foundation Standards and Benchmarks and research-based curriculum resources as guides in their creation. Teachers teach best when they have prepared their own materials with the appropriate expectations of desired rigor and classroom capability in mind.

**Provide a description of parent expectations and the plan for parental involvement.**

The Ben Gamla Jewish Charter School recognizes that parents/guardians are most engaged when they have meaningful opportunities to shape school programs and provide input. Parents/guardians will have the ability to participate in town hall type dialogue or question and answer sessions, either by grade level or as a school, with school administration periodically.

Parent/guardian input will be collected through surveying multiple times per year. The School Services Team will reach out to state and local health and family services agencies to assist families who need these services. The Board of Directors and Principal/Director will work closely to develop strategic partnerships, and to define what those strategic partnerships will involve. The school may seek partnerships with higher education institutions for teacher recruitment, and collaboration on educational research. The School may seek partnerships with high quality youth organizations. One means of stakeholder involvement is participation in the Board's regular meetings. When a board meeting notice is posted, the School draft agenda will be included so that stakeholders – as well as the public - can attend and offer public comment either generally or on a specific agenda item. The Board of Directors may also seek stakeholder comments on proposed board initiatives via a request for written comment or an invitation to provide oral comment at a board or committee meeting. Although not yet formally addressed by the Board of Directors, the Board of Directors may choose to include stakeholders on standing or ad hoc board committees. The Board is committed to continuously evaluating its efforts to promote stakeholder involvement and ensuring that stakeholders have a voice.

While the School model is based on a virtual learning experience, the School fully acknowledges that in-person engagement is essential for reaching students and families who may not have access

to online services and/or digital media. After approval, the School will hold frequent, publicly available community meetings, information sessions throughout the year, as well as using the email list serve to continue to communicate news, progress, and school achievements to interested parties in the community. Our goal is to create a network of regional support where families can support one another, identify local tutoring and mentoring opportunities, and feel affiliated with a school community.

Lastly, an integral part of supporting the school's vision and mission is preparing students for success in career and college endeavors and to build relationships and foster early opportunities for the transition after high school. Studies have shown that connection with a college and participation in dual enrollment programs increase the likelihood that students will not only graduate from high school but enroll and successfully complete undergrad and graduate programs in college. In order to cement the opportunity for future success, the School will seek collaborations with available local college and university campuses within Oklahoma.

**Enter the proposed discipline policy, including special education students.**

Student Conduct and Discipline Policies and Procedures

In order to maximize student learning for all students, the Ben Gamla Jewish Charter School will provide a virtual school environment that promotes appropriate behavior and minimizes disruptions. The Board believes that the best discipline is intrinsic and self-imposed and that students should learn to assume responsibility for their own behavior and the consequences of their actions. All students are expected to have a clear and consistent understanding of the Student Code of Conduct and comply with all School policies and procedures.

The Code of Conduct requires students to:

- conform to reasonable standards of socially acceptable behavior; including appropriate digital citizenship for themselves and others
- respect the person and property of others;
- respect the rights of others;
- preserve the degree of order necessary to the educational program in which they are engaged; and
- comply with the requests of School administrators, teachers, and staff.

The Code of Conduct designates sanctions for student noncompliance with the Code which shall:

- relate in kind and degree to the noncompliance;
- help the student learn to take responsibility for their actions; and
- be directed, where possible, to reduce the effects of any harm which may have been

- caused by the student's misconduct.

Prior to being enrolled and as a condition of enrollment, parents and students must:

- Acknowledge receipt of the Code of Conduct; and
- Agree to comply with all expectations and procedures contained therein.

The School shall not discriminate on the basis of a protected class, including but not limited to race, color, national origin, age, religion, disability that can be served by virtual learning, or biological sex in its discipline policy and practices.

The Board shall adopt procedures consistent with this policy.

1) To date, the Board has not formally adopted a Discipline Policy. However, we anticipate that the Board will adopt this or a similar policy no later than the end of the year prior to opening in the Fall of 2026.

2) The Board will formally draft a Code of Conduct that will include, but not be limited to an Attendance Policy, Engagement Policy, and general student conduct expectations (e.g., academic dishonesty, bullying and cyberbullying, acceptable use, internet use, etc.), as well as sanctions for noncompliance.

An important aim of Jewish education is the development of each person. Discipline is necessary for the development of that person. The immediate goal of discipline is to create a favorable atmosphere for learning.

The terms punishment and discipline are not synonymous, nor are they correctly used interchangeably. Whereas punishment attempts to control people by force or reprisal, discipline is an active teaching process which at its best helps students figure out how to cope with difficulties. Discipline places the burden of responsibility on the student where it belongs and provides a supportive process for helping the student make whatever changes are necessary to resolve the situation. Discipline sets consistent, firm and reasonable limits to behavior in line with student and group needs and with appropriate expectations of student and group behavior.

Students should be encouraged to develop good habits such as courtesy, respect, kindness, helpfulness, cooperation, and responsibility as well as good study habits. All of these are key to discipline, primarily self-discipline.

Each teacher is required to establish a set of classroom rules and consequences. The students should understand the meaning of these rules in the same way that the teacher does. Parents/guardians should also be given a copy of the plan at the beginning of the school year. Parents/guardians should be contacted for any behavior problems the student is encountering.

As a general rule, teachers are expected to handle the discipline problems that arise within the school day within their classroom. The principal's involvement in discipline should not be used as a threat, as it diminishes the teacher's authority. Except in cases of emergency or for immediate and serious infractions, try to notify the principal ahead of time about the possibility of being involved in a discipline situation. In cases of a severe infraction the principal should be involved immediately.

Teachers will discipline students in private with dignity and sensitivity – no physical, verbal or emotional abuse will be tolerated. Teachers will be consistent and fair in their expectations of the students.

More serious disciplinary options include lunch or after school detention, a behavior contract, suspension and expulsion.

**Elementary School**

A student should not be excluded from art, music, computers, etc. as a form of discipline or for misbehaving. Children should not be left unsupervised for student and family engagement events, as a disciplinary measure or while on a field trip. Misbehaving students should be separated from the group and placed with the teacher.

Teachers should refrain from entire class consequences or consequences that are difficult to carry out. Written consequences that allow a child to reflect upon his/her own actions are particularly useful.

Repetitive sentence writing is not allowed. Religion should never be a consequence or punishment (i.e., writing scripture verses, prayers, etc.)

**High School**

The student drug testing policy is in place to preserve the long-term welfare of the student and the entire school community. Drug testing is intended to prevent and address the personal and social ills caused by drug dependence and to help students who have abused drugs to become drug free. The School will provide a positive educational and counseling program for all students and will afford any student with a drug problem the opportunity to get the help needed. Care will be taken to respect a student’s right to confidentiality and to involve parents/guardians of the student in addressing drug abuse problems that are discovered.

The School reserves the right to dismiss immediately any student in the event of especially grave infractions of this policy or if this is determined to be in the best interest of the student body in general or the individual student in question. The cost of the random testing is absorbed by the School while the cost of reasonable suspicion testing will be the responsibility of the parent/guardian.

**Bullying / Harassment / Hazing**

All students have a right to a safe and healthy school environment free of all forms of intimidation or harassment. Bullying, harassment, hazing and/or other threatening behavior by a student will not be accepted. Students engaging in such behavior, seriously or in jest or online, may be liable to disciplinary action up to and including suspension and/or expulsion.

The principal and/or other designated administrator will investigate all complaints of bullying, harassment or any other types of threatening behavior, whether verbal, written, or online. All allegations of bullying, harassment, hazing and/or other threatening behavior will be taken seriously and investigated in a timely manner.

**Corporal Punishment**

Corporal punishment or handling students roughly is not allowed under any circumstance. Teachers who find themselves getting extremely angry or frustrated with a student, should walk away from the student. Do not touch a student when angry or extremely frustrated. Corporal punishment includes, but is not limited to: spanking, shaking, slapping, pinching, hair pulling.

**Suspension**

Certain offenses, occurring during school related activities, are considered more serious and may warrant suspension of a child. Only the principal may initiate suspension of a student which may last from one to twenty days.

**Expulsion**

While in many cases expulsion is reserved for extremely serious or persistent misconduct, a student may be expelled from school for a single instance of misconduct. Only the principal may initiate the expulsion of a student.

**Special Education**

Students may be referred for special education evaluation by their parent/guardian, teacher, or the Student Support Team (SST). The team, consisting of general education teachers, special education staff, and school administrators will regularly review data on students that are not progressing as expected. The SST will consult with the parent/guardian and address struggling students' needs through the Multi-Tiered Systems of Support/Response to Intervention and Instruction (SMTSS/RtII) process. The teacher will implement and document interventions and the student's response to interventions. If a student is referred for an evaluation, the students' response to MTSS/RtII efforts are used as one data metric in the determination of special education eligibility. These interventions will not be used to delay or deny a parent/guardian-requested special education evaluation. A student's eligibility for special education and related services will be determined through assessments administered by a school psychologist, classroom data, review of records and

parent and teacher input. The school will conduct an initial evaluation, and eligibility and related services will be determined as prescribed in 34 CFR § 300.301.

Students determined in need of itinerant or supplemental level of support will access the general education curriculum with adaptations and modifications as outlined in their IEP in the general education classroom with their typical peers. Special education and general education teachers will collaborate to make necessary adaptations and modifications. Students may receive more intense instruction in small groups (with or without general education peers) or one-on-one sessions, depending on the specific needs of the student and as described in the student's IEP. Students that qualify for the alternative state assessment, Oklahoma Alternative Assessment Program (OAAP), will utilize a comprehensive program using an alternative curriculum which will include core content, social skills instruction and daily living skills based on individual needs.

Alternative placements are considered when current educational environment is no longer meeting the needs of the student and the IEP team determines that a student needs more intensive supports and programming. Alternative placements can include center-based programs, approved private placements and/or home and hospital instruction.

**Individualized Disability Education Act (IDEA) & Section 504 Rehabilitation Act**

The Ben Gamla Jewish Charter School Board estimates that 20% of the student population will require special education support and services. This estimate is based on currently available data for statewide virtual charter schools taken from the 2021 Virtual funding report conducted by the National Association of Charter School Authorizers.

The Ben Gamla Jewish Charter School Board will comply with all applicable State and Federal Laws in serving students with disabilities, including, but not limited to, Section 504 of the Rehabilitation Act ("Section 504"), the Americans with Disabilities Act ("ADA"), the Individuals with Disabilities Education Act ("IDEA"), as well as Oklahoma Special Education Rules to the extent that it does not compromise the religious tenets of the school and the instructional model of the school. The proposed school administrative office will be ADA compliant.

After a student's application for enrollment has been confirmed, families will be given the opportunity to inform the School if their child has an IEP or 504 Plan. The parent/guardian/adult student may provide a copy of the documents, or the School will request the documents from the previous school.

Upon enrollment, the special education team will review the evaluation report and IEP from the previous school district. After consultation with the parent/guardian/adult student, the school will offer comparable services as outlined in the student's existing IEP. An IEP Team will be convened within 10 instructional days of obtainment of the IEP to adopt or amend the existing IEP. For a student with an existing 504 Plan, we will convene a 504-team meeting with the parent/guardian/adult student in a reasonable amount of time, but no later than 30 days after the obtainment of the 504 plan. In addition to being active participants in the IEP Team and 504 team

meetings, the parent/guardian/adult student will be provided with a copy of the Procedural Safeguards Notice on a yearly basis at minimum.

**Submit a roster of governing board members and contact information.**

- Peter Deutsch
- Ezra Husney
- Brett Farley

*Additional board members will be added to the roster upon approval of application.

**Submit evidence of each board member's residency.**

*See above. Additional board members will be added to the roster upon approval of application.

**Submit a proposed governing board meeting calendar.**

The board meets at 12 noon on the third Thursday of every month.

**Submit the sample daily schedule including bell schedule, class size, instructional staff to student ratio, subjects (and average time on task), recess/free time, and meals and for high schools including access to advanced placement, dual enrollment, and career and technical education.**

Instruction is delivered by the teacher via synchronous and asynchronous teacher created lessons utilizing The National Ben Gamla Jewish Charter School Foundation Standards and Benchmarks and research-based curriculum resources as guides in their creation. Teachers teach best when they have prepared their own materials with the appropriate expectations of desired rigor and classroom capability in mind. Meals and free time will be built in to the daily schedules.

Recommended Ratios & Sizes Ideal Range: Aim for 10-15 students per teacher allowing for individualized feedback, goal setting, and active participation. Upper Limit: Avoid exceeding 20-25 students per class, as interaction drops and teachers struggle to meet individual needs, making it harder for kids to grasp concepts. For Younger Grades (Primary): ratios of 12:1 or less can significantly improve teaching quality and student engagement.

Student-teacher ratios may vary by division, with figures around 20:1 to 25:1, depending on the specific school level (Elementary vs. High School), working with fewer teachers and more students per educator, around 23:1 overall, while maintaining a virtual, personalized learning model for a large student body in Oklahoma.

**Early Elementary K-3 Sample Activities:**

- Parent/guardian logs into the learning system
- learning management page will contain lessons for the day and scheduled activities including those activities to be supported by the parent/guardian and teacher.

- Teacher will provide a schedule of online live classes each day for direct instruction.
- Parent/guardian and student read together the assignments and the daily schedule
- Student and parent/guardian organize the materials for the day's lessons and begin typical early elementary activities in three to four subject areas of concentration involving perceptual-motor development, reading individually out loud, listening, reading together out loud, and basic numeracy skill development
- Student and parent/guardian attend periodic synchronous sessions via the web classroom with the teacher of record
- Student participates independently in technology supported learning games served up by the System
- Teacher verifies attendance (5.5 hours required daily)
- Teacher and Parent/guardian review progress and teacher modifies System's course pacing and supplemental lessons as needed to maximize the learning potential of the student

**Upper Elementary 4-5 Sample Activities:**

- Parent/guardian and student log into System
- System serves up lessons for the day and scheduled activities including those activities to be supported by the parent/guardian and teacher
- Teacher will provide a schedule of online live classes each day for direct instruction.
- Parent/guardian and student read together the assignments and the daily schedule
- Student and Parent/guardian organize the materials for the day's lessons and begin typical upper elementary activities in four to five subject areas of concentration involving perceptual-motor development, reading individually out loud, listening, reading together out loud, and basic numeracy skill development in addition to science, language development, and foreign language study if assigned.
- Student is introduced to age-appropriate novels and other readings and assigned reading assignments from a reading list of relevant novels
- Student interacts with technology supported learning activities designed to strengthen academic skills at a level determined by computer adaptive academic skill testing to be the appropriate level for the student.
- Teacher verifies attendance (5.5 hours required daily)
- Teacher and Parent/guardian review progress and teacher modifies System's course pacing and supplemental lessons as needed to maximize the learning potential of the student

**Middle School 6-8 Sample Activities:**

- Parent/guardian and student log into the System
- System serves up lessons for the day and scheduled activities including those activities to be supported by off-line activities and the organization of science experiments to be done in concert with the online science curriculum
- Teacher will provide a schedule of online live classes each day for direct instruction.
- Parent/guardian reviews the days lessons and activities with the student
- Five subject areas are prepared for the day's learning activities
- Student attends synchronous learning sessions present under the direction of the teacher
- Student interacts with others online in the development of group projects and assignments that require peer collaboration to complete
- Student interacts with technology supported learning activities designed to strengthen academic skills at a level determined by computer adaptive academic skill testing to be the appropriate level for the student
- Student works independently on skill and knowledge attainment assignments
- Student reviews expected outcomes for the day
- Student takes quizzes and end of unit exams to measure skill mastery and attainment based on the lessons for the day
- Student electronically submits all required written assignments to the teacher
- Teacher verifies attendance (6.75 hours required daily)
- Teacher, student and Parent/guardian review daily progress and teacher modifies System's course pacing and supplemental lessons as needed to maximize the learning potential of the student
- Parent/guardian logs into Parent/guardian System account to review progress and request assistance if needed
- Teacher meets virtually and by web conference tools with Parent/guardian and Student at least every 30 days to review monthly progress, complete required documentation, and provide academic counseling or referrals to appropriate agencies for services as needed

**High School 9-12 Sample Activities:**

- Student logs into the System

- System serves up lessons for the day and scheduled activities including those activities to be supported by off-line activities and the organization of science experiments, readings, written assignments, and synchronous activities to be done in concert with the online curriculum
- Teachers will provide a schedule of online live classes each day for direct instruction.
- Student reviews the daily lessons and activities with the Parent/guardian
- Students review expected outcomes for the day
- Five subject areas are prepared for the day's learning activities
- Student attends synchronous learning sessions present under the direction of the teacher
- Student interacts with others online in the development of group projects and assignments that require peer collaboration to complete
- Student interacts with technology supported learning activities designed to strengthen academic skills at a level determined by computer adaptive academic skill testing to be the appropriate level for the student
- Student takes quizzes and end of unit exams to measure skill mastery and attainment based on the lessons for the day
- Student electronically submits all required written assignments to the teacher
- Teacher verifies attendance (6.75 hours required daily). teacher, Student and Parent/guardian review daily progress and teacher modifies System's course pacing and supplemental lessons as needed to maximize the learning potential of the student
- Student may participate in interest clubs, student government, and intramural sports
- Student participates in community support activities
- Parent/guardian logs into Parent/guardian System account to review progress and request assistance if needed
- Teacher meets virtually and by web conference tools with Parent/guardian and student at least every 30 days to review monthly progress, complete required documentation, and provide academic counseling or referrals to appropriate agencies for services as needed.

Some students receive and execute assignments early in the morning on the same rhythm of a traditional school, but many more find their productivity is best in the afternoon or evenings. At the School, students meet according to schedule, but asynchronously learn at the times convenient to their schedules while ensuring the daily minimum of instructional hours. A weekly schedule follows what is presented in a daily schedule and is consistent over time. The Scope and Sequence of the curriculum drives what and when standards are being taught throughout the academic year.

For High School level students, progress from one grade level to another will be based on credits earned. Teachers and administrators will work to ensure that all students have access to any state allowable alternative pathways to graduation, and that any existing credit flexibility and dual enrollment options are utilized. Students who experience course failure and become credit deficient will have access to additional opportunities to recoup credits via programs such as summer school or credit recovery course work. Students (and parents) are expected to regularly consult and follow course pacing guides to ensure that all assignments and assessments are completed by the established due dates. Extensions are handled at the course level teacher's discretion. Early interventions will occur by the teacher and/or school leader when students fall behind their pacing guides, not logging in to the system or consistently failing. Contact with the parent and students will occur in various manners including electronic (email), verbal (phone/video) and in-person meetings. In order to cement the opportunity for future success, the School will seek collaborations with available local college and university campuses within Oklahoma.

The School proposed curriculum is innovative, rigorous, research-based, and can be custom-tailored to students' unique skills and interests. It includes world class content and college preparatory skill-building, as well as access to fine arts, world languages, and career-focused electives. The school's curriculum and instructional framework is guided by national best practices in K-12 online learning models. The curriculum design methodology uses principles of Universal Design for Learning, ensuring that both the curriculum and the instructors provide multiple opportunities for engagement, representation, as well as action and expression to ensure that students will repeat their encounters with the same topics throughout their career, each time increasing the complexity in order to reinforce previous learning, and also to reteach concepts one-on-one and in small groups to ensure mastery. Some of the proposed vendors are listed below, this list is expected to grow as research continues to be done in preparation of a virtual program:

- Core Knowledge Foundation Curriculum & Electives- Grades K-5: Accelerate Education, Grades 6-8: StrongMind and eDynamic Learning; Grades 9-12: StrongMind and eDynamic Learning
- AP Courses- Accelerate Education
- CTE Courses- eDynamic Learning
- Credit Recovery Courses- Accelerate Education
- Supplemental Curricular Resources-iReady, Brain Pop, DIBELS, IXL, NewsELA, and Reading A-Z

The curricular offerings were selected as a curated holistic approach to instruction, and all providers have mapped the offered courses to state standards. All the selected vendors have data available to support the effectiveness of their offerings, and the school's choice of the vendors is based on extensive evaluative information reviewed by the Foundation in proposing the education program to be offered to the School Board.

Board press release: "SCSB Cites State Supreme Court Decision in Rejecting Jewish Charter Proposal," filed below on March 24, 2026, as ECF No. 1-3 (Exhibit 3 to Complaint)

# SCSB Cites State Supreme Court Decision in Rejecting Jewish Charter Proposal

Share 4

EMAIL

Monday, February 09, 2026

The Oklahoma Statewide Charter School Board (SCSB) today unanimously voted to reject an application submitted by the Ben Gamla Jewish Charter School Foundation during its regular monthly meeting.

The Board's decision primarily was based on binding legal precedent established by the Oklahoma Supreme Court in 2024, which held that a religious charter school would be unlawful under the state's Constitution. That ruling arose from litigation involving the then Statewide Virtual Charter School Board (SVCSB) and Oklahoma Attorney General Gentner Drummond, who sued the SVCSB over its 2023 approval of a proposed virtual charter school by the Roman Catholic Archdiocese of Oklahoma City and the Diocese of Tulsa.

The Oklahoma Supreme Court sided with Drummond. The SCSB appealed to the U.S. Supreme Court, asserting that the state Constitution excluding religious organizations from operating publicly funded charter schools solely because of their religious status raised federal constitutional questions under the Free Exercise Clause.

-

On May 22, 2025, the U.S. Supreme Court issued a 4–4 split decision with one justice recusing, resulting in the Oklahoma Supreme Court's ruling being affirmed due to an "equally divided (U.S. Supreme) Court."

"I believe the Board was placed in a difficult position," said SCSB Chairman Brian Shellem. "While we value innovation, parental choice, and high-quality educational opportunities for families, we are unfortunately bound by the Oklahoma Supreme Court ruling from 2024, even if we disagree with it."

Shellem said that he welcomes actions from the Legislature, Ben Gamla, and those who believe the laws in Oklahoma should align with the U.S. Constitution. Ultimately, he added, he hopes the issue makes it back to the U.S. Supreme Court because the lack of judicial consensus demands the need for legal clarity and precedent.

“Merit should be the deciding factor if a charter is awarded to an applicant. Families deserve more high-quality, publicly funded schools from which to choose and our nation’s collective future depends on improving its education system,” he said. “Alienating proven, successful partners runs contrary to us achieving that goal, which is why this deserves resolution at the highest level with the U.S. Supreme Court.”

Last Modified on Feb 09, 2026

# Board notice of first rejection of Ben Gamla's application for initial authorization, filed below on March 24, 2026, as ECF No. 1-4 (Exhibit 4 to Complaint)

OKLAHOMA
Statewide Charter
School Board

February 13, 2026

Mr. Brett Anthony Farley
Ben Gamla Jewish Charter School
20183 Highlander Ridge Dr.
Edmond, OK 73012

Dear Mr. Farley,

In accordance with 70 O.S. § 3-134(E)(3) and OAC 777:10-3-3, this letter serves as written notice of the Statewide Charter School Board's rejection of your application. The Board met on Monday February 9, 2026, at 1:00 p.m. for its regularly scheduled meeting at the Oklahoma History Center, 800 Nazih Zuhdi Drive in Oklahoma City, Oklahoma, to consider, among other agenda items, the Ben Gamla Jewish Chater School's application for initial authorization. In a 8-0 vote, the Board voted to reject the application.

Strengths of the application were acknowledged at the public board meeting, however Board action was taken to reject the application with a unanimous vote by the quorum of board members present at the February 2026 regular public board meeting.

As required by title 70, section § 3-134(E)(3) of the Oklahoma Statutes, the Board provides you with the following reasons for rejection:

1. The application refers to the governing board holding virtual meetings which does not comply with the Open Meeting Act, 25 O.S. §§ 301–314, as required in under title 70, section § 3-136(A)(15).

2. The school's governing board structure does not comply with title 70, section 3-136(A)(7) of the Oklahoma Statutes because two board members reside outside of Oklahoma. Section 3-136(A)(7) requires all board members to be Oklahoma residents.

3. The governing board of the school is currently comprised of three (3) board members, and there is no indication that these board members will have a child or grandchild attend the school. School governing boards are required to include five (5) members, with 1 being a parent, grandparent, or guardian of a student attending or who previously attended the charter school under OKLA. ADMIN. CODE § 777:10-1-3(c)(3).

4. The description of the relationship between the foundation and the school indicates concerning overlap similar to that of an Educational Management Organization that operates and manages a school without a clear separation between the organizations such as contractor and vendor as required under OKLA. ADMIN. CODE § 777:10-1-4(1).

OKLAHOMA Statewide Charter School Board

5. The application states that the Board has not adopted a formal disciplinary policy and, as a result, did not include a discipline policy in its application as required by title 70, section 3-134(B)(18) of the Oklahoma Statutes.

6. Without an approved disciplinary policy included in the application, the Board cannot verify that the school will follow student suspension requirements set forth in title 70, sections 24-101.3 and 3-136(A)(11) of the Oklahoma Statutes.

7. The statement of assurances required of governing board members by OKLA. ADMIN. CODE § 777:10-3-3(b)(8)(L) (requiring governing board members to assure full compliance with federal and Oklahoma law) were modified to caveat compliance and afford legal latitude.

8. The special education component of the application caveats compliance by disclaiming "so long as compliance does not compromise Ben Gamla's religious tenets and instructional model." This does not comply with title 70, section 3-136(A)(6) of the Oklahoma Statutes.

9. Between the letter of intent and application, material discrepancies in grades served and projected enrollment exist. Specifically, these are:

    a. In the letter of intent submitted on November 3, 2025, you indicated that the school would serve grades 9–12 and anticipated a 40-student enrollment initially.

    b. In the application submitted on December 30, 2025, you stated that the school would serve grades K–12 (adding a total of nine other grades) and anticipated a target enrollment of 400—10 times the amount set forth in the letter of counsel. For grades 9–12, the target enrollment was 160—four times the amount set forth in the letter of intent.

10. Title 70, section 3-136(A)(2) of the Oklahoma Statutes states, "A charter school shall be nonsectarian in its programs, admission policies, employment practices, and all other operations. A sponsor may not authorize a charter school or program that is affiliated with a nonpublic sectarian school or religious institution." The Oklahoma Supreme Court issued an opinion in 2024, Drummond.v¡.Oklahoma.Statewide.Virtual.Charter.Sch¡.Bd¡?2024 OK 53, 558 P.3d 1, holding, "Under Oklahoma law, a charter school is a public school and, as such, must be nonsectarian." Finally, the U.S. Supreme Court in consolidated cases 24-394 and 24-396 ordered that the judgment of the Supreme Court of Oklahoma is affirmed.

Title 70, section 3-134(E)(3) of the Oklahoma Statutes permits a governing board for the proposed school to address the rejection of the application through revision, resubmission, and reconsideration of the application provision. For reconsideration, a revised application must be received by the SCSB within thirty (30) days from receipt of notification of the rejection of the application. The certified mail signature date will be considered the date of notification. After receipt of the revised application, the SCSB would have an additional thirty (30) days from the

OKLAHOMA
Statewide Charter
School Board

receipt to reconsider the revised application. Should questions arise, please contact the SCSB office.

Sincerely,

Skyler H. Lusnia

Skyler H. Lusnia CPA, CIA
Director of School Performance
Statewide Charter School Board
2501 N. Lincoln Blvd. Ste 201
Oklahoma City, OK 73105
405.331.0381
skyler.lusnia@SCSB.ok.gov

# Ben Gamla's addendum to application for initial authorization, filed below on March 24, 2026, as ECF No. 1-5 (Exhibit 5 to Complaint)

February 27, 2026

Oklahoma Statewide Charter School Board
M.C. Connors Building
2501 N. Lincoln Blvd., Suite 201
Oklahoma City, OK 73105

Dear Members of the Oklahoma Statewide Charter School Board:

On behalf of The National Ben Gamla Jewish Charter School Foundation, Inc. (the "Applicant"), we respectfully submit the attached Addendum for your consideration as a revision to the original charter application for Ben Gamla Jewish Charter School, pursuant to Title 70, Section 3-134(E)(3) of the Oklahoma Statutes. This submission is intended to satisfy the concerns outlined in the Board's February 13 rejection letter and to provide clarification and additional documentation responsive to the issues identified therein.

As set forth in our Letter of Intent, Ben Gamla Jewish Charter School seeks authorization to establish a virtual public charter school serving students statewide. The school's vision is that Oklahoma students will gain a rigorous, values-based education that integrates general academic excellence with Jewish religious learning and ethical development. Its mission is to provide an online program for grades K–12 delivering Oklahoma's state-approved academic standards alongside Jewish religious studies, enabling students to achieve college readiness while developing deep Jewish knowledge, faith, and values within a supportive learning community. The attached Addendum reaffirms and clarifies how this mission will be implemented in full compliance with Oklahoma and federal laws.

While it is our aim in the attached Addendum to fully satisfy the concerns identified by the Board and staff, we also wish to reiterate our clear intent to pursue approval and launch of Ben Gamla Jewish Charter School consistent with the mission detailed in our Letter of Intent. We remain committed to delivering a high-quality virtual instructional model that blends synchronous and asynchronous learning; aligns college-preparatory coursework with Oklahoma Academic Standards; provides structured systems for attendance, engagement, and accountability; and offers appropriate student services across a statewide platform. We further affirm our commitment to governance, fiscal transparency, and operational readiness consistent with all statutory and regulatory requirements governing statewide charter schools.

We appreciate the Board's careful review of our application and its stated concerns, and we welcome continued engagement to ensure that all statutory and compliance standards are fully met. We remain prepared to provide any additional information or clarification the Board may require during this reconsideration process. Further, should the Board desire a full revised application, we are prepared to make this available upon request.

Thank you for your time and thoughtful consideration.

Respectfully submitted,



Peter Deutsch
For The National Ben Gamla Jewish Charter School Foundation, Inc.
P.O. Box 817689
Hollywood, FL 33081
Email: prdeutsch1@gmail.com
Phone: 954-232-9579

**Addendum to Ben Gamla Jewish Charter School**
**Revised Application for Initial Authorization**

The following are offered in response to the ten reasons for rejection of the Ben Gamla Charter School Application for Initial Authorization:

*1.The application refers to the governing board holding virtual meetings which does not comply with the Open Meeting Act, 25 O.S. §§ 301–314, as required in under title 70, section § 3-136(A)(15).*

**Response**

The Board affirms that, upon authorization by the Oklahoma Statewide Charter Board, the Governing Board for Ben Gamla Jewish Charter School will cease all virtual meetings and commence public meetings in compliance with Oklahoma's Open Meetings Act pursuant to all provisions in 25 O.S. §§ 301–314, as required in under title 70, section § 3-136(A)(15).

*2. The school's governing board structure does not comply with title 70, section 3-136(A)(7) of the Oklahoma Statutes because two board members reside outside of Oklahoma. Section 3-136(A)(7) requires all board members to be Oklahoma residents.*

**Response**

In compliance with 70, section 3-136(A)(7), the following Oklahoma residents are the current members of the Ben Gamla Jewish Charter School and additional Oklahoma members will be added:

1.Brett Farley (parent)

2.James Timberlake

3.Brandy Belding

4.Robert Ruiz

5.Kandice Jeske

6.Mike Lapolla

7.Tzvi Meth

*3. The governing board of the school is currently comprised of three (3) board members, and there is no indication that these board members will have a child or grandchild attend the school. School governing boards are required to include five (5) members, with 1 being a parent, grandparent, or guardian of a student attending or who previously attended the charter school under OKLA. ADMIN. CODE § 777:10-1-3(c)(3).*

**Response**

See above indication for "parent".

*4. The description of the relationship between the foundation and the school indicates concerning overlap similar to that of an Educational Management Organization that operates and manages a school without a clear separation between the organizations such as contractor and vendor as required under OKLA. ADMIN. CODE § 777:10-1-4(1).*

**Response**

The Board attests that The National Ben Gamla Jewish Charter School Foundation, Inc. maintains clear separation from the Governing Board for the Ben Gamla Jewish Charter School. Further, we affirm that upon authorization, the Governing Board will engage an approved Educational Management Organization as required by OKLA. ADMIN. CODE § 777:10-1-4(1) and the draft contract for that proposed engagement will be submitted to the SCSB for approval in advance of execution as required by Oklahoma statute and in accordance with the Oklahoma Charter School contract template provision 6.1.6.

*5. The application states that the Board has not adopted a formal disciplinary policy and, as a result, did not include a discipline policy in its application as required by title 70, section 3-134(B)(18) of the Oklahoma Statutes.*

**Response**

See disciplinary policy attachment #1.

*6. Without an approved disciplinary policy included in the application, the Board cannot verify that the school will follow student suspension requirements set forth in title 70, sections 24-101.3 and 3-136(A)(11) of the Oklahoma Statutes.*

**Response**

See suspension requirements attachment #2.

*7. The statement of assurances required of governing board members by OKLA. ADMIN. CODE § 777:10-3-3(b)(8)(L) (requiring governing board members to assure full compliance with federal and Oklahoma law) were modified to caveat compliance and afford legal latitude.*

**Response**

See attached Statements of Assurance for the members of the Governing Board pursuant to OKLA. ADMIN. CODE § 777:10-3-3(b)(8)(L).

*8. The special education component of the application caveats compliance by disclaiming "so long as compliance does not compromise Ben Gamla's religious tenets and instructional model." This does not comply with title 70, section 3-136(A)(6) of the Oklahoma Statutes.*

**Response**

The Board attests that Ben Gamla Jewish Charter School will comply with all federal and state laws relating the education of children with disabilities in the same manner and instructional model as an Oklahoma public school district including, but not limited to: The Individuals with Disability Education Act (IDEA), 20 USC §§ 1400-1482; Section 504 of the Rehabilitation Act of 1973 [29 USC § 794]; Title II of the Americans with Disabilities Act; and Policies and Procedures of the Oklahoma State Department of Education for Special Education in Oklahoma.

*9. Between the letter of intent and application, material discrepancies in grades served and projected enrollment exist. Specifically, these are:*

a. *In the letter of intent submitted on November 3, 2025, you indicated that the school would serve grades 9–12 and anticipated a 40-student enrollment initially.*

b. *In the application submitted on December 30, 2025, you stated that the school would serve grades K–12 (adding a total of nine other grades) and anticipated a target enrollment of 400—10 times the amount set forth in the letter of counsel. For grades 9–12, the target enrollment was 160—four times the amount set forth in the letter of intent.*

**Response**

Our Letter of Intent (see attachment #3) indicated a plan to provide online education for grades 9-12. In the course of preparation of our application and after significant internal discussion, the Board resolved that providing a fuller offering for grades K-12 represents a more robust and meaningful education program for Ben Gamla Jewish Charter School. Moreover, offering a fuller educational system that exposes students to rigor and academic standards of excellence in the earlier years better prepares them for performance in grades 9-12.

*10. Title 70, section 3-136(A)(2) of the Oklahoma Statutes states, "A charter school shall be nonsectarian in its programs, admission policies, employment practices, and all other operations. A sponsor may not authorize a charter school or program that is affiliated with a nonpublic sectarian school or religious institution." The Oklahoma Supreme Court issued an opinion in 2024, Drummond.v¡.Oklahoma.Statewide.Virtual.Charter.Sch¡.Bd¡?.2024 OK 53, 558 P.3d 1, holding, "Under Oklahoma law, a charter school is a public school and, as such, must be nonsectarian." Finally, the U.S. Supreme Court in consolidated cases 24-394 and 24-396 ordered that the judgment of the Supreme Court of Oklahoma is affirmed.*

**Response**

As indicated in our cover letter, the Board reaffirms our commitment to provide a rigorous, values-based education that integrates general academic excellence with Jewish religious learning and ethical development. It is our sincere hope that members of the Oklahoma Statewide Charter Board will recognize our sincere mission to expand quality educational opportunities in Oklahoma with the same level of rigor and academic standards that have marked similar awardwinning charter schools in Florida.

**Attachment #1**

## STUDENT CONDUCT, BEHAVIOR AND DISCIPLINE

The Ben Gamla Jewish Charter School is committed to providing an environment where students can learn, grow, and interact in ways that promote academic success, personal responsibility, and community well-being. Expectations outlined below apply to all students across virtual platforms, school-sponsored activities, and in-person events.

These policies at Ben Gamla function as a preventative and instructional framework that establishes clear expectations for student conduct and reinforces positive behaviors across the school community. Rather than reacting to misconduct alone, the policy emphasizes teaching and supporting behaviors that contribute to a healthy school culture.

Ben Gamla students are expected to align their actions with three guiding values:

Be Respectful
Be Responsible
Be Resilient

These expectations apply in academic settings, online platforms, school events, and interactions with peers and staff.

Being Respectful includes attentive listening, following instructions, engaging appropriately during virtual sessions, supporting classmates, and maintaining punctuality for both virtual and in-person activities.

Being Responsible requires students to manage their academic and behavioral obligations. This includes submitting coursework by weekly deadlines, completing benchmark assessments on time, attending required virtual sessions, responding to school communications, and accepting accountability for behavior during school-sponsored events.

Being Resilient reflects perseverance and adaptability. Students show resilience by continuing effort when work becomes challenging, seeking assistance from Teachers or Community Family Advisors, asking questions, reviewing feedback to improve performance, completing assignments despite setbacks, and engaging confidently with new peers.

Teachers and staff consistently observe and reinforce positive behavior aligned with Ben Gamla values. Students who demonstrate these attributes may receive recognition or rewards. Learning Coaches are encouraged to collaborate with teachers to support and reinforce positive conduct.

## DIGITAL CONDUCT AND K-12 EXPECTATIONS

Appropriate Online Behavior

All students using online platforms are expected to conduct themselves in ways that promote a positive digital learning experience.

Students should:

- Communicate respectfully
- Maintain a constructive attitude
- Treat others with kindness
- Offer assistance when appropriate
- Participate responsibly and enjoy learning

Students should avoid:

- Negative or harmful language
- Profanity or inappropriate expressions
- Any form of online cruelty
- Cyberbullying Prohibited

Cyberbullying includes actions such as intimidation, threats, misuse of another person's login credentials, spreading false or harmful information, sharing offensive images or videos, and engaging in inappropriate discussions or messages. Any online behavior intended to harm, embarrass, or disrupt another individual is not permitted.

## HARASSMENT AND BULLYING PREVENTION

Ben Gamla strictly forbids harassment and bullying in all forms. Staff receive ongoing training to recognize, respond to, document, and report incidents.

Students and Learning Coaches are informed of bullying prevention strategies and school policies through ongoing education, including virtual sessions.

Bullying is defined as repeated conduct—verbal, physical, emotional, social, sexual, or electronic—that targets an individual or group and results in, or is intended to result in, emotional distress, physical harm, or interference with educational participation. Bullying may be directed toward students, staff, or administrators.

Students are encouraged to report bullying whether they experience it directly or witness it occurring. Reports may be made to a Community Advisor, counselor, principal, or other school personnel. All reports are investigated and addressed in accordance with Ben Gamla policy and state law.

## SCHOOL-SUPPORTED EVENTS AND CONDUCT EXPECTATIONS

Students attending school-sponsored activities must follow all behavioral expectations. Disruptive actions such as threatening conduct, physical altercations, or inappropriate language will result in immediate parent notification.

A three-strike system may be applied for minor behavioral violations, potentially resulting in suspension from future in-person events. However, severe infractions —including weapon

possession, drug violations, or serious bullying—are subject to immediate disciplinary action without warning.

## DRESS STANDARDS

Attire worn at in-person school functions must be appropriate, modest, and non-disruptive. Clothing that creates safety concerns or discomfort for others is not permitted. Certain events, such as graduation ceremonies, may require specific dress guidelines.

## ACCOUNT ACCESS AND ACADEMIC COMPLIANCE

A student account may be locked when school staff have made multiple unsuccessful attempts to address urgent concerns such as missed academic deadlines, poor Live Class attendance, or failure to participate in required state testing.

Account access will be restored once the student completes the necessary corrective steps, which may include completing assessments, scheduling a Back on Track meeting, or attending required testing. Students or Learning Coaches who are unsure how to resolve an account lock should immediately contact their Community Advisor.

## WEAPONS AND THREATENING BEHAVIOR

The possession, use, transfer, or display of any weapon—or any item reasonably perceived as a weapon—at any Ben Gamla-sponsored in-person activity is grounds for immediate expulsion.

Weapons include firearms, objects designed or used to cause bodily harm, and imitation or look-alike weapons. Items such as bats, bottles, sticks, locks, pipes, pencils, or pens may be classified as weapons if used or intended to cause harm. Self-defense devices are not permitted at school events.

Threats involving weapons or violent language may result in similar disciplinary consequences. Law enforcement or juvenile authorities will be notified as required. The Head of School or designee may review cases individually.

## DRUGS, ALCOHOL, AND PROHIBITED SUBSTANCES

Ben Gamla maintains a strict alcohol- and drug-free environment. The possession, use, distribution, or sale of illegal drugs, controlled substances, alcohol, mood-altering substances, or prohibited materials is not allowed on school property, during virtual sessions, or at any school-sponsored activity.

Improper use or distribution of prescription or over-the-counter medications is also prohibited. Marijuana use or possession is forbidden in all school-related contexts, including transportation vehicles.

Violations may result in immediate expulsion and notification of law enforcement. The Head of School may consider modifying consequences based on individual circumstances.

## TOBACCO-FREE POLICY

Ben Gamla is dedicated to promoting student and staff health by maintaining a tobacco-free environment. Tobacco products of any kind are prohibited on school property, during virtual sessions, and at school-sponsored events.

Students found using or possessing tobacco products at school-related activities may face expulsion and potential involvement of juvenile authorities.

Final disciplinary decisions may be reviewed by the Head of School.

## VAPING PROHIBITION

The use, possession, promotion, or distribution of vaping devices or vaping related products is strictly forbidden in all Ben Gamla learning environments— virtual and in-person.

Prohibited items include e-cigarettes, vape pens, mods, cartridges, e-liquids (with or without nicotine), and all related accessories. This policy applies regardless of student age and covers classes, events, extracurricular activities, and any Ben Gamla-affiliated function.

Violations may result in disciplinary action including parent notification, educational interventions on vaping risks, suspension from activities, or referral to law enforcement. Counseling and prevention resources are available through school wellness programs.

## GANG-RELATED ACTIVITY PROHIBITION

Gang involvement or gang-associated behavior is not permitted at any Ben Gamla school activity or event. Such behavior is considered dangerous, disruptive, and inconsistent with the school's mission.

Students engaging in gang-related conduct may face suspension, disciplinary consequences, or criminal charges depending on the severity of the behavior.

Reporting Requirements

In accordance with Section 650.7 of Title 21 of the Oklahoma Statutes, school employees who reasonably suspect gang involvement by a student under eighteen must notify the designated school authority. That authority may contact local law enforcement. Reports may be made verbally, in writing, or through district-approved methods.

Employees or contractors acting in good faith are protected from civil or criminal liability related to such reports.

**Attachment #2**

## STUDENT DISCIPLINE, REMOVAL, AND DUE PROCESS GUIDELINES

## GENERAL AUTHORITY AND DISCIPLINARY OVERSIGHT

Maintaining a safe, orderly, and productive virtual learning environment requires clearly defined disciplinary authority. The Principal, or a designated administrator, may impose a short-term suspension lasting up to ten (10) school days. The Principal has authority to impose long-term suspensions or expulsions of up to eighty (80) school days, and in certain cases, up to one (1) calendar year.

Beginning with the applicable school year, students enrolled in grades kindergarten through three shall not be subjected to out-of-school suspension or expulsion except under limited circumstances. These include incidents involving firearms, knife offenses, bomb threats, criminal acts resulting in serious bodily injury or substantial property damage, or situations in which removal is necessary to protect the immediate safety of the student, peers, or school personnel.

A student may not be suspended or expelled solely due to unexcused absences from virtual instruction.

## EMERGENCY REMOVAL IN A VIRTUAL SETTING

If the Principal or designee determines that a student's continued participation in live virtual sessions or school-sponsored activities presents a health concern, poses a threat to individuals or property, or substantially disrupts the educational process, the student may be temporarily removed from participation without completing the full suspension or expulsion procedure beforehand.

For students in grades kindergarten through three, emergency removal will typically apply only for the remainder of the school day, and the student may resume participation the next school day unless further disciplinary review is warranted.

For students in grades four through twelve, removal from virtual classes or activities requires prompt notice and a follow-up opportunity for a hearing on the next school day.

## FIREARMS, KNIVES, AND SERIOUS OFFENSES

A mandatory expulsion of one (1) year shall be imposed for bringing a firearm to any school-sponsored activity, field trip, interscholastic event, extracurricular function, or any location being used for an official School program.

Expulsion for a period not exceeding one (1) year may also be imposed for:

- Possessing or introducing a firearm at a School-related activity
- Bringing a knife to a School-sponsored event
- Possessing a firearm or knife at a School function, even if another individual originally introduced the item

- Committing an act that would constitute a serious criminal offense if committed by an adult and that results in major physical injury or significant property damage
- Issuing a bomb threat connected to a School activity or event

A firearm includes any weapon designed to expel a projectile by explosive action, including starter guns, frames or receivers, silencers, and destructive devices such as bombs, grenades, rockets exceeding four ounces of propellant, missiles with more than one-quarter ounce of explosive charge, mines, or similar devices.

A knife refers to any sharp-bladed instrument capable of inflicting serious bodily harm.

## MODIFICATION OF ONE-YEAR EXPULSIONS

The Principal may adjust a mandatory one-year expulsion under specific circumstances, including but not limited to:

- Recommendations from individuals knowledgeable about the student's needs under the Individuals with Disabilities Education Act
- Evidence that the student did not realize they possessed the prohibited item
- Evidence that the student did not understand the item qualified as a firearm or knife
- Situations where the item was brought as part of an educational activity without awareness of its prohibited status
- Eligibility for placement in an alternative program

## ADDITIONAL GROUNDS FOR EXPULSION OR SUSPENSION

Students may be expelled for up to eighty (80) school days for substantial misconduct, serious rule violations, or other justified reasons.

During any period of suspension or expulsion, students may not participate in live virtual sessions, extracurricular programs, field trips, or other School-related events without express permission from the Principal. Participation in schoolsponsored functions during disciplinary periods requires administrative approval.

## INSTRUCTIONAL ACCESS DURING DISCIPLINE

Students assigned in-school suspension will participate in a structured, supervised virtual learning setting and may complete academic assignments missed due to the disciplinary action.

For out-of-school suspensions, the Board authorizes continued access to instructional materials. Educational services may include online assignments, tutoring sessions, completion of exams or quizzes, written reflections related to the behavior incident, and graded coursework. Students must be given the opportunity to complete missed assignments and earn at least partial credit. Grades may be adjusted due to the disciplinary status; however, completed work will not automatically receive a failing grade solely because of the suspension.

The Principal may extend all or part of an expulsion into the subsequent school year.

If an out-of-school suspension occurs within the final ten (10) school days of the academic year, it will not carry forward into the next school year. Instead, alternative consequences—such as community service or other approved assignments—may be required during the first full weekday of summer break. Failure to complete assigned consequences may result in further administrative action, though not automatic carryover of the suspension.

## EXTRACURRICULAR PARTICIPATION

Participation in co-curricular and extracurricular activities is considered a privilege. The Principal may prohibit a student from involvement in some or all extracurricular activities based on misconduct. The duration of such restriction will reflect the seriousness of the behavior and will align with the Code of Conduct. Because extracurricular involvement is not a right, notice and appeal procedures are not required for such restrictions.

## ALTERNATIVE CONSEQUENCES

The Board authorizes the Principal to assign community service or other restorative measures either alongside or instead of suspension or expulsion, except in cases involving mandatory firearm expulsion.

## APPEAL STRUCTURE

For suspension appeals, the Board will designate a representative for appeals of expulsion. Decisions shall be heard by a designee who had no involvement in the original expulsion determination.

The Board will be responsible for ensuring that all disciplinary actions comply with applicable laws and this policy.

## DUE PROCESS: SUSPENSION PROCEDURES

The following procedures apply to out-of-school suspensions (not in-school suspensions):

Before a suspension is imposed, the student will receive written Notice of Intent outlining:

**The reasons for the proposed suspension**

If applicable, and if the student is age sixteen (16) or older, notice that permanent exclusion may be pursued for certain serious criminal offenses

Students will have an opportunity for an informal conference with the Principal or designee to respond to the allegations. Witnesses are not permitted at this informal meeting.

When feasible, and for students in grades kindergarten through three, consultation with a contracted mental health professional will occur prior to suspension. If additional mental health services appear necessary, assistance will be provided to parents or guardians in identifying available providers, without financial obligation to the School.

Within one school day of imposing suspension, written notice will be sent to the parent, guardian, or custodian explaining:

- The reason for suspension
- The right to appeal to the Board of Directors or its designee within fourteen (14) days
- The right to representation
- The right to request a hearing, including executive session

## DUE PROCESS: EXPULSION PROCEDURES

Only the Principal has authority to expel a student.

Prior to expulsion:

- Written notice of intent to expel must be delivered to both the student and parent/guardian.

The notice must state:

- The grounds for the proposed expulsion
- The date, time, and location (virtual or otherwise) of the hearing, scheduled no sooner than three (3) and no later than five (5) school days after notice, unless extended at the family's request
- If applicable, notice of possible permanent exclusion for students age sixteen (16) or older

For students in grades kindergarten through three, consultation with a mental health professional will occur when feasible, and families will be assisted in locating appropriate services if needed.

A formal hearing will allow the student and family to present their response before the Superintendent.

Within one school day following an expulsion decision, written notice will be provided to the parent/guardian and the Board of Directors detailing:

- The reasons for expulsion
- The right to appeal within fourteen (14) days
- The right to representation
- The right to request executive session
- If applicable, notice of potential permanent exclusion

When expulsion exceeds twenty (20) days or extends into a new semester or school year, families will also receive information about community-based programs designed to address behavioral concerns.

The Principal must complete expulsion proceedings even if the student withdraws before the hearing concludes.

**PROHIBITION OF CORPORAL PUNISHMENT**

Under no circumstances shall teachers, administrators, non-licensed employees, or transportation personnel use corporal punishment as a disciplinary measure.

Reasonable physical intervention may be used only when necessary to prevent imminent injury, secure dangerous objects, defend oneself, or protect individuals or property during a disturbance at a school-sponsored activity.

**Attachment #3**

November 3, 2025

Oklahoma Statewide Charter School Board
M.C. Connors Building
2501 N. Lincoln Blvd., Suite 301
Oklahoma City, OK 73105

Dear Members of the Statewide Charter School Board,

On behalf of The National Ben Gamla Jewish Charter School Foundation, Inc. (the "Applicant"), I am pleased to submit this Letter of Intent to Apply for Authorization to establish Ben Gamla Jewish Charter School, a virtual public charter high school serving students across the State of Oklahoma beginning in the 2026–27 school year.

Vision. Ben Gamla envisions Oklahoma students gaining a rigorous, values-based education that integrates general academic excellence with Jewish religious learning and ethical development.

Mission. Ben Gamla will provide an online grades 9–12 program delivering Oklahoma's state-approved academic standards alongside Jewish religious studies, enabling students to achieve college readiness while developing deep Jewish knowledge, faith, and values within a supportive learning community.

Grades to be Served & Growth. The school will open as a high school (grades 9–12) and will remain a high school. We anticipate an initial enrollment of approximately 40 students across grades 9–12, with growth expected as awareness of the program expands.

Instructional Emphasis. Ben Gamla's virtual program will blend synchronous and asynchronous instruction, featuring:

- College-preparatory coursework aligned to Oklahoma Academic Standards;
- Daily Jewish religious studies (text, practice, ethics) delivered by qualified instructors;
- Individualized supports, advising, and co-curricular enrichment accessible online;
- Robust student attendance, engagement, and assessment systems appropriate to a statewide virtual high school.
- Applicant Information & Organizational Readiness.
- Applicant/Operator: The National Ben Gamla Jewish Charter School Foundation, Inc.
- Incorporation: Filed with the Oklahoma Secretary of State on June 5, 2025; nonprofit entity in goodstanding (EIN pending; the Foundation will pursue 501(c)(3) recognition).

- Training: A member of the founding team will complete the required Charter School Applicant Trainingprior to submission of the full application.
- Board/Founding Team (initial):
- Peter Deutsch — Yale Law graduate; former Member of the U.S. House of Representatives; founderof Ben Gamla Hebrew language and culture charter schools in Florida.
- Brett Farley — Executive Director, Catholic Conference of Oklahoma; background in policy, advocacy,and organizational leadership.
- Ezra Husney — Yale Law graduate; experience in religious-freedom law (including federal clerkship).

In submitting this Letter of Intent, the Applicant affirms its capacity and commitment to develop a complete application that details governance, academics, operations, finance, virtual-school compliance (attendance, accountability, and student services), and all other requirements of the Oklahoma Statewide Charter School Board.

Thank you for your consideration. We look forward to engaging with the Board and staff during the upcoming authorization cycle.

Sincerely,

Peter Deutsch
For The National Ben Gamla Jewish Charter School Foundation, Inc.
P.O. Box 817689 • Hollywood, FL 33081
Email: prdeutsch1@gmail.com • Phone: 954-232-9579

Board notice of second rejection of Ben Gamla's application for initial authorization, filed below on March 24, 2026, as ECF No. 1-6 (Exhibit 6 to Complaint)

Appellate Case: 26-6166 Document: 26 Date Filed: 11/08/2026 Page: 174

OKLAHOMA
Statewide Charter
School Board

March 10, 2026

Mr. Brett Anthony Farley
Ben Gamla Jewish Charter School
20183 Highlander Ridge Dr.
Edmond, OK 73012

Dear Mr. Farley,

In compliance with 70 O.S. § 3-134 and OAC 777:10-3-3, the Statewide Charter School Board (SCSB) met on Monday, March 9, 2026, at 1:00 p.m. in a regular open meeting held at the Oklahoma History Center located at 800 Nazih Zuhdi Drive in Oklahoma City, Oklahoma to consider the Ben Gamla Jewish Chater School Revised Application for Initial Authorization submitted to the SCSB on February 17, 2026.

Board action was taken to reject the application with a unanimous vote by the quorum of board members present at the February 2026 regular public board meeting.

The following reason for rejection was cited: Chapter 70-3-136 of the Oklahoma Charter Schools Act states, "A. Beginning July 1, 2024, a written contract entered into between the Statewide Charter School Board and the governing board of a charter school or statewide virtual charter school or a written contract entered into between a sponsor and the governing board of a charter school shall ensure compliance with the following: 2. A charter school shall be nonsectarian in its programs, admission policies, employment practices, and all other operations. A sponsor may not authorize a charter school or program that is affiliated with a nonpublic sectarian school or religious institution." Further, the Supreme Court of Oklahoma in case number 121694 concluded, "Under Oklahoma law, a charter school is a public school and, as such, must be nonsectarian." Finally, the Supreme Court of the United States in cases numbered 24-394 and 24-396 ordered and adjudged that the judgement of the Supreme Court of Oklahoma is affirmed.

Should questions arise, please contact the SCSB office.

Sincerely,

Skyler H. Lusnia CPA, CIA
Director of School Performance
Statewide Charter School Board
2501 N. Lincoln Blvd. Ste 201
Oklahoma City, OK 73105
405.331.0381
skyler.lusnia@SCSB.ok.gov

# Ben Gamla's Motion for Preliminary Injunction, filed below on March 27, 2026, as ECF No. 10

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., *et al.*,

*Plaintiffs*,

v.

GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma, *et al.*,

*Defendants*.

Case No. 5:26-cv-00582-R

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs the National Ben Gamla Jewish Charter School Foundation, Inc. ("Ben Gamla"), and Peter Deutsch hereby move this Court to preliminarily enjoin Defendants from enforcing Okla. Stat. Ann. tit. 70, § 3-136(A)(2) to exclude Plaintiffs from participating in Oklahoma's charter school program on account of their religious status, beliefs, or practices. Plaintiffs respectfully request that this Court set a hearing date as soon as practicable and issue an order by May 22—before the end of the public school year. A decision on this timeline would give parents time to make plans for the upcoming school year and allow Ben Gamla adequate time to prepare and start operations.

As described in more detail in the accompanying memorandum, Plaintiffs seek to form a Jewish virtual charter school to promote outstanding academic and co-curricular programs infused with the Jewish understanding of the human person and grounded in the

enduring Jewish values of truth (*emet*), beauty (*yofi*), and goodness (*tov*). But Oklahoma law categorically excludes religious schools from eligibility in its charter school program. *See* Okla. Stat. Ann. tit. 70, § 3-136(A)(2).

That is unconstitutional. The Supreme Court has made clear that governments cannot exclude otherwise eligible individuals and institutions from public benefit programs solely because they are religious unless the law satisfies strict scrutiny. *See, e.g.*, *Carson v. Makin*, 596 U.S. 767, 778-81 (2022). And binding Supreme Court precedent forecloses any argument that Defendants possess a sufficiently compelling interest to justify the restriction here. *See id.* at 780-81.

Nor is it true that Ben Gamla is engaged in state action. Again, controlling precedent establishes that a Ben Gamla school—a privately operated religious school organized under Oklahoma law for exclusively educational, charitable, and religious purposes—would not be transformed into a state actor merely because it contracted with the state to provide educational services. *See, e.g.*, *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982).

**WHEREFORE**, Plaintiffs pray that this Court grant a preliminary injunction in this action. This request is based on this Motion; the accompanying supporting Opening Brief; the supporting declarations and exhibits of Eric Baxter and Peter Deutsch; as well as the papers, evidence, and records on file in this action; and any other written or oral evidence or argument as may be presented at or before the time this motion is heard by this Court.

Dated: March 27, 2026

Respectfully submitted,

/s/ Eric S. Baxter
Eric S. Baxter
DC Bar No. 479221
Eric C. Rassbach
TX Bar No. 24013375
Daniel L. Chen
DC Bar No. 1781783
Phillip J. Allevato*†
CA Bar No. 362581
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
(202) 955-0095
*ebaxter@becketfund.org*

**Application pro hac vice to the Western District of Oklahoma pending.*

*†Not a member of the DC Bar; admitted in California. Practice limited to cases in federal court.*

Robert G. McCampbell
OBA No. 10390
David A. Herber
OBA No. 33527
GABLEGOTWALS
499 W. Sheridan Ave., Suite 2200
Oklahoma City, OK 73102
Tel 405-235-5500
*RMcCampbell@Gablelaw.com*

*Attorneys for Plaintiffs*

# Ben Gamla's Brief in Support of Motion for Preliminary Injunction, filed below on March 27, 2026, as ECF No. 11

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., *et al.*,

*Plaintiffs*,

v.

GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma, *et al.*,

*Defendants*.

Case No. 5:26-cv-00582-R

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**Hearing and Ruling Requested by May 22, 2026**

Robert G. McCampbell
OBA No. 10390
David A. Herber
OBA No. 33527
GABLEGOTWALS
499 W. Sheridan Ave., Suite 2200
Oklahoma City, OK 73102
Tel 405-235-5500
*RMcCampbell@Gablelaw.com*

Eric S. Baxter
DC Bar No. 479221
Eric C. Rassbach
TX Bar No. 24013375
Daniel L. Chen
DC Bar No. 1781783
Phillip J. Allevato*†
CA Bar No. 362581
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
(202) 955-0095
*ebaxter@becketfund.org*

**Application pro hac vice to the Western District of Oklahoma pending.*

*†Not a member of the DC Bar; admitted in California. Practice limited to cases in federal court.*

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

FACTS ..... 2

A. Oklahoma's Charter School Act ..... 2

B. The National Ben Gamla Jewish Charter School Foundation ..... 4

C. *Drummond* and the OCSA's nonsectarian requirement ..... 6

D. The Board denies Ben Gamla's application based on *Drummond* ..... 7

LEGAL STANDARD ..... 10

ARGUMENT ..... 10

I. Ben Gamla is likely to succeed on the merits. ..... 10

A. The Board's denial violates the Free Exercise Clause. ..... 10

1. The Board's denial violates *Carson* ..... 10

2. The Board's denial fails strict scrutiny. ..... 12

3. Ben Gamla is not a state actor. ..... 13

a. Binding precedent holds that Ben Gamla is not a state actor. ..... 13

b. *Drummond* is wrong and does not control. ..... 17

c. Multiple circuit courts have rejected *Drummond's* reasoning. ..... 19

II. The remaining factors favor granting a preliminary injunction. ..... 21

CONCLUSION ..... 23

CERTIFICATE OF SERVICE ..... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
103 F.4th 765 (11th Cir. 2024) .......... 22

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999) .......... 15, 16

*Ark. Writers' Project, Inc. v. Ragland*,
481 U.S. 221 (1987) .......... 7

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) .......... 22

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001) .......... 14, 15, 18

*Carson v. Makin*,
596 U.S. 767 (2022) .......... 10, 11, 12, 19

*Catholic Benefits Ass'n LCA v. Sebelius*,
24 F. Supp. 3d 1094 (W.D. Okla. 2014) .......... 10

*Caviness v. Horizon Cmty. Learning Ctr., Inc.*,
590 F.3d 806 (9th Cir. 2010) .......... 19, 20

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) .......... 12

*Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) .......... 22, 23

*Does 1-11 v. Bd. of Regents of Univ. of Colo.*,
100 F.4th 1251 (10th Cir. 2024) .......... 10, 22, 23

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
356 F.3d 1256 (10th Cir. 2004) .......... 22

*Dutcher v. Matheson*,
840 F.3d 1183 (10th Cir. 2016) .......... 13, 17

*Espinoza v. Mont. Dep't of Revenue*,
591 U.S. 464 (2020) .......... 11

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) .......... 12

*Giri v. Nat'l Bd. of Med. Examiners*,
718 F. Supp. 3d 30 (D.D.C. 2024) .......... 23

*Hobby Lobby Stores, Inc. v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013) .......... 10, 21, 23

*Jackson v. Metro. Edison Co.*,
419 U.S. 345 (1974) .......... 15, 18, 19

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995) .......... 17-18

*Lindke v. Freed*,
601 U.S. 187 (2024) .......... 17

*Logiodice v. Trs. of Me. Cent. Inst.*,
296 F.3d 22 (1st Cir. 2002) .......... 16, 20, 21

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) .......... 22

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) .......... *passim*

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 23

*Oklahoma Statewide Charter Sch. Bd. v. Drummond*,
605 U.S. 165 (2025) .......... 7

*Polk County v. Dodson*,
454 U.S. 312, 317-20 (1981) .......... 18

*Rendell-Baker v. Kohn*,
457 U.S. 830 (1982) .......... *passim*

*Robert S. v. Stetson Sch., Inc.*,
256 F.3d 159 (3d Cir. 2001) .......... 16, 21

*RoDa Drilling Co. v. Siegal*,
552 F.3d 1203 (10th Cir. 2009) ........ 22

*Santiago v. Puerto Rico*,
655 F.3d 61 (1st Cir. 2011) ........ 16

*St. Isidore of Seville Catholic Virtual Sch. v. Drummond*,
145 S. Ct. 1134 (2025) ........ 7

*Drummond ex rel. State v. Oklahoma Statewide Virtual Charter Sch. Bd.*,
558 P.3d 1 (Okla. 2024) ........ *passim*

*TMJ Implants, Inc. v. Aetna, Inc.*,
498 F.3d 1175 (10th Cir. 2007) ........ 13, 17

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017) ........ 11

*West v. Atkins*,
487 U.S. 42 (1988) ........ 15, 16

*Zelman v. Simmons-Harris*,
536 U.S. 639 (2002) ........ 12

**Statutes & Constitutions**

Okla. Stat. Ann. tit. 70, § 3-130 ........ 2

Okla. Stat. Ann. tit. 70, § 3-131 ........ 2, 3

Okla. Stat. Ann. tit. 70, § 3-132 ........ 15

Okla. Stat. Ann. tit. 70, § 3-134 ........ 2

Okla. Stat. Ann. tit. 70, § 3-136 ........ 2, 3, 4

Okla. Stat. Ann. tit. 70, § 3-142 ........ 3, 12-13

U.S. Const. amend. XIV, § 1 ........ 13

**Other Authorities**

Okla. Statewide Charter Sch. Bd., *OKSCSB Meeting: 01/12/26* (Jan. 12, 2026) ........ 7

Okla. Statewide Charter Sch. Bd., *OKSCSB Meeting: 02/09/26* (Feb. 9, 2026) .......... 8

Okla. Statewide Charter Sch. Bd., *OKSCSB Meeting: 03/09/2026* (Mar. 9, 2026) .......... 9

## INTRODUCTION

This case poses a simple yet recurring question: can the government exclude religious institutions from a public benefit because of their religion? The Supreme Court has repeatedly said no, rejecting states' attempts to exclude religious schools, parents, and students from publicly available benefits solely based on their religion. Yet after each ruling, many states have sought to continue excluding religious schools.

Following *Trinity Lutheran*, Montana claimed it could exclude schools based on their religious use of state funds, shuttering its entire scholarship program to accomplish that goal. The Supreme Court reversed in *Espinoza*. Following *Espinoza*, Maine asserted that it could exclude religious schools because they were functionally part of Maine's public-school system. The Supreme Court rejected that argument in *Carson*. And now, Oklahoma contends that it must exclude religious schools because by contracting with the state to provide a free education with public funds, these privately owned and operated religious schools somehow become state actors engaged in state action.

Defendant Oklahoma Statewide Charter School Board felt constrained by the Oklahoma Supreme Court's decision in *Drummond ex rel. State v. Oklahoma Statewide Virtual Charter School Board*, 558 P.3d 1 (Okla. 2024), which forbade religious charter schools from receiving funding. So it denied the application of Plaintiff National Ben Gamla Jewish Charter School Foundation, Inc. to form an Oklahoma charter school, arguing that a private, religious school formed around the Jewish faith would be engaged in state action.

But *Drummond* was wrongly decided and is not binding on this Court. The decision violates U.S. Supreme Court precedent on the Free Exercise Clause, the Establishment Clause, and the state-action doctrine. The proposed private Jewish school would in no way be engaged in state action merely because state law labels its conduct "public." Nor does the fact that the school would contract with Oklahoma to provide educational services transform it into an arm of the government.

Constitutional analysis turns on substance, not labels, and the state-action doctrine must not be extended to trample religious liberty. The Establishment Clause does not apply to Ben Gamla, and the Free Exercise Clause protects it. This Court should therefore grant a preliminary injunction and allow Ben Gamla to participate in Oklahoma's charter school program.

## FACTS

### A. Oklahoma's Charter School Act

In 1999, the Oklahoma Legislature passed the Oklahoma Charter Schools Act ("OCSA" or "the Act"). Okla. Stat. Ann. tit. 70, § 3-130. The Act invites any qualified "private college or university, private person, or private organization" to apply for state funding to operate a charter or virtual charter school. *Id.* § 3-134(C). The OCSA's express purposes are, in part, to "[e]ncourage the use of different and innovative teaching methods," "[p]rovide additional academic choices for parents and students," and "[e]stablish new forms of accountability for schools." *Id.* § 3-131. For these reasons, Oklahoma allows private institutions substantial flexibility to run charter schools. *Id.* § 3-136(A)(1), (3). Indeed, subject to some exceptions, virtual charter schools in Oklahoma are "exempt from

all statutes and rules relating to schools, boards of education, and school districts." *Id.* § 3-136(A)(1).

Practically, this means charter schools need not follow Oklahoma's core curriculum requirements and may instead craft "a curriculum which emphasizes a specific learning philosophy or style or certain subject areas." *Id.* § 3-136(A)(3). Instead of being subject to a publicly appointed school board, a charter school is run by a private "governing board" "which shall be responsible for the policies and operational decisions of the charter school." *Id.* § 3-136(A)(7). And charter schools are also free to adopt their own "personnel policies, personnel qualifications, and method of school governance." *Id.* § 3-136(C). State funding of charter schools is directly tied to enrollment. *Id.* § 3-142(A), (C). A charter school "receive[s] the State Aid allocation … and any other state-appropriated revenue generated by its students for the applicable year." *Id.* § 3-142(A).

The OCSA characterizes charter schools as "public" in the sense that they are "free" to all students and "supported by public taxation." *Id.* § 3-136(A)(9); *id.* § 1-106. But charter schools are not "public" in the sense that the government operates and runs them, as it does with traditional public schools. Indeed, Oklahoma does not require any student to attend a charter school. And because charter schools are owned and operated by private parties, they are not traditional public schools. In fact, the whole purpose of creating charter schools is to provide alternatives to the public schools. *Id.* § 3-131. And the OCSA has successfully done just that, sparking innovation and expanding parental choice by funding a diverse range of private institutions. Publicly funded charter schools include those focused on

science, the fine arts, language immersion, cultural awareness, tribal identity, classical education, and more. Ex. 1 ("Baxter Decl.") ¶ 7; Ex. 1-C.

The state, however, has categorically forbidden one type of private entity from participating in the charter school program: religious groups. The OCSA expressly requires that a charter school be "nonsectarian in its programs, admission policies, employment practices, and all other operations." Okla. Stat. Ann. tit. 70, § 3-136(A)(2). This "nonsectarian" requirement means that "[a] sponsor may not authorize a charter school or program that is affiliated with a nonpublic sectarian school or religious institution." *Id.*

**B. The National Ben Gamla Jewish Charter School Foundation**

In December 2025, Plaintiff Peter Deutsch, a former Democratic congressman from Florida, founded the National Ben Gamla Jewish Charter School Foundation, Inc. ("Ben Gamla") in Oklahoma. Deutsch is a member of Ben Gamla's board. Shortly after it was formed, Ben Gamla applied to charter the Ben Gamla Jewish Charter School ("Ben Gamla School" or "the School"). Ben Gamla School is designed to be a private religious school organized under Oklahoma law for exclusively educational, charitable, and religious purposes. Although Ben Gamla is the charter sponsor, the School would contract with an educational management agency to oversee the establishment and ongoing operations of the school.

As part of Ben Gamla's distinctive religious mission, students will receive instruction in Jewish religion, culture, values, rituals, texts, holidays, and practices. Ex. 2 ("Deutsch Decl.") ¶¶ 26, 30; Ex. 2-A at 4. This includes the study of *mitzvot* (commandments), the call of *tikkun olam* (shaping the world toward justice, compassion, and godliness), and

other Jewish traditions and religious practices. Deutsch Decl. ¶ 30; *see also* Ex. 2-A at 3-4. Furthermore, Ben Gamla's academic and co-curricular programs are grounded in the enduring Jewish values of truth (*emet*), beauty (*yofi*), and goodness (*tov*), and the School is committed to preparing students to engage thoughtfully and confidently in contemporary society. Deutsch Decl. ¶ 29; *see also* Ex. 2-A at 5. Ben Gamla believes that because G-d created the universe and orders all within it, a Jewish perspective permeates all subjects, including academics, and unifies all knowledge. Deutsch Decl. ¶ 27; *see also* Ex. 2-A at 3.

Ben Gamla's application explained that while also furthering its religious mission, the School will promote academic excellence using best practices in general and virtual education. Ex. 2-A at 4. Ben Gamla noted that it will abide by and satisfy all the OCSA's requirements, except the condition that Ben Gamla abandon its religious identity and mission to qualify as a charter school. Deutsch Decl. ¶ 36.

This is not Deutsch's first venture into the charter school space. In 2006, Deutsch founded the National Ben Gamla Charter School Foundation in Florida ("Ben Gamla Florida"). Ben Gamla Florida's mission is to "provide a safe environment for innovative instructional practices that continuously light the path toward maximum student achievement and personal growth." Deutsch Decl. ¶¶ 11, 14.

Ben Gamla Florida opened its first charter school in Florida in 2007 and now operates a network of four charter schools across the state. *Id.* ¶¶ 11-12. These schools were the first English-Hebrew charter schools in the United States and integrate instruction in Hebrew language, culture, and history throughout their curricula to give all students a useful tool in our global society. *Id.* ¶ 14. The Ben Gamla Florida schools are dedicated to the driving

principle of charter schools: to exercise autonomy and choice related to curriculum delivery, parent involvement, discipline, and special programs in order to reach maximum student achievement and personal growth. *Id.* The schools have been widely recognized for the quality of their education, and many students remain on their waiting lists each year. *Id*. ¶¶ 18-22. The Ben Gamla Florida schools, however, do not integrate Jewish religious values into their curriculum. *Id.* ¶ 17.

**C. *Drummond* and the OCSA's nonsectarian requirement**

In 2023, the predecessor to the Statewide Charter School Board approved an application for a Catholic school, St. Isidore of Seville Catholic Virtual School. *Drummond*, 558 P.3d at 6-7 ¶ 5. In approving the application, the Board relied on earlier guidance from the Oklahoma Attorney General that the OCSA's nonsectarian requirement violated the federal Constitution. But upon taking office, the new Attorney General—Defendant Drummond—sought a writ of mandamus from the Oklahoma Supreme Court to bar St. Isidore's charter, claiming that chartering St. Isidore would violate the OCSA, the Oklahoma Constitution, and the federal Constitution. *Id.* at 7 ¶ 8.

In a split decision, the Oklahoma Supreme Court agreed. *Id.* It concluded that—by contracting with the state to provide a "*free public* education"—St. Isidore became a state actor. *Id.* at 12 ¶ 30. That, according to the Court, meant that St. Isidore's religious mission, beliefs, and practices violated the OCSA and the Oklahoma Constitution's bar on aid to "sectarian" institutions, as well as the federal Constitution's Establishment Clause. *Id.* at 9-14 ¶¶ 15, 27, 29-31, 34, 37, 41. And because the Court found St. Isidore to be engaged

in state action, it held that the United States Supreme Court's free exercise cases like *Carson, Espinoza*, and *Trinity Lutheran* were irrelevant. *Id*. at 14-15 ¶¶ 42-44.

St. Isidore and the Board sought writs of certiorari from the United States Supreme Court. *St. Isidore of Seville Catholic Virtual Sch. v. Drummond*, 145 S. Ct. 1134 (2025); *Okla. Statewide Charter Sch. Bd. v. Drummond*, 145 S. Ct. 1134 (2025). The Supreme Court granted and consolidated the cases and received full briefing and oral argument. But after a recusal from Justice Barrett, the Supreme Court affirmed the Oklahoma Supreme Court in a split 4-4 *per curiam* decision. *Oklahoma Statewide Charter Sch. Bd. v. Drummond*, 605 U.S. 165 (2025). Under longstanding Supreme Court precedent, a split decision of this sort does not constitute precedent. *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 234 n.7 (1987) ("Of course, an affirmance by an equally divided Court is not entitled to precedential weight.").

**D. The Board denies Ben Gamla's application based on *Drummond***

The Board held a hearing on January 12, 2026, where Deutsch made an oral presentation in support of Ben Gamla's application, explained his expertise in running successful charter schools, and noted how he wanted to bring that experience to Oklahoma. Okla. Statewide Charter Sch. Bd., *OKSCSB Meeting: 01/12/26*, at 1:42:38-1:59:22 (Jan. 12, 2026), https://www.youtube.com/live/AknrUunlTIY; Baxter Decl. ¶ 2.

On February 9, the Board held a hearing and rejected Ben Gamla's application. Board members explained that they felt compelled to do so because of the *Drummond* decision and Ben Gamla's religious character. For example, Defendant Gardenhire remarked that the Board's "hands are tied" by the "writ of mandamus from the state Supreme Court," so

any other potential issues with Ben Gamla's application were "immaterial to the discussion." Okla. Statewide Charter Sch. Bd., *OKSCSB Meeting: 02/09/26*, at 2:20:03-18 (Feb. 9, 2026), https://www.youtube.com/watch?v=_CxrYka29tY; Baxter Decl. ¶ 3. Gardenhire also noted that other publicly-funded schools, specifically one focused on Native American culture, "[also] had essentially a cultural-spiritual component embedded within it to honor the culture and spirituality of Native Americans, and the school operated that way, and nobody raised any concerns at that point." *Id.* at 2:20:51-2:21:39. He explained that he didn't think Ben Gamla was "materially different," and he was "troubled" by that unequal treatment. *Id.*

Other Board members agreed with Gardenhire. Defendant Rutkauskas stated that even though "the Ben Gamla Jewish Charter School has an excellent reputation in Florida" and "do[es] a fantastic job," "our hands are tied most definitely." *Id.* at 2:21:49-2:22:18. "The decision today won't be because they are not a good candidate or qualified or a school that I think would bring tremendous assets to the State of Oklahoma." *Id.* Defendant Tomcho similarly said, "Regardless of this school's reputation or whatever strengths that it has, we have to follow the law and right now the law says no." *Id.* at 2:29:44-52.

The Board then unanimously denied the application, citing the reasons stated on the record, namely the Oklahoma's Supreme Court's decision in *Drummond*. *Id.* at 2:30:20-2:31:03. The Board issued a press release stating that the Board's "decision primarily was based on binding legal precedent established by the Oklahoma Supreme Court in 2024, which held that a religious charter school would be unlawful under the state's Constitution." Ex. 1-A at 1; Baxter Decl. ¶ 5. On February 13, 2026, the Board formally

denied the charter, citing a handful of minor deficiencies, as well as the Oklahoma's Supreme Court's decision in *Drummond*. Ex. 2-B; Deutsch Decl. ¶ 40.

On February 27, Ben Gamla filed a revised application with the Board, curing all deficiencies noted by the Board, except its noncompliance with the OCSA's nonsectarian requirement. At its regular meeting on March 9, the Board discussed the revised application. The Board's staff noted that Ben Gamla "was found to have sufficiently resolved 9 out of the Board's 10 concerns." Okla. Statewide Charter Sch. Bd., *OKSCSB Meeting: 03/09/2026*, at 1:10:08-1:11:26 (Mar. 9, 2026), https://www.youtube.com/watch?v=6hd17f_KoIw; Baxter Decl. ¶ 4. But "there is one item—the requirement to be nonsectarian—that the revised application does not resolve." *Id.* The Board therefore voted unanimously to deny Ben Gamla's application based solely on the religious character of the proposed School. *Id.* at 1:16:20-1:19:20. On March 10, Defendant Lusnia sent an official letter formally denying Ben Gamla's application due to the School's religious character. Ex. 2-D; Deutsch Decl. ¶ 43.

On March 24, Ben Gamla filed this lawsuit. Dkt. 1. Ben Gamla now moves for a preliminary injunction allowing it to participate in Oklahoma's charter school program without having to surrender its religious mission. Ben Gamla respectfully requests that this Court set a hearing date as soon as practicable and issue an order by May 22, 2026—before the end of the public school year. A decision on this timeline would give parents time to make plans for the upcoming school year and allow Ben Gamla adequate time to prepare and start operations.

## LEGAL STANDARD

A preliminary injunction is warranted when a plaintiff shows (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent relief, (3) that equities favor relief, and (4) that relief is in the public interest. *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1267 (10th Cir. 2024); *see also Catholic Benefits Ass'n LCA v. Sebelius*, 24 F. Supp. 3d 1094, 1102 (W.D. Okla. 2014). All four requirements are met here.

## ARGUMENT

### I. Ben Gamla is likely to succeed on the merits.

This Court should grant preliminary relief because Ben Gamla is likely to succeed on the merits of its Free Exercise claim. Indeed, "in First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

#### A. The Board's denial violates the Free Exercise Clause.

##### 1. The Board's denial violates *Carson*.

Denying Ben Gamla access to a publicly available benefit—here, the right to form and operate a publicly-funded private charter school—violates *Carson v. Makin*, 596 U.S. 767 (2022). In *Carson*, Maine offered a "tuition assistance" program to families in rural areas without access to public high schools, allowing those families to choose a private school for their children at state expense. *Id.* at 771-73. Citing the Establishment Clause, however, Maine limited parents to using the tuition assistance at "nonsectarian school[s]."

The Supreme Court rejected Maine's arguments, holding that disqualifying religious schools "solely because of their religious character" violated the Free Exercise Clause. *Id.* at 780 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017)). By "'condition[ing] the availability of benefits' in that manner, Maine's tuition assistance program … 'effectively penalize[d] the free exercise' of religion." *Id.* The Court further held that "a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Id.* at 778. The cases *Carson* relied upon, *Trinity Lutheran* and *Espinoza v. Montana Department of Revenue*, both stand for the "unremarkable" principle that conditioning public benefits based on religion violates the Free Exercise Clause. *Id.* at 779.

In *Trinity Lutheran*, Missouri denied a religious school generally available funds for rubber playground resurfacing because of the school's "religious status." 582 U.S. at 458. In *Espinoza*, Montana prohibited parents from using a state scholarship program to send their children to any school controlled by a "church, sect, or denomination." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 468 (2020). In both cases, the Court held that "laws that impose special disabilities on the basis of religious status" also impose "a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Id.* at 475 (quoting *Trinity Lutheran*, 582 U.S. at 462).

This "unremarkable" principle applies with equal force here. Oklahoma has chosen to partner with private organizations through a generally available government program. As in *Carson*, this program is open to a "wide range" of private entities. 596 U.S. at 780. Yet, also as in *Carson*, the state here conditions this benefit on an applicant's religious status

and exercise. *Id.* at 781. Because this "special disability" disqualifies religious entities "solely because they are religious," it "must be subjected to 'the strictest scrutiny.'" *Id.* at 780.

**2. The Board's denial fails strict scrutiny.**

To survive strict scrutiny, a government policy must advance "interests of the highest order" and be "narrowly tailored to achieve those interests." *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021) (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)). The Board's potential governmental interests include (1) enforcing the no-aid provisions in the OCSA and Oklahoma's Constitution, and (2) not violating the Establishment Clause. Neither interest is compelling, so Oklahoma fails strict scrutiny.

As to the interest in enforcing the no-aid provisions, the Supreme Court has repeatedly held that "such an interest in separating church and state more fiercely than the Federal Constitution cannot qualify as compelling in the face of the infringement of free exercise." *Carson*, 596 U.S. at 781 (cleaned up) (collecting cases). "A State's antiestablishment interest does not justify enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." *Id.*

Nor does the second interest fare any better. "[A] neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." *Id.* (citing *Zelman v. Simmons-Harris*, 536 U.S. 639, 652-53 (2002)). Here, any public funds flow to Ben Gamla only through the individual choices of families, as in *Zelman*. *See* Okla. Stat. Ann. tit. 70,

§ 3-142(A), (C). No parent is required to send their child to Ben Gamla or any Oklahoma charter school. Thus, this phantom Establishment Clause interest cannot justify Ben Gamla's religious exclusion.

**3. Ben Gamla is not a state actor.**

**a. Binding precedent holds that Ben Gamla is not a state actor.**

The Free Exercise Clause thus forbids excluding Ben Gamla from Oklahoma's charter school program. Previously, the Oklahoma Supreme Court relied on the state-action doctrine to do just that. *Drummond*, 558 P.3d at 9. But controlling precedent establishes that the Ben Gamla School and other Oklahoma charter schools are not engaged in state action. The Oklahoma Supreme Court was thus wrong in *Drummond*. And "[i]t is beyond cavil that [federal courts] are not bound by a state court interpretation of federal law." *Dutcher v. Matheson*, 840 F.3d 1183, 1195 (10th Cir. 2016) (collecting cases). Indeed, "[a] federal court … owes no deference to state-court interpretation of the United States Constitution." *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1181 (10th Cir. 2007).

The Fourteenth Amendment applies to actions of a "State." U.S. Const. amend. XIV, § 1. Thus, the "state-action doctrine distinguishes the government from individuals and private entities." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019). That doctrine, when properly applied, "protects a robust sphere of individual liberty." *Id.*

The controlling case is *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982). There, the Supreme Court concluded that a privately operated school that contracted with the state to educate troubled high school students was not a state actor. *Id.* at 839-43. Even though the state provided "virtually all" of the school's funding and subjected the school to "detailed

regulations concerning" anything from "recordkeeping to student-teacher ratios" to "personnel policies," the school was not a governmental actor. *Id.* at 831-36, 840. Rather, the school was a "private institution … operated by a board of directors, none of whom are public officials or are chosen by public officials." *Id.* at 832, 840-41. The presence of government contracts did not transform the school into a state actor, and it didn't matter that the school performed a "public function" of helping educate students that the state itself couldn't educate. *Id.* at 842.

Those facts all apply here as well. Ben Gamla School would be a privately operated school with an independent, non-government appointed board of directors. And though it would contract with Oklahoma and be subject to some state regulation, under *Rendell-Baker*, that would be insufficient to render Ben Gamla School a state actor. Moreover, although the School would be educating students, that is in no way an exclusive public function. Oklahoma's charter schools do not supplant the state's actual, government-run public schools. And no student would be required by the state to attend Ben Gamla School or any other charter school.

Indeed, under Supreme Court precedent, "a private entity can qualify as a state actor" in only "a few limited circumstances." *Halleck*, 587 U.S. at 809. As relevant here, those limited circumstances include:

1. When a private organization is "entwine[d]" with the state "to the point of largely overlapping identity." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 303 (2001).

2. "[W]hen the government compels" or significantly encourages a "private entity to take a particular action." *Halleck*, 587 U.S. at 809.
3. When a "private entity performs a traditional, exclusive public function." *Id.*
4. When "the government has outsourced one of its constitutional obligations to a private entity." *Id.* at 810 n.1 (discussing *West v. Atkins*, 487 U.S. 42, 56 (1988)).

None apply here.

First, the state is not entwined with Ben Gamla School. In *Brentwood*, the Supreme Court held that there was state action because government officials ran the ostensibly private athletic association to the point where they were part of its "management," "composition," and "workings." 531 U.S. at 297-98. Here, there is no organizational overlap between the state and Ben Gamla School. No Ben Gamla School member or board member is a government official or employee acting in that capacity. And the state doesn't otherwise run Ben Gamla School. In fact, the OCSA allows charter schools to contract with non-governmental sponsors, Okla. Stat. Ann. tit. 70, § 3-132(A)(2),—and Ben Gamla School intends to do so—thereby demonstrating that the Oklahoma Legislature did not intend for organizational entwinement between the state and charter schools.

Second, the state doesn't compel or encourage Ben Gamla School's religious conduct. State action can arise when a government "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999). The relevant "choice" in this analysis is "the challenged action of the regulated entity." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). Here, the challenged action is

Ben Gamla School's religious status and conduct, which is established not through the state but through the school's independent decisions. The state has not coerced or even encouraged those decisions. Those religious decisions are thus private, and even "with the mere approval or acquiescence of the State," they are "not state action." *Am. Mfrs.*, 526 U.S. at 52.

Third, "the education of children does not … fall within the narrow range of exclusive state functions." *Santiago v. Puerto Rico*, 655 F.3d 61, 69 (1st Cir. 2011); *see also Logiodice v. Trs. of Me. Cent. Inst.*, 296 F.3d 22, 27 (1st Cir. 2002) ("Accordingly, the Supreme Court, in *Rendell-Baker v. Kohn*, and lower courts, including this one, have declined to describe private schools as performing an exclusive public function." (citations omitted) (collecting cases)); *see also Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 165-66 (3d Cir. 2001). As a result, Ben Gamla School is not engaged in state action merely because it is educating students.

Fourth, the state has not outsourced any constitutional obligations to Ben Gamla School. In *West v. Atkins*, the Supreme Court held that a doctor engaged in state action when he contracted with the government to fulfill its Eighth Amendment obligations to provide adequate medical care to incarcerated individuals. 487 U.S. at 54. The Court found state action because inmates could turn only to "those physicians authorized by the State." *Id.* at 55. The inmate was left without any recourse except to "rely on prison authorities to treat his medical needs." *Id.* at 54.

That's a far cry from the situation here. Unlike *West*, where the government fully outsourced its medical obligations to inmates to a private contractor, Oklahoma has not

fully delegated its duty to provide free education to the Ben Gamla School. The state continues to run public schools for all families, and no student or family is required to attend Ben Gamla School (or any charter school for that matter). Simply put, contracting with private actors to provide educational alternatives is not the wholesale delegation of a government function. So Ben Gamla School is not engaged in state action.

**b. *Drummond* is wrong and does not control.**

The Oklahoma Supreme Court's decision in *Drummond* reached the opposite conclusion. But that decision badly botched the state-action analysis and is not binding on this question of federal law. *See, e.g., Dutcher*, 840 F.3d at 1195; *TMJ Implants*, 498 F.3d at 1181.

As explained, in *Drummond*, a privately operated Catholic religious school applied to participate in Oklahoma's charter school program. In a split decision, the Oklahoma Supreme Court held that the school's Free Exercise rights were nonexistent because under Supreme Court precedent, the school became a state actor by participating in a governmental program. But every one of the *Drummond* court's justifications for finding state action runs headlong into applicable Supreme Court precedent.

First, the Oklahoma Supreme Court stressed that charter schools had been statutorily designated as "public" schools so they must be state actors. But "[t]he distinction between private conduct and state action turns on substance, not labels." *Lindke v. Freed*, 601 U.S. 187, 188 (2024). Otherwise, states could strip private actors of their constitutional rights merely by labeling them as state actors. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513

U.S. 374, 392 (1995) ("[I]t is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining … constitutional rights[.]").

For that reason and others, the Supreme Court has repeatedly held that labeling an entity "public" does not transform a private actor into a state actor. So for example, in *Jackson*, the Supreme Court held that state legislation defining a privately operated electric company as a "public utility" did not mean the company engaged in state action. 419 U.S. at 350 n.7, 352-54. The same was true in *Polk County v. Dodson*, where the Court looked beyond the "public defender" label and held that the lawyer was not engaged in state action while representing indigent defendants. 454 U.S. 312, 317-20 (1981). And most recently in *Halleck*, the Court concluded that an operator of "public access channels" was not engaged in state action. 587 U.S. at 805. *Drummond* thus erred by unduly emphasizing the statutory designation of charter schools.

Next, the Oklahoma Supreme Court claimed that the existence of a contract and extensive state monitoring meant that St. Isidore was closely "entwined with the State." *Drummond*, 558 P.3d at 11 ¶ 29. But the U.S. Supreme Court has repeatedly rejected "the 'being heavily regulated makes you a state actor' theory of state action." *Halleck*, 587 U.S. at 816. Indeed, *Brentwood*—the decision that *St. Isidore* relied upon—expressly acknowledged that "service providers" who operate pursuant to contracts are not "public actors." *Brentwood*, 531 U.S. at 299 (distinguishing that case from *Rendell-Baker*, 457 U.S. at 839-43). Rather, "[a]cts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Rendell-Baker*, 457 U.S. at 841. Nor does the fact that a contractor might be

"subject to extensive state regulation" change the conclusion. *Jackson*, 419 U.S. at 350. At bottom, the proper inquiry is whether the state's regulatory regime "compel[s]" or significantly encourages Ben Gamla's religious exercise. *Halleck*, 587 U.S. at 809. It doesn't, *supra* at 15-16, so there is no state action.

Finally, though *Drummond* conceded that "[t]he provision of education may not be a traditionally exclusive public function," it held that "*free public* education is exclusively a public function." 558 P.3d at 11-12 ¶ 30. That circular reframing accomplishes little. "[T]he definition of a particular program can always be manipulated to subsume the challenged condition, and to allow States to recast a condition on funding in this manner would be to see the First Amendment reduced to a simple semantic exercise." *Carson*, 596 U.S. at 784 (cleaned up). And *Rendell-Baker* also forecloses such arguments, as that case involved free publicly funded education, yet the Court still found no state action. 457 U.S. at 832. The "legislative policy choice" to "provide [educational] services for … students at public expense" "in no way makes [such] services the exclusive province of the State." *Id.* at 842.

#### c. Multiple circuit courts have rejected *Drummond*'s reasoning.

At every step, *Drummond*'s reasoning contravenes Supreme Court precedent. For that reason, multiple federal courts of appeal have rejected the very arguments that the *Drummond* court adopted.

For example, in *Caviness v. Horizon Community Learning Center, Inc.*, 590 F.3d 806, 812 (9th Cir. 2010), the Ninth Circuit held that "a private nonprofit corporation running a charter school that [was] defined as a 'public school' by state law" was not engaged in state

action. Though Arizona law characterized charter schools as public actors, that label was insufficient to support the plaintiff's claim of state action. *Id.* at 814. Furthermore, the Ninth Circuit held that the charter school was not "a state actor by virtue of 'public entwinement in [its] management and control." *Id.* at 816 n.6. "Even extensive government regulation of a private business is insufficient to make [it] a state actor if the challenged conduct was 'not compelled or even influenced by any state regulation.'" *Id.* at 816 (quoting *Rendell-Baker*, 457 U.S. at 841-42). As to the traditional exclusive function analysis, the Ninth Circuit also rejected the exact argument adopted by the Oklahoma Supreme Court. It held that the argument that "'*public* educational services' are traditionally and exclusively the province of the state" was "foreclosed by *Rendell-Baker*." *Id.* at 814-15.

The First Circuit agrees. In *Logiodice*, 296 F.3d 22, a student sued a private high school that contracted with the state to "accept and educate all" of the district's high school students. The student claimed that the school was a state actor and had deprived him of due process, but the First Circuit rejected the claim. *Id.* at 24-25. With respect to the entwinement theory, the First Circuit noted that Maine "sponsored" attendance for the vast majority of the school's students and "regulate[d] contract schools in various respects." *Id.* at 28. But that was not enough to render those schools state actors. Rather, the school was "run by private trustees and not public officials," so it was not engaged in state action. *Id.*

Similarly, the First Circuit held that "education is not and never has been a function reserved to the state." *Id.* at 26. While *Drummond* accepted this argument, it made the very mistake the First Circuit warned against: "narrow[ing] and refin[ing] the category as that

of providing a publicly funded education available to all students generally." *Id.* "There is no indication that the Supreme Court had this kind of tailoring by adjectives in mind when it spoke of functions 'exclusively' provided by government." *Id.* at 27.

Finally, in *Robert S.*, 256 F.3d 159, the Third Circuit—in an opinion by then-Judge Alito—also rejected the arguments adopted in *Drummond*. The school there "worked in close concert with state and local governments" to "provid[e] treatment and education to juvenile sex offenders." *Id.* at 163. A plaintiff sued the private school under § 1983, and the Third Circuit rejected the claim because the school "did not act under color of state law." *Id.* at 161. That's because the school's "receipt of government funds did not make it a state actor." *Id.* at 165. Nor did "detailed requirements set out in [the state's] contracts" make a difference, as "they did not 'compel or even influence'" the challenged conduct. *Id.* And the fact that the school provided "services that [the government] was required by state law to provide" was insufficient to show an exclusive state function. *Id.* at 166. As then-Judge Alito held, this "very argument" was "rejected in *Rendell-Baker*." *Id.*

In short, *Drummond* was wrongly decided. This Court is not bound by state courts on questions of federal law and would not be the first federal court to recognize that charter schools are not state actors. This Court should thus conclude that Ben Gamla is not engaged in state action and that Ben Gamla's exclusion from Oklahoma's charter school program violates the Free Exercise Clause.

## II. The remaining factors favor granting a preliminary injunction.

Plaintiffs have demonstrated a likelihood of success on their First Amendment claim and are therefore entitled to injunctive relief. *Hobby Lobby*, 723 F.3d at 1145 ("[I]n First

Amendment cases, the likelihood of success on the merits will often be the determinative factor.”). In any event, the remaining factors favor relief.

***Irreparable harm.*** When plaintiffs “suffer harm of a constitutional dimension, such harm is irreparable.” *Does 1-11*, 100 F.4th at 1274; *see also Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) (“[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.”). That is especially true in First Amendment cases, as “the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.” *Does 1-11*, 100 F.4th at 1274 (quoting *Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020)). Here, Plaintiffs’ Free Exercise rights are violated by Oklahoma’s religious discrimination in its charter school program. That “unquestionably constitutes irreparable injury.” *Id.*; *see also Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025).

Moreover, Ben Gamla will suffer irreparable harm because every year it is excluded from Oklahoma’s charter school program, it will lose the opportunity to educate children. Lost opportunities are widely recognized as quintessential irreparable harm. *See, e.g.*, *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004) (“lost opportunities to distribute unique products” constitutes irreparable harm); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009) (same); *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 780 (11th Cir. 2024) (“Moreover, and more specifically, each lost opportunity to enter [the] contest works an irreparable injury because it prevents [Plaintiffs] from competing at all—not just for the $20,000 cash prize but also for … ongoing mentorship and the ensuing business opportunities that a

contest victory might provide."); *cf. Giri v. Nat'l Bd. of Med. Examiners*, 718 F. Supp. 3d 30, 44 (D.D.C. 2024) ("The loss of opportunity to pursue one's chosen profession due to alleged discrimination is widely recognized as constituting an irreparable injury." (collecting cases)). That is especially true where the lost opportunity prevents an organization from advancing its religious mission. *See Diocese of Brooklyn*, 592 U.S. at 19.

***Balance of equities and the public interest.*** "[W]hen the Government is the opposing party," the third and fourth factors "merge." *Does 1-11*, 100 F.4th at 1267 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And when the government "intru[des] on religious liberty," the analysis is simple: "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 1274. Here, the balance of equities and public interest strongly favor Ben Gamla. Oklahoma's exclusion of religious institutions from its charter school program violates the Free Exercise Clause, so "an injunction would be in the public interest." *Hobby Lobby*, 723 F.3d at 1147.

## CONCLUSION

This Court should grant Plaintiffs' motion for a preliminary injunction.

Dated: March 27, 2026

Respectfully submitted,

/s/ Eric S. Baxter
Eric S. Baxter
DC Bar No. 479221
Eric C. Rassbach
TX Bar No. 24013375
Daniel L. Chen
DC Bar No. 1781783
Phillip J. Allevato*†
CA Bar No. 362581
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
(202) 955-0095
*ebaxter@becketfund.org*

**Application pro hac vice to the Western District of Oklahoma pending.*

*†Not a member of the DC Bar; admitted in California. Practice limited to cases in federal court.*

Robert G. McCampbell
OBA No. 10390
David A. Herber
OBA No. 33527
GABLEGOTWALS
499 W. Sheridan Ave., Suite 2200
Oklahoma City, OK 73102
Tel 405-235-5500
*RMcCampbell@Gablelaw.com*

*Attorneys for Plaintiffs*

# Kaiman Intervenors' Motion to Intervene and Brief in Support, filed below on April 1, 2026, as ECF No. 15

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., et al.,<br><br>*Plaintiffs*,<br><br>-against-<br><br>GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma, et al.,<br><br>*Defendants*. | Case No. 5:26-cv-00582-R |

**MOTION TO INTERVENE AND BRIEF IN SUPPORT BY RABBI DANIEL KAIMAN, BRADLEY ARCHER, ERIKA DUBOSE, SYDNEY GEBHARDT, KARA JOY MCKEE, MICHELE MEDLEY, AND GENE PERRY**

# TABLE OF CONTENTS

INTRODUCTION ..... 1

LEGAL AND FACTUAL BACKGROUND ..... 3

ARGUMENT ..... 10

I. Proposed Intervenors are entitled to intervene as of right under Rule 24(a)(2) ..... 11

A. Proposed Intervenors' motion is timely ..... 10

B. Proposed Intervenors have important interests in this case ..... 12

C. Proposed Intervenors' ability to protect their interests will be impaired if they are not allowed to intervene ..... 15

D. Proposed Intervenors' interests will not be adequately represented by the existing parties ..... 17

II. Alternatively, the Court should grant permissive intervention under Rule 24(b) ..... 20

CONCLUSION ..... 23

# TABLE OF AUTHORITIES

## Cases

*Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*,
567 F.3d 278 (6th Cir. 2009) .................... 16

*Ariz. Christian Sch. Tuition Org. v. Winn*,
563 U.S. 125 (2011) .................... 13

*Brammer-Hoelter v. Twin Peaks Charter Acad.*,
602 F.3d 1175 (10th Cir. 2010) .................... 15

*Brown v. Bd. of Educ.*,
347 U.S. 483 (1954) .................... 15

*Coal. of Arizona/New Mexico Cntys. for Stable Econ. Growth v. Dep't of Interior*,
100 F.3d 837 (10th Cir. 1996) .................... 12, 18

*Colo. Cas. Ins. Co. v. S & S Joint Venture*,
No. 11-CV-02182-MSK-KLM,
2011 WL 6055408 (D. Colo. Dec. 6, 2011) .................... 13

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .................... 13

*Drummond ex rel. State v. Okla. Statewide Virtual Charter School Board*,
558 P.3d 1 (Okla. 2024) .................... 3, 13, 14, 15

*Fent v. Contingency Rev. Bd.*,
163 P.3d 512 (Okla. 2007) .................... 13

*Flast v. Cohen*,
392 U.S. 83 (1968) .................... 13

*Immel v. Tulsa Pub. Facilities Auth.*,
490 P.3d 135 (Okla. 2021) .................... 13

*Kane County v. United States (Kane III)*,
928 F.3d 877 (10th Cir. 2019) .................... 11, 12, 13, 16, 17, 19, 20

*Kane County v. United States (Kane IV)*,
94 F.4th 1017 (10th Cir. 2024) .......... 17

*Kellogg v. Sch. Dist. No. 10*,
74 P. 110 (Okla. 1903) .......... 13

*Lower Ark. Valley Water Conservancy Dist. v. United States*,
252 F.R.D. 687 (D. Colo. 2008) .......... 21, 22

*Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*,
578 F.2d 1341 (10th Cir. 1978) .......... 16

*Oklahoma ex rel. Edmondson v. Tyson Foods, Inc.*,
619 F.3d 1223 (10th Cir. 2010) .......... 11

*Okla. Pub. Emps. Ass'n v. Okla. Dep't of Cent. Servs.*,
55 P.3d 1072 (Okla. 2002) .......... 13

*Okla. Statewide Charter Sch. Bd. v. Drummond*,
605 U.S. 165 (2025) .......... 3

*San Juan County v. United States*,
503 F.3d 1163 (10th Cir. 2007) (en banc) .......... 11, 12, 20

*Sanguine, Ltd. v. U.S. Dep't of Interior*,
736 F.2d 1416 (10th Cir. 1984) .......... 11

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) .......... 15

*United States v. N. Colo. Water Conservancy Dist.*,
251 F.R.D. 590 (D. Colo. 2008) .......... 21

*Utah Ass'n of Cntys. v. Clinton*,
255 F.3d 1246 (10th Cir. 2001) .......... 12, 15, 17, 19

*W. Energy All. v. Zinke*,
877 F.3d 1157 (10th Cir. 2017) .......... 10, 11, 17, 19

*W. Virginia State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) .......... 15

*WildEarth Guardians v. U.S. Forest Serv.*,
573 F.3d 992 (10th Cir. 2009) .......... 12, 16, 19

*Wurz v. Bill Ewing's Serv. Ctr., Inc.*,
129 F.R.D. 175 (D. Kan. 1989) .... 12

**Statutes and Rules**

Fed. R. Civ. P. 24 .... 10, 11, 20, 21

Okla. Stat. tit. 70, § 1-124 .... 14

Okla. Stat. tit. 70, § 3-136 .... 14, 19

Okla. Stat. tit. 70, § 3-140 .... 19

Okla. Stat. tit. 70, § 18-201.1 .... 14

**Constitutional Provisions**

Okla. Const. art. 1, § 5 .... 14

Okla. Const. art. 2, § 5 .... 14

Okla. Const. art. 6, § 4 .... 8

U.S. Const. amend. I .... 14

**Other Authorities**

Gordon Lafer, Breaking Point: The Cost of Charter Schools for Public School Districts 10–11, 17 (2018), https://bit.ly/4dj2QMY .... 14

Letter from Gentner Drummond, Att'y Gen. Okla., to Rebecca L. Wilkinson, Exec. Dir., Statewide Virtual Charter Sch. Bd. (Feb. 23, 2023), https://bit.ly/4tgWW3o .... 8

Rebecca L. Wilkinson, Okla. Op. Att'y Gen. No. 2022-7 (2022), https://bit.ly/4bKJU8A .... 8, 19

## INTRODUCTION

Rabbi Daniel Kaiman, Bradley Archer, Erika DuBose, Sydney Gebhardt, Kara Joy McKee, Michele Medley, and Gene Perry move to intervene in this case as defendants. They do so to ensure that their tax dollars do not support a religious public school and are not diverted from their inclusive, secular public schools. Proposed Intervenors are all Oklahoma taxpayers. All of them are also parents of students attending Oklahoma public schools, except that one is a public-school student. One of the Proposed Intervenors is a rabbi, and one is a teacher at a public school.

Plaintiff Ben Gamla Jewish Charter School Foundation seeks to establish a taxpayer-funded religious public charter school where Jewish religious teachings would permeate all subjects. Ben Gamla filed this lawsuit to challenge the constitutionality of Oklahoma's prohibitions against religious charter schools. Defendants are board members and officers of the Oklahoma Statewide Charter School Board, as well as Oklahoma Attorney General Gentner Drummond. A majority of the Board's members have indicated that they believe that religious public charter schools should be permitted. Attorney General Drummond has taken the opposite position, but he has only nine months left in his term, and it is unknown what position his successor will take on the issues presented by this case. Proposed Intervenors, on the other hand, are committed to defending the constitutionality of the challenged Oklahoma prohibitions throughout the life of this litigation and are well-positioned to do so.

Under Federal Rule of Civil Procedure 24(a), Proposed Intervenors have a right to intervene in this case. Their application is timely because this case—filed eight days

ago—is in its infancy. They have several important interests in this case: First, as Oklahoma taxpayers, Proposed Intervenors have an interest in vindicating their right under Oklahoma law to ensure that their tax dollars are spent lawfully. Second, as public-school parents, a teacher, and a student, Proposed Intervenors have an interest in preventing the diversion of limited public resources away from their schools to a religious school that would not be open to or appropriate for them or their children. Third, Proposed Intervenors who teach at or plan to send their children to Oklahoma charter schools have an interest in preserving the constitutional protections that charter-school teachers and students now enjoy. These important interests may be impaired if Proposed Intervenors are not allowed to protect them here, due to both the direct consequences of an adverse merits decision allowing state funding of Ben Gamla and the long-term *stare decisis* effects that ultimate resolution of this litigation in favor of Ben Gamla may have. Finally, Proposed Intervenors' participation in this case is necessary to ensure that their interests are adequately represented, given the support for religious charter schools by a majority of the Board's members and the uncertainty over whether Attorney General Drummond's successor will continue to defend the constitutionality of the challenged Oklahoma prohibitions upon taking office in nine months.

Alternatively, this Court should grant permissive intervention under Federal Rule of Civil Procedure 24(b). Proposed Intervenors assert defenses that share with the main action common questions of law and fact—including whether or not the U.S. Constitution required the Board to grant Ben Gamla's application. Intervention will not unduly delay or prejudice the adjudication of the original parties' rights, for the case has only just

begun. And permissive intervention is further supported by discretionary factors used by courts in this Circuit.

## LEGAL AND FACTUAL BACKGROUND

In *Drummond ex rel. State v. Oklahoma Statewide Virtual Charter School Board*, 558 P.3d 1, 11–15 (Okla. 2024)—a lawsuit challenging authorization of a religious virtual charter school called St. Isidore of Seville Catholic Virtual School—the Oklahoma Supreme Court held that Oklahoma charter schools are governmental entities and state actors and are thus prohibited from promoting religion to students or coercing students to take part in religious activities. As here, the Board and its members were defendants in the *Drummond* litigation—only there, the Board defended its decision to *approve* a religious charter school, after being sued for doing so by Attorney General Drummond. *See, e.g.*, Brief for Petitioners at ii, 2, *Okla. Statewide Charter Sch. Bd. v. Drummond*, 605 U.S. 165 (2025) (No. 24-394), https://bit.ly/485HMpF. After losing before the Oklahoma Supreme Court, the Board appealed to the U.S. Supreme Court. Petition for a Writ of Certiorari, *Drummond*, 605 U.S. 165 (No. 24-394), https://bit.ly/483lEMB.[1] The U.S. Supreme Court affirmed the Oklahoma Supreme Court's decision by a 4–4 vote. *Drummond*, 605 U.S. 165.

---

[1] St. Isidore was originally approved by a predecessor entity, the Oklahoma Statewide Virtual Charter School Board. Brief for Petitioners at ii, 16, *Drummond*, 605 U.S. 165 (No. 24-394). During the pendency of the *Drummond* case, that entity was replaced by the current Board, which inherited the entity's powers and obligations. *Id.* at ii; Okla. Stat. tit. 70, § 3-132.1. The current Board continued to defend the approval of St. Isidore, including in proceedings before the U.S. Supreme Court. *See, e.g.*, Petition for a Writ of Certiorari, *Drummond*, 605 U.S. 165 (No. 24-394).

Despite the Oklahoma Supreme Court's clear pronouncement in *Drummond*, Ben Gamla now seeks to establish an explicitly religious virtual charter school. On November 3, 2025, Ben Gamla sent the Board a letter of intent to apply for charter authorization. (ECF No. 1-5, at 16.) In December 2025, Ben Gamla submitted to the Board an application for initial charter authorization. (Compl. ¶ 73, ECF No. 1.) On February 9, 2026, the Board denied Ben Gamla's application and, on February 13, 2026, issued a rejection letter to Ben Gamla explaining its reasons for denial. (ECF No. 1-4, at 1–2.) On February 27, 2026, citing Okla. Stat. tit. 70, § 3-134(E)(3)—which authorizes charter applicants to "submit a revised application for reconsideration" to the Board within thirty days of rejection—Ben Gamla submitted an addendum to its application. (ECF No. 1-5, at 1.) The addendum purported "to satisfy the concerns outlined in the Board's February 13 rejection letter and to provide clarification and additional documentation responsive to the issues identified therein." (*Id.*) Ben Gamla did not, however, submit a "full revised application." (*Id.*) On March 9, 2026, the Board again denied Ben Gamla's application. (ECF No. 1-6.)

Ben Gamla's letter of intent, application, and addendum make clear that Jewish religious teachings will be integrated into "every dimension of . . . life" at Ben Gamla (ECF No. 1-2, at 8, 38) and that a core part of the school's mission will be to "enabl[e] students to . . . develop[] deep Jewish knowledge, faith, and values" (ECF No. 1-5, at 1, 16). The school will be "operated . . . for . . . religious purposes." (ECF No. 1-2, at 3.) Students will take mandatory "religion/theology classes"; learn about "Jewish religious beliefs, principles, and ethical frameworks"; and study "religious rituals." (*Id.* at 8, 61.)

Employees will be required to "support the principles, teachings, and commitments of the Jewish community"; to "refrain from actions that are contrary to the teachings of the community"; and to "uphold the standards of the Jewish tradition in their day-to-day work and personal lives." (*Id.* at 3.)

In addition, statements in Ben Gamla's application demonstrate or indicate that the school plans to follow discriminatory policies or practices. For example, while Ben Gamla professes that it will accept students "of different faiths or no faith," it qualifies that statement by warning that "[a]dmission assumes the student and family willingness to adhere with respect to the beliefs, expectations, policies, and procedures of the school." (*Id.* at 59.) What is more, Ben Gamla "retains its right to consider religion as a factor in employment-related decisions." (*Id.* at 54.)

During and contemporaneously with its February 9 and March 9 meetings, the Board—or at least a majority of its nine (*see* Okla. Stat. tit. 70, § 3-132.1(A)) members—indicated disagreement with the Oklahoma Supreme Court's decision in *Drummond*. In a statement issued by the Board on its website, Board Chairman Brian Shellem characterized *Drummond*'s outcome as ill-advised and explained that the Board was "unfortunately" bound by it "even if we disagree with it." (ECF No. 1-3, at 2–3.) At the February 9 meeting, Board Member Damon Gardenhire stated that he was "troubled by the fact that our hands are tied by the State Supreme Court decision," in part because he believed that decision to be based on "a very unfortunate, bigoted history." (Feb. 9 Board

Meeting Tr., Ex. 1,[2] at 3.) Board Member David Rutkauskas "agree[d] with Mr. Gardenhire" and called the situation "unfortunate." (*Id.*) Board Member William Pearson stated that he "would love to vote for a school of this type" but could not do so "because of the rule of law that we have in Oklahoma." (*Id.* at 4.) Board Member Jared Buswell argued that public schools of the past were "founded in order to teach religious precepts." (*Id.*) At the March 9 meeting, Mr. Gardenhire reiterated his "personal disagreements with" *Drummond*, and Mr. Buswell "agree[d] with [Mr. Gardenhire's] comments." (Mar. 9 Board Meeting Tr., Ex. 2, at 2.) Throughout the two meetings, no Board member spoke in support of *Drummond*'s reasoning or outcome. (Feb. 9 Tr., Ex. 1; Mar. 9 Tr., Ex. 2.)

At the February 9 meeting, the Board also voted to seek private counsel for any litigation stemming from its denial of Ben Gamla's application. (Feb. 9 Tr., Ex. 1, at 9–10.) Ordinarily, the Oklahoma Attorney General would represent the Board in litigation against it. (*Id.* at 7.) But the Board did not wish to be represented by Attorney General Drummond in any lawsuits challenging its denial of Ben Gamla's application even though he vigorously and successfully opposed religious charter schools in the *Drummond* case.

Instead, at its March 9 meeting, the Board voted to retain First Liberty Institute as counsel for this matter. (*Id.* at 11–12.) In *Drummond*, First Liberty filed amicus briefs on behalf of itself and certain Oklahoma entities and officials arguing that Oklahoma's

[2] Citations to exhibit numbers refer to exhibits attached to this Motion. Exhibits attached to Plaintiffs' Complaint are cited by ECF number.

prohibitions against religious charter schools are unconstitutional, and First Liberty took the same position on behalf of those Oklahoma clients in a separate lawsuit that challenged the proposed religious charter school at issue in *Drummond*.[3] After the U.S. Supreme Court's 4–4 affirmance of *Drummond*, First Liberty issued a press release calling the outcome "disappointing" and promising "more legal battles ahead to ensure the government treats faith-based organizations fairly." (May 2025 First Liberty Press Release, Ex. 3, at 3.) And on March 24—the same day that Ben Gamla filed this lawsuit—First Liberty issued a press release confirming that it is representing the Board in this case and stating, "The Board is simply doing what the Oklahoma Supreme Court requires, which is discriminate against faith-based applicants simply because they are religious. If it were not for the ban on religious schools, the board would have approved this school's application." (Mar. 2026 First Liberty Press Release, Ex. 4, at 2.)

Earlier in the month, on March 11, Attorney General Drummond filed a lawsuit in state court arguing that the Board improperly failed to include deficiencies unrelated to religion in the grounds for its final denial of Ben Gamla's application. Petition for Writ of Mandamus at 1–2, *Drummond v. Okla. Statewide Charter Sch. Bd.*, No. CV-2026-649

---

[3] *See* Brief of *Amici Curiae* Ryan Walters et al. in Support of Petitioners, *Drummond*, 605 U.S. 165 (No. 24-394), https://bit.ly/4c1Rc70; Brief of *Amici Curiae* Ryan Walters et al. in Support of Petitioners, *Okla. Statewide Charter Sch. Bd. v. Drummond*, 145 S. Ct. 1134 (mem.) (2025) (No. 24-394), https://bit.ly/4tfKzVs; Brief of *Amici Curiae* in Support of Respondents and Intervenor-Respondents, *Drummond*, 558 P.3d 1 (No. MA-121694), https://bit.ly/4sHsVtK; Defendant Oklahoma State Department of Education and Defendant State Superintendent of Public Instruction Ryan Walters' Motion to Dismiss, *OKPLAC, Inc. v. Statewide Virtual Charter Sch. Bd.*, No. CV-2023-1857 (Okla. Dist. Ct. Sept. 20, 2023), https://bit.ly/4lWhcFa.

(Okla. Dist. Ct. Mar. 11, 2026), https://bit.ly/4uMZPuu. Attorney General Drummond alleged that the Board did so intentionally in order to engineer a record designed to prevent certain state-law issues from being considered in Ben Gamla's lawsuit before this Court. *Id.* at 2, 11–12.

In his official capacity, Attorney General Drummond is a defendant in this lawsuit, as are members and officials of the Board. (Compl. ¶¶ 14–24, ECF No. 1.) While Attorney General Drummond has defended the constitutionality of Oklahoma's prohibitions against religious charter schools, his predecessor John O'Connor issued an opinion (which Drummond revoked) that those prohibitions violate the U.S. Constitution. Rebecca L. Wilkinson, Okla. Op. Att'y Gen. No. 2022-7 (2022), https://bit.ly/4bKJU8A; Letter from Gentner Drummond, Att'y Gen. Okla., to Rebecca L. Wilkinson, Exec. Dir., Statewide Virtual Charter Sch. Bd. (Feb. 23, 2023), https://bit.ly/4tgWW3o; *accord* Compl. ¶ 44, ECF No. 1.

Attorney General Drummond's term ends on January 11, 2027 (*see* Okla. Const. art. 6, § 4), and he is not running for re-election (Feb. 9 Tr., Ex. 1, at 6). It is unknown who Attorney General Drummond's successor will be and whether that person will agree with Drummond's or O'Connor's views on the issues in this case.

Proposed Intervenors have various beliefs and backgrounds, but they share two core convictions: a public school must not be religious, and tax dollars must not fund religious instruction in public schools. Rabbi Daniel Kaiman is the Principal Rabbi of a congregation in Oklahoma and is raising two Jewish children who attend a non-charter public elementary school in Oklahoma. (Kaiman Decl., Ex. 6 ¶¶ 2–3, 6.) Bradley Archer

is an atheist, a teacher at an Oklahoma charter school, and the parent of a nonreligious child who currently attends a non-charter public school in Oklahoma and will in the 2026–27 school year start attending the charter school where Mr. Archer teaches. (Archer Decl., Ex. 7 ¶¶ 2–3, 6.) Erika DuBose is a practicing Jew, a social worker for the Cherokee Nation, and the parent of two children—also practicing Jews—who attend a non-charter public high school in Oklahoma. (DuBose Decl., Ex. 8 ¶¶ 2, 5, 8.) Sydney Gebhardt—an adult child of Ms. DuBose who is a senior at a non-charter public high school in Oklahoma—is a nonbinary practicing Jew and advocate for LGBTQ+ inclusion. (Gebhardt Decl., Ex. 9 ¶¶ 2, 5, 8.) Kara Joy McKee and Gene Perry are a Jewish married couple and the parents of a child who attends a non-charter public elementary school in Oklahoma and is being raised within the Jewish tradition. (McKee Decl., Ex. 10 ¶¶ 2, 5; Perry Decl., Ex. 11 ¶¶ 2, 5.) Michele Medley is nonreligious, a child-and-family therapist, and the parent of two children who currently attend non-charter public schools in Oklahoma, one of whom will start attending an Oklahoma charter school in the 2026–27 school year. (Medley Decl., Ex. 12 ¶¶ 2, 6, 10.)

Each Proposed Intervenor pays taxes to the State of Oklahoma that provide revenue for public schools—including charter schools—and would be used to fund Ben Gamla if it is allowed to operate as a charter school. All the Proposed Intervenors object to unlawful use of their tax payments for religious instruction in public schools. The Proposed Intervenors who have children in Oklahoma public schools further object to public funds being diverted from their nonreligious public schools—which already face serious resource limitations—to Ben Gamla, a school that would not be appropriate for or

welcoming to Proposed Intervenors' children. As a public-school student, Mx. Gebhardt objects for the same reason. Likewise, as a public-school teacher, Mr. Archer objects to public funds being diverted from his nonreligious employer school to Ben Gamla, a school that would impose religion-based requirements for employment that he could not meet. (Archer Decl., Ex. 7 ¶¶ 4–11, 13–14; DuBose Decl., Ex. 8 ¶¶ 3–11; Gebhardt Decl., Ex. 9 ¶¶ 3–11; Kaiman Decl., Ex. 6 ¶¶ 4–11; McKee Decl., Ex. 10 ¶¶ 3–11; Medley Decl., Ex. 12 ¶¶ 4–11, 13–15; Perry Decl., Ex. 11 ¶¶ 3–11.)

Mr. Archer, as a charter-school teacher and soon-to-be charter-school parent, and Ms. Medley, as a soon-to-be charter-school parent, additionally fear that a judicial decision in favor of Ben Gamla could take away constitutional rights that all charter-school teachers and students now enjoy. (Archer Decl., Ex. 7 ¶ 12; Medley Decl., Ex. 12 ¶ 12.)

## ARGUMENT

The Tenth Circuit "has historically taken a 'liberal' approach to intervention and thus favors the granting of motions to intervene." *W. Energy All. v. Zinke*, 877 F.3d 1157, 1164 (10th Cir. 2017). Federal Rule of Civil Procedure 24(a) requires that a court grant intervention if certain conditions are met, while Rule 24(b) authorizes a court to permit intervention if other conditions are met. Proposed Intervenors satisfy the standards for both intervention as of right under Rule 24(a) and permissive intervention under Rule 24(b).

**I. Proposed Intervenors are entitled to intervene as of right under Rule 24(a)(2).**

To intervene as of right, a proposed intervenor must establish that: "(1) the application is timely; (2) it claims an interest relating to the property or transaction which is the subject of the action; (3) the interest may as a practical matter be impaired or impeded; and (4) the interest may not be adequately represented by existing parties." *Kane County v. United States (Kane III)*, 928 F.3d 877, 890 (10th Cir. 2019); Fed. R. Civ. P. 24(a)(2). These requirements "may be relaxed in cases raising significant public interests." *Kane III*, 928 F.3d at 890 (quoting *San Juan County v. United States*, 503 F.3d 1163, 1201 (10th Cir. 2007) (en banc)). And in applying this four-part test, the courts of this Circuit are guided primarily by practical considerations, rather than "rigid, technical requirements." *San Juan County*, 503 F.3d at 1195. Proposed Intervenors satisfy all four parts of this test.

**A. Proposed Intervenors' motion is timely.**

This motion is timely. Timeliness is determined "in light of all of the circumstances." *Sanguine, Ltd. v. U.S. Dep't of Interior*, 736 F.2d 1416, 1418 (10th Cir. 1984). "[T]hree non-exhaustive factors are particularly important: (1) the length of time since the movants knew of their interests in the case; (2) prejudice to the existing parties; and (3) prejudice to the movants." *Zinke*, 877 F.3d at 1164 (citation modified). Prejudice must be "caused by the movant's delay, not by the mere fact of intervention." *Oklahoma ex rel. Edmondson v. Tyson Foods, Inc.*, 619 F.3d 1223, 1236 (10th Cir. 2010). A motion to intervene is particularly timely when it comes in the "early stage of the litigation," as there is a "lack of prejudice to [the parties] flowing from the length of time between the

initiation of the proceedings and the motion to intervene." *Utah Ass'n of Cntys. v. Clinton*, 255 F.3d 1246, 1250–51 (10th Cir. 2001) (allowing intervention after two-and-a-half years because the case was not yet ready for trial); *see also Wurz v. Bill Ewing's Serv. Ctr., Inc.*, 129 F.R.D. 175, 177 (D. Kan. 1989) ("[S]ix [] weeks from the filing of the action is not an unreasonable amount of time within which to file a motion to intervene."). Here, Proposed Intervenors filed their motion eight days after this lawsuit was filed and five days after Plaintiffs filed a preliminary-injunction motion. Proposed Intervenors intend to submit a proposed response to the preliminary-injunction motion by the due date for the responses of the existing parties. Thus Proposed Intervenors easily meet the timeliness requirement.

**B. Proposed Intervenors have important interests in this case.**

Proposed Intervenors have "interest[s] relating to the property or transaction which is the subject of the action." *Kane III*, 928 F.3d at 890. The interest requirement is a "highly fact-specific . . . practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Coal. of Arizona/New Mexico Cntys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 841 (10th Cir. 1996) (citation modified). One way to meet the requirement is to show an interest that "is direct, substantial, and legally protectable." *San Juan County*, 503 F.3d at 1194. "But other interests may also suffice." *Id.* at 1195. And the "burden to satisfy this condition is minimal." *WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992, 996 (10th Cir. 2009) (citation modified). An intervenor-defendant need not demonstrate

Article III standing unless it seeks relief different from that sought by the parties. *See Kane III*, 928 F.3d at 886–87 & nn.11–12.

Proposed Intervenors have multiple direct, substantial, and legally protectable interests in this case. As Oklahoma taxpayers, Proposed Intervenors have an interest in opposing Plaintiffs' claims in order to protect Proposed Intervenors' individually enforceable state-law taxpayer rights. Under Oklahoma law, state taxpayers have the right "to challenge the unlawful or unconstitutional expenditure of state funds." *Okla. Pub. Emps. Ass'n v. Okla. Dep't of Cent. Servs.*, 55 P.3d 1072, 1078 (Okla. 2002); *accord Immel v. Tulsa Pub. Facilities Auth.*, 490 P.3d 135, 142 (Okla. 2021); *Fent v. Contingency Rev. Bd.*, 163 P.3d 512, 520 (Okla. 2007); *Kellogg v. Sch. Dist. No. 10*, 74 P. 110, 116 (Okla. 1903). A need to protect state-law rights is sufficient to support intervention under Rule 24(a). *See Colo. Cas. Ins. Co. v. S & S Joint Venture*, No. 11-CV-02182-MSK-KLM, 2011 WL 6055408, at *3 (D. Colo. Dec. 6, 2011) ("[G]ranting leave to intervene would allow [proposed intervenor] to preserve its right to defend its economic interest related to the underlying state court lawsuit . . . ."). In addition, the U.S. Supreme Court has recognized that taxpayers have special interests in preventing the unlawful use of their tax funds to support a religion, as that "coerce[s] a form of religious devotion in violation of conscience." *See Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 141 (2011); *accord DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 347 (2006); *Flast v. Cohen*, 392 U.S. 83, 102–06 (1968). Here, Proposed Intervenors seek to protect their right to prevent millions of tax dollars (*see* Ben Gamla Five-Year Budget, Ex. 5) from funding a religious charter school. As the Oklahoma Supreme Court held in

*Drummond*, such funding would violate the Oklahoma Charter Schools Act, the Oklahoma Constitution, and the U.S. Constitution's Establishment Clause. 558 P.3d at 15; *see also* Okla. Stat. tit. 70, § 3-136(A)(2); Okla. Const. art. 1, § 5; Okla. Const. art. 2, § 5; U.S. Const. amend. I.

Proposed Intervenors have additional interests in this litigation in their capacities as public-school parents, a teacher, and a student. A ruling in favor of Ben Gamla could divert already-limited public resources away from Proposed Intervenors' secular schools and to a religious school that would not be appropriate for or welcoming to them or their children and that would impose religion-based employment requirements that the intervenor-teacher could not meet. *See supra* at 9–10. Oklahoma public schools, including virtual charter schools, receive funding based in part on the number of students they serve. Okla. Stat. tit. 70, § 1-124; *id.* § 18-201.1. When students leave one public school for another, their per-pupil funds are allocated to the new school. But school-district costs do not decrease proportionally with student enrollment, because school districts must still pay fixed costs for indispensable items such as facilities and administration. Reductions in student enrollment can therefore result in budget cuts that adversely affect the quality of education a school provides. *See, e.g.*, Gordon Lafer, Breaking Point: The Cost of Charter Schools for Public School Districts 10–11, 17 (2018), https://bit.ly/4dj2QMY. Thus, an adverse ruling authorizing the public funding of a religious charter school could harm the quality of Proposed Intervenors' schools by taking funding away from them.

Finally, the Proposed Intervenors who teach at or plan to send their children to

Oklahoma charter schools have interests in preserving their and their children's existing constitutional protections at work and school. Under current caselaw, Oklahoma charter schools are governmental entities and state actors and therefore must comply with the constitutional obligations that apply to the government. *Drummond*, 558 P.3d at 9–14; *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010). Ben Gamla argues that Oklahoma charter schools should not be considered state actors and therefore need not comply with constitutional requirements. (Compl. ¶¶ 121, 130, 141, 150, ECF No. 1.) A ruling in Ben Gamla's favor could therefore set a precedent that could enable Proposed Intervenors' charter schools to ignore the many constitutional rights that public-school teachers, parents, and students have long enjoyed, such as equal protection (*e.g.*, *Brown v. Bd. of Educ.*, 347 U.S. 483, 495 (1954)), free speech (*e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514 (1969)), and religious freedom (*e.g.*, *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Potentially adverse "*stare decisis* effect[s]" like these are valid interests under Rule 24(a)(2), regardless of whether they relate to "the particular issue before the court." *Utah Ass'n of Cntys.*, 255 F.3d at 1252–54.

In sum, Proposed Intervenors have significant legal, economic, and educational interests in this case.

### C. Proposed Intervenors' ability to protect their interests will be impaired if they are not allowed to intervene.

Denying intervention would impair Proposed Intervenors' interests. "To satisfy [the impairment] element of the intervention test, a would-be intervenor must show only

that impairment of its substantial legal interest is *possible* if intervention is denied." *Id.* at 1253 (emphasis added). Impairment "is not limited to consequences of a strictly legal nature." *Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 578 F.2d 1341, 1345 (10th Cir. 1978). And, like the interest requirement, the impairment requirement poses a "minimal" burden (*WildEarth Guardians*, 573 F.3d at 995) and is a matter of "practical judgment" (*Kane III*, 928 F.3d at 891).

Proposed Intervenors meet this minimal burden. An adverse merits judgment here would impair Proposed Intervenors' right under Oklahoma law to prevent the illegal delivery of their tax dollars to a religious public charter school. An adverse judgment would also impair Proposed Intervenors' interests as public-school parents, a teacher, and a student by diverting funds from their secular public schools. In addition, Ben Gamla would undoubtedly attempt to use a ruling in its favor here to block any separate future challenge to the funding and operation of Ben Gamla as a public charter school. And if intervention is denied, Proposed Intervenors will face substantial obstacles in any later effort to recoup public funding of Ben Gamla. *See Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 287 (6th Cir. 2009) (once funds are disbursed to recipients, recovery can be "difficult, if not judicially impossible"). Likewise, there would be no way to later undo harm to Proposed Intervenors' schools caused by the diversion of public funds away from them.

Moreover, if Ben Gamla prevails on the merits, Proposed Intervenors' interests could be impaired in ways that extend beyond the direct effects of this case on its participants. "[T]he *stare decisis* effect of the . . . judgment"—and especially of an

appellate ruling—could hinder future efforts by Proposed Intervenors to challenge other religious charter schools and to enforce their constitutional rights as charter-school parents and a teacher. *See Utah Ass'n of Cntys.,* 255 F.3d at 1254; *see also id.* ("[A] judgment in favor of plaintiffs in this case would impair the intervenors' interest in promoting their environmental protection goals by seeking presidential designation of *other* national monuments *in the future*." (emphases added)).

**D. Proposed Intervenors' interests will not be adequately represented by the existing parties.**

Finally, Proposed Intervenors meet their burden to demonstrate that their interests may not be adequately represented by the existing parties. "For a proposed intervenor to establish inadequate representation by a representative party, the possibility of divergence of interest need not be great, and this showing is easily made when the representative party is the government." *Kane III*, 928 F.3d at 891 (citation modified). Indeed, the Tenth Circuit has "expressed doubt about whether [the government] can 'adequately represent the interests of a private intervenor *and* the interests of the public.'" *Kane County v. United States (Kane IV)*, 94 F.4th 1017, 1030 (10th Cir. 2024) (quoting *Zinke*, 877 F.3d at 1168). That doubt is due in part to the government's "obligat[ion] to consider a broad spectrum of views, many of which may conflict with the particular interest of the would-be intervenor." *Utah Ass'n of Cntys.*, 255 F.3d at 1256. Furthermore, adequacy of representation under "Rule 24(a)(2) requires that the interests of [the parties] be *identical*, not just harmonious." *Kane IV*, 94 F.4th at 1033 (citation modified).

Here, Proposed Intervenors' and Defendants' interests are far from identical. To begin with, as governmental officials, Defendants face unique institutional constraints. The prospect of future lawsuits, liability for attorney's fees, and potential damages may materially influence their litigation and settlement strategy. Proposed Intervenors have no such institutional interests and are unreservedly committed to preserving Oklahoma's system of secular, nondiscriminatory public schools.

What is more, the defendant Board members' conduct and statements make plain that they will not adequately represent Proposed Intervenors' interests. The Board litigated in favor of religious charter schools in *Drummond*, and a majority of the Board's members continue to express disagreement with *Drummond*'s reasoning and outcome. *See supra* at 5–6. Indeed, the Board hired as counsel for this case an organization that has consistently advocated for legalizing religious charter schools (*see supra* at 6–7) and just last week pejoratively described the *Drummond* decision as requiring the Board to "discriminate against faith-based applicants simply because they are religious" (Mar. 2026 First Liberty Press Release, Ex. 4, at 2). Proposed Intervenors obviously cannot rely on the Board to defend the constitutionality of Oklahoma's prohibitions against religious charter schools. *See Coal. of Arizona/New Mexico Cntys.*, 100 F.3d at 845 (agency's "ability to adequately represent" proposed intervenor was "made all the more suspect by its [demonstrated] reluctance in protecting" his goals).

And while defendant Attorney General Drummond has consistently defended the constitutionality of the challenged prohibitions, he has only nine months left in his term. It is unknown whether the person who succeeds Drummond as Attorney General will

continue to oppose religious charter schools or will instead advocate in favor of their existence, as did Drummond's predecessor by issuing an opinion arguing that Oklahoma's requirements that charter schools be secular violate the U.S. Constitution. *See* Okla. Op. Att'y Gen. No. 2022-7, *supra*. The Tenth Circuit has repeatedly concluded that proposed intervenors satisfied the inadequacy-of-representation requirement when—as here—there was a genuine risk that the position of governmental defendants could change, including because of an election. *See Kane III*, 928 F.3d at 895; *Zinke*, 877 F.3d at 1168; *WildEarth Guardians*, 573 F.3d at 997; *Utah Ass'n of Cntys.*, 255 F.3d at 1256.

In addition, one of the arguments that Proposed Intervenors would make if allowed to take part in this case is that discriminatory practices or policies of Ben Gamla disqualify it from being a public charter school. Charter schools cannot lawfully discriminate in student admissions, student discipline, and employment (*e.g.*, Okla. Stat. tit. 70, §§ 3-136(A)(2), 3-136(A)(9), 3-140), but there was substantial evidence that St. Isidore (the proposed religious charter school at issue in *Drummond*) planned to discriminate in all those ways.[4] Attorney General Drummond did not present arguments concerning St. Isidore's discrimination to the Oklahoma Supreme Court in *Drummond*.[5] If Attorney General Drummond takes the same approach here, Proposed Intervenors'

---

[4] *See* First Amended and Supplemental Petition, Ex. A, at PE71, 91, 133–34, 159, 161–70, 190–92, 195, 201–02, 222, 253–54, *OKPLAC, Inc. v. Statewide Virtual Charter Sch. Bd.*, No. CV-2023-1857 (Okla. Dist. Ct. Jan. 31, 2024), https://bit.ly/48haNyF (Part 1), https://bit.ly/4s64OUK (Part 2).

[5] *See* Petitioner's Brief in Support of Application to Assume Original Jurisdiction and Petition for Writ of Mandamus and Declaratory Judgment, *Drummond*, 558 P.3d 1 (No. MA-121694), https://bit.ly/41G7jC4; Petitioner's Reply to Respondents' and Intervenor's Briefs in Response, *Drummond*, 558 P.3d 1 (No. MA-121694), https://bit.ly/4dBXIDV.

interests in preventing diversion of their public-school tax funds to support unlawful discrimination that would exclude them or their children would go unrepresented.

In conclusion, unlike any existing party to this case, Proposed Intervenors are not only committed but also well-positioned to vigorously defend—throughout the likely multi-year life of this litigation—the constitutionality of Oklahoma's requirements that public charter schools be secular and open to all. They therefore meet the inadequacy-of-representation requirement.

* * * * *

Proposed Intervenors thus satisfy all the requirements for intervention as of right. And this case raises "significant public interest[]" questions about Oklahoma's system of secular public schools, which further weighs in favor of allowing intervention under Rule 24(a). *See Kane III*, 928 F.3d at 890 (quoting *San Juan County*, 503 F.3d at 1201).

**II. Alternatively, the Court should grant permissive intervention under Rule 24(b).**

If intervention is not granted as of right, it should be permitted under Federal Rule of Civil Procedure 24(b). Permissive intervention is warranted upon timely motion when a movant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). When evaluating a motion for permissive intervention, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). In exercising their discretion to grant permissive intervention, courts in this Circuit have considered various other factors, including "whether the would-be intervener's input adds value to the existing litigation"; "whether the petitioner's interests are adequately

represented by the existing parties"; and "the availability of an adequate remedy in another action." *See, e.g.*, *Lower Ark. Valley Water Conservancy Dist. v. United States*, 252 F.R.D. 687, 690–91 (D. Colo. 2008) (quoting *United States v. N. Colo. Water Conservancy Dist.*, 251 F.R.D. 590, 599 (D. Colo. 2008)).

Proposed Intervenors assert defenses that "share[] with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). Ben Gamla asserts that the Board violated the Free Exercise and Equal Protection Clauses by denying its charter-school application. (Compl. ¶¶ 108–150, ECF No. 1.) If permitted to intervene, Proposed Intervenors will mount a merits defense to these claims on multiple grounds, including that (i) public charter schools are governmental entities and state actors and therefore lack rights under the Free Exercise and Equal Protection Clauses; (ii) even if charter schools had such rights, the Clauses do not require Oklahoma to authorize religious education in its charter schools; (iii) indeed, the Establishment Clause affirmatively prohibits Oklahoma from doing so; and (iv) discriminatory practices or policies of Ben Gamla disqualify it from lawfully operating as a public charter school.

Moreover, intervention will not "unduly delay or prejudice the adjudication of the original parties' rights" (Fed. R. Civ. P. 24(b)(3)), as this case was filed only eight days ago, and Plaintiffs' preliminary-injunction motion was filed only five days ago. *See Lower Ark. Valley*, 252 F.R.D. at 691 ("[I]ntervention would not 'unduly delay or prejudice adjudication of the original parties' rights' because neither defendant has yet filed an answer to Plaintiff's complaint, and because no party appears to have yet conducted any factual discovery."). As noted above, Proposed Intervenors plan to submit

a proposed response to the preliminary-injunction motion by the due date for the responses of the existing parties.

Permissive intervention is also supported by the additional factors set forth in cases like *Lower Ark. Valley*, 252 F.R.D. at 690–91. Proposed Intervenors would add value to the case by presenting a robust merits defense. And Proposed Intervenors' counsel bring substantial experience in church-state, religious-freedom, and public-education litigation. Indeed, many of Proposed Intervenors' counsel currently represent intervenors in a similar case involving an attempt to establish a religious charter school in Knox County, Tennessee. Order Granting Motion to Intervene, *Wilberforce Acad. of Knoxville v. Knox Cnty. Bd. of Educ.*, No. 3:25-CV-00584 (E.D. Tenn. Jan. 30, 2026). In addition, many of Proposed Intervenors' counsel represented Oklahoma taxpayers in a state-district-court lawsuit challenging the proposed St. Isidore religious charter school. *See* First Amended and Supplemental Petition, *OKPLAC, Inc.*, No. CV-2023-1857, https://bit.ly/48haNyF. And many of Proposed Intervenors' counsel represented *amici* in the *Drummond* litigation, filing briefs in the U.S. and Oklahoma Supreme Courts.[6] This expertise will aid the Court's consideration of the constitutional issues and weighs in favor of granting permissive intervention. Further, as explained above, Proposed Intervenors' interests will not be adequately represented by Defendants. And finally, attempting to protect Proposed Intervenors' interests in an alternative forum could be

[6] *See* Brief of Oklahoma Parent Legislative Advocacy Coalition et al. as *Amici Curiae* in Support of Respondent, *Drummond*, 605 U.S. 165 (No. 24-394), https://bit.ly/47p1yMI; Brief, in Support of Petitioner, of *Amici Curiae* Taxpayers, *Drummond*, 558 P.3d 1 (No. 121,694), https://bit.ly/4lUS1CO.

difficult and inefficient, result in multiple lawsuits concerning the same issue, and lead to conflicting adjudications.

## CONCLUSION

For the foregoing reasons, Proposed Intervenors' Motion to Intervene should be granted.

Respectfully submitted on April 1, 2026.

s/ Brent Rowland
Brent Rowland, OBA No. 13415
Morgan Bandy, WI Bar No. 1130673*
Oklahoma Appleseed Center for Law & Justice
624 S. Denver Ave., Suite 400
Tulsa, OK 74119
Telephone: (918) 519-5750
brent@okappleseed.org / morgan@okappleseed.org

Daniel Mach, DC Bar No. 461652*
Heather L. Weaver, DC Bar No. 495582*
American Civil Liberties Union Foundation
915 15th Street, NW, Suite 600
Washington, DC 20005
Telephone: (202) 675-2330
dmach@aclu.org / hweaver@aclu.org

Nancy A. Noet, WI Bar No. 1023106*
Samuel T. Grover, WI Bar No. 1096047*
Freedom From Religion Foundation
PO Box 750
Madison, WI 53701
Telephone: (608) 256-8900
noetn@ffrf.org / sgrover@ffrf.org

Alex J. Luchenitser, DC Bar No. 473393*
Luke Anderson, DC Bar No. 90042004*
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 466-7306 / (202) 898-2134
luchenitser@au.org / anderson@au.org

Jessica Levin, CA Bar No. 338240*
Wendy Lecker, NY Bar No. 2283125*
Patrick Cremin, CA Bar No. 345406*
Katrina Reichert, CA Bar No. 357984*
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102
Telephone: (973) 624-1815
JLevin@edlawcenter.org / WLecker@edlawcenter.org / PCremin@edlawcenter.org / KReichert@edlawcenter.org

*Attorneys for Proposed Intervenors*
* *Pro hac vice* motion submitted herewith or forthcoming.

# Transcript of portions of Board meeting held on February 9, 2026, filed below on April 1, 2026, as ECF No. 15-1 (Exhibit 1 to Kaiman Intervenors' Motion to Intervene)

**OKSCSB Meeting: 02/09/26**
**Americans United for Separation of Church and State**
**February 13, 2026**
**Transcript by TransPerfect**

**[02:10:22]**

**BRIAN SHELLEM:** Moving on to 9E, action presentation discussion of possible action regarding the approval or rejection of the National Ben Gamla Jewish Charter School Foundation Inc. application for initial authorization.

**SKYLER LUSNIA:** Okay, so this is the other application that is up for approval and rejection today. And just want to, again, address the strengths and concerns that were identified throughout the staff review of this application. The application for Ben Gamla Jewish Charter School was submitted on December 30th, 2025, and was presented to the Statewide Charter School Board at its January 12th, 2026 regular board meeting. And it has been reviewed by our staff. Access to the application has also been provided to the board. Hopefully you've had a chance to look at it. In review of the application, the applicant stated a mission to promote academic excellence, and has outlined a strong academic program using current and successful curriculum standards and benchmarks, as well as instructional strategies and methodologies suitable for virtual learning, and with a commitment to fully align and exceed, actually, Oklahoma's academic standards. The applicant provided key elements of the curriculum, including integrated curriculum, rigorous academics, differentiated instruction, progress monitoring, whole student supports, student engagement and participation, and a strong assessment system. The academic program emphasized universal design for learning as the framework for curriculum development. And in addition, the application presents a reasonable financial and operational plan with assurances through the application process that required funding and experienced school administration would be established. While no immediate financial concerns exist, the negotiation of the financial support of the proposed school's foundation would need to be fully vetted, a process which has already been established by our agencies for all schools authorized by the Statewide Charter School Board, and with similar contracts. Organizationally, the Ben Gamla School System has a demonstrated record of educational success. I did want to mention that during the capacity interview, the school model was compared to a corporate board model akin to a Fortune 500 company with a model that can be used for successful expansion and replication. Application concerns related to the requirements of the Oklahoma Open Meeting Act, Oklahoma's fiscal year operations, Oklahoma cost accounting system requirements, and the board's composition were brought up, especially as questions during the capacity interview, and I think even during their presentation in January. For the most part, these concerns were alleviated in the applicant's capacity interview with clear statements of assurance that they would fully comply with federal, state, and local applicable laws and regulations. There's a special education concern. The school governing board, this is a paraphrased quote from the application, the school governing board will follow the law to the extent that it does not compromise the instructional model of the school. Clarification surrounding this caveat was not found in the application and would certainly need to be clarified. So the Oklahoma Charter Schools Act states that a charter school shall be non-sectarian. Further, the Supreme Court of Oklahoma concluded that under Oklahoma law, a charter school is a public school and as such must be non-sectarian. Finally, the Supreme Court of the United States ordered that the judgment of the Supreme Court in Oklahoma is affirmed. So I went over the strengths and the concerns and then the final one being something that is associated with law and

Supreme Court decisions. And I'll leave it up to the board for discussion and Thomas, if he needs to opine on anything.

**THOMAS SCHNEIDER:** Board members, as I previously indicated, under 3-134, the board has the power and duty to deny inadequate or weak applications. And so I want to highlight some

**[02:15:00]**

issues that I had in reviewing the application. One, virtual meetings, it was calling for virtual meetings that does not comply with the Open Meeting Act. And it was interesting that that was in the application. Board member residency, currently two members of the three-person board, which Skylar did say is inadequate under the board's rules, are out of state. All board members for a charter school have to be in-state residents. And there has to include five members of the board with one being a parent or grandparent, guardian or if a student attending or has previously attended the school, ensuring that the board membership and foundation membership don't overlap. Another concerning issue was that the application explicitly stated that there was no formal discipline policy adopted under the application that has to be submitted for your review. Student suspension requirements, which I would guess would be a part of that disciplinary policy, were also not included in the application. Seven statement of assurances were provided. Those are required under the Oklahoma Admin Code, Title 777, Chapter 10, Subchapter 3, Section 3 and then B8L, I'll let you do that, requires full compliance of Oklahoma and state law, their statement of assurances, caveat compliance. And then finally, I would just point to the special education aspect that Skylar has already highlighted. That was a concern for me as it was basically caveating the provision of special education students as required. And that is applicable whether you're a private school or public school. And then again, page one of the letter intent, it's initially stated that it was going to be a school for grades nine through 12 with 40 students starting initially. The application provided to this board on page five indicated that the school was now going to serve K through 12. And then those numbers for enrollment for first year on page 141, what were a minimum of 335, a goal of 400, a max of 495 and ongoing. And if we're just comparing apples to apples for the first year, nine through 12 number, that increased by four times since the letter of intent. So I just wanted to make sure that you were aware of that. The letter of intent was submitted to the board on November 3rd, 2025, and the application was received on December 30th, 2025. So there was a significant jump in the anticipated enrollment.

**BRIAN SHELLEM:** I would say we have a lot to discuss here. Obviously it'd be nice if as many members of the public come and make comments and are passionate about schools as maybe some of our public comments have been today and previously. As I've engaged in discussions with some of these schools and I think all of us know what our obligation is, especially based on the history of the previous board and this board and the history there and what we need to do. I would say we are bound by the Oklahoma State Supreme Court. Obviously we can even if we disagree with that ruling. And I think there's legal arguments to be made that obviously went to the US Supreme Court, 4-4 tie, it just punts it back to us. So I want to make sure we're addressing this. And as we look at, I'll call it players on the field. And if we

would go, hey, would they provide excellent academic outcomes, would we desire that? We need to be able to say, hey, we know what they're going to teach religion, right? They've been really explicit about that. So I want to open this discussion up because we are going to split some hairs here and we need to go with this application be approved or would we say, are we going to reject it for all the other reasons that Mr. Schneider listed or is it just on this aspect of teaching religion? So I'm going to open it up to the rest of the board and I want to hear your comments. I think we know where we're all going to be at the end of the day, but I think it's imperative that we, the staff is going to have a responsibility to dictate why the application is rejected. They will have an opportunity to remove or add things to their application within 30 days just like every other applicant. So.

**[02:20:00]**

**DAMON GARDENHIRE:** I would just note that I think our hands are tied and we have a writ of mandamus from the state Supreme Court. So with respect to the other issues, those are somewhat immaterial to the discussion. We really have that on the table to deal with. As I hear people bring up our state constitution, though I am struck by the fact that we do have a Blaine Amendment in our state constitution, the history and the facts on that are clear. And it's a very unfortunate, bigoted history that was inserted into state constitutions all over the United States in the late 19th century and early 20th century. We have that in our constitution. That's what our state Supreme Court used to justify their decision. I was involved with helping get a Native American school started. Unfortunately, I had to close because of operational concerns but when it was approved by the State Board of Education, it was fairly clear, I think, that that school had essentially a cultural, spiritual component embedded within it to honor the culture and spirituality of Native Americans. And the school operated that way. And nobody raised any concerns at that point. I don't see this particular school as materially different as an analog to that other school. So I am troubled by the fact that our hands are tied by the State Supreme Court decision, but I think we have to honor it and it's a very clear directive.

**DAVID RUTKAUSKAS:** Yeah, I would agree with Mr. Gardenhire. It is an unfortunate situation that we find ourselves in. The Ben Gamla Jewish Charter School has an excellent reputation in Florida. They do a fantastic job. It is, our hands are tied, most definitely, but it's not – the decision today won't be because they are not a good candidate or qualified or something, a school that I think would bring tremendous assets to the state of Oklahoma and the charter school movement. But unfortunately, we are bound today, and it is very unfortunate.

**JARED BUSWELL:** For the reasons given by our staff and our council, I'm prepared to reject this application today. I want to make a historical note. I find the namesake of the school very interesting because this is one of the names of people that public educators should know as much or more than John Dewey, Horace Mann, and several of the people who are famous in public education. You know, Joshua Ben Gamla was responsible and the people, his contemporaries of that day, probably is the first instance of government-funded public education we can find in world history. This is something I asked myself a couple of years ago was where did public education actually begin? And this is the first instance I can find in world history. Somebody may find something older in a different location, but I find it very interesting that there is

actually a school in Florida that's been operating for years that I was not aware of named after this individual. So I just wanted to let people know or remind people that public schools, not only in the United States, but in other places in the world were founded in order to teach religious precepts.

**WILLIAM PEARSON:** I think, I don't think, I know we're all about school choice for the children of Oklahoma. What troubles me, not necessarily the laws of Oklahoma because there's means to redress those. And I haven't seen any attempt to redress those in any manner, shape or form. My real concern is that I don't see a grassroots effort from the Jewish community in the state of Oklahoma. Now, maybe I'm wrong, but I haven't seen it. What I have seen is the synagogues, both from Oklahoma City and Tulsa come out in opposition to this. And I find that very interesting that the Jewish community, the people that are involved daily in Jewish lifestyle, that they're opposed to this. And they're opposed to it because of what we've heard, not only in public comments, but what we've heard from our staff today. So while I would love to vote for a school of this type,

**[02:25:00]**

but because of the rule of law that we have in Oklahoma, which remains until somebody decides to do a referendum or someone decides to float a bill, it's going to stay the same. And it has a rippling effect, not only from the constitution, it has a rippling effect down to our statute, Title 70, which we're here today because of. It has a ripple effect down to our own administrative rules. I see – I'll use Yogi Berra, "This is déjà vu all over again."

**BRIAN SHELLEM:** He also has one, "it's not over till it's over."

**WILLIAM PEARSON:** Good one, Chairman. But in previous attempts, it's been an attempt for judicial law fare to try to overturn the rules of Oklahoma. And I just don't believe that that's the appropriate method to change the laws of Oklahoma to take it to the courts. I think it should be either a referendum or legislators should stand up and make a change for this. I know we have many legislators just down the road that would love to vote yes on this today to approve this, but they're not here. We are, and we are constrained because of what they haven't done. So based on those comments, I don't think we can approve this application today.

**BRIAN SHELLEM:** I agree with you, Mr. Pearson. I thank you for your comments as well and your insight. You know, one thing that I often, in the discussions I have with a lot of people is when we look at our arena in this type of school, they say, well, you know, we're teaching religious, we're paying for that. And I said, you know, the issues with our contract is the state is not interested in teaching Sunday school. We want great players on the field. We want them to teach great math. We want to teach great English. We want them to teach great science. We want that to be done. The question is, this is a school of choice and there's a value proposition, right? And what their premise is, is they believe by operating a foundational of religion, they can be more effective in that. I will be voting no as well. But when we look at the choice movement, as someone says, I think I can maybe flop over a ball – by flop over a bar differently by taking a different approach and when I look at our culture today, we tend to look at the

problems we have in our education system. And one of the foundational things, many of us are faith and some of us may not have any faith at all. One of the foundational items is the fear of the Lord is the beginning of wisdom. And I think we fail to do that many times and we wonder why we have problems. There seems to be a lack of respect starting at home for parents, a lack of respect for people of authority, be it teachers in the classroom, be it principals. And it comes to this foundational belief, the fear of the Lord. And again, I'm not preaching at anybody, but when we had someone read the beginning of our constitution and says by the authority of Almighty God at the beginning of our constitution, we was recognized by the founders of the state and the founders of our country that the rights that we were given are inalienable rights from our creator. And so we are bound by the Oklahoma Supreme Court. We know there's decisions that will continue to be made and we know that there's other people who disagree with the decision we're going to make, but I agree that we must continue to fight for education. So when we say, hey, we want great schools, I want the best player. If we would say, 'hey, listen, let's say they're the best guy on the Thunder happened to be Jewish.' We say, 'sorry, we can't do it.' We want someone who gets the ball in the basket. We want people who will get the education to the kids and they will be able to be productive members of society. And one of the things, when we look at the application for St. Isidore, there was no requirement that someone had to participate in those activities. Those were provisions of the contract. So with that, I will be voting no today, but I want to make sure everyone has a chance to say what their feelings are about this issue and take it from there.

**SUPERINTENDENT LINDEL FIELDS:** Are you entertaining the motion?

**BRIAN SHELLEM:** Currently, no. I want to give everyone an opportunity to say what you think.

**DR. KITTY CAMPBELL:** I just think regardless of the school's reputation or whatever strengths that it has, the law, we have to follow the law, and right now the law says no.

**BRIAN SHELLEM:** Yep, okay.

**[02:30:00]**

**DR. REBECCA WILKINSON:** Just a quick reminder, as you do move toward a motion, please remember that the motion needs to be very clear as to the reasons for denial, if it is denial, or to approve the application. The reasons have to be very clear.

**DAMON GARDENHIRE:** Mr. Chair, I would move to deny the application for the initial authorization of the National Ben Gamla Jewish Charter School Foundation Incorporated for the reasons stated on the record by board staff and by our board council.

**SUPERINTENDENT LINDEL FIELDS:** Second.

**BRIAN SHELLEM:** Further discussion? Call for a vote.

**MERIN GRACEY:** Mr. Rutkauskas?

**DAVID RUTKAUSKAS:** Yes.

**MERIN GRACEY:** Mr. Shellem?

**BRIAN SHELLEM:** Yes.

**MERIN GRACEY:** Superintendent Fields?

**SUPERINTENDENT LINDEL FIELDS:** Yes.

**MERIN GRACEY:** Mr. Pearson.

**WILLIAM PEARSON:** Yes.

**MERIN GRACEY:** Dr. Campbell.

**DR. KITTY CAMPBELL:** Yes.

**MERIN GRACEY:** Mr. Buswell.

**JARED BUSWELL:** Yes.

**MERIN GRACEY:** Ms. Tomcho.

**BRITNI TOMCHO:** Yes.

**MERIN GRACEY:** Ms. Hidy. Mr. Gardenhire.

**DAMON GARDENHIRE:** Yes.

**MERIN GRACEY:** Mr. Chairman, motion carries.

**BRIAN SHELLEM:** Moving on, 9F, action discussion and possible action regarding the legal counsel to 74-0-S-20-I, Title 74, State Government, 74-20-I, Contracting for Legal Representation by Private Attorneys Approved by the Attorney General. The reason I asked that this be put on the board agenda is I think it's clear that we anticipate that we are going to have a lawsuit on our hands based on our previous vote. They've indicated as such, they've said so publicly, and considering our Attorney General currently, and again, the reason is this is no reflection on Mr. Schneider. I think, Thomas, you have provided outstanding legal work for the board. I appreciate your professionalism in every aspect, including some of the things we've been discussing. So in no way is this a reflection of you, and I want to make that clear on the record as well. So I think you would be very capable of representing us if needed to, but I think there are political issues at work here. Our current Attorney General is running for governor, and

Mr. Schneider works for our Attorney General. And we know that this board was in conflict with our Attorney General before. Any attorney that would represent this board would have to defend our decision on the rule of law, and do that vigorously, and make sure that we're represented well in our decisions. With that, we know we were in conflict with our counsel before our Attorney General. Obviously, I think the opinions of this board have been cleared of what that would be, and so I would like to consider that option, and I'm putting it before this board because I believe it's a board decision. And by requesting the 20-I, it gives us that ability to potentially have an attorney that is not going to be influenced by political whims. So open it up for discussion, thoughts.

**DR. REBECCA WILKINSON:** I will say that I did go in and just print the statute related to a 20-I request, and I did do a copy of the application form that must be submitted. Just in general, there are only three ways that you can gain counsel as a board. One is that you have the authority to hire your own attorney, which this board does not. It's generally only the very large state agencies that have that authority to employ counsel. Two, you can have representation from the Attorney General office, which is what we do. Or if you believe there is a conflict of interest or perhaps the AG office doesn't have the personnel available, a 20-I request can be made to the AG for him to determine if it's appropriate or not for this board to have separate counsel, and the process then continues from there. We have to be very clear as to the reasons why we would make this request. They have to be clear, legitimate reasons for us to submit the application and have the Attorney General to review it. I jumped in when really that was legal language to consider, but just to make it maybe a little less awkward. I don't know if I achieved that or not.

**BRIAN SHELLEM:** Mr. Schneider, if you could add clarity to Dr. Wilkinson's comments.

**THOMAS SCHNEIDER:** She spoke to the statute well. I, for those of you who are around the table, I did provide proposed agenda language for you today. Take it for what you will. I just wanted to make sure that

**[02:35:00]**

as you move through this process, that one, that you were sticking as tightly to the Open Meeting Act as possible, but also preserving your ability and the chair's to go out and seek people and then present them for your review, maybe potentially invite them if that is something that you're interested in and hearing from them and then deciding at an open meeting once you've had that opportunity to review their proposal. So that's all that was. It wasn't to get in anybody's way. I just wanted to make sure that we were operating pursuant to the Open Meeting Act.

**DR. REBECCA WILKINSON:** Just for context, the only other time this board or its predecessor, the Virtual Charter School Board went down this road, we did something similar. The staff went out and we collected names of agencies. They provided us if they were interested in taking on this role with information about their company, their firm, what they could bring to the table. And then it was brought back to this board to look at those potential 20-I attorneys and make a decision. And at the time, Mr. Pearson, it probably was the only unanimous vote that we

had because we did go through that process and collectively look at potential representation. I don't know if time allows for that process.

**BRIAN SHELLEM:** I don't know. Just to add some clarity.

**DR. REBECCA WILKINSON:** It's trying to predict the future. I can't predict.

**BRIAN SHELLEM:** I can't predict the future, but I would say by all indicators, I would be shocked if there's not a lawsuit filed by Friday. So just so we're aware, I'm not saying that's what's going to happen. I'm not psychic, but I would be surprised. And I believe that the board should be best…

**WILLIAM PEARSON:** Are you giving odds, Mr. Chairman?

**BRIAN SHELLEM:** What's that?

**WILLIAM PEARSON:** Are you giving odds?

**BRIAN SHELLEM:** No, I'm not giving odds.

**DAMON GARDENHIRE:** Make a bet on [INDISCERNIBLE] about that.

**BRIAN SHELLEM:** Yeah, I'm not going to make a pact with the state and then have to give up some of that revenue. No.

**DAMON GARDENHIRE:** I'd make a motion regarding this if it's appropriate at this time.

**BRIAN SHELLEM:** I want to make sure everyone has the opportunity to say something, but then we'll entertain a motion in just a second.

**JARED BUSWELL:** I simply agree in principle with the motion we're considering about taking the politics out of the situation and hiring an independent counsel who is not part of any political debates in the state of Oklahoma.

**DAVID RUTKAUSKAS:** I would agree with what Jared just said. And we are going to be sued. Could be very well Friday. And if I could have voted for the school today without being bound, I would have voted yes. I think it would be great for the Jewish community and the Jewish kids to have this option of a high quality school. You can see from the enrollment numbers how they're going way up. So we are going to need outside counsel. This will be a legal thing, and the attorney general's running for governor right now. And as Jared said, we want to take politics out of this.

**WILLIAM PEARSON:** I would add that it's an excellent point about the election cycle that we're going to go through in 26, that there is a governor's race and the AG is involved in that. Politics are going to get involved. They always do. And these things drag out. The last one

dragged out for two years. So there could be a whole different philosophy in the AG's office by then. And I think it would behoove this body to have our own representation.

**BRIAN SHELLEM:** And with that in mind, I think Mr. Schneider did an excellent job while we were represented by ADF in regards to St. Isidore. He handled the day-to-day business in a very professional manner. Our kudos to you in that regard as well. So I would say our request would represent just the issue at hand with Ben Gamala, not any other business. If we can continue to keep that, I'll call it firewall. And you did a great job of respecting that even though we were in conflict with the AG's office in regards to the St. Isidore issue. I would say, if you're going to be here, Mr. Schneider, I think you did a great job. I'm assuming you could continue in that manner. If we were to vote for this, we still have to get an approval, but I would like to not necessarily have to have an additional outside counsel like we did in our predecessor board.

**THOMAS SCHNEIDER:** Understood.

**BRIAN SHELLEM:** Okay. Any other comments? Okay, we'll entertain a motion.

**DAMON GARDENHIRE:** I'd move to authorize the board chair and the executive director to identify and engage attorneys and/or firms willing to represent the board in potential or anticipated litigation

**[02:40:00]**

and bring them to the board for discussion and approval.

**BRIAN SHELLEM:** Second. Further discussion?

**JARED BUSWELL:** I'm considering a friendly amendment to specify related to the Ben Gamla Jewish Charter School that the motion should specify related to that issue as opposed to being open-ended to all issues.

**DAMON GARDENHIRE:** I mean, I would accept that friendly amendment.

**DR. REBECCA WILKINSON:** I would welcome that friendly amendment.

**BRIAN SHELLEM:** Yes.

**JARED BUSWELL:** Okay, thank you.

**BRIAN SHELLEM:** So adopted in the motion. Okay, call for a vote.

**MERIN GRACEY:** Mr. Rutkauskas.

**DAVID RUTKAUSKAS:** Yes.

**MERIN GRACEY:** Mr. Shellem.

**BRIAN SHELLEM:** Yes.

**MERIN GRACEY:** Superintendent Fields.

**SUPERINTENDENT LINDEL FIELDS:** Yes.

**MERIN GRACEY:** Mr. Pearson.

**WILLIAM PEARSON:** Yes.

**MERIN GRACEY:** Dr. Campbell.

**DR. KITTY CAMPBELL:** Yes.

**MERIN GRACEY:** Mr. Buswell.

**JARED BUSWELL:** Yes.

**MERIN GRACEY:** Ms. Tomcho.

**BRITNI TOMCHO:** Yes.

**MERIN GRACEY:** Ms. Hidy. Mr. Gardenhire.

**DAMON GARDENHIRE:** Yes.

**MERIN GRACEY:** Mr. Chairman, motion carries.

TRANSPERFECT
LEGAL SOLUTIONS

I hereby certify that "OKSCSB Meeting 020926" is, to the best of my knowledge and belief, a true and accurate transcription from English to English.

Anders Nelson
Anders Nelson (Feb 17, 2026 15:48:53 EST)

______________________
Anders Nelson
Project Manager
TransPerfect Legal Solutions

February 17, 2026

216 EAST 45TH STREET, 9TH FLOOR, NEW YORK, NY 10017 T +1 212.400.8845 F +1.212.867.3106
LEGAL.TRANSPERFECT.COM

# Transcript of portions of Board meeting held on March 9, 2026, filed below on April 1, 2026, as ECF No. 15-2 (Exhibit 2 to Kaiman Intervenors' Motion to Intervene)

**[01:09:14]**

**BRIAN T. SHELLEM:** Moving on. We'll go on to 8(b). Action: Presentation, discussion, and possible action regarding the approval or rejection of the National Ben Gamla Jewish Charter School Foundation. Need revised application for initial authorization.

**SKYLER LUSNIA:** Yes, thank you. So under Title 70, subsection 3-134 of the Oklahoma Charter Schools Act, the applicant may submit a revised application for reconsideration to the proposed sponsor within 30 days after receiving notification of rejection. The proposed sponsor shall accept or reject a revised application within 30 days of its receipt. So the notice of rejection letter outlining the 10 reasons for rejection was received by the applicant on February 17th of 2026. Ben Gamla Jewish Charter School

**[01:10:00]**

submitted a revised application, in the form of an addendum, on Friday, February 27th of 2026. Upon agency staff review of the revised application, the applicant was found to have sufficiently resolved nine out of the board's ten concerns. For instance, the applicant attests to adhere to all applicable laws and regulations, required of virtual charter schools in Oklahoma, including board member residency requirements, open meeting act requirements, and having a parent or grandparent on the board. The statements of assurances were executed for seven board members, all of which reside in Oklahoma with one member anticipating to be the parent board member. And I forgot to put this in here, but the statement of assurances wording was also updated to align with exactly what's required by statute. That being said, the religious tenants of the application are still present. So there is one item, the requirement to be non-sectarian that the revised application does not resolve. As the board is aware, the Oklahoma Charter School Act states that a charter school shall be non-sectarian. Further, the Supreme Court of Oklahoma concluded that under Oklahoma law, a charter school is a public school, and as such must be non-sectarian. Finally, the Supreme Court of the United States ordered that the judgment of the Supreme Court of Oklahoma is affirmed. So I'll leave it to the board for questions, discussion, and whatever action it deems appropriate.

**BRIAN T. SHELLEM:** So obviously we had lengthy discussion last time. I would say this is more formality. I don't think we need to get quite into the weeds as much, since we've had that lengthy discussion. So more or less, they've corrected everything other than this religious teaching component. Is that correct? Just want to make sure to reiterate.

**SKYLER LUSNIA:** That's the agency staff review perspective. I think our general counsel is raising his finger.

**BRIAN T. SHELLEM:** I think our legal counsel—

**THOMAS SCHNEIDER:** In actual rejection letter that we sent to the school, the one thing tat I felt was non-responsive, and today I will say that staff did [INDISCERNIBLE 01:12:08]

assurances, so that was something that came in. But I just feel that the response on the actual enrollment [INDISCERNIBLE 01:12:20] discrepancies, that was not sufficiently—

**BRIAN T. SHELLEM:** You mean from their LOI from 40 to potentially 400?

**THOMAS SCHNEIDER:** They—you know, this sort of gap, that seemed to not really fall into. And so I would just point that out to the board. The board [INDISCERNIBLE 01:12:38] with applications. And I believe—we believe that the discrepancies and material discrepancies are great, and the enrollment numbers distinctively, I just think there's a giant gap here..

**BRIAN T. SHELLEM:** I would say I don't think that's a material difference. Maybe there's a higher demand once they continue to put it out because the numbers can solve—if they can figure out how to teach all those kids. But I'll call it the heart of their application hasn't changed. Just maybe the number of students is what you're saying. From their LOI versus their revised application.

**THOMAS SCHNEIDER:** Yeah.

**BRIAN T. SHELLEM:** Yeah.

**THOMAS SCHNEIDER:** [INDISCERNIBLE 01:13:18] presentation in January, I think there was a number of 15-20 is what I heard of people that I can reach out to. Double that with the community statements, the Jewish community. There just seems to be discrepancies there on what the [INDISCERNIBLE 01:13:39].

**BRIAN T. SHELLEM:** I don't know if that would—again, my opinion, it wouldn't be a material difference why we would reject a school like that. I think there's enough reason we're going to issue. I think we all know what the end of the outcome is going to be here, but it's for the record of why we're rejecting them and why would we be rejecting them. So that would be open for discussion. I don't know if anybody else thinks it's a material issue because of their LOI, letter of intent, this 40 versus what their application—Mr. Gardenhire?

**DAMON GARDENHIRE:** I think bottom line is we have a writ of mandamus and that's the holding of the state supreme court. I have my own personal disagreements with that, including their historical revisionism about our Blaine Amendment. We do in fact have a Blaine Amendment in our state constitution and its origins are other Blaine Amendments around the country. And as you pointed out in the last meeting, that is a question more likely for state voters. But it is a part of our state's history. It's unfortunate. With that said, we have a state Supreme Court opinion that is a writ of mandamus and it's quite clear.

**BRIAN T. SHELLEM:** Any other comments on this?

**JARED BUSWELL:** I agree with Damon's comments. And just on the particulars of the ten items that are

**[01:15:00]**

improved in this application, in the renewed application, I found that number four was maybe the weakest, but still not a reason to deny the application. As far as I was concerned about the separation between the organizing the leadership of the educational management organization that they would hire, so they simply said we're not going to hire that organization. We're going to choose a new one, according to Oklahoma statute. So it's sort of a promise to upon approval then we'll hire the right one. So I just wanted to say I thought that was the weakest, but all 10 were pretty solid revisions to the application, in my opinion.

**BRIAN T. SHELLEM:** Excluding the one.

**JARED BUSWELL:** It's decent. It's just the weakest. And I just thought of the weakest, the others are stronger.

**BRIAN T. SHELLEM:** Alright. Any other further discussion? Alright. In that case, we will entertain a motion to potential—go ahead, Mr. Pearson.

**WILLIAM PEARSON:** I can make the motion. I move to deny the revised application for initial authorization for the National Ben Gamla Jewish Charter School Foundation Incorporated for the reasons stated on the record by board staff and counsel.

**BRIAN T. SHELLEM:** Okay. Well—okay. Um, you sure you want to second that motion based on what our counsel is? But there is a motion on the floor. We will, um, consider debate on that. Um, I don't think we—I'm going to tell you why I'm going to vote no on the, on the, on the motion. Now, I think we're going to need to reject this, this school no matter what. But our counsel stated that because of their belief of the difference in number of school, and Mr. Gardenhire, you made a second—so you made the second based on what our counsel had said too. So I just want to make sure we're getting it right for, for that. So there's a motion on the floor. If somebody would like to second it, they can. Or we can amend the motion. I personally don't think the reasons that our counsel stated for the number, the number of students from their LOI versus what they potentially—would a rule would be enough for us to reject that application. I think there's enough just simply on the religious teaching aspect of it. I want to make sure we get our motions right for the record. So if somebody would like to—or if you would like to amend the motion, I don't know if you want to or not.

**WILLIAM PEARSON:** Amend the motion.

**BRIAN T. SHELLEM:** If you want to, you can.

**WILLIAM PEARSON:** I can amend the motion and I amend the motion to eliminate recommendation from the board's counsel to purpose and reason for denying the application is based on the mandamus Damon had mentioned, and the secular clause and Title 70.

**BRIAN T. SHELLEM:** Okay. I think that seems—again, I, I would support that motion myself. But if someone else would like to second that motion, I, I wholeheartedly agree with you, Mr. Pearson. And so forgive me for parsing words, but this is what our attorneys like to do, right.

**JARED BUSWELL:** Could I hear the whole content of the whole motion at once?

**REBECCA WILKINSON:** Yes. I was thinking about that for board secretary as well. Make sure we have it correct.

**WILLIAM PEARSON:** I move to reject—I move to deny the revised application for initial authorization for the National Ben Gamla Jewish Charter School Foundation for the reasons stated on the record by the board staff, the mandamus order from, from the courts, and the secular clause that is contained within Title 70 state law for schools.

**JARED BUSWELL:** Thank you. I understand it better.

**BRIAN T. SHELLEM:** Okay. Anybody would like to second the motion?

**DAMON GARDENHIRE:** I'll second that.

**BRIAN T. SHELLEM:** Alright. Any debate? Okay. Call for a vote?

**MARIN GRACEY:** Dr. Campbell?

**DR. KITTY CAMPBELL:** Yes.

**MARIN GRACEY:** Mr. Buswell?

**JARED BUSWELL:** Yes.

**MARIN GRACEY:** Mr. Pearson?

**WILLIAM PEARSON:** Yes.

**MARIN GRACEY:** Ms. Anderson?

**COURTNEY ANDERSON:** Yes.

**MARIN GRACEY:** Mr. Gardenhire?

**DAMON GARDENHIRE:** Yes.

**MARIN GRACEY:** Mr. Shellem?

**BRIAN T. SHELLEM:** Yes.

**MARIN GRACEY:** Ms. [PH 01:19:08] Wise?

**MS. WISE:** Yes.

**MARIN GRACEY:** Ms. Tomcho?

**BRITNI TOMCHO:** Yes.

**MARIN GRACEY:** Mr. Rutkauskas? Mr. Chairman, motion carries.

**BRIAN T. SHELLEM:** Motion carries. So they've been rejected. Here we go. Alright. Moving on to 8(c). Action: Review, discussion, and possible action regarding the procurement of outside legal counsel in accordance with 74OS20I for potential or anticipated litigation. As we know, um, Ben Gamla has indicated that they plan to litigate this matter, which we just rejected him for, for the religious beliefs. Mr. Schneider has been very helpful in giving us counsel on this. I, I want to bring to light, last month we approved the 20I request. This board has already said, we would like to have outside counsel.

**[01:20:00]**

I wanted to involve a few of our board members, obviously, without having a quorum. So I asked Mr. Buswell, Mr. Pearson, and Mr. Gardenhire to join me in some conference calls with two that we know are very outstanding. I had done some work prior to reaching out to others. But those conference calls were with Alliance Defending Freedom and First Liberty. Um, I think both of those are—both those firms are outstanding. Obviously, ADF had represented us in the past. They did an excellent job in representing us in Oklahoma and also at the U.S. Supreme Court. Um, but I wanted to make sure that we had objectivity in the situation where we face today. And so what I'd like to do before I just give all my opinion, I want to open it up to those board members who were part of those conversations and let them share with you. I would have loved to have all of us, but we would violate the open meetings laws and/or we would have had to have a—an executive session and have them both come in. I just didn't think that was the best, uh, respect of all our board members' time. So, um, if those board members who participated, I'd like to have you guys share your, your opinions and your thoughts in regards to those two firms. And then we can open it up to discussion with the entire board here.

**DAMON GARDENHIRE:** Sure. I mean my impression is both very highly qualified to do the work. I walked away impressed with both. I don't know that I walked away with some sort of definitive, um, you know, glaring difference between the two entities. Uh, they, they both do very similar work and I—it felt like they were both qualified. So really whichever we land on I think is probably going to do an excellent job at the end of the day.

**BRIAN T. SHELLEM:** Is it alright for you to share kind of your perspective of what you thought may could potentially help our board in, you know, one of those decisions?

**DAMON GARDENHIRE:** Sure. I mean one of them actually has a few more, uh, geographically located attorneys, and may have a better understanding of idiosyncrasies related to Oklahoma, our history, our, our constitution with burning point of kerosene in it, things like that. One of the strangest constitutions on the planet. Um, and so they might have a better, up close and personal view on some of the things that we're, we're dealing with, you know, as opposed to the other, the other group.

**BRIAN T. SHELLEM:** So to add some clarity to the other board members, um, I think, I think it's fair to say that every board member who was on the calls think that legally in the, in the court, they—both firms would represent us equally as well, meaning they are both excellent, of the highest caliber. They are—they, they would be both part of the A team. And again, this is no reflection that we don't think Mr. Thomas or Thomas Schneider is not an A team attorney. We've already discussed that. We, we think you're excellent. But I think there's, there's one of the key factors that Mr. Gardenhire is—there's three attorneys that are with First Liberty who are from Oklahoma and have strong Oklahoma ties. Um, three of them are already on the 20I list and are representing the state in other matters as well currently. That ways—and that, that would be First Liberty. Um, does that add the clarity that you're trying to seek, Mr. Gardenhire? Yep, okay.

**JARED BUSWELL:** Also, I want to reiterate that there's not a difference in financial costs between the two firms.

**BRIAN T. SHELLEM:** Correct. Whereas there were some people we talked about—or talked with early on, they would be charging us and we—our agency would pay. Both of these firms would represent us pro bono.

**WILLIAM PEARSON:** I would say there were pros and cons. Both firms are, uh, nonprofit organizations that specialize in religious freedom. Because they are a nonprofit, that's the pro. Uh, we're not spending any of our money. But I'm reminded constantly, it's something I've lived with all my life, that there's no such thing as a free lunch. That there's, uh, there's always a catch to it. I'm not sure what that catch is. Uh, the con was that I believe it's ADF was one of those. Did I get that correct?

**BRIAN T. SHELLEM:** ADF and First Liberty.

**WILLIAM PEARSON:** ADF is exactly the same firm that represented this board against the state of Oklahoma. Again, at the, uh, Oklahoma Supreme Court and the U.S. Supreme Court. So, um, I see a con is, is that's the perception that what, what is—why is the board going to, uh, same law firm that they used last time

**[01:25:00]**

to fight the state with the state law and state constitution. Uh, I agree with, with Damon that Liberty is the other nonprofit specializing in religious freedom. As a, a majority, I would say of

their attorneys that are only citizens or have familiarity with, with Oklahoma, the con with the two is that I have first-hand experience that they collaborated, uh, against the last law suit constantly. So those, those, those are some issues. So if, if I'm, if I'm left with ADF or Liberty, uh, you know, my recommendation is go to Liberty because of perception reasons, because of their Oklahoma connections, their familiarity with the case. Um, they haven't argued the case, uh, law. They participated in the background. They are very familiar with Oklahoma law and the constitution and particular statutes that we're dealing with. So, um, I see this as, uh, a law firm that wants another bite of the apple, is, is how I see it. And, uh, so like I said, my recommendation would be to go to Liberty.

**BRIAN T. SHELLEM:** So to, to echo a little bit more what is—to give you a little bit more insight, um, ADF is currently representing a school in Tennessee. This issue is percolating in the state of Tennessee as well. Just so you're aware, their attorney general had issued a, a statement to the opposite of our current attorney general that actually is exactly as our previous attorney general. Obviously people with legal minds seem to have this debate going back and forth. The difference there is one of the schools wanted to apply and their board wouldn't even let them accept the application. So they didn't get a yes or no vote. ADF is representing one of those schools. One of the advantages I think First Liberty would bring is that we would have our sole counsel versus ADF representing—if these things end up consolidating later on, one of the advantages of having our own attorney is representing our interests, not necessarily always looking at the interest of another party they could potentially be representing as well. I hope that made sense. Does everyone understand that? So, um, if anybody's been in litigation, you don't want your attorney to have to cut the baby. So, um—but Mr. Buswell?

**JARED BUSWELL:** A quick question. I don't remember two years ago, perhaps because I was new or the way events worked out, I don't remember, um, having to make a decision between, uh, hiring either of these good choices, ADF or First Liberty. But is there any reason why we chose ADF at, at that time that bears, uh, relevance to today's discussion?

**BRIAN T. SHELLEM:** It was the, the, the—in fact, Mr. Pearson was on the board of the virtual board who chose ADF. And so the, the, the decision was made prior to—

**JARED BUSWELL:** That's right. That's right.

**BRIAN T. SHELLEM:** To us—this, this, uh, agency—

**JARED BUSWELL:** Prior to this body.

**BRIAN T. SHELLEM:** Yeah. Correct. Questions from other board members? You know, it's a big deal choosing your attorney. So we want to make sure we get it right. But you were on those phone calls as well.

**JARED BUSWELL:** Yeah. I was, uh, very comfortable—I, I, I also, um, experienced working with ADF as, as our representatives, our counsel. Utmost professionalism. Excellence in every aspect. Uh, even in meetings that weren't scheduled, just walking around Washington, D.C.,

waiting in line at the Supreme Court. The way they handled the whole situation was top notch. And so I just couldn't say enough about how excellent they, they did.

**BRIAN T. SHELLEM:** Yeah. And I, I will say this. Both firms are very complementary towards one another. And as Ms. Pearson said, they have worked on the same side of previous litigation. Even the firm that potentially is going to represent Ben Gamla has been in that same arena. We, we understand that. Um, but I think having the fidelity of an attorney who will represent solely us and this interest, I think is an imperative fact that I don't want to set, set aside. Um, I think ADF is phenomenal. They, they are great. I think First Liberty is outstanding and phenomenal as well. So it comes down to what we want to choose as, as a board and I can tell you, based on being truly objective of where, where the facts are, I would lean towards First Liberty based on where we stand. It would probably be a little bit harder for us and our staff. So our apologies to, uh—if we go, go forward because ADF is very familiar with our process.

**[01:30:00]**

They know everything about us. So there is a whole other—I would say familiarity we would have to happen. But our job is to make decisions for the best for the state of Oklahoma that represents this board's values as well. So I know it might be harder. I see the disappointment. But I think we—if we weigh the decisions, we, we have to be objective in, in doing, doing that. So, um, for that reason, I would probably choose First Liberty, um, being objective, not just emotional or tie. The easy choice would be yeah, let's just do the ADF. They already know and understand Oklahoma law. I think First Liberty does as well. Um, they were one of the two finalists in the, the previous consideration, so I don't think they were, um—

**REBECCA WILKINSON:** That is one thing I was going to add is that when even the Statewide Virtual Charter School Board was making this same decision, both of these firms were at the top of their list and received the same complements and the same confidence in the two.

**JARED BUSWELL:** In the midst of these conversations, we had some in-depth, uh, in-depth questions just trying to get to some difference, some substantial difference between the two firms. Um, I noted that in one of the answers—and I don't have the exact paperwork in front of me, but that, uh, to my knowledge, uh, First Liberty is currently working—partnered with Becket Fund on a case in Washington state. And, um, and that may be, uh, perceived as some sort of, you know, you know, too close of a partnership with that particular firm that may or may not be on the opposite end of a potential case. And so I just—you know, just getting down to those little things. I lean more comfortable with ADF, but I'd be excited about either option.

**BRIAN T. SHELLEM:** Um, you know, and ADF, just in full disclosure, um, I talked to Jim Campbell who argued for us in front of the Supreme Court just last week. And he, he—we've talked about that exact issue because they have partnered with Becket in the past, so they have a good relationship with them. They don't currently have any co-litigation. Um, but it's been—he said it's probably been about 10 years since they've been on the same side partnering together. So I think it's a very good observation. Um, and we can—maybe we have A.J. Ferate here.

Would that potentially be a, a, an issue? You can just answer from there. Um, in regards to, uh, Becket.

**REBECCA WILKINSON:** The, uh, the podium would be better.

**BRIAN T. SHELLEM:** Yeah, that's fine. So you'd be—

**REBECCA WILKINSON:** On the record.

**BRIAN T. SHELLEM:** On the record.

**REBECCA WILKINSON:** Yes.

**BRIAN T. SHELLEM:** On, on video.

**A. J. FERATE:** Good afternoon, board. My name is A.J. Ferate. I'm an attorney with Spencer Fang here in town and I've been a volunteer attorney with First Liberty for 14—or 12 years, sorry, 12 years now. So, uh, it's good to be with you this afternoon. Um, uh, I think the specific question that's being asked is, is there any issue between, um, Becket and, and, um, First Liberty as far as trying to process this litigation. I would say the answer is no. Um, there's enough attorneys in each organization that they work on one case over here and another case over here, uh, separate from each other. And, and in law firms and the rules of ethics really just kind of require, um, walls that—it's referred to I think as a, as a Chinese Wall within, within legal ethics, um, where you just wall yourself off from what's going on, on the other side, and you don't discuss it and you don't know what's going on or anything like that. And so, um, so even, even if it were, um, considered to be some sort of an issue, I would say no, that there's not. And, um, you know, I can say for one, as a volunteer attorney, I'm not involved in that Washington state issue and I would be—would actually be involved in, in this matter.

**BRIAN T. SHELLEM:** So the Chinese Wall, is it's because it's the Chinese Great Wall? I just didn't know if Trump would take offense if you didn't call it a border wall or something like that, you know.

**A. J. FERATE:** I don't know if it's a great wall or what. That's never actually been, been explained. But I think my, my ethics professor in law school, it was one of those little dividing walls that, you know, it's there. It's to, it's to separate the two. But, uh, but great. It can be great if you want it to be.

**BRIAN T. SHELLEM:** It's a Chinese Wall.

**A. J. FERATE:** It's a Chinese Wall.

**BRIAN T. SHELLEM:** Okay. Thank you very much. Any other questions for A. J.? Because I, I think it's important that we have that and ask—thank you for providing that clarity.

**A. J. FERATE:** Yeah.

**BRIAN T. SHELLEM:** Alright. Any other questions from board members who were not able to be part of those calls? We want to make sure we add any clarity to that.

**BRITNI TOMCH:** I think just my opinion, not a question. But just in my opinion that, um, going with ADF again to like the things that Mr. Pearson said, I think that those conflicts of having represented us before, and also, um, them representing a case in Tennessee,

**[01:35:00]**

that that is a big con in my book.

**BRIAN T. SHELLEM:** Yes?

**A. J. FERATE:** Thank you for indulging me again. I just got notice when I went back to my seat that that case is over in Washington state, so there is no issue there.

**BRIAN T. SHELLEM:** Okay. Okay. Thank you very much.

**A. J. FERATE:** Yeah.

**BRIAN T. SHELLEM:** Thank you. So that one's done. That resolves that, right. So they've been in a case in the past. One more recent than the other, but the ADF and, yeah—

**JARED BUSWELL:** The point of my statement was to say that we're really splitting hairs here between two good options. It's good to have good options. Uh, my instinct is to really trust, uh, Brian, as far as a person who's really spoken face-to-face the most with these two firms, and has talked to employees and, and just kind of navigating, uh, the whole way. I, I really kind of trust his perspective on this.

**BRIAN T. SHELLEM:** Well, I wanted to involve really these other board members, not just rely on myself. You know, and I appreciate their time to come and spend time with each of those firms via conference call. Um, and I think your insight—and I felt that was very, very helpful too. So—

**BRITNI TOMCHO:** And, and just to—the First Liberty, the one that's more familiar with Oklahoma State Constitution?

**BRIAN T. SHELLEM:** Well, we have three attorneys that are actually from Oklahoma. You know, and A. J. Ferate being one of them is right here on Broadway Extension and, and Britton Road. Um, so very, very close. But they're—they would use the, the entirety of their firm to represent us, but there's—out of the four attorneys that they would use, three of them are from Oklahoma.

**REBECCA WILKINSON:** It might just be interesting to mention that when we, uh, were represented by ADF, uh, that we also had a need for a second firm here in Oklahoma that provided some of that Oklahoma context, helped with filings, that sort of thing. And that would not be necessary with the, with the, the other firm.

**BRIAN T. SHELLEM:** Yep. Yep.

**WILLIAM PEARSON:** Mr. Chair?

**BRIAN T. SHELLEM:** Yep?

**WILLIAM PEARSON:** I'd like to make a motion.

**BRIAN T. SHELLEM:** Okay. Absolutely, Mr. Pearson.

**WILLIAM PEARSON:** That, uh, the board selects Liberty—

**BRIAN T. SHELLEM:** First Liberty.

**WILLIAM PEARSON:** First Liberty as our 20I selection to represent the board in any potential legal action brought about by the rejection of Ben Gamla Foundation Jewish School application.

**BRIAN T. SHELLEM:** There's a motion on the floor. Is there a second?

**DAMON GARDENHIRE:** Second.

**BRIAN T. SHELLEM:** Okay. Any further debate? Okay. Call for a vote.

**MARIN GRACEY:** Mr. Pearson?

**WILLIAM PEARSON:** Yes.

**MARIN GRACEY:** Dr. Campbell?

**DR. KITTY CAMPBELL:** Yes.

**MARIN GRACEY:** Ms. Anderson?

**COURTNEY ANDERSON:** Yes.

**MARIN GRACEY:** Mr. Buswell?

**JARED BUSWELL:** Yes.

**MARIN GRACEY:** Mr. Shellem?

**BRIAN T. SHELLEM:** Yes.

**MARIN GRACEY:** Ms. Tomcho?

**BRITNI TOMCHO:** Yes.

**MARIN GRACEY:** Mr. Rutkauskas? Ms. Heidi?

**MS. WISE:** Yes.

**MARIN GRACEY:** Sorry, Wise. Mr. Gardenhire?

**DAMON GARDENHIRE:** Yes.

**MARIN GRACEY:** Mr. Chairman, the motion carries.

**BRIAN T. SHELLEM:** Motion carries. Congratulations, First Liberty. Alright.

**REBECCA WILKINSON:** One thing that I would say as a closing comment, that we will work closely with First Liberty to establish a, a contract and then to complete the application that will go to Attorney General Drummond to make the decision as to whether or not he will approve, uh, outside counsel for this board.

**[01:38:29]**

TRANSPERFECT
LEGAL SOLUTIONS

I hereby certify that "OKSCSB Meeting 0  092026" is, to the best of my knowledge and belief, a true and accurate transcription from English to English.

Anders Nelson
Anders Nelson (Mar 11, 2026 09:21:56 EDT)

Anders Nelson
Project Manager
TransPerfect Legal Solutions

March 11, 2026

216 EAST 45TH STREET, 9TH FLOOR, NEW YORK, NY 10017 T +1 212.400.8845 F +1.212.867.3106
LEGAL.TRANSPERFECT.COM

Press release issued by First Liberty Institute on May 23, 2025, filed below on April 1, 2026, as ECF No. 15-3 (Exhibit 3 to Kaiman Intervenors' Motion to Intervene)

ABOUT (https://firstliberty.org/about-us/) CASES (https://firstliberty.org/cases/)

PROGRAMS (https://firstliberty.org/) NEWS (https://firstliberty.org/news)

CONNECT (https://firstliberty.org/contact-us/)

(https://firstliberty.org)

GET LEGAL HELP (https://firstliberty.org/request-legal-help/)

GIVE (https://firstliberty.org/donation/support-first-liberty-main/)

# News

# Split Supreme Court Blocks Nation's First Religious Charter School, Setting Up Future Legal Battles

**Share: (https://www.facebook.com/sharer/sharer.php?u=https://firstliberty.org/news/supreme-court-blocks-nations-first-religious-charter-school/) (https://twitter.com/home?status=Split Supreme Court Blocks Nation's First Religious Charter School, Setting Up Future Legal Battles%0Ahttps://firstliberty.org/news/supreme-court-blocks-nations-first-religious-charter-school/) (https://www.linkedin.com/shareArticle?mini=true&url=https://firstliberty.org/news/supreme-court-blocks-nations-first-religious-charter-school/&title=Split Supreme Court Blocks Nation's First Religious Charter School, Setting Up Future Legal Battles&summary=&source=)**

May 23, 2025

## MORE NEWS

(https://firstliberty.org/news/first-liberty-insider-march-27th-2026/)

### First Liberty Insider: March 27th, 2026 (https://firstliberty.org/new liberty-insider-march-27th-2026/)




by Jorge Gomez (https://firstliberty.org/authors/#gomez) • 3 minutes

The nation's first publicly funded religious charter school has been blocked, following a split decision from the U.S. Supreme Court.

On Thursday, the Court issued a 4-4 decision without an opinion (https://www.supremecourt.gov/opinions/24pdf/24-394_9p6b.pdf). The nation's highest court affirmed a ruling from the Oklahoma Supreme Court, which disallowed St. Isidore of Seville Catholic Virtual School.

St. Isidore was excluded from receiving publicly available benefits simply because of its religious character. Oklahoma's Charter School Board approved St. Isidore to participate in the state's network of independently designed and privately operated charter schools. But the Oklahoma Supreme Court ruled that a publicly-funded religious charter school is unconstitutional.

The U.S. Supreme Court issued a one-sentence statement upholding the lower court's decision, saying only: "The judgment is affirmed by an equally divided Court."

Only eight of the Court's nine justices heard the case. Justice Amy Coney Barrett recused herself. Barret is a former law professor at Notre Dame. The law school's Religious Liberty Clinic represented St. Isidore.

First Liberty and the law firms Gibson Dunn and Spencer Fane filed a friend-of-the-court brief (https://firstliberty.org/news/supporting-oklahoma-religious-charter-school/) supporting the school's inclusion in the state's program. First Liberty represents Oklahoma Superintendent of Public Instruction Ryan Walters, the State Board of Education and the State Department of Education.

"We are disappointed, but the result of this 4-4 decision with no opinion is that the fight against religious bigotry will continue in Oklahoma and across the country," said Hiram Sasser, Executive General Counsel for First Liberty. "We will not stop until we can bring an end to religious discrimination in education."

U.S. Supreme Court Brings Good News with Major Ruling for Evangelist, opening up huge doors to share your faith.




(https://firstliberty.org/news/u-s-supreme-court-brings-good-news-with-major-ruling-for-evangelist/)

**U.S. Supreme Court Brings Good News with Major Ruling for Evangelist (https://firstliberty.org/news/u-s-supreme-court-brings-good-news-with-major-ruling-for-evangelist/)**

Preach it, brother! Supreme Court victory for Mississippi Evangelist opens up huge doors to share your faith.

"Allowing the exclusion of religious schools from our charter school program in the name of 19th century religious bigotry is wrong," said Superintendent Walters. "As state superintendent, I will always stand with parents and families in opposition to religious discrimination and fight until all children in Oklahoma are free to choose the school that serves them best, religious or otherwise."

This is a disappointing outcome, but there is a silver lining. The Court did not issue an opinion, nor was there a majority of the Court that decided either way, which means that a bad precedent was not set. On the contrary, this ruling allows for litigating this issue in the future.

What's more, the ruling only applies in Oklahoma and does not affect the issue of religious charter schools nationwide. In other words, religious schools in other states are still eligible to apply for and receive public funding on an equal basis as secular organizations.

**The Fight to Protect Religious Education is Far from Over.**

This week's result means there will be more legal battles ahead to ensure the government treats faith-based organizations fairly and the same as everyone else.

In recent years, the Supreme Court has told states three separate times that their practice of excluding religious organizations from public benefits is "odious" to the Constitution. Those cases include *Trinity Lutheran Church v. Comer*, *Espinoza v. Montana Department of Revenue*, and *Carson v. Makin*—First Liberty's Treat Children Fairly (https://firstliberty.org/treat-children-fairly/) case.

The Supreme Court's landmark ruling in *Carson* made clear that states cannot discriminate in student-aid programs against parents who send their children to religious schools. That decision also ensured fairness in how the government treats all religious schools and organizations.

Even so, many lower courts still have not fully or faithfully applied the binding precedents set by the nation's highest court.

Our Supreme Court victories opened doors of opportunity and restored religious liberty to millions of Americans. But opponents of religious liberty are relentless.

No matter how many times they get schooled on the Constitution, some refuse to follow the Supreme Court's direction. Every effort to advance religious liberty is being met with resistance and lawsuits.

First Liberty is fighting dozens of cases (https://firstliberty.org/category-cases/schools/?relationStatus=1654) involving religious schools, as well as multiple other fronts, to make sure that the victories we secured can continue to have impact—and that means we need your continued support.

Please give to First Liberty today. Your gift is essential in this fight—it's the difference maker that will help us win more cases and secure the blessings of liberty for our children and grandchildren.

**GIVE ONCE** **GIVE MONTHLY**

**$25** **$50** **$100**

$ Or enter your own gift amount:

**DONATE $50 ONE-TIME**

(https://www.facebook.com/firstlibertyinstitute) (https://www.instagram.com/firstlibertyinstitute/) (https://x.com/firstliberty_) (https://www.youtube.com/c/FirstLibertyInstitute) (https://www.linkedin.com/company/firstliberty/)

Key Cases (https://firstliberty.org/fea cases/)
Coach Joe Kennedy (https://firstliberty.org/coa joe-kennedy/)
Pastor Chris Avell (https://firstliberty.org/pas chris/)
Alaska Airlines (https://firstliberty.org/ala

First Liberty Live! (https://firstlibertylive.con
Newsletter (https://firstliberty.org/nev sign-up/)
Meet Our Team (https://firstliberty.org/abc us/team/)
Internships (https://firstliberty.org/abc us/internships/)

Annual Report (https://firstliberty.org/anr report/)
Get Legal Help (https://firstliberty.org/req legal-help/)
Give (https://firstliberty.org/dor first-liberty-main/)

# Press release issued by First Liberty Institute on March 24, 2026, filed below on April 1, 2026, as ECF No. 15-4 (Exhibit 4 to Kaiman Intervenors' Motion to Intervene)

# Press Releases

## Attorneys for Oklahoma Charter School Board Respond to Lawsuit Filed Over Decision Forced by State Supreme Court

**Share:** (https://www.facebook.com/sharer/sharer.php?u=https://firstliberty.org/media/attorneys-for-oklahoma-charter-school-board-respond-to-lawsuit-filed-over-decision-forced-by-state-supreme-court/) (https://twitter.com/home?status=Attorneys for Oklahoma Charter School Board Respond to Lawsuit Filed Over Decision Forced by State Supreme Court%0Ahttps://firstliberty.org/media/attorneys-for-oklahoma-charter-school-board-respond-to-lawsuit-filed-over-decision-forced-by-state-supreme-court/) (https://www.linkedin.com/shareArticle?mini=true&url=https://firstliberty.org/media/attorneys-for-oklahoma-charter-school-board-respond-to-lawsuit-filed-over-decision-forced-by-state-supreme-court/&title=Attorneys for Oklahoma Charter School Board Respond to Lawsuit Filed Over Decision Forced by State Supreme Court&summary=&source=)

March 24, 2026

### MORE NEWS

(https://firstliberty.org/media/appeals-court-agrees-church-can-challenge-texas-utility-districts-levying-excessive-fees-during-construction-project/)

**Appeals Court Agrees: Church Can Challenge Texas Utility District's Levying Excessive Fees During Construction Project (https://firstliberty.org/medi court-agrees-church-can-challenge-texas-utility-districts-levying-excessive-fees-during-construction-project/)**

**Press Releases (https://firstliberty.org/category-media/press-releases/)**

**News Release**

**For Immediate Release: 3.24.26**

**Contact:** John Manning, media@firstliberty.org (mailto:media@firstliberty.org)
Direct: 972-941-4453

**Attorneys for Oklahoma Charter School Board Respond to Lawsuit Filed Over Decision Forced by State Supreme Court**

*Charter school board denied application of Jewish school because Oklahoma Supreme Court requires religious discrimination in decision making.*

**Oklahoma City, OK**—Today, a federal lawsuit was filed against the Oklahoma Statewide Charter School Board ("SCSB") by the National Ben Gamla Jewish Charter School Foundation after the board rejected Ben Gamla's application for a state charter school.  First Liberty Institute and Spencer Fane LLP represent the SCSB.

"The Board is simply doing what the Oklahoma Supreme Court requires, which is discriminate against faith-based applicants simply because they are religious.  If it were not for the ban on religious schools, the board would have approved this school's application," said Hiram Sasser, Executive General Counsel for First Liberty Institute.

The National Ben Gamla Jewish Charter School Foundation applied to the SCSB to become the nation's first state-funded religious / Jewish charter school. The SCSB rejected the application because it is bound by the decision of the Oklahoma Supreme Court in *Drummond v. Oklahoma Statewide Virtual Charter School Board*, which stated that religious charter schools violated the Oklahoma Constitution.

###

**About First Liberty Institute**

First Liberty Institute (https://firstliberty.org/) is a non-profit public interest law firm and the largest legal organization in the nation dedicated exclusively to defending religious freedom for all Americans.

To arrange an interview, contact John Manning at media@firstliberty.org (mailto:media@firstliberty.org) or by calling 972-941-4453.

News Release For Immediate Release: 3.27.26 Contact: John Manning, media@firstliberty.org Direct: 972-941-4453 Appeals Court Agrees: Church Can Challenge Texas Utility District's Levying Excessive Fees During Construction Project The case returns to trial court to consider claims under the First Amendment and the Texas Religious Freedom Restoration Act. The Woodlands, TX — […]

(https://firstliberty.org/media/trump-administration-asked-to-investigate-kentucky-coffee-shop-after-firing-employee-for-religious-beliefs/)

## Trump Administration Asked to Investigate Kentucky Coffee Shop after Firing Employee for Religious Beliefs (https://firstliberty.org/media/trump-administration-asked-to-investigate-kentucky-coffee-shop-after-firing-employee-for-religious-beliefs/)

First Liberty Institute and the law firm Sturgill Turner filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against local Louisville coffee shop chain, Heine Brothers, on behalf of former employee and current college student, Paige Rogers.

(https://www.facebook.com/firstlibertyinstitute) (https://www.instagram.com/firstlibertyinstitute/)

(https://x.com/firstliberty_) (https://www.youtube.com/c/FirstLibertyInstitute)

(https://www.linkedin.com/company/firstliberty/)

# Five-year budget attached to Ben Gamla's application for initial authorization, filed below on April 1, 2026, as ECF No. 15-5 (Exhibit 5 to Kaiman Intervenors' Motion to Intervene)

| | | Start-up | FY2026 | FY2027 | FY2028 | FY2029 | FY2030 | Assumptions |
|---|---|---|---|---|---|---|---|---|
| **Funding - Enrollment Revenue** | | | | | | | | |
| | | | | | | | | |
| **Total Enrollment** | | | 500 | 500 | 1000 | 1250 | 1500 | |
| | | | | | | | | |
| FTE | FTE(Gen.ED)FTE(SPED) | | 425 | 425 | 800 | 1000 | 1200 | Assumes 87% funded ADA Assumes 20% SPED populations |
| | State Aid | | 75 | 75 | 200 | 250 | 300 | |
| State | Other - State Special Disbursments | | $2,559,253.00 | $2,688,057.00 | $5,689,222.16 | $6,881,976.35 | $8,255,041.08 | |
| | | | $0 | $0 | $0 | $0 | $0 | |
| | | | | | | | | |
| Total State | | $0 | $2,559,253 | $2,688,057,01 | $5,689,222 | $6,881,976 | $8,225,041 | |
| Accel School Funding | | $0 | $0 | $0 | $0 | $0 | $0 | |
| Total Local | | $0 | $0 | $0 | $0 | $0 | $0 | |
| | | | | | | | | |
| **Total Revenue/Funding** | | $0 | $2,559,253 | $2,688,057 | $5,689,222 | $6,881,976 | $8,255,041 | |
| **Instructional Employee Related Cost** | | | | | | | | |
| | | | | | | | | |
| Regular Instructional Staff | Regular Education Teachers Salaries | $0 | $630,000 | $645,750 | $1,323,788 | $1,646,663 | $2,088,937 | |
| | Regular Education Teachers Benefits | $0 | $217,350 | $217,350 | $434,700 | $543,375 | $720,683 | Assumes 34.5% for taxes and benefit allocation |
| | | | | | | | | Assumes annual salary increase of 2.5% per year |
| | | | | | | | | |
| Special Ed/ELL Instructional Staff | ELL Teachers Salaries | $0 | $46,668 | $46,671 | $119,004 | $142,340 | $192,570 | |
| | Special Education Teachers Salaries | $0 | $108,579 | $111,293 | $222,654 | $282,510 | $325,737 | |
| | ELL & Special Education Teachers Benefits | $0 | $37,460 | $38,396 | $76,816 | $97,466 | $112,379 | |
| Support Staff | Success Coaches/Counselor Salaries | $0 | $40,008 | $41,008 | $82,041 | $104,096 | $126,702 | |
| | Support Staff Benefits | $0 | $6,900 | $6,900 | $28,304 | $35,913 | $43,712 | |
| **Total - Instruction Employee Related Costs** | | $0 | $1,086,965 | $1,107,368 | $2,287,307 | $2,852,363 | $3,610,720 | |
| | | | | | | | | |
| **Instructional Program Costs** | | | | | | | | |
| General Ed Instructional Program | Student Testing and Assessment | $0 | $75,000 | $75,000 | $238,913 | $328,252 | $422,811 | |
| | School Extracurricular Activities | $0 | $37,500 | $37,500 | $119,457 | $164,126 | $211,406 | Academic field trips and graduation activities |
| | Student Internet Access Hardware | $0 | $50,000 | $50,000 | $53,045 | $54,636 | $56,275 | |
| | Curriculum & Materials, BG System, and Instructional Support Services | $0 | $650,000 | $650,000 | $1,950,000 | $2,600,000 | $3,250,000 | |
| | Student Technology Assistance Services | $0 | $75,000 | $75,000 | $225,000 | $300,000 | $375,000 | See attached price list for costs |
| | Student Computer & Software | $0 | $244,375 | $85,000 | $170,000 | $212,500 | $255,000 | See attached price list for costs (Assumption) |
| Staff Training/PD (Teachers) | | | $6,348 | $13,146 | $20,369 | $28,123 | $35,945 | |
| Regular Instructional Program | | $0 | $1,138,223 | $985,646 | $2,776,784 | $3,687,637 | $4,606,437 | |
| Special Ed Instructional Program | State Testing (Travel & Administration) | $0 | $25,000 | $25,761 | $26,546 | $27,354 | $28,187 | |
| | IEP Management Software | $0 | $2,500 | $2,563 | $2,627 | $2,692 | $2,760 | |
| | Alternate Curriculum | $0 | $1,206 | $1,206 | $3,757 | $5,139 | $6,647 | |
| | Assistive Technology | $0 | $24,279 | $24,279 | $75,602 | $103,432 | $133,763 | |
| | Special Education Direct Delivery Services | $0 | $42,500 | $42,500 | $85,000 | $106,250 | $126,675 | |
| Special Ed Instructional Program | | $0 | $95,485 | $96,309 | $193,532 | $244,867 | $298,032 | |
| | | | | | | | | |
| Total - Instructional Program Costs | | $0 | $2,320,673 | $2,189,323 | $5,257,623 | $6,784,867 | $8,515,189 | |
| | | | | | | | | |
| Ben Gamla Jewish Charter School - Base Budget | | | | | | | | |
| | | | | | | | | |
| Administrative Employee Related Costs | | | | | | | | |
| Special Ed Admin Staff | Manager of Special Education | $0 | $0 | $0 | $0 | $80,000 | $82,000 | |
| | Special Education Coordinator | $0 | $60,000 | $61,500 | $63,038 | $64,613 | $66,229 | |
| | SPED Admin Benefits | $0 | $20,700 | $21,218 | $21,748 | $49,892 | $51,139 | |
| Administration Staff | Head of School | $8,333 | $100,000 | $102,500 | $105,063 | $107,689 | $110,381 | |
| | Principal(s) | $0 | $0 | $0 | $85,000 | $87,125 | $89,303 | |
| | CTE Coordinator | $0 | $75,000 | $76,875 | $78,797 | $80,767 | $82,786 | |
| | Student Services Coordinator | $0 | $50,000 | $51,250 | $52,531 | $53,845 | $55,191 | |
| | Register | $0 | $22,000 | $22,500 | $22,500 | $22,500 | $49,672 | |
| | Administration Assistants | $0 | $0 | $0 | $0 | $0 | $40,000 | |
| | Operations Manager | $0 | $60,000 | $61,500 | $63,038 | $64,613 | $66,229 | |
| | Attendance/Testing Officer | $0 | $0 | $0 | $0 | $0 | $42,000 | |
| | Administration Staff Benefits | $2,875 | $113,850 | $116,696 | $148,939 | $152,662 | $184,769 | |
| Full School Staff | Bonus Allocation | $0 | $44,097 | $77,688 | $114,843 | $151,960 | $189,917 | |
| | Stipends | $0 | $20,000 | $20,600 | $21,218 | $21,855 | $22,510 | |
| Total -Administrative Employee Related Costs | | $11,208 | $566,147 | $612,327 | $776,715 | $937,521 | $1,132,126 | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Support Services - Administration | School Treasurer | $0 | $75,000 | $77,284 | $79,638 | $82,063 | $84,562 | Independently contracted services | |
| | Encumbrance Clerk | $0 | $45,000 | $46,125 | $47,278 | $48,460 | $49,672 | Independently contracted services | |
| | Staff Recruiting | $19,446 | $5,634 | $4,692 | $4,968 | $5,012 | $5,406 | Approximately $250 per new hire | |
| | Legal Services | $10,000 | $5,000 | $5,150 | $5,305 | $5,628 | $5,628 | | |
| | Insurance - D&O and Liability | $10,000 | $36,000 | $37,096 | $38,226 | $39,390 | $40,590 | | |
| | Office Supplies | $0 | $5,000 | $5,152 | $5,309 | $5,471 | $5,637 | | |
| | Office Postage | $0 | $1,000 | $1,030 | $1,062 | $1,094 | $1,127 | | |
| | Copiers / Reproduction | $0 | $4,000 | $4,122 | $4,247 | $4,377 | $4,510 | | |
| | Association Dues | $0 | $2,000 | $2,061 | $2,124 | $2,188 | $2,255 | | |
| | Travel and Conferences (Admin Staff) | $7,500 | $4,000 | $4,122 | $4,247 | $4,924 | $6,201 | | |
| | Board Related Expenses | $0 | $10,000 | $10,305 | $10,618 | $10,942 | $11,275 | | |
| | Community Outreach and School Website | $0 | $50,000 | $50,000 | $100,000 | $125,000 | $150,000 | | |
| | Enrollment Processing Fee | $0 | $50,000 | $50,000 | $100,000 | $125,000 | $150,000 | | |
| | School Operations Support Services | $0 | $255,925 | $268,806 | $569,222 | $688,197 | $825,504 | | |
| | School Business Support Services | $0 | $48,394 | $96,528 | $144,411 | $191,904 | $239,722 | | |
| Charter Authorizer Fee | | $0 | $24,197 | $48,264 | $72,206 | $95,952 | $119,861 | Assumes an oversight fee of 1% of revenue | |
| Support Services - Administration | | $46,946 | $621,150 | $710,737 | $1,188,861 | $1,435,602 | $1,701,950 | | |
| Miscellaneous | External Audit | $0 | $15,000 | $15,457 | $15,928 | $16,413 | $16,912 | | |
| | Admin Payroll Processing | $0 | $22,986 | $22,986 | $64,347 | $86,699 | $111,317 | | |
| Banking Fees | | $0 | $1,000.00 | $1,030 | $1,062 | $1,094 | $1,127 | | |
| Business | | $0 | $38,986 | $59,299 | $81,337 | $104,205 | $129,357 | | |
| Pupil Health | Contracted Pupil Health Support | $0 | $3,780 | $6,616 | $9,620 | $12,605 | $16,980 | | |
| Pupil Health | | $0 | $3,780 | $6,616 | $9,620 | $12,605 | $16,980 | | |
| Total Support Services | | $0 | $42,766 | $65,915 | $90,957 | $116,810 | $146,337 | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Total - Business & Operations Costs | | $46,946 | $749,448 | $888,656 | $1,461,732 | $1,786,003 | $2,140,960 | | |
| | | | | | | | | | |
| Ben Gamla Jewish Charter School - Base Budget | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Facilities Cost | | | | | | | | | |
| Facilities & Maintenance Services | | $0 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | Assumes a 1,500 sqft office @ $10 per sqft | |
| Office Rent Office Utilities | | | | | | | | | |
| Maintenance and Repair | | | | | | | | | |
| High Speed Internet & Telephone | | | | | | | | | |
| In Person Covid-19 Health Measures Furniture | | | | | | | | | |
| Fixtures and Equpment | | | | | | | | | |
| | | | | | | | | | |
| **Total - Facilities Cost** | | $0 | $52,250 | $51,251 | $52,392 | $54,392 | $56,033 | | |
| Debt Service / Other Expenditures | Interest | $0 | $0 | $0 | $0 | $0 | $0 | | |
| | | | | | | | | | |
| Total Gross Expenses | | $58,155 | $3,688,518 | $3,741,557 | $7,548,868 | $9,562,813 | $11,844,308 | | |
| | | | | | | | | | |
| Total Net Expenses | | $0 | $2,314,824 | $2,466,223 | $4,290,235 | $5,320,212 | $6,599,082 | | |
| | | | | | | | | | |
| Surplus (Deficit) | | $0 | $244,429 | $221,834 | $1,398,987 | $1,561,765 | $1,655,959 | | |
| Surplus (Deficit) % | | 0% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | | |
| | | | | | | | | | |
| Fund Balance | | $0 | $217,350 | $217,350 | $434,700 | $543,375 | $720,683 | | |
| Fund Balance % | | 0% | 1.00% | 1.00% | 2.00% | 2.50% | 30.00% | | |
| | | | | | | | | | |
| | | | | | | | | | |

# Declaration of Rabbi Daniel Kaiman, filed below on April 1, 2026, as ECF No. 15-6 (Exhibit 6 to Kaiman Intervenors' Motion to Intervene)

**DECLARATION OF RABBI DANIEL KAIMAN**

I, Rabbi Daniel Kaiman, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I presently reside in Tulsa County, Oklahoma.

2. I am the Principal Rabbi of Congregation B'nai Emunah in Tulsa, Oklahoma. I am a member of the Rabbinical Assembly, which is the professional association of Conservative rabbis. I received my rabbinic ordination from the Ziegler School of Rabbinic Studies at the American Jewish University.

3. I am the parent of two children who attend a non-charter public elementary school in Tulsa County, Oklahoma.

4. I pay various taxes to the State of Oklahoma that provide revenue for public schools, including charter schools. These include individual income taxes, general sales taxes, and motor-vehicle taxes. I also pay local property taxes to Tulsa County.

5. I understand that Ben Gamla Jewish Charter School desires to be a public charter school that teaches a religious curriculum. I object to the use of tax dollars to fund Ben Gamla Jewish Charter School as a public charter school for the reasons stated below.

6. I am passionate about Jewish education—indeed, I have dedicated my life to it. Children in my congregation, including my own children, receive excellent, privately funded Jewish education through our synagogue and at home in accordance with our community values. But the mixing of religion and government creates opportunities for religious coercion. So I strongly object to the use of tax dollars to fund a religious public school.

7. I also understand that Ben Gamla reserves the right to discriminate in employment, and that its policies or practices would have discriminatory effects on prospective and actual students and employees. Not only do I object to my tax dollars funding a school that

may or will discriminate, but I also could not send my children to Ben Gamla in good conscience. Part of why I send my children to public school is that I value having them learn alongside students of other backgrounds.

8. As the parent of two students in public school, I see firsthand our public schools' resource limitations. For example, my children's teachers regularly ask for donated school supplies, and the school regularly seeks donations to fund staff positions and make infrastructure improvements. I believe that approval of Ben Gamla as a public charter school would result in diversion of these limited public resources away from other public schools, including my children's, that are appropriate for and welcoming to students of all faiths and backgrounds.

9. I believe that government funding of Ben Gamla as a public charter school would violate the separation of church and state.

10. I believe that government funding of Ben Gamla as a public charter school would be unlawful.

11. I seek to intervene in this case to protect my interests—as a taxpayer and as a parent of children attending an Oklahoma public school—in preventing the unlawful government funding of Ben Gamla as a public charter school.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Tulsa County, Oklahoma, on March 12, 2026.

DK

Rabbi Daniel Kaiman

# Declaration of Bradley Archer, filed below on April 1, 2026, as ECF No. 15-7 (Exhibit 7 to Kaiman Intervenors' Motion to Intervene)

**DECLARATION OF BRADLEY ARCHER**

I, Bradley Archer, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I presently reside in Tulsa County, Oklahoma.

2. I am a social-studies teacher at a charter school in Tulsa County, Oklahoma. I teach United States History, Women's Studies, and Introduction to Epistemology.

3. I am the parent of a child who attends a non-charter public school in Tulsa County, Oklahoma. Beginning in the 2026–2027 schoolyear, my child will attend the charter school at which I teach.

4. I pay various taxes to the State of Oklahoma that provide revenue for public schools, including charter schools. These include individual income taxes, general sales taxes, and motor-vehicle taxes. I also pay local property taxes to Tulsa County.

5. I understand that Ben Gamla Jewish Charter School desires to be a public charter school that teaches a religious curriculum. I object to the use of tax dollars to fund Ben Gamla Jewish Charter School as a public charter school for the reasons stated below.

6. I am an atheist. I object to my tax dollars being used to present religious teachings as truth. I object to my tax dollars being used to promote any religion or one set of religious beliefs over others.

7. I am raising my child in a secular household. At the same time, I also encourage my child to be curious about spirituality and open to various religious and nonreligious beliefs. I could not—consistently with my beliefs—send my child to Ben Gamla because it plans to promote one particular set of religious beliefs.

8. In addition, I would fear that my child would face religious discrimination at Ben Gamla. I understand that Ben Gamla reserves the right to discriminate in employment, and that

its policies or practices would have discriminatory effects on prospective and actual students and employees.

9. I further understand that Ben Gamla plans to require teachers to "advocate for the school" and its "mission"; to "uphold and support" Jewish "principles, teachings, and commitments"; to "refrain from actions that are contrary to the teachings of the community"; and to "uphold the standards of the Jewish tradition in their day-to-day work and personal lives." I would thus be precluded from working as a teacher at Ben Gamla, as my atheistic beliefs prevent me from advocating for, embracing, or making life decisions based on any particular set of religious values.

10. I object to my tax dollars funding any school that may or will discriminate.

11. As a public-school parent and teacher, I see firsthand our public schools' resource limitations. For example, I often purchase classroom supplies with my own money. Insufficient funding has also led to severe statewide staff shortages, and schools often must resort to hiring underqualified emergency teachers. I believe that approval of Ben Gamla as a public charter school would result in diversion of limited public resources away from other public schools—including my child's current school and the school where I teach—that are appropriate for and welcoming to students of all faiths and backgrounds.

12. I understand that, under current law, Oklahoma charter schools must comply with the constitutional obligations that apply to the government. I further understand that Ben Gamla is arguing in this case that Oklahoma charter schools should not be subject to the constitutional obligations that apply to the government. If the court system agrees with Ben Gamla on this, then I could lose many important constitutional protections that all public-school teachers,

including charter-school teachers, currently enjoy. Likewise, my child could lose constitutional protections that all public-school students, including charter-school students, currently enjoy.

13. I believe that government funding of Ben Gamla as a public charter school would violate the separation of church and state.

14. I believe that government funding of Ben Gamla as a public charter school would be unlawful.

15. I seek to intervene in this case to protect my interests—as a taxpayer, a public-school teacher at a charter school, and a public-school and soon-to-be public-charter-school parent—in preventing the unlawful operation and government funding of Ben Gamla as a public charter school.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Tulsa County, Oklahoma, on 3/12/, 2026.

Bradley Archer

# Declaration of Erika DuBose, filed below on April 1, 2026, as ECF No. 15-8 (Exhibit 8 to Kaiman Intervenors' Motion to Intervene)

# DECLARATION OF ERIKA DUBOSE

I, Erika DuBose, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I presently reside in Tulsa County, Oklahoma.

2. I am the parent of two children who attend a non-charter public high school in Tulsa County, Oklahoma. One of these children—my adult child Sydney Gebhardt, who is a senior at an Oklahoma public high school—also seeks to intervene in this case. I have three other children who graduated from Oklahoma public schools.

3. I pay various taxes to the State of Oklahoma that provide revenue for public schools, including charter schools. These include individual income taxes, general sales taxes, and motor-vehicle taxes. I also pay local property taxes to Tulsa County.

4. I understand that Ben Gamla Jewish Charter School desires to be a public charter school that teaches a religious curriculum. I object to the use of tax dollars to fund Ben Gamla Jewish Charter School as a public charter school for the reasons stated below.

5. I am Jewish, and I am raising my children as practicing Jews. My family and I regularly attend synagogue at Congregation B'nai Emunah in Tulsa, Oklahoma. One of my school-aged children works as a *madricha* (an assistant teacher) at Temple Israel in Tulsa. Another of my school-aged children serves as a volunteer on the steering committee of Keshet—an organization dedicated to promoting LGBTQ+-affirming spaces within Jewish communities, particularly for Jewish youth. My grandmother and her parents fled from Germany during the Holocaust. My family's experience as members of a religious minority—both past and present—informs my strong support of the separation of church and state. So even though I am passionate about Jewish education—and have seen firsthand its positive impact on my family—I believe that public funds should never be used to fund religious education.

6. I also understand that Ben Gamla reserves the right to discriminate in employment, and that its policies or practices would have discriminatory effects on prospective and actual students and employees. Not only do I object to my tax dollars funding a school that discriminates, but I also could not send my children to Ben Gamla in good conscience. Part of why I send my children to public school is that I value having them learn alongside students of other backgrounds. I am passionate about public education because it brings together and strengthens communities.

7. As the parent of public-school students, I see firsthand our public schools' resource limitations. For example, my children's schools have seen a steady decrease in enrichment classes over the past several years. Oklahoma already ranks near the bottom of national public-education rankings. Because of these things, my children worry about being at a competitive disadvantage for college. I believe that approval of Ben Gamla as a public charter school would result in diversion of limited public resources away from other public schools, including my children's, that are appropriate for and welcoming to students of all faiths and backgrounds.

8. I am a social worker employed by the Cherokee Nation. As someone who works with indigenous communities, I am well aware of the shameful history of proselytizing religious boarding schools in Oklahoma that—with the support of the government—were designed to "beat the Indian" out of indigenous children. I fear that a judicial decision in favor of religious charter schools could clear the way for a revival of such practices.

9. I believe that government funding of Ben Gamla as a public charter school would violate the separation of church and state.

10. I believe that government funding of Ben Gamla as a public charter school would be unlawful.

11. I seek to intervene in this case to protect my interests—as a taxpayer and as a parent of children attending an Oklahoma public school—in preventing the unlawful government funding of Ben Gamla as a public charter school.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Tulsa County on March 12, 2026.

Erika DuBose
Erika DuBose

# Declaration of Sydney Gebhardt, filed below on April 1, 2026, as ECF No. 15-9 (Exhibit 9 to Kaiman Intervenors' Motion to Intervene)

**DECLARATION OF SYDNEY GEBHARDT**

I, Sydney Gebhardt, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I presently reside in Tulsa County, Oklahoma.

2. I am a high-school senior attending a non-charter public high school in Tulsa County, Oklahoma. My mother, Erika DuBose, also seeks to intervene in this case.

3. I pay taxes to the State of Oklahoma that provide revenue for public schools, including charter schools. These include general sales taxes and motor-vehicle taxes.

4. I understand that Ben Gamla Jewish Charter School desires to be a public charter school that teaches a religious curriculum. I object to the use of tax dollars to fund Ben Gamla Jewish Charter School as a public charter school for the reasons stated below.

5. I have been a practicing Jew my entire life, and I regularly attend a synagogue in Tulsa, Oklahoma. When I was fourteen, I had a *b'nai mitzvah*. I am actively involved with Keshet, an organization dedicated to promoting LGBTQ+-affirming spaces within Jewish communities, particularly for Jewish youth. I serve on Keshet's steering committee, and I have participated in several Keshet Shabbaton events—weekend retreats where LGBTQ+ Jewish teens gather to learn, build community, and practice Jewish rituals. I have participated in Shabbat services, including by reading a poem during Pride Month. I participate in Student to Student through the Jewish Federation of Tulsa. Student to Student is an outreach and education program through which I share my perspective on Jewish religion and culture with other students. Every Wednesday, I go to *midrasha*, a Jewish education program for teens, where we learn about Jewish history, religion, and culture and prepare for adulthood.

6. I work part-time at a Christian church in Tulsa, where I do childcare. My job duties include supporting children's religious education.

7. I believe that the separation of church and state helps all religions, particularly minority religions. So while I am passionate about Jewish education and support religious education in general, I believe that public funds should never be used to fund religious education, no matter the religion.

8. I further understand that Ben Gamla reserves the right to discriminate in employment, and that its policies or practices would have discriminatory effects on prospective and actual students and employees. Not only do I object to my tax dollars funding a school that discriminates, but I also would never consider attending Ben Gamla. I simply could not, in good conscience, attend a school that isn't open and accessible to everyone. It is very important to me to learn alongside students of different backgrounds and abilities. Additionally, as a nonbinary person, I would fear facing discrimination myself if I were to attend Ben Gamla.

9. I believe that approval of Ben Gamla as a public charter school would result in diversion of limited public resources away from other public schools, including my own, that are appropriate for and welcoming to students of all faiths and backgrounds.

10. I believe that government funding of Ben Gamla as a public charter school would violate the separation of church and state.

11. I believe that government funding of Ben Gamla as a public charter school would be unlawful.

12. I seek to intervene in this case to protect my interests—as a taxpayer and as a student attending an Oklahoma public school—in preventing the unlawful government funding of Ben Gamla as a public charter school.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Tulsa County, Oklahoma, on March 13, 2026.

Sydney Gebhardt
Sydney Gebhardt

# Declaration of Kara Joy McKee, filed below on April 1, 2026, as ECF No. 15-10 (Exhibit 10 to Kaiman Intervenors' Motion to Intervene)

# DECLARATION OF KARA JOY MCKEE

I, Kara Joy McKee, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I presently reside in Tulsa County, Oklahoma.

2. My husband is Gene Perry, who also seeks to intervene in this case. We are the parents of a child who attends a non-charter public elementary school in Tulsa County, Oklahoma.

3. I pay various taxes to the State of Oklahoma that provide revenue for public schools, including charter schools. These include individual income taxes, general sales taxes, and motor-vehicle taxes. I also pay local property taxes to Tulsa County.

4. I understand that Ben Gamla Jewish Charter School desires to be a public charter school that teaches a religious curriculum. I object to the use of tax dollars to fund Ben Gamla Jewish Charter School as a public charter school for the reasons stated below.

5. My family and I are Jewish and are active members of a local synagogue. My husband and I are raising our child within the Jewish tradition. Our child regularly attends Sunday school at our synagogue.

6. It is important to me that my child learns about Judaism within our Jewish community and not at a public school, where I could not trust religious teaching to be free from governmental influence. I also doubt that Ben Gamla is authentically committed to our Jewish values because it seeks to weaken the separation of church and state—which has been a crucial protection for religious minorities in this country. I therefore would not consider sending my child to Ben Gamla.

7. I object to the use of tax dollars to fund any religious public school because I believe that doing so would violate the separation of church and state. I value the separation of church and state because it protects religious freedom for everyone.

8. I also understand that Ben Gamla reserves the right to discriminate in employment, and that its policies or practices would have discriminatory effects on prospective and actual students and employees. I am bisexual, and several of my family members are LGBTQ+. Several of my family members have disabilities. Partly due to my family's experiences and my own identity, I am a strong advocate for inclusive public education that ensures all students, including LGBTQ+ students and students with disabilities, attend school in a safe and supportive environment. I therefore object to my tax dollars funding a school that may or will discriminate.

9. As the parent of a public-school student, I see firsthand our public schools' resource limitations. For example, Oklahoma public schools, including my child's, lack sufficient resources to support students facing poverty, English language learners, and students with adverse childhood experiences. I believe that approval of Ben Gamla as a public charter school would result in diversion of these limited public resources away from other public schools, including my child's, that are appropriate for and welcoming to students of all faiths and backgrounds.

10. I believe that government funding of Ben Gamla as a public charter school would be unlawful.

11. I seek to intervene in this case to protect my interests—as a taxpayer and as a parent of a child attending an Oklahoma public school—in preventing the unlawful government funding of Ben Gamla as a public charter school.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Tulsa County, Oklahoma, on March 25, 2026.

Kara Joy McKee

# Declaration of Gene Perry, filed below on April 1, 2026, as ECF No. 15-11 (Exhibit 11 to Kaiman Intervenors' Motion to Intervene)

**DECLARATION OF GENE PERRY**

I, Gene Perry, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I presently reside in Tulsa County, Oklahoma.

2. My wife is Kara Joy McKee, who also seeks to intervene in this case. We are the parents of a child who attends a non-charter public elementary school in Tulsa County, Oklahoma.

3. I pay various taxes to the State of Oklahoma that provide revenue for public schools, including charter schools. These include individual income taxes, general sales taxes, and motor-vehicle taxes. I also pay local property taxes to Tulsa County.

4. I understand that Ben Gamla Jewish Charter School desires to be a public charter school that teaches a religious curriculum. I object to the use of tax dollars to fund Ben Gamla Jewish Charter School as a public charter school for the reasons stated below.

5. My family and I are Jewish and are active members of a local synagogue. My wife and I are raising our child within the Jewish tradition. Our child regularly attends Sunday school at our synagogue.

6. It is important to me that my child learns about Judaism within our Jewish community and not at a public school, where I could not trust religious teaching to be free from governmental influence. I also doubt that Ben Gamla is authentically committed to our Jewish values because it seeks to weaken the separation of church and state—which has been a crucial protection for religious minorities in this country. I therefore would not consider sending my child to Ben Gamla.

7. I further understand that Ben Gamla reserves the right to discriminate in employment, and that its policies or practices would have discriminatory effects on prospective

and actual students and employees. I object to tax dollars funding a school that may or will discriminate.

8. As the parent of a public-school student, I see firsthand our public schools' resource limitations. For example, my child's school has high class sizes, and our district recently cut several programs, including reading tutors, to deal with budget limitations. I believe that approval of Ben Gamla as a public charter school would result in diversion of these limited public resources away from other public schools, including my child's, that are appropriate for and welcoming to students of all faiths and backgrounds.

9. I believe that government funding of Ben Gamla as a public charter school would violate the separation of church and state.

10. I believe that government funding of Ben Gamla as a public charter school would be unlawful.

11. I seek to intervene in this case to protect my interests—as a taxpayer and as a parent of a child attending an Oklahoma public school—in preventing the unlawful government funding of Ben Gamla as a public charter school.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Tulsa County, Oklahoma, on March 25, 2026.

Gene Perry

# Declaration of Michele Medley, filed below on April 1, 2026, as ECF No. 15-12 (Exhibit 12 to Kaiman Intervenors' Motion to Intervene)

**DECLARATION OF MICHELE MEDLEY**

I, Michele Medley, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I presently reside in Oklahoma County, Oklahoma.

2. I am the parent of three children. My middle and youngest children currently attend non-charter public schools in Oklahoma County, Oklahoma. My oldest child graduated from a public school in Oklahoma County, and my middle child will graduate this spring. My youngest child has autism and is LGBTQ+. My oldest child also has autism and is nonverbal. My youngest child will start attending a charter school in Oklahoma County in the 2026–27 schoolyear.

3. I pay various taxes to the State of Oklahoma that provide revenue for public schools, including charter schools. These include individual income taxes, general sales taxes, and motor-vehicle taxes. I also pay local property taxes to Oklahoma County.

4. I understand that Ben Gamla Jewish Charter School desires to be a public charter school that teaches a religious curriculum. I object to the use of tax dollars to fund Ben Gamla Jewish Charter School as a public charter school for the reasons stated below.

5. I object to my tax dollars supporting any religious school because I believe that public dollars should only support schools that are appropriate for and welcoming to students of all faiths and backgrounds.

6. I am not religious. I object to my tax dollars being used to promote religious beliefs to which I do not subscribe.

7. My middle child is Christian, and my youngest is nonreligious. I am raising my children to respect and value people of all religious beliefs, and I strive to raise them in an open environment in which they can choose which faith, if any, to follow, without pressure from any

authority figure. In the past, I have sent my children to a Jewish, interfaith camp that taught students about Jewish culture without pushing any particular religious belief. I would not, however, consider sending my children to Ben Gamla, in part because it plans to promote particular religious beliefs that my children and I do not share.

8. In addition, I would fear that my youngest child would face discrimination at Ben Gamla due to being LGBTQ+ and having autism, and that both of my school-aged children would face religious discrimination at Ben Gamla. I understand that Ben Gamla reserves the right to discriminate in employment, and that its policies or practices would have discriminatory effects on prospective and actual students and employees.

9. I object to my tax dollars funding a school that may or will discriminate.

10. I am a Licensed Master of Social Work and a child and family therapist. Through my work and my experience as a public-school parent, I see firsthand our public schools' resource limitations. For example, most of the children I work with do not receive adequate mental-health and special-education support at school. Indeed, many of them face severe mental-health difficulties, including suicidal thoughts, that I believe could be ameliorated by better supports at school.

11. I believe that approval of Ben Gamla as a public charter school would result in diversion of limited public resources away from other public schools, including my children's, that are appropriate for and welcoming to students of all faiths and backgrounds.

12. I understand that, under current law, Oklahoma charter schools must comply with the constitutional obligations that apply to the government. I further understand that Ben Gamla is arguing in this case that Oklahoma charter schools should not be subject to the constitutional obligations that apply to the government. If the court system agrees with Ben Gamla on this,

then I fear that my youngest child will lose many important constitutional protections while attending a charter school starting next schoolyear.

13. I believe that government funding of Ben Gamla as a public charter school would violate the separation of church and state.

14. I believe that government funding of Ben Gamla as a public charter school would be unlawful.

15. I seek to intervene in this case to protect my interests—as a taxpayer, as a parent of children attending Oklahoma public schools, and as a parent of a child who will soon attend an Oklahoma public charter school—in preventing the unlawful operation and government funding of Ben Gamla as a public charter school.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Oklahoma County on March 12th, 2026.

Michele Medley
Michele Medley

# Attorney General Drummond's Motion to Dismiss, filed below on April 14, 2026, as ECF No. 52

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., and PETER DEUTSCH,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**GENTNER DRUMMOND, *et al.***<br><br>**Defendants.** | **Case No. 5:26-cv-00582-R** |

**DEFENDANT ATTORNEY GENERAL GENTNER DRUMMOND'S**
**MOTION TO DISMISS, WITH BRIEF IN SUPPORT**

Defendant Gentner F. Drummond, in his official capacity as Attorney General of Oklahoma (the "Attorney General"), hereby moves this Court to dismiss all claims against him and to remove his name from the caption of this action pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).[1] The Attorney General further reserves the right to seek attorneys' fees and costs incurred in bringing this motion pursuant to 42 U.S.C. § 1988.

Despite being named as the lead defendant, the Attorney General has no role in the administration of the Oklahoma Charter Schools Act ("OCSA"), the processing or denial of charter school applications, or the enforcement of the OCSA's nonsectarian requirement.

[1] Nothing in this motion should be construed as a waiver of the Attorney General's authority to represent the interests of the State of Oklahoma and its citizens in matters arising under the Oklahoma Charter Schools Act or any other provision of Oklahoma law. The Attorney General expressly reserves the right to appear, intervene, or participate in any proceeding in which the interests of the State or its people are at issue. *See* OKLA. STAT. tit. 74, § 18b(A)(3); *see also Cherokee Nation v. United States Dep't of the Interior,* 2025 OK 4, ¶ 55, 564 P.3d 58, 74 (holding that the Attorney General "may act independently…, and represent such segment of the State's interest not represented by" other representatives of the State).

Those responsibilities belong exclusively to the Oklahoma Statewide Charter School Board and its staff (collectively, the "Board")—the very entities that denied Plaintiffs' application and that are separately named as defendants in this action. Naming the Attorney General as a defendant in this case was a transparent attempt to generate a headline, not to identify a proper party, and the Complaint should be dismissed accordingly.

## BACKGROUND

Plaintiff National Ben Gamla Jewish Charter School Foundation, Inc. ("Ben Gamla") is an Oklahoma non-profit corporation that sought to establish a sectarian virtual charter school in Oklahoma. Dkt. 1, ¶¶ 12, 63, 73. In December 2025, Ben Gamla submitted a charter school application to the Board. *Id.* ¶ 65. After a hearing, the Board voted unanimously to deny the application on February 9, 2026. Dkt. 1, ¶¶ 86, 94. After Ben Gamla submitted a revised application, the Board again voted unanimously to deny the application on March 9, 2026. *Id.* ¶ 103.

Critically, the Attorney General played no role in the Board's denial of Ben Gamla's application. To the contrary, on March 11, 2026, the Attorney General was forced to file a Petition for Writ of Mandamus against the Board in Oklahoma County District Court, seeking to compel the Board to discharge its independent statutory duty to identify all valid, non-constitutional grounds for rejection of Ben Gamla's application. *See Drummond v. Okla. Statewide Charter Sch. Bd.*, No. CV-2026-649 (Okla. Cnty. Dist. Ct. filed Mar. 11, 2026); dkt. 1, ¶ 105. In that petition, the Attorney General expressly stated that he "takes **no position** in this proceeding on the constitutional or statutory questions" resolved by the Oklahoma Supreme Court regarding the nonsectarian requirement. Dkt. 1, ¶ 106. That the Attorney General had

to sue the Board to compel compliance with its own statutory obligations confirms that the Board—not the Attorney General—administers the OCSA and that the Attorney General exercises no control over the Board's application decisions.

## ARGUMENT AND AUTHORITIES

### I. Standard of Review.

To survive a motion to dismiss, a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," dismissal is required. *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). Where a plaintiff sues the wrong official and the defendant has no connection to the challenged conduct, dismissal is required.

### II. The Attorney General Has No Connection to the Enforcement of the OCSA's Nonsectarian Requirement and Is Not a Proper Defendant.

Under *Ex parte Young*, 209 U.S. 123 (1908), a suit may proceed against a state officer in his official capacity only if the officer has "some connection with the enforcement of the act." *Id.* at 157. Absent such a connection, the suit "is merely making [the officer] a party as a representative of the state, and thereby attempting to make the state a party," which sovereign immunity forbids. *Id.* An officer need not have a "special connection" to the statute, but the officer "must have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007) (citing *Ex parte Young*, 209 U.S. at 157).

Courts consistently reject attempts to apply *Ex parte Young* to state officials based solely on a generalized duty to enforce the law. *See, e.g., Bishop v. Oklahoma*, 333 F. App'x 361, 365 (10th Cir. 2009) ("[T]he Oklahoma officials' generalized duty to enforce state law, alone, is insufficient to subject them to a suit challenging a constitutional amendment they have no specific duty to enforce."); *Women's Emergency Network v. Bush*, 323 F.3d 937, 949–50 (11th Cir. 2003); *Doyle v. Hogan*, 1 F.4th 249, 255 (4th Cir. 2021); *United States v. Abbott*, 85 F.4th 328, 334 (5th Cir. 2023) ("[W]here the challenged law 'makes clear that another agency is the agency responsible for the law's administration and enforcement,' only that agency is a proper defendant under *Ex parte Young*.").

The Tenth Circuit's analysis in *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742 (10th Cir. 2010), is directly on point. There, the court examined whether the Oklahoma Attorney General had a sufficient connection to specific provisions of the Oklahoma Taxpayer and Citizen Protection Act. The court found the Attorney General was a proper defendant as to Section 7(B) because he had specific duties related to that provision—drafting contracts for state officials and bringing civil actions against violators. *Id.* at 760. But as to Section 7(C)—the anti-discrimination provision—the court held that the Attorney General was *not* a proper defendant because the plaintiffs "do not cite to any Oklahoma law authorizing the Attorney General to enforce that provision." *Id.* The court dismissed the Attorney General from the Section 7(C) challenge entirely because the Oklahoma Human Rights Commission, not the Attorney General, was charged with enforcing that provision. *Id.*

This case presents an even clearer example than *Edmondson*'s Section 7(C) claim. The OCSA vests authority over charter school applications exclusively with the Board. OKLA.

STAT. tit. 70, § 3-134(C) (Board may sponsor virtual charter schools); *id.* § 3-134(E) (Board reviews and acts on applications). The Board—not the Attorney General—reviews applications, conducts capacity interviews, votes on applications, and issues formal denial letters. *See* Dkt. 1, ¶¶ 78–84, 99–104. The Board's Executive Director, Chairman, members, and Director of School Performance are all separately named as defendants. *Id.* ¶¶ 15–25.

Plaintiffs do not—and cannot—cite any provision of the OCSA that authorizes the Attorney General to approve or deny charter school applications, enforce the nonsectarian requirement against applicants, or take any action against a charter school applicant for being religious. The Attorney General's general authority as "chief law officer of the State," OKLA. STAT. tit. 74, § 18b(A), and his authority to "initiate or appear in any action in which the interests of the state or the people of the state are at issue," *id.* § 18b(A)(3), do not constitute the kind of specific enforcement connection required by *Ex parte Young* and *Edmondson*.

The Attorney General's recently filed mandamus petition against the Board underscores this point. Far from controlling the Board or enforcing the nonsectarian requirement against charter school applicants, the Attorney General was forced to petition a state court to compel the Board to discharge its own statutory obligations. An official who must resort to mandamus to influence the Board's conduct cannot plausibly be characterized as "enforcing" the statute the Board administers.[2]

[2] Indeed, the fact that the Attorney General previously had to file a lawsuit against the Board's predecessor related to the same constitutional provision further highlights the absurdity of naming him as a defendant in this suit. *See Drummond ex rel. State v. Okla. Statewide Virtual Charter Sch. Bd.*, 2024 OK 53, 558 P.3d 1.

As the Third Circuit cautioned, permitting a suit against high-ranking state officials based solely on generalized enforcement authority would mean that "each state's high policy officials would be subject to defend every suit challenging the constitutionality of any state statute, no matter how attenuated his or her connection to it." *1st Westco Corp. v. Sch. Dist. of Phila.*, 6 F.3d 108, 112–13 (3d Cir. 1993). That is precisely the result Plaintiffs seek here, and it should be rejected.

## III. Plaintiffs Also Lack Article III Standing to Maintain Claims Against the Attorney General.

Independent of the *Ex parte Young* analysis, Plaintiffs' claims against the Attorney General should be dismissed because Plaintiffs cannot satisfy the redressability requirement of Article III standing as to him. "[S]tanding is not dispensed in gross." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Rather, "plaintiffs must demonstrate standing for each claim that they press" against each defendant, "and for each form of relief that they seek." *Id.* Accordingly, "for every defendant, there must be at least one plaintiff with standing to seek an injunction." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). A plaintiff's "injury resulting from the conduct of one defendant should [not] have any bearing on her Article III standing to sue other defendants." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 65–66 (2d Cir. 2012); *see also Hernandez v. Grisham*, 499 F. Supp. 3d 1013, 1048 (D.N.M. 2020) (Browning, J.) (holding that "the plaintiff must demonstrate standing against each defendant" and dismissing one defendant for lack of standing while allowing identical § 1983 claims to proceed against others); *Rolaff v. Farmers Ins. Co.*, No. CIV-19-0689-J, 2020 WL 4939172, at *4 (W.D. Okla. Mar. 19, 2020) (Jones, J.) (dismissing defendants where plaintiffs lacked standing to assert claims against them).

Plaintiffs' alleged injury—the denial of Ben Gamla's charter school application—was inflicted entirely by the Board, not the Attorney General. It was the Board that reviewed the application and voted unanimously, twice, to deny it. Dkt. 1, ¶¶ 86, 94, 103. An injunction issued solely against the Attorney General would not reverse the Board's decision, would not compel the Board to approve the application, and would not otherwise alter the Board's independent exercise of its statutory authority over charter school applications. OKLA. STAT. tit. 70, §§ 3-132.2; 3-134(E)(3). Put simply, an order directed at the Attorney General alone would accomplish nothing to ameliorate Plaintiffs' injuries. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (requiring, as an "irreducible constitutional minimum" of standing, that the plaintiff's injury be "likely" to be "redressed by a favorable decision").

This is not a case in which the Attorney General has any authority over the Board's decisions. Unlike the Governor in *Hernandez*, who could direct her subordinate to amend the challenged policy and thereby redress the plaintiffs' injuries, 499 F. Supp. 3d at 1053–54, the Attorney General has no supervisory authority over the Board and no ability to compel the Board to approve a charter school application. OKLA. STAT. tit. 70, § 3-132.1(A) (identifying the Governor, President Pro Tempore of the Senate, Speaker of the House of Representatives, Superintendent of Public Instruction, and State Auditor and Inspector as the only Oklahoma officers with appointment or removal power over Board members). To the contrary, the Attorney General was forced to file a mandamus petition in state court merely to compel the Board to follow its own statutory obligations—confirming that the Attorney General cannot direct the Board's conduct and that any relief against him would leave Plaintiffs' injury entirely unredressed. The Board caused the harm, and only a remedy against the Board will redress it.

*See Murthy*, 603 U.S. at 73–74 (finding plaintiffs had "a redressability problem" where enjoining the defendants would not alter the independent actions of the entities that actually caused the injury); *Bronson v. Swensen*, 500 F.3d 1099, 1111 (10th Cir. 2007) ("The redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute.").

**IV. The Eleventh Amendment Bars All Claims Against the Attorney General.**

Under the Eleventh Amendment, states are generally immune from suits in federal court. *See Edelman v. Jordan*, 415 U.S. 651, 667–68 (1974). The *Ex parte Young* exception permits suits against state officers only when the officer has a connection with enforcement of the challenged statute and the plaintiff seeks prospective relief. *Ex parte Young*, 209 U.S. at 155–56; *Edmondson*, 594 F.3d at 760. As demonstrated above, the Attorney General has no enforcement connection to the OCSA's nonsectarian requirement. Because the *Ex parte Young* exception does not apply, the Eleventh Amendment bars all claims against the Attorney General. *See Edmondson*, 594 F.3d at 760 (dismissing Attorney General from claims where he lacked particular duty to enforce challenged provision).

**V. The Court Should Remove the Attorney General's Name from the Caption.**

Upon dismissal, the Attorney General respectfully requests that the Court order the caption of this case modified to remove his name. The Attorney General was improperly named as a defendant. He has no role in the administration of the OCSA, no authority to grant or deny charter school applications, and no enforcement connection to the nonsectarian requirement. The proper defendants—the Board and its members—are already parties to this case. Indeed, at the very moment Plaintiffs filed this lawsuit naming the Attorney General as

a defendant for supposedly controlling the Board, the Attorney General was petitioning a state court to compel that same Board to follow the law. Retaining the Attorney General's name in the caption after dismissal would serve no purpose other than to perpetuate the misleading impression that he bears some responsibility for the conduct at issue. The Court should therefore direct that the pleadings be modified accordingly. *See Grider v. City & Cnty. of Denver*, 958 F. Supp. 2d 1262, 1270 (D. Colo. 2013) (upon dismissing claims against one defendant for lack of standing, ordering that "[a]ll future pleadings shall omit reference to the City and County of Denver as a Defendant in this case").

## VI. The Attorney General Reserves the Right to Seek Attorneys' Fees.

Under 42 U.S.C. § 1988(b), a court may award attorneys' fees to a prevailing defendant in a § 1983 action when the plaintiff's claim is "frivolous, unreasonable, or without foundation." *Hughes v. Rowe*, 449 U.S. 5, 14 (1980) (per curiam); *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978).

The claims against the Attorney General lack legal foundation. Plaintiffs identify no statutory provision vesting the Attorney General with authority to administer or enforce the OCSA's charter school provisions against applicants. The proper defendants are already named. Including the Attorney General serves no legitimate litigation purpose. Therefore, the Attorney General expressly reserves the right to seek attorneys' fees and costs incurred in defending against claims that should never have been brought against him.

## CONCLUSION

For the foregoing reasons, the Attorney General respectfully requests that this Court: (1) dismiss all claims against the Attorney General under Fed. R. Civ. P. 12(b)(1) and 12(b)(6);

(2) order the caption modified to remove the Attorney General's name; and (3) grant all other relief as the Court deems appropriate.

Respectfully Submitted,

s/Garry M. Gaskins, II

GARRY M. GASKINS, II, OBA NO. 20212
*Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Direct: (405) 521-3921
Garry.Gaskins@oag.ok.gov
*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of April, 2026, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

s/Garry M. Gaskins, II
Garry M. Gaskins, II

# Board Answer to Complaint, filed below on April 16, 2026, as ECF No. 59

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma, *et al.*,<br><br>*Defendants*. | Case No. 5:26-cv-00582-R |

## ANSWER

Pursuant to Federal Rule of Civil Procedure 12, Defendants Brian T. Shellem, Amber Hidy, Britni Tomcho, Damon Gardenhire, David Rutkauskas, Dr. Kitty Campbell, Jared Buswell, Lindel Fields, and William Pearson (collectively, "Board Defendants"), all in their official capacities, submit the following Answer. *See* ECF No. 1.[1]

## INTRODUCTION

1. Admitted with the clarification that Okla. Stat. tit. 70 §§ 3-130–3-167 comprises the Oklahoma Charter Schools Act.

2. Admitted that charter schools have a variety of focus areas, including science, fine arts, language immersion, cultural awareness, or classical education. Admitted that the Comanche Academy Charter School is tribally-authorized by an Act of

[1] Board Defendants include Plaintiffs' Complaint headings as a helpful reference for this Court. These headings are not factual allegations to which any response is required.

the Comanche Nation of Oklahoma. The remaining language in this paragraph is a characterization of Plaintiffs' position to which no response is required. To the extent a response is required, admitted.

3. Admitted that Okla. Stat. tit. 70, § 3-136(A)(2) requires that a charter school be "nonsectarian in its programs, admission policies, employment practices, and all other operations" and that a charter school may not be authorized if it is "affiliated with a nonpublic sectarian school or religious institution." The remaining language in this paragraph is a characterization of Plaintiffs' position to which no response is required. To the extent a response is required, admitted.

4. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

5. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

6. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

7. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

8. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, Board Defendants lack sufficient knowledge or information to respond to this allegation.

9. Admitted that Board Defendants denied Ben Gamla's revised application on the sole basis that Ben Gamla proposed a religious charter school. Board Defendants lack

sufficient knowledge or information to respond to Plaintiffs' intentions for its proposed charter school.

10. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

11. This paragraph contains Plaintiffs' conclusions of law and requested relief, to which no response is required. To the extent a response is required, Board Defendants do not oppose Plaintiffs' request as outlined further below.

## THE PARTIES

12. Admitted.

13. Admitted.

14. Admitted.

15. Defendant Wilkinson was voluntarily dismissed from this lawsuit on April 15, 2026. ECF No. 56.

16. Admitted.

17. Admitted.

18. Admitted.

19. Admitted.

20. Admitted.

21. Admitted.

22. Denied.

23. Admitted.

24. Admitted.

25. Defendant Lusnia was voluntarily dismissed from this lawsuit on April 15, 2026. ECF No. 56.

## JURISDICTION AND VENUE

26. Admitted.

27. Admitted.

## FACTUAL ALLEGATIONS

***The Oklahoma Charter Schools Act***

28. Admitted with the clarification that Okla. Stat. tit. 70 §§ 3-130–3-167 comprises the Oklahoma Charter Schools Act.

29. Admitted.

30. Admitted.

31. Admitted that the quoted language accurately reflects that charter schools may "craft a curriculum emphasizing a specific learning philosophy or style or certain subject areas." The remaining language in this paragraph is a characterization of Plaintiffs' position to which no response is required. To the extent a response is required, denied.

32. Admitted.

33. Admitted.

34. Admitted.

35. The allegation in this paragraph is a characterization of Plaintiffs' position to which no response is required. To the extent a response is required, admitted.

36. Admitted.

37. Admitted.

38. Admitted.

39. Admitted.

40. Admitted that Comanche Academy Charter School is tribally-authorized. Denied that Academy of Seminole and Academy of Okmulgee are tribally-authorized.

41. Admitted that Okla. Stat. tit. 70, § 3-136(A)(2) requires that a charter school be "nonsectarian in its programs, admission policies, employment practices, and all other operations" and that a charter school may not be authorized if it is "affiliated with a nonpublic sectarian school or religious institution." The remaining language in this paragraph is a characterization of Plaintiffs' position to which no response is required. To the extent a response is required, admitted.

***The St. Isidore Case***

42. Admitted.

43. Admitted that in 2023, Oklahoma Statewide Virtual Charter School Board approved the revised application of St. Isidore of Seville Catholic Virtual School. The Oklahoma Statewide Charter School Board is the successor-in-interest to the Oklahoma Statewide Virtual Charter School Board. *See* Okla. Stat. tit. 70, § 3-131.1(I).

44. Admitted.

45. Admitted.

46. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

47. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

48. The allegation in this paragraph contains Plaintiffs' characterizations of the Attorney General's brief, to which no response is required. To the extent a response is required, admitted.

49. Admitted.

50. Admitted.

51. Admitted.

52. The allegation in this paragraph contains Plaintiffs' characterizations of the Attorney General's actions, to which no response is required. To the extent a response is required, admitted.

53. Admitted.

54. This paragraph appears to be a heading, to which no response is required.

55. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

56. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

57. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

58. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

59. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

60. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

61. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

62. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

63. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

64. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

65. Admitted.

66. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

67. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

68. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

69. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

70. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

71. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

72. Admitted to the extent that the quoted language appears in Ben Gamla's application. Board Defendants lack sufficient knowledge or information to admit or deny any further allegations in this paragraph.

73. Admitted.

74. Admitted to the extent that the quoted language appears in Ben Gamla's application. Board Defendants lack sufficient knowledge or information to admit or deny any further allegations in this paragraph.

75. Admitted to the extent that the quoted language appears in Ben Gamla's application. Board Defendants lack sufficient knowledge or information to admit or deny any further allegations in this paragraph.

76. Admitted to the extent that allegations reflect what appears in Ben Gamla's application. Board Defendants lack sufficient knowledge or information to admit or deny any further allegations in this paragraph.

77. Admitted to the extent that allegations reflect what appears in Ben Gamla's application. Board Defendants lack sufficient knowledge or information to admit or deny any further allegations in this paragraph.

78. Admitted.

79. Admitted.

80. Admitted with clarification that the governing board of a school need not be fully formed until the "ready-to-open" phase.

81. This paragraph appears to be a heading, to which no response is required.

82. Admitted with clarification that the Board held a meeting on January 12, 2026.

83. Admitted.

84. Admitted.

85. Admitted.

86. Admitted.

87. Admitted.

88. Admitted.

89. The allegation in this paragraph is a characterization of Plaintiffs' position to which no response is required. To the extent a response is required, admitted.

90. Admitted.

91. Admitted.

92. Admitted.

93. Admitted.

94. Admitted.

95. Admitted.

96. Admitted.

97. Admitted.

98. Admitted.

99. Admitted.

100. Admitted.

101. Admitted.

102. Admitted.

103. Admitted.

104. Admitted.

105. Admitted.

106. Admitted.

## CLAIMS FOR RELIEF

## COUNT I

## 42 U.S.C. § 1983
**FREE EXERCISE CLAUSE VIOLATION**
**CATEGORICAL EXCLUSION FROM OTHERWISE-AVAILABLE GOVERNMENT BENEFITS**

107. Board Defendants repeat and incorporate all preceding responses in this Answer.

108. Admitted.

109. Admitted.

110. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

111. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

112. Board Defendants lack sufficient knowledge or information to admit or deny the allegations in this paragraph.

113. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

114. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

115. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

116. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

117. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

118. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

119. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

120. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

121. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

122. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

## COUNT II

### 42 U.S.C. § 1983
### FREE EXERCISE CLAUSE VIOLATION
### NOT GENERALLY APPLICABLE

123. Board Defendants repeat and incorporate all preceding responses in this Answer.

124. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

125. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

126. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

127. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

128. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

129. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

130. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

131. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

## COUNT III

### 42 U.S.C. § 1983
### FREE EXERCISE CLAUSE VIOLATION
### NOT NEUTRAL

132. Board Defendants repeat and incorporate all preceding responses in this Answer.

133. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

134. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

135. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

136. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

137. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

138. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

139. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

140. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

141. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

142. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

## COUNT IV

### 42 U.S.C. § 1983
### EQUAL PROTECTION VIOLATION
### DISCRIMINATION BASED ON RELIGION

143. Board Defendants repeat and incorporate all preceding responses in this Answer.

144. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

145. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

146. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

147. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

148. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

149. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

150. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

151. The allegation in this paragraph contains Plaintiffs' conclusions of law, to which no response is required. To the extent a response is required, admitted.

**PRAYER FOR RELIEF**

The remaining paragraphs of the Complaint contain Plaintiffs' requested relief, to which no response is required. To the extent a response is required:

a. Board Defendants do not oppose this request for relief on this basis;

b. Board Defendants do not oppose this request for relief on this basis;

c. Board Defendants do not oppose this request for relief;

d. Board Defendants deny that the Oklahoma Statewide Charter School Board should be liable for any reasonable attorneys' fees and costs; and

e. Denied.

**AFFIRMATIVE DEFENSES**

1. This Court, in its discretion, should decline to award attorneys' fees and costs since awarding attorneys' fees and costs against Board Defendants would be unjust. *See Zinna v. Congrove*, 680 F.3d 1236, 1239 (10th Cir. 2012). Ben Gamla brings this action while Defendants are "powerless to provide the remedy without breaching" the order of the Oklahoma Supreme Court in *Drummond*, "with resultant substantial damages." *Soc'y of Professional Journalists, Headliners Chapter v. Briggs*, 687 F. Supp. 1521, 1525 (D. Utah 1988) (refusing to award fees because the defendants' powerlessness to remedy constituted a special circumstance rendering fees unjust). Board Members expressed their

desire to approve Ben Gamla's charter school application. But refusal to comply with the Oklahoma Supreme Court's order of mandamus in *Drummond* is indirect contempt of court, 21 O.S. § 565, and may be punished with a fine not exceeding $500.00 or imprisonment in the county jail not exceeding six months, 21 O.S. § 566. Since the Board—absent committing indirect contempt of court—is unable to provide Ben Gamla its sought-after remedy, an award of attorneys' fees and costs would be unjust.

Respectfully submitted this 16 day of April, 2026.

*/s/ Anthony J. Ferate*
Anthony J. Ferate, OBA No. 21171
SPENCER FANE LLP
9400 North Broadway Extension, Suite 600
Oklahoma City, Oklahoma 73114
(405) 844-9900
ajferate@spencerfane.com

Hiram S. Sasser, III, OBA No. 19557
Holly M. Randall,* OBA No. 34763
Erin E. Smith,* OBA No. 35232
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075
(972) 941-4444
hsasser@firstliberty.org
hrandall@firstliberty.org
esmith@firstliberty.org

**Applications pro hace vice to the Western District pending.*

***Attorneys for Oklahoma Statewide Charter School Board Defendants***

# Kaiman Intervenors' Brief in Opposition to Ben Gamla's Motion for Preliminary Injunction, filed below on April 17, 2026, as ECF No. 62-1

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., et al.,<br><br>*Plaintiffs*,<br><br>-against-<br><br>GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma, et al.,<br><br>*Defendants*. | Case No. 5:26-cv-00582-R |

**PROPOSED BRIEF IN OPPOSITION**
**BY PROPOSED INTERVENORS RABBI DANIEL KAIMAN ET AL.**
**TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION .......... 1

LEGAL AND FACTUAL BACKGROUND .......... 1

ARGUMENT .......... 4

I. Plaintiffs are unlikely to succeed on the merits .......... 5

  A. Plaintiffs lack Article III standing .......... 5

  B. Plaintiffs' claims are not ripe .......... 7

  C. Plaintiffs' Free Exercise Clause arguments fail .......... 7

    1. Oklahoma virtual charter schools are state actors because they are governmental entities .......... 8

    2. Alternatively, Oklahoma virtual charter schools are state actors under state-action tests that apply to private entities .......... 14

    3. The Tenth Circuit and numerous other courts have concluded that charter schools are governmental entities and state actors .......... 19

    4. Because public charter schools are state actors, Plaintiffs may not assert their free-exercise challenge .......... 21

    5. The Establishment Clause prohibits religious charter schools .......... 22

    6. *Carson*, *Espinoza*, and *Trinity Lutheran* are inapplicable .......... 24

II. Plaintiffs do not satisfy the remaining preliminary-injunction factors .......... 25

CONCLUSION .......... 25

# TABLE OF AUTHORITIES

## Cases

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967) ........ 7

*Agostini v. Felton*,
521 U.S. 203 (1997) ........ 23

*Arkansas v. Texas*,
346 U.S. 368 (1953) ........ 13

*Blanco v. Success Acad. Charter Schs., Inc.*,
722 F. Supp. 3d 187 (S.D.N.Y. 2024) ........ 20

*Bd. of Educ. v. Grumet*,
512 U.S. 687 (1994) ........ 23

*Biden v. Nebraska*,
600 U.S. 477 (2023) ........ 9, 13

*Bowen v. Kendrick*,
487 U.S. 589 (1988) ........ 23

*Brammer-Hoelter v. Twin Peaks Charter Acad.*,
602 F.3d 1175 (10th Cir. 2010) ........ 19

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001) ........ 19

*Capitol Square Rev. & Advisory Bd. v. Pinette*,
515 U.S. 753 (1995) ........ 22

*Carson ex rel. O.C. v. Makin*,
596 U.S. 767 (2022) ........ 25

*Caviness v. Horizon Cmty. Learning Ctr., Inc.*,
590 F.3d 806 (9th Cir. 2010) ........ 21

*Coleman v. Utah State Charter Sch. Bd.*,
673 F. App'x 822 (10th Cir. 2016) ........ 19

*Comm. for Pub. Educ. & Religious Liberty v. Nyquist*,
413 U.S. 756 (1973) ........ 24

*Daugherty v. Vanguard Charter Sch. Acad.*,
116 F. Supp. 2d 897 (W.D. Mich. 2000) ..... 20

*Day v. Bond*,
500 F.3d 1127 (10th Cir. 2007) ..... 5, 6

*Dep't of Transp. v. Ass'n of Am. R.Rs.*,
575 U.S. 43 (2015) ..... 8

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
489 U.S. 189 (1989) ..... 19

*Dillon v. Twin Peaks Charter Acad.*,
241 F. App'x 490 (10th Cir. 2007) ..... 19–20

*Drummond ex rel. State v. Okla. Statewide Virtual Charter Sch. Bd.*,
558 P.3d 1 (Okla. 2024),
*aff'd by an equally divided court*, 605 U.S. 165 (2025) ..... 2, 12, 15

*Edwards v. Aguillard*,
482 U.S. 578 (1987) ..... 22

*Engel v. Vitale*,
370 U.S. 421 (1962) ..... 23

*Epperson v. Arkansas*,
393 U.S. 97 (1968) ..... 23

*Espinoza v. Mont. Dep't of Revenue*,
591 U.S. 464 (2020) ..... 25

*Everson v. Bd. of Educ.*,
330 U.S. 1 (1947) ..... 23

*Evans v. Newton*,
382 U.S. 296 (1966) ..... 18

*Fam. C.L. Union v. Dep't of Child. & Fams.*,
837 F. App'x 864 (3d Cir. 2020) ..... 20

*Fields v. Speaker of Pa. House of Representatives*,
936 F.3d 142 (3d Cir. 2019) ..... 22

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ..... 22

*Gundy v. City of Jacksonville*,
50 F.4th 60 (11th Cir. 2022) ........ 22

*Illinois ex rel. McCollum v. Bd. of Educ.*,
333 U.S. 203 (1948) ........ 23

*Jackson v. Metro. Edison Co.*,
419 U.S. 345 (1974) ........ 13, 14

*Jones v. SABIS Educ. Sys., Inc.*,
52 F. Supp. 2d 868 (N.D. Ill. 1999) ........ 20

*Larkin v. Grendel's Den, Inc.*,
459 U.S. 116 (1982) ........ 23

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995) ........ 8, 11, 13, 14

*Lee v. Weisman*,
505 U.S. 577 (1992) ........ 22

*Lindke v. Freed*,
601 U.S. 187 (2024) ........ 8

*Logiodice v. Trs. of Me. Cent. Inst.*,
296 F.3d 22 (1st Cir. 2002) ........ 21

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 5

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) ........ 13, 15, 17, 18

*Murthy v. Missouri*,
603 U.S. 43 (2024) ........ 5, 6

*Nampa Classical Acad. v. Goesling*,
447 F. App'x 776 (9th Cir. 2011) ........ 20

*Patrick v. Success Acad. Charter Schs., Inc.*,
354 F. Supp. 3d 185 (E.D.N.Y. 2018) ........ 20

*Peltier v. Charter Day Sch.*,
37 F.4th 104 (4th Cir. 2022) ........ 15, 20

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) .......... 22

*Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*,
908 F. Supp. 2d 597 (M.D. Pa. 2012) .......... 20

*Polk County v. Dodson*,
454 U.S. 312 (1981) .......... 13, 14

*Rendell-Baker v. Kohn*,
457 U.S. 830 (1982) .......... 20, 21

*Riester v. Riverside Cmty. Sch.*,
257 F. Supp. 2d 968 (S.D. Ohio 2002) .......... 20

*Robert S. v. Stetson School, Inc.*,
256 F.3d 159 (3d Cir. 2001) .......... 21

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) .......... 22

*Rocky Mountain Gun Owners v. Polis*,
121 F.4th 96 (10th Cir. 2024) .......... 5

*Santa Fe Indep. Sch. Dist. v. Doe*,
530 U.S. 290 (2000) .......... 22

*Sch. Dist. v. Schempp*,
374 U.S. 203 (1963) .......... 23

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017) .......... 25

*United States v. Ackerman*,
831 F.3d 1292 (10th Cir. 2016) .......... 9, 14

*United States v. Minn. Transitions Charter Schs.*,
50 F. Supp. 3d 1106 (D. Minn. 2014) .......... 20

*Utah Republican Party v. Cox*,
892 F.3d 1066 (10th Cir. 2018) .......... 7

*Wallace v. Jaffree*,
472 U.S. 38 (1985) .......... 22–23

*West v. Atkins*,
487 U.S. 42 (1988) ........ 18, 19

*Wilson v. Glenwood Intermountain Props., Inc.*,
98 F.3d 590 (10th Cir. 1996) ........ 5

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 5

*Wittner v. Banner Health*,
720 F.3d 770 (10th Cir. 2013) ........ 19

*Ysursa v. Pocatello Educ. Ass'n*,
555 U.S. 353 (2009) ........ 21

*Zelman v. Simmons-Harris*,
536 U.S. 639 (2002) ........ 24

*Zorach v. Clauson*,
343 U.S. 306 (1952) ........ 22

**Constitutional Provisions**

Okla. Const. art. I, § 5 ........ 10, 15, 18, 19

Okla. Const. art. XI, § 2 ........ 10, 18

Okla. Const. art. XI, § 3 ........ 10, 18

Okla. Const. art. XIII, § 1 ........ 10, 15, 16, 18, 19

**Statutes**

20 U.S.C. § 7801 ........ 12

Okla. Stat. tit. 70, § 1-109 ........ 11

Okla. Stat. tit. 70, §§ 3-130 to 3-145.11 ........ 1, 9

Okla. Stat. tit. 70, § 3-131 ........ 10

Okla. Stat. tit. 70, § 3-132.1 ........ 9, 21

Okla. Stat. tit. 70, § 3-132.2 ........ 1, 12, 20

Okla. Stat. tit. 70, § 3-134 ........ 1, 2, 4, 9, 10, 11, 14, 19, 24

Okla. Stat. tit. 70, § 3-136 .......... 2, 6, 10, 11, 12, 14, 15, 18

Okla. Stat. tit. 70, § 3-137 .......... 2, 10

Okla. Stat. tit. 70, § 3-140 .......... 6, 10

Okla. Stat. tit. 70, § 3-141 .......... 11

Okla. Stat. tit. 70, § 3-142 .......... 2, 11, 12, 24

Okla. Stat. tit. 70, § 3-144 .......... 24

Okla. Stat. tit. 70, § 6-401 .......... 11

Okla. Stat. tit. 70, § 9-108 .......... 11

Okla. Stat. tit. 70, § 11-103.6m .......... 11

Okla. Stat. tit. 70, § 11-103.16 .......... 11

Okla. Stat. tit. 70, § 11-202 .......... 11

Okla. Stat. tit. 70, § 18-200.1 .......... 2, 11, 24

Okla. Stat. tit. 70, § 18-201.1 .......... 2, 11, 24

Okla. Stat. tit. 70, § 24-100.10 .......... 11

Okla. Stat. tit. 70, § 24-101.3 .......... 11

Okla. Stat. tit. 70, § 24-157 .......... 11

Okla. Stat. tit. 70, § 1210.196 .......... 11

Okla. Stat. tit. 70, § 1210.201 .......... 6

Okla. Stat. tit. 70, § 1210.508 .......... 11

Okla. Stat. tit. 70, § 1210.508-5 .......... 11

Okla. Stat. tit. 70, § 1210.508-6 .......... 11

Okla. Stat. tit. 70, § 1210.508B .......... 11

Okla. Stat. tit. 70, § 1210.545 .......... 10

**Regulations**

Okla. Admin. Code § 210:35-3-201 ........................................ 10

Okla. Admin. Code § 210:35-33-2 ........................................ 11

Okla. Admin. Code § 210:40-87-6 ........................................ 11

Okla. Admin. Code § 777:10-3-3 ........................................ 2, 7, 25

**Other Authorities**

Carl F. Kaestle, *Pillars of the Republic: Common Schools and American Society, 1780–1860* (Eric Foner, ed., 1983)........................................ 16, 17

Derek W. Black, *The Fundamental Right to Education*, 94 Notre Dame L. Rev. 1059 (2019) ........................................ 16

Derek W. Black, *Localism, Pretext, and the Color of School Dollars*, 107 Minn. L. Rev. 1415 (2023) ........................................ 16

Dianna Everett, *The Encyclopedia of Oklahoma History and Culture: Schools, Common*, Okla. Hist. Soc'y, https://perma.cc/544H-RJH8.................... 15, 16

Johann N. Neem, *Democracy's Schools: The Rise of Public Education in America* (2017) ........................................ 17

Okla. Jud. Ethics Op. 2023-3, 538 P.3d 572 (Okla. Jud. Ethics Advisory Panel 2023) ........................................ 14

Oscar William Davison, *Oklahoma's Educational Heritage*, 27 Chrons. Okla. 354 (1949), https://perma.cc/M6YQ-JNVS ........................................ 15

## INTRODUCTION

Because all children have the right to an education, public schools must be open to and welcoming of all students, and they must not promote any particular religion. Plaintiffs seek to upend these longstanding principles—and violate federal and state constitutional and statutory prohibitions—by opening the nation's first religious public charter school. Their motion for a preliminary injunction should be denied.

To start, Plaintiffs lack standing. Ben Gamla's charter-application materials include disqualifying deficiencies distinct from the school's plans to inculcate one religion. Thus, Plaintiffs have not demonstrated an injury that would be redressed by the relief they seek. Similarly, Plaintiffs' claims are not ripe because they have not completed necessary steps in the charter-application process.

Even if Plaintiffs have standing and the case is ripe, Plaintiffs' claims fail on the merits. As recognized by numerous courts—including the Tenth Circuit and the Oklahoma Supreme Court—charter schools are governmental entities or other state actors. As such, they cannot assert Free Exercise Clause claims. And even if they could, the Establishment Clause bars charter schools from promoting religion.

## LEGAL AND FACTUAL BACKGROUND

Ben Gamla seeks authorization to become a virtual charter school. (Compl. ¶ 9, ECF No. 1.) Virtual charter schools are "public school[s] established by contract with . . . the Statewide Charter School Board." Okla. Stat. tit. 70, § 3-132.2(C)(1)(b); *see also id.* § 3-134(E)(3). The Oklahoma legislature created virtual charter schools through the Oklahoma Charter Schools Act ("OCSA," Okla. Stat. tit. 70, §§ 3-130 to 3-145.11) to

carry out a state constitutional duty to provide free and universal public education. *Drummond ex rel. State v. Okla. Statewide Virtual Charter Sch. Bd.*, 558 P.3d 1, 12 (Okla. 2024), *aff'd by an equally divided court*, 605 U.S. 165 (2025). Before a virtual charter school can enter into a contract with the Board, the Board must approve a detailed charter application. *Id.* § 3-134(B). The Board and other governmental entities oversee virtual charter schools throughout their existence (*e.g., id.* §§ 3-134(I), 3-137(H)), and the Board may dissolve a school for poor performance or other good cause (*id.* § 3-137(C)–(F)). Virtual charter schools must "be as equally free and open to all students as traditional public schools" (*id.* § 3-136(A)(9)) and are funded under the same statutory formulas that apply to other public schools (*id.* §§ 3-142(A), 3-142(C), 18-200.1, 18-201.1). And, like other public schools, they are subject to a comprehensive statutory and regulatory framework that governs their academic programs, treatment of students, reporting obligations, records, meetings, and boards. *See infra* at 11–12.

Like all other public schools, Oklahoma charter schools must be neutral toward religion. *Id.* § 3-136(A)(2), (9); Okla. Admin. Code § 777:10-3-3(b)(8)(L); *Drummond*, 558 P.3d at 18. But Plaintiffs have made clear that Jewish religious teachings will be integrated into "every dimension of . . . life" at their proposed school (ECF No. 1-2 at 8, 38) and that a core part of the school's mission will be to help students "develop[] deep Jewish knowledge, faith, and values" (ECF No. 1-5 at 1, 16). Students will take mandatory "religion/theology classes"; learn "Jewish religious beliefs, principles, and ethical frameworks"; and study "religious rituals." (ECF No. 1-2 at 4, 8, 16, 61.)

In addition, statements in Ben Gamla's application demonstrate that the school plans to follow discriminatory policies and practices. Though Ben Gamla professes that it will accept students "of different faiths or no faith," it belies that statement by warning that "[a]dmission assumes the student and family willingness to adhere with respect to the beliefs, expectations, policies, and procedures of the school." (*Id.* at 59.) The school plans to promote "core Jewish teachings related to . . . the sanctity of life, the sanctity of marriage . . . and the ethical guidance our tradition offers regarding sexuality and gender." (*Id.* at 38.) And while Ben Gamla states that it "shall not discriminate" on the basis of a variety of characteristics that include "biological sex," it does not list sexual orientation and gender identity among the protected traits. (*Id.* at 63.) Further, the school will refrain from disability-based discrimination only insofar as students "can be served by virtual learning." (*Id.*) Ben Gamla also "retains its right to consider religion as a factor in employment-related decisions." (*Id.* at 54.) Employees will be required to "support the principles, teachings, and commitments of the Jewish community"; "refrain from actions that are contrary to the teachings of the community"; and "uphold the standards of the Jewish tradition in their day-to-day work and personal lives." (*Id.* at 3.)

The Board twice rejected Ben Gamla's application—once at a February 9, 2026 meeting, and again at a March 9, 2026 meeting after Ben Gamla's submission of an addendum to its application. (ECF No. 1-4 at 1–2; ECF No. 1-6.) The addendum purported "to satisfy the concerns" that the Board had raised during its February 9 meeting and in a subsequent rejection letter. (ECF No. 1-5 at 1.) But the addendum did not alter Ben Gamla's plans to provide a religious education. (ECF No. 1-5.)

Nor did the addendum remedy various other application deficiencies. For instance, as Attorney General Drummond has explained in an ongoing state-court lawsuit, even after the addendum, Ben Gamla's application materials contain substantial discrepancies in enrollment projections. Pet. Writ Mand. 5–6, 9–10, *Drummond v. Okla. Statewide Charter Sch. Bd.*, No. CV-2026-649 (Okla. Dist. Ct. Mar. 11, 2026), https://perma.cc/769E-AQBP.[1] Drummond also raised concerns about the school's board and operational structure. *Id.* at 6, 10–11. In addition, Ben Gamla's application did not include proposed governing bylaws or documentation showing completion of the Board's pre-application training (ECF No. 1-2; Ex. 1 hereto)—both of which are required by OCSA (Okla. Stat. tit. 70, § 3-134(A), (B)(9), (B)(22))—and neither defect was remedied by Ben Gamla's addendum (ECF No. 1-5). And while the addendum addressed one problematic clause in Ben Gamla's application relating to special-education compliance (*id.* at 4–5), it did not address (*id.* at 1–5) any of the above-described statements in the application that evince plans to follow discriminatory policies and practices (*supra* at 3).

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

[1] The Attorney General's lawsuit points only to discrepancies between Ben Gamla's letter of intent and its application. Pet. Writ Mand., *Drummond*, No. CV-2026-649, at 5–6. But there are also enrollment-projection discrepancies *within* the application itself. (*Compare* Ex. 2 hereto (initial target enrollment of 400), *with* ECF No. 15-5 at 2 (budget projecting enrollment of 500).)

the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs do not satisfy any of these requirements, so the Court should deny their motion.

**I. Plaintiffs are unlikely to succeed on the merits.**

**A. Plaintiffs lack Article III standing.**

Plaintiffs lack standing. To establish standing, Plaintiffs must show (1) a concrete and particularized, actual or imminent injury; (2) resulting from Defendants' conduct; (3) that is likely to be redressed by a favorable judgment. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Applying these principles, the Tenth Circuit has held that "a person who fails to satisfy lawful, nondiscriminatory requirements or qualifications for [a] benefit lacks standing to raise claims of discrimination in the denial of [that] benefit." *Wilson v. Glenwood Intermountain Props., Inc.*, 98 F.3d 590, 593 (10th Cir. 1996); *accord Day v. Bond*, 500 F.3d 1127, 1135 (10th Cir. 2007).

"At the preliminary injunction stage . . . the plaintiff must make a clear showing that she is likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation modified). When "the information pertaining to standing is in the plaintiff's possession . . . then the plaintiff must move beyond the mere allegations in their pleadings and provide specific facts, supported by affidavits or other evidence, to demonstrate standing." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 108 (10th Cir. 2024) (citation modified). Plaintiffs have not done so here.

Plaintiffs request a preliminary injunction that would prohibit Defendants from "exclud[ing] Plaintiffs from participating in Oklahoma's charter school program on account of their religious status, beliefs, or practices." (Pls.' Mot. Prelim. Inj. 1.) But

Ben Gamla's application materials include deficiencies that "disqualify [the school] from eligibility for [charter authorization] even absent" Oklahoma's requirement that charter schools be nonreligious. *See Day*, 500 F.3d at 1135. Plaintiffs therefore "cannot show injury caused by" the challenged requirement; "nor can [they] show injury that would be redressed by a decision in [their] favor." *See id.*

For instance, Ben Gamla's application demonstrates that the school plans to follow discriminatory policies and practices (*supra* at 3–4) that violate OCSA's prohibitions on discrimination on any basis against students and religious discrimination in employment (Okla. Stat. tit. 70, §§ 3-136(A)(2), 3-136(A)(6), 3-136(A)(9), 3-140, 1210.201). Plaintiffs fall far short of making a "clear showing" (*Murthy*, 603 U.S. at 58) that their proposed school would be "as equally . . . open to all students as traditional public schools" (Okla. Stat. tit. 70, § 3-136(A)(9)). The school cannot be "open to all" in any meaningful sense while requiring students and their families to "adhere with respect to" the school's particular beliefs, including beliefs about religion, sexuality, and gender. (ECF No. 1-2 at 38, 59.) Moreover, Ben Gamla's statement that it will refrain from discriminating based on disability only insofar as a student "can be served by virtual learning" (ECF No. 1-2 at 63) disregards OCSA's unqualified prohibition against discrimination in admissions based on "disabling condition" (Okla. Stat. tit. 70, § 3-140(D)). And Ben Gamla's application materials contain various other material deficiencies (*supra* at 4), including deficiencies that Attorney General Drummond considers disqualifying (Pet. Writ Mand. 9–12, *Drummond*, No. CV-2026-649).

Because of its application's deficiencies, Ben Gamla would be precluded from being a charter school even if the Court grants Plaintiffs' requested relief. Thus, Plaintiffs have not met their burden to show that they likely have standing.

**B. Plaintiffs' claims are not ripe.**

This case is also unripe. To determine whether a case is ripe, courts "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967). Doing so prevents "premature adjudication." *Id.* at 148. Plaintiffs have yet to complete all necessary application steps, such as submitting proposed bylaws and documentation of pre-application training. (*Supra* at 4.) And there are ongoing disputes among the Defendants over the reasons for rejecting Ben Gamla's application (*id.*), which cast significant "uncertainty" on the issues in this case and render them unfit for adjudication. *See Utah Republican Party v. Cox*, 892 F.3d 1066, 1093 (10th Cir. 2018). As for "hardship to the parties," Plaintiffs would not be "significantly impaired" by deferring adjudication (*see id.*), because Ben Gamla could not open its school until July 2027 even if it were to obtain a preliminary injunction tomorrow. The Board's regulations require charter applications to "be submitted at least eighteen (18) months . . . prior to July of the expected school opening year." Okla. Admin. Code § 777:10-3-3(a)(4). Ben Gamla submitted its application in December 2025. (Compl. ¶ 65.)

**C. Plaintiffs' Free Exercise Clause arguments fail.**

Even if Plaintiffs have standing and their claims are ripe, they fail on the merits. Oklahoma virtual charter schools are public schools, governmental entities, and state

actors. As such, they do not have Free Exercise Clause rights to challenge the very laws that create them. But even if Ben Gamla could do so, the Establishment Clause prohibits religious charter schools.

**1. Oklahoma virtual charter schools are state actors because they are governmental entities.**

In cases involving governmental employees or entities, "state action is easy to spot," and "[c]ourts do not ordinarily pause to consider whether [the Constitution] applies to the actions of police officers, public schools, or prison officials." *Lindke v. Freed*, 601 U.S. 187, 195 (2024). Thus, to determine whether a party is a state actor, courts first consider whether the party is a governmental entity; if it is, there is no need to consider state-action tests applicable to private parties. For example, in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 378, 399 (1995), the Supreme Court held that Amtrak "is part of the Government for purposes of the First Amendment," and that it was therefore "unnecessary to traverse th[e] difficult terrain" of determining when the acts of private entities can be regarded as state action.

The Supreme Court explained in *Lebron* that Amtrak was created by legislation, is controlled by government-appointed officials, and exists to pursue governmental objectives. *Id.* at 383–86, 391, 397–400. The Supreme Court reaffirmed that Amtrak is a governmental entity in *Department of Transportation v. Ass'n of American Railroads*, 575 U.S. 43, 52–53 (2015), pointing to these and additional considerations, including that "Congress has mandated certain aspects of Amtrak's day-to-day operations," that Amtrak is "dependent on federal financial support," that Amtrak must provide annual reports on

certain matters to Congress and the President, and that Amtrak has other characteristics of governmental entities, such as being subject to the Freedom of Information Act. Likewise, in *Biden v. Nebraska*, 600 U.S. 477, 491 (2023), the Supreme Court held that the Missouri Higher Education Loan Authority ("MOHELA") is a governmental entity because "[i]t was created by the State to further a public purpose, is governed by state officials and state appointees, reports to the State, and may be dissolved by the State." In addition, then-Judge Gorsuch applied similar analysis in *United States v. Ackerman*, 831 F.3d 1292, 1295–1300 (10th Cir. 2016), concluding that a clearinghouse for missing children was a governmental entity because it was given exclusive duties and powers by a federal statute, was funded primarily by the federal government, and was controlled by the government, including via "statutorily required . . . functions, a fact that evinces the sort of 'day-to-day' statutory control over its operations that the Court found tellingly present in the Amtrak cases."

Oklahoma virtual charter schools have all the characteristics listed in these cases.

***Created and subject to dissolution by governmental action.*** Governmental action is responsible for the creation of Oklahoma virtual charter schools in two respects. First, virtual charter schools were authorized by the Oklahoma legislature through OCSA, Okla. Stat. tit. 70, §§ 3-130 to 3-145.11. Second, an individual virtual charter school can come into existence only if the Board—a governmental entity—approves a detailed application for a charter. *Id.* §§ 3-132.1(A), 3-132.1(I), 3-134(B), 3-134(I). Oklahoma virtual charter schools can also be dissolved by governmental action. They could be abolished entirely by repeal of OCSA. And the Board may deny renewal of or terminate

the charter of an individual school for poor performance or other good cause. *Id.* § 3-137(D)–(F).

***Controlled by governmental officials.*** Throughout their existence, Oklahoma virtual charter schools remain under the control of governmental officials. The Board must provide "oversight of the operations of . . . virtual charter schools" with respect to performance and legal compliance. *Id.* § 3-134(I)(1), (7). It must also "approve or deny" certain "proposed contracts" that virtual charter schools seek to sign. *Id.* § 3-134(I)(6). Moreover, the schools must submit annual accreditation applications to the Oklahoma State Department of Education. Okla. Admin. Code § 210:35-3-201(a). And the Oklahoma State Board of Education must identify underperforming virtual charter schools through a statutorily defined process that can lead to school closure. Okla. Stat. tit. 70, § 3-137(H) (citing *id.* § 1210.545).

***Pursue governmental objectives.*** Oklahoma virtual charter schools are charged with fulfilling governmental objectives, including an Oklahoma constitutional mandate to provide free education that is open to all. *See* Okla. Const. art. I, § 5; art. XI, §§ 2–3; art. XIII, § 1; Okla. Stat. tit. 70, § 3-131(A). To that end, OCSA requires virtual charter schools to "be as equally free and open to all students as traditional public schools." Okla. Stat. tit. 70, § 3-136(A)(9). Thus, OCSA prohibits virtual charter schools from "charg[ing] tuition or fees" (*id.*) and requires that a lottery be used to select which students may enroll in a charter school if the number of students applying exceeds the space available (*id.* § 3-140(A), (D)).

***Directed by statutory mandates.*** Oklahoma exercises significant control over virtual charter schools' day-to-day operations through extensive statutory requirements that do not apply (*see generally* Okla. Admin. Code § 210:35-33-2) to private schools. Oklahoma virtual charter schools must establish "academic program[s] aligned with state standards" (Okla. Stat. tit. 70, § 3-134(B)(12))[2] and must adhere to various other requirements and prohibitions that apply to other public schools.[3] Plaintiffs point out that Oklahoma virtual charter schools are exempt from certain rules that govern other public schools. (Pls.' Br. Supp. Prelim. Inj. 2–3 (citing Okla. Stat. tit. 70, § 3-136(A)(1).) But these exemptions do not change any of the numerous characteristics, described herein, that render Oklahoma virtual charter schools governmental entities. *See Lebron*, 513 U.S. at 392 (Amtrak was a governmental entity despite being exempted from various legal requirements ordinarily applicable to governmental bodies).

***Fully funded by the state.*** Oklahoma provides full state funding for virtual charter schools based on the same statutory formulas that apply to traditional public schools. Okla. Stat. tit. 70, §§ 3-142(A), 3-142(C), 18-200.1, 18-201.1.

---

[2] Plaintiffs' assertion that "charter schools need not follow Oklahoma's core curriculum requirements" (Pls.' Br. Supp. Prelim. Inj. 3) is incorrect (Okla. Stat. tit. 70, § 3-134(B)(12)).

[3] *E.g.*, *id.* §§ 11-103.6m(C) (computer-science course requirements); 11-103.16 (cursive-handwriting instruction); 24-157(B)(1) (prohibition against teaching certain concepts); 1210.508B(D) (prohibition of a particular teaching model); 3-136(A)(10), 1-109(A) (school year length); 3-141(A), 9-108 (bus transportation); 3-136(A)(4), 1210.508(F), 1210.508-5 (student testing); 3-136(A)(11), 24-101.3 (student suspension); 11-202 (school libraries); 6-401 (electronic communication with students); 24-100.10(A), 1210.196(B) (provision of health-related information); 1210.508-6 (college financial-aid applications); Okla. Admin. Code § 210:40-87-6(a)–(b) (insurance coverage and fidelity bonding).

***Mandatory reporting requirements.*** Oklahoma virtual charter schools must submit to the Board detailed annual reports that cover a wide range of topics, such as "student academic proficiency" and "financial performance and sustainability." *Id.* § 3-136(A)(18); *see also id.* § 3-136(A)(17). And they must comply with all other "reporting requirements" that apply to public "school district[s]." *Id.* § 3-136(A)(5).

***Other attributes of governmental entities.*** Like other governmental entities, Oklahoma virtual charter schools must "comply with the Oklahoma Open Meeting Act and the Oklahoma Open Records Act." *Id.* § 3-136(A)(15). Governing board members are "subject to the same conflict of interest requirements" and "continuing education requirements" as members of local school boards. *Id.* § 3-136(A)(7). Oklahoma virtual charter schools and their employees are eligible for many of the same benefits that Oklahoma provides to public schools and their employees. *Id.* §§ 3-136(A)(13)–(14), 3-142(F). And Oklahoma virtual charter schools are "considered . . . school district[s] for purposes of tort liability." *Id.* § 3-136(A)(12).

***Defined as public schools and governmental entities.*** OCSA defines "charter school" as "a public school established by contract." *Id.* § 3-132.2(C)(1)(b). Furthermore, each Oklahoma virtual charter school is "considered a local education agency" (*id.* § 3-142(D)), which is "a public board of education or other public authority" that administers public schools (20 U.S.C. § 7801(30)(A)). And, of course, the Oklahoma Supreme Court concluded in *Drummond*, 558 P.3d at 10–11, that Oklahoma virtual charter schools are governmental entities as a matter of state law.

To be sure, in determining whether an entity is governmental for federal constitutional purposes, how the entity is defined by statute cannot override the substance of what the entity is. *See Lebron*, 513 U.S at 392–93, 397. Nevertheless, the U.S. Supreme Court has accorded considerable weight to how a state defines an entity. *See Biden*, 600 U.S. at 490–91 (emphasizing that MOHELA was statutorily defined as a "public instrumentality" and concluding that MOHELA was governmental both "[b]y law and function"); *Arkansas v. Texas*, 346 U.S. 368, 370 & nn.7–9 (1953) (relying on state judicial opinions that held that University of Arkansas was a state entity, together with factors similar to those used in Amtrak cases, to conclude that University was governmental). Here, the substance and the definition both lead to the same conclusion—that Oklahoma virtual charter schools are governmental entities.

Plaintiffs point to three cases in which entities or persons labeled as "public" were not engaged in state action: *Manhattan Community Access Corp. v. Halleck*, 587 U.S. 802, 805 (2019); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350 n.7 (1974); and *Polk County v. Dodson*, 454 U.S. 312, 317–20 (1981). (Pls.' Br. 18.) But the entity at issue in *Halleck* was not even labeled "public"—it was a private nonprofit corporation that merely operated a public-access cable channel (587 U.S. at 805); and the entity at issue in *Jackson* was a "privately owned and operated" utility company (419 U.S. at 350). Neither entity was defined under state law as governmental, and neither had any substantive attributes of governmental entities. *See Halleck*, 587 U.S. at 805, 809–11 & n.1; *Jackson*, 419 U.S. at 350–53. And in *Polk*, the Court concluded that public defenders are not state actors when acting as counsel in a criminal proceeding because in

doing so they act as adversaries to the state. *See* 454 U.S. at 318–20, 325. Oklahoma virtual charter schools are defined as governmental entities under state law, have numerous attributes of governmental entities, and do not act as adversaries to the state.

Pointing out that OCSA allows "private organization[s]" to *apply* to establish a virtual charter school (Okla. Stat. tit. 70, § 3-134(C)), Plaintiffs nevertheless repeatedly describe charter schools as "private" (Pls.' Br. 2–4, 10, 14). But in *Ackerman*, then-Judge Gorsuch rejected a similar framing, reasoning that "an admittedly private entity can be made into a public one later." 831 F.3d at 1299. So even if Ben Gamla was private when it submitted a charter application, upon approval it would become a governmental body, and the members of its board would become public officials. *See* Okla. Jud. Ethics Op. 2023-3, 538 P.3d 572, 572 (Okla. Jud. Ethics Advisory Panel 2023) (treating service on board of Oklahoma charter school as "appointment to a governmental committee, board, commission, or other governmental position"); Okla. Stat. tit. 70, § 3-136(A)(7).

As Oklahoma virtual charter schools are governmental entities, there is no doubt that they are state actors, and this should end the inquiry. *See Lebron*, 513 U.S. at 378.

**2. Alternatively, Oklahoma virtual charter schools are state actors under state-action tests that apply to private entities.**

Even if Oklahoma virtual charter schools are not governmental entities, they are still state actors. In some circumstances, the conduct of private entities "may be fairly treated as that of the State itself." *Jackson*, 419 U.S. at 351. Oklahoma virtual charter schools are state actors under three of the state-action tests that apply to private entities.

***Traditional, exclusive public function.*** A private entity is a state actor when it exercises a function "traditionally *and* exclusively performed" by the government. *Halleck*, 587 U.S. at 809. Oklahoma virtual charter schools perform the traditional, exclusive public function of providing education that is "free and open to all students" (Okla. Stat. tit. 70, § 3-136(A)(9)). *See Peltier v. Charter Day Sch.*, 37 F.4th 104, 115–23 (4th Cir. 2022) (en banc) (public charter schools "perform the traditionally exclusive government function of operating the state's public schools"); *Drummond*, 558 P.3d at 12.

In Oklahoma, the provision of education that is free and open to all has been an exclusively public function since the state came into existence. Prior to statehood in 1907, schools in Oklahoma generally fell into three categories: subscription schools, mission schools, and schools operated by Indigenous people. Dianna Everett, *The Encyclopedia of Oklahoma History and Culture: Schools, Common*, Okla. Hist. Soc'y, https://perma.cc/544H-RJH8. These schools were not free and open to all. Subscription schools relied on funding from pupils' parents. *Id.* Mission schools and those operated by Indigenous people primarily served only Indigenous pupils. *See* Oscar William Davison, *Oklahoma's Educational Heritage*, 27 Chrons. Okla. 354, 362–65 (1949), https://perma.cc/M6YQ-JNVS. While the children of white settlers were sometimes allowed to attend these schools, they were required to pay tuition. *Id.* at 365–66. Under this hodgepodge educational framework, many children did not have access to educational facilities. Everett, *supra*.

But after the enactment of the 1907 Oklahoma Constitution—which guaranteed "free" education for "all the children of the state" (Okla. Const. art. I, § 5; art. XIII, §

1)—education expanded rapidly in Oklahoma. According to the state's first superintendent of public instruction, Oklahoma enrolled in 1908 "not less than 140,000 children who never entered a public schoolhouse before and a vast majority of whom never attended a school of any kind a single day." Everett, *supra*. Oklahoma public schools had done what private education simply could not: provide a system of free education for all children.

Oklahoma's experience mirrors that of states across the union, where "tax support was a necessary condition for a free school system." Carl F. Kaestle, *Pillars of the Republic: Common Schools and American Society, 1780–1860* 151 (Eric Foner, ed., 1983). In the early days of the Republic, schools were generally "a product of private action" and were "not open to all, free, or a part of some formal system of schools." Derek W. Black, *Localism, Pretext, and the Color of School Dollars*, 107 Minn. L. Rev. 1415, 1450 (2023). Early schools "depended heavily on tuition," and "many communities had no schools at all." *Id.* This changed with the advent of the "common schools" movement, which transformed education in the North in the 1820s and 1830s and in the South after the Civil War. *Id.* at 1450–51. Common schools "fell under the purview of public officials" and were "funded by state and local taxes." *Id.* at 1451.

Soon, states "began abolishing tuition and fees in common schools," and many states mandated "free" education for "all" in their constitutions. *Id.* at 1457–58. As a result, nationwide school enrollment increased quickly after the Civil War. *See* Derek W. Black, *The Fundamental Right to Education*, 94 Notre Dame L. Rev. 1059, 1094 (2019).

Public education grew in the nineteenth century because private schooling had proven to be incapable of providing a system of free education open to all. *See* Johann N. Neem, *Democracy's Schools: The Rise of Public Education in America* 67 (2017). In some places, private charity schools offered free education "explicitly for the poor," but "traditional views" dictated that "[s]chooling should not be free for those able to pay for it." *See* Kaestle, *supra*, at 60, 149. Meanwhile, the affluent sent their children to "expensive and exclusive" independent pay schools. *Id.* at 60. Assessing this class-segregated education system, lawmakers across the country concluded that "free public education in common schools was vital." Neem, *supra*, at 67. In the words of North Carolina state senator Archibald Murphey, provision of universal education "*require[d]* a system of public education" because "private effort" had failed to accomplish that goal. *Id.* (emphasis added). Thus, education that is free and open to all students is a traditionally exclusive public function both in Oklahoma and nationwide.

Plaintiffs contend that the Court should analyze a broader function—"the education of children"—not education that is free and open to all. (Pls.' Br. 16.) But the conduct at issue must be identified with specificity instead of being defined too broadly. For example, although the government does not conduct elections for private offices, such as positions on corporate boards, running elections for *public* office is a quintessential example of a traditionally exclusive public function. *See Halleck*, 587 U.S. at 809–10 (collecting cases). Similarly, although both private and public parks exist, trustees of public parks are considered state actors because operating a public park is a

function that "traditionally serves the community." *See Evans v. Newton*, 382 U.S. 296, 302 (1966). So too is education that is free and open to all.

***Outsourced constitutional obligation.*** "[A] private entity may" also "be deemed a state actor when the government has outsourced one of its constitutional obligations to [the] entity." *Halleck*, 587 U.S. at 810 n.1. For instance, in *West v. Atkins*, 487 U.S. 42, 56 (1988), the Court held that a physician who contracted with the state to provide medical services to incarcerated individuals was a state actor even though he was not a state employee, because the state had "delegated" to the doctor "its constitutional duty to provide adequate medical treatment to those in its custody." The Oklahoma Constitution obligates the state to provide free education that is open to all. *See* Okla. Const. art. I, § 5; art. XI, §§ 2–3; art. XIII, § 1. Oklahoma virtual charter schools are statutorily created to perform this constitutionally mandated state duty. *See* Okla. Stat. tit. 70, § 3-136(A)(9). Thus, they are state actors.

Plaintiffs point out that the state would not be delegating *all* responsibility for public education for the entire state to Ben Gamla. (Pls.' Br. 16–17.) But the state in *West* did not delegate responsibility for all medical care in prisons across the state to a single doctor. Indeed, the state prison at issue employed both a "full-time staff physician" and contract doctors such as the defendant there. 487 U.S. at 44. A partial delegation of a constitutional duty is a delegation all the same.

Plaintiffs also try to distinguish *West* by pointing out that the incarcerated individual there "could turn only to 'those physicians authorized by the State.'" (Pls.' Br. 16–17 (quoting *West*, 487 U.S. at 55).) But the Court in *West* discussed this lack of

choice only to explain why a constitutional duty existed there notwithstanding that there is no recognized, freestanding right to healthcare under the Constitution. *See* 487 U.S. at 54; *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). Here, Oklahoma children enjoy an express right to access public education that is free and open to all. *See* Okla. Const. art. I, § 5; art. XIII, § 1. And, as in *West*, Oklahoma's virtual charter schools—like other public schools—provide that education to children only upon approval by the state. *See* Okla. Stat. tit. 70, § 3-134(B).

***Entwinement.*** Under the "entwinement" test, an entity is a state actor when it is "entwined with governmental policies, or when government is entwined in [its] management or control." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (citation modified); *accord Wittner v. Banner Health*, 720 F.3d 770, 778 (10th Cir. 2013). Oklahoma virtual charter schools are entwined with the state in this manner. Only the Board—a governmental entity—may sponsor virtual charter schools and grant charters. Governmental entities exercise control over Oklahoma virtual charter schools in many respects. And the operations of virtual charter schools are further directed by numerous statutory and regulatory requirements. *See supra* at 9–12.

**3. The Tenth Circuit and numerous other courts have concluded that charter schools are governmental entities and state actors.**

Consistently with the analysis above, the Tenth Circuit has treated charter schools as governmental entities. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1180, 1188 (10th Cir. 2010); *Coleman v. Utah State Charter Sch. Bd.*, 673 F. App'x 822, 830 (10th Cir. 2016); *Dillon v. Twin Peaks Charter Acad.*, 241 F. App'x 490, 496–97

(10th Cir. 2007). Many other federal courts—including the en banc Fourth Circuit, panels of the Third and Ninth Circuits, and numerous district courts—have treated charter schools as governmental entities or other state actors as well.[4]

Ignoring these authorities, Defendants rely on the Supreme Court's decision in *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), to assert that Oklahoma virtual charter schools are not state actors. (Pls.' Br. 13–14.) But there, the Supreme Court ruled that a *private* school for troubled youths was not a state actor for purposes of employment-related claims. 457 U.S. at 832–35, 843. As discussed above, Oklahoma virtual charter schools are public schools, not private ones. Okla. Stat. tit. 70, § 3-132.2(C)(1)(b). They are created through governmental action (*supra* at 9), unlike the school in *Rendell-Baker* (*see* 457 U.S. at 832). They perform the traditionally exclusive public function of providing education that is free and open to all students (*supra* at 15–18), while the school in *Rendell-Baker* was for "students who could not be served by traditional public schools," a function "that until recently the State had not undertaken" (457 U.S. at 842). Moreover, unlike the educational functions of Oklahoma virtual charter schools (*supra* at 9–12), "regulators showed relatively little interest in the [*Rendell-Baker*] school's

[4] *See, e.g.*, *Peltier*, 37 F.4th at 115–23; *Fam. C.L. Union v. Dep't of Child. & Fams.*, 837 F. App'x 864, 869 (3d Cir. 2020); *Nampa Classical Acad. v. Goesling*, 447 F. App'x 776, 777–78 (9th Cir. 2011); *Blanco v. Success Acad. Charter Schs., Inc.*, 722 F. Supp. 3d 187, 227 (S.D.N.Y. 2024); *Patrick v. Success Acad. Charter Schs., Inc.*, 354 F. Supp. 3d 185, 209 n.24 (E.D.N.Y. 2018); *United States v. Minn. Transitions Charter Schs.*, 50 F. Supp. 3d 1106, 1120 (D. Minn. 2014); *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 908 F. Supp. 2d 597, 604–05 (M.D. Pa. 2012); *Riester v. Riverside Cmty. Sch.*, 257 F. Supp. 2d 968, 972–73 (S.D. Ohio 2002); *Daugherty v. Vanguard Charter Sch. Acad.*, 116 F. Supp. 2d 897, 906–07 (W.D. Mich. 2000); *Jones v. SABIS Educ. Sys., Inc.*, 52 F. Supp. 2d 868, 876, 879 (N.D. Ill. 1999).

personnel matters," and the Supreme Court's holding in the case addressed only whether the school was a state actor with respect to employment claims (*see* 457 U.S. at 841–42).

Other cases that Plaintiffs cite (Pls.' Br. 19–21) are inapposite for similar reasons. In *Caviness v. Horizon Community Learning Center, Inc.*, 590 F.3d 806, 812–14, 817–18 (9th Cir. 2010), the court held that a charter school's employment decisions were not state action based on an analysis of Arizona statutory and constitutional provisions that are substantially different from Oklahoma's. Moreover, the *Caviness* court did not decide whether performance of the school's *educational* functions was state action. *Id.* Finally, *Logiodice v. Trustees of Maine Central Institute*, 296 F.3d 22, 24–25 (1st Cir. 2002), and *Robert S. v. Stetson School, Inc.*, 256 F.3d 159, 162, 166 (3d Cir. 2001), were lawsuits against private schools, not charter schools.

**4. Because public charter schools are state actors, Plaintiffs may not assert their free-exercise challenge.**

Because Oklahoma virtual charter schools are governmental entities and state actors, they have no right under the Free Exercise Clause to present religious programming that state law prohibits. Oklahoma virtual charter schools are created by state law and through charters granted by the Board—a governmental entity to which the schools are subordinate. *See* Okla. Stat. tit. 70, § 3-132.1(A). "[S]ubordinate unit[s] of government . . . ha[ve] no privileges or immunities under the federal constitution which [they] may invoke in opposition to the will of [their] creator." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009) (citation modified).

In addition, when a state actor speaks in the course of exercising their official duties, their speech is government speech. *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). A person delivering government speech has no right under the First Amendment, including its Free Exercise Clause, to deliver speech that a statute or a governmental policy prohibits. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009); *Gundy v. City of Jacksonville*, 50 F.4th 60, 80–81 (11th Cir. 2022); *Fields v. Speaker of Pa. House of Representatives*, 936 F.3d 142, 158–60 (3d Cir. 2019).

**5. The Establishment Clause prohibits religious charter schools.**

Even if Plaintiffs could challenge Oklahoma's bar against religious charter schools under the First Amendment, that bar cannot violate the Free Exercise Clause because it is necessary to comply with the Establishment Clause. Adherence to the Establishment Clause is a compelling governmental interest that satisfies any level of scrutiny under the First Amendment. *See Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 761–62 (1995); *Lee v. Weisman*, 505 U.S. 577, 587 (1992). And limitations that the Establishment Clause requires are, inherently, narrowly tailored to that interest. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 628–29 (1984). Oklahoma's prohibition against religious charter schools is required by the Establishment Clause for three reasons.

***First***, "[g]overnment may not . . . undertake religious instruction []or blend secular and sectarian education." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952). The Supreme Court has repeatedly held that the Constitution does not permit public schools to inculcate religion. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 310–13 (2000); *Lee*, 505 U.S. at 598; *Edwards v. Aguillard*, 482 U.S. 578, 596–97 (1987); *Wallace v.*

*Jaffree*, 472 U.S. 38, 61 (1985); *Epperson v. Arkansas*, 393 U.S. 97, 109 (1968); *Sch. Dist. v. Schempp*, 374 U.S. 203, 205 (1963); *Engel v. Vitale*, 370 U.S. 421, 424 (1962); *Illinois ex rel. McCollum v. Bd. of Educ.*, 333 U.S. 203, 211–12 (1948). As Oklahoma virtual charter schools are public schools and state actors, they may not integrate religious instruction into their curriculum or otherwise promote religion to students.

***Second***, the Establishment Clause "means at least this: Neither a state nor the Federal Government can set up a church." *Everson v. Bd. of Educ.*, 330 U.S. 1, 8, 15–16 (1947). Relatedly, the Establishment Clause prohibits "a fusion of governmental and religious functions." *Schempp*, 374 U.S. at 222. Consistently with these principles, the Supreme Court has held that states may not operate "joint public-school religious-group program[s]." *McCollum*, 333 U.S. at 205, 209–10. Nor may they create special public-school districts structured around a single religious sect. *See Bd. of Educ. v. Grumet*, 512 U.S. 687, 690 (1994). "The Framers did not set up a system of government in which important, discretionary governmental powers would be delegated to or shared with religious institutions," particularly where such powers are "employed for explicitly religious goals." *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 125, 127 (1982). The Board therefore may not establish a religious public school or delegate the core governmental function of providing public education to a religious institution that will impose religious doctrine in carrying out that function.

***Third***, the Establishment Clause bars the government from directly providing public funds to institutions for support of religious activities. *See, e.g.*, *Agostini v. Felton*, 521 U.S. 203, 228–30 (1997); *Bowen v. Kendrick*, 487 U.S. 589, 621 (1988);

*Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 780 (1973). There is a narrow exception to this rule: Public funds may support religious education when "a government aid program is neutral with respect to religion, and provides assistance *directly to a broad class of citizens* who, in turn, direct government aid to religious schools *wholly* as a result of their own genuine and independent private choice." *See Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002) (emphases added). For this "true private choice" exception to apply, "government aid" must "reach[] religious schools *only* as a result of the genuine and independent choices of private individuals." *Id.* at 649 (emphasis added). Oklahoma's funding of virtual charter schools does not satisfy this exception. Public funds are not allocated or paid directly to a broad class of citizens and do not reach virtual charter schools solely as a result of parental choices. Rather, public funds are allocated and paid by the state directly to virtual charter schools, as part of the state's funding of public schools. *See* Okla. Stat. tit. 70, § 3-142(A). The Board, not private individuals, has the power to approve virtual charter schools. *Id.* § 3-134(B). And the amount of funding is determined primarily through a complex statutory formula that—though it includes the number of students served—also incorporates a number of other factors. *See id.* §§ 3-142(A)–(B), 18-200.1, 18-201.1. Moreover, regardless of how many students they serve, virtual charter schools are eligible to receive additional state funds for start-up expenses and certain other costs. *Id.* § 3-144(A).

**6. *Carson*, *Espinoza*, and *Trinity Lutheran* are inapplicable.**

Because permitting Ben Gamla to operate as a religious public charter school would violate the Establishment Clause, the three principal cases on which Plaintiffs rely

(Pls.' Br. 10–12) for their free-exercise argument—*Carson ex rel. O.C. v. Makin*, 596 U.S. 767 (2022); *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020); and *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017)—are inapplicable. In all three of those cases, the Supreme Court held that the state support requested for the religious schools at issue would not have violated the Establishment Clause. All of those schools were private schools, not public ones. None of them was a governmental entity or other state actor. And in *Carson*, the Court explicitly held that a state "may provide a strictly secular education in its public schools." 596 U.S. at 785.

## II. Plaintiffs do not satisfy the remaining preliminary-injunction factors.

Finally, the remaining preliminary-injunction factors weigh against Plaintiffs. As noted above (*supra* at 7), because Ben Gamla submitted its application in December 2025 (Compl. ¶ 65), the school could not open before July 2027 even if the Court were to grant the preliminary injunction Plaintiffs seek. *See* Okla. Admin. Code § 777:10-3-3(a)(4). So even if Plaintiffs face harm here, there is no rush—any such harm could be prevented by a final decision on the merits (if Plaintiffs are entitled to prevail) after discovery and full briefing. Proposed Intervenors and the public, however, would be harmed by a preliminary injunction that would require tax funding of an unconstitutional religious school and erode Oklahoma's system of free public schools that are open to all students.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied.

Respectfully submitted on April 17, 2026.

s/ Alex J. Luchenitser

Brent Rowland, OBA No. 13415
Morgan Bandy, WI Bar No. 1130673*
Oklahoma Appleseed Center for Law & Justice
624 S. Denver Ave., Suite 400
Tulsa, OK 74119
Telephone: (918) 519-5750
brent@okappleseed.org /
morgan@okappleseed.org

Daniel Mach, DC Bar No. 461652*
Heather L. Weaver, DC Bar No. 495582*
American Civil Liberties Union Foundation
915 15th Street, NW, Suite 600
Washington, DC 20005
Telephone: (202) 675-2330
dmach@aclu.org / hweaver@aclu.org

Nancy A. Noet, WI Bar No. 1023106*
Samuel T. Grover, WI Bar No. 1096047*
Freedom From Religion Foundation
PO Box 750
Madison, WI 53701
Telephone: (608) 256-8900
noetn@ffrf.org / sgrover@ffrf.org

Alex J. Luchenitser,
DC Bar No. 473393*
Luke Anderson, DC Bar No. 90042004*
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 466-7306 /
(202) 898-2134
luchenitser@au.org / anderson@au.org

Jessica Levin, CA Bar No. 338240*
Wendy Lecker, NY Bar No. 2283125*
Patrick Cremin, CA Bar No. 345406*
Katrina Reichert, CA Bar No. 357984*
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102
Telephone: (973) 624-1815
JLevin@edlawcenter.org /
WLecker@edlawcenter.org /
PCremin@edlawcenter.org /
KReichert@edlawcenter.org

*Attorneys for Proposed Intervenors*
* Admitted *pro hac vice*.

# Document regarding training certificate, attached to Ben Gamla's application for initial authorization, filed below on April 17, 2026, as ECF No. 62-2 (Exhibit 1 to Brief in Opposition to Motion for Preliminary Injunction)

Training certificate for Robert Ruiz to be provided before Jan 12, 2026, board meeting.

# Enrollment-projection documents attached to Ben Gamla's application for initial authorization, filed below on April 17, 2026, as ECF No. 62-3 (Exhibit 2 to Brief in Opposition to Motion for Preliminary Injunction)

## School Enrollment Projections

School Name: Ben Gamla Jewish Chart School
Planned Location: Oklahoma City, OK
Planned Opening Year: 2026

| Enrollment | Year 1 | | | Year 2 | | | Year 3 | | | Year 4 | | | Year 5 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Min | Goal | Max | Min | Goal | Max | Min | Goal | Max | Min | Goal | Max | Min | Goal | Max |
| Pre-K | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kindergarden | 5 | 10 | 15 | 10 | 15 | 20 | 15 | 20 | 25 | 35 | 40 | 45 | 80 | 85 | 90 |
| Grade 1 | 5 | 10 | 15 | 10 | 15 | 20 | 15 | 20 | 25 | 35 | 40 | 45 | 80 | 85 | 90 |
| Grade 2 | 15 | 20 | 25 | 20 | 25 | 30 | 20 | 25 | 30 | 40 | 45 | 50 | 80 | 85 | 90 |
| Grade 3 | 20 | 25 | 30 | 25 | 30 | 35 | 25 | 30 | 35 | 50 | 55 | 60 | 80 | 85 | 90 |
| Grade 4 | 25 | 30 | 35 | 30 | 35 | 40 | 45 | 50 | 55 | 60 | 65 | 70 | 75 | 80 | 85 |
| Grade 5 | 25 | 30 | 35 | 30 | 35 | 40 | 45 | 50 | 55 | 65 | 70 | 75 | 75 | 80 | 85 |
| Grade 6 | 30 | 35 | 40 | 40 | 45 | 50 | 60 | 65 | 75 | 70 | 75 | 80 | 80 | 85 | 95 |
| Grade 7 | 35 | 40 | 50 | 45 | 50 | 60 | 60 | 65 | 75 | 80 | 85 | 95 | 80 | 85 | 95 |
| Grade 8 | 35 | 40 | 50 | 45 | 50 | 60 | 60 | 65 | 75 | 80 | 85 | 95 | 90 | 95 | 105 |
| Grade 9 | 35 | 40 | 50 | 45 | 50 | 60 | 60 | 65 | 75 | 80 | 85 | 95 | 90 | 95 | 105 |
| Grade 10 | 35 | 40 | 50 | 45 | 50 | 60 | 60 | 65 | 75 | 80 | 85 | 95 | 90 | 95 | 105 |
| Grade 11 | 35 | 40 | 50 | 45 | 50 | 60 | 60 | 65 | 75 | 80 | 85 | 95 | 90 | 95 | 105 |
| Grade 12 | 35 | 40 | 50 | 45 | 50 | 60 | 60 | 65 | 75 | 80 | 85 | 95 | 95 | 100 | 110 |
| **Total Enrollment Projected** | 335 | 400 | 495 | 435 | 500 | 595 | 585 | 650 | 750 | 835 | 900 | 995 | 1085 | 1150 | 1250 |

BEN GAMLA
JEWISH CHARTER SCHOOL

## Ben Gamla – Jewish Charter School
## Appendix H: Year 1 Minimum Enrollment

| Grade Levels | 2026-27 | 2026-27 | 2027-28 | 2028-29 | 2029-30 |
|---|---|---|---|---|---|
| K | 10 | 15 | 20 | 40 | 85 |
| 1 | 10 | 15 | 20 | 40 | 85 |
| 2 | 20 | 25 | 25 | 45 | 85 |
| 3 | 25 | 30 | 30 | 55 | 85 |
| 4 | 30 | 35 | 50 | 65 | 80 |
| 5 | 30 | 35 | 50 | 70 | 80 |
| 6 | 35 | 45 | 65 | 75 | 85 |
| 7 | 40 | 50 | 65 | 85 | 85 |
| 8 | 40 | 50 | 65 | 85 | 95 |
| 9 | 40 | 50 | 65 | 85 | 95 |
| 10 | 40 | 50 | 65 | 85 | 95 |
| 11 | 40 | 50 | 65 | 85 | 95 |
| 12 | 40 | 50 | 65 | 85 | 100 |
| K-5 Totals Above | 125 | 155 | 195 | 315 | 500 |
| 6-8 Totals Above | 115 | 145 | 195 | 245 | 265 |
| 9-12 Totals above | 160 | 200 | 260 | 340 | 385 |
| Totals Above | 400 | 500 | 650 | 900 | 1150 |

# Board's Response to Ben Gamla's Motion for Preliminary Injunction, filed below on April 17, 2026, as ECF No. 63

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., *et al.*,

*Plaintiffs*,

v.

GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma, *et al.*,

*Defendants*.

Case No. 5:26-cv-00582-R

**OKLAHOMA STATEWIDE CHARTER SCHOOL BOARD DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**INTRODUCTION** .......... 1

**BACKGROUND** .......... 2

**ARGUMENT** .......... 8

**I. THE *DRUMMOND* DECISION DOES NOT BIND THIS COURT.** .......... 8

**A.** Part I ignored relevant decisions of the United States Supreme Court. .......... 9

**B.** Parts II, III, and IV's analyses of federal law are irrelevant to this Court's determination of the issues presented. .......... 12

**II. BEN GAMLA MEETS THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION.** .......... 13

**A.** Ben Gamla is likely to succeed on the merits of its claims. .......... 13

**B.** The remaining factors favor an injunction. .......... 16

**III. AN INJUNCTION IS NECESSARY FOR BOARD MEMBERS TO COMPLY WITH THEIR OATH OF OFFICE.** .......... 17

**CONCLUSION** .......... 17

**CERTIFICATE OF SERVICE** .......... 19

# TABLE OF AUTHORITIES

## CASES

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) ............... 15

*Carson v. Makin*, 596 U.S. 767 (2022) ............... 11, 14, 16

*Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806 (9th Cir. 2010) ............... 15

*Does 1–11 v. Bd. of Regents of Univ. of Colo.*, 100 F. 4th 1251 (10th Cir. 2024) ............... 13

*Drummond v. Okla. Statewide Virtual Charter Sch. Bd.*, 558 P.3d 1 (Okla. 2024) ... passim

*Espinoza v. Mont. Dep't of Revenue,* 591 U.S. 464 (2020) ............... 1, 10, 11, 14

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) ............... 16, 17

*Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974) ............... 12

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) ............... 13

*Lebron v. Nat'l R.R. Passenger Corp.,* 513 U.S. 374 (1995) ............... 12

*Lindke v. Freed*, 601 U.S. 187 (2024) ............... 15

*Logiodice v. Trs. of Me. Cent. Inst.*, 296 F.3d 22 (1st Cir. 2002) ............... 15

*Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802 (2019) ............... 12, 14, 15

*Marbury v. Madison*, 1 Cranch 137 (1803) ............... 11

*Michigan v. Long*, 463 U.S. 1032 (1983) ............... 9

*Nitro-Lift Technologies, LLC v. Howard*, 568 U.S. 17 (2012) (per curiam) ............... 11

*Oklahoma Statewide Charter Sch. Bd. v. Drummond*, 605 U.S. 165 (2025) (per curiam) .. 7

*Oliver v. Hofmeister*, 368 P.3d 1270 (Okla. 2016) ............... 5

*Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104 (4th Cir. 2022) ............... 15

*Polk Cnty. v. Dodson*, 454 U.S. 312 (1981) ........................................................................12

*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) ....................................................................12, 15

*Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159 (3d Cir. 2001) ..............................................15

*TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175 (10th Cir. 2007)................................9, 13

*Trevino v. Thaler*, 569 U.S. 413 (2013) ....................................................................................9

*Trinity Lutheran Church of Columbia, Inc. v. Comer,* 582 U.S. 449 (2017) .................1, 14

*VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151 (10th Cir. 2021)..........................15

*Wilder v. Turner*, 490 F.3d 810 (10th Cir. 2007)..........................................................9, 12

*Wilson v. Hawaii*, No. 23-7517, 2024 WL 5036306 (U.S. Dec. 9, 2024) (Thomas, J., statement respecting the denial of certiorari)..........................................................9, 10

*Zelman v. Simmons-Harris*, 536 U.S. 639 (2002)..............................................................16

**STATUTES**

Okla. Stat. tit. 70, § 18-200.1.........................................................................................16

Okla. Stat. tit. 70, § 3-132.1...............................................................................................2

Okla. Stat. tit. 70, § 3-132.2...............................................................................................2

Okla. Stat. tit. 70, § 3-134...................................................................................................8

Okla. Stat. tit. 70, § 3-136...................................................................................................3

Okla. Stat. tit. 70, §§ 3-130 *et seq* ......................................................................................3

**OTHER AUTHORITIES**

Br. for Pet'rs, Okla. Statewide Charter Sch. Bd. v. Drummond, 605 U.S. 165 (No. 24-394). .........................................................................................................................14

Original Pet., OKPLAC, Inc. v. Statewide Virtual Charter Sch. Bd., No. CV-2023-1857 (Okla. Cnty. Dist. Ct. July 31, 2024)......................................................................5

Pet. for a Writ of Cert., Okla. Statewide Charter Sch. Bd. v. Drummond, 605 U.S. 165 (No. 24-394)....................14

**CONSTITUTIONAL PROVISIONS**

Okla. Const. art. II, § 5. ....................10

U.S. Const. art. VI, cl. 2....................8

## INTRODUCTION

Ben Gamla's application for a proposed Jewish charter school placed the Oklahoma Statewide Charter School Board in a difficult situation. The Board believed—and still believes—that denying Ben Gamla's otherwise-qualified revised application solely because of its religious character would violate the Free Exercise Clause of the United States Constitution. But the Oklahoma Supreme Court issued a mandate in *Drummond v. Oklahoma Statewide Virtual Charter School Board* that prohibited the Board from approving Ben Gamla's otherwise-qualified revised application because of its religious character. 558 P.3d 1 (Okla. 2024). Due to its commitment to following the law and abiding by the court's order in *Drummond*, the Board denied Ben Gamla's revised application.

The United States Supreme Court calls this type of discrimination, based solely on religious character, "odious to our Constitution." *Trinity Lutheran Church of Columbia, Inc. v. Comer,* 582 U.S. 449, 467 (2017). And a state constitution's requirement that no money or "no-aid" be provided to religious organizations offers no excuse. *See Espinoza v. Mont. Dep't of Revenue,* 591 U.S. 464, 488–89 (2020). But until a federal court says otherwise, the Board is required to continue engaging in odious discrimination per the *Drummond* decision. For this reason, and because Ben Gamla is likely to succeed on the merits of its free exercise claims, the Board respectfully requests this Court grant the Motion for Preliminary Injunction.

## BACKGROUND

***The Oklahoma Statewide Charter School Board and Oklahoma Charter Schools Act***

The Oklahoma Statewide Charter School Board exists to "support and expand education choice for Oklahoma families by authorizing and overseeing high-quality charter schools and implementing supplementary learning opportunities, ensuring access to innovative educational environments that promote academic excellence and that prepare students for successful lives." Oklahoma Statewide Charter School Board, https://oklahoma.gov/scsb.html (last modified Mar. 3, 2026). As a statutorily created state board, its nine Board Members supervise the operation of virtual and brick-and-mortar charter schools across the state; ensure charter school compliance with state law, and maintain the procedure for accepting, approving, and disapproving proposed charter school applications; among other duties. *See* Okla. Stat. tit. 70, §§ 3-132.1, 132.2. Board Members hire an Executive Director and other staff to serve at the Board's direction. Okla. Stat. tit. 70, § 3-132.2.

The Oklahoma Statewide Charter School Board was established on July 1, 2024. Okla. Stat. tit. 70, § 3-132.1(I). It is the successor-in-interest to the Oklahoma Statewide Virtual Charter School Board, which was abolished on the same date. *Id.* Upon the statutory change, the Oklahoma Statewide Charter School Board was automatically substituted in litigation for the Oklahoma Statewide Virtual Charter School Board. Decl. of Hiram S. Sasser, III (Sasser Decl.), Ex 1-E at 2. Therefore, as predecessor and successor, the actions and obligations of the Oklahoma Statewide Virtual Charter School Board and the Oklahoma Statewide Charter School Board are interchangeable.

The Oklahoma Charter Schools Act governs the establishment and operation of charter schools. *See* Okla. Stat. tit. 70, §§ 3-130 *et seq*. Relevant here is the religious exclusion from participation:

> A charter school shall be nonsectarian in its programs, admission policies, employment practices, and all other operations. A sponsor may not authorize a charter school or program that is affiliated with a nonpublic sectarian school or religious institution[.]

Okla. Stat. tit. 70, § 3-136(A)(2). This ban is twofold—status and use. The second sentence prohibits religious groups from operating a charter school because of their religious status—i.e., affiliation with a religious institution. And the first sentence prohibits a charter school having any religious use—i.e., being religious in its programs or operation. Together, these two bans are a full-scale prohibition on a charter school having any religious character whatsoever.

In 2022, Executive Director Rebecca Wilkinson requested an official opinion of the Oklahoma Attorney General as to whether enforcement of the Oklahoma Charter Schools Act's religious exclusion would violate the First Amendment's Free Exercise Clause, as interpreted in *Trinity Lutheran Church of Colombia, Inc. v. Comer*, *Espinoza v. Montana Department of Revenue*, and *Carson v. Makin.* Sasser Decl., Ex. 1-A at 1. Then-Oklahoma Attorney General John O'Connor ultimately concluded that enforcement of either the status or use religious exclusions would likely be unconstitutional under the Free Exercise Clause, because "they single out religiously affiliated organizations based solely on their 'sectarian' status or their anticipated use of public funds for religious purposes." *Id.* at 14–15.

Upon taking office in early 2023, Oklahoma Attorney General Gentner Drummond withdrew Former General O'Connor's opinion. *Id.*, Ex. 1-B at 1. General Drummond cited alleged legal uncertainties surrounding the application of federal state action doctrine to charter schools as the reason for the withdrawal, stating that he was "hopeful that the U.S. Supreme Court w[ould] definitively rule on this unsettled issue." *Id.*

***St. Isidore of Seville Catholic Virtual School***

Also in early 2023, the Archdiocese of Oklahoma City and Diocese of Tulsa applied to the Board for a proposed charter school: St. Isidore of Seville Catholic Virtual School. *See Drummond*, 558 P.3d at 6–7. St. Isidore's revised application ran directly into both religious exclusions: the operator was affiliated with two religious institutions and the school planned to "fully incorporate" the teachings of the Catholic Church into its operation. *Id.* at 14. Aside from its religious character, St. Isidore's revised application was otherwise exemplary and worthy of approval under the Act. Sasser Decl., Ex. 1-C at 3.

So the Board Members, having taken an oath to uphold the Constitution of the United States, had a choice to make. *Id.* Should they vote to deny St. Isidore's revised application because of its religious character and risk violating the Free Exercise Clause? Or should they approve it in spite of its religious character in violation of the Oklahoma Charter Schools Act's religious exclusion?

At an open meeting, the Board voted 3-2 to approve St. Isidore's revised application (and eventually, a contract for sponsorship). *Drummond*, 558 P.3d at 6–7. Doing so reflected the Board's belief that enforcing the religious exclusion against St. Isidore would violate the Free Exercise Clause and that approval was consistent with the Oklahoma

Supreme Court's decision in *Oliver v. Hofmeister,* which held that a "state funded scholarship provided to students with disabilities to attend a private school of choice" did not offend the Oklahoma Constitution when parents chose religious schools. 368 P.3d 1270, 1272 (Okla. 2016); *see also* Sasser Decl., Ex. 1-C at 14–15.

***Drummond v. Oklahoma Statewide Virtual Charter School Board***

Litigation over St. Isidore quickly ensued. A public-education advocacy organization, alongside nine Oklahoma taxpayers, sued in Oklahoma County District Court. Original Pet., OKPLAC, Inc. v. Statewide Virtual Charter Sch. Bd., No. CV-2023-1857 (Okla. Cnty. Dist. Ct. July 31, 2024). General Drummond's lawsuit followed—this one an original jurisdiction action at the Oklahoma Supreme Court. Sasser Decl., Ex. 1-D.

General Drummond sought a writ of mandamus compelling the Board to rescind its contract with St. Isidore, arguing that the "contract is in violation of the U.S. Constitution as well as Oklahoma's Constitution." *Id.* at ¶ 10. The Board opposed General Drummond's Petition. *Id.*, Ex. 1-C.

The Oklahoma Supreme Court assumed original jurisdiction and held that "the St. Isidore Contract violates the Oklahoma Constitution, the [Oklahoma Charter Schools] Act, and the federal Establishment Clause." *Drummond*, 558 P.3d at 7. To reach that decision, the court began with Article II, Section 5 of the Oklahoma Constitution, which "prohibits the State from using public money for the benefit or support of any religious institution." *Id.* at 7. It held that "[t]he expenditure of state funds for St. Isidore's operations constitutes the use of state funds for the benefit and support of the Catholic church" in violation of the Oklahoma Constitution. *Id.* at 8–9. The court then further held that St. Isidore's existence

violated Article I, Section 5 of the Oklahoma Constitution which requires Oklahoma to establish and maintain "a system of public schools, which shall be open to all the children of the state and free from sectarian control" and the Oklahoma Charter Schools Act's religious exclusion. *Id.* at 9.

To reach the conclusion that St. Isidore violated the federal Establishment Clause, the Oklahoma Supreme Court reasoned that St. Isidore was a governmental entity and a state actor. *Id.* at 9–15. To determine that St. Isidore was a governmental entity, the court relied on the Oklahoma Charter Schools Act's legislative label that "a charter school is a public school, sponsored by a governmental entity." *Id.* at 9 (emphasis omitted). And to alternatively conclude that St. Isidore was a state actor, the Oklahoma Supreme Court analyzed "U.S. Supreme Court state actor tests." *Id.* at 11.

After holding that St. Isidore was a governmental entity and state actor, the court held that "it cannot ignore the mandates of the Establishment Clause." *Id.* at 13. Because St. Isidore planned to "fully incorporate Catholic teachings into every aspect of the school, . . . require students to spend time in religious instruction and activities, . . . [and] permit state spending in direct support of the religious curriculum and activities[,]" the Board's sponsorship contract with St. Isidore violated the Establishment Clause. *Id.* at 14.

Finally, the court held that the Free Exercise Clause was not implicated because of state action. *Id.* at 14–15.

Justice Kuehn dissented. *Id.* at 15–19 (Kuehn, J., dissenting). In her view, "St. Isidore would not become a 'state actor' merely by contracting with the [Board] to provide a choice in educational opportunities." *Id.* at 15. Nor would funding St. Isidore violate

Article II, Section 5 of the Oklahoma Constitution. *Id.* But rather, excluding St. Isidore under Article II, Section 5 (or the Oklahoma Charter Schools Act's religious exclusion) would violate the Free Exercise Clause. *Id.* at 18–19.

Both the Board and St. Isidore sought—and were granted—certiorari at the United States Supreme Court. *Oklahoma Statewide Charter Sch. Bd. v. Drummond*, 605 U.S. 165, 166 (2025) (per curiam). But the Supreme Court, with Justice Barrett recused, deadlocked 4-4. *Id.* That tie resulted in a consolidated one-line opinion: "The judgment is affirmed by an equally divided court." *Id.* So the Oklahoma Supreme Court's decision in *Drummond* remained binding, requiring the Board to enforce the religious exclusion or risk harsh penalties for violating a court order. Sasser Decl., Ex. 1-E at 3–4.

***The Ben Gamla Jewish Charter School***

In 2025, the National Ben Gamla Jewish Charter School Foundation, Inc. applied for a proposed charter school—Ben Gamla Jewish Charter School. Decl. of Peter Deutsch, Pls. Ex. 2 at ¶ 26, ECF No. 11-2 at 6. Ben Gamla wished to "incorporate[] a Jewish perspective in all subjects"—teaching "Jewish religion, culture, values, rituals, texts, holidays, and practices" throughout its school. *Id.* at ¶¶ 27–30. The application affirmed that it would abide by all provisions of the Oklahoma Charter Schools Act, except for the religious exclusion. *Id.* at ¶ 31.

The Board denied Ben Gamla's application at a public meeting, then sent Ben Gamla a letter listing ten reasons for the rejection, including the religious exclusion and the *Drummond* decision. Pls. Ex. 2-B, ECF No. 11-2 at 82–83. Ben Gamla exercised its statutory right to submit a revised application for another vote of the Board at a public

meeting. Pls. Ex. 2-C, ECF No. 11-2 at 86–90; *see also* Okla. Stat. tit. 70, § 3-134(E)(3). Satisfied that Ben Gamla explained or cured the other nine reasons for rejection, the Board denied the revised application solely under the religious exclusion and *Drummond*. Pls. Ex. 2-D, ECF No. 11-2 at 103; *see also* Sasser Decl., Ex. 1-F.

But at both meetings, Board Members expressed their discontent with having to do so. *See* Compl. at ¶¶ 87–94, 103, ECF No 1 at 14–15, 17. One Member remarked that the *Drummond* decision meant that the Board's "hands are tied," regardless of the strengths of Ben Gamla's revised application. *Id.* at ¶ 87. Despite the Board's advocacy at the Oklahoma Supreme Court and United States Supreme Court that denying an applicant solely because of its religion violated the Free Exercise Clause, the *Drummond* decision required it to do just that.

And now the Board is reaping what the *Drummond* decision sowed on its behalf—a lawsuit alleging it violated Ben Gamla's First and Fourteenth Amendment rights. But the Board was powerless to do otherwise with Ben Gamla's revised application under *Drummond*. In fact, General Drummond already threatened Board Members with criminal contempt of court, should they fail to implement *Drummond*'s result. Sasser Decl., Ex. 1-E at 3–4. But until a federal court says otherwise, the Board is required to continue engaging in religious discrimination.

## ARGUMENT

### I. THE *DRUMMOND* DECISION DOES NOT BIND THIS COURT.

No part of the *Drummond* decision is binding on this Court. *See* U.S. Const. art. VI, cl. 2. The decision consists of four parts: (I) a holding that the Oklahoma Constitution and

the Oklahoma Charter Schools Act's religious exclusion prohibited the Board's contract with St. Isidore; (II) a holding that St. Isidore would be a governmental entity and alternatively, a state actor; (III) a dicta analysis that the Establishment Clause prohibited the St. Isidore contract, and; (IV) a holding that the Free Exercise Clause did not apply to the case. Through either improper avoidance or incorrect analysis, each part of the *Drummond* decision involves an interpretation of federal law. *Drummond*, 558 P.3d at 7–15. But "[i]t is beyond cavil that [a federal court is] not bound by a state court interpretation of federal law." *Wilder v. Turner*, 490 F.3d 810, 814 (10th Cir. 2007) (quotation omitted). In fact, a federal court "owes no deference to state-court interpretation of the United States Constitution." *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1181 (10th Cir. 2007). So the analyses in *Drummond* are irrelevant to this Court's determination of the issues in this case.

**A. Part I ignored relevant decisions of the United States Supreme Court.**

Part I held that the Oklahoma Constitution and Oklahoma Charter Schools Act prohibited the Board from contracting with St. Isidore. The court stated later in its opinion that this determination "affords bona fide, separate, adequate, and independent grounds" to rest its decision. *Drummond*, 558 P.3d at 13. It is true that a federal court "will not review judgments of state courts that rest on adequate and independent state grounds." *Michigan v. Long*, 463 U.S. 1032, 1041–42 (1983). But only "'constitutionally proper' rules can create adequate and independent state grounds." *Wilson v. Hawaii*, No. 23-7517, 2024 WL 5036306, at *20 (U.S. Dec. 9, 2024) (Thomas, J., statement respecting the denial of certiorari) (quoting *Trevino v. Thaler*, 569 U.S. 413, 421 (2013)). So state supreme courts

must give the Constitution its "due regard," and a "state-law holding . . . is not an adequate nonfederal ground" where it violates the Constitution. *Id.* (quotation omitted).

The Oklahoma Supreme Court primarily rested its decision on Article II, Section 5 of the Oklahoma Constitution, or the "no-aid" clause, which reads:

> No public money or property shall ever be appropriated, applied, donated, or used, directly or indirectly, for the use, benefit, or support of any sect, church, denomination, or system of religion, or for the use, benefit, or support of any priest, preacher, minister, or other religious teacher or dignitary, or sectarian institution as such.

But without any mention of the United States Constitution in this analysis, despite the Board raising the issue, Sasser Decl., Ex. 1-C at 10–11, the "[Oklahoma] Supreme Court failed to give the [First] Amendment its due regard." *Wilson*, 2024 WL 5036306, at *20 (Thomas, J., statement). Had it properly asked the "threshold question of whether the [First] Amendment allows" Article II, Section 5 to prohibit the Board's contract with St. Isidore, the Oklahoma Supreme Court would have found that "[t]he answer is 'no.'" *Id.*

In *Espinoza v. Montana Department of Revenue,* the Montana Supreme Court relied on the state's "no-aid" provision to strike down a program providing tuition assistance to parents that choose to send their students to private, religious schools. 591 U.S. at 474. The United States Supreme Court reversed, stating that Montana cannot have an "interest in separating church and State 'more fiercely' than the Federal Constitution . . . in the face of free exercise." *Id.* at 484–85. And "[g]iven the conflict between the Free Exercise Clause and the application of the no-aid provision here, the Montana Supreme Court should have 'disregard[ed]' the no-aid provision and decided this case 'conformably to the

[C]onstitution' of the United States." *Id.* at 488 (quoting *Marbury v. Madison*, 1 Cranch 137, 178 (1803)).

Applying *Espinoza* here, Article II, Section 5 is not a "constitutionally proper" state ground for the Oklahoma Supreme Court's decision. Dissenting Justice Kuehn raised this exact concern. She argued that the Majority ignored the Free Exercise Clause in ways that "destined [*Drummond*] for the same fate as the Montana Supreme Court's opinion in *Espinoza*." *Drummond*, 558 P.3d at 18–19 (Kuehn, J., dissenting). The Majority did not heed her warnings.

Therefore, the *Drummond* decision is not binding here, and this Court should afford no deference to its determination that Article II, Section 5 prohibits religious charter schools. For the same reasons, this Court can also disregard the Oklahoma Supreme Court's holdings that Article I, Section 5 and the Oklahoma Charter Schools Act's religious exclusion prohibit such contracts.

Instead, this Court is bound to follow *Espinoza*. But the holding in Part I of the *Drummond* decision fails to properly consider the impact of the Free Exercise Clause, and cases like *Trinity Lutheran, Espinoza,* and *Carson*. *See Carson v. Makin*, 596 U.S. 767 (2022). So this Court must ignore the *Drummond* decision, because it rests on constitutionally improper state grounds. *See Nitro-Lift Technologies, LLC v. Howard*, 568 U.S. 17, 19–20 (2012) (per curiam) (holding that an Oklahoma Supreme Court decision did not rest on "adequate and independent state grounds," despite the court saying that it did, when the decision "disregards" relevant Supreme Court precedent).

**B. Parts II, III, and IV's analyses of federal law are irrelevant to this Court's determination of the issues presented.**

Part II held that St. Isidore was a governmental entity and alternatively, a state actor. But whether an entity is a state actor under 42 U.S.C. § 1983 is a question for federal courts to determine under federal law.

The Oklahoma Supreme Court's conclusion that St. Isidore is a "governmental entity" because of the Oklahoma Charter Schools Act's labeling of charter schools as "public school[s]" is only binding in Oklahoma state courts—not here. *Drummond*, 558 P.3d at 10–12. That's because the Supreme Court's decisions in *Jackson v. Metropolitan Edison Company*, 419 U.S. 345, 351 (1974), *Polk County v. Dodson*, 454 U.S. 312, 317–20 (1981), *Lebron v. National Railroad Passenger Corporation,* 513 U.S. 374, 392–93 (1995), and *Manhattan Community Access Corporation v. Halleck*, 587 U.S. 802, 816 (2019), bind this Court. And those decisions all reject the idea that legislative labels and some degree of state regulation transform a private entity into a state actor.

And the court's alternative analysis of the Supreme Court's state action tests is nothing more than pontification about federal law. *See Wilder*, 490 F.3d at 814. Regardless of the Oklahoma Supreme Court's dicta as to its applicability, *Drummond*, 558 P.3d at 12, *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), binds this Court. And *Rendell-Baker* holds that a privately-operated, publicly-funded school that is regulated by public authorities is not a state actor. *Id.* at 831, 839–43.

Part III offered a dicta-analysis of the Establishment Clause that cites exclusively to decisions of the Supreme Court interpreting the Constitution, and Part IV concluded St.

Isidore's case did not implicate the Free Exercise Clause, despite the Board raising the issue.[1] Sasser Decl., Ex. 1-C at 10–11. So this Court "owes no deference" to either determination. *TMJ Implants*, 498 F.3d at 1181.

Therefore, the *Drummond* decision, in its entirety, is not binding on this Court and should not weigh in its determination of whether Ben Gamla is likely to succeed on the merits of its claims.

## II. BEN GAMLA MEETS THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION.

A preliminary injunction is proper against the government where the plaintiff shows a likelihood of success on the merits, a likelihood of irreparable harm if the injunction is not granted, and that the balances of equities and public interest favor an injunction. *Does 1–11 v. Bd. of Regents of Univ. of Colo.*, 100 F. 4th 1251, 1267 (10th Cir. 2024).

### A. Ben Gamla is likely to succeed on the merits of its claims.

"When evaluating likelihood of success on the merits, it is critical to consider all factors that may bear on the probability that the moving party will succeed" including "the likelihood that the Supreme Court will grant review in the case." *Id.* (quotation omitted). The Supreme Court's past grant of review in *Drummond*—where no decision was reached due to a technicality—leaves the issues primed for Supreme Court review again. The Board takes the same position here that it took before the Oklahoma Supreme Court and

[1] The Oklahoma Supreme Court's analysis of the Establishment Clause and Free Exercise Clause also ignored the impact of *Kennedy v. Bremerton School District* on the religion clauses. *See* 597 U.S. 507, 534–35 (2022) (stating that "in place of *Lemon* and the endorsement test," which was "abandoned," the "Establishment clause must be interpreted by reference to historical practices and understandings" (citation modified)).

the United States Supreme Court in *Drummond*: that the Oklahoma Charter Schools Act's religious exclusion violates the Free Exercise Clause. *See* Sasser Decl., Ex. 1-C at 10–11; Pet. for a Writ of Cert., *Okla. Statewide Charter Sch. Bd.*, 605 U.S. 165 (No. 24-394); Br. for Pet'rs, *Okla. Statewide Charter Sch. Bd.*, 605 U.S. 165 (No. 24-394).

The Supreme Court has "repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson*, 596 U.S. at 778; *see also Trinity Lutheran Church*, 582 U.S. at 458, *Espinoza*, 591 U.S. at 475–76. But the Oklahoma Charter Schools Act's religious exclusion requires that exact violation—the rejection of any applicant affiliated with a religious institution or that desires to operate a religious charter school. So the Board, bound by *Drummond*, reluctantly denied Ben Gamla's otherwise-qualified revised application solely because of Ben Gamla's religious character.

When faced with similar discrimination in *Trinity Lutheran*, the Supreme Court held that "the exclusion of [an applicant] from a public benefit for which it is otherwise qualified, solely because it is [religious], is odious to our Constitution . . . and cannot stand." 582 U.S. at 467. And Oklahoma cannot justify its discrimination with "an interest in separating church and state 'more fiercely' than the Federal Constitution." *Carson*, 596 U.S. at 781 (quoting *Espinoza*, 591 U.S. at 484–85). The Oklahoma Charter Schools Act's religious exclusion therefore violates the Free Exercise Clause.

Application of the Establishment Clause does not alter this analysis. First, the Establishment Clause does not even apply if Ben Gamla, a private corporation, is not a state actor. *Cf. Manhattan Cmty. Access Corp.*, 587 U.S at 804–05 (holding that because a

private party is not a state actor, the First Amendment does not apply). It is not. *Rendell-Baker*, 457 U.S. at 839–843; *cf. VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1161 (10th Cir. 2021) (applying *Rendell-Baker*). Other circuit courts agree that privately-operated, publicly-funded schools are not state actors. *See Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806 (9th Cir. 2010); *Logiodice v. Trs. of Me. Cent. Inst.*, 296 F.3d 22 (1st Cir. 2002); *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159 (3d Cir. 2001). *But see Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104 (4th Cir. 2022).

This consistent result is because application of any federal state action test leads to the conclusion that privately-operated but publicly-funded schools are private actors. Oklahoma charter schools are not so "entwined with governmental policies," management, or control such that it is a state actor. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001). Neither has the state compelled any charter school to exist. *See Manhattan Ctmy. Access Corp.*, 587 U.S. at 809. Nor is educating students a "traditional, exclusive public function." *Id.* And Oklahoma is not outsourcing its constitutional obligation to create a system of public schools when it allows private organizations to operate charter schools as an additional education option for families, on top of traditional public school. *See id.* at 810 n.1. Finally, legislatively labeling charter schools "public" does not render them state actors, because "[t]he distinction between private conduct and state action turns on substance, not labels." *Lindke v. Freed*, 601 U.S. 187, 197 (2024); *Caviness*, 590 F.3d at 812 ("We therefore begin with the recognition that [the state legislature] has statutorily defined a charter school as a 'public

school' . . . However, because the conduct of a private corporation is at issue, our inquiry does not end there.").

Second, "a neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." *Carson*, 596 U.S. at 781 (citing *Zelman v. Simmons-Harris*, 536 U.S. 639, 652–653 (2002)). Attendance at Ben Gamla is entirely voluntary: no parent is required to send his or her student there. But Ben Gamla will only receive funding if parents choose to do so. *See* Okla. Stat. tit. 70, § 18-200.1. So any per-pupil funding provided to Ben Gamla is the result of "the private decision of individual parents" consistent with the Establishment Clause. *Zelman*, 536 U.S. at 652.

Because Ben Gamla would not be a state actor, there is no issue of religious establishment here for this court to consider. Instead, Ben Gamla—a private actor—retains its free exercise rights to not be excluded from a generally available public benefit simply because it is religious. For that reason, Ben Gamla is likely to succeed on the merits of its claims.

**B. The remaining factors favor an injunction.**

"[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd. sub nom.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). That is because "the loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury," "when a law is likely unconstitutional, the interests of . . . the government . . . do not outweigh a plaintiff's interest in having its

constitutional rights protected," and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores*, 723 F.3d at 1145–46 (citation modified). So Ben Gamla meets the remaining requirements for a preliminary injunction.

## III. An Injunction Is Necessary for Board Members to Comply with Their Oath of Office.

Board Members take an oath of office to uphold the Constitution of the United States. Sasser Decl., Ex. 1-C at 3. But the *Drummond* decision and the Attorney General's threats of jail time currently make it impossible for the Board Members to comply with that obligation. The Oklahoma Charter Schools Act's religious exclusion and the *Drummond* decision alone are why the Board denied Ben Gamla's revised application. *See id.*, Ex. 1-F. Until a federal court rules on the unconstitutionality of the religious exclusion under the Free Exercise Clause, the Board must comply with the *Drummond* decision and regrettably continue its discrimination against religious applicants. It is powerless to do otherwise.

## Conclusion

This Court should grant Plaintiffs' motion for preliminary injunction.

Respectfully submitted this 17 day of April, 2026.

*/s/ Anthony J. Ferate*
Anthony J. Ferate, OBA No. 21171
SPENCER FANE LLP
9400 North Broadway Extension, Suite 600
Oklahoma City, Oklahoma 73114
(405) 844-9900
ajferate@spencerfane.com

Hiram S. Sasser, III, OBA No. 19557
Holly M. Randall,* OBA No. 34763
Erin E. Smith,* OBA No. 35232
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075
(972) 941-4444
hsasser@firstliberty.org
hrandall@firstliberty.org
esmith@firstliberty.org

**Applications pro hace vice to the Western District pending.*

***Attorneys for Oklahoma Statewide Charter School Board Defendants***

# Attorney General Drummond's Response to Ben Gamla's Motion for Preliminary Injunction, filed below on April 17, 2026, as ECF No. 64

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., and PETER DEUTSCH,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**GENTNER DRUMMOND, *et al.***<br><br>**Defendants.** | **Case No. 5:26-cv-00582-R** |

**DEFENDANT ATTORNEY GENERAL GENTNER DRUMMOND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, WITH BRIEF IN SUPPORT**

Defendant Gentner F. Drummond, in his official capacity as Attorney General of Oklahoma (the "Attorney General"), respectfully submits this response to Plaintiffs' Motion for Preliminary Injunction and separately filed brief in support (Dkts. 10, 11).[1] For the reasons set forth in the Attorney General's Motion to Dismiss (Dkt. 52) and as further explained below, Plaintiffs' motion for a preliminary injunction should be denied as to the Attorney General because he is not a proper party to this action and no injunctive relief can properly run against him.[2]

[1] The Attorney General has previously filed a Motion to Dismiss (Dkt. 52), which is incorporated herein by reference. The arguments set forth in this response are in addition to, and not in lieu of, the grounds for dismissal set forth in the Motion to Dismiss.

[2] Nothing in this response should be construed as a waiver of the Attorney General's authority to represent the interests of the State of Oklahoma and its citizens in matters arising under the Oklahoma Charter Schools Act or any other provision of Oklahoma law. The Attorney General expressly reserves the right to appear, intervene, or participate in any proceeding in

## ARGUMENT

### I. No Preliminary Injunction Can Issue Against the Attorney General Because He Is Not a Proper Defendant.

A preliminary injunction is an extraordinary remedy that "should not be issued unless the movant's right to relief is 'clear and unequivocal.'" *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). As a threshold matter, a court cannot enjoin a party who has no connection to the conduct being challenged. *See Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 760 (10th Cir. 2010) (dismissing Attorney General from claims where he lacked a particular duty to enforce the challenged provision). A preliminary injunction against the Attorney General would be meaningless because he has no authority to grant or deny charter school applications, no role in enforcing the nonsectarian requirement against applicants, and no ability to provide Plaintiffs the relief they seek.

As set forth in detail in the Attorney General's Motion to Dismiss, the Oklahoma Charter Schools Act ("OCSA") vests authority over charter school applications exclusively with the Oklahoma Statewide Charter School Board (the "Board"). OKLA. STAT. tit. 70, § 3-134(C), (E). The Board—not the Attorney General—reviews applications, conducts capacity interviews, holds hearings, votes on applications, and issues formal denial letters. Dkt. 1, ¶¶ 78–84, 99–104. The Attorney General's general authority as "chief law officer of the State" does not constitute the kind of specific enforcement connection required by *Ex parte Young*, 209 U.S. 123, 157 (1908), and *Edmondson*, 594 F.3d at 760. The Attorney General incorporates the Motion to Dismiss in its entirety and will not repeat those arguments here.

---

which the interests of the State or its people are at issue. *See* OKLA. STAT. tit. 74, § 18b(A)(3); *see also Cherokee Nation v. United States Dep't of the Interior*, 2025 OK 4, ¶ 55, 564 P.3d 58, 74.

Where there is no enforcement connection between the Attorney General and the challenged statute, the *Ex parte Young* exception to sovereign immunity does not apply, and the Eleventh Amendment bars the suit. *Edmondson*, 594 F.3d at 760. Because the *Ex parte Young* exception is a prerequisite to any injunctive relief against a state officer, the Court should deny the preliminary injunction as to the Attorney General on this threshold ground alone.

## II. The Board Denied the Application Based on a Court Decision, Not at the Attorney General's Direction, and the Attorney General's Mandamus Petition Confirms He Has No Enforcement Connection.

Plaintiffs acknowledge that the Board denied Ben Gamla's application because the Board felt bound by the Oklahoma Supreme Court's decision in *Drummond ex rel. State v. Oklahoma Statewide Virtual Charter Sch. Bd.*, 2024 OK 53, 558 P.3d 1, *aff'd by an equally divided Court sub nom Okla. Statewide Charter Sch. Bd. v. Drummond*, 605 U.S. 165 (2025). Dkt. 11 at 7–9. In other words, the Board denied the application based on a judicial decision—not at the Attorney General's direction. This only reinforces the Attorney General's lack of an enforcement connection to the nonsectarian requirement.[3]

The Attorney General's recently filed mandamus petition against the Board further confirms the point. On March 11, 2026, the Attorney General filed a Petition for Writ of Mandamus against the Board in Oklahoma County District Court, seeking to compel the

---

[3] The Board Defendants' response suggests that the Attorney General "threatened Board Members with criminal contempt of court." Dkt. 63 at 8. But to be clear, the correspondence referenced by the Board (Sasser Decl., Ex. 1-E at 3–4) concerned the Board's obligation to comply with the Oklahoma Supreme Court's final judgment in *Drummond v. Oklahoma Statewide Virtual Charter School Board*—specifically, the writ of mandamus directing the Board to rescind its contract with St. Isidore of Seville Catholic Virtual School. That is a matter of compliance with a final judgment in a concluded case, affirmed by an equally divided United States Supreme Court. It has nothing to do with The National Ben Gamla Jewish Charter School Foundation, Inc.'s ("Ben Gamla") application.

Board to discharge its statutory duty to identify and incorporate into the record all valid, non-constitutional grounds for rejection. *See Drummond v. Okla. Statewide Charter Sch. Bd.*, No. CV-2026-649 (Okla. Cnty. Dist. Ct. filed Mar. 11, 2026).

An official who must resort to mandamus to compel the Board's compliance with its own statutory duties is not "enforcing" the nonsectarian requirement against charter school applicants. To the contrary, the mandamus petition demonstrates that the Board operates independently of the Attorney General, and that the Attorney General's involvement in this area is limited to ensuring the Board's compliance with its procedural obligations. That is the opposite of the discrete enforcement connection required by *Ex parte Young*, 209 U.S. at 157.

## III. Even Setting Aside the Threshold Defect, Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits Against the Attorney General.

Even if the Attorney General were a proper defendant—and he is not—Plaintiffs have not demonstrated a likelihood of success on the merits sufficient to warrant the extraordinary remedy of a preliminary injunction.[4]

Plaintiffs' entire case rests on the premise that the nonsectarian requirement in the Oklahoma Charter Schools Act violates the Free Exercise Clause. But that requirement has already been upheld. Six of the eight Justices hearing the case at the Oklahoma Supreme Court concluded that the nonsectarian requirement is consistent with both the Oklahoma Constitution and the federal Establishment Clause, and that Oklahoma charter schools are

[4] The Attorney General takes no position in this response on the merits of Plaintiffs' constitutional claims, consistent with the position taken in his pending mandamus petition. *See Drummond v. Okla. Statewide Charter Sch. Bd.*, No. CV-2026-649 (Okla. Cnty. Dist. Ct. filed Mar. 11, 2026), at 1 (Attorney General "takes no position in this proceeding on the constitutional or statutory questions" resolved in *Drummond v. Oklahoma Statewide Virtual Charter School Board*).

state actors whose religious exercise would constitute government endorsement of religion. *Drummond*, 558 P.3d at 15. The United States Supreme Court granted certiorari, received full briefing and oral argument, and affirmed by an equally divided Court. *Drummond*, 605 U.S. at 165.

Plaintiffs correctly note that an affirmance by an equally divided Court does not constitute binding precedent in a separate case. But neither is it a nullity. The fact remains that after full briefing by the parties, and after oral argument, at least four Justices of the United States Supreme Court concluded that the nonsectarian requirement—as applied to another religious charter school[5]—does not violate the Free Exercise Clause. And six Justices of the Oklahoma Supreme Court reached the same conclusion. That is hardly the kind of "clear and unequivocal" showing required for the extraordinary remedy of a preliminary injunction. *Beltronics*, 562 F.3d at 1070.

Moreover, Plaintiffs' Free Exercise argument depends entirely on their contention that charter schools are not state actors. But the Oklahoma Supreme Court's contrary holding—that charter schools operating under the OCSA are state actors—was affirmed by the equally divided Supreme Court and remains the law of Oklahoma. This Court need not resolve that question to deny the preliminary injunction as to the Attorney General; the existence of substantial authority on both sides of the state-action question is itself sufficient to defeat the "clear and unequivocal" standard required for preliminary relief.

---

[5] This should not be considered an admission that the Attorney General believes that Ben Gamla is otherwise qualified to operate as a charter school. As articulated in the Attorney General's Petition for Writ of Mandamus, the Attorney General does not believe that Ben Gamla satisfies other independent state law requirements for the issuance of a charter. *Drummond*, No. CV-2026-649 (Okla. Cnty. Dist. Ct.

## CONCLUSION

For the foregoing reasons, the Attorney General respectfully requests that this Court deny Plaintiffs' Motion for Preliminary Injunction as to the Attorney General. The Attorney General has no enforcement connection to the OCSA's nonsectarian requirement, is not a proper defendant in this action, and cannot be enjoined to redress the injuries Plaintiffs allege. To the extent the Court reaches the merits, the weight of existing authority does not support the extraordinary remedy Plaintiffs seek.

Respectfully Submitted,

s/Garry M. Gaskins, II

GARRY M. GASKINS, II, OBA NO.
20212
*Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Direct: (405) 521-3921
Garry.Gaskins@oag.ok.gov
*Counsel for Defendants*

# Moore Intervenors' Motion to Intervene, filed below on April 17, 2026, as ECF No. 66

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma, *et al.*,<br><br>Defendants, | ) | Case No. 5:26-cv-00582-R |

**MOTION TO INTERVENE AND BRIEF IN SUPPORT BY CRICKET MOORE, CATHLEEN TICHENOR, DANIEL HENSLEY, LUZ CRUZ, AND LARISSA PORT**

Dated: April 17, 2026

Heidi J. Long, OBA #17667
Heather N. Hendricks, OBA #20996
Ryan Leonard, OBA #19155
LEONARD, LONG & CASSIL, PLLC
6301 N. Western, Suite 250
Oklahoma City, OK 73102
(405) 702-9900
hlong@llc-attorneys.com
hhendricks@llc-attorneys.com
rleonard@llc-attorneys.com

*Attorneys for Cricket Moore, Cathleen Tichenor, Daniel Hensley, Luz Cruz, and Larissa Port*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

ARGUMENTS AND AUTHORITIES........................................................................ 4

I. The Oklahoma Families are entitled to intervene as a matter of right pursuant to Rule 24(a) ........................................................................................ 4

a. This motion is timely, being filed promptly upon Intervenor's notice of the allegations and upon confirmation that no other party will adequately represent the Oklahoma Families' interests ................................................ 5

b. The Oklahoma Families claim multiple important interests relating to the subject of the action that will be impaired if Plaintiffs are successful.......... 6

i. The Oklahoma Families have an interest in continuing to receive Section 504 services for their children ................................................... 8

1. A voluntary agreement between a charter school sponsor and operator to comply with federal disability standards does not offer the Oklahoma Families any real legal protections ................................ 10

ii. The Oklahoma Families' present schools are reliant upon their designation as "public schools" for critical Title I funding .................. 12

iii. The Oklahoma Families have an interest in preserving public charter schools' eligibility for State Aid ......................................................... 17

iv. The Oklahoma Families have an interest in preserving their constitutional rights and those of their children .................................... 19

c. The Oklahoma Families interests are not adequately represented by any of the present parties other proposed intervenors....................................... 21

II. Alternatively, the Oklahoma Families Should be Permitted to Intervene Pursuant to Fed.R.Civ.P. 24(b) ................................................................. 23

CONCLUSION ............................................................................................ 25

# TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES**

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999) ........ 21

*Goss v. Lopez*,
419 U.S. 565 (1975) ........ 19

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) ........ 20

*Nat'l Ass'n for the Advancement of Colored People v. New York*,
413 U.S. 345 (1973) ........ 5

*Oklahoma Statewide Charter Sch. Bd. v. Drummond ex rel. Oklahoma*,
605 U.S. 165 (2025) ........ 1

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ........ 19

*U.S. v. Virginia*,
518 U.S. 515 (1996) ........ 20

*W. Virginia State Bd. Of Educ. v. Barnette*,
319 U.S. 624 (1943) ........ 20

**FEDERAL CIRCUIT COURTS OF APPEALS CASES**

*Degge v. City of Boulder, Colo.*,
336 F.2d 220 (10th Cir. 1964)........ 23, 24

*Kane Cnty., Utah v. United States*,
928 F.3d 877 (10th Cir. 2019)........ 7, 24

*Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regul. Comm'n*,
578 F.2d 1341 (10th Cir. 1978)........ 7

*Okla. ex rel. Edmondson v. Tyson Foods, Inc.*
619 F.3d 1223 (10th Cir. 2010)........ 5

*Peltier v. Charter Day School, Inc.*
37 F.4th 104 (4th Cir. 2022) ........ 21

*Sanguine, Ltd. v. U.S. Dep't of Interior*,
736 F.2d 1416 (10th Cir. 1984) ........ 6

*Utah Ass'n of Ctys. v. Clinton*,
255 F.3d 1246 (10th Cir. 2001) ........ 6

*W. Energy All. v. Zinke*,
877 F.3d 1157 (10th Cir. 2017) ........ 5, 7, 21

*WildEarth Guardians v. United States Forest Serv.*,
573 F.3d 992 (10th Cir. 2009) ........ 21

**OKLAHOMA STATECASES**

*Copeland v. Admiral Pest Control*,
933 P.2d 937 (Okla. Civ. App. 1996) ........ 12

*Drummond v. Oklahoma Statewide Virtual Charter School Board*,
2024 OK 53, 558 P.3d 1 (Okla. 2024) ........ 1, 2, 17, 18, 19

*G.A. Mosites Co. v. Aetna*,
545 P.2d 746 (Okla. 1976) ........ 12

*Keel v. Titan Constr. Corp.*,
639 P.2d 1228 (Okla. 1981) ........ 12

**STATUTES AND RULES**

20 U.S.C. §1400 *et seq* ........ 8

20 U.S.C. §6301 *et seq* ........ 8, 14

29 U.S.C. §794(a) ........ 8

Fed.R.Civ.P. 24(a) ........ 4, 8

Fed.R.Civ.P. 24(b) ........ 23

34 C.F.R §104.31 ........ 8, 9

34 C.F.R §104.33 .......... 8, 9

34 C.F.R §104.39 .......... 9, 10

34 C.F.R §200.66(b)(2) .......... 16

34 C.F.R §303.23 .......... 14

Okla. Const. art. I, § 5 .......... 17

Okla. Const. art. XIII, § 1 .......... 17

Okla. Stat. tit. 15 §29 .......... 12

Okla. Stat. tit. 70 §3-142 .......... 17

Okla. Stat. tit. 70 §18-103 .......... 17

Okla. Stat. tit. 70 §28-101 .......... 18

## INTRODUCTION

In Oklahoma, charter schools are public schools. Such is the holding of the Oklahoma Supreme Court in *Drummond v. Oklahoma Statewide Virtual Charter School Board*, 2024 OK 53, 558 P.3d 1 (Okla. 2024), affirmed by an equally divided United States Supreme Court. *Oklahoma Statewide Charter Sch. Bd. v. Drummond ex rel. Oklahoma*, 605 U.S. 165 (2025). Plaintiffs, the National Ben Gamla Jewish Charter School Foundation, Inc., and its founder, Peter Deutsch, disagree. They ask this Court to overrule *Drummond.*

Charter schools have been an important component of Oklahoma's system of free public schools for nearly three decades, providing children and families with the opportunity to choose the schools that best suit their needs. Public charter schools, as they exist and operate right now in Oklahoma, are a success story. At first blush, Plaintiffs' position would appear to expand public school choice options for Oklahomans. Unfortunately, however, in their assertions minimizing the "public" role of Oklahoma charter schools, Plaintiffs' position seeks to alter their fundamental nature – transforming them from the public schools they are today to state-funded private schools. In so doing, Plaintiffs disregard the foundation upon which Oklahoma's public charter schools have been built.

The Proposed Intervenors in this case are parents of children who attend brick-and-mortar public charter schools in Oklahoma City and Tulsa, Oklahoma, and other parents whose children attend a virtual charter school remotely from their home (collectively, the "Oklahoma Families"). Some of their children have disabilities and receive special

accommodations pursuant to federal law to ensure that they receive an equal education to their peers. The children of the Oklahoma Families attend schools that receive federal funding for schools with a substantial percentage of children from low-income families, which helps provide additional support and services school-wide. All of the Oklahoma Families' charter schools are free to attend, supported by Oklahoma's annual education appropriation for public schools. The schools are also "free" in that the Oklahoma Families' participation in the programs has never been conditioned on the waiver of any rights to which they are entitled under the laws of the State of Oklahoma or the United States, including rights granted by the Constitutions of the State of Oklahoma and the United States. The availability and scope of these accommodations, support programs, state funding, and preservation of their constitutional rights in a public school setting are all dependent on their charter schools being public schools.

Plaintiffs, The National Ben Gamla Jewish Charter School Foundation, Inc. and their founder, applied unsuccessfully for approval to operate a religious school in Oklahoma as a public charter school. In support of their arguments that their rights of free exercise are violated by Oklahoma laws preventing them from opening such a school, Plaintiffs seek to redefine what it means to be a "public school" by arguing that "public" means only that charter schools are free and open to all. They expressly reject that they (and, by extension all Oklahoma charter school operators), are state actors or that they are engaged in state action. (See, Doc. No. 1, Complaint at ¶¶1, 121, 141, 150). Defendants, the Oklahoma Statewide Charter School Board members, have stated publicly that the *Drummond* decision, *supra*, is the sole impediment to their approval of Plaintiffs' religious

school. Their Answer to the Complaint asserts no objection to Plaintiffs' position. (Doc. No. 59). Defendant Drummond, Oklahoma's Attorney General, seeks to be dismissed from this lawsuit and takes no position on the merits. (Doc. No. 52).

Also pending before this Court is a motion to intervene by Rabbi Daniel Kaiman, Bradley Archer, Erika DuBose, Sydney Gebhardt, Kara Joy McKee, Michele Medley, and Gene Perry ("Taxpayer Intervenors"), who are solely concerned with preventing Plaintiffs from using their public education tax dollars to teach religion. That is not the basis for which the Oklahoma Families seek to intervene.

Not presently represented in this litigation are the interests of more than 50,000[1] Oklahoma school children who will be adversely impacted if Plaintiffs prevail in their claims, and that is why the Oklahoma Families seek to intervene. The Oklahoma Families do not oppose Plaintiffs' religious convictions or religious education in any way. Rather, the Oklahoma Families object to Plaintiffs' use of this litigation to accomplish their goals because of the substantial harm it will cause Oklahoma Families and their children, which perhaps is unintended but is harm nevertheless. Specifically, if Plaintiffs succeed in this lawsuit, public charter schools in Oklahoma risk losing their primary sources of funding, *i.e.* state and federal funding, and may well cease to exist. If that were to happen, the children of Oklahoma Families—and presumably tens of thousands more throughout the state—would find themselves without access to the same quality public education and disability accommodations they currently receive at their respective public charter schools.

[1] Annual Report & Dashboard, 2024-2025, Oklahoma Public Charter School Board Annual Report & Dashboard. https://oklahoma.gov/scsb.html

Even if the loss of funding could be averted, however, if this Court were to accept Plaintiffs' arguments, the Oklahoma Families could still find themselves losing access to critical disability protections and relinquishing their constitutional rights by continuing to attend their chosen schools.

Thus, the Oklahoma Families have direct and substantial interests in ensuring that charter schools in Oklahoma remain public. These important interests are presently unrepresented and unprotected in this litigation. The existing parties' and proposed Taxpayer Intervenor's interests would *all* be served by a decision of this Court deeming charter schools private, or "not public." But such a momentous change should not be considered without understanding the consequences to the families who rely upon public charter schools for the education of their children. Therefore, this Court should allow the Oklahoma Families to intervene so they can protect their children's access to equal education at public charter schools, their children's access to targeted support and services provided to low-income students, their children's opportunity to choose a public charter school that serves their unique needs, and preserve their children's constitutional rights as public school students.

## ARGUMENT AND AUTHORITIES

### I. The Oklahoma Families are entitled to intervene as a matter of right pursuant to Rule 24(a)

Under Fed. R. Civ. P. 24(a)(2), "the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the

movant's ability to protect its interest, unless existing parties adequately represent that interest." A party moving to intervene as of right must show "(1) the application is timely; (2) the applicant[s] claim[ ] an interest relating to the property or transaction which is the subject of the action; (3) the applicant[s'] interest may as a practical matter be impaired or impeded; and (4) the applicant[s'] interest is [not] adequately represented by existing parties." *W. Energy All. v. Zinke*, 877 F.3d 1157, 1164 (10th Cir. 2017), *citing United States v. Albert Inv. Co.,* 585 F.3d 1386, 1390 (10th Cir. 2009). The Tenth Circuit "has historically taken a 'liberal' approach to intervention and thus favors the granting of motions to intervene." *Id.* As set forth below, the Oklahoma Families meet each of the criteria to be entitled to intervene as a matter of right.

**a. This motion is timely, being filed promptly upon Intervenor's notice of the allegations and upon confirmation that no other party will adequately represent the Oklahoma Families' interests.**

An application to intervene must be timely. Timeliness is to be determined from all of the circumstances. *Nat'l Ass'n for the Advancement of Colored People v. New York*, 413 U.S. 345, 365-66 (1973); *Okla. ex rel. Edmondson v. Tyson Foods, Inc*. 619 F.3d 1223, 1232 (10th Cir. 2010). "Three factors are particularly important to the timeliness determination: (1) the length of time since the movants knew of their interests in the case; (2) prejudice to the existing parties; and (3) prejudice to the movants." *W. Energy All. v. Zinke*, 877 F.3d 1157, 1164–65 (10th Cir. 2017). In this instance, all three factors weigh in favor of the Oklahoma Families' application being timely. First, only three weeks have elapsed since the Complaint was filed, and the Oklahoma Families learned only yesterday that their interests in the case would not be adequately represented by any of the existing

parties, as (1) Defendant Drummond seeks to be dismissed as a party to the case (Doc. No. 52), (2) Defendant Oklahoma Statewide Charter School Board administrators Wilkinson and Lusnia have been voluntarily dismissed (Doc. No. 56), and (3) the remaining Defendant Oklahoma Statewide Charter School Board members have filed an Answer stating they have no objection to the most significant requests in Plaintiffs' Prayer for Relief (including requests for a declaration that a portion of the Oklahoma Charter School Act be deemed to violate the Free Exercise Clause and the Establishment Clause of the First Amendment, and preliminary and permanent injunctive relief against its enforcement) (Doc. No. 59, p. 15).[2] Second, allowing the Oklahoma Families to intervene would cause no prejudice to the existing parties. Upon information and belief, no discovery has been conducted in this case, and no Scheduling Order has been entered. The Oklahoma Families are prepared to file their Answer (Attachment 1) immediately if this Motion is granted by the Court. Finally, there would be no prejudice to movant, as the Oklahoma Families are prepared to engage instantly in the litigation in accordance with any Scheduling Order or other directive of this Court. The brief time that has elapsed since the initiation of the litigation and the filing of this Motion ensures that the Oklahoma Families will have the opportunity to present all their arguments and defenses in full.

**b. The Oklahoma Families claim multiple important interests relating to the subject of the action that will be impaired if Plaintiffs are successful.**

[2] Compare, *Sanguine, Ltd. v. U.S. Dep't of Interior*, 736 F.2d 1416, 1418 (10th Cir. 1984) (Motion to Intervene was found to be timely when filed thirty days after entry of judgment); *Utah Ass'n of Ctys. v. Clinton*, 255 F.3d 1246, 1251 (10th Cir. 2001) (Motion timely although filed over two years after the Complaint had been filed).

The existence of an interest and the impairment of that interest are assessed together. "As already noted, the question of impairment is not separate from the question of existence of an interest. . . . It should be pointed out that the Rule refers to impairment 'as a practical matter.' Thus, the court is not limited to consequences of a strictly legal nature." *Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regul. Comm'n*, 578 F.2d 1341, 1345 (10th Cir. 1978) (internal citations omitted). The stare decisis effects of a court's holding, particularly in cases of first impression, can be sufficient to meet the requirement. *Id.* Of key importance to the analysis is that a movant is not required to show that that a particular harm will result, but only that that "it is 'possible' the interests they identify will be impaired." *Zinke,* at 1167. Such an impairment "may be contingent upon the outcome of litigation." (internal citations omitted). *Kane County, Utah v. United States,* 928 F.3d 877, 891 (10th Cir. 2019). Here, the Oklahoma Families' interest in the undisrupted education of their children and their participation in Oklahoma's system of free public schools are at issue, and they would be directly affected by this Court's decision if this Court were to accept Plaintiffs' arguments.

The Oklahoma Families represent the interests of families who have children enrolled in Oklahoma's public charter schools and have an interest in continuing to be enrolled in public charter schools. The Oklahoma Families have benefited from the opportunity to choose from a series of public school options, without waiving any of their rights to receive important disability services, Title I services, and without waiving their Constitutionally conferred rights to free exercise, freedom of expression, due process, and equal protection. Plaintiffs' position as set forth in the Complaint (Doc. No. 1) jeopardizes

not only the Oklahoma Families' ability to receive the same services under the same conditions as other public school families, and assert their constitutional rights in the same way, but potentially jeopardizes the entirety of public funding for charter schools in Oklahoma.

As set forth in greater detail below, the Oklahoma Families' rights to their continued levels of funding, services, and legal freedoms are precisely the type of practical interests contemplated by Rule 24(a), and the likelihood those interests will be impaired far exceeds the "possibility" threshold required to support intervention.

**i. The Oklahoma Families have an interest in continuing to receive Section 504 services for their children.**

Section 504 of the Rehabilitation Act prohibits discrimination based on disability in "any program or activity receiving Federal financial assistance."[3] The Oklahoma Families have children who attend public charter schools which, which like most public schools, receive federal funding through the Individuals with Disabilities in Education Act ("IDEA"),[4] and the Elementary and Secondary Education Act ("ESSA")[5] and are therefore

---

[3]29 U.S.C. § 794(a); 34 C.F.R. § 104.31 (2023).

[4] 20 U.S.C. §1400 *et seq*.

[5] The 'Elementary and Secondary Education Act of 1965' (ESEA) was reauthorized by the 'Every Student Succeeds Act of 2015' (ESSA). The ESSA also governs Title II, III, IV, and V. *See* 20 U.S.C. § 6301 *et seq*.

subject to Section 504.[6,7]

If Plaintiffs prevail and Oklahoma public charter schools become merely "state-funded, but privately operated" schools (Doc. No. 1, Complaint, ¶1) and essentially classified as "private" and not "public" schools, the children of the Oklahoma Families who currently receive support pursuant to a Section 504 plan will lose critical anti-discrimination and equal access protections. Section 504 is applicable to both public and private schools. However, a school's obligations pursuant to these laws depends on its classification as either "public" or "private." Under Section 504, "[a] recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate education to each qualified handicapped person . . .regardless of the nature or severity of the person's handicap"[8] and must provide accommodations that do not impose an "undue hardship" on the public school.[9] On the other hand, "[a]recipient that provides

[6] 34 C.F.R. § 104.39 ("A recipient that provides private elementary or secondary education may not, on the basis of handicap, exclude a qualified handicapped person if the person can, with minor adjustments, be provided an appropriate education . . . within that recipient's program or activity.").

[7] U.S. Dept. of Educ., Office of Civil Rights, *Frequently Asked Questions about the Rights of Students with Disabilities in Public Charter Schools under Section 504 of the Rehabilitation Act of 1973* (Dec. 28, 2016) at 1, fn. 3, https://www.ed.gov/media/document/frequently-asked-questions-about-rights-of-students-disabilities-public- charter-schools-under-section-504-of-rehabilitation-act-of-1973-2016-89985.pdf

[8] 34 C.F.R. §104.33(a).

[9] 34 C.F.R. § 104.31 (Recipients must make reasonable accommodations for people with disabilities "unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.").

a private education may not, on the basis of handicap, exclude a qualified handicap if the person can, with minor adjustments, be provided an appropriate education."[10] (emphasis added). The "minor adjustments" standard applicable to private schools "differs radically from the obligations of similar public programs."[11] To date, public charter schools have been defined and treated as public schools subject to the same rigorous disability protection standards as traditional public schools.[12] Plaintiffs' implicit suggestion that charter schools are an alternative to public education – and not an alternative form of public education - threatens to eliminate vital anti-discrimination protections afforded public charter school students.

**1. A voluntary agreement between a charter school sponsor and operator to comply with federal disability standards does not offer the Oklahoma Families any real legal protections.**

The "radical difference" between disability protections in public vs. private schools is best understood by its impact on some of the children of the Oklahoma Families, at least

[10] 34 C.F.R. § 104.39 (Recipients must make reasonable accommodations for people with disabilities "unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.").

[11] Memorandum from Richard D. Komer, Deputy Assistant Secretary for Policy, to OCR Staff, 22 IDELR 669, at 672-73 (July 27, 1990).

[12] U.S. Dept. of Educ., Office of Civil Rights, Frequently Asked Questions about the Rights of Students with Disabilities in Public Charter Schools under Section 504 of the Rehabilitation Act of 1973 (Dec. 28, 2016) at 6. ("Charter schools are public schools and, therefore, there is no difference between the Section 504 rights of students with disabilities who are enrolled in charter schools and those who are enrolled in other public elementary or secondary schools.").

one of whom found themselves excluded from a private school environment when that school could not meet their child's needs (Declaration of Larissa Port, Exhibit 5 at ¶4). The Oklahoma Families acknowledge Plaintiffs' charter addendum to its original application remedies its prior deficiency (in which Plaintiffs asserted the school would comply with Section 504 and other protections for students with disabilities only to the extent doing so would not conflict with Plaintiffs' religious tenets). After its preliminary denial by the Charter Board, Plaintiffs revised the application and agreed to provide services to students with disabilities "in the same manner and instructional model as an Oklahoma public school district."[13] However, the fact a single charter school chooses to voluntarily acquiesce to the law in its charter addendum provides no protection to the Oklahoma Families. They do not attend and do not plan to attend Plaintiffs' school. Their concern is that federal regulators and federal courts would not have authority to enforce the federal disability laws against any other Oklahoma charter schools – at least not in the same manner or to the same extent they can against traditional public schools.

Furthermore, to the extent the law requires a charter sponsor, such as Defendant Oklahoma Statewide Charter School Board, and a charter school to enter into an agreement which, among other things, provides for protections of students with disabilities, children and families are not parties to that contract. Students at charter schools are likely not third-party beneficiaries of charter/sponsor contracts that can sue to enforce the Section 504 obligations in the charter contracts. In other words, the charter contract provides no remedy

[13] Addendum (Doc. No. 1-5, at p. 6.)

and no recourse in the event a student's Section 504 rights are violated. Accordingly, if Plaintiffs prevail and, as a result, Section 504 is deemed applicable to charter schools only as it applies to private schools (resulting in the loss of accommodations for students with Section 504 plans), the contract terms between the sponsor and the school do not create meaningful enforcement rights for the aggrieved students and families. This is because in Oklahoma, only contracts "made expressly for the benefit of a third person, may be enforced by [them] . . ."[14] This requirement necessarily means a direct, explicit intent to benefit the students must be present, not just a foreseeable benefit.[15] There is no legal authority in Oklahoma that speaks to whether public charter school students are third party beneficiaries of the contracts between their operators and sponsors.

The Oklahoma Families have children with disabilities who require accommodations from their public charter schools. Those rights are legally enforceable under Section 504 as long as their schools are recognized as "public" schools, but not if they were to be designated as "private schools." For this reason, the Oklahoma Families have substantial interests in this litigation.

**ii. The Oklahoma Families' present schools are reliant upon their designation as "public schools" to be eligible for Title I funding.**

---

[14] Okla. Stat. tit 15 §29.

[15] See, e.g., *G.A. Mosites Co. v. Aetna*, 545 P.2d 746 (Okla. 1976) (subcontractor was not a third party beneficiary of the contractor contract with a bonding company); *Keel v. Titan Constr. Corp.*, 639 P.2d 1228 (Okla. 1981) (homeowner was third party beneficiary of contractor contract with architect); *Copeland v. Admiral Pest Control*, 933 P.2d 937 (Okla. Civ. App. 1996).

Title I is the largest federal program benefiting elementary and secondary public schools and students, including several of the Oklahoma Families.[16] The program provides financial support to schools serving students from low-income families.[17] Depending on a school's concentration of students in poverty, Title I funding can either be used to deliver targeted programming to low-income students (known as Title I services) or to provide activities that benefit all students in a public school with a high concentration of low-income students (known as designated Title I schools).

Title I funding is typically used for programming that supplements instruction or provides tutoring, upgrades instructional materials, coordinates social services, addresses school safety issues and increases family engagement. Title I funds can also be dedicated to support specific academic assessments and school improvement activities. These funds are essential for the Oklahoma public charter schools that receive and depend on Title I funds to provide services and programming for their students, including several of the schools attended by Oklahoma Families.

States receive Title I funding from the federal government pursuant to a specific funding formula that considers the number of students eligible for Title I programs and

---

[16] National Center for Education Statistics, *Revenues and Expenditures for Public Elementary and Secondary Education: School Year 2021–22 (Fiscal Year 2022)*, U.S. Dep't of Ed., Inst. of Ed. Scis., (last updated May 30, 2024), https://nces.ed.gov/pubs2024/2024301.pdf.

[17] *See generally Title I, Part A of the Elementary and Secondary Education Act of 1965, as Amended by the Every Student Succeeds Act: Providing Equitable Services to Eligible Private School Children, Teachers, and Families – Updated Non-Regulatory Guidance*, U.S. DEP'T OF ED., [hereinafter *Title 1, Part A of ESEA Uniform Guidance*] https://www.ed.gov/sites/ed/files/2023/05/Title-I-ES-guidance-revised-5-2023.pdf.

services in the state.[18] Title I funding is distributed to the states via State Education Agencies ("SEAs"), which distribute the Title I funds to Local Education Agencies ("LEAs"). An LEA is defined in federal law as "a public board of education or other public authority legally constituted within a State for either administrative control or direction of [public elementary or secondary schools]."[19] For Title I eligible students enrolled in public schools, Title I funding is allocated to the public elementary and secondary schools according to a formula that either (1) provides a set amount of Title I funding to the entire school based on the concentration of Title I eligible students, or; (2) allocates specific dollar amounts to each school based on the cost of services provided to eligible students in each grade.[20] In Oklahoma, unlike in some other states, public charter schools are considered LEAs and receive their Title I funds directly.[21] Notably, private schools are never LEA's under the federal definition; private schools can never receive Title I funds directly from the state.[22]

Plaintiffs' contention that charter schools are private actors is in clear contradiction of the defined role of an LEA as a "public authority." If, for example, Harding Charter Preparatory School in Oklahoma City (a designated Title I school) were to suddenly lose

---

[18] *See generally id.*

[19] 34 C.F.R. §303.23.

[20] *See* ESEA Section 1113(a) and Section 1113(a)(5)(A); 20 U.S.C. §6313 *et seq*.

[21] Oklahoma State Department of Education Title I, Part A Handbook (2005), p. 11.

[22] ESEA Section 1117(d)(1).

its status as a "public authority," and thus instantly become ineligible to be an LEA under federal law, all the school's Title I funds would disappear. Title I monies for the school support services would not be available to fund the school's activities, which have been important to the Oklahoma Families for their ongoing participation. The Title I funding regulations, mechanisms, and program supports are all illustrative of the fact that Oklahoma's charter schools are not simply labeled as public schools and state actors – they are interwoven into Oklahoma's public school system.

Even assuming, without conceding, that the loss of "LEA" status in itself could be remedied to allow for continued Title I funding (presumably by requiring that Oklahoma charters be part of another LEA), if Oklahoma charter schools are deemed to be "private" or "not public" for Title I funding purposes, the consequences would be severe. The federal law and regulations that govern Title I grant programs treat private schools differently than public schools. Title I funds can be used to support students enrolled in private schools, but only as necessary to provide *equitable* services—not the funds required to provide *identical* services to those provided to Title I eligible students enrolled in public schools.[23]

In addition to the bar on direct payments to private schools and the absence of a guarantee of identical services, the provision of Title I equitable services at a private school may not benefit "the needs of [a] private school or the general needs of children in the

[23] ESEA Section 1117(b)(1)(J)(ii) (general rule is to provide equitable services to eligible low-achieving students in each school commensurate with the funds generated by students from low-income families in that school).

private school."[24] In other words, a private school can never be a "designated Title I school" in which Title I services benefit all students who attend the school, even if the private school enrolls a high-concentration of low-income students. And, unlike a public school that enrolls Title I eligible students, there is no guarantee a private school will receive funding to serve all of its Title I eligible students.[25]

If charter schools in Oklahoma suddenly lose their status as public schools and are characterized by federal authorities as private, these schools and all of their Title I eligible students will lose access to currently available funding, programs, and services provided under Title I. The Oklahoma Families, and similarly situated families across the state, face the risk of losing the very support and services they rely and depend upon for their children's continued academic progress and success in public school.

The Oklahoma Families have children in attendance at Title I Schools, and as such they benefit from federal funding for supplemental instruction, student support services, and other benefits that would no longer be funded if the schools were to lose their status as LEAs and/or if they were deemed to be private schools. Therefore, they have an interest in ensuring that their children continue to enjoy the full range of educational benefits that they are entitled to at their public charter school.

---

[24] ESEA Section 1117(d); 34 C.F.R. § 200.66(b)(2); *Title 1, Part A of ESEA Uniform Guidance*, at 36, https://www.ed.gov/sites/ed/files/2023/05/Title-I-ES-guidance-revised-5-2023.pdf.

[25] *See Title 1, Part A of ESEA Uniform Guidance*, at 33, https://www.ed.gov/sites/ed/files/2023/05/Title-I-ES-guidance-revised-5-2023.pdf. (listing Title I eligibility requirements for private school students).

**iii. The Oklahoma Families have an interest in preserving public charter schools' eligibility for State Aid.**

The central premise of Plaintiffs' argument is that public charter schools are publicly-funded private entities rather than state actors. Although this position may advance Plaintiffs' Free Exercise argument, Plaintiffs appear to ignore its consequences and the harm it will cause to children like those of the Oklahoma Families. If Plaintiffs prevail, the very existence of public charter schools will be threatened because public charter schools' primary source of funding— commonly referred to as "State Aid"—depends on their status as "public" schools.

The Education Article of the Oklahoma Constitution states in relevant part: "The Legislature shall establish and maintain a system of free public schools wherein all the children of the State may be educated." Okla. Const. art. XIII, § 1. *See also* Okla. Const. art. I, § 5. Pursuant to the Oklahoma Constitution, the Legislature annually appropriates funds through Oklahoma's State Aid formula.[26] Public charter schools are funded by State Aid funds specifically allocated by the Oklahoma Legislature for the state's public education system.[27] Public charter schools receive State Aid, as do all public schools in the state.[28] This is not by happenstance, it is by design. As explained in *Drummond*, the

[26] Okla. Stat. tit 70 §18-103.

[27] A charter school shall receive the State Aid allocation, federal funds to which it is eligible and qualifies for, and any other state-appropriated revenue generated by its students for the applicable year. Okla. Stat. tit. 70 §3-142.

[28] *Id.*

Oklahoma Charter Schools Act was enacted to carry out the Legislature's duty to establish and maintain the system of free public schools contemplated by Art. I, § 5. *Drummond*, at ¶13.

If this Court determines that a charter school established under Oklahoma law is not a "public school" and is instead merely a state funded, privately operated service provider, then under a plain reading of Oklahoma's Constitution, Oklahoma charter schools could be deemed private schools for purposes of the state's Education Article. If that were to occur, charter schools could not be considered part of the "system of free public schools" that the Legislature must maintain and support, thus risking all the State Aid currently received by all Oklahoma charter schools, including those attended by Oklahoma Families.[29]

State funding is the primary source of funding for Oklahoma public charter schools. Without continued access to state funding, charter schools across the state would be forced to close, and the Oklahoma Families (and thousands of others) would lose access to the public charter schools in which their children are currently thriving. Accordingly, Oklahoma Families have a substantial interest in this litigation that threatens charter schools' status as public schools, their funding as public schools, and therefore their continued existence.

---

[29] Oklahoma private schools also benefit from school choice in Oklahoma, primarily through Oklahoma's Parental Choice Tax Credit, which authorizes up to $7,500 per child, per year for parents to spend on education expenses at qualified (religious or secular) private schools; however, those tax credits are not drawn from Oklahoma's State Aid Allocation for public education. In fact, that program is not administered by the Oklahoma Department of Education; rather, it is administered by the Oklahoma Tax Commission. Okla. Stat. tit. 70 §28-101.

### iv. The Oklahoma Families have an interest in preserving their constitutional rights and those of their children

The Oklahoma Families have an interest in asserting their children's right under the Oklahoma and United States Constitutions. In *Drummond*, 2024 OK 53, 558 P.3d 1 (Okla. 2024), the Oklahoma Supreme Court held that charter schools are public schools that form a part of the system of free public schools in Oklahoma and that its operators are engaged in state action. *Id*. at 9. In their Brief in Support of Preliminary Injunction, Plaintiffs argue *Drummond* was wrongly decided and insist their school is a private actor entitled to the protections of the Free Exercise clause. (Doc. No. 11, at p. 2).

Ironically, if this Court were to accept Plaintiffs' position, it would extinguish the very same constitutional rights for the children of the Oklahoma Families and the other children in attendance at Oklahoma public charter schools. Over sixty years ago, the United States Supreme Court held, "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years. . .The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself **and all of its creatures**—Boards of Education not excepted." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506-507 (1969) (emphasis added).

Public school children enjoy not only the protections of free expression, but of all of the rights guaranteed under the Bill of Rights.[30] *See*, *e.g.*, *Goss v. Lopez*, 419 U.S. 565

[30] The same principles of free exercise, freedom of expression, due process and equal protection are guaranteed in Articles I and II of the Oklahoma Constitution.

(1975) (recognizing a student's legitimate entitlement to a public education as a property interest protected by the Due Process clause); *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (holding that school administrators could not compel a student to "confess by word or act their faith therein"); *U.S. v. Virginia*, 518 U.S. 515 (1996) (striking down exclusion of female students).

Moreover, public school families' rights to freely exercise their faiths and to direct the religious education of their children during school are also well-established. The U.S. Supreme Court recently upheld the rights of public school parents to challenge instructional material that conflicted with their sincerely held religious beliefs, holding "[t]he practice of educating one's children in one's religious beliefs, like all religious acts and practices, receives a generous measure of protection from our Constitution. . . Drawing on 'enduring American tradition,' we have long recognized the rights of parents to direct 'the religious upbringing' of their children." *Mahmoud v. Taylor,* 606 U.S. 522, 547 (2025).

But the ability of any of the Oklahoma Families to enforce their rights as public school parents, and those of their children as public school students, is extinguished if Plaintiffs should persuade this Court that charter schools are "private operators" and not "state actors" as claimed in their Complaint (Doc No. 1 at ¶1). Private conduct is not subject to the same limitations and is therefore not a matter of constitutional significance. "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful,'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50, (1999) (internal citations omitted). In short, public charter school students would not have

the same rights as their traditional public school peers in the event of a school official's overreach.

The Oklahoma Families should not have to choose between enrolling in the public charter school of their choice and surrendering their constitutional rights. If this Motion is granted, the Oklahoma Families will argue that this Court should find (as did the Oklahoma Supreme Court) that the Fourth Circuit's conclusion in *Peltier v. Charter Day School, Inc*. 37 F.4th 104 (4th Cir. 2022) is well reasoned, and conclude that charter schools in Oklahoma are public schools in label and in fact, and that students who attend them are entitled to the protections of the Constitution.

**c. The Oklahoma Families' interests are not adequately represented by any of the present parties or other proposed intervenors.**

The burden to show inadequate representation is "minimal" and "[t]he possibility of divergence of interest need not be great in order to satisfy the burden of the applicants." *W. Energy All. v. Zinke*, 877 F.3d 1157, 1168 (10th Cir. 2017); *WildEarth Guardians v. United States Forest Serv.*, 573 F.3d 992, 996 (10th Cir. 2009).

As alleged, Defendant Oklahoma Statewide Charter School Board, through the statements of its members in their official capacities, has made clear that it would like to approve Plaintiffs' application to operate a charter school program (Doc. No. 1, ¶¶84-92, 97), and in their Answer they confirm that they have no objection to Plaintiffs' prayers for declaratory and injunctive relief. (Doc. No. 59, p. 15). The Oklahoma Attorney General has moved to dismiss this action as to himself on the basis that he is not a proper party and that Plaintiffs do not have standing to bring claims against him, but his motion is silent as to

the constitutionality of the challenged provision of the Oklahoma Charter Schools Act. (Doc. No. 52). The proposed Taxpayer Intervenors do not represent the interests of children presently participating in Oklahoma's charter schools. (Doc. No. 22). Were this Court to find that charter schools are not true "public schools", as argued by Plaintiffs, then public charter schools may cease to exist, and the Taxpayer Intervenors' concerns in the litigation likely would be alleviated.

The Oklahoma Families, by contrast, have a substantial interest in protecting the availability of services, programs and/or protections for their children at their public charter schools. They have a substantial interest in ensuring their funding continues uninterrupted and that their rights are preserved. Were this Court to hold charter schools in Oklahoma are private actors, as Plaintiffs urge, only the Oklahoma Families and their children would be harmed, as

- Plaintiffs would be permitted the opportunity to operate a charter school in keeping with their religious faith;
- Defendant Oklahoma Statewide Charter School Board would continue to have the ability to enter into charter agreements with an expanded pool of eligible applicants; and
- The Taxpayer Intervenors (if this Court authorizes their intervention), whose families attend traditional public schools, could at least continue to avail themselves of the benefits and services in the traditional public schools they attend.

For the Oklahoma Families, however, their educational circumstances would fundamentally change overnight. Their ability to choose a public school that best meets the needs of their children would be limited or extinguished, resulting in significant hardship to each of these families (*see* Oklahoma Families' Declarations, attached as Exhibits 1-5). No existing party to this case represents these interests, and the Oklahoma Families are the only parties capable of articulating and protecting them. As a result, the Oklahoma Families have a right to intervene under Rule 24(a), and their motion should be granted.

## II. Alternatively, the Oklahoma Families Should be Permitted to Intervene Pursuant to Fed. R. Civ. P. 24(b).

If this Court determines that intervention as of right is unwarranted, permissive intervention under Fed. R. Civ. P. 24(b) should be granted. Permissive intervention under Rule 24(b) is discretionary with this Court, permitting intervention to "anyone who. . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In exercising this discretion, the Court "shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Degge v. City of Boulder, Colo.*, 336 F.2d 220, 222 (10th Cir. 1964).

Here, the Court should permit the Oklahoma Families to intervene pursuant to Rule 24(b) because defenses regarding the Oklahoma Families' public nature of charter schools present common questions of law with the main action, namely whether public charter schools are state actors or more akin to private schools. Plaintiffs allege that Oklahoma's prohibitions on religious charter schools violate their rights under the Free Exercise Clause because they are not engaged in state action. If permitted to intervene, the Oklahoma

Families will counter this claim by correctly demonstrating that charter schools in Oklahoma are, in label and in fact, public schools and state actors. The same issues brought before this court – whether Plaintiffs are engaged in state action or not, the consequences of that designation, and whether Oklahoma's charter schools are public or private – all have a direct impact on the Oklahoma Families, and are the reasons they should be afforded the opportunity to speak to those issues as a party.

If the Oklahoma Families are permitted to intervene under 24(b), there will be no risk of undue delay or prejudice to the adjudication of the rights of the original parties. On the contrary, the Oklahoma Families are prepared to immediately file a responsive pleading in the instant case (a proposed Answer is submitted contemporaneously with this Motion, as Attachment 1). Upon information and belief, no discovery has been conducted, nor has any Scheduling Order been entered, and the Oklahoma Families will comply with any requirements set by the Court. There will be no prejudice to any other party in ensuring that the important issues before this Court are thoroughly briefed by representatives of the Oklahoma Families.

The Tenth Circuit considers permissive intervention to be within the discretion of the district court, as set forth in *Degge, supra*. The Oklahoma Families urge that discretion should be exercised in favor of allowing their permissive intervention given the important public interests at stake. Even in cases of intervention as a matter of right, the Tenth Circuit has recognized that "the requirements for intervention may be relaxed in cases raising significant public interests." *Kane Cnty., Utah v. United States*, 928 F.3d 877, 890 (10th Cir. 2019). There can be fewer interests of greater public significance in Oklahoma than its

system of free public schools and the rights of the citizens who participate in it. The controversy is of such great significance that the same issue before this Court has been the subject of review, argument, and decision before both the Oklahoma State Supreme Court and the United States Supreme Court. Yet, it appears that unless the Oklahoma Families (and others) are permitted to intervene in this case, there will be no substantive defense offered in response to Plaintiffs' arguments.

## CONCLUSION

For the foregoing reasons, the Oklahoma Families respectfully move that they be allowed to intervene in this action pursuant to Fed.R.Civ.P. 24(a) as a matter of right or, alternatively, permissively pursuant to Fed.R.Civ.P. 24(b).

Respectfully submitted,

/s/ Heidi J. Long
Heidi J. Long, OBA #17667
Heather N. Hendricks, OBA #20996
Ryan Leonard, OBA #19155
LEONARD, LONG & CASSIL, PLLC
6301 N. Western, Suite 250
Oklahoma City, OK 73102
(405) 702-9900
hlong@llc-attorneys.com
hhendricks@llc-attorneys.com
rleonard@llc-attorneys.com

***Attorneys for Cricket Moore, Cathleen Tichenor, Daniel Hensley, Luz Cruz, And Larissa Port***

# Declaration of Cricket Debra Ann Moore, filed below on April 17, 2026, as ECF No. 66-1 (Exhibit 1 to Moore Intervenors' Motion to Intervene)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., *et al.* | ) | |
| Plaintiffs, | ) | Case No. 5:26-CV-00582-R |
| v. | ) | |
| GENTNER DRUMMOND, in his official Capacity as Attorney General of Oklahoma, *et al.*, | ) | |
| Defendants. | ) | |

**DECLARATION OF CRICKET DEBRA ANN MOORE**

I, Cricket Debra Ann Moore, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury the following is true and correct:

1. I am an adult resident of Tulsa County, Oklahoma and I have personal knowledge of the facts stated herein and am competent to testify thereto.

2. I am the parent of a high school student who attends the Tulsa School of Arts and Sciences ("TSAS"), a Title I-designated public charter school in Tulsa, Oklahoma.

3. I have two (2) other children who attend traditional public schools; however, a traditional public school was not a good fit for my third child. TSAS prepares students for the future, recognizing that not all students have the same future goals. Through a liberal arts framework centered on research and critical thinking, my entrepreneurial child is developing independent views of what the future might look like.

Appellate Case: 26-6166 Document: 26 Date Filed: 11/08/2026 Page: 436

4. The teacher-student ratio at TSAS is significantly more for 6-12 grade programs than it is in a traditional public-school setting. My child benefits from receiving an education each day from teachers who know my child and work with my child to ensure future goals can be met.

5. This is my child's fourth (4th) year at TSAS. When we started at TSAS, coming from a traditional public school, I watched a drastic jump in confidence. Excitement about school classes and projects increased, along with grades. Since being at TSAS, my child has become more tolerant and accepting of others and has gained a better understanding of the surrounding community and how that community works to benefit others.

6. I am aware that a significant percentage of TSAS students come from households that fall below the poverty level. As a public charter school that serves a high number of students who qualify to receive free- and reduced-price lunches, TSAS has access to Title I funding that is essential to its ability to operate.

7. I serve on the Board of Trustees for TSAS, and I have seen and participated in the Board's decisions regarding the best use of Title 1 funding. My child, as well as all students at TSAS, benefit from Title I funding through: academic support and instruction in reading and math (free tutoring); schoolwide programs focused on student achievement (in literacy); student support services (counseling); school resources such as materials and technology (peer-led annual review of curriculum); and professional development of educators at the charter school (teacher coaching and mentorship programs).

8. I believe the ability to access Title I funds and to provide high quality educational options for children like my child depends on public charter schools remaining public, and I have a significant interest in protecting my child from the harm that would result if TSAS were to lose access to the Title I funding it currently receives.

9. I am also aware that TSAS, like all public schools in Oklahoma, is funded through the state aid formula.

10. I believe the position being advanced by Plaintiffs in this lawsuit will result in TSAS's loss of eligibility for state funding commensurate with other public schools, threatening the very existence of the public charter school, because Plaintiffs seek to have charter schools in Oklahoma classified and treated as private schools.

11. In choosing to enroll at TSAS, my child has the same constitutional rights enjoyed by peers in attendance at traditional public schools, including the right to free exercise of religion, free speech, due process, and equal protection recognized in the constitutions of the state of Oklahoma and the United States. I have never agreed to waive my child's rights as a condition of participating in a public charter school.

12. I object to Plaintiffs' position in this lawsuit because, if this Court agrees with Plaintiffs that charter operators are not state actors or governmental entities for federal and state constitutional purposes, the effect would be to extinguish my child's protections under the constitutions of the state of Oklahoma and the United States without my consent.

13. I seek to intervene in the above-captioned action (1) to protect my interest as a parent of a child attending a public charter school – one that I chose for my child because I

believe it to be the best public school option for my child – in the State of Oklahoma; (2) to protect my child's currently available constitutional rights; (3) to protect my family's interest in ensuring that charter schools in Oklahoma remain public schools so that the Title I funding and State aid allocation funding that is vital to my child's public charter school (and to my child's educational future) are protected; and (4) to make this court aware that these interests, which are important and unique to me and my family, are immediately jeopardized by the position being advanced the Plaintiffs in this lawsuit.

Executed in Tulsa County, Oklahoma, on April 16, 2026.

C. Debra Moore

Cricket Debra Ann Moore

# Declaration of Cathleen Tichenor, filed below on April 17, 2026, as ECF No. 66-2 (Exhibit 2 to Moore Intervenors' Motion to Intervene)

# DECLARATION OF CATHLEEN TICHENOR

I, Cathleen Tichenor, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury the following is true and correct:

1. I am an adult resident of Oklahoma County, Oklahoma and I have personal knowledge of the facts stated herein and am competent to testify thereto.
2. I am the parent of students in the Harding Charter Preparatory School District ("HCPSD") in Oklahoma City, Oklahoma. Specifically, I have a 3rd grader at Harding Preparatory Elementary School at Kelley, 6th grader at Harding Preparatory Middle School at Independence, and 9th and 11th graders who attend Harding Preparatory High School.
3. In choosing to enroll at HCPSD, one of Oklahoma's public charter school districts, my children have the same constitutional rights enjoyed by peers in attendance at traditional public schools, including the right to free exercise of religion, free speech, due process, and equal protection recognized in the constitutions of the state of Oklahoma and the United States. I have never agreed to waive my children's rights as a condition of participating in a public charter school.
4. HCPSD has worked with me and two of my children to develop plans under Section 504 of the Rehabilitation Act tailored specifically to meet the unique needs of my children. All of my children qualify for free lunches through Title I funded services.
5. The Section 504 plans provide necessary accommodations for my children's academic needs. The plans are tailored to the needs of each of my children requiring more than minor adjustments to contribute to my children's success in supporting retention and mastery of information.
6. As a public charter school district that serves a high percentage of students who qualify to receive free and reduced price lunches I am aware that HCPSD has access to Title I funding

that is essential to its ability to operate and keep its doors open for my children and other children of the state of Oklahoma.

7. My concerns are not just limited to HCPSD (and many other public charter schools across the state of Oklahoma). I believe the ability to access Title I funds and to provide high quality educational options for children like my children depends on public charter schools remaining public and I have a significant interest in protecting my children from the harm that would result if HCPSD were to lose access to the Title I programming it currently receives.

8. My children and I are direct beneficiaries of Section 504 of the Rehabilitation Act and Title I funding and we belong to the class of persons the statute was designed to protect.

9. As a public charter school, I understand the HCPSD is subject to stricter regulations under Section 504 than it would be if it were a private school.

10. I believe that my children's ability to have and maintain a Section 504 disability accommodation plan depends on public charter schools remaining public, and I have a significant interest in protecting my children from the educational emotional harm that would result if a public charter school, like HCPSD, were no longer required to provide the same level of disability accommodations under Section 504.

11. I am grateful Section 504 requires public schools to make meaningful, reasonable accommodations to ensure all children, including children like mine, have the opportunity to receive a free, appropriate education. The public school requirements of Section 504 allows my children to have disability accommodation plans at HCPSD, and I appreciate the continuing efforts of the administrators and teachers at HCPSD to implement my children's Section 504 plan successfully.

12. I believe that my and my children's interest in having and maintaining a Section 504 disability plan is threatened by the position being advanced by Plaintiff in this lawsuit because Plaintiff seeks to have charter schools in Oklahoma, like HCPSD, classified and treated as private schools.

13. It is my understanding that classifying charter schools in Oklahoma like HCPSD as private schools could result in the application of Section 504 provisions relating to private schools rather than the provisions regarding public schools, resulting in significantly reduced protections against discrimination and equal access for students like my child.

14. I am aware that HCPSD, like all public schools in Oklahoma, is funded through the state aid formula.

15. My children and I are direct beneficiaries of the state aid formula for funding of public charter schools, and we belong to the class of persons the state aid formula is intended to protect.

16. I believe the position being advanced by Plaintiff in this lawsuit will result in HCPSD's loss of eligibility for state funding commensurate with other public schools, threatening the very existence of the public charter school, because Plaintiff seeks to have charter schools in Oklahoma classified and treated as private schools.

17. I object to the Plaintiff's position in this lawsuit because, if charter schools lose their status as public schools as result of this lawsuit, I believe (1) that my children and other children across the State of Oklahoma will be deprived of the benefits conferred by section 504 in the form of disability accommodations at public charter schools and will be harmed directly by the inability to have and maintain section 504 disability accommodations plan like the ones my children have at HCPSD; (2) that my children and other children across the State of Oklahoma will be deprived of the benefits conferred by Title I services and funding that my children and other

Appellate Case: 26-6166 Document: 26 Date Filed: 11/08/2026 Page: 443

children across the state of Oklahoma rely on; and (3) that my children and other children across the State of Oklahoma will be deprived of the benefits conferred on me and my children in the form of access to public charter schools and will be harmed directly by the loss of critical services and critical funding for public charter schools like HCPSD.

18. I object to Plaintiff's position in this lawsuit because, if this Court agrees with Plaintiff that charter operators are not "state actors" or government entities for federal and state constitutionals purposes, the effect would be to extinguish my child's protections under the constitutions of the state of Oklahoma and the United States without my consent.

19. I seek to intervene in the above captioned action (1) to protect my interest as a parent of children attending a public charter school —one that I chose for my children because I believe it to be the best public school option for my children—in the State of Oklahoma; (2) to protect my family's interest in ensuring that charter schools in Oklahoma remain public schools so that the full scope of section 504 benefits that are vital to my child's education are protected; (3) to protect my family's interest in ensuring that charter schools in Oklahoma remail public schools so that the Title I funding and State aid allocation funding that is vital to my children's public charter school (and to my children's educational future) is protected; and (4) to make this court aware that these interests, which are important and unique to me and my family, are immediately jeopardized by the position being advanced the plaintiff in this lawsuit.

Executed in Oklahoma County, Oklahoma, on April 13 2026.

Cathleen Tichenor

# Declaration of Daniel Hensley, filed below on April 17, 2026, as ECF No. 66-3 (Exhibit 3 to Moore Intervenors' Motion to Intervene)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., *et al.*

Plaintiffs,

v.

GENTNER DRUMMOND, in his official Capacity as Attorney General of Oklahoma, *et al.*,

Defendants.

Case No. 5:26-CV-00582-R

**DECLARATION OF DANIEL HENSLEY**

I, Daniel Hensley, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury the following is true and correct:

1. I am an adult resident of Oklahoma County, Oklahoma and I have personal knowledge of the facts stated herein and am competent to testify thereto.

2. I am the parent of a 6th grade student who attends Harding Charter Preparatory Middle School at Independence and a 9th grade student who attends Harding Charter Preparatory High School, both public charter schools within the Harding Charter Preparatory School District ("HCPSD") in Oklahoma City, Oklahoma.

3. My children have been diagnosed with conditions that warrant a plan under Section 504 of the Rehabilitation Act tailored specifically to meet the unique needs of my children.

4. Prior to joining the Harding School District my children were in a traditional public school which was large and impersonal. The needs of my children were overlooked and

significant delays occurred in getting their 504 plans established. In fact, we spent well over 6 months attempting to establish a plan the traditional school identified as necessary for one of my children. The impersonal nature of the student experience and the lack of urgency in providing necessary assistance led us to look elsewhere to meet the needs of our family.

5. HCPSD enjoys a much smaller school population than our previous school which allows for the teachers, administration, and staff to have personal knowledge of my children's strengths and weaknesses. This more personalized knowledge led to quicker development of responsive accommodations for my children under Section 504.

6. The Section 504 plans provide: accommodations focusing on environmental distraction control, such as noise reduction and preferential seating; executive functioning support, such as agenda checks, organizational help and extended time; and testing modifications, providing for a small group setting and frequent breaks for both classroom and Oklahoma State Testing Program assessments. The Section 504 plan requirements all contribute to my children's success in supporting retention and mastery of information.

7. I believe that my children's ability to have and maintain a Section 504 disability accommodation plan depends on public charter schools remaining public, and I have a significant interest in protecting my children from the educational and emotional harm that would result if public charter schools, like HCPSD, were no longer required to provide the same level of disability accommodations under Section 504.

8. My children have attended traditional public schools and did not thrive in them. Returning to a traditional public school would be detrimental to my children by removing the support system they have come to rely on with personalized attention and would require significant changes in how my family interacts with the school to again attempt for their Section 504 accommodations to be implemented at all much less as effectively as they are at HCPSD.

9. I am grateful Section 504 requires public schools to make meaningful, reasonable accommodations to ensure all children, including children like mine, have the opportunity to receive a free, appropriate education. The public school requirements of Section 504 allow my children to have disability accommodation plans at HCPSD, and I appreciate the continuing efforts of the administrators and teachers at HCPSD to implement my children's Section 504 plans successfully.

10. I believe that my and my children's interest in having and maintaining a Section 504 disability plan is threatened by the position being advanced by Plaintiffs in this lawsuit because Plaintiffs seek to have charter schools in Oklahoma, like HCPSD classified and treated as private schools.

11. I am aware that HCPSD, like all public schools in Oklahoma, is funded through the state aid formula.

12. I believe the position being advanced by Plaintiffs in this lawsuit may result in HCPSD's loss of eligibility for state funding commensurate with other public schools, threatening the very existence of the public charter school, because Plaintiffs seek to have charter schools in Oklahoma treated as private schools.

13. In choosing to enroll at HCPSD, my children have the same constitutional rights enjoyed by peers in attendance at traditional public schools, including the right to free exercise of religion, free speech, due process, and equal protection recognized in the constitutions of the state of Oklahoma and the United States. I have never agreed to waive my children's rights as a condition of participating in a public charter school.

14. I object to Plaintiffs' position in this lawsuit because, if this Court agrees with Plaintiffs that charter operators are not state actors or governmental entities for federal and state constitutional purposes, the effect would be to extinguish my child's protections under the constitutions of the state of Oklahoma and the United States without my consent.

15. I seek to intervene in the above captioned action (1) to protect my interest as a parent of children attending a public charter school - one that I chose for my children because I believe it to be the best public school option for my children - in the State of Oklahoma; (2) to protect my family's interest in ensuring that charter schools in Oklahoma remain public schools so that the full scope of Section 504 benefits that are vital to my children's education are protected; (3) to protect my family's interest in ensuring that the charter schools in Oklahoma remain public schools so that the funding that is vital to my children's public charter school (and to my child's educational future) is protected; (4) to protect my child's currently available constitutional rights; and (5) to make this court aware that these interests, which are important and unique to me and my family, are immediately jeopardized by the position being advanced Plaintiffs in this lawsuit.

Executed in Oklahoma County, Oklahoma, on April 17, 2026.

Daniel Hensley

Appellate Case: 26-6166 Document: 26 Date Filed: 11/08/2026 Page: 449

# Declaration of Luz M. Cruz, filed below on April 17, 2026, as ECF No. 66-4 (Exhibit 4 to Moore Intervenors' Motion to Intervene)

JEWISH CHARTER SCHOOL )
FOUNDATION, INC., *et al.* )
)
Plaintiffs, ) Case No. 5:26-CV-00582-R
)
v. )
)
GENTNER DRUMMOND, in his official )
Capacity as Attorney General of )
Oklahoma, *et al.*, )
)
Defendants. )

**DECLARATION OF LUZ M. CRUZ**

I, Luz M. Cruz, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury the following is true and correct:

1. I am an adult resident of Rogers County, Oklahoma, and I have personal knowledge of the facts stated herein and am competent to testify thereto.
2. I am the parent of a high school student who attends Tulsa Honor Academy, a public charter school in Tulsa, Oklahoma.
3. Before enrolling at Tulsa Honor Academy, my child attended a traditional public school closer to our home. My child had a plan under Section 504 of the Rehabilitation Act at my child's former public school; however, it was not being implemented well. My child was behind academically and failing a class.
4. We chose Tulsa Honor Academy after hearing about its reputation as a college preparatory public school. Since enrolling, Tulsa Honor Academy has worked with

me and my child to develop a plan under Section 504 of the Rehabilitation Act tailored specifically to meet my child's unique needs.

5. The Section 504 plan for my child provides necessary accommodations for my child's academic needs. My child struggles with reading comprehension and math word problems. The plan ensures additional time is available to turn in assignments, ensures opportunities to take short breaks as necessary, and/or ensures the opportunity to seek support from the Section 504 plan staff at Tulsa Honor Academy. All these accommodations are necessary for my child's success under Tulsa Honor Academy's rigorous academic curriculum.

6. I believe that my child's ability to have and maintain a Section 504 disability accommodation plan depends on public charter schools remaining public, and I have a significant interest in protecting my child from the educational emotional harm that would result if a public charter school, like Tulsa Honor Academy, were no longer required to provide the same level of disability accommodations under Section 504.

7. I am grateful Section 504 requires public schools to make meaningful, reasonable accommodations to ensure all children, including children like mine, have the opportunity to receive a free, appropriate education. The public school requirements of Section 504 allow my child to have a disability accommodation plan at Tulsa Honor Academy, and I appreciate the continuing efforts of the administrators and teachers at Tulsa Honor Academy to implement my child's Section 504 plan successfully.

lawsuit because Plaintiffs seeks to have charter schools in Oklahoma, like Tulsa Honor Academy, classified and treated as private schools.

9. In choosing to enroll at Tulsa Honor Academy, my child has the same constitutional rights enjoyed by peers in attendance at traditional public schools, including the right to free exercise of religion, free speech, due process, and equal protection recognized in the constitutions of the state of Oklahoma and the United States. I have never agreed to waive my child's rights as a condition of participating in a public charter school.

10. I object to Plaintiffs position in this lawsuit because, if this Court agrees with Plaintiffs that charter operators are not state actors or governmental entities for federal and state constitutional purposes, the effect would be to extinguish my child's protections under the constitutions of the state of Oklahoma and the United States without my consent.

11. I believe a significant percentage of students at Tulsa Honor Academy come from households that fall below the poverty level. As a public charter school that serves a high number of students who qualify to receive free- and reduced-price lunches, Tulsa Honor Academy has access to Title funding that is essential to its ability to operate. At Tulsa Honor Academy, my child is the recipient of free lunches.

12. Additionally, I am aware that Tulsa Honor Academy, like all public schools in

13. I believe the ability of Tulsa Honor Academy to access Title I funds and state funding to provide high quality educational options for children like my child depends on public charter schools remaining public, and I have a significant interest in protecting my child from the harm that would result if Tulsa Honor Academy were to lose access to the Title I funding or the state aid that it currently receives.

14. I seek to intervene in the above captioned action (1) to protect my interest as a parent of a child attending a public charter school – one that I chose for my child because I believe it to be the best public school option for my child – in the State of Oklahoma; (2) to protect my family's interest in ensuring that charter schools in Oklahoma remain public schools so that the full scope of Section 504 benefits that are vital to my child's education are protected; (3) to protect my child's currently available constitutional rights; (4) to protect my family's interest in ensuring that the charter schools in Oklahoma remain public schools so that the state and federal funding that is vital to my child's public charter school (and to my child's educational future) is protected; and (5) to make this court aware that these interests, which are important and unique to me and my family, are immediately jeopardized by the position being advanced the Plaintiffs in this lawsuit.

Executed in Rogers County, Oklahoma, on April 17, 2026.

Luz M. Cruz

# Declaration of Larissa Port, filed below on April 17, 2026, as ECF No. 66-5 (Exhibit 5 to Moore Intervenors' Motion to Intervene)

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., *et al.* | ) | |
| Plaintiffs, | ) | Case No. 5:26-CV-00582-R |
| v. | ) | |
| GENTNER DRUMMOND, in his official Capacity as Attorney General of Oklahoma, *et al.,* | ) | |
| Defendants. | ) | |

## **DECLARATION OF LARISSA PORT**

I, Larissa Port, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury the following is true and correct:

1. I am an adult resident of Oklahoma County, Oklahoma and I have personal knowledge of the facts stated herein and am competent to testify thereto.
2. I am the parent of four (4) students who attend Epic Charter Schools. Epic Charter Schools operates state-wide. My students are enrolled in Epic's One-on-One learning model.
3. Three (3) of my children have been diagnosed with conditions that warrant a plan under Section 504 of the Rehabilitation Act tailored specifically to meet my children's unique needs.

4. When my oldest child was ready to start school, we knew traditional public school was not a viable option for our family. I contacted a private school for enrollment, but was told they did not provide the accommodations that my oldest child would need.

5. My child required multiple therapy sessions, and we needed a flexible school schedule in order to be able to attend the various therapy appointments. At the same time, I did not feel adequate to provide my child's education alone through home-schooling. Epic Charter Schools allowed the schedule flexibility but also provided the curriculum and teachers, so my child could receive the best public education possible. Now I fulfill a supportive role in my child's education, but do not bear the responsibility of being the sole education provider.

6. My oldest child has a specific learning disorder in reading with difficulties in word reading accuracy, fluency, and comprehension. Epic Charter Schools worked with me and my child to devise a Section 504 plan with a range of support, including making the testing accessible to my child through a text-to-speech option. Curriculum is also available in text-to-speech, and my oldest child utilizes this; however, the curriculum accommodation is not specifically identified in the Section 504 plan. The Section 504 plan does permit verbal responses in class work instead of written responses.

7. My oldest child lacks the ability to hold focus and attention. This makes it hard for my child to remember what the teacher has said regarding lessons, assignments, and due dates. Under the Section 504 plan, teacher directions are simplified, repeated, and signage is used. The Section 504 plan offers frequent breaks.

8. Most importantly, my child's teacher understands it is beneficial if my oldest child works on one subject each day, as opposed to working through four (4) or five (5) different subjects a day. This more focused approach has enhanced my child's ability to succeed with Epic's curriculum.

9. My third-born child also benefits from Section 504 disability accommodations provided by Epic Charter Schools. My third-born child's diagnosed disabilities render a traditional public school environment overwhelming. Further, my child's diagnoses create the need for extra time to think and process. This can lead to fatigue in concentration and task completion for my child.

10. Epic Charter Schools worked with me to establish a Section 504 plan for my third-born child that provides for small group testing, extended time to complete tests and assignments, paper and pencil work in collaboration with the teacher, and assistive technology, including noise-cancelling headphones.

11. My third-born child required extensive therapy sessions. As a family, we exercised our choice to select Epic Charter Schools, which provided the schedule flexibility necessary to attend therapy appointments but also complete schoolwork.

12. I have another child with a Section 504 plan, but that child is not dependent on the plan this year. This child requires accommodations for testing; however, this year state testing may occur remotely.

13. Epic Charter Schools has been extremely easy to work with in implementing and honoring the Section 504 plans for my children. Without the accommodations provided

by Epic Charter Schools, my children would be "left behind" in public schools and not be able to succeed.

14. I believe that my children's ability to have and maintain a Section 504 disability accommodation plan depends on public charter schools remaining public, and I have a significant interest in protecting my children from the educational emotional harm that would result if a public charter school, like Epic Charter Schools, were no longer required to provide the same level of disability accommodations under Section 504.

15. I am grateful Section 504 requires public schools to make meaningful, reasonable accommodations to ensure all children, including children like mine, have the opportunity to receive a free, appropriate education. The public school requirements of Section 504 allow my children to have a disability accommodation plan at Epic Charter Schools, and I appreciate the continuing efforts of the administrators and teachers at Epic Charter Schools to implement my children's Section 504 plan successfully.

16. I believe that my and my children's interest in having and maintaining a Section 504 disability plan is threatened by the position being advanced by Plaintiffs in this lawsuit because Plaintiffs seeks to have charter schools in Oklahoma, like Epic Charter School, classified and treated as private schools.

17. I am also aware that Epic Charter Schools, like all public schools in Oklahoma, is funded through the state aid formula.

18. I believe the position being advanced by Plaintiffs in this lawsuit will result in Epic Charter Schools' loss of eligibility for state funding commensurate with other public

schools, threatening the very existence of the public charter school, because Plaintiffs seek to have charter schools in Oklahoma classified and treated as private schools.

19. In choosing to enroll at Epic Charter Schools, my children have the same constitutional rights enjoyed by peers in attendance at traditional public schools, including the right to free exercise of religion, free speech, due process, and equal protection recognized in the constitutions of the state of Oklahoma and the United States. I have never agreed to waive my children's rights as a condition of participating in a public charter school.

20. I object to Plaintiffs' position in this lawsuit because, if this Court agrees with Plaintiffs that charter operators are not state actors or governmental entities for federal and state constitutional purposes, the effect would be to extinguish my children's protections under the constitutions of the state of Oklahoma and the United States without my consent.

21. I seek to intervene in the above-captioned action (1) to protect my interest as a parent of children attending a public charter school – one that I chose for my children because I believe it to be the best public school option for my children – in the State of Oklahoma; (2) to protect my family's interest in ensuring that charter schools in Oklahoma remain public schools so that the State aid allocation funding that is vital to my children's public charter school (and to my children's educational future) is protected; (3) to protect my children's currently available constitutional rights; (4) to protect my family's interest in ensuring that charter schools in Oklahoma remain public schools so that the full scope of Section 504 benefits that are vital to my children's education are protected; and (5) to make this court aware that these interests, which are

important and unique to me and my family, are immediately jeopardized by the position being advanced the Plaintiffs in this lawsuit.

Executed in Oklahoma County, Oklahoma, on April 16, 2026.

Larissa Port

# Board's Opposition to Kaiman Intervenors' Motion to Intervene, filed below on April 22, 2026, as ECF No. 76

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., *et al.*,

*Plaintiffs*,

v.

GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma, *et al.*,

*Defendants*.

Case No. 5:26-cv-00582-R

**OKLAHOMA STATEWIDE CHARTER SCHOOL BOARD DEFENDANTS' OPPOSITION TO MOTION TO INTERVENE**

## TABLE OF CONTENTS

**INTRODUCTION** ........................................ 1

**BACKGROUND** ........................................ 1

**ARGUMENT** ........................................ 2

**I. MOVANTS LACK ARTICLE III STANDING TO INTERVENE.** ........................................ 2

**II. MOVANTS CANNOT INTERVENE AS OF RIGHT.** ........................................ 5

**A. Movants lack a direct, substantial, legally protectable interest related to the subject of this case.** ........................................ 5

**B. Movants' purported interests will not be impaired if intervention is denied.** ........................................ 9

**C. Movants' purported interests are adequately represented.** ........................................ 10

**III. PERMISSIVE INTERVENTION IS IMPROPER.** ........................................ 12

**CONCLUSION** ........................................ 14

**CERTIFICATE OF SERVICE** ........................................ 16

# TABLE OF AUTHORITIES

**Cases**

*Archer v. U.S.*,
268 F.2d 687 (10th Cir. 1959)....12

*Ariz. Christian Sch. Tuition Org. v. Winn*,
563 U.S. 125 (2011)....7

*Arney v. Finney*,
967 F.2d 418 (10th Cir. 1992)....13

*Barnes v. Sec. Life of Denver Ins. Co.*,
945 F.3d 1112 (10th Cir. 2019)....5, 8, 10

*City of Stilwell, Okla. v. Ozarks Rural Elec. Co-op, Corp.*,
79 F.3d 1038 (10th Cir. 1996)....8, 12

*Daggett v. Comm'n on Gov't Ethics & Election Pracs.*,
172 F.3d 104 (1st Cir. 1999)....12

*Democracy N.C. v. N.C. State Bd. of Elections*,
No. 1:20CV457, 2020 WL 6591397 (M.D.N.C. June 24, 2020)....13

*Diamond v. Charles*,
476 U.S. 54 (1986)....3, 4

*Drummond v. Okla. Statewide Virtual Charter Sch. Bd.*,
558 P.3d 1 (Okla. 2024)....2

*Glyde Solar, LLC v. Newby*,
No. 2:24-cv-00057, 2024 WL 5349932 (D. Utah Dec. 13, 2024)....13

*Hein v. Freedom From Religion Found., Inc.*,
551 U.S. 587 (2007)....7

*Hollingsworth v. Perry*,
570 U.S. 693 (2013)....1, 4

*Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*,
971 F.3d 1222 (10th Cir. 2020)....4

*Kane Cnty., Utah v. U.S.*,
928 F.3d 877 (10th Cir. 2019)....3, 9, 10, 11

*Okla. Pub. Emps. Ass'n v. Okla. Dep't of Cent. Servs.*,
55 P.3d 1072 (Okla. 2002) .......... 7

*Okla. v. U.S. Dep't of the Interior*,
569 F. Supp. 3d 1155 (W.D. Okla. 2021) .......... 11

*Oregon-California Trials Ass'n v. Walsh*,
467 F. Supp. 3d 1007 (D. Colo. 2020) .......... 14

*Payne v. Tri-State Careflight, LLC*,
No. CIV 14-1044 JB/KBM, 2016 WL 9738302 (D.N.M. July 12, 2016) .......... 13

*Pub. Serv. Co. of New Mexico v. Barboan*,
857 F.3d 1101 (10th Cir. 2017) .......... 14

*San Juan Cnty., Utah v. U.S.*,
503 F.3d 1163 (10th Cir. 2007) .......... 6, 7, 8

*SEC v. LBRY, Inc.*, 26 F.4th 96 (1st Cir. 2022) .......... 12

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
581 U.S. 433 (2017) .......... 3

*Tri-State Generation & Transmission Ass'n, Inc. v. N.M. Pub. Regul. Comm'n*,
787 F.3d 1068 (10th Cir. 2015) .......... 11

*U.S. v. City of Albuquerque*,
No. CIV 14-1025 RB/KK, 2015 WL 13747189 (D.N.M. June 2, 2015) .......... 13

*U.S. v. Michigan*,
424 F.3d 438 (6th Cir. 2005) .......... 8

*Victim Rts. L. Ctr. v. Rosenfelt*,
988 F.3d 556 (1st Cir. 2021) .......... 12

*W. Energy All. v. Jewell*,
No. CIV 16-0912 WJ/KBM, 2017 WL 3600741 (D.N.M. Jan. 13, 2017) .......... 14

**Statutes**

Fed. R. Civ. P. 24 .......... 5

Okla. Stat. tit. 70, § 28-103 .......... 4

Okla. Stat. tit. 70, § 3-136 .......... 2

Okla. Stat. tit. 70, §§ 3-130 *et seq.* .......... 4

**Other Authorities**

7C Fed. Prac. & Proc. Civ. § 1909 (Wright & Miller, 3d ed.) .......... 12

ACLU, *Statement on Oklahoma Attorney General's Lawsuit Regarding St. Isidore of Seville Catholic Virtual School* (Oct. 20, 2023), https://www.aclu.org/press-releases/statement-on-oklahoma-attorney-generals-lawsuit-regarding-st-isidore-of-seville-catholic-virtual-school .......... 11

Br. for Resp't, Okla. Statewide Charter Sch. Bd. v. Drummond, 605 U.S. 165 (2025) (Nos. 24–394, 24–396) 2025 WL 1002809 .......... 10

Br. in Opp'n, Okla. Statewide Charter Sch. Bd. v. Drummond, 605 U.S. 165 (2025) (No. 24-394), 2024 WL 4787943 .......... 10

Br., in Supp. of Pet'r, of Amici Curiae, Drummond v. Okla. Statewide Virtual Charter Sch. Bd., MA-121694 (Okla. Dec. 27, 2023) .......... 14

FFRF Action Fund, *'Secularist' Okla. AG Criticizes The Favoring Of A Religious Charter School* (Mar. 20, 2026), https://ffrfaction.org/secularist-okla-ag-criticizes-the-favoring-of-a-religious-charter-school/ .......... 11

Pet. for Writ of Mandamus, Drummond v. Okla. Statewide Charter Sch. Bd., No. CV-2026-649 (Okla. Cnty. Dist. Ct. Mar. 11, 2026) .......... 3

Resp'ts' Br. in Resp. to Pet'r's Appl. and Pet., Drummond v. Okla. Statewide Virtual Charter Sch. Bd., No. MA-121694 (Okla. Nov. 21, 2023) .......... 3

## INTRODUCTION

Movants—seven Oklahoma residents who identify themselves as taxpayers, parents, a teacher, and a student—seek to intervene to defend the constitutionality of the Oklahoma Charter Schools Act's religious exclusion. This Court should deny Movants intervention for three independent reasons.

*First*, Movants lack Article III standing. *See Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013) ("[The Supreme Court] ha[s] never before upheld the standing of a private party to defend the constitutionality of a state statute when state officials have chosen not to.").

*Second*, Movants fail to carry their burden for intervention as of right. They lack any direct, substantial, and legally protectable interests. Without any interests, Movants fail to show impairment. And without any impaired interests, Movants fail to show inadequate representation.

*Third*, granting permissive intervention is an abuse of discretion. Movants' intervention would cause unnecessary duplication and complexity. Movants' policy concerns are best addressed through amicus participation. This Court should deny the Motion to Intervene.

## BACKGROUND

In December 2025, Ben Gamla Jewish Charter School submitted a formal application for initial virtual charter school authorization to the Oklahoma Statewide Charter School Board. Compl., ECF No. 1 at ¶ 65. The application materials indicated that "students will receive instruction in Jewish religion, culture, values, rituals, texts, holidays, and practices" and that the school "seeks to provide outstanding academic and

co-curricular programs infused with a Jewish understanding of the human person and grounded in the enduring Jewish values of truth (*emet*), beauty (*yofi*), and goodness (*tov*), as expressed in Jewish thought and tradition." *Id.* at ¶¶ 72, 75.

In February 2026, the Board denied the application, citing the Oklahoma Supreme Court's decision in *Drummond v. Oklahoma Statewide Virtual Charter School Board*, 558 P.3d 1 (Okla. 2024), and the Oklahoma Charter Schools Act's religious exclusion, Okla. Stat. tit. 70, § 3-136(A)(2). ECF No. 1-4 at 3.[1] After the denial, Ben Gamla submitted a revised application. ECF No. 1-5. In March 2026, the Board denied Ben Gamla's revised application. This time, the sole reason for denial of the revised application was Ben Gamla's religious character. ECF No. 1-6.

Ben Gamla filed the present federal lawsuit challenging the constitutionality of the Act's religious exclusion. ECF No. 1 at ¶¶ 107–51. Ben Gamla asserts claims under the Free Exercise and Equal Protection Clauses, arguing that the Board's denial of its revised application violated these constitutional provisions. *Id.* at ¶¶ 107–51. Defendants in this action are the Board and the Oklahoma Attorney General. *Id.* at ¶¶ 14, 15–24. Movants filed this Motion to join as Intervenor-Defendants.

## ARGUMENT

### I. MOVANTS LACK ARTICLE III STANDING TO INTERVENE.

"[A]n intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing." *Town of Chester, N.Y. v.*

[1] References to ECF documents are to the ECF-numbered pages.

*Laroe Estates, Inc.*, 581 U.S. 433, 440 (2017); *see also Kane Cnty., Utah v. U.S.*, 928 F.3d 877, 887 n.12 (10th Cir. 2019) ("*Town of Chester* involved a plaintiff-side intervenor, but we see no reason not to apply that rule to defendant-side intervenors as well."). The Board, in the *Drummond* litigation, argued that the religious exclusion violated the Free Exercise Clause. *See* Resp'ts' Br. in Resp. to Pet'r's Appl. and Pet., Drummond v. Okla. Statewide Virtual Charter Sch. Bd., No. MA-121694 (Okla. Nov. 21, 2023). Nothing about its litigation position has changed since. *See* Answer, ECF No. 59. And the Oklahoma Attorney General refuses to take a position on the merits. *See* Mot. to Dismiss, ECF No. 52; Resp. to Mot. for Prelim. Inj., ECF No. 64 at 4 n.4 (taking "no position . . . on the merits of Plaintiffs' constitutional claims"); *cf.* Pet. for Writ of Mandamus, Drummond v. Okla. Statewide Charter Sch. Bd., No. CV-2026-649 (Okla. Cnty. Dist. Ct. Mar. 11, 2026) (taking "**no position** . . . on the constitutional or statutory questions" (emphasis in original)). So Movants would be the only party seeking to defend the constitutionality of the Act's religious exclusion. Therefore, Movants must possess Article III standing to intervene. *Kane Cnty.*, 928 F.3d at 886–87.[2]

Article III standing requires a party to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Town of Chester*, 581 U.S. at 438 (citation omitted). An injury in fact is one that is concrete and particularized and actual or imminent.

---

[2] Movants cannot rely on "piggyback standing" because they are the only party seeking to defend the constitutionality of the Act's religious exclusion. *Diamond v. Charles*, 476 U.S. 54, 64 (1986) (explaining that piggybacking on "the State's undoubted standing exists only if the State is in fact an appellant before the Court").

*Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1231 (10th Cir. 2020). In other words, "it must actually exist." *Id.* (citation omitted). Litigants "must seek relief for an injury that affects him in a 'personal and individual way'" and "possess a 'direct stake in the outcome.'" *See Hollingsworth*, 570 U.S. at 705 (citations omitted). The "[Supreme Court] ha[s] never before upheld the standing of a private party to defend the constitutionality of a state statute when state officials have chosen not to." *Id.* at 715.[3]

Movants' stated intention is to intervene to defend the constitutionality of the Act's religious exclusion. *See* ECF No. 15 at 6 (claiming "commit[ment] to defending the constitutionality of the challenged Oklahoma prohibitions"). "[S]uch a 'generalized grievance,' no matter how sincere is insufficient." *Hollingsworth*, 570 U.S. at 706. Movants have no role in enforcing the Oklahoma Charter Schools Act, so they lack a "'personal stake' in defending its enforcement that is distinguishable from the general interest of every citizen." *Id.* at 707 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The Supreme Court made clear that "Article III standing is not to be placed in the hands of concerned bystanders, who will use it simply as a vehicle for the vindication of value interests." *Id.* (quoting *Diamond v. Charles*, 476 U.S. 54, 62 (1986)) (citation modified).

---

[3] Absent a state statute conferring standing to defend the constitutionality of a challenged state statute to private parties, Movants have no standing to intervene. *See Diamond*, 476 U.S. at 65 n.17. The State of Oklahoma conferred no such right here. *Contrast* Okla. Stat. tit. 70, §§ 3-130 *et seq. with* Okla. Stat. tit. 70, § 28-103(B) (conferring taxpayer standing to defend the Oklahoma Parental Choice Tax Credit Act).

This Court need not wade into the shoal waters of this Circuit's intervention rules. It should deny the Motion for lack of standing.

## II. MOVANTS CANNOT INTERVENE AS OF RIGHT.

In addition to standing, Federal Rule of Civil Procedure 24(a)(2) requires a movant seeking intervention as of right to establish "(1) timeliness, (2) an interest relating to the property or transaction that is the subject of the action, (3) the potential impairment of that interest, and (4) inadequate representation by existing parties." *Barnes v. Sec. Life of Denver Ins. Co.*, 945 F.3d 1112, 1121 (10th Cir. 2019) (citation omitted).

First, the Movants' proffered interests are not "direct, substantial, and legally protectable" interests related to the transaction that is the subject of this case. *Id.* Instead, they are policy arguments in favor of retaining the Act's religious exclusion. Second, because they are not interests, they cannot be "impair[ed]." *Id.* at 1123. Third, without direct, substantial, and legally protectable interests, there is no need for adequate representation.

### A. Movants lack a direct, substantial, legally protectable interest related to the subject of this case.

Movants have the burden to show that they assert a "direct, substantial, and legally protectable" interest relating to the transaction that is the subject of the action. *Id.* at 1121. "A protectable interest is one that would be impeded by the disposition of the action." *Id.* at 1122 (quoting *W. All. v. Zinke*, 887 F.3d 1157, 1165 (10th Cir. 2017)). Whether Movants possess an "interest sufficient to warrant intervention as a matter of right is a highly fact-specific determination." *Id.* at 1121 (quoting *Kane Cnty.*, 928 F.3d at 889). The interest

must be practical and direct, not speculative or contingent on future events. *See San Juan Cnty., Utah v. U.S.*, 503 F.3d 1163, 1203 (10th Cir. 2007).

Movants seek to intervene to defend the constitutionality of the Act's religious exclusion. ECF No. 15 at 6. In support they allege three "interests" that warrant intervention as of right: (1) "vindicating their right under Oklahoma law to ensure that their tax dollars are spent lawfully," (2) "preventing the diversion of limited public resources away from their schools to a religious school that would not be open to or appropriate for them or their children," and (3) "preserving the constitutional protections that charter-school teachers and students now enjoy." ECF No. 15 at 7. Each of these proffered interests are either irrelevant to the transaction that is the subject of this action or so broad that they cannot satisfy Movants' burden to prove they are substantial, protectable interests related to the Board's denial of Ben Gamla's revised application.

First, Movants claim that they must intervene to protect their "individually enforceable state-law taxpayer rights." ECF No. 15 at 18. While intervention may be based on interests that are "contingent upon the outcome of the litigation," interests that are "*too* contingent, *too* indirect and hardly substantial" do not warrant intervention as of right. *San Juan Cnty.*, 503 F.3d at 1202–03. Movants' alleged concerns as taxpayers are contingent on a host of actions indirect to this litigation. For instance, negotiating a contract for sponsorship with the Board and various other prerequisites must occur before taxpayer dollars ever flow to a sponsored school.

Moreover, Movants' arguments fail because the Board denied Ben Gamla's revised application. ECF No. 1-6. No taxpayer money was spent—let alone unlawfully.[4]

Movants argue that they require intervention because they possess state taxpayer status to challenge state expenditures under Oklahoma law. ECF No. 15 at 18. But Movants do not possess a protectable state-law right. Their generalized interest in preventing unlawful spending does not support intervention because it does not give them standing under Oklahoma law. Taxpayers do not have standing to challenge spending when a state agency has "express statutory authority to contract with a non-governmental agency to provide certain services." *Okla. Pub. Emps. Ass'n v. Okla. Dep't of Cent. Servs.*, 55 P.3d 1072, 1079 (Okla. 2002).

And even though the Supreme Court recognizes taxpayer standing to challenge violations of the Establishment Clause under limited circumstances, *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 138–39 (2011); *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 609 (2007) (plurality), Movants' interests are speculative and entirely contingent on future events, *San Juan Cnty.*, 503 F.3d at 1203. Any claim Movants would make is not ripe for adjudication. A host of events outside the scope of this case must occur before a charter school receives any amount of taxpayer funding.

[4] If this Court determines that the Act's religious exclusion is unconstitutional, and the Board sponsors Ben Gamla's creation, any taxpayer funding flowing to Ben Gamla—or any religious charter school thereafter—would not be "unlawful." *See Carson v. Makin*, 596 U.S. 767, 781 (2022) (citing *Zelman v. Simmons-Harris*, 536 U.S. 639, 652–53 (2002)).

Second, Movants claim that they have an interest in protecting against diversion of funds from their secular schools to religious schools that "would not be appropriate for or welcoming to them or their children and that would impose religion-based employment requirements that the intervenor-teacher could not meet." ECF No. 15 at 19. Setting aside Movants' irrelevant and inappropriate claims about potential conduct of Ben Gamla, this interest is not "direct, substantial, and legally protectable." *Barnes*, 945 F.3d at 1121. Taxpayer funding of charter schools contains many intervening actions, some of which must be completed by nonparties and through processes not at issue in this case. At best, Movants' concerns about diversion of taxpayer funds are contingent interests in their schools'—not their own—financial benefit or loss. *See City of Stilwell, Okla. v. Ozarks Rural Elec. Co-op, Corp.*, 79 F.3d 1038, 1042 (10th Cir. 1996). "An interest of this sort is too attenuated and does not satisfy the 'direct and substantial' requirement of Rule 24(a)(2)." *Id.*

Third, Movants claim they have an interest in "preserving their and their children's existing constitutional protections at work and school." ECF No. 15 at 20. Utilizing a lengthy, nonlinear, and speculative chain of events, Movants assume that this Court will find that charter schools are private entities and that this "could enable" their charter schools to violate their equal protection rights. ECF No. 15 at 20.

These collateral concerns are too attenuated to justify intervention as of right. *See San Juan Cnty.*, 503 F.3d at 1202. While Movants may be concerned about hypothetical issues, these issues are not currently, and may never be, before this Court. *U.S. v. Michigan*, 424 F.3d 438, 444 (6th Cir. 2005).

**B. Movants' purported interests will not be impaired if intervention is denied.**

To satisfy the impairment element, Movants "must have an interest that could be adversely affected by the litigation." *Kane Cnty.*, 928 F.3d at 891 (quoting *San Juan Cnty.*, 503 F.3d at 1199). But Movants' theories of impairment are the type of attenuated concerns that do not require intervention.

Movants claim that the direct consequences of an adverse merits decision finding the Act's religious exclusion unconstitutional will impair their interests. ECF No. 15 at 21. Specifically, they claim that denial of their intervention would impair their: (1) "right under Oklahoma law to prevent the illegal delivery of their tax dollars to a religious charter school," (2) interest in "diver[sion of] funds from their secular public schools," (3) ability to separately "challenge . . . the funding and operation of Ben Gamla as a public charter school, (4) "effort to recoup public funding of Ben Gamla," and (5) ability to "undo harm to Proposed Intervenors' schools caused by the diversion of public funds away from them." ECF 15 at 16.

Movants also claim that the stare decisis effect of a Ben Gamla victory will impair their interests. ECF No. 15 at 7, 21–22. They argue that if this Court finds the Act's religious exclusion unconstitutional—and especially if that decision is upheld on appeal—then Movants' future efforts "to challenge other religious charter schools and to enforce their constitutional rights" could be hindered. ECF No. 15 at 21–22.

But the case before this Court only addresses whether the Act's religious exclusion is unconstitutional. It does not seek—nor can it—to adjudicate the compliance obligations of existing charter schools, the enforcement practices of regulators, or the future policy

choices of nonparty educational institutions. And the expenditure of taxpayer funds is too attenuated and reliant on nonparties and actions outside the reach of the instant case. Any impact on those entities and their statutory rights would be indirect and dependent on intervening decisions by parties and actions not subject to this Court's jurisdiction. "If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." *Barnes*, 945 F.3d at 1123 (citation omitted). But Movants cannot demonstrate such practical effect because their claimed harm depends on a series of contingent future events beyond the scope of this litigation. Just like Movants' interests, Movants' theory of impairment is too attenuated and speculative to warrant intervention as of right.

**C. Movants' purported interests are adequately represented.**

Even if Movants could establish impairment of a direct, substantial, and legally protectable interest, they fail to show inadequacy of representation. *See Kane Cnty.*, 928 F.3d at 892. Movants' "interests" lie in preserving the Act's religious exclusion—an exclusion Defendant Attorney General Gentner Drummond previously defended at the U.S. Supreme Court. Br. in Opp'n, Okla. Statewide Charter Sch. Bd. v. Drummond, 605 U.S. 165 (2025) (No. 24-394), 2024 WL 4787943; Br. for Resp't, Okla. Statewide Charter Sch. Bd. v. Drummond, 605 U.S. 165 (2025) (Nos. 24–394, 24–396) 2025 WL 1002809; *see also* ECF No. 15 at 11 ("[Drummond] vigorously and successfully opposed religious charter schools in the *Drummond* case.") And when objectives are shared, adequate representation is presumed, even when the party in the case is a government entity. *See Tri-State Generation & Transmission Ass'n, Inc. v. N.M. Pub. Regul. Comm'n*, 787 F.3d

1068, 1074 (10th Cir. 2015) (presumption of adequate representation applied to "New Mexico Attorney General, who [was] obligated by law to defend the constitutionality of the statute"); *see also Okla. v. U.S. Dep't of the Interior*, 569 F. Supp. 3d 1155, 1164 (W.D. Okla. 2021).

Recently, General Drummond earned the title "Secularist of the Week" from the Freedom From Religion Foundation Action Fund. *See* FFRF Action Fund, *'Secularist' Okla. AG Criticizes The Favoring Of A Religious Charter School* (Mar. 20, 2026), https://ffrfaction.org/secularist-okla-ag-criticizes-the-favoring-of-a-religious-charter-school/. And the ACLU likewise praised General Drummond in a press release. ACLU, *Statement on Oklahoma Attorney General's Lawsuit Regarding St. Isidore of Seville Catholic Virtual School* (Oct. 20, 2023), https://www.aclu.org/press-releases/statement-on-oklahoma-attorney-generals-lawsuit-regarding-st-isidore-of-seville-catholic-virtual-school ("We applaud Attorney General Drummond for his efforts to protect church-state separation" and "The lawsuit filed today demonstrates that AG Drummond shares this commitment"). Movants' concerns about the end of General Drummond's term are speculative. This Court should not consider them.

Further, Movants cannot prove inadequacy by stressing some unique argument that only they will raise. *Cf.* ECF No. 15 at 24–25. "[R]epresentation is not inadequate simply because the applicant and the representative disagree regarding the facts or law of the case." *Kane Cnty.*, 928 F.3d at 892 (citation omitted). The fact that Movants wish to advance additional policy arguments or employ different litigation tactics does not establish inadequate representation. *See* 7C Fed. Prac. & Proc. Civ. § 1909 (Wright & Miller, 3d

ed.). An "interest in making an additional constitutional argument in defense of government action" does not meet Movants' burden. *Victim Rts. L. Ctr. v. Rosenfelt*, 988 F.3d 556, 562 (1st Cir. 2021). That is why courts routinely deny motions to intervene when movants intend to assert alternative legal arguments. *See SEC v. LBRY, Inc.*, 26 F.4th 96, 100 (1st Cir. 2022) (collecting cases). And this Court should do the same.

## III. PERMISSIVE INTERVENTION IS IMPROPER.

This Court should also deny permissive intervention. Denying permissive intervention is appropriate here for several reasons, including the same reasons given above for denying intervention as of right. Federal Rule of Civil Procedure 24(b) permits permissive intervention when a movant "has a claim or defense that shares with the main action a common question of law or fact." Whether to grant permissive intervention is discretionary, *City of Stilwell*, 79 F.3d at 1043, and it may be denied for any reason "rationally relevant," *Daggett v. Comm'n on Gov't Ethics & Election Pracs.*, 172 F.3d 104, 113 (1st Cir. 1999). A district court must consider "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Archer v. U.S.*, 268 F.2d 687, 690 (10th Cir. 1959).

In exercising its discretion, the Court may consider additional factors such as "whether the would-be intervenor's input adds value to the existing litigation," the movant's "interests are adequately represented by the existing parties," and "the availability of an adequate remedy in another action." *Glyde Solar, LLC v. Newby*, No.

2:24-cv-00057, 2024 WL 5349932, at *1 (D. Utah Dec. 13, 2024).[5] While not a requirement, a finding of adequate representation supports denial of permissive intervention. *Payne v. Tri-State Careflight, LLC*, No. CIV 14-1044 JB/KBM, 2016 WL 9738302, at *18 (D.N.M. July 12, 2016) (citing *City of Stilwell*, 79 F.3d at 1043).

First, Movants' intervention would create duplication and unnecessary complexity. "An intervenor's interest should not merely duplicate existing claims or defenses and must bring something more to the action." *U.S. v. City of Albuquerque*, No. CIV 14-1025 RB/KK, 2015 WL 13747189, at *2 (D.N.M. June 2, 2015) (quotations omitted). Adding seven additional defendants would result in duplicative briefing, overlapping arguments, and redundant positions on the core legal and factual questions.

Courts also question whether "intervention would only clutter the action unnecessarily." *Arney v. Finney*, 967 F.2d 418, 421 (10th Cir. 1992). Movants' unique legal theories and factual perspectives do not have direct, legal bearing on issues presented to this Court. The addition of another defendant group would increase the complexity of the litigation with no upside. Their presence would inject a fourth set of parties, along with increased briefing, motion practice, and scheduling conflicts. *See Democracy N.C. v. N.C. State Bd. of Elections*, No. 1:20CV457, 2020 WL 6591397, at *2 (M.D.N.C. June 24, 2020). Permissive intervention will cause "undue delay and potentially obfuscate the

---

[5] Even if this Court determines that Movants have claims that may be brought, permissive intervention should still be denied. Movants possess the availability of an adequate remedy in a separate action. *See U.S. v. City of Albuquerque*, Case No. CIV 14-1025 RB/KK, 2015 WL 13747189, at *5 (D.N.M. June 2, 2015) ("Proposed Intervenors are free to file their equal protection claims in another case.").

relevant issues in the lawsuit." *W. Energy All. v. Jewell*, No. CIV 16-0912 WJ/KBM, 2017 WL 3600741, at *8 (D.N.M. Jan. 13, 2017). Allowing Movants to "inject their own agenda into this case . . . only prejudice[s] the existing parties to this lawsuit trying to resolve the issues that were raised in the Complaint." *Id.*

Movants' primary contribution—their policy concerns regarding potential downstream effects on nonparty charter schools and funding-condition enforcement—are best addressed through amicus participation. District courts have "broad discretion in allowing participation of *amicus curiae*." *Oregon-California Trials Ass'n v. Walsh*, 467 F. Supp. 3d 1007, 1073 (D. Colo. 2020) (citation omitted). Amicus participation is a well-established and adequate vehicle for presenting policy arguments and broader institutional concerns that extend beyond the immediate parties' interests. Similar policy concerns to those of Movants were appropriately raised in the *Drummond* litigation through amicus briefing after a denial of intervention. *See* Br., in Supp. of Pet'r, of Amici Curiae, Drummond v. Okla. Statewide Virtual Charter Sch. Bd., MA-121694 (Okla. Dec. 27, 2023). The Board does not oppose Movants' participation as amicus curiae in the instant case, and this Court would remain free to consider Movants' briefed arguments. *See Pub. Serv. Co. of New Mexico v. Barboan*, 857 F.3d 1101, 1114 (10th Cir. 2017).

## CONCLUSION

This Court should deny the Motion to Intervene.

Respectfully submitted this 22 day of April, 2026.

*/s/ Anthony J. Ferate*
Anthony J. Ferate, OBA No. 21171
SPENCER FANE LLP
9400 North Broadway Extension, Suite 600
Oklahoma City, Oklahoma 73114
(405) 844-9900
ajferate@spencerfane.com

Hiram S. Sasser, III, OBA No. 19557
Holly M. Randall,* OBA No. 34763
Erin E. Smith,* OBA No. 35232
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075
(972) 941-4444
hsasser@firstliberty.org
hrandall@firstliberty.org
esmith@firstliberty.org

**Admitted pro hace vice.*

***Attorneys for Oklahoma Statewide Charter School Board Defendants***

# Ben Gamla's Opposition to Kaiman Intervenors' Motion to Intervene, filed below on April 22, 2026, as ECF No. 77

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., *et al.*,

*Plaintiffs*,

v.

GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma, *et al.*,

*Defendants*.

Case No. 5:26-cv-00582-R

**PLAINTIFFS' OPPOSITION TO OKLAHOMA TAXPAYERS' MOTION TO INTERVENE (DKT. 15)**

Robert G. McCampbell
OBA No. 10390
David A. Herber
OBA No. 33527
GABLEGOTWALS
499 W. Sheridan Ave., Suite 2200
Oklahoma City, OK 73102
Tel 405-235-5500
*RMcCampbell@Gablelaw.com*

Eric S. Baxter
DC Bar No. 479221
Eric C. Rassbach
TX Bar No. 24013375
Daniel L. Chen
DC Bar No. 1781783
Phillip J. Allevato*
CA Bar No. 362581
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
(202) 955-0095
*ebaxter@becketfund.org*

**Not a member of the DC Bar; admitted in California. Practice limited to cases in federal court.*

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

LEGAL STANDARD ........ 5

ARGUMENT ........ 6

I. Movants lack Article III standing. ........ 6

A. Movants seek different relief so they must show standing. ........ 6

B. Movants do not have standing as taxpayers. ........ 8

C. Movants' other alleged interests are generalized grievances. ........ 13

II. Movants cannot intervene as of right. ........ 16

III. Movants do not satisfy the requirements for permissive intervention. ........ 19

CONCLUSION ........ 19

CERTIFICATE OF SERVICE ........ 21

## TABLE OF AUTHORITIES

**Page(s)**

*Allen v. Wright*,
468 U.S. 737 (1984) .... 8

*Am. Ass'n of People with Disabilities v. Herrera*,
257 F.R.D. 236 (D.N.M. 2008) .... 18

*Ariz. Christian Sch. Tuition Org. v. Winn*,
563 U.S. 125 (2011) .... *passim*

*Ark Encounter, LLC v. Stewart*,
311 F.R.D. 414 (E.D. Ky. 2015) .... 17

*Bowen v. Kendrick*,
487 U.S. 589 (1988) .... 11

*Chiles v. Thornburgh*,
865 F.2d 1197 (11th Cir. 1989) .... 17, 18

*Chrisman v. C.I.R.*,
82 F.3d 371 (10th Cir. 1996) .... 11

*City of Herriman v. Bell*,
590 F.3d 1176 (10th Cir. 2010) .... 19

*City of Stilwell v. Ozarks Rural Elec. Co-op. Corp.*,
79 F.3d 1038 (10th Cir. 1996) .... 5, 18

*Clapper v. Amnesty Int'l*,
568 U.S. 398 (2013) .... 14, 16

*Coal. of Ariz./N.M. Cntys. for Stable Econ. Growth v. Dep't of the Interior*,
100 F.3d 837 (10th Cir. 1996) .... 16

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .... 11

*Doremus v. Bd. of Educ.*,
342 U.S. 429 (1952) .... 9, 10, 14, 17

*E. Bay Sanctuary Covenant v. Biden*,
102 F.4th 996 (9th Cir. 2024) .... 18

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 8

*Flast v. Cohen*,
392 U.S. 83 (1968) .......... 8, 10

*Hein v. Freedom From Religion Found., Inc.*,
551 U.S. 587 (2007) .......... *passim*

*Higganbotham v. Oklahoma ex rel. Okla. Transp. Comm'n*,
328 F.3d 638 (10th Cir. 2003) .......... 11

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) .......... *passim*

*Kane County v. United States*,
928 F.3d 877 (10th Cir. 2019) .......... 6

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 9, 14, 18

*Nova Health Sys. v. Gandy*,
416 F.3d 1149 (10th Cir. 2005) .......... 15

*Okla. Pub. Emps. Ass'n v. Okla. Dep't of Cent. Servs.*,
55 P.3d 1072 (Okla. 2002) .......... 13

*Perry v. Brown*,
52 Cal. 4th 1116 (2011) .......... 12

*Rocky Mountain Wild v. Dallas*,
98 F.4th 1263 (10th Cir. 2024) .......... 6

*San Juan Cnty. v. United States*,
503 F.3d 1163 (10th Cir. 2007) .......... 16, 17, 18

*Town of Chester v. Laroe Ests., Inc.*,
581 U.S. 433 (2017) .......... 5, 6

*Tri-State Generation and Transmission Ass'n v. N.M. Pub. Regul. Comm'n*,
787 F.3d 1068 (10th Cir. 2015) .......... 19

*United States v. RaPower-3, LLC*,
341 F.R.D. 311 (D. Utah 2022) .......... 19

*Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*,
454 U.S. 464 (1982) ........ 10, 11

*Washington v. Food & Drug Admin.*,
108 F.4th 1163 (9th Cir. 2024) ........ 19

*WildEarth Guardians v. U.S. Forest Serv.*,
573 F.3d 992 (10th Cir. 2009) ........ 16

**Statutes**

Okla. Stat. Ann. tit. 70, § 3-136 ........ 3

Okla. Stat. Ann. tit. 70 § 3-142 ........ 14, 15

**Other Authorities**

Fed. R. Civ. P. 24 ........ 5

## INTRODUCTION

Seven Oklahoma taxpayers have moved to intervene in this lawsuit to protect Oklahoma's practice of discriminating against religious institutions. But before they can join this case, the Movants face a fundamental, threshold problem: Article III of the United States Constitution. Because they seek relief that is far different and broader than that sought by the existing Defendants, this Court must first ask whether the Movants have any cognizable legal interest in this litigation. The answer is no.

Movants claim they are entitled to intervene based on their status as Oklahoma taxpayers. They also state a generalized concern for the quality of public education in Oklahoma. But neither foundation supports intervention, and together, they illustrate precisely the kind of abstract, undifferentiated grievances that the Supreme Court has consistently held are insufficient to confer standing.

Start with taxpayer standing. Courts have repeatedly declined to find that an individual's payment of taxes is sufficient to confer Article III standing, and for good reason. The U.S. Supreme Court has for decades narrowly interpreted taxpayer standing, cabining it to discrete circumstances involving a direct expenditure pursuant to Congress's power under the Taxing and Spending Clause. Because the interests of taxpayers are, in essence, the interests of the public at large, deciding a constitutional claim based solely on taxpayer standing would violate Article III.

Movants' concern for the quality of public education in Oklahoma also fails to satisfy Article III's requirements. Their theory is that if Plaintiffs ultimately prevail in this litigation, and if students ultimately enroll at Ben Gamla, and if those students are from

their children's schools, then per-pupil funding might be allocated away from their children's schools, which might then experience budget pressures, which might then affect educational quality. This is not a cognizable legal injury; it is a policy concern riddled with independent, speculative contingencies.

Movants who fear that a ruling for Plaintiffs might possibly erode constitutional protections at public schools in some future case are in no better position. The high school student who pays general sales and motor-vehicle taxes and objects on principle to religious charter schools presents nothing more than a generalized grievance indistinguishable from that of any other concerned bystander. These are the kinds of interests—diffuse, contingent, and shared with the public at large—that courts must screen out at the threshold, not amplify through intervention.

For similar reasons, Movants also lack any protectable legal interest in this litigation. To support intervention, an interest cannot be too contingent, indirect, or generalized. But Movants' interests are precisely that. Nor do Movants establish that they are entitled to permissive intervention, as they possess only general legal, ideological, and policy objections to the challenged governmental action at issue here.

Accordingly, this Court should deny the Oklahoma taxpayers' motion for intervention.

## FACTUAL BACKGROUND

In December 2025, Plaintiff Peter Deutsch, a former Democratic congressman from Florida, founded the National Ben Gamla Jewish Charter School Foundation, Inc. ("Ben Gamla") in Oklahoma. Shortly after, Ben Gamla applied to the Oklahoma Statewide Charter School Board ("the Board") to create an Oklahoma charter school where students

would receive a rigorous academic education alongside a deep cultural and ethical grounding derived from the Jewish faith, heritage, and tradition. On February 9, 2026, the Board voted to reject Ben Gamla's application. The Board listed ten supposed deficiencies with Ben Gamla's application. Most importantly, the Board found that Ben Gamla's Jewish identity conflicted with the Oklahoma Charter Schools Act ("OCSA"), which includes a nonsectarian requirement forbidding charter schools from being religious. *See* Okla. Stat. Ann. tit. 70, § 3-136(A)(2). Within the thirty-day statutory deadline, Ben Gamla amended its application to cure the alleged defects, but without altering its religious identity. On March 9, the Board again voted to reject Ben Gamla's application, identifying the school's religious nature as the sole reason for the denial.

Attorney General Drummond immediately filed a petition for writ of mandamus in the state district court for Oklahoma County, seeking to enforce the OCSA by "compel[ling] the Board to discharge its independent statutory duty to identify all valid, non-constitutional grounds for rejection of Ben Gamla's application." Dkt. 52 at 2; *see also Drummond v. Okla. Statewide Charter Sch. Bd.*, No. CV-2026-649 (Okla. Cnty. Dist. Ct. Mar. 11, 2026) ("Petition for Writ"). There, Drummond sought to compel the Board "to amend its March 10, 2026 rejection letter" to include additional "independent, non-constitutional grounds" for rejecting Ben Gamla's application. Petition for Writ at 13.

Ben Gamla filed this suit against the Attorney General and the Board on March 24, 2026, and filed a Motion for Preliminary Injunction three days later.

In response, Drummond filed a Motion to Dismiss, arguing he had "no role in the administration of the [OCSA], the processing or denial of charter school applications, or

the enforcement of the OCSA's nonsectarian requirement." Dkt. 52 at 1. He expressly takes "no position" on this proceeding's "constitutional or statutory questions." *Id.* at 2. Drummond further claims that he "exercises no control over the Board's application decisions," though he simultaneously notes his "authority to represent the interests of the State of Oklahoma and its citizens in matters arising under the Oklahoma Charter Schools Act" and expressly refuses to "waive[ ]" that legal authority. *Id.* at 1 n.1, 3.

The Board filed an Answer in which they admitted to most of Ben Gamla's allegations and agreed that this Court should enjoin the OCSA's nonsectarian requirement and declare it unconstitutional. Dkt. 59 at 15. Indeed, in its response to Plaintiffs' motion for preliminary injunction, the Board expressly agrees with Plaintiffs' legal arguments, notes that "an injunction is necessary for Board Members to comply with their oath of office," and requests that the Court "grant Plaintiffs' motion for preliminary injunction." Dkt. 63 at 17.

Unlike both Drummond and the Board, Movants deny nearly all of Ben Gamla's allegations. *See generally* Dkt. 15-14. Movants are seven Oklahoma taxpayers seeking to "ensure that their tax dollars do not support a religious public school and are not diverted from their inclusive, secular public schools." Dkt. 15 at 1 ("Mot."). Six movants are parents of children in government-run public schools; one is a high school senior and the child of another movant who claims injury through payment of general sales and motor-vehicle taxes. Dkt. 15-9 ¶ 3. Some movants, as charter-school teachers or "soon-to-be charter-school parent[s]," "fear" that permitting Ben Gamla to operate a charter school will "take away constitutional rights." Mot. at 10.

Given that supposed interest in this litigation, Movants vigorously argue that Oklahoma's nonsectarian requirement is constitutional. Dkt. 15-14 at 2-3. Unlike both the Board—which affirmatively agrees that injunctive relief is warranted—and Drummond—who takes no position on the issue, does not seek to defend the state law, and seeks only his dismissal on limited, procedural grounds—Movants "are unreservedly committed to preserving Oklahoma's system of secular, nondiscriminatory public schools." Mot. at 18. Indeed, Movants assert that they should be permitted to intervene to present arguments that would otherwise go "unrepresented." *Id.* at 19-20.

## LEGAL STANDARD

Intervention as of right is appropriate where, among other things, a third party "claims an interest relating to the property or transaction" at issue that would be "impair[ed] or impede[d]" by the "action" and is not "adequately represent[ed]" by the existing parties. Fed. R. Civ. P. 24(a)(2). Permissive intervention is a matter of the Court's discretion, *City of Stilwell v. Ozarks Rural Elec. Co-op. Corp.*, 79 F.3d 1038, 1043 (10th Cir. 1996), and may be appropriate where the third party "has a claim or defense that shares with the main action a common question of law or fact," Fed. R. Civ. P. 24(b)(1)(B). Additionally, under Rule 24, putative intervenors "must demonstrate Article III standing" when they seek "relief that is different from that which is sought by a party with standing." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 440 (2017).

## ARGUMENT

### I. Movants lack Article III standing.

Intervenors "must demonstrate Article III standing" when they seek relief that is different from that which is sought by the party with standing. *Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1286 n.5 (10th Cir. 2024) (quoting *Town of Chester*, 581 U.S. at 439-40). This rule applies to both plaintiff-intervenors and defendant-intervenors. *Kane County v. United States*, 928 F.3d 877, 887 n.12 (10th Cir. 2019). To show standing, a party must "possess a direct stake in the outcome of the case." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (cleaned up).

#### A. Movants seek different relief so they must show standing.

Under *Town of Chester*, putative intervenors seeking relief different from that sought by parties with standing must establish their own independent Article III standing. 581 U.S. at 439-40. Here, Movants bear that burden. Though they claim to seek the same relief sought by the existing Defendants, Mot. at 12-13, the filings in this case tell a different story.

Attorney General Drummond seeks limited relief in this case. As explained in his motion to dismiss, Drummond takes "no position" on the "constitutional or statutory questions" in this proceeding. Dkt. 52 at 2. Rather than defend the constitutionality of Section 70-3-136(A)(2), Drummond merely argues that he "has no role in the administration of the [OCSA]," so he should be dismissed from the action as an unnecessary party. *Id.* at 1-2. He also asserts he was wrongly named as a defendant because a court order against him cannot redress Plaintiffs' injuries. *Id.* at 6-8. Regardless of

whether Drummond is right or wrong (he's wrong), the limited nature of his requested relief is clear: his (and only his) dismissal from the case on technical, procedural grounds without reaching the merits of the constitutional claims. *Id.* at 2. Indeed, when this case proceeds, he expressly asks for the Court to "order the caption of this case modified to remove his name." *Id.* at 8.

While Drummond seeks only his individual dismissal and takes no position on the merits, Movants, on the other hand, are committed to defending the OCSA's religious exclusion "throughout the life of this litigation and are well-positioned to do so." Mot. at 1. They directly dispute that the OCSA's nonsectarian requirement violates the First Amendment. Dkt. 15-14 at 2-3. As they see it, funding Ben Gamla would violate the OCSA, the Oklahoma Constitution, and the U.S. Constitution. Mot. at 12-23.

In fact, in support of intervention, Movants acknowledge that they will raise new independent arguments and seek different relief. For example, Movants say they will proffer arguments that "Attorney General Drummond did not present" and that would otherwise go "unrepresented." *Id.* at 19-20. And they claim their interests are "far from identical" from existing Defendants because they "are unreservedly committed to preserving Oklahoma's system of secular, nondiscriminatory public schools." *Id.* at 18. That relief, and the legal bases for them, are far broader and far different than the ones presented by Drummond.

That relief is also entirely different from the relief sought by the Board. The Board agrees that Ben Gamla is entitled to injunctive relief. *See* Dkt. 59 at 15; Dkt. 63 at 1 ("[B]ecause Ben Gamla is likely to succeed on the merits of its free exercise claims, the

Board respectfully requests this Court grant the Motion for Preliminary Injunction."). For the Board, it was placed in a "difficult situation" because the Board was "powerless" to grant Ben Gamla's application due to the Oklahoma Supreme Court's *Drummond* decision, which adopted the Attorney General's argument in an earlier lawsuit and held the Board must categorically deny all religious charter-school applications. Dkt. 63 at 1, 8, 17. As the Board explains, Drummond "already threatened Board members with criminal contempt of court, should they fail to implement *Drummond*'s result." *Id.* at 8. Thus, the Board asks this Court to grant an injunction to allow Board members to comply with their oaths of office. *Id.* at 17. Again, to put it mildly, that relief is different from an order upholding "the constitutionality of the challenged Oklahoma prohibitions." Mot. at 1. Accordingly, Movants must demonstrate that they possess Article III standing.

**B. Movants do not have standing as taxpayers.**

Movants cannot demonstrate standing. First, they claim a protectable legal interest in their supposed "state-law taxpayer rights," specifically their "special interests in preventing the unlawful use of their tax funds to support a religion." Mot. at 13 (citing *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 141 (2011), and *Flast v. Cohen*, 392 U.S. 83, 102-06 (1968)). But such generalized grievances are insufficient for standing.

Article III's standing requirements "screen out" parties "who might have only a general legal, moral, ideological, or policy objection to a particular government action," and "prevent[] the federal courts from becoming a 'vehicle for the vindication of the value interests of concerned bystanders.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381-82 (2024) (quoting *Allen v. Wright*, 468 U.S. 737, 756 (1984)). A litigant "raising only a

generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573-74 (1992).

Taxpayer standing is a type of generalized grievance. Taxpayer standing is predicated on the idea that "an individual who has paid taxes has a 'continuing, legally cognizable interest in ensuring that those funds are not *used* by the Government in a way that violates the Constitution.'" *Winn*, 563 U.S. at 134 (quoting *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 599 (2007)). But "this type of interest is too generalized and attenuated to support Article III standing." *Hein*, 551 U.S. at 599. In other words, taxpayer standing "is not generally deemed sufficient to establish standing in federal court." *Winn*, 563 U.S. at 131. Indeed, the Supreme Court has "repeatedly emphasized" that the "bar on taxpayer standing" "must be applied with 'rigor.'" *Hein*, 551 U.S. at 609.

The logic against conferring broad taxpayer standing applies in the Establishment Clause context. In *Doremus v. Board of Education*, 342 U.S. 429 (1952), taxpayers brought an Establishment Clause challenge to a New Jersey law that authorized public school teachers to read passages from the Bible. The Court dismissed the appeal for lack of standing, holding that "the interests of a taxpayer in the moneys of the federal treasury are too indeterminable, remote, uncertain and indirect to furnish a basis for an appeal to the preventive powers of the Court." *Id.* at 433. This was "equally true when a state Act" was at issue, and thus, a taxpayer must show that he or she is "in danger of sustaining some

direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." *Id.* at 434.

Similarly, in *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464 (1982), the Supreme Court dismissed a lawsuit brought by taxpayers upset by the transfer of federal property to a religious college. The Court held that relaxed standing requirements "do[ ] not become more palatable when the underlying merits concern the Establishment Clause." *Id.* at 489. It also clarified that any exceptions to the general bar on taxpayer standing apply *only* to challenges to the "exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution." *Id.* at 478. In all other circumstances, taxpayer standing provides no "continuing, legally cognizable interest in ensuring that … funds are not used by the Government in a way that violates the Constitution." *Winn*, 563 U.S. at 134 (quoting *Hein*, 551 U.S. at 599).

Movants resist this conclusion. First, they argue that under *Flast v. Cohen*, they possess standing under an exception to the general rule against taxpayer standing. But in *Flast*, taxpayers sought to enjoin the expenditure of federal funds under a program which they alleged was unconstitutionally supporting religious schools. The Court found taxpayer standing on narrow grounds, holding that "a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution." *Flast*, 392 U.S. at 102.

Subsequent decisions from the Supreme Court confirm that *Flast* is a "narrow exception to the general constitutional prohibition against taxpayer standing." *Hein*, 551 U.S. at 602. In *Valley Forge*, the Court found the plaintiffs had no standing under *Flast* to challenge an

agency's decision to transfer a parcel of federal property. 454 U.S. at 464. In *Hein*, the Court found no standing under *Flast* to challenge federal executive actions even when funded by general appropriations. In *Winn*, the Court found no standing under *Flast* to challenge state government tax credits, explaining that *Flast* provides only a "'narrow exception' to 'the general rule against taxpayer standing.'" 563 U.S. at 138 (quoting *Bowen v. Kendrick*, 487 U.S. 589, 618 (1988)). And in *DaimlerChrysler Corp. v. Cuno*—cited by Movants, *see* Mot. at 13—the Supreme Court explained that expanding *Flast* "would be quite at odds with its narrow application in our precedent." 547 U.S. 332, 348 (2006). It therefore dismissed the action because "state taxpayers have no standing under Article III to challenge state tax or spending decisions simply by virtue of their status as taxpayers." *Id.* at 346.

*Flast*, then, has no application to this case. Movants attempt to intervene to defend a state agency's decision to deny a charter school application—a far cry from an exercise of Congress's power under the Taxing and Spending Clause. *See, e.g.*, *Higganbotham v. Oklahoma ex rel. Okla. Transp. Comm'n*, 328 F.3d 638, 641 (10th Cir. 2003) ("The Supreme Court thus far has recognized only one exception to this rule: a taxpayer may have standing to challenge Congressional action taken pursuant to the Spending Clause when the action allegedly violates the Establishment Clause of the First Amendment."); *Chrisman v. C.I.R.*, 82 F.3d 371, 373 n.1 (10th Cir. 1996) ("Under the limited exception to the general bar on taxpayer challenges to decisions concerning appropriations, in order to achieve standing, a taxpayer must demonstrate a logical link between his status as a

taxpayer and the exercise of congressional power under the taxing and spending clause of the Constitution[.]"). Movants thus lack Article III standing.

Perhaps sensing their *Flast* argument is untenable, Movants contend that Oklahoma law grants them standing in federal court. Mot. at 13 ("individually enforceable state-law taxpayer rights"). But that argument fares no better.

Parties may litigate in state court even when they wouldn't otherwise satisfy the requirements of Article III. But that doesn't mean that a party with a state-law right can automatically sue in federal court. Indeed, the Supreme Court in *Hollingsworth* dealt with this precise scenario and dismissed for lack of standing.

*Hollingsworth* arose when same-sex couples challenged California's Proposition 8 in federal court. Proposition 8 amended California's constitution to prohibit same-sex marriage. *Hollingsworth*, 570 U.S. at 701. Its proponents—who were state citizens—intervened to defend the initiative alongside state government officials. *Id.* at 702. When the district court ruled for the plaintiffs, the state officials declined to appeal. *Id.*

The citizen proponents, however, appealed. *Id.* The Ninth Circuit then certified a question to the California Supreme Court asking whether, under California law, proponents of a state proposition could legally defend its validity and constitutionality. *Id.* at 702-03. The California Supreme Court held that, under California law, the proponents were authorized to defend the validity of Proposition 8 and to appeal any judgment invalidating it. *Perry v. Brown*, 52 Cal. 4th 1116, 1127 (2011).

Relying on that answer, the Ninth Circuit found standing. But the Supreme Court reversed, holding that the proponents lacked Article III standing even though, under state

law, they had the ability to defend the initiative. That's because, for Article III purposes, "[t]heir only interest in having the District Court order reversed was to vindicate the constitutional validity" of Proposition 8. *Hollingsworth*, 570 U.S. at 706. And that interest was nothing more than a generalized grievance, insufficient to support standing. *Id.* The Supreme Court explained that it did not "question California's sovereign right to maintain an initiative process, or the right of initiative proponents to defend their initiatives in California courts, where Article III does not apply." *Id.* at 714-15. "But … standing in federal court is a question of federal law, not state law. And no matter its reasons, the fact that a State thinks a private party should have standing to seek relief for a generalized grievance cannot override our settled law to the contrary." *Id.*

*Hollingsworth* applies fully here. Regardless of whether Oklahoma courts permit "standing … based … on the status of its members as *taxpayers*," *Okla. Pub. Emps. Ass'n v. Okla. Dep't of Cent. Servs.*, 55 P.3d 1072, 1078 (Okla. 2002), "standing in federal court is a question of federal law, not state law," *Hollingsworth*, 570 U.S. at 715. And as previously explained, "the bar on taxpayer standing" "must be applied with rigor." *Hein*, 551 U.S. at 609; *see supra*, at 8-11.

**C. Movants' other alleged interests are generalized grievances.**

Movants' other two alleged legal interests—preventing the possible diversion of resources from their public schools and preventing public funding of a charter school that may engage in religious discrimination (Mot. at 13-14)—also fail to establish standing. At bottom, both theories rest on the type of "generally available grievance about government" that the Supreme Court has "repeatedly held" is insufficient to confer jurisdiction.

*Hollingsworth*, 570 U.S. at 706. Article III instead requires a "concrete and particularized" injury that is "actual or imminent," not conjectural or widely shared. *Lujan*, 504 U.S. at 560. Movants allege no such injury.

Movants' "divergence of funds" theory falters from the start, as, their own open-ended language suggests. *See* Mot. at 14 ("Ben Gamla *could* divert" funds away from secular schools) (emphasis added). Any divergence of funds is dependent on a chain of contingencies: that Plaintiffs prevail, students from Movants' schools transfer to Ben Gamla, and any resulting funding changes materially affect Movants. And even if Ben Gamla eventually prevails and students transfer to the school, there is still no guarantee Movants' schools would be harmed. Rather, as the Supreme Court has recognized "[w]hen a government expends resources … its budget does not necessarily suffer." *Winn*, 563 U.S. at 136. That outcome is "pure speculation," *id.*, especially because charter school funding is based on the funding attributable to each student enrolled, Okla. Stat. Ann. tit. 70 § 3-142(A), (C). Movant's speculation about potential financial injury to their children's schools is thus a far cry from the concrete injury Article III demands. *Winn*, 563 U.S. at 136. In short, Movants' "[a]llegation[ ] of [a] *possible* future injury" based on a "highly attenuated chain of possibilities" does not suffice for standing. *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409-10 (2013).

Similarly, Movants lack a "direct and particular financial interest" in the suit necessary for a concrete and particularized injury. *Doremus*, 342 U.S. at 434-35. Their concern about the allocation of public education funds is indistinguishable from the interests of every parent, student, and taxpayer in Oklahoma. *See Hein*, 551 U.S. at 600 ("Interest in the

moneys of the Treasury is shared with millions of others." (cleaned up)). Such claims are paradigmatic generalized grievances that do not present cognizable injury under Article III. *Id.* at 599-600.

Moreover, even if Movants had a legally cognizable interest in preventing the divergence of funding, that injury is not traceable to Ben Gamla or the Board. Any funding effects that might arise are the product of legislative choice, not the decision to grant Ben Gamla's charter application. The Oklahoma Legislature has already authorized the use of public funds for the charter school program. Okla. Stat. Ann. tit. 70, § 3-142(A), (C). And even if the rejection of Ben Gamla's application were upheld, funds would continue flowing to other charter schools. If Movants believe public schools will be underfunded because of the charter school program generally, their fight lies with the Legislature—not with Ben Gamla. A win here simply will not redress their claims. As the Tenth Circuit has recognized, when the alleged injury is the result of "the independent action of some third party not before the court … Article III does not" allow that claim in court. *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005) (cleaned up). Because any asserted financial effects depend on intervening policy choices, Movants' interest here is insufficient to establish standing.

Movants' claim that they have an interest in preventing the funding of schools that may engage in religious discrimination fares no better. Mot. at 16. Again, there is no "legally cognizable interest in ensuring that [public] funds are not used by the Government in a way that violates the Constitution." *Hein*, 551 U.S. at 599 (emphasis omitted). These "type[s] of interest[s] [are] too generalized and attenuated" to give rise to "the kind of redressable

'personal injury' required for Article III standing." *Id.*; *see also id.* at 612 (federal courts are not "forums for taxpayers' 'generalized grievances'"). That principle forecloses any finding of standing here.

What's more, Movants' claim is, again, pure speculation. Even if Ben Gamla ultimately prevails, and even if some religious charter schools were to adopt religious hiring or admissions standards, it does not follow that Movants will be affected. Not all charter schools will choose to adopt religious policies, and any such downstream effects remain entirely conjectural. *See Clapper*, 568 U.S. at 410.

In short, Movants' asserted interests are conjectural, widely shared, and dependent on a cascade of contingencies untethered to this litigation. They therefore lack the concrete, particularized, and redressable injury that Article III demands.

**II. Movants cannot intervene as of right.**

Beyond lacking standing, Movants also fail to meet Rule 24(a)'s requirements to intervene. Specifically, Movants fail to allege a sufficient legal interest to warrant intervention. *See San Juan Cnty. v. United States*, 503 F.3d 1163, 1203 (10th Cir. 2007).

"Whether an applicant has an interest sufficient to warrant intervention as a matter of right is a highly fact-specific determination." *Coal. of Ariz./N.M. Cntys. for Stable Econ. Growth v. Dep't of the Interior*, 100 F.3d 837, 841 (10th Cir. 1996). A would-be intervenor must show that its "substantial legal interest" would be impaired by denial. *WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992, 995 (10th Cir. 2009). "[P]ractical judgment must be applied in determining whether the strength of the interest and the potential risk of injury to that interest justify intervention." *San Juan Cnty.*, 585 F.3d at 1199. For an interest

to be substantial, it must not be "too contingent," "too indirect" or too generalized. *Id.* at 1202 (emphasis omitted). Indeed, an "intervenor cannot rely on an interest that is wholly remote or speculative." *Id.* at 1203 (cleaned up).

As noted previously, Movants assert three supposedly protectable interests: (1) a right as an Oklahoma taxpayer "to challenge the unlawful or unconstitutional expenditure of state funds," (2) an interest in preventing diversion of public resources away from Movants' secular schools, and (3) an interest in protecting "existing constitutional protections at work and school." Mot. at 13-15. All fall short.

As a threshold matter, because Movants lack standing to protect any of these interests, they cannot claim a substantial interest vindicable by a federal court, even in the intervention context. *See Chiles v. Thornburgh*, 865 F.2d 1197, 1212-13 (11th Cir. 1989) (noting that standing cases "are relevant to help define the type of interest that the intervenor must assert"). After all, "if any taxpayer's generalized concern about the use of their tax dollars is insufficient to bring a suit but is considered substantial and direct enough to intervene in other suits, what is to prevent all [Oklahoma] taxpayers from intervening in a suit such as this one?" *Ark Encounter, LLC v. Stewart*, 311 F.R.D. 414, 419 (E.D. Ky. 2015).

But even if Movants had standing, they still would not have a protectable interest because their claimed interests are too generalized and speculative.

This is especially true with Movants' supposed interest as Oklahoma taxpayers. Again, any injuries resulting from an allocation of tax money are "too indeterminable, remote, uncertain and indirect." *Doremus*, 342 U.S. at 433. Rather they are the paradigmatic

example of a "generalized grievance," *Hollingsworth*, 570 U.S. at 706, that cannot serve as a protectable interest justifying intervention.

Next, Movants' claimed interest in preventing the divergence of funding similarly fails. As discussed above, any change in funding to Movants' schools is purely hypothetical. *See E. Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1002 (9th Cir. 2024) ("Incidental effects … [are] attenuated and speculative.").

Indeed, the Tenth Circuit has dismissed similarly speculative economic harm as an insufficient interest. In *Ozarks*, a municipality sought to condemn facilities owned by a local electric cooperative. 79 F.3d at 1041. The local cooperative's wholesale supplier sought to intervene, claiming it had a financial interest in the litigation. *Id.* at 1042. Namely, it argued that an unfavorable result would lead to an increase in costs for its other customers. The Tenth Circuit rejected this argument because the limited financial stakes were "too contingent," "too indirect," and "hardly substantial." *San Juan Cnty.*, 503 F.3d at 1202 (emphasis omitted). That same reasoning means that Movants' no-divergence-of-funding interest fails.

Finally, Movants' general interest in preventing alleged discrimination likewise falls short. Again, this "type of interest is too generalized and attenuated." *Hein*, 551 U.S. at 599; *see also Lujan*, 504 U.S. at 573-74. More is required for intervention. "An intervenor must specify a 'particularized interest rather than a generalized grievance.'" *Am. Ass'n of People with Disabilities v. Herrera*, 257 F.R.D. 236, 246 (D.N.M. 2008) (quoting *Thornburgh*, 865 F.2d at 1212). Movants fail to do so here and intervention should be denied.

**III. Movants do not satisfy the requirements for permissive intervention.**

"Rule 24(b)(1)(B) governing permissive intervention provides that, on timely motion, the court may permit anyone to intervene who 'has a claim or defense that shares with the main action a common question of law or fact.'" *Tri-State Generation and Transmission Ass'n v. N.M. Pub. Regul. Comm'n*, 787 F.3d 1068, 1074 (10th Cir. 2015).

Movants fail to satisfy the requirements for permissive intervention for the same reasons they fail to satisfy the requirements for intervention as of right. Because they seek relief that is different and broader than the relief sought by existing Defendants, Movants must show independent Article III standing, which they fail to do. *See supra*, 8-16; *see City of Herriman v. Bell*, 590 F.3d 1176, 1183-84 (10th Cir. 2010) (holding district court abused its discretion by granting permissive intervention because a political subdivision lacked "independent standing and the authority to bring [an] equal protection claim"); *Washington v. Food & Drug Admin.*, 108 F.4th 1163, 1171, 1178 (9th Cir. 2024) (denying intervention both as of right and permissively because movant sought "separate relief" without "independent standing"); *United States v. RaPower-3, LLC*, 341 F.R.D. 311, 313-14, 317 (D. Utah 2022) ("Where Prospective Intervenors have failed to establish their injury will likely be redressed by a favorable decision, they lack standing to intervene of right. For the same reason, Prospective Intervenors lack standing for permissive intervention.") (collecting cases). This Court should thus deny permissive intervention as well.

**CONCLUSION**

For the foregoing reasons, this Court should deny intervention.

Dated: April 22, 2026

Respectfully submitted,

/s/ Eric S. Baxter

Eric S. Baxter
DC Bar No. 479221
Eric C. Rassbach
TX Bar No. 24013375
Daniel L. Chen
DC Bar No. 1781783
Phillip J. Allevato*
CA Bar No. 362581
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
(202) 955-0095
*ebaxter@becketfund.org*

** Not a member of the DC Bar; admitted in California. Practice limited to cases in federal court.*

Robert G. McCampbell
OBA No. 10390
David A. Herber
OBA No. 33527
GABLEGOTWALS
499 W. Sheridan Ave., Suite 2200
Oklahoma City, OK 73102
Tel 405-235-5500
*RMcCampbell@Gablelaw.com*

*Attorneys for Plaintiffs*

# Ben Gamla's Opposition to Moore Intervenors' Motion to Intervene, filed below on May 7, 2026, as ECF No. 85

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., *et al.*,

*Plaintiffs*,

v.

GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma, *et al.*,

*Defendants*.

Case No. 5:26-cv-00582-R

**PLAINTIFFS' RESPONSE IN OPPOSITION TO SECOND MOTION TO INTERVENE (DKT. 66)**

Robert G. McCampbell
OBA No. 10390
David A. Herber
OBA No. 33527
GABLEGOTWALS
499 W. Sheridan Ave., Suite 2200
Oklahoma City, OK 73102
Tel 405-235-5500
*RMcCampbell@Gablelaw.com*
*DHerber@Gablelaw.com*

Eric S. Baxter
DC Bar No. 479221
Eric C. Rassbach
TX Bar No. 24013375
Daniel L. Chen
DC Bar No. 1781783
Benjamin A. Fleshman
DC Bar No. 1781280
Phillip J. Allevato*
CA Bar No. 362581
Siena A. Marcelle
DC Bar No. 90043763
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
(202) 955-0095
*ebaxter@becketfund.org*

**Not a member of the DC Bar; admitted in California. Practice limited to cases in federal court.*

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 1

LEGAL STANDARD ........ 4

ARGUMENT ........ 4

I. Movants lack Article III standing to intervene. ........ 5

A. Movants seek different relief so they must establish Article III standing. ........ 5

B. Movants do not have Article III standing. ........ 6

1. Movants' claimed interest in disability protections does not establish standing. ........ 7

2. Movants' claimed interest in preserving constitutional rights does not establish standing. ........ 11

3. Movants' claimed interest in public funding does not establish standing. ........ 12

II. Movants cannot intervene as of right. ........ 15

III. Movants cannot permissively intervene. ........ 17

CONCLUSION ........ 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Christian Sch. Tuition Org. v. Winn*,
563 U.S. 125 (2011) .......... 13

*Chiles v. Thornburgh*,
865 F.2d 1197 (11th Cir. 1989) .......... 15

*City of Herriman v. Bell*,
590 F.3d 1176 (10th Cir. 2010) .......... 17

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .......... 11

*City of Stilwell v. Ozarks Rural Elec. Co-op. Corp.*,
79 F.3d 1038 (10th Cir. 1996) .......... 4

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 7, 13

*Coal. of Ariz./N.M. Cntys. for Stable Econ. Growth v. Dep't of Interior*,
100 F.3d 837 (10th Cir. 1996) .......... 15

*Doe v. Hochul*,
139 F.4th 165 (2d Cir. 2025) .......... 10, 13

*Doe ex rel. Doe v. Hunter*,
796 Fed. App'x 532 (10th Cir. 2019) .......... 8, 9, 14

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 6, 9-10

*Habecker v. Town of Estes Park*,
518 F.3d 1217 (10th Cir. 2008) .......... 7, 11, 14, 15

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) .......... 6

*Kane County v. United States*,
928 F.3d 877 (10th Cir. 2019) .......... 5

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 6, 7, 12

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) .......... 11

*Nova Health Sys. v. Gandy*,
416 F.3d 1149 (10th Cir. 2005) .......... 6, 11, 14

*O'Shea v. Littleton*,
414 U.S. 488 (1974) .......... 11

*Rocky Mountain Wild v. Dallas*,
98 F.4th 1263 (10th Cir. 2024) .......... 5

*S. Utah Wilderness All. v. Kempthorne*,
525 F.3d 966 (10th Cir. 2008) .......... 16

*Safe Streets All. v. Hickenlooper*,
859 F.3d 865 (10th Cir. 2017) .......... 5

*San Juan County v. United States*,
503 F.3d 1163 (10th Cir. 2007) .......... 15, 16

*Simon v. E. Ky. Welfare Rts. Org.*,
426 U.S. 26 (1976) .......... 6

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 8

*Drummond ex rel. State v. Okla. Statewide Virtual Charter Sch. Bd.*,
558 P.3d 1 (Okla. 2024) .......... 2

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 13

*Town of Chester v. Laroe Ests., Inc.*,
581 U.S. 433 (2017) .......... 4, 5

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 14

*Tri-State Generation & Transmission Ass'n v. N.M. Pub. Regul. Comm'n*,
787 F.3d 1068 (10th Cir. 2015) .......... 17

*Trump v. New York*,
592 U.S. 125 (2020) .......... 14

*United States v. RaPower-3, LLC*,
341 F.R.D. 311 (D. Utah 2022) .......... 17

*Washington v. FDA*,
108 F.4th 1163 (9th Cir. 2024) .......... 17

*WildEarth Guardians v. U.S. Forest Serv.*,
573 F.3d 992 (10th Cir. 2009) .......... 15

**Statutes**

Okla. Stat. Ann. tit. 70, § 3-136 .......... 9, 15

**Other Authorities**

34 C.F.R. § 200.64 .......... 12

Fed. R. Civ. P. 24 .......... 4

15 *Moore's Federal Practice* § 101.40 (3d ed. 1997) .......... 8

## INTRODUCTION

Five residents of Oklahoma move to intervene to protect programs and services at their children's state-funded charter schools. But like the Oklahoma taxpayers who sought intervention earlier in this case, the five Movants here seek relief that is far different and broader than that sought by the existing Defendants. So Movants must show they possess Article III standing. They have failed to do so.

Movants' alleged injuries—worries about lost disability protections, concerns about diminished constitutional protections, and fears about lost government funding—are not cognizable because they are speculative, hypothetical, and remote. What's more, even if Movants could demonstrate Article III injuries, they have separately failed to demonstrate that these injuries are directly traceable to Ben Gamla's actions. That's because Movants' rights are either already separately secured by state law or are wholly contingent on the independent actions of third parties not before this Court.

Similarly, Movants lack any protectable legal interest in this litigation. Their stated interests are too contingent and indirect, so they cannot intervene as of right. And Movants have also failed to demonstrate that they are entitled to permissive intervention.

For these reasons, this Court should deny Movants' motion for intervention.

## FACTUAL BACKGROUND

In December 2025, Plaintiff Peter Deutsch, a former Democratic congressman from Florida, founded the National Ben Gamla Jewish Charter School Foundation, Inc. ("Ben Gamla") in Oklahoma. Dkt. 1 ¶¶ 55, 63, 65 ("Compl."). Ben Gamla applied to the Oklahoma Statewide Charter School Board to create a charter school where students would

receive a rigorous academic education alongside a deep cultural and ethical grounding derived from the Jewish faith, heritage, and tradition. *Id.* ¶¶ 65-77. The Board rejected Ben Gamla's application twice—first in February 2026, and again on March 9 after Ben Gamla amended its application to cure alleged defects not at issue in this lawsuit. *Id.* ¶¶ 83-104. This second time, the Board identified Ben Gamla's religious identity as the sole reason for the denial, citing the Oklahoma Charter Schools Act's ("OCSA") nonsectarian requirement and the Oklahoma Supreme Court's decision in *Drummond ex rel. State v. Oklahoma Statewide Virtual Charter School Board*, 558 P.3d 1 (Okla. 2024). *Id.* ¶¶ 100-04.

Ben Gamla filed this suit against Drummond and the Board on March 24, 2026, and moved for a preliminary injunction three days later.

In response, Drummond filed a motion to dismiss, arguing he has "no role in the administration of the [OCSA], the processing or denial of charter school applications, or the enforcement of the OCSA's nonsectarian requirement." Dkt. 52 at 1. He expressly takes "no position" on this proceeding's "constitutional or statutory questions." *Id.* at 2. Drummond further claims that he "exercises no control over the Board's application decisions," though he simultaneously notes his "authority to represent the interests of the State of Oklahoma and its citizens in matters arising under the Oklahoma Charter Schools Act" and expressly refuses to "waive[ ]" that legal authority. *Id.* at 1 n.1, 3. Separately, Drummond filed a state-court mandamus petition seeking to compel the Board to identify additional, non-constitutional grounds for rejecting Ben Gamla's charter application. Pet. for Writ of Mandamus, *Drummond v. Okla. Statewide Charter Sch. Bd.*, No. CV-2026-649

(Okla. Cnty. Dist. Ct. Mar. 11, 2026); Compl. ¶ 105. But in that petition, Drummond failed to make a substantive defense of the OCSA's nonsectarian requirement.

The Board filed an Answer and admitted to most of Ben Gamla's allegations, agreeing that this Court should enjoin the OCSA's nonsectarian requirement and declare it unconstitutional. Dkt. 59 at 15. Indeed, in its response to Plaintiffs' motion for preliminary injunction, the Board expressly agrees with Plaintiffs' legal arguments, notes that "an injunction is necessary for Board Members to comply with their oath of office," and requests that the Court "grant Plaintiffs' motion for preliminary injunction." Dkt. 63 at 17.

On April 1, a group of seven Oklahoma taxpayers moved to intervene, claiming their status as taxpayers entitled them to participate in this lawsuit. Dkt. 15. Plaintiffs opposed that motion to intervene. Dkt. 77.

On April 24, a different group of five Oklahoma residents also sought intervention. Dkt. 66 ("Mot."). All five Oklahoma residents are parents of children who attend Oklahoma charter schools; four are parents of children who receive disability accommodations under Section 504 of the Rehabilitation Act. *Id.* at 1-2. Together, these Movants state that they "believe that [their] children's ability to have and maintain a Section 504 disability accommodation plan depends on public charter schools remaining public" and that Plaintiffs' litigation may "result in … loss of eligibility for state funding." Dkt. 66-1 ¶ 10; Dkt. 66-2 ¶¶ 10, 12, 16; Dkt. 66-3 ¶¶ 7, 10, 12; Dkt. 66-4 ¶ 6; Dkt. 66-5 ¶¶ 14, 16, 18. They also contend that allowing Plaintiffs to set up a religious charter school would permit their own charter schools to "extinguish" their children's constitutional rights. Dkt. 66-1 ¶ 12; Dkt. 66-2 ¶ 18; Dkt. 66-3 ¶ 14; Dkt. 66-4 ¶ 10; Dkt. 66-5 ¶ 20.

Movants also argue that none of the existing Defendants seek the relief necessary to vindicate Movants' alleged interests. *See* Mot. at 5-6, 21-22 (explaining that Drummond seeks to be dismissed as an improper party and that the Board has no objection to Plaintiffs' requested relief). On that basis, they seek to intervene and participate in this litigation.

**LEGAL STANDARD**

Intervention as of right is appropriate where, among other things, a third party "claims an interest relating to the property or transaction" at issue that would be "impair[ed] or impede[d]" by the "action" and is not "adequately represent[ed]" by the existing parties. Fed. R. Civ. P. 24(a)(2). Permissive intervention is a matter of the Court's discretion, *City of Stilwell v. Ozarks Rural Elec. Co-op. Corp.*, 79 F.3d 1038, 1043 (10th Cir. 1996), and may be appropriate where the third party "has a claim or defense that shares with the main action a common question of law or fact," Fed. R. Civ. P. 24(b)(1)(B). Additionally, putative intervenors "must demonstrate Article III standing" when they seek "relief that is different from that which is sought by a party with standing." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439-40 (2017).

**ARGUMENT**

Movants are not entitled to intervene for multiple reasons. Most fundamentally, because they seek relief that is broader than the relief sought by existing Defendants, they must demonstrate Article III standing. But Movants' alleged interests in defending disability protections, constitutional rights, and government funding do not establish Article III standing. That's because Movants have not suffered a cognizable injury in fact, nor have they demonstrated that any injury is caused or fairly traceable to this litigation involving

Ben Gamla. Furthermore, Movants fail to satisfy the requirements for intervention under Rule 24. This Court should thus deny intervention.

**I. Movants lack Article III standing to intervene.**

**A. Movants seek different relief so they must establish Article III standing.**

Intervenors "must demonstrate Article III standing" when they seek relief that is different from that which is sought by the party with standing. *Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1286 n.5 (10th Cir. 2024) (quoting *Town of Chester*, 581 U.S. at 439-40). This requirement to show standing applies to both plaintiff-intervenors and defendant-intervenors. *Kane County v. United States*, 928 F.3d 877, 887 n.12 (10th Cir. 2019) ("*Town of Chester* involved a plaintiff-side intervenor, but we see no reason not to apply that rule to defendant-side intervenors as well."); *accord Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 912 (10th Cir. 2017) ("Article III's requirements apply to *all* intervenors, whether they intervene to assert a claim or defend an interest.").

Here, Movants expressly acknowledge that "[n]o existing party to this case" represents their interests, and they argue that they "are the only parties capable of articulating and protecting" those interests. Mot. at 23. Movants seek a judicial ruling that "charter schools in Oklahoma are, in label and in fact, public schools and state actors." *Id.* at 24. That relief, they concede, is different from the relief sought by the Board and Drummond—who either agree with Ben Gamla on the merits or seek only "to dismiss this action as to [Drummond] on the basis that he is not a proper party" but whose "motion is silent as to the constitutionality of the challenged provision of the [OCSA]." *Id.* at 21-22.

Accordingly, under binding Supreme Court and Tenth Circuit precedent, Movants must show that they have Article III standing to intervene in this case.

**B. Movants do not have Article III standing.**

To show standing, a party must "possess a direct stake in the outcome of the case." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (cleaned up). "This requires the litigant to prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Id.* at 704 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). To show an injury in fact, a party "must seek a remedy for a personal and tangible harm." *Id.* And that harm or injury must be "concrete and particularized," as well as "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560.

A party must also demonstrate traceability, which requires a party to show that his injuries "likely will be caused by the defendant's conduct." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). "Like the injury in fact requirement, the causation requirement screens out plaintiffs who were not injured by the defendant's action." *Id.* at 383.

For an injury to be "fairly traceable" to the opposing party, it cannot be "the result of the independent action of some third party not before the court." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1155-56 (10th Cir. 2005) (quoting *Lujan*, 504 U.S. at 560). If "speculative inferences are necessary to connect [a party's] injury to the challenged action," this burden has not been met. *Id.* at 1157 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 45-46 (1976)).

Movants incorrectly argue that they are "not required to show [that] a particular harm will result, but only [that] it is 'possible.'" Mot. at 7 (internal quotation marks omitted). But "[s]tanding is not an ingenious academic exercise in the conceivable." *Lujan*, 504 U.S. at 566 (internal quotation marks omitted). Rather, a "threatened injury must be *certainly impending*," and "'[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Although a harm's traceability "need not rise to the level of proximate causation, Article III does 'require proof of a substantial likelihood'" that the opposing party caused the moving party's injury. *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1225 (10th Cir. 2008).

Here, Movants assert three theories of injury. First, Movants argue that this litigation will harm their children's disability protections under Section 504 of the Rehabilitation Act. Second, they claim that this litigation will lead to the loss of their children's constitutional rights, as they allege their children's charter schools will be free to discriminate in the areas of free speech, religion, and expression. Third, Movants contend that this litigation will lead to lower funding from state and federal sources. None of these theories suffice for standing.

**1. Movants' claimed interest in disability protections does not establish standing.**

Four of the five Movants claim that if charter schools are properly designated as private schools, they "will lose critical anti-discrimination and equal access protections." Mot. at 9. This argument fails both the injury-in-fact and traceability requirements for standing.

First, "[a] 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). Standing should be denied if "the injury is only hypothetical in the sense that the plaintiff *could* have been injured, but was not." *Doe ex rel. Doe v. Hunter*, 796 Fed. App'x 532, 537 (10th Cir. 2019) (quoting 15 *Moore's Federal Practice* § 101.40(4)(b)(i) (3d ed. 1997)).

Here, Movants' injuries are speculative, hypothetical, and remote. In their declarations, the Movants repeatedly state in boilerplate language that they "believe" their children's Section 504 accommodation plans "depend[ ] on public charter schools remaining public." *See, e.g.*, Dkt. 66-2 ¶¶ 10, 12; Dkt. 66-3 ¶¶ 7, 10; Dkt. 66-4 ¶ 6; Dkt. 66-5 ¶¶ 14, 16. But nowhere in their declarations do Movants say anything about what their charter schools have promised them, whether those schools would continue to offer disability accommodations to their children, and whether those accommodations are guaranteed by Section 504 and nothing else.

In similar circumstances, the Tenth Circuit refused to find standing. In *Doe ex rel. Doe v. Hunter*, Jane Doe, an unborn child acting through her father, sought to challenge the exceptions for legal abortions in the fetal-homicide laws of the United States and Oklahoma. 796 Fed. App'x at 533-34. The district court noted that the complaint repeatedly used the term "could"—that Doe *could* be subjected to an abortion—and that the complaint was "conspicuously silent as to the actual intent of Doe's mother." *Id.* at 535 (cleaned up). Accordingly, the district court dismissed for lack of standing.

The Tenth Circuit affirmed, adopting the district court's reasoning. It explained that allegations that harms that "could" or "can" happen "do not establish a concrete,

particularized injury." *Id.* at 536. So too here, as Movants simply repeat statements regarding their "belie[fs]" about losing disability accommodations. Dkt. 66-2 ¶¶ 10, 12; Dkt. 66-3 ¶¶ 7, 10; Dkt. 66-4 ¶ 6; Dkt. 66-5 ¶¶ 14, 16. Without more—especially any information concerning the requirements of the law or the "actual intent" of Movants' charter schools—Movants have only stated a hypothetical and speculative injury. *Hunter*, 796 Fed. App'x at 535, 537 ("[H]ypotheticals do not establish that Doe is subject to any risk, much less a substantial risk[.]").

Second, Movants also fail the traceability requirement. Movants assert that their alleged loss of disability protections is directly traceable to Ben Gamla's litigation. If this Court rules in favor of Ben Gamla and holds that charter schools are private schools, that—Movants contend—will mean the end of their disability accommodations.

But Oklahoma law already independently requires every charter school to comply with federal and state disability law. Section 70-3-136(A)(6) of the OCSA expressly states that "[a] charter school or virtual charter school shall comply with all federal and state laws relating to the education of children with disabilities in the same manner as a school district." Okla. Stat. Ann. tit. 70, § 3-136(A)(6). This requirement applies as a matter of Oklahoma statutory law, not because of the public-private question at issue in this case. Thus, any injury Movants would suffer would not be traceable to this litigation because the disability protections Movants seek to protect are already secured by state law.

When confronted with similar traceability problems, courts have consistently found that parties lack standing. In *FDA v. Alliance for Hippocratic Medicine*, for example, physicians who objected to providing abortion-related treatment sued to enjoin the FDA

from relaxing dispensing requirements for abortion-inducing drugs. 602 U.S. at 372-73. The physicians claimed that they could be required—against their consciences—to render treatment to complete abortions. *Id.* at 387. The Supreme Court held that the physicians lacked standing because existing federal conscience laws already protected them. *Id.* at 387. Moreover, the Supreme Court specifically faulted the doctors for failing to provide any evidence that those conscience laws failed to protect them. *Id.* at 388.

Similarly, in *Doe v. Hochul*, 139 F.4th 165 (2d Cir. 2025), the Second Circuit found that an unborn child, Baby Nicholas, lacked standing to challenge a New York statute abolishing the crime of fetal homicide. The plaintiff alleged that because Defendants no longer enforced fetal homicide laws, he was at greater risk of harm from his mother's former partner, who had a history of domestic violence. *Id.* at 187. But the Second Circuit disagreed, finding that existing criminal laws "would surely provide some deterrence to such an act of violence." *Id.* at 188. Citing *Alliance for Hippocratic Medicine*, the Court held that "when another statute would impede the alleged harm from occurring, the 'chain of causation' is broken and traceability is lacking." *Id.*

Those cases are directly applicable here. Like the plaintiffs in *Alliance for Hippocratic Medicine*, Movants have not provided any evidence in their declarations showing that their schools will fail or refuse to accommodate their children and provide disability services consistent with state law. And like the plaintiffs in *Alliance for Hippocratic Medicine* and *Hochul*, Oklahoma law already provides the disability protections that Movants fear will be harmed. Therefore, like the plaintiffs in *Alliance for Hippocratic Medicine* and *Hochul*, "the 'chain of causation' is broken and traceability is lacking." *Hochul*, 139 F.4th at 188.

**2. Movants' claimed interest in preserving constitutional rights does not establish standing.**

Movants next argue that they have an interest in "asserting their children's right[s] under the Oklahoma and United States Constitutions." Mot. at 19. But that argument fails for at least two reasons. First, Movants' argument relies on a chain of "speculative inferences … to connect [their] injury to the challenged action." *Habecker*, 518 F.3d at 1225. Second, and relatedly, Movants' argument relies on "the independent action of some third party not before the court." *Nova Health*, 416 F.3d at 1158. In other words, any injury to Movants' claimed constitutional rights would come about only through the hypothetical future actions of some third party—something the Supreme Court has repeatedly said is insufficient to confer standing. *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-07 (1983) (collecting cases); *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) (no standing where prospect of future constitutional injury rested "on the likelihood that [plaintiffs] will again be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before petitioners").

An injury to Movants' claimed constitutional rights would arise only if (1) the Movants' charter schools were actually public, rather than private, entities,[1] (2) the Movants sought to exercise one of their claimed rights, and (3) the Movants' charter schools took some

[1] Movants' argument begs the question in this regard, assuming that their schools are public entities and that Movants presently could assert their hypothetical constitutional claims against their charter schools in the first instance. If, as Ben Gamla argues, charter schools are private entities, then Movants' claimed constitutional rights are merely illusory as the Constitution does not apply to private actors. *See Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019).

independent action that infringed on Movants' claimed rights. Movants' argument thus posits a hypothetical situation where they might someday need to assert one of any number of rights against their school for a not-yet-identified violation of those claimed rights. But Movants have identified nothing to suggest that their schools would do anything to jeopardize their interests, or that the hypothetical future conduct of their schools is in any way attributable to Ben Gamla's efforts to have its rights vindicated. Thus, Movants are worried about a hypothetical injury that might someday be committed by a third party, which cannot confer standing upon them to intervene in this case.

**3. Movants' claimed interest in public funding does not establish standing.**

Finally, Movants' asserted interest in preserving state and federal funding for charter schools likewise fails to establish standing. Movants claim Ben Gamla's litigation risks decreasing public funding for charter schools, but that theory rests on speculation and hinges on a chain of contingencies and the independent actions of third parties not before the Court. Such hypothetical harms fall well short of the "concrete and particularized" and "actual or imminent" injury that Article III requires. *Lujan*, 504 U.S. at 560.

Movants first argue that if charter schools are reclassified as private schools, "all the[ir] school's Title I funds would disappear." Mot. at 15. But Title I funds remain available to private schools under existing law. Rather than receiving funds directly, private schools receive funding through Local Educational Agencies ("LEAs") under a statutorily prescribed framework. *See* 34 C.F.R. § 200.64(a)(1)-(2). Indeed, Movants concede as much. *See* Mot. at 15 (acknowledging the same). Thus, because existing law "would

impede the alleged harm from occurring, the 'chain of causation' is broken and traceability is lacking." *Hochul*, 139 F.4th at 188; *see supra* pp. 9-10.

Movants' fallback theory—that this new framework will yield reduced Title I funding—fares no better. It is "pure speculation" to assume that a change in funding mechanism necessarily results in less funding. *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 136 (2011). Movants must first demonstrate that LEAs would reduce funding for their specific schools, but they point to no such evidence, let alone that any funding would not be replaced from different sources or funding mechanisms, or that any services or programs for their children would actually be affected. Rather, it is equally likely that schools could maintain their services through alternative allocations or funding. *Cf. id.* at 136 ("When the government expends resources … its budget does not necessarily suffer.").

Indeed, any reduction in funding or services is dependent on (1) an LEA, exercising its independent discretion, allocating fewer resources to Movants' schools based on the private school designation; (2) school administrators, in turn, reducing programming in response to those decisions; and (3) that programming tangibly affecting the educational experience for Movants' children. Such conjectural and contingent harms are insufficient to establish the "concrete and particularized" injury required for Article III standing. *See Clapper*, 568 U.S. at 410-11 (no cognizable injury where plaintiffs can only speculate that a series of contingent events will occur); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (rejecting standing premised on a similarly speculative chain of possibilities); *Winn*, 563 U.S. at 136 ("economic and political speculation" insufficient to establish standing).

Movants' final claim that they have a protectable interest in maintaining state aid for charter schools fails for similar reasons. Here, Movants speculate that a ruling in Ben Gamla's favor would prompt the Oklahoma Legislature to abandon all funding for charter schools, and if that happens, they claim their children's schools would close. Mot. at 17-18. Again, simply claiming that they "could" suffer a future injury means Movants' "injury is only hypothetical" and insufficient to confer Article III standing. *Hunter*, 796 Fed. App'x at 537 (cleaned up); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 437-38 (2021) ("mere risk of future harm" is not enough); *Trump v. New York*, 592 U.S. 125, 133 (2020) ("The Government's eventual action will reflect both legal and practical constraints, making any prediction about future injury just that—a prediction.").

And even if Movants could show they would lose public funding for their schools (they cannot), Movants still must show Ben Gamla's conduct "caused [Movants'] injury in fact." *Nova Health*, 416 F.3d at 1156 (collecting cases). But any loss of funding that could happen cannot be traced to Ben Gamla.

Oklahoma's charter schools are already either public or private. All Ben Gamla seeks is approval as a charter school. It is not responsible for the multiple intervening and independent events that would have to take place before Movants experienced any harm. *See supra* pp. 13-14. Each link in this chain is highly speculative, and multiple links depend on an independent actor (typically a government body) taking a particular responsive action. But no LEA, school board, or state legislature is a party in this case. So any independent decision that they may make about funding "breaks the chain of causation." *Habecker*, 518 F.3d at 1226. "Without this link" Movants' asserted financial injury "cannot

be said to be fairly traceable" to Ben Gamla and "does not give rise to standing" necessary for Movants to intervene. *Id.*

**II. Movants cannot intervene as of right.**

For the same reasons that Movants lack standing, Movants also fail to meet Rule 24(a)'s requirements to intervene: they have failed to allege a sufficient legal interest to warrant intervention. *See Chiles v. Thornburgh*, 865 F.2d 1197, 1212-13 (11th Cir. 1989) (standing cases "are relevant to help define the type of interest that the intervenor must assert").

"Whether an applicant has an interest sufficient to warrant intervention as a matter of right is a highly fact-specific determination." *Coal. of Ariz./N.M. Cntys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 841 (10th Cir. 1996). A prospective intervenor must show that they have a "substantial legal interest" that would be impaired by denial. *WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992, 995 (10th Cir. 2009). An interest that is "too contingent" on future events, "too indirect," or too generalized is insufficient because an "intervenor cannot rely on an interest that is wholly remote and speculative." *San Juan County v. United States*, 503 F.3d 1163, 1202-03 (10th Cir. 2007) (en banc) (emphasis omitted). All of Movants' interests fail this standard.

First, Movants' assertion that they will lose disability benefits is worse than speculative; it's demonstrably wrong. The OCSA already requires all charter schools to provide the same level of benefits for children with disabilities as public schools. *See* Okla. Stat. Ann. tit. 70, § 3-136(A)(6). Even if disability benefits were reliant solely on charter school contractual obligations, Movants have not included any details or allegations about what their schools have promised them, whether the schools would try to refuse granting

disability accommodations if they were labeled private schools, and whether Section 504 is the sole reason they provide disability accommodations. *See supra* pp. 8-9. In other words, a long chain of uncertain events (including actions violating state law) would need to take place before any of Movants' children lose benefits. Movants simply state that they "believe" they'll lose disability accommodations, but that is not enough for intervention. *See id*.

Second, Movants' claimed interest in preserving the ability to one day assert constitutional claims against entirely distinct parties over as-yet-unknown conduct that violates an undefined set of rights rests entirely on predictions about the hypothetical conduct of third parties. *See supra* pp. 11-12. It is thus so "wholly remote and speculative" that it cannot support intervention. *San Juan County*, 503 F.3d at 1203.

Finally, Movants' concerns about the loss of federal and state funding similarly rest on speculation about the actions of other government entities. As explained, Title I funding would still be available to private schools, even if the mechanism for distributing that funding is slightly different. *See supra* pp. 12-13. There is no guarantee (or even a substantial likelihood) that Movants' schools will lose their Title I funding. It is similarly speculative to guess at what the Oklahoma Legislature may choose to do with state funding for charter schools in the wake of any ruling from this Court. *See supra* pp. 14-15. If Movants' concerns ever materialize, "Movants may press any legal claims they might have against the Government" at that juncture. *S. Utah Wilderness All. v. Kempthorne*, 525 F.3d 966, 970 (10th Cir. 2008) (affirming denial of motion to intervene).

**III. Movants cannot permissively intervene.**

"Rule 24(b)(1)(B) governing permissive intervention provides that, on timely motion, the court may permit anyone to intervene who 'has a claim or defense that shares with the main action a common question of law or fact.'" *Tri-State Generation & Transmission Ass'n v. N.M. Pub. Regul. Comm'n*, 787 F.3d 1068, 1074 (10th Cir. 2015).

Movants fail to satisfy the requirements for permissive intervention for the same reasons they fail to satisfy the requirements for intervention as of right. Because they seek relief that is different and broader than the relief sought by existing Defendants, Movants must show independent Article III standing, which they fail to do. *See supra* pp. 5-15; *see City of Herriman v. Bell*, 590 F.3d 1176, 1183-84 (10th Cir. 2010) (holding district court abused its discretion by granting permissive intervention because a political subdivision lacked "independent standing and the authority to bring [an] equal protection claim"); *Washington v. FDA*, 108 F.4th 1163, 1171, 1178 (9th Cir. 2024) (denying intervention both as of right and permissively because movant sought "separate relief" without "independent standing"); *United States v. RaPower-3, LLC*, 341 F.R.D. 311, 313-14, 317 (D. Utah 2022) ("Where Prospective Intervenors have failed to establish their injury will likely be redressed by a favorable decision, they lack standing to intervene of right. For the same reason, Prospective Intervenors lack standing for permissive intervention.") (collecting cases). This Court should thus deny permissive intervention.

**CONCLUSION**

This Court should deny Movants' motion to intervene.

Dated: May 7, 2026

Respectfully submitted,

/s/ Eric S. Baxter

Eric S. Baxter
DC Bar No. 479221
Eric C. Rassbach
TX Bar No. 24013375
Daniel L. Chen
DC Bar No. 1781783
Benjamin A. Fleshman
DC Bar No. 1781280
Phillip J. Allevato*
CA Bar No. 362581
Siena A. Marcelle
DC Bar No. 90043763
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
(202) 955-0095
*ebaxter@becketfund.org*

*Not a member of the DC Bar; admitted in California. Practice limited to cases in federal court.*

Robert G. McCampbell
OBA No. 10390
David A. Herber
OBA No. 33527
GABLEGOTWALS
499 W. Sheridan Ave., Suite 2200
Oklahoma City, OK 73102
Tel 405-235-5500
*RMcCampbell@Gablelaw.com*
*DHerber@Gablelaw.com*

*Attorneys for Plaintiffs*

# Board's Opposition to Moore Intervenors' Motion to Intervene, filed below on May 7, 2026, as ECF No. 86

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., *et al.*,

*Plaintiffs*,

v.

GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma, *et al.*,

*Defendants*.

Case No. 5:26-cv-00582-R

**OKLAHOMA STATEWIDE CHARTER SCHOOL BOARD DEFENDANTS' RESPONSE IN OPPOSITION TO MOTION TO INTERVENE**

## INTRODUCTION

Movants—parents of children who attend brick-and-mortar or virtual charter schools—raise important concerns to the operation of charter schools. State and federal benefits—via disability services, Title I funding, and eligibility for State Aid—and protecting students' constitutional rights are vital aspects of education administration in Oklahoma.

According to Movants, the availability or provision of these benefits or protections hinges on the classification of charter schools as "public schools" or "private schools." But that distinction is not at issue in this litigation. Here, Ben Gamla asks this Court to determine whether the Oklahoma Charter Schools Act's religious exclusion violates the United States Constitution. To be sure, part of that determination is a narrow analysis of whether a charter school is engaged in state action under 42 U.S.C. § 1983. But a judicial decision that Oklahoma charter school operators are not engaged in state action for the purposes of a First Amendment claim will not immediately or inherently transform charter schools into private educational institutions. Nor will the provision of state and federal benefits or students' constitutional rights be jeopardized by a determination that a severable provision of state statute violates the Constitution. Because Movants' alleged consequences are too speculative to be direct, substantial, or legally protectable interests, and because they lack standing to intervene, this Court should deny the motion.

## BACKGROUND

In December 2025, Ben Gamla Jewish Charter School submitted a formal application for initial virtual charter school authorization to the Oklahoma Statewide

Charter School Board. Compl., ECF No. 1 at ¶ 65. The application materials indicated that "students will receive instruction in Jewish religion, culture, values, rituals, texts, holidays, and practices" and that the school "seeks to provide outstanding academic and co-curricular programs infused with a Jewish understanding of the human person and grounded in the enduring Jewish values of truth (*emet*), beauty (*yofi*), and goodness (*tov*), as expressed in Jewish thought and tradition." *Id.* at ¶¶ 72, 75.

In February 2026, the Board denied the application, citing the Oklahoma Supreme Court's decision in *Drummond v. Oklahoma Statewide Virtual Charter School Board*, 558 P.3d 1 (Okla. 2024), and the Oklahoma Charter Schools Act's religious exclusion, Okla. Stat. tit. 70, § 3-136(A)(2). ECF No. 1-4 at 3.[1] After the denial, Ben Gamla submitted a revised application. ECF No. 1-5. In March 2026, the Board denied Ben Gamla's revised application. This time, the sole reason for denial of the revised application was Ben Gamla's religious character. ECF No. 1-6.

Ben Gamla filed the present federal lawsuit challenging the constitutionality of the Act's religious exclusion. ECF No. 1 at ¶¶ 107–51. Ben Gamla asserts claims under the Free Exercise and Equal Protection Clauses, arguing that the Board's denial of its revised application violated these constitutional provisions. *Id.* at ¶¶ 107–51. Defendants in this action are the Board and the Oklahoma Attorney General. *Id.* at ¶¶ 14, 15–24. Movants filed this Motion to join as Intervenor-Defendants. Mot. to Intervene, ECF No. 66.

[1] References to ECF documents are to the ECF-numbered pages.

## ARGUMENT

### I. MOVANTS' INTERESTS ARE NOT DIRECT, SUBSTANTIAL, OR LEGALLY PROTECTABLE, NOR INADEQUATELY REPRESENTED.

Federal Rule of Civil Procedure 24(a)(2) requires a movant seeking intervention as of right to establish "(1) timeliness, (2) an interest relating to the property or transaction that is the subject of the action, (3) the potential impairment of that interest, and (4) inadequate representation by existing parties." *Barnes v. Sec. Life of Denver Ins. Co.*, 945 F.3d 1112, 1121 (10th Cir. 2019) (citation omitted). The Board does not dispute the timeliness of the Motion. But Movants do not prove the remaining elements for intervention as of right.

Movants have the burden to show that they assert a "direct, substantial, and legally protectable" interest relating to the transaction that is the subject of the action. *Id.* at 1118. "A protectable interest is one that would be impeded by the disposition of the action." *Id.* at 1122 (quoting *W. Energy All. v. Zinke*, 877 F.3d 1157, 1165 (10th Cir. 2017)). That interest must be practical and direct, not speculative or contingent on future events. *See San Juan Cnty. v. United States*, 503 F.3d 1163, 1203 (10th Cir. 2007). And while intervention may be based on interests that are "contingent upon the outcome of the litigation," interests that are "*too* contingent, *too* indirect and hardly substantial" do not warrant intervention as of right. *San Juan Cnty.*, 503 F.3d at 1202–03 (citations omitted).

Movants claim that the outcome of this case will result in the loss of federal and state funding for Oklahoma charter schools. ECF No. 66 at 13–23. Specifically, they point to the loss of disability services, Title I, and State Aid funding. *Id.* They also assert an

interest in preserving their children's constitutional rights. *Id.* at 24. Movants argue that, currently, charter schools and students only receive these benefits and protections because charter schools are "public schools." *Id.* at 6–9. And that if this Court determines charter schools are private—not state—actors, Oklahoma charter schools and students will lose access to these important benefits. *Id.* at 9. But that is not what at issue in this case.

Here, Ben Gamla only asks this Court to determine whether the Oklahoma Charter Schools Act's religious exclusion, Okla. Stat. tit. 70, § 3-136(A)(2), violates the United States Constitution. ECF No. 1 at ¶¶ 107–51. Certainly, part of that determination involves this Court's narrow analysis of whether a charter school is engaged in state action under 42 U.S.C. § 1983. *Id.* at ¶¶ 121, 130, 141, 150. But the determination of whether a private actor is engaged in state action is different from a determination of whether a school itself if "private" or "public." *See Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 812 (9th Cir. 2010) (stating that "We therefore begin with the recognition that [the state legislature] has statutorily defined a charter school as a 'public school' . . . However, because the conduct of a private corporation is at issue, our inquiry does not end there" before engaging in a state action analysis); *see also Carson v. Makin*, 596 U.S. 767, 782–86 (2022).

So this Court's decision that Oklahoma charter schools are not engaged in state action for the purposes of the First Amendment will not automatically transform charter schools into private educational institutions. Nor can it.

It's important to note that the Oklahoma Charter Schools Act contains a severability clause. Okla. Stat. tit. 70, § 3-145.10. So even if this Court finds that Oklahoma charter

school operators are not state actors, and thus entitled to First Amendment rights, only the challenged provision—§ 3-136(A)(2)—would be void. The remainder of the Oklahoma Charter Schools Act—and its ample requirements to follow federal and state law—would stay intact and legally enforceable in the future.[2]

So Movants' collateral concerns are too attenuated to justify intervention as of right. *See San Juan Cnty.*, 503 F.3d at 1202. While Movants may be concerned about hypothetical issues, these issues are not currently, and may never be, before this Court. *United States v. Michigan*, 424 F.3d 438, 444 (6th Cir. 2005) (denying intervention as of right where "the proposed intervenors seem more concerned about what will transpire *in the future"* as a result of a district court's decision). They are therefore too contingent to justify intervention in this case.

---

[2] Okla. Stat. tit. 70, § 3-132.2(B) ("The State Board of Education shall be responsible for accreditation of charter schools and virtual charter schools and ensure compliance with special education laws and federal laws and programs administered by the State Board of Education."); 3-134(I)(7) (delineating the Board's authority to "[m]onitor, in accordance with charter contract terms, the performance and legal compliance of charter schools and virtual charter schools"); 3-136(A)(1) ("a charter school or virtual charter schools shall comply with all federal regulations and state and local rules and statutes relating to health, safety, civil rights, and insurance"); 3-136(A)(6) ("A charter school or virtual charter school shall comply with all federal and state laws relating to the education of children with disabilities in the same manner as a school district[.]"); 3-136(A)(9) ("A charter school or virtual charter school shall be as equally free and open to all students as traditional public schools and shall not charge tuition or fees[.]"); 3-137(D) ("The sponsor may deny the request for renewal if it determines the charter school or virtual charter school has failed to complete the obligations of the contract or comply with the provisions of the Oklahoma Charter Schools Act."); 3-137(F) ("A sponsor may terminate a contract during the term of the contract for failure to meet the requirements for student performance contained in the contract and performance framework, failure to meet the standards of fiscal management, violations of the law, or other good cause."); 3-167(B) ("School districts shall not be exempted from forming, convening or participating in an advisory council or committee if required by federal law or regulation.").

Even if Movants could establish impairment of a direct, substantial, and legally protectable interest, they fail to show inadequacy of representation. *See Kane Cnty. v. United States*, 928 F.3d 877, 892 (10th Cir. 2019). First, the Board has no intention of arguing that charter schools should become ineligible for state or federal benefits and did not do so in the *Drummond* litigation. Second, when objectives are shared, adequate representation is presumed, even when the party in the case is a government entity. *See Tri-State Generation & Transmission Ass'n, Inc. v. N.M. Pub. Regul. Comm'n*, 787 F.3d 1068, 1074 (10th Cir. 2015). Movants' desired outcome is consistent with Defendant Attorney General Gentner Drummond's previous assertions before the Oklahoma and United States Supreme Courts that charter schools are state actors and "public schools." Br. in Opp'n, Okla. Statewide Charter Sch. Bd. v. Drummond, 605 U.S. 165 (2025) (No. 24-394), 2024 WL 5104000, at *20–21; Br. for Resp't, Okla. Statewide Charter Sch. Bd. v. Drummond, 605 U.S. 165 (2025) (Nos. 24–394, 24–396), 2025 WL 1002809, at *18. Lastly, Movants cannot prove inadequacy by stressing some unique argument that only they will raise. "[R]epresentation is not inadequate simply because the applicant and the representative disagree regarding the facts or law of the case." *Kane Cnty.*, 928 F.3d at 892 (citation omitted). The fact that Movants wish to advance additional policy arguments or employ different litigation tactics does not establish inadequate representation. *See* 7C Fed. Prac. & Proc. Civ. § 1909 (Wright & Miller, 3d ed.). Intervention as of right is improper.

## II. PERMISSIVE INTERVENTION SHOULD BE DENIED.

This Court should also deny permissive intervention. Denying permissive intervention is appropriate here for several reasons, including the same reasons given above

for denying intervention as of right. Federal Rule of Civil Procedure 24(b) permits permissive intervention when a movant "has a claim or defense that shares with the main action a common question of law or fact." Whether to grant permissive intervention is discretionary, *City of Stilwell v. Ozarks Rural Electric Cooperative Corporation*, 79 F.3d 1038, 1043 (10th Cir. 1996), and it may be denied for any reason "rationally relevant," *Daggett v. Commission on Government Ethics and Election Practices*, 172 F.3d 104, 113 (1st Cir. 1999).

Courts also question whether "intervention would only clutter the action unnecessarily[.]" *Arney v. Finney*, 967 F.2d 418, 421 (10th Cir. 1992). Movants' unique legal theories and factual perspectives about state and federal benefits do not have direct, legal bearing on issue presented to this Court: the constitutionality of the Act's religious exclusion. Permissive intervention will cause "undue delay and potentially obfuscate the relevant issues in the lawsuit." *W. Energy All. v. Jewell*, No. CIV 16-0912 WJ/KBM, 2017 WL 3600741, at *8 (D.N.M. Jan. 13, 2017); *see also id.* (allowing Movants to "inject their own agenda into this case . . . only prejudice[d] the existing parties to this lawsuit trying to resolve the issues that were raised in the Complaint").

Movants' concerns are best addressed through amicus participation. District courts have "broad discretion in allowing participation of *amicus curiae*." *Oregon-California Trails Ass'n v. Walsh*, 467 F. Supp. 3d 1007, 1073 (D. Colo. 2020) (citation omitted). Amicus participation is a well-established and adequate vehicle for presenting policy arguments and broader institutional concerns that extend beyond the immediate parties' interests. The Board does not oppose Movants' participation as amicus curiae, and this

Court would remain free to consider Movants' briefed arguments. *See Pub. Serv. Co. of New Mexico v. Barboan*, 857 F.3d 1101, 1114 (10th Cir. 2017).

## III. MOVANTS LACK ARTICLE III STANDING TO INTERVENE.

"[A]n intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 440 (2017); *see also Kane Cnty.*, 928 F.3d at 887 n.12 ("*Town of Chester* involved a plaintiff-side intervenor, but we see no reason not to apply that rule to defendant-side intervenors as well."). The Board, in the *Drummond* litigation, argued that charter schools are not state actors. *See* Resp'ts' Br in Opp'n to Pet's. Pet. for Writ of Mandamus & Decl. J., Drummond v. Okla. Statewide Virtual Charter Sch. Bd., No. MA-121694 (Okla. Nov. 21, 2023). Nothing about its litigation position has changed since. *See* Answer, ECF No. 59. And the Oklahoma Attorney General refuses to take a position on the merits. *See* Mot. to Dismiss, ECF No. 52 at 2; Resp. to Mot. for Prelim. Inj., ECF No. 64 at 4 n.4 (taking "no position . . . on the merits of Plaintiffs' constitutional claims"); *cf.* Pet. for Writ of Mandamus, Drummond v. Okla. Statewide Charter Sch. Bd., No. CV-2026-649 (Okla. Cnty. Dist. Ct. Mar. 11, 2026) (taking "**no position** . . . on the constitutional or statutory questions") (emphasis in original). So Movants would be the only party seeking to argue that charter schools are state actors. Therefore, Movants must possess Article III standing to intervene. *Kane Cnty.*, 928 F.3d at 886–87.[3]

---

[3] Movants cannot rely on "piggyback standing" because they are the only party seeking to argue that charter schools are state actors. *Diamond v. Charles*, 476 U.S. 54, 64 (1986) (explaining that piggybacking on "the State's undoubted standing exists only if the State is in fact an appellant before the Court").

Article III standing requires a party to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Town of Chester*, 581 U.S. at 438 (citation omitted). An injury in fact is one that is concrete and particularized and actual or imminent. *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1231 (10th Cir. 2020).

Movants' stated intention is to "protect their children's access to equal education at public charter schools, their children's access to targeted support services provided to low-income students, their children's opportunity to choose a public charter schools that serves their unique needs, and preserve their children's constitutional rights as public school students." ECF No. 66 at 4. But as shown above, these consequences are speculative and hypothetical to the outcome of this litigation. The Movants have not, and cannot, show that injury is concrete and particularized and actual or imminent.

## CONCLUSION

This Court should deny the Motion to Intervene.

Respectfully submitted this 7th day of May, 2026.

*/s/ Anthony J. Ferate*
Anthony J. Ferate, OBA No. 21171
SPENCER FANE LLP
9400 North Broadway Extension, Suite 600
Oklahoma City, Oklahoma 73114
(405) 844-9900
ajferate@spencerfane.com

Hiram S. Sasser, III, OBA No. 19557
Holly M. Randall,* OBA No. 34763
Erin E. Smith,* OBA No. 35232
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075
(972) 941-4444
hsasser@firstliberty.org
hrandall@firstliberty.org
esmith@firstliberty.org

**Admitted pro hace vice.*

***Attorneys for Oklahoma Statewide Charter School Board Defendants***

# District Court Order granting Kaiman Intervenors' and Moore Intervenors' Motions to Intervene, filed below on June 3, 2026, as ECF No. 89

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., et al.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. CIV-26-582-R** |
| **GENTER DRUMMOND, in his official capacity as Attorney General of Oklahoma, et al.,** | ) | |
| **Defendants.** | ) | |

**ORDER**

After the Oklahoma Statewide Charter School Board denied Plaintiffs' application to operate a religious charter school, Plaintiffs initiated this lawsuit asserting claims under the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. A group of Oklahoma taxpayers and a group of parents of children that attend Oklahoma charter schools have each separately moved to intervene in this action as defendants [Doc. Nos. 15, 66]. Plaintiffs and the Charter School Board defendants each filed a response opposing intervention [Doc. Nos. 76, 77, 85, 86] and the proposed-intervenors filed separate reply briefs [Doc. Nos. 80, 88]. Because the proposed intervenors are entitled to intervene as of right, or in the alternative permissively, the motions are granted.

### ***Background***

Plaintiffs, the National Ben Gamla Jewish Charter School Foundation Inc. and its founder Peter Deutsch, seek to establish a virtual charter school in Oklahoma that has a distinctive religious mission grounded in the Jewish faith. Compl. [Doc. No. 1] ¶¶ 65-77. However, under Oklahoma law, a charter school must be "nonsectarian in its programs, admission policies, employment practices, and all other operations." Okla. State. tit. 70, § 3-136(A)(2). Recently, in *Drummond ex rel. State v. Oklahoma Statewide Virtual Charter Sch. Bd.*, 558 P.3d 1 (Okla. 2024), the Oklahoma Supreme Court upheld this nonsectarian requirement, concluding that a charter school is a state actor, the creation of a religious charter school violates the Establishment Clause of the First Amendment, and the Free Exercise Clause of the First Amendment does not apply to a state-created school. *Drummond* was affirmed on appeal by an equally divided Supreme Court. *Oklahoma Statewide Charter Sch. Bd. v. Drummond ex rel. Oklahoma*, 605 U.S. 165 (2025).

Consistent with *Drummond*, the Oklahoma Statewide Charter School Board denied Plaintiffs' charter school application based on the school's religious character. Compl. ¶¶ 81-103. Significant here, several members of the Charter School Board expressed disagreement with the *Drummond* decision during their consideration of Plaintiffs' application. *Id.*

Plaintiffs then initiated this lawsuit against the members of the Charter School Board in their official capacities and the Oklahoma Attorney General in his official capacity. Plaintiffs allege that the nonsectarian requirement discriminates against religious institutions in violation of the Free Exercise Clause of the First Amendment and the Equal

Protection Clause of the Fourteenth Amendment. They seek a declaration that the nonsectarian requirement contained in Oklahoma state law is unconstitutional and an injunction prohibiting Defendants from enforcing the law. The Board filed an Answer [Doc. No. 59] indicating it does not oppose Plaintiffs' requested relief. The Attorney General filed a Motion to Dismiss [Doc. No. 52] arguing that he is not a proper party to this action.

Against this backdrop, two separate groups seek to intervene under Federal Rule of Civil Procedure 24. First, a group of Oklahoma Taxpayers (who also attend or have children that attend Oklahoma public schools) argue they have an interest in ensuring their tax dollars do not fund religious instruction in public schools, funds are not diverted to a religious school that would not be appropriate for their children, and the constitutional protections enjoyed by charter school students and teachers are preserved. Second, a group of Oklahoma Families who have children that attend charter schools argue they have an interest in ensuring that charter schools maintain their designation as public schools, and the consequent funding, services, and constitutional protections that designation provides. Plaintiffs and the Board object to intervention, arguing that both groups lack standing and do not satisfy the requirements for intervention outlined in Rule 24.

***Discussion***

Rule 24 provides two mechanisms for intervention: intervention as of right and permissive intervention. The proposed interveners invoke both avenues, contending that they are entitled to intervene as of right or, in the alternative, permissively. But before addressing each of those arguments, the Court resolves an antecedent issue raised by

Plaintiffs and the Board: whether the proposed intervenors must independently establish Article III standing.

**A. Standing**

Citing to *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433 (2017), Plaintiffs and the Board contend the proposed-intervenors must establish Article III standing to intervene in this action, which they cannot do. In *Town of Chester*, 581 U.S. at 440, the Supreme Court held that "an intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing." But notably, *Town of Chester* involved a plaintiff-side intervenor and it was unclear whether he was seeking relief that was different than the relief sought by the existing plaintiff, specifically a separate money judgment in his own name. *Id.* at 440. Faced with those circumstances, the Supreme Court applied the "simple rule" that "[a]t least one plaintiff must have standing to seek each form of relief requested" to an intervening plaintiff:

> For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right. Thus, at the least, an intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests.

*Id.* at 439. Subsequent Supreme Court decisions have similarly recognized that an intervenor must establish independent Article III standing when the intervenor is seeking additional relief or independently invoking a federal court's jurisdiction, such as by appealing a decision the preexisting parties do not challenge. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,* 591 U.S. 657, 674 n.6 (2020) (finding that appellate court erred by inquiring into intervening defendant's independent Article III

standing where the intervenor sought the same relief as the appellant); *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019) (explaining that "it was not previously incumbent on the [intervening defendant] to demonstrate its standing" where it appeared in support of preexisting defendant at trial and on appeal "[b]ecause neither role entailed invoking a court's jurisdiction").

Here, unlike in *Town of Chester,* the proposed-intervenors seek to intervene as defendants for the sake of opposing, not pursuing, any form of judicial relief.[1] Plaintiffs and the Board point out that the existing Defendants are either seeking dismissal from the case or do not oppose the requested relief. Thus, the proposed-intervenors would be the only litigants seeking to defend the constitutionality of the challenged statute. But that does not change the fundamental posture of the case. There is presently a justiciable controversy[2] between the existing parties and the proposed-intervenors are not seeking any additional relief or invoking the Court's jurisdiction. Under these circumstances, the proposed-intervenors are not required to independently demonstrate their Article III standing. *See Greater Chautauqua Fed. Credit Union v. Marks,* No. 1:22-CV-2753

[1] In *Kane Cnty v. United States*, 928 F.3d 877, 887 n.12 (10th Cir. 2019) ("*Kane III*"), the Tenth Circuit applied *Town of Chester's* holding to a defense-side intervenor but held that the intervenor could rely on the standing of the preexisting defendant because it was not seeking different relief. Notably, the Tenth Circuit also explicitly rejected the proposition, previously stated as dicta in *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 913 (10th Cir. 2017), "that 'any party' seeking to intervene must demonstrate its own independent Article III standing." *Id.* at 887 n.11. Rather, the Tenth Circuit explained that an intervenor could "piggyback" on the standing of a preexisting party where there was a live case or controversy and the intervenor did not seek different relief. *Id.*

[2] Although the Board seemingly agrees with Plaintiffs' legal arguments regarding the constitutionality of the statute and do not oppose Plaintiffs' requested relief, its refusal to grant Plaintiffs' application suffices to preserve a justiciable dispute. *See United States v. Windsor,* 570 U.S. 744, 759 (2013) ("The Government's position—agreeing with Windsor's legal contention but refusing to give it effect—meant that there was a justiciable controversy between the parties[.]").

(MKV), 2023 WL 2744499, at *6 (S.D.N.Y. Mar. 31, 2023) ("They do not seek relief different than that sought by any party with standing; in fact, they do not seek any traditional relief at all: they request no money judgment, no declaratory judgment, and no injunction."); *Brumback v. Ferguson*, 343 F.R.D. 335, 345 (E.D. Wash. 2022) ("A defendant is not the injured party in a lawsuit and its presence does not invoke the power of the federal court."); *Env't Integrity Project v. Wheeler*, No. 20-CV-1734 (KBJ), 2021 WL 6844257, at *2 (D.D.C. Jan. 27, 2021) (then Judge Jackson concluding that defendant intervenors "are not required to demonstrate that they have Article III standing" because they "are not invoking the Court's jurisdiction – let alone seeking relief that is broader than or different from the party invoking the Court's jurisdiction") (quotation marks and alterations omitted); *AAAG-California, LLC v. Kisana,* 553 F. Supp. 3d 1042, 1047 (D. Utah 2021) ("Courts generally do not require parties opposing judicial relief to demonstrate standing[.]"); *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 938 n.3 (N.D. Tex. 2019) ("Putative Intervenors, on the other hand, do not ask the Court to do anything; they do not raise a counterclaim, cross-claim, or any other claim for relief.")

**B. Intervention as of Right**

Issues of standing now resolved, the Court turns to the proposed-intervenors contention that they are entitled to intervene in this action as of right. The Tenth Circuit "has historically taken a liberal approach to intervention and thus favors the granting of motions to intervene." *W. Energy All. v. Zinke*, 877 F.3d 1157, 1164 (10th Cir. 2017) (quotation marks omitted). And, pertinent to this case, "the requirements for intervention

may be relaxed in cases raising significant public interests." *Kane III*, 928 F.3d at 890 (quotation marks omitted).

Rule 24(a)(2) "provides that a 'court must permit anyone to intervene' who, (1) 'on timely motion,' (2) 'claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest,' (3) 'unless existing parties adequately represent that interest.'" *Berger v. N. Carolina State Conf. of the NAACP*, 597 U.S. 179, 190 (2022) (quoting Fed. R. Civ. P. 24(a)(2) (brackets omitted). No one disputes that both motions to intervene, which were filed less than a month after the Complaint and before any significant litigation developments, are timely. The Court therefore focuses its analysis on the remaining requirements, both of which are contested.

The primary dispute amongst the litigants concerns Rule 24(a)(2)'s interest and impairment requirement. To meet this requirement, "an applicant 'must have an interest that could be adversely affected by the litigation.'" *Kane III*, 928 F.3d at 891 (quoting *San Juan Cnty. v. United States*, 503 F.3d 1163, 1199 (10th Cir. 2007) (abrogated on other grounds)). "The sufficiency of an applicant's interest is a highly fact-specific determination," *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 295 F.3d 1111, 1115 (10th Cir. 2002), that requires the application of "'practical judgment' when 'determining whether the strength of the interest and the potential risk of injury to that interest justify intervention.'" *Kane III*, 928 F.3d at 891 (quoting *San Juan Cnty.*, 503 F.3d at 1199). These "are not rigid, technical requirements" but are instead "a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with

efficiency and due process." *San Juan Cnty.,* 503 F.3d at 1195 (quotation marks omitted). "Although the intervenor cannot rely on an interest that is wholly remote and speculative, the intervention may be based on an interest that is contingent upon the outcome of the litigation." *Id.* at 1203 (quotation marks omitted). The burden is "minimal" and is generally satisfied if the intervenor "would be substantially affected in a practical sense by the determination made in the action." *WildEarth Guardians v. U.S. Forest Serv.,* 573 F.3d 992, 995 (10th Cir. 2009) (quotations marks omitted).

Here, the Oklahoma Taxpayers and the Oklahoma Families argue that they have protectable interests that may be impaired if they are not allowed to intervene. Starting with the Oklahoma Taxpayers (who are also students or parents of students at Oklahoma public schools), they contend they have an important interest in vindicating their right under state law to ensure their tax dollars are spent lawfully,[3] in preventing the diversion of limited public resources away from their nonsectarian schools and to a religious school, and in preserving the constitutional protections that charter school teachers and students currently enjoy. Regardless of whether these interests are sufficient to confer standing, the Court is persuaded that they are sufficiently strong to support intervention, particularly given the significant public interests at stake and the lack of adverseness amongst the existing parties. As state taxpayers and parents of students at Oklahoma public schools, these proposed-intervenors have an interest in preventing the potentially unlawful use of their state tax

[3] *See White v. Stitt,* 579 P.3d 636, 642 (Okla. 2025) ("Taxpayers have a legal right to the lawful appropriation and expenditure of public funds."); *Oklahoma Pub. Emps. Ass'n v. Oklahoma Dep't of Cent. Servs.,* 55 P.3d 1072, 1078 (Okla. 2002) ("Thus, a taxpayer possesses standing to seek equitable relief when alleging that a violation of a statute will result in an illegal expenditure of public funds or the imposition of an illegal tax.").

dollars to fund a religious charter school and in preventing the diversion of funds from their nonsectarian public schools to a sectarian charter school. These interests would, as a practical matter, be impaired by a ruling in favor of Plaintiffs, which could result in a taxpayer funded religious school or a finding that charter schools are not state actors. *See Am. C.L. Union of Minnesota v. Tarek Ibn Ziyad Acad.,* No. CIV. 09-138DWFJJG, 2009 WL 2215072, at *5 (D. Minn. July 21, 2009) (concluding that taxpayers had standing to challenge a state spending program that disbursed public funds to a charter school that was allegedly nonsectarian); *see also Flast v. Cohen,* 392 U.S. 83, 103 (1968) (recognizing a narrow avenue for taxpayer standing in an Establishment Clause case).

The Oklahoma Families contend that they too have a protectable interest, and one that is different from the Oklahoma Taxpayers. They argue that, as the parents of children attending charter schools, they have a direct and substantial interest in ensuring that charter schools retain their designation as public schools, which ensures that the schools receive certain forms of federal and state funding as well as certain federal antidiscrimination protections. For similar reasons, the Court is persuaded that these interests and the risk of impairment to these interests is sufficiently strong to support intervention. The Oklahoma Families have an interest in protecting the services and funding that they currently receive at their charter schools. This interest is at risk of impairment given that a key issue in this case is whether a charter school is state actor. *See Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of City of St. Louis*, 894 F.3d 959, 965–66 (8th Cir. 2018) (finding that charter school parents suffered a concrete injury where an adverse ruling would result in a loss of school funding and a decline in quality).

Further, despite Plaintiffs' and the Board's protestations to the contrary, the interests of the proposed-intervenors are not so speculative or attenuated as to warrant denying intervention. The point of Plaintiffs' lawsuit is to declare the nonsectarian requirement in Oklahoma's charter school law unconstitutional so that they may establish a religious charter school. Resolution of their claims will almost certainly involve analyzing whether a charter school is a public school and whether the First Amendment prohibits the expenditure of public funds to support it. The interests of the proposed-intervenors in preventing the diversion of their tax dollars to a religious school and in maintaining the public-school status of their charter schools "could be" adversely affected by this case. *Kane III*, 928 F.3d at 891. The proposed-intervenors have therefore met their burden to show a potential impairment of their respective interests.

The remaining dispute, advanced only by the Board, concerns whether the existing parties adequately represent the interests claimed by the proposed intervenors. The burden of showing inadequate representation "is minimal, and it is enough to show that the representation 'may be' inadequate." *Kane III*, 928 F.3d at 892 (quotation marks omitted). "An applicant may fulfill this burden by showing collusion between the representative and an opposing party, that the representative has an interest adverse to the applicant, or that the representative failed in fulfilling his duty to represent the applicant's interest." *Sanguine, Ltd. v. U.S. Dep't of Interior*, 736 F.2d 1416, 1419 (10th Cir. 1984). However, a mere disagreement regarding the facts or law of the case is not sufficient. *Id.*

The proposed intervenors have met their minimal burden of showing that the existing parties will not adequately represent their interests. The Board does not oppose

Plaintiffs' requested relief and has previously expressed its disagreement with the *Drummond* decision. *See Coal. of Arizona/New Mexico Ctys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 845 (10th Cir. 1996) (finding inadequate representation where existing party's prior action demonstrated "reluctance" to provide a defense). As for the Attorney General, he is presently seeking dismissal from this action as an improper party. And although he has previously defended the lawfulness of the nonsectarian requirement, whether his predecessor will take the same position is far from clear. *See Zinke,* 877 F.3d at 1169 (10th Cir. 2017) (finding inadequate representation where a "change in the Administration raises the possibility of divergence of interest or a shift during litigation") (quotation marks omitted).

Additionally, the interests of the Oklahoma Taxpayers and the Oklahoma Families are sufficiently distinct such that intervention by one group does not preclude intervention by the other. For a proposed intervenor to establish inadequate representation by a representative party, "the possibility of divergence of interest need not be great[.]" *Kane III*, 928 F.3d at 894. Indeed, adequate representation requires the interests to "be *identical*, not just harmonious." *Kane Cnty. v. United States (Kane IV)*, 94 F.4th 1017, 1033 (10th Cir. 2024) (quotation marks omitted). Although the interests of the Oklahoma Families and the Oklahoma Taxpayers may overlap in certain ways, they are not entirely coextensive. The primary concern of the Oklahoma Taxpayers is preventing the diversion of the public funds to a religious school, whereas the Oklahoma Families are focused on protecting the funding and services that flow to a public charter school. Both groups have met their minimal

burden of showing that they may not be adequately represented by the existing parties, or the other proposed-intervenor.

Under the circumstances presented here, and without prejudging the merits of the underlying claims, the Court concludes that the proposed-intervenors are entitled to intervene as of right under Fed. R. Civ. P. 24(a).

**C. Permissive Intervention**

Proposed intervenors argue that, even if they are not entitled to intervene as of right, they should at least be granted permission to intervene under Rule 24(b)(2), which provides for permissive intervention upon the timely motion of anyone who "has a claim or defense that shares with the main action a common question of law or fact." The proposed-intervenors intend to present defenses that share common questions of law or fact with the main action, including whether charter schools are state actors or engaged in state action. *See City of Herriman v. Bell*, 590 F.3d 1176, 1184 (10th Cir. 2010) ("[T]he words 'claim or defense,' as they appear in Rule 24(b), should not be strictly interpreted so as to preclude permissive intervention."). Further, intervention will not cause undue delay or prejudice the adjudication of the existing parties' rights given the early stages of the litigation and the fact that the proposed-interveners are prepared to promptly file their responsive pleadings. The Board's concern that the intervention of two additional parties would unnecessarily "clutter" the action is unfounded and, in any event, undermined by its suggestion that the movants be allowed to participate as amicus curiae. Accordingly, as an alternative finding, permissive intervention is warranted.

### *Conclusion*

For the reasons stated above, both the Oklahoma Taxpayers and the Oklahoma Families are entitled to intervene under Fed. R. Civ. P. 24(a)(2). Alternatively, they are entitled to intervene under Fed. R. Civ. P. 24(b). Accordingly, the Motion to Intervene [Doc. No. 15] is GRANTED and the Motion to Intervene [Doc. No. 66] is GRANTED. The defendant-intervenors shall file their responsive pleadings within 14 days of the date of this order.

IT IS SO ORDERED this 3rd day of June, 2026.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE

# District Court Order granting Attorney General Drummond's Motion to Dismiss, filed below on June 9, 2026, as ECF No. 90

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., et al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. CIV-26-582-R** |
| **REBECCA WILKINSON, in her official capacity as Executive Director of the Statewide Charter School Board, et al.,** | ) | |
| **Defendants.** | ) | |

**ORDER**

The National Ben Gamla Jewish Charter School Foundation Inc. and its founder, Peter Deutsch, seek a declaration that a provision of Oklahoma state law requiring charter schools to be nonsectarian is unconstitutional. As defendants, Plaintiffs named the individual members of the Oklahoma Statewide Charter School Board in their official capacities and the Attorney General in his official capacity. Now before the Court is a Motion to Dismiss [Doc. No. 52] filed by the Attorney General contending that he is not a proper defendant because he has no role in the enforcement of the challenged provision. Plaintiffs responded in opposition [Doc. No. 81] and the Attorney General replied [Doc. No. 87]. For the reasons explained below, the Attorney General's Motion is granted, and he will be removed from the caption of this case.

### ***Relevant Background***

The Oklahoma Charter Schools Act provides for the establishment and operation of charter schools that are sponsored by various entities. Okla. Stat. tit. 70, § 30-132(A). The Act vests the Statewide Charter School Board with the "sole authority to sponsor" virtual charter schools, *id.* at § 3-132.1(A), requires the Board to establish procedures for approving or disapproving virtual charter school applications, *id.* at § 3-132.2(3), and empowers the Board to "accept or reject sponsorship of the virtual charter school" after receipt of an application. *Id.* at § 3-134(E)(3).

Consistent with these procedures, Plaintiffs submitted a charter school application to the Board seeking to establish a virtual charter school. The proposed charter school would have a "distinctive religious mission" that would include "instruction in Jewish religion, culture, values, rituals, texts, holidays, and practices." Compl. [Doc. No. 1] ¶¶ 75. The Board denied the application based on a provision of the Oklahoma Charter Schools Act that requires a charter school to "be nonsectarian in its programs, admission policies, employment practices, and all other operations." Okla. Stat. tit. 70, § 3-136(A)(2). The Board also relied on a recent Oklahoma Supreme Court decision finding that the "establishment of a religious charter school violates Oklahoma statutes, the Oklahoma Constitution, and the Establishment Clause." *Drummond v. Oklahoma Statewide Virtual Charter Sch. Bd.*, 558 P.3d 1, 15 (Okla. 2024) (affirmed by an equally divided Supreme Court in *Oklahoma Statewide Charter Sch. Bd. v. Drummond*, 605 U.S. 165, 166 (2025)).

Following the denial of the application, Plaintiffs initiated this lawsuit asserting claims under the Free Exercise Clause of the First Amendment and the Equal Protection

Clause of the Fourteenth Amendment. They seek a declaration that the nonsectarian requirement is unconstitutional and an injunction prohibiting Defendants from enforcing the requirement or otherwise denying Plaintiffs' eligibility to obtain a charter based on their religious identity. The Attorney General contends that he is not a proper defendant under *Ex Parte Young*, 209 U.S. 123 (1908), and is immune from suit under the Eleventh Amendment.

***Discussion***

"The Eleventh Amendment is a jurisdictional bar that precludes unconsented suits in federal court against a state and arms of the state." *Wagoner Cnty. Rural Water Dist. No. 2. v. Grand River Dam Auth.*, 577 F.3d 1255, 1258 (10th Cir. 2009). The immunity "extends to 'suit[s] against a state official in his or her official capacity' because such suits are 'no different from a suit against the State itself.'" *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

*Ex parte Young* provides an exception to this rule. Under this doctrine, "a plaintiff may sue individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks only prospective relief." *Hendrickson*, 992 F.3d at 965. "Before this exception applies, however, the state official, by virtue of his office, 'must have some connection with the enforcement' of the challenged law about which plaintiff complains." *Eaves v. Polis*, 167 F.4th 1304, 1313 (10th Cir. 2026) (quoting *Ex parte Young*, 209 U.S. at 157). "Though the official need not 'have a special connection to the unconstitutional act or conduct,' they must 'have a particular duty to

enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Free Speech Coal., Inc. v. Anderson*, 119 F.4th 732, 736 (10th Cir. 2024) (quoting *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007)). A "'generalized duty to enforce state law'" is, standing alone, insufficient to subject a state official to suit. *Hendrickson*, 992 F.3d at 967 (quoting *Bishop v. Oklahoma*, 333 F. App'x 361, 365 (10th Cir. 2009).

Here, Plaintiffs are challenging the nonsectarian requirement contained in the Oklahoma Charter Schools Act, but the Attorney General does not have any particular duty to enforce this provision. The Oklahoma Charter Schools Act empowers the Board, not the Attorney General, to deny virtual charter school applications. The Board is therefore vested with the power to enforce the nonsectarian requirement, and the Board did so in this case. The Attorney General's authority to "[t]o initiate or appear in any action in which the interests of the state or the people of the state are at issue" is insufficient to subject to him to suit where, as here, the challenged statute vests enforcement authority in a separate entity. Okla. Stat. tit. 74, § 18b(A)(3)

*Hendrickson*, 992 F.3d at 956, involved a similar scenario. There, a state employee sued his former union, the governor, and the attorney general seeking a declaration that a statute authorizing the union to serve as his exclusive representative violated his First Amendment rights. The statute placed the power to enforce the exclusive representation provision in an independent board whose members could not be removed by the governor. *Id.* at 966. Because the statute specifically vested the power to enforce the challenged provision in "a body independent of the Governor and the Attorney General," the Tenth

Circuit concluded that the governor and attorney general were not proper parties under *Ex parte Young*. *Id.* at 966-968. Likewise, here, the Oklahoma Charter Schools Act vests the power to enforce the nonsectarian requirement in a separate Board and Plaintiffs have not shown that the Attorney General exercises any authority over the Board.

Resisting this conclusion, Plaintiffs note that the Attorney General has twice sought mandamus relief against the Board. *See Drummond*, 558 P.3d at 6 (seeking writ of mandamus directing the Board to rescind a charter school contract for a religious school); *Drummond v. Okla. Statewide Charter Sch. Bd.*, No. CV-2026-649 (Okla. Cnty. Dis. Ct. March 11, 2026) (seeking writ of mandamus directing the Board to identify all non-constitutional grounds for rejection of Ben Gamla's application). But contrary to Plaintiffs' characterization, the Attorney General's resort to seeking mandamus relief suggests a lack of authority over the Board and an inability to enforce the Oklahoma Charter Schools Act. Because the Attorney General "does not enforce or give effect" to the nonsectarian requirement, he "cannot be named as a defendant in this case under the *Ex parte Young* exception to Eleventh Amendment immunity." *Free Speech Coal.*, 119 F.4th at 738-740 (10th Cir. 2024) (dismissing state attorney general because the challenged statute placed enforcement authority with private actors and the attorney general lacked power to direct their actions); *see also Peterson v. Martinez*, 707 F.3d 1197, 1207 (10th Cir. 2013) ("But when a state law explicitly empowers one set of officials to enforce its terms, a plaintiff cannot sue a different official absent some evidence that the defendant is connected to the enforcement of the challenged law.").

The two primary cases cited by Plaintiffs do not dictate a different result. Plaintiffs first cite *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014), in support of their argument that the Attorney General's ability and willingness to bring lawsuits against the Board demonstrates a practice of enforcing the statute. In *Kitchen*, 755 F.3d at 1200, the Tenth Circuit considered whether the state attorney general and governor were proper parties to an action by several Utah residents challenging a state law banning same-sex marriage. State law also provided that any county clerk that knowingly issued a marriage license for a prohibited marriage was guilty of a misdemeanor. *Id.* at 1202. The governor and attorney general maintained that they had "ample authority" to ensure the county clerks would comply with the same-sex marriage ban when issuing marriage licenses. *Id.* at 1202. Their position was supported by state law, which charged the governor with supervising ministerial officers and charged the attorney general with supervising the district attorneys that were responsible for filing criminal charges against noncompliant county clerks. *Id.* at 1202-03. The governor had also directed state agencies to consult with the attorney general about their compliance with the marriage ban. *Id.* Against that backdrop, the Tenth Circuit concluded "that the Governor's and the Attorney General's actual exercise of supervisory power and their authority to compel compliance from county clerks and other officials" established "the requisite nexus" between the officials and the challenged law.

Here, in contrast to the record presented in *Kitchen*, Plaintiffs have not shown that the Attorney General has any "supervisory power" over the Board, that the Attorney General is directing or consulting with the Board about its compliance with the challenged law, or that the Attorney General has the authority to compel compliance by filing criminal

charges against the individual Board members. The "nexus" between the challenged law and the state official's actual supervisory power and enforcement authority that was found to be sufficient in *Kitchen* is therefore not present here.

Plaintiffs' second case, *Chamber of Commerce of the United States of America v. Edmondson*, 594 F.3d 742 (10th Cir. 2010), is also distinguishable. In *Edmondson*, the Tenth Circuit concluded that the Oklahoma attorney general was a proper defendant in a lawsuit challenging a provision that required businesses contracting with the state to use a specific employment verification system. *Id.* at 573-57. The Tenth Circuit found that the Attorney General had a particular duty to enforce the provision based on his duty to prepare contracts for state agencies, Okla. Stat. tit. 74, § 18b(A)(7), and his authority to initiate any action in which the interests of the state are at issue, *id.* at § 18b(A)(3). *Edmondson*, 594 F.3d at 757-58. The Tenth Circuit reasoned that an injunction running against the attorney general would prevent him from preparing contracts that required use of the employment verification system and prevent him from bringing lawsuits against businesses or defending state agencies sued by their contractors on the basis of the challenged provision. *Edmondson*, 594 F.3d at 758. These statutory duties, and the attorney general's demonstrated willingness to exercise them, were sufficient to render the attorney general a proper defendant with respect to the employment verification provision. *Id.* at 760.

But notably, the Tenth Circuit reached "the opposite conclusion with regard to" a second provision of the same statute which made it a discriminatory practice to discharge certain employees. The attorney general was not a proper defendant for this claim because the plaintiffs did "not cite to any Oklahoma law authorizing the Attorney General to

enforce that provision." *Id.* at 760. In reaching this conclusion, the Tenth Circuit observed that the attorney general's "duty to prosecute all actions in which the state is interested is not enough to make him a proper defendant in every such action." *Id.* (quotation marks and alterations omitted). Further, this second provision placed investigatory and enforcement power in a separate commission. *Id.* at 754; *see Free Speech Coal,* 119 F.4th at 739, 739 n.9 (emphasizing that the provision in *Edmondson* placed enforcement authority in a separate entity).

Like the plaintiffs in *Edmondson*, Plaintiffs rely on the attorney general's authority to initiate or appear in any action in which the state is interested to establish a connection between the Attorney General and the enforcement of the nonsectarian requirement. Okla. Stat. tit. 74, §18b(A)(3). But the situation here is more like the second provision in *Edmondson* than the first. Unlike the first provision, where the attorney general demonstrated a willingness to bring enforcement actions directly against businesses that violated state law, Plaintiffs have not shown that the attorney general is bringing enforcement actions against charter schools that do not comply with the nonsectarian requirement. More critically, and similar to the second provision in *Edmondson*, state law empowers a separate entity to enforce the challenged provision. Given that statutory scheme, the Attorney General's "duty to prosecute all action in which the state is interested is not enough to make him a proper defendant." *Edmondson*, 594 F.3d at 760 (quotation marks and alterations omitted).

## *Conclusion*

As outlined above, Plaintiffs have not established that the Attorney General has a particular duty to enforce the challenged statute such that he is a proper party under *Ex parte Young*.[1] For that reason, the Attorney General's Motion to Dismiss [Doc. No. 52] is GRANTED and he will be removed from the caption of this case.

IT IS SO ORDERED this 9th day of June, 2026.

**DAVID L. RUSSELL**
**UNITED STATES DISTRICT JUDGE**

[1] Given this ruling, it is unnecessary to resolve the Attorney General's separate argument that Plaintiffs lack standing to maintain a claim against him.

# Moore Intervenors' Opposition to Motion for Preliminary Injunction, filed below on June 17, 2026, as ECF No. 94

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKKLAHOMA**

| | | |
|---|---|---|
| THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>REBECCA WILKINSON, in her official capacity as Executive Director of the Statewide Charter School Board, *et al.*,<br><br>Defendants, | ) | Case No. 5:26-cv-00582-R |

**BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION BY INTERVENORS CRICKET MOORE, CATHLEEN TICHENOR, DANIEL HENSLEY, AND LARISSA PORT**

Dated: June 17, 2026

SUBMITTED BY:

s/ Heather Hendricks
Ryan Leonard, OBA #19155
Heidi J. Long, OBA #17667
Heather Hendricks, OBA #20996
LEONARD, LONG & CASSIL, PLLC
6301 N. Western, Suite 250
Oklahoma City, OK 73102
(405) 702-9900
rleonard@llc-attorneys.com
hlong@llc-attorneys.com
hhendricks@llc-attorneys.com

*Attorneys for Intervenor-Defendants Cricket Moore, Cathleen Tichenor, Daniel Hensley, Luz Cruz and Larissa Port*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STANDARD OF REVIEW ........ 4

ARGUMENTS AND AUTHORITIES ........ 4

I. Plaintiffs are unlikely to succeed on the merits of their claims ........ 4

A. Oklahoma charter schools are "public schools" under *Carson* ........ 5

B. Federalism favors substantial deference to Oklahoma's determination of how it will provide public education to its citizens. ........ 9

C. Strict scrutiny does not apply. ........ 14

D. Oklahoma's public charter schools are state actors ........ 14

E. Oklahoma's public charter schools are created and controlled by Oklahoma law and are therefore "government entities." ........ 18

II. Plaintiffs cannot establish that they will suffer irreparable harm or that the balance of equities and the public interest weigh in their favor ........ 21

CONCLUSION ........ 22

# TABLE OF AUTHORITIES

## U.S. SUPREME COURT CASES

*Biden v. Nebraska*, 600 U.S. 477 (2023) .......... 19

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) .......... 17

*Carson v. Makin*, 596 U.S. 767 (2022) .......... passim

*Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020) .......... 2

*Gonzales v. O Centro Espirita Beneficiente Uniao Do Vegetal*, 544 U.S. 973 (2005) .......... 21

*Lebron v. Nat'l R.R. Passenger Corp*, 513 U.S. 374 (1995) .......... 4, 18

*Mahmoud v. Taylor*, 606 U.S. 522 (2025) .......... 4

*Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802 (2019) .......... 17

*Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617 (2018) .......... 13

*Missouri v. Jenkins*, 515 U.S. 70, 112-113 (1995) (O'Connor, J., concurring) .......... 10

*Nken v. Holder*, 556 U.S. 418 (2009) .......... 22

*Rendell-Baker*, 457 U.S. 830 (1982) .......... 4, 15, 16, 18

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017) .......... 2

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981) .......... 21

*U.S. v. Lopez*, 514 U.S. 549 (1995) .......... 10

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) .......... 4

## TENTH CIRCUIT COURT OF APPEALS CASES

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175 (10th Cir. 2010) .......... 14

*Coleman v. Utah State Charter Sch. Bd.*, 673 F. App'x 822 (10th Cir. 2016) .......... 14

*Milonas v. Williams*, 691 F.2d 931 (10th Cir. 1982) ........ 14

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004) ........ 21

**FOURTH CIRCUIT COURT CASES**

*Peltier v. Charter Day Sch., Inc.,* 37 F.4th 104 (4th Cir. 2022) ........ 11

**OKLAHOMA CASES**

*Drummond, ex rel. State v. Okla. Statewide Virtual Charter School Bd.*, 2024 OK 53, P.3d 1 ........ passim

*Drummond v. Oklahoma Statewide Virtual Charter School Board*, consolidated with *St. Isidore of Seville v. Drummond*, 605 U.S.165 (2025) ........ 1

*Drummond v. Oklahoma Statewide Virtual Charter School Board,* 605 U.S. 165 (2026) ........ 1

*Oliver v. Hofmeister*, 2016 OK 15, 368 P.3d 1270 ........ 2, 13

*Prescott v. Oklahoma Capitol Preservation Commission*, 2015 OK 54 ........ 13

**STATUTES AND RULES**

OAC 777:10-3-3 ........ 3, 22

Okla. Const. Art. I, §5 ........ 11, 17

Okla. Const. Art. II, §5 ........ 13

Okla. Stat. tit. 51 O.S. §151 *et seq* ........ 8

Okla. Stat. tit. 51 O.S. §155(18) ........ 8

Okla. Stat. tit. 70 O.S. § 1-106 ........ 12

Okla. Stat. tit. 70 O.S. § 3-132 ........ 16, 19

Okla. Stat. tit. 70 O.S. § 3-132.2 ........ 6, 11

Okla. Stat. tit. 70 §3-134(12) ........ 7

Okla. Stat. tit. 70 §3-134(C) ........ 9

Okla. Stat. tit. 70 §3-136 ........ 17, 20

Okla. Stat. tit. 70 §3-136 (C) ........ 16, 18

Okla. Stat. tit. 70 §3-136(A)(2) ........ 1

Okla. Stat. tit. 70 §3-136(A)(4) ........ 7

Okla. Stat. tit. 70 §3-136(A)(9) ........ 7, 8

Okla. Stat. tit. 70 §3-136(A)(11) ........ 9

Okla. Stat. tit. 70 §3-136(A)(12) ........ 8

Okla. Stat. tit. 70 §3-136(A)(13) ........ 7

Okla. Stat. tit. 70 §3-136(A)(14) ........ 8

Okla. Stat. tit. 70 §3-136(A)(15) ........ 8

Okla. Stat. tit. 70 §3-137 ........ 20

Okla. Stat. tit. 70 §3-139 ........ 8

Okla. Stat. tit. 70 §3-142 ........ 15

Okla. Stat. tit. 70 §24-101.3 ........ 9

Okla. Stat. tit. 70 O.S. § 28-101, *et seq.* ........ 11

## INTRODUCTION

Plaintiffs ask this Court to invalidate the actions of the Oklahoma Legislature and the state Supreme Court by holding a provision of the Oklahoma Charter Schools Act ("OCSA") (specifically 70 O.S. §3-136(A)(2)) violates their right to freely exercise their Jewish faith because it requires public charter schools (like all other public schools everywhere) be non-sectarian. One need not speculate as to the type of educational system Plaintiffs envision as ideal. In an amicus brief to the Supreme Court in *Drummond v. Oklahoma Statewide Virtual Charter School Board*, 605 U.S. 165 (2026), Plaintiff Peter Deutsch wrote admiringly of an era before public school systems existed across this country, where private religious institutions (funded in part by public monies) took a primary role in providing secondary education.[1] But Oklahoma is a sovereign state and owes no deference to Plaintiffs' preferred system of common schools. And no amount of Plaintiffs' wishful thinking can convert Oklahoma's chosen policy of providing free public education through both traditional public schools and public charter schools—subject to the U.S. Constitution's Establishment Clause and other protections—into one in which the OCSA is merely a conduit for public funding of private schools.

Yet that is precisely what Plaintiffs seek to do through their Motion for Preliminary Injunction [Doc. No. 11]. To achieve their desired end of operating a

[1] Brief of Amicus Curiae Hon. Peter Deutsch Supporting Petitioners, at pp. 5-18, *Drummond v. Oklahoma Statewide Virtual Charter School Board*, consolidated with *St. Isidore of Seville v. Drummond*, 605 U.S.165 (2025).

publicly funded religious school, Plaintiffs deploy a series of arguments designed to persuade this Court that they are unfairly excluded from a government program in violation of the Free Exercise Clause. Those arguments fail.

Plaintiffs assert that Oklahoma's charter schools are "publicly-funded private charter schools." [Doc. No. 11] at p. 10. But saying so does not permit Plaintiffs to avail themselves of the Supreme Court's recent Free Exercise precedents such as *Carson v. Makin*, 596 U.S. 767 (2022), *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), and *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020).[2] Charter schools in Oklahoma are *public* schools – not just in "label," but in law and in fact. As a power that is not granted to the United States, the power to provide, define, and regulate public education is reserved to the states and its people. Oklahoma has the right to set up its public schools in any lawful manner it sees fit within its boundaries, and the Oklahoma Supreme Court—consistent with the Oklahoma legislature—has concluded that Oklahoma charter schools are public schools. *Drummond ex rel. State v. Oklahoma Statewide Virtual Charter Sch. Bd.*, 2024 OK 53, 558 P.3d 1.

Oklahoma's considered legislative and judicial determination that its public charter schools are in fact part of Oklahoma's free and open-to-all public school system is enough to dispose of Plaintiffs' Free Exercise Clause argument. That is because, under *Carson* itself, Oklahoma "may provide a strictly secular education in its public

---

[2] Oklahoma private religious schools, which are not public charter schools, have long had the right to benefit from tuition tax credits in the same manner as secular private schools, as upheld by the Oklahoma Supreme Court in *Oliver v. Hofmeister*, 2016 OK 15, 368 P.3d 1270.

schools." 596 U.S. at 785. Like all public schools, public charter schools in Oklahoma are (among other hallmarks) free, open to all, and subject to certain state curriculum requirements, *id.* at 783, and thus are subject to the Establishment Clause. That is true whether viewed as a matter of federalism, "state action" doctrine, or the Supreme Court's "governmental entity" test—all of which reinforce Oklahoma's treatment of charter schools as public schools.

Plaintiffs also claim that they will suffer irreparable harm absent a preliminary injunction because enrollees must make plans for the upcoming Fall semester. This argument is baseless. Oklahoma's state regulations require an application to be submitted between 18 and 24 months prior to a school's opening. *See* OAC 777:10-3-3.

The Oklahoma Families are parents of children who attend brick-and-mortar public charter schools in Oklahoma City and Tulsa, Oklahoma, and other parents whose children attend a virtual charter school remotely from their home. Like most parents, they care deeply about ensuring their children receive the best possible education. The Oklahoma Families intervened in this lawsuit because it is important to them that their public charter schools continue to be recognized as public. As set forth in their Motion to Intervene [Doc. 66], the availability and scope of important disability accommodations and protections under state and federal law, support programs, state funding, and preservation of their constitutional rights in a public school setting are all dependent on their charter schools being public schools.

Contrary to Plaintiffs' assertions, the Oklahoma Families will demonstrate that (1) Oklahoma's charter schools are "public schools" based on the key characteristics outlined in *Carson v. Makin*; (2) Oklahoma's determination that charter schools are public schools should receive substantial deference under principles of federalism; (3) Oklahoma charter schools are "state actors" under existing Tenth Circuit precedent and *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982); and (4) Oklahoma charter schools are "government entities" under *Lebron v. Nat'l R.R. Passenger Corp*, 513 U.S. 374 (1995). The Oklahoma Families also will show that there is no real risk of irreparable harm to Plaintiffs and that neither the equities nor the public interest tip in their favor. Plaintiffs' Motion for Preliminary Injunction [Doc. No. 10] should accordingly be denied.

## STANDARD OF REVIEW

To obtain the "extraordinary" relief of a preliminary injunction, a party must show that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction would be in the public interest. *Mahmoud v. Taylor*, 606 U.S. 522, 546 (2025) citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). In this case, Plaintiffs fail to make any of the requisite showings.

## ARGUMENTS AND AUTHORITIES

### I. Plaintiffs are unlikely to succeed on the merits of their claims.

Plaintiffs argue this Court should grant preliminary injunctive relief because they are likely to succeed on the merits of their Free Exercise claim. Plaintiffs claim that the denial by the Oklahoma Charter School Board (the "Board") of their charter

application runs afoul of *Carson v. Makin*, 596 U.S. 767 (2022), and that Ben Gamla (though denominated under Oklahoma law as a "public charter school") is not a governmental actor subject to the Establishment Clause. These arguments fail.

**A. Oklahoma charter schools are "public schools" under *Carson*.**

Plaintiffs assert that the Board's denial of their charter application on the basis of its intended religious purpose violates the Free Exercise Clause as interpreted by the U.S. Supreme Court in *Carson*. In *Carson*, the state of Maine developed a school choice program in which the state paid tuition with public funds to Maine families' private schools of choice, but Maine refused to allow state-funded tuition payments to be made to religious private schools. *Id.* The U.S. Supreme Court held the denial of a public benefit – the right of a private religious school to receive publicly funded tuition payments in the same manner as any other private school – violated the Free Exercise Clause. *Id.* Maine justified its denial of public funds for religious private schools on the basis the payments were intended to subsidize a "rough equivalent" of a public education and thus only secular schools were eligible for the payments. *Id.* at 777. Maine asserted "the public benefit Maine is offering is a free public education." *Id.* at 782. But the Court rejected Maine's assertion there was any similarity between public schools and the private schools funded by Maine's tuition assistance programs, stating the statute authorizing the tuition payments to private schools contained "no suggestion that 'the private school' must somehow provide a 'public' education" and "the difference between private schools eligible to receive tuition assistance under Maine's program and a Maine public school are numerous and important." *Id.* at 782- 783.

Crucially, however, the Supreme Court made clear that "Maine may provide a strictly secular education in its public schools." *Id.* at 785.

Unlike the private religious schools at issue in *Carson*, Oklahoma's public charter schools are "public" as a matter of law and fact. Under the OCSA, "[a] 'charter school' means: . . . a public school established by contract with a school district board of education, a higher education institution, an institution of higher learning accredited pursuant to Section 4103 of Title 70 of the Oklahoma Statutes, a federally recognized Indian tribe, or the Statewide Charter School Board. . ." 70 O.S. § 3-132.2.

As important as their legal designation, however, is the fact that Oklahoma's charter schools are public in all critical respects. In *Carson*, the U.S. Supreme Court identified five characteristics inherent in public schools and found none of them were applicable to the private schools receiving state tuition assistance in Maine. *Carson,* 596 U.S. at 783-784. Oklahoma's public charter schools, however, exhibit each of the characteristics of a "public school" identified by the Supreme Court in *Carson*.

The first two characteristics considered by the *Carson* court were the Maine private schools' rights to (1) set their own admission standards and (2) charge tuition. "To start with the most obvious, private schools are different by definition because they do not have to accept all students." *Id.* at 783. "Second, the free public education that Maine insists it is providing through the tuition assistance program is often *not free,*" because the stipends provided were often less than the cost of tuition. *Id.* (emphasis in original). In Oklahoma, as in Maine, private schools are free to set their own criteria for admission and tuition. Public charter schools, however, have no such discretion and

"shall be as equally free and open to all students as traditional public schools." 70 O.S. §3-136(A)(9).

The third characteristic identified in *Carson* is that, in Maine, private schools' curriculum "need not even resemble that taught in the Maine public schools." *Id.,* at 783. Plaintiffs in this case assert the flexibility encouraged by the OCSA means, as a practical matter, "charter schools need not follow Oklahoma's core curriculum requirements[.]" [Doc. No. 11] at p. 9. Plaintiffs' legal argument would undoubtedly be stronger if that were the case, but it is not. While Oklahoma's public charter schools are afforded some flexibility in their program offerings and emphasis, Oklahoma has not ceded its authority to set state academic standards to individual charter schools. On the contrary, Oklahoma public charter schools' academic programs must align with Oklahoma's state standards. *See* 70 O.S. § 3-134(12). Further, in *Carson*, the Court also pointed to the private schools' exclusion from mandatory annual assessments as evidence the private schools were not in the business of providing public education. Oklahoma's public charter schools, on the other hand, are required to participate in Oklahoma's School Testing Program. *See* 70 O.S. §3-136(A)(4).

The fourth characteristic identified in *Carson* concerns teacher credentialing requirements. While Oklahoma does not require standard state certification of teachers in public charter schools, the OCSA treats charter school teachers—unlike private school teachers—as public educators. For example, public charter school teachers are eligible to participate in the state teacher retirement program (70 O.S. §3-136(A)(13)), and they maintain their seniority and status if they return to teaching in a public school

after teaching in a charter school. 70 O.S. §3-139. Charter schools, in their discretion, may also elect to participate in state health insurance programs. 70 O.S. §3-136(A)(14). Thus, while public charter schools do enjoy some flexibility in employing academic personnel, these personnel are closely integrated into the public school benefits system and protected in their career status.

The final characteristic identified by the Court in *Carson* is Maine private religious schools could, in their discretion, choose to offer single-sex instruction. *Carson,* 596 U.S. at 784. In Oklahoma, however, charter schools are public schools, and they must be open to all students in the same manner as traditional public schools. Oklahoma public schools cannot be single-sex at their discretion. 70 O.S. §3-136(A)(9).

Other characteristics of Oklahoma charter schools, though not expressly considered in *Carson,* reinforce that charter schools are public, not private. For example, Oklahoma's traditional public schools are shielded from liability under Oklahoma's sovereign immunity laws, including the Oklahoma Governmental Tort Claims Act. 51 O.S. §151, *et seq.* Notably, Oklahoma's public charter schools, unlike private schools, are shielded by the same sovereign immunity as traditional public schools.[3] 70 O.S. §3-136(A)(12). Similarly, while private schools are not required to comply with sunshine laws such as Oklahoma's Open Records and Open Meeting Act laws, Oklahoma's public charter schools and traditional public schools are required to abide by these laws. 70 O.S. §3-136(A)(15). Public charter schools and traditional

---

[3] Independent contractors, on the other hand, are expressly excluded from sovereign immunity protections of the State. 51 O.S. §155(18).

public schools are also both bound by Oklahoma's statutory due process protections for students, which require notice and a hearing before a long-term suspension. 70 O.S. §3-136(A)(11) and 70 O.S. §24-101.3. In *Carson*, the Supreme Court held Maine's state tuition payment statute violated the Free Exercise Clause because all private schools could participate in Maine's program, except for religious private schools. That is the opposite of what takes place in Oklahoma, where "[a] private school shall not be eligible to contract for a charter school or virtual charter school under the provisions of the OCSA." 70 O.S. §3-134(C).

Finally, *Carson* expressly rejected the claim that "under our decision today Maine *must* fund religious education." *Carson,* 596 U.S. at 785. The majority observed that Maine retained a number of options for providing secular education: it could increase availability of transportation, provide some combination of tutoring, remote learning, or even operate boarding schools of its own. *Id.* Or, as relevant here, Maine could "expand the reach of its public school system." *Id.* Oklahoma, through the OCSA, has done just that by creating public charter schools that match the characteristics of a public school outlined by the majority in *Carson*, confirming that Oklahoma's nonsectarian requirement does not amount to a Free Exercise violation. Plaintiffs' arguments find no support in *Carson*.

**B. Federalism favors substantial deference to Oklahoma's determination of how it will provide public education to its citizens.**

Oklahoma is entitled to deference in structuring its public school system. The education of a state's citizens is not a power granted to the federal government, rather

it is reserved to the states and its people. U.S. Const. amend. X. Plaintiffs argue federal courts owe no deference to a state's interpretation of federal law, and they further claim that under federal law Plaintiff Ben Gamla is not a state actor. [Doc. No. 11] at p.17. But the critical question before this Court, as articulated in *Carson*, is whether charter schools in Oklahoma are public schools and thus must comply with the Establishment Clause. This Court should pay substantial deference to the State of Oklahoma's choices (in both form and substance) on that question.[4]

What constitutes a public school has historically been the purview of state governments, as state governments have a "claim" over public education.*Missouri v. Jenkins*, 515 U.S. 70, 112-113 (1995) (O'Connor, J., concurring); *see also U.S. v. Lopez*, 514 U.S. 549, 564 (1995) ("States historically have been sovereign" over education). In light of this sovereignty, federal courts should afford significant weight to a state's views on whether a school is public or not, even for federal constitutional purposes.

Precedent backs that principle. In the context of desegregation, federal courts were "specifically admonished to 'take into account the interests of state and local authorities in managing their own affairs.'" *Jenkins*, 515 U.S. at 112-113 (O'Connor, J., concurring). More recently, the Fourth Circuit declined to "reject[] the state's

[4] See, also, The Federal Role in Education, U.S. Department of Education ("Education is primarily a State and local responsibility in the United States.") https://www.ed.gov/about/ed-overview/federal-role-in-education; and National Conference of State Legislatures, FAQ: The Education Department and the Federal Role in Education ("States are granted plenary authority on matters of education by the 10th Amendment to the U.S. Constitution.") https://www.ncsl.org/state-legislatures-news/details/faq-the-education-department-and-the-federal-role-in-education.

designation of [charter] schools as public institutions" because doing so "would infringe on North Carolina's sovereign prerogative, undermining fundamental principles of federalism." *Peltier v. Charter Day Sch., Inc.,* 37 F.4th 104, 121 (4th Cir. 2022). *Peltier* recognized the operation of public-school systems is a function "traditionally and exclusively reserved to the states." *Id.* at 119.

In Oklahoma, the Legislature is constitutionally required to create and maintain a system of nonsectarian free public schools open to all. Okla. Const. Art. I, §5. The State of Oklahoma provides free public schools open to all through traditional local public schools. In 1999, Oklahoma passed the OCSA, which expanded public school options within the State.[5] 70 O.S. §3-132.2. In stark contrast to the view presented by Plaintiffs in this case, Oklahoma has never considered public charter schools to be mere contractors or "publicly funded private charter schools." [Doc. 11] at p. 16. Each charter school in Oklahoma is unique, but each is a public school in all material respects. Differences may be found in the involvement of parents and other community members in planning and oversight and the "loosening of the bureaucratic apron strings" as referenced in *Peltier*, 37 F.4th at 121. And differences may be found in the various foci of the different charter schools. Nonetheless, each charter school is "public" as defined by the Oklahoma School Code: "all free schools supported by public taxation." 70 O.S.

---

[5] Additionally, in 2024, the State of Oklahoma began to afford even more education opportunities by providing tax credits to families who send their children to private schools, even private religious schools. *See* Okla. Stat. tit. 70, §28-101, *et seq.* Accordingly, there is no reason to question Oklahoma's commitment to protecting free exercise.

§1-106. And, as explained in detail *supra*, Oklahoma charter schools are public in character as well as in law.

Oklahoma's classification of charter schools as public schools is not mere window dressing for discrimination against religious private schools or an overly enthusiastic commitment to the Establishment Clause. Longstanding precedents from Oklahoma's Attorneys General highlight Oklahoma's commitment to asserting control over its public charter schools. For example, in 2007, a question arose as to whether the Oklahoma Legislature had unlawfully delegated its legislative authority over public education by enacting the OCSA. Answering in the negative, the Oklahoma Attorney General opined:

> [The OCSA has] specific standards to be followed in creating and operating charter schools that are part of the public school system. Oklahoma's charter schools are under the control of the Legislature, which not only enacted the statutes implementing the Act, but which retains the authority to amend the Act. Through the enactment of the Act, the Legislature has accomplished its mandate of establishing and maintaining a system of free public education. The Legislature retains the ultimate power to provide a free public education. Therefore, to answer your question, the Act does not violate the constitutional requirement that it is the responsibility of the Legislature to provide a free public education to Oklahoma's children, and does not constitute an unlawful delegation of legislative power.

2007 OK AG 23, ¶23.

Later, in 2015, the Oklahoma Attorney General described Oklahoma public charter schools as "a concurrent system" alongside traditional brick and mortar schools. 2015 OK AG 11, ¶1. Most recently, the Oklahoma Supreme Court explicitly held that

Oklahoma charter schools are "public schools." *Drummond, ex rel. State v. Okla. Statewide Virtual Charter School Bd.*, 2024 OK 53, ¶22, 558 P.3d 1, 10. Certainly, Oklahoma could have chosen to offer a different public school system to serve the needs of citizens. But Oklahoma did no such thing, and it should not be compelled to do so.

The Free Exercise Clause prohibits government action on the basis of religious animus and bars "even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 638 (2018). It may be appropriate for a federal court to question a state's policy if there is evidence that it is tainted by religious animus. There is no such animus toward Ben Gamla here. First, as demonstrated by the defendant Board's reluctance to deny the Plaintiffs' charter application in this case, the current Board is positively inclined toward the religious nature of the school. Second, Oklahoma holds that its separation of church and state doctrines are designed to ensure churches are free from state control – and not the other way around. See *Oliver v. Hofmeister*, 2016 OK 15, ¶20.

In *Drummond*, relying on *Prescott v. Oklahoma Capitol Preservation Commission*, 2015 OK 54, ¶¶17-20, the Oklahoma Supreme Court held that Oklahoma's "no aid" law (Okla. Const. Art. II §5) prohibiting direct public funding of sectarian institutions is not an odious "Blaine Amendment." *Drummond,* 558 P.3d, at 8 ¶11. Hence, Oklahoma's sovereignty and principles of federalism require that Oklahoma be entitled to substantial deference on how it provides a free public education to its citizens—including through public charter schools. After all, as the Supreme

Court has recognized, Oklahoma "may provide a strictly secular education in its public schools." *Carson*, 596 U.S. at 785.

**C. Strict scrutiny does not apply.**

Oklahoma charter schools are public schools subject to the Establishment Clause, not the Free Exercise Clause. Therefore, strict scrutiny does not apply.

**D. Oklahoma's public charter schools are state actors.**

Plaintiffs argue that, because Plaintiff Ben Gamla is not a "state actor," "[t]he Free Exercise Clause thus forbids excluding Plaintiff Ben Gamla from Oklahoma's charter school program." [Doc. 11] at p. 19. On the contrary, separate from but consistent with the *Carson* factors and federalism considerations discussed above, *Drummond* correctly holds that Oklahoma charter schools are "state actors" and "government entities" under federal law. *Drummond*, 558 P.3d at 11 ¶26. The *Drummond* decision observes that

> [t]he Tenth Circuit Court of Appeals has also treated charter schools as state actors. *See Coleman v. Utah State Charter Sch. Bd.*, 673 F. App'x 822, 830 (10th Cir. 2016) (noting "charter schools are public schools using public funds to educate school children"); *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010) (holding a charter school was a governmental entity); *Milonas v. Williams*, 691 F.2d 931, 940 (10th Cir. 1982) (holding state funding, contracts with state, and extensive state regulation were some of the facts that demonstrated sufficiently close nexus between state and operators of school).

*Drummond*, 558 P.3d at 19 fn 11.

Even though all the Tenth Circuit decisions cited in *Drummond* were decided after *Rendell-Baker v. Kohn,* 457 U.S. 830 (1982), Plaintiffs address none of the Tenth Circuit authorities on point and rely almost exclusively on *Rendell-Baker* for their argument that public charter schools are not state actors. Thus, Plaintiffs are unlikely to prevail on the merits of their argument.

In *Rendell-Baker*, a private school contracted to provide specialized services to maladjusted youth was held not to be a "state actor." Terminated employees complained that their release had been in violation of their First Amendment rights of free speech, and Fifth and Fourteenth Amendment rights of due process. *Id.* at 835. The Court, observing that the contractor could not be liable under §1983 unless some state action had actually taken place, examined the following four factors to determine whether the contractor's actions were attributed to the state: (1) the level of state funding; (2) the extent of state regulation; (3) whether the services were within the exclusive purview of the state, and; (4) whether a "symbiotic relationship" existed between the contractor and the state. *Id.* at 840-842. An examination of the four *Rendell-Baker* factors demonstrates that, unlike the contractor in *Rendell-Baker*, Oklahoma's public charter schools meet the test for state action.

First, Oklahoma's public charter schools receive per-pupil state funding from the same pool of legislatively appropriated tax dollars as any other traditional public school. 70 O.S. §3-142. Second, Oklahoma's public charter schools are heavily regulated by the State. As set forth *supra*, Argument I(A), Oklahoma's public charter schools are not simply private school contractors providing a service – they are subject to the same

level of regulation as traditional public schools in all major respects. Third, Oklahoma's public charter schools are engaged in a "public function" that has been "traditionally the exclusive prerogative of the state." *Id.* at 842. Here, too, provision of free education, open to all, has always been within Oklahoma's exclusive purview. In *Rendell-Baker*, the contractor fell short on this point. The Court in *Rendell-Baker* observed that the school in question was an alternative school designed for maladjusted youth. *Id.* Here, the OCSA requires public charter schools to serve the same population of children according to the same set of State standards, albeit with certain permitted (pre-approved) variation in focus and emphasis. Finally, as to the fourth factor, unlike the school contractor in *Rendell-Baker*, a public charter school's relationship with its authorizing entity (in Oklahoma, the authorizer is termed a "sponsor" under the OCSA) is "symbiotic." The "sponsorship" of a charter school denotes a closer connection than simple eligibility for public funding (as is the case with private schools) or outsourcing for the sake of efficiency (as is the case with a contractor). Oklahoma's public charter schools can be established only through sponsorship with an approved entity and cannot exist independently. 70 O.S. §3-132. In fact, Oklahoma's public charter schools cannot admit students or receive public education dollars until they have been sponsored. 70 O.S. §3-136(C). If a public charter school loses its charter, the school does not simply lose an important client – it is extinguished. As such, under *Rendell-Baker*, Oklahoma's public charter schools are state actors.

In *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802 (2019), also cited by Plaintiffs, the Court held that a private entity qualifies as a state actor under "limited

circumstances. *Id.* at 807. But, as set forth in detail *supra* (Section I(A)), Oklahoma's public charter schools are not private entities. Upon formation, they are "public" schools. 70 O.S. §3-136. And, as detailed below (Section I(E)), they are "government entities." Even accepting for the sake of argument that they are private entities, public charter schools are engaged in precisely the type of state action that falls within *Halleck's* recognized exceptions.

*Halleck* holds that an entity may qualify as a state actor if the State is "entwined in [its] management or control." *See Halleck*, 587 U.S. at 809, citing *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001). And if a State has "outsourced a constitutional function," the private entity may be a state actor. *Halleck,* 587 U.S. at FN 1, citing *West v. Atkins*, 487 U.S. 42, 56 (1988) Here, both exceptions noted in *Halleck* apply. First and foremost, Oklahoma's public charter schools serve as a component of the Legislature's duty to establish and maintain a system of free public schools under Okla. Const. Art I, §5. *Drummond,* 558 P.3d 9 ¶13; *see also*, 2007 OK AG 23. Oklahoma's public charter schools are funded directly through state aid funding and are recognized as "LEAs" -local education authorities – entitled to direct access to public education dollars.[6] They are required to serve children with disabilities who would not be entitled to receive services in private schools. 70 O.S. §3-136(C). And in recognition that public charter schools are engaged in state

[6] An LEA is defined in federal law as "a public board of education or other <u>public authority</u> legally constituted within a State for either administrative control or direction of [public elementary or secondary schools]." 34 C.F.R. §303.23.

action, Oklahoma extends the State's sovereign immunity protections to its public charter schools. 70 O.S. §3-136(A)(12). All of these characteristics demonstrate that Oklahoma's public charter schools are both "entwined" in the State's management and control and carrying out the State's constitutional function.

In sum, the Tenth Circuit has recognized charter schools as "state actors" even after *Rendell-Baker* was decided and Oklahoma's public charter schools otherwise meet the criteria as "state actors" under *Rendell-Baker* and *Halleck*. Plaintiffs therefore cannot avail themselves of the Free Exercise Clause.

**E. Oklahoma's public charter schools are created and controlled by Oklahoma law and are therefore "government entities."**

The Oklahoma Supreme Court concluded that charter schools are not only "state actors," but also "government entities" under Oklahoma law. *Drummond*, 558 P.3d at 10, ¶20. Under *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995) and *Biden v. Nebraska*, 600 U.S. 477, 493 (2023), charter schools are also government entities as a matter of federal law, because they are both created and controlled by the state.[7]

In *Lebron*, a plaintiff sued Amtrak for violating his First Amendment rights. *Id.* at 377. Amtrak argued that it was not a governmental entity – indeed, while the entity was established by an act of Congress, its charter specifically stated that Amtrak was not a government agency. *Id.* at 392. The U.S. Supreme Court rejected Amtrak's

[7] For a detailed comparison with other states and public charter school characteristic of state action and control, see National Alliance for Public Charter Schools: Government Entities for Federal Constitutional Purposes (June 9, 2026), available at http://publiccharters.org.

defense, holding that entities that are "created and controlled" by the government are part of the government itself. *Id.* at 397. As explained by the Court, "[t]hat Government-created and -controlled corporations are (for many purposes at least) part of the Government itself has a strong basis, not merely in past practice and understanding, but in reason itself." *Id.* "It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." *Id.* More recently, in *Biden v. Nebraska*, 600 U.S. 477 (2023) the U.S. Supreme Court considered whether Missouri's student loan authority ("MOHELA") was a government entity and concluded it was. *Id.* at 491.

Here, if approved, Plaintiffs' proposed charter school would be a governmental entity created and controlled by the State. The OCSA is a component of the Oklahoma's system of free public schools. *Drummond*, 558 P.3d at 9, ¶¶13-14. Ben Gamla's charter school cannot be established except upon securing a sponsorship. 70 O.S. §3-132. And while it is true that Plaintiffs may be free to name a governance board (subject to requirements of the OCSA), Ben Gamla must secure prior approval of its proposed: educational program to be offered, participation in statewide testing, compliance with reporting requirements, financial audits, and audit procedures, compliance with disability laws, residency and conflicts of interest requirements for board members, school calendar, due process for student suspensions, employee benefits, personnel policies, and protocol for reporting of adverse incidents. 70 O.S. 3-136. All of these critical requirements must be memorialized in the charter contract. *Id.*

Once approved, the charter contract cannot be modified without approval. 70 O.S. §3-136. The charter contract must also set forth the State's responsibilities for oversight of the public charter school, including setting a performance framework and setting of performance indicators for: student academic proficiency, academic growth, achievement gaps, student attendance, recurrent enrollment methodology, graduation rates, postsecondary readiness, financial performance, audit findings, accreditation, governing board performance and stewardship, legal compliance, and student mobility. *Id.* The sponsor must evaluate whether the indicators demand a performance improvement plan, and monitor compliance if so. 70 O.S. §3-137. It is clear that the State's responsibilities are not only in the initial establishment of a public charter school, but also extend to include ongoing and continuous monitoring, supervision, and oversight. A charter may also be dissolved by its sponsor. *Id.* Upon termination of a charter, property purchased with state funds is returned to the sponsor. *Id.* In sum, Oklahoma charter schools are government entities under Oklahoma and federal law, created and controlled by their sponsors, and Plaintiffs are unlikely to prevail on the merits of their claims.

### II. Plaintiffs cannot establish that they will suffer irreparable harm or that the balance of equities and the public interest weigh in their favor.

Plaintiffs argue that because they have raised a Free Exercise claim, they should be favored in their request for preliminary injunction. But the limited purpose of such an extraordinary remedy "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

The Tenth Circuit has identified a preliminary injunction that alters the status quo as a disfavored injunction. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004) (en banc), cert. granted sub nom on other grounds, *Gonzales v. O Centro Espirita Beneficiente Uniao Do Vegetal*, 544 U.S. 973 (2005).

Here, Plaintiffs seek such disfavored injunction. Plaintiffs seek to preclude the Board from following Oklahoma law, a law that was upheld as constitutional by the Oklahoma Supreme Court in *Drummond*. In so doing, Plaintiffs are asking this Court to sanction the first ever religious charter school in the United States. Under no circumstance can Plaintiffs' claims be construed as seeking to maintain the "status quo." Such disfavored injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro*, 389 F.3d at 975.

Plaintiffs fail to demonstrate that they will be irreparably harmed if they are denied injunctive relief. Plaintiffs primarily rely on their desire to open their school in Fall of 2026 and allow prospective families to make enrollment plans. [Doc. No. 11] at p. 15. But even if this Court were to grant Plaintiffs' Motion, and even if the Board were to ultimately approve Plaintiffs' charter school application, by law Ben Gamla cannot open its doors in Fall 2026. Under Oklahoma law, an application for a charter school must be submitted between 18 and 24 months prior to the July of the expected opening. OAC 777:10-3-3. Plaintiffs submitted the application that is the subject of this lawsuit on February 27, 2026. [Doc. No. 11] at p. 15. Thus, at the earliest, Plaintiffs could not open their school until the Fall of 2027. Further, even if Plaintiffs were to prevail on

their theory that they are not public schools, it is unclear how their school would be funded (as Oklahoma presently funds charter schools on the basis that they are part of the state's public school system[8]).

Finally, the balancing of the equities and public interest do not tip in Plaintiffs' favor in this case. Relying upon *Nken v. Holder*, 556 U.S. 418, 435 (2009), Plaintiffs argue that "it is always in the public interest to prevent the violation of a party's constitutional rights." Yet, in this case, the Oklahoma Families seek to uphold Oklahoma law and preserve their constitutional rights and the rights of 30,000 other Oklahoma public charter school students. Plaintiffs, on the other hand, ask this Court for a sea change that risks a violation of the Establishment Clause. The countervailing constitutional and equitable interests of the Oklahoma Families and other Oklahoma citizens are at least as strong.

## CONCLUSION

The Motion for Preliminary Injunction should be denied.

Respectfully submitted,

/s/ Heather Hendricks
Heidi J. Long, OBA #17667
Ryan Leonard, OBA #19155
LEONARD, LONG & CASSIL, PLLC
6301 N. Western, Suite 250
Oklahoma City, OK 73118
(405) 702-9900
rleonard@llc-attorneys.com
hlong@llc-attorneys.com

[8] See 70 O.S. §3-142.

hhendricks@llc-attorneys.com

***Attorney for the Intervenors, The Oklahoma Families***

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2026, I electronically transmitted the attached document to the Clerk of Court using the Electronic Case Filing System for filing. Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to those registered participants of the ECF System.

/s/ Heather Hendricks

# District Court Order granting Kaiman Intervenors' Motion for Leave to File Opposition to Motion for Preliminary Injunction, filed below on July 7, 2026, as ECF No. 103

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

**THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., et al.,**

**Plaintiff,**

**v.** **Case No. CIV-26-582-R**

**BRIAN T. SHELLEM, in his official Capacity as Chairman of the Statewide Charter School Board, et al.,**

**Defendants.**

## ORDER

Upon consideration, and in accordance with the Court's order granting intervention [Doc. No. 89], the Motion by Proposed Intervenors [Doc. No. 62] seeking leave to file a brief in opposition to Plaintiff's Motion for Preliminary Injunction is GRANTED. The brief in opposition filed at Doc. No. 62-1 and its corresponding exhibits are deemed filed.

IT IS SO ORDERED this 7th day of July, 2026.



**DAVID L. RUSSELL**
**UNITED STATES DISTRICT JUDGE**

Board's Motion to Stay Discovery, filed below on July 24, 2026, as ECF No. 110

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., *et al.*,

*Plaintiffs*,

v.

BRIAN T. SHELLEM, in his official capacity as Chairman of the Statewide Charter School Board, *et al.*,

*Defendants*;

RABBI DANIEL KAIMAN, *et al.*,

*Defendant-Intervenors*;

CRICKET MOORE, *et al.*,

*Defendant-Intervenors*.

Case No. 5:26-cv-00582-R

**OKLAHOMA STATEWIDE CHARTER SCHOOL BOARD DEFENDANTS' MOTION TO STAY DISCOVERY**

Oklahoma Statewide Charter School Board Defendants respectfully move this Court to temporarily stay all discovery in this matter pending resolution—including any appeal—of Plaintiffs' Motion for Preliminary Injunction. ECF Nos. 10, 11. Defendant-Intervenors Oklahoma Taxpayers served discovery requests on Plaintiffs and Board Defendants, including requests for production, interrogatories, and a non-party subpoena. The discovery they seek is unnecessary for resolution of the threshold legal question in this case: whether the Oklahoma Charter Schools Act's religious prohibition

violates the Free Exercise Clause or Equal Protection Clause. *See* ECF No. 1. This Court should exercise its discretion and temporarily stay all discovery pending final, appellate disposition of Plaintiffs' Motion for Preliminary Injunction.

## BACKGROUND

Earlier this year, Plaintiffs applied for authorization of a Jewish charter school from the Oklahoma Statewide Charter School Board. ECF No. 1. The Board, bound by the Oklahoma Supreme Court's decision in *Drummond v. Oklahoma Statewide Virtual Charter School*, denied Plaintiffs' revised application solely because of the Oklahoma Charter Schools Act's religious prohibition. ECF No. 1-6; *see also* 558 P.3d 1 (Okla. 2024), Okla. Stat. tit. 70, § 3-136(A)(2).

Plaintiffs filed a complaint alleging that the Act's religious prohibition, Okla. Stat. tit. 70, § 3-136(A)(2), violates the Free Exercise and Equal Protection Clauses of the First Amendment to the United States Constitution and named the Oklahoma Statewide Charter School Board Members as Defendants.[1] ECF No. 1. Plaintiffs followed the Complaint with a Motion for Preliminary Injunction, seeking to enjoin the Board from enforcing the Act's religious prohibition. ECF Nos. 10, 11. Board Defendants responded to Plaintiffs' motion, conceding that Plaintiffs are likely to succeed on the merits. ECF No. 63.

The Court subsequently permitted two sets of intervenors: Oklahoma Taxpayers and Oklahoma Families. ECF No. 89. Oklahoma Taxpayers are currently the sole party

---

[1] Attorney General Drummond was also named as a Defendant, but he was later dismissed. ECF No. 90.

seeking discovery—serving interrogatories and requests for production on the Plaintiffs and interrogatories, requests for production, and a non-party subpoena on the Board. ECF No. 107.

The Motion for Preliminary Injunction is fully briefed and set for oral argument on August 5, 2026. ECF No. 106.

## ARGUMENT

District courts possess broad discretion to stay proceedings as part of their power to control their own dockets with economy of time and effort for the court, counsel, and litigants. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Clinton v. Jones*, 520 U.S. 681, 706 (1997). This inherent authority requires courts to exercise balanced judgment, weighing competing interests. *See Landis*, 299 U.S. at 254–55. Courts may also issue a stay pursuant to Federal Rule of Civil Procedure 26(c), which permits limiting discovery for good cause to protect a party from undue burden or expense. Such decisions rest firmly within the discretion of the district court. *See Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 674 (10th Cir. 2002) (reviewing discovery rulings for abuse of discretion).

When determining whether a discovery stay is appropriate, courts may consider: (1) the interests of the non-movant in obtaining discovery expeditiously and prejudice of a delay; (2) the burden on the movant of continuing discovery; (3) judicial convenience; (4) nonparty interests in staying discovery; and (5) the public interest. *Mfrs. All. Ins. Co. v. Baker*, No. CIV-23-1007-SLP, 2024 WL 4112782, at *1 (W.D. Okla. Sept. 6, 2024). And unlike when contemplating the stay of an entire proceeding

(as opposed to temporarily staying discovery), movants do not need to show hardship in being required to go forward. *See In re Church of Jesus Christ of Latter-Day Saints Tithing Litig.*, No. 2:24-md-03102-RJS-DAO, 2024 WL 4349160, at *2 n.23 (D. Utah Sept. 30, 2024) (discussing Tenth Circuit standards for staying discovery).

A stay is proper here for four reasons: (1) allowing discovery before the resolution of legal questions presented in the Motion for Preliminary Injunction unnecessarily drives up litigation costs for all parties; (2) Oklahoma Taxpayers seek discovery that is irrelevant to the legal question at issue in this case; (3) Oklahoma Taxpayers have other means available for the information they seek; and (4) Counsel for Oklahoma Taxpayers agreed to a similar stay in a previous case concerning a religious charter school pending resolution of the threshold constitutional question.

***First,*** allowing discovery before resolution of the legal question presented in the Motion for Preliminary Injunction unnecessarily drives up litigation costs for all parties. In a civil rights lawsuit, a prevailing party may seek an award of reasonable attorneys' fees and costs. 42 U.S.C. § 1988. Plaintiffs pray for this relief in their Complaint. Prayer, ECF No. 1 (requesting the Court award Plaintiffs' reasonable attorneys' fees and costs). Through their Answer and Response to Plaintiffs' Motion for Preliminary Injunction, Board Defendants state their belief that denying Ben Gamla's revised application—as *Drummond v. Oklahoma Statewide Virtual Charter School Board* and the Act's religious prohibition require—violated the United States Constitution. *See* 558 P.3d 1; Okla. Stat. tit. 70, § 3-136(A)(2). By doing so, the taxpayer-funded Board Defendants are mitigating any potential fee liability. *See* ECF No. 59 (stating that

Board Defendants do not oppose Plaintiffs request for relief but opposing Plaintiffs prayer for attorneys' fees and costs).

But Oklahoma Taxpayers (whose very basis for standing is premised on the prudence of taxpayer expenditures) initiated discovery and opened the floodgates of attorneys' fees and costs. And should Plaintiffs prevail, they will likely seek recovery of those heightened fees from Board Defendants—the government party required to deny Ben Gamla's revised application. In reality, this would leave the Oklahoma taxpayers (the broader public) financially responsible for Oklahoma Taxpayers' (Defendant-Intervenors) unnecessary and premature inflation of litigation costs. *See In re Church of Jesus Christ of Latter-Day Saints Tithing Litig.*, 2024 WL 4349160, at *3–4 (temporarily staying discovery where the "cost and time Defendants commit to their discovery responses will be significant," "the First Amendment issues underlying the case will generate numerous, legitimate discovery disputes," and where "avoiding potentially wasteful efforts by the court and the litigants serves" the "public's primary interest in . . . an efficient and just resolution" (citation modified)).

***Second,*** Oklahoma Taxpayers seek discovery that is irrelevant to the legal question in this case. Board Defendants do not dispute that they denied Ben Gamla's revised application due to its religious character, as the Act's religious prohibition requires. ECF No. 1, ¶ 104; ECF No. 59, ¶ 104. The question Plaintiffs raise is solely one of law—whether that prohibition violates the United States Constitution.

But Oklahoma Taxpayers seek fact discovery on a litany of issues that offer no assistance in resolving that threshold legal question. The interrogatories and requests

for production aim primarily at other issues surrounding statutory compliance—employment policies, service of students with disabilities, educational management organizations, board member composition, and funding (among many others).

It is true that the Oklahoma Statutes and Oklahoma Administrative Code contain a set of requirements that charter school applicants must meet. *See generally* Okla. Stat. tit. 70, § 3-134; Okla. Admin. Code § 777:10-3-3. Those requirements are irrelevant. Board Defendants admitted to denying Ben Gamla's revised application due to its religious character. ECF No. 59, ¶ 104. The Board Chairman stated under oath that Ben Gamla's only inadequacy was its religious character. ECF No. 63-1 at 99 (Decl. of Brian Thomas Shellem, Br. in Opp'n to Pet. for Writ of Mandamus at ¶ 15, *Drummond v. Oklahoma Statewide Charter School Board*, No. CV-2026-649 (Okla. Cnty. Dist. Ct. Apr. 2, 2026)). And the Board's Executive Director, who holds a doctorate in Education Leadership and served in her role for eleven years, agreed, under oath, that the Act's religious prohibition was the reason for Ben Gamla's denial. ECF No. 63-1 at 103, 107 (Decl. of Rebecca Lee Wilkinson, Ed. D., Br. in Opp'n to Pet. for Writ of Mandamus at ¶ 32, *Drummond v. Oklahoma Statewide Charter School Board*, No. CV-2026-649 (Okla. Cnty. Dist. Ct. Apr. 2, 2026)). She added that, in her experience, exact regulatory compliance—such as exact board member composition—often occurs after the school develops further or begins enrolling students. *Id.* at 106–07) (Wilkinson Decl. at ¶¶ 26–28).

But that further development can never occur. So long as Ben Gamla retains its religious character, its revised application must be denied. Regardless of whether Ben

Gamla met every other requirement of Oklahoma law governing charter school applicants, the question of whether the Act's religious prohibition violates the United States Constitution remains. That is the exact question the Complaint asks, and it would be improper to allow Oklahoma Taxpayers, as intervenors, to broaden the scope of this case. *See Vinson v. Washington Gas Light Co.*, 321 U.S. 489, 498 (1944) ("[A]n intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues[.]").

Rather, the proper place to adjudicate the issues Oklahoma Taxpayers raise—Ben Gamla's compliance with state statutory and regulatory requirements for charter school applicants—is state court. In fact, a lawsuit exists in state court concerning whether Ben Gamla's revised application warranted denial for reasons beyond its religious character.[2] *See United States v. Venjohn*, 104 F.4th 179, 190 (10th Cir. 2024) ("It is a foundational pillar of our federalist judicial system that we show state courts a healthy respect for their judgments on state law, and they us for judgments on federal law."). Instead, Oklahoma Taxpayers intervened in this lawsuit, and they must take the litigation as they find it. *See W. Refin. Sw., Inc. v. U.S. Dep't of the Interior*, No. 16-442 JH/GBW, 2016 WL 9447761, at *5 (D.N.M. Nov. 29, 2016) ("[A]n intervenor may argue only the issues raised by the principal parties and may not enlarge those issues.").

---

[2] In that lawsuit, the Board asserts, consistent with its position here, that Ben Gamla's religious character was the sole reason for its denial. *See* ECF No. 63-1 at 81 (Br. in Opp'n to Pet. for Writ of Mandamus at 7, *Drummond v. Oklahoma Statewide Charter School Board*, No. CV-2026-649 (Okla. Cnty. Dist. Ct. Apr. 2, 2026)).

***Third,*** Oklahoma Taxpayers have other means available for the information they seek. All information needed to litigate the threshold legal issue in this case is available online, including Board meeting minutes and videos. *See* SCSB Board Meetings, https://oklahoma.gov/scsb/about-us/board-meetings.html#accordion-ae8c7b3cc2-item-9b6e9598d0 (last visited July 22, 2026) (linking Board meeting minutes from 2024 to present); Oklahoma Statewide Charter School Board, YouTube, https://www.youtube.com/@okscsb/streams (last visited July 22, 2026) (linking Board meeting videos from 2025 to present). Ben Gamla's application and revised application are available in the record of this case. ECF Nos. 1, 11, 63. The Board Chairman and Executive Director submitted sworn, factual attestations regarding the reason for Ben Gamla's denial to a state court. ECF No. 63-1 at 99 (Shellem Decl.), 107 (Wilkinson Decl.). Statutory and regulatory requirements—including the requirements for charter school applicants and general functions and procedures of the Board—are accessible on the Oklahoma State Courts Network or Oklahoma Statewide Charter School Board websites. OSCN, https://www.oscn.net/home/ (last visited July 22, 2026); Oklahoma Statewide Charter School Board, https://oklahoma.gov/scsb.html (last visited July 22, 2026).

***Fourth,*** Counsel for Oklahoma Taxpayers agreed to a similar stay in a previous case concerning a religious charter school pending resolution of the threshold constitutional question. In 2023, the Board approved St. Isidore of Seville Catholic Virtual School's charter school application. *Drummond*, 558 P.3d at 6–7. Shortly after, a group of Oklahoma taxpayers sued, alleging St. Isidore violated several statutory and

regulatory requirements, including non-discrimination requirements, laws governing education of students with disabilities, and the religious prohibition. First Am. and Suppl. Pet., *OKPLAC, INC. v. Statewide Virtual Charter School Board*, No. CV-2023-1857 (Okla. Cnty. Dist. Ct. Jan. 31, 2024). While that case was pending in Oklahoma County District Court, Oklahoma Attorney General Gentner Drummond filed an original jurisdiction action at the Oklahoma Supreme Court concerning only whether the Act's religious prohibition required the Board to deny St. Isidore's application. *Drummond*, 558 P.3d at 7. Ultimately, all Counsel for parties in the district court case agreed to—and the Court ordered—a stay of that litigation pending review of the constitutional questions in *Drummond*. Agreed Order to Stay Litig., *OKPLAC, INC. v. Statewide Virtual Charter School Board*, No. CV-2023-1857 (Okla. Cnty. Dist. Ct. Jun. 27, 2024); Agreed Order Extending Stay of Litig., *OKPLAC, INC. v. Statewide Virtual Charter School Board*, No. CV-2023-1857 (Okla. Cnty. Dist. Ct. Feb. 20, 2025). This agreement was premised upon St. Isidore's agreement not to open as a charter school in the coming year. *Id.*

But here, despite the circumstances—and Counsel—being nearly identical, Counsel for Oklahoma Taxpayers resists such a stay. The plaintiffs in Oklahoma County District Court raised many of the same issues Oklahoma Taxpayers seek discovery for here.[3] And much like St. Isidore (who agreed not to operate as a school),

[3] This is unsurprising given the overlap of legal issues, counsel, and named parties. Defendant-Intervenor Michele Medley was a Plaintiff in the Oklahoma County District Court case. First Am. and Suppl. Pet. at ¶ 14, *OKPLAC, INC. v. Statewide Virtual Charter School Board*, No. CV-2023-1857 (Okla. Cnty. Dist. Ct. Jan. 31, 2024). The

Ben Gamla will not operate as a charter school while this litigation proceeds. It cannot; its revised application was denied.

## CONCLUSION

Board Defendants respectfully request that this Court stay all discovery in this matter pending resolution—including any appeal—of Plaintiffs' Motion for Preliminary Injunction.

---

Oklahoma Statewide Virtual Charter School Board was a Defendant in the Oklahoma County District Court case. First Am. and Suppl. Pet. at ¶ 20, *OKPLAC, INC. v. Statewide Virtual Charter School Board*, No. CV-2023-1857 (Okla. Cnty. Dist. Ct. Jan. 31, 2024).

Respectfully submitted this 24th day of July, 2026.

*/s/ Anthony J. Ferate*
Anthony J. Ferate, OBA No. 21171
SPENCER FANE LLP
9400 North Broadway Extension, Suite 600
Oklahoma City, Oklahoma 73114
(405) 844-9900
ajferate@spencerfane.com

Hiram S. Sasser, III, OBA No. 19557
Holly M. Randall,* OBA No. 34763
Erin E. Smith,* OBA No. 35232
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075
(972) 941-4444
hsasser@firstliberty.org
hrandall@firstliberty.org
esmith@firstliberty.org
**Admitted pro hac vice*

***Attorneys for Oklahoma Statewide Charter School Board Defendants***

# Ben Gamla's Motion to Stay Discovery, filed below on July 24, 2026, as ECF No. 111

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., *et al.*,

*Plaintiffs*,

v.

BRIAN T. SHELLEM, in his official capacity as Chairman of the Oklahoma Statewide Charter School Board, *et al.*,

*Defendants*,

RABBI DANIEL KAIMAN, *et al.*,

*Defendant-Intervenors*,

CRICKET MOORE, *et al.*,

*Defendant-Intervenors*.

Case No. 5:26-cv-00582-R

**PLAINTIFFS' MOTION TO STAY DISCOVERY AND BRIEF IN SUPPORT**

Robert G. McCampbell
OBA No. 10390
David A. Herber
OBA No. 33527
GABLEGOTWALS
499 W. Sheridan Ave., Ste. 2200
Oklahoma City, OK 73102
(405) 235-5500
*RMcCampbell@Gablelaw.com*
*DHerber@Gablelaw.com*

Daniel L. Chen
DC Bar No. 1781783
Eric S. Baxter
DC Bar No. 479221
Eric C. Rassbach
TX Bar No. 24013375
Benjamin A. Fleshman
DC Bar No. 1781280
Phillip J. Allevato*
CA Bar No. 362581
Siena A. Marcelle
DC Bar No. 90043763
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
(202) 955-0095
*ebaxter@becketfund.org*

**Not a member of the DC Bar; admitted in California. Practice limited to cases in federal court.*

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

LEGAL STANDARD ........ 4

ARGUMENT ........ 5

I. No discovery is needed to resolve the purely legal issue in this case. ........ 5

II. At minimum, this Court for efficiency reasons should stay discovery pending resolution of Plaintiffs' motion for preliminary injunction. ........ 11

CONCLUSION ........ 14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alzheimer's Inst. of Am. v. Comentis, Inc.*,
No. 09-cv-1366, 2010 WL 11508734 (W.D. Okla. Dec. 17, 2010) ........................ 5, 11

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ........................ 13

*Arapahoe Cnty. Public Airport Auth. v. FAA*,
242 F.3d 1213 (10th Cir. 2001) ........................ 9, 10

*Brentwood Acad. v. Tennessee Secondary Sch. Athl. Ass'n*,
531 U.S. 288 (2001) ........................ 6

*Central Kansas Credit Union v. Mutual Guar. Corp.*,
102 F.3d 1097 (10th Cir. 1996) ........................ 9

*Drummond v. Okla. Statewide Charter Sch. Bd.*,
No. CV-2026-649 (Okla. Cnty. Dist. Ct. Mar. 11, 2026) ........................ 10

*Evergreen Holdings, Inc. v. Sequoia Global, Inc.*,
No. 08-cv-776, 2008 WL 4723008 (W.D. Okla. Oct. 23, 2008) ........................ 11

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
146 S. Ct. 1114 (2026) ........................ 13

*Freeman v. Cmty. Strategies, Inc.*,
No. 25-cv-170, 2025 WL 2345090 (W.D. Okla. July 7, 2025) ........................ 4

*Graham v. Gray*,
827 F.2d 679 (10th Cir. 1987) ........................ 4

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) ........................ 12

*Hutchinson v. Pfeil*,
211 F.3d 515 (10th Cir. 2000) ........................ 11

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936) ........................ 4-5

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995) .......... 6

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982) .......... 5

*Macias v. N.M. Dep't of Lab.*,
21 F.3d 366 (10th Cir. 1994) .......... 9

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) .......... 14

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) .......... 6

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*,
508 U.S. 656 (1993) .......... 8

*OKPLAC, Inc. v. Statewide Virtual Charter Sch. Bd.*,
No. CV-2023-1857 (Okla. Cnty. Dist. Ct. Jan. 18, 2024) .......... 10

*Petrus v. Bowen*,
833 F.2d 581 (5th Cir. 1987) .......... 11

*Rendell-Baker v. Kohn*,
457 U.S. 830 (1982) .......... 5

*Roe No. 2 v. Ogden*,
253 F.3d 1225 (10th Cir. 2001) .......... 8

*Samuels v. Baldwin*,
No. 14-cv-2588, 2015 WL 232121 (D. Colo. Jan. 16, 2015) .......... 11

**Statutes**

Okla. Stat. Ann. tit. 70 § 3-136 .......... 6

**Other Authorities**

Okla. Admin. Code § 777:10-3-3 .......... 7, 8

## INTRODUCTION

This case is about whether charter schools are state actors—a purely legal question. Plaintiffs and the Charter Board Defendants thus agree that no discovery is needed for this lawsuit at all. And the Moore Intervenors concur that, even if discovery is needed, it should be stayed pending resolution of Plaintiffs' motion for preliminary injunction. Yet the Taxpayer Intervenors want to force extensive discovery on matters entirely irrelevant to the sole issue in this case: whether charter schools are state actors.

Taxpayer Intervenors' argument for discovery is paper thin. They concede that discovery is not needed for the merits of the preliminary injunction. Their opposition brief makes legal arguments only and identifies no issues of fact. Instead, Taxpayer Intervenors contend discovery is relevant to standing. They argue that information about Ben Gamla's corporate documents and donors, its admission, discipline, and hiring policies, its class syllabi and curricula, and its religious views on marriage and sexuality will somehow disclose that Plaintiffs are not, in fact, "able and ready" to establish a charter school.

That argument is a nonstarter for several reasons. First, Taxpayer Intervenors are wrong on the law. The Oklahoma Charter School Act's (OCSA) absolute bar against Plaintiffs because of their religion is alone sufficient for standing. Second, even if that weren't true, only the Charter Board can decide whether Plaintiffs are qualified for a charter under the OCSA. This Court cannot second guess that state-law decision, and Taxpayer Intervenors are barred from expanding this lawsuit to challenge it.

Moreover, granting discovery will open a flood of motion practice, unnecessarily burdening this Court's and the parties' resources. Plaintiffs have extensive constitutional

and proportionality objections to Taxpayer Intervenors' discovery requests—including their requests seeking disclosure of Plaintiffs' donors and probing their religious practices, which are irrelevant to standing. Even the requests for Plaintiffs' school curricula and policies are improper as they are considered by the Board at a later stage of the proceeding—a stage to which Plaintiffs can never progress due to the OCSA's religious bar.

For all these reasons, discovery is irrelevant, prejudicial, and unduly burdensome. This Court should accordingly stay all discovery or—at minimum—stay it pending resolution of Plaintiffs' motion for preliminary injunction, including any appeals.

## FACTUAL BACKGROUND

In December 2025, Plaintiffs submitted to the Board an application for authorization to establish the Ben Gamla Jewish Charter School. *See generally* Dkt. 1-2. Ben Gamla's purpose is to provide interested Oklahoma students a stellar education with a cultural and ethical grounding in the Jewish faith, heritage, and tradition. *Id.* at 5. Plaintiffs believe that because G-d created the universe and orders all within it, a Jewish perspective should permeate all subjects and unify all knowledge. *Id.* at 4. Thus, as part of Ben Gamla's distinctive mission, students will receive instruction in Jewish religion, culture, values, rituals, texts, holidays, and practices. *Id.* at 5.

Initially, the Board voted unanimously to reject Plaintiffs' application for a variety of reasons, including Ben Gamla's religious identity. Dkt. 1-4 at 2-3. In response, Plaintiffs submitted an addendum, addressing all the Board concerns, except Ben Gamla's religious nature. *See generally* Dkt. 1-5. Upon reviewing the addendum, the Board concluded that

Plaintiffs had adequately resolved all substantive concerns, yet again unanimously denied the application. Dkt. 1-6. Citing the OCSA and the Oklahoma Supreme Court's decision in *Drummond*, the Board concluded that, "[u]nder Oklahoma law, a charter school is a public school and, as such, must be nonsectarian." *Id.*

Plaintiffs sued. Dkt. 1. Contending that the OCSA's religious bar violates the U.S. Constitution's Free Exercise and Equal Protection Clauses, Plaintiffs also moved for a preliminary injunction. Dkts. 10-11. Taxpayer Intervenors then sought intervention to defend the OCSA's nonsectarian requirement. The Moore Intervenors followed with a motion to intervene of their own.

After this Court granted both motions to intervene, Taxpayer Intervenors immediately pushed for a Rule 26(f) discovery conference. At that conference, Plaintiffs, the Board, and the Moore Intervenors all agreed that discovery and any proposed scheduling were premature. But the Taxpayer Intervenors forged ahead. Within two days, they had served expansive discovery requests on both Plaintiffs and the Board, including demands for the personal contact information of all former and current board members of Plaintiff National Ben Gamla Jewish Charter School Foundation, Inc. (not just the Oklahoma school); all persons involved in the decision to create Ben Gamla; and all donors who have or intend to provide more than $5,000 to Ben Gamla. They also seek information about Plaintiffs' religious beliefs and practices and Ben Gamla's operational policies. Dkt. 107 at 8-9. At Taxpayer Intervenors' continued insistence, the parties filed a Joint Status Report on July 14. *Id.* at 1-12. In the Joint Status Report, Plaintiffs opposed discovery entirely and the Board—which had previously opposed discovery—abstained from the Report in light of

the Court having scheduled a status conference. *Id.* at 1, 2. The Moore Intervenors explained that they were not challenging standing and suggested that discovery was unnecessary at this time. *Id.* at 3, 7. Despite this, Taxpayer Intervenors indicated that they would still need discovery, including expert reports, with an estimated nine months to complete. *Id.* at 7; Taxpayer Intervenors Proposed Scheduling Order at 2-3 (July 15, 2026).

At the status conference held on July 16, the Court discussed the need for a preliminary-injunction hearing and heard arguments as to whether discovery should be stayed. As a result, the Court requested that Plaintiffs and the Board file a motion to stay discovery.[1] Plaintiffs' motion for preliminary injunction remains pending, with a hearing scheduled for August 5.

## LEGAL STANDARD

"[A] trial court's decision to allow or deny discovery is discretionary." *Graham v. Gray*, 827 F.2d 679, 681 (10th Cir. 1987). Courts "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including … specifying terms, including time and place … for the disclosure or discovery[.]" Fed. R. Civ. P. 26(c)(1). A district court may "stay proceedings pending before it and to control its docket for the purpose of 'economy of time and effort for itself, for counsel, and for litigants.'" *Freeman v. Cmty. Strategies, Inc.*, No. 25-cv-170, 2025 WL 2345090, at *1 (W.D. Okla. July 7, 2025) (citing *Landis v. N. Am. Co.*, 299 U.S. 248,

[1] Although Plaintiffs do not believe that any discovery is warranted in this case, Plaintiffs reserve all rights to object to specific discovery requests including, but not limited to, their scope, breadth, and relevance.

254 (1936)). In deciding to stay discovery, a court considers "(1) whether a stay would promote judicial economy; (2) whether a stay would avoid confusion and inconsistent results; and (3) whether a stay would unduly prejudice the parties or create undue hardship." *Id.* (*quoting Alzheimer's Inst. of Am. v. Comentis, Inc.*, No. 09-cv-1366, 2010 WL 11508734, at *2 (W.D. Okla. Dec. 17, 2010)).

## ARGUMENT

### I. No discovery is needed to resolve the purely legal issue in this case.

The facts regarding the submission and denial of Plaintiffs' charter application are undisputed. No party contests that Plaintiffs submitted a charter application to the Board. No party contests that the Board denied the application. And no party contests that the Board's sole reason for denying the application was Plaintiffs' failure to meet the OCSA's nonsectarian requirement.

What *is* in dispute is the legal status of Oklahoma charter schools. Intervenors insist that charter schools are governmental entities or state actors. *See* Dkt. 62-1. Plaintiffs assert that charter schools are private. *See* Dkts. 11, 99, 100. If Intervenors are correct, then Plaintiffs' have no First Amendment claims. But if Plaintiffs are correct, the Free Exercise Clause forbids Oklahoma from excluding religious schools from the charter-school program. Either way, the only thing in dispute is whether charter schools are state actors.

Resolving that question does not turn on any unknown facts. It turns on various legal tests that assess whether charter schools' actions are "fairly attributable to the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). For example, the state actor analysis asks whether a charter

school "performs a traditional, exclusive public function." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019). The question is simply whether the function charter schools perform has traditionally and exclusively been the State's prerogative—a legal question on which Taxpayer Intervenors' discovery will have no bearing.

The state actor analysis also asks whether an entity is so heavily regulated and controlled by the government that it is "entwine[d]" with the government, *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 303 (2001), or "compel[ed]" by the government "to take a particular action," *Halleck*, 587 U.S. at 809. Again, here the Court need only look at Oklahoma's charter-school regulations to determine whether they meet the governing standards for government entwinement or compulsion.

Another test—the governmental entity test—similarly requires no factual development. This test asks whether the government created the private entity (here, Ben Gamla) "by a special statute." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995). The Court need only look at the Oklahoma Charter School Act to see there is no such "special statute" creating any charter school. No discovery is needed.

Additionally, like the state actor test, the governmental entity test asks about governmental control over the entity—specifically, whether the governing board is created or controlled by the government. *See id.* at 385. But here, it is undisputed that Oklahoma Law requires charter schools to appoint their own independent governing board. *See* Okla. Stat. Ann. tit. 70, § 3-136(A)(7). In short, all of the facts necessary to resolve the central legal issue in this case are undisputed and already before the Court.

Indeed, Taxpayer Intervenors have raised no facts relevant to whether Oklahoma charter schools are state actors. Instead, they suggest discovery is necessary to evaluate Plaintiffs' standing. They claim Plaintiffs cannot challenge the OCSA's religious bar because, in their view, Plaintiffs might not be able to satisfy other statutory requirements regarding school bylaws, personnel, or curricular choices. Dkt. 62-1 at 5-6. Taxpayer Intervenors are wrong.

For one thing, Taxpayer Intervenors' desired information is irrelevant to Ben Gamla's denial at the outset of Oklahoma's multi-step charter school application process. Under the newest regulations (and the ones Plaintiffs were subject to), there are three steps to the process: (1) the Pre-application Phase, (2) the Phase 1 charter application, and (3) the Phase 2 ready-to-open application. In the Pre-application Phase, the applicant submits a letter of intent laying out its vision and mission, educational model, community engagement efforts, and governing board. *See* Okla. Admin. Code § 777:10-3-3(a)(3). In Phase 1, the school's application contains additional descriptions of the school's governing board and founding team, its educational model, and implementation plan. *See id.* § 777:10-3-3(b). But that phase necessarily only involves a preliminary assessment and results only in initial approval of the application. Afterwards, the parties must still negotiate and execute a charter contract. Only then does an applicant enter Phase 2 of the process, where the Board and applicant work to make sure the school is ready to open by developing specific plans regarding finances, academic offerings, and organizational capacity. *See id.* § 777:10-3-3(c). Final approval for a school opening is dependent on successfully fulfilling these Phase

2 ready-to-open requirements. *Id.* ("The Ready-to-Open requirements must be fulfilled to attain final approval for school opening.").

Plaintiffs' application was rejected during *Phase 1* because of its religious identity; but the information Taxpayer Intervenors claim is necessary to establish standing is not addressed until *Phase 2* of the process, where the Board and applicant develop specific operation plans. The discovery Taxpayer Intervenors seek thus has no bearing on whether Plaintiffs can challenge the Board's religiously discriminatory rejection of their application in Phase 1.

Even if the information Taxpayer Intervenors seek were related to the correct phase of the application process, their theory of standing misreads Tenth Circuit and Supreme Court caselaw. As Plaintiffs have already explained, Dkt. 99 at 2-5, Plaintiffs only need show that they (1) belong to the correct class of entities that can apply for Charter schools (which they do), *Roe # 2 v. Ogden*, 253 F.3d 1225, 1230 (10th Cir. 2001), (2) that they are "able and ready to" apply (which they are—and have already done), and (3) "that a discriminatory policy prevents [them] from doing so on an equal basis" (which is true). *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993). Having already been rejected based on religion, their standing is easily established. *Id*. (standing established by "denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit").

But even if Taxpayer Intervenors' theory of standing were correct, they would not be entitled to discovery beyond what is already in the administrative record. To the extent Taxpayer Intervenors believe that the evidence before the Board establishes Plaintiffs'

inability to meet OCSA criteria, *see* Dkt. 62-1 at 5-6 (identifying record evidence Taxpayer Intervenors believe defeats Plaintiffs' standing), that conflicts with the Board's own determination, *see* Dkt. 11 (describing Board's reasoning and citing record evidence). And this Court must "give deference to a state administrative agency's interpretation and application of a state statute which it is charged with administering." *Macias v. N.M. Dep't of Lab.*, 21 F.3d 366, 369 (10th Cir. 1994); *see also Cent. Kan. Credit Union v. Mut. Guar. Corp.*, 102 F.3d 1097, 1105 (10th Cir. 1996) (applying this "presumption of validity" to application of Kansas statute). That includes the Board's assessment of whether Plaintiffs met the statutory requirements based on the facts that were before it.

Such deference is especially warranted here, as denying standing would preclude Plaintiffs and every other proponent of a religious charter school from ever challenging the OCSA's religious exclusion. Plaintiffs' application has already been denied, and the additional showings demanded by Taxpayer Intervenors can be made to the Board only in Phase 2, a phase religious applicants can never reach because of the religious ban in Phase 1. But even if this Court did not give any deference to the Board's assessment of the record, no additional discovery would be needed because the record already contains the information that was before the Board when it made its decision.

Taxpayer Intervenors try to get around this by suggesting that evidence that was never before the Board in the first place *might* show that the Board was wrong in its assessment. This is an entirely theoretical position that would drastically expand the scope of this case, which an intervenor is not allowed to do. *See, e.g.*, *Arapahoe Cnty. Pub. Airport Auth. v. FAA*, 242 F.3d 1213, 1217 n.4 (10th Cir. 2001) ("[A]s an intervening party, the City may

join issue only on matters brought before the court by the [plaintiff].”). Plaintiffs have challenged only the OCSA's religious exclusion as a violation of the Free Exercise and Equal Protection Clauses. But Taxpayer Intervenors' arguments “as a whole, are directed toward [Plaintiffs'] standing”—an issue that is not an “‘essential predicate[]’ or substantively connected to the issues [Plaintiffs] presented in” their case. *Id.* Taxpayer Intervenors' theoretical concerns over Plaintiffs' ability to satisfy statutory criteria would go far afield from the core legal issues presented in this case: whether Oklahoma charter schools are state actors.

Indeed, Taxpayer Intervenors' concerns more closely align with the state-court action brought by Attorney General Drummond seeking to force the Board to apply the Act as he thinks it should be applied. *See Drummond v. Okla. Statewide Charter Sch. Bd.*, No. CV-2026-649 (Okla. Cnty. Dist. Ct. Mar. 11, 2026). If Taxpayer Intervenors are concerned with the way the Board applied the Act here, then they should have brought their own lawsuit,[2] or pleaded a cross-claim against the Board, or even sought to join Attorney General Drummond's case. They did none of that. Instead, they dove into this case *to defend the OCSA's religious exclusion*. *See* Dkt. 15. Taxpayer Intervenors offer no legitimate basis for going well beyond the limits of that issue and seeking expansive and intrusive discovery into Plaintiffs' standing. This Court should accordingly hold that no

[2] Indeed, counsel for Taxpayer Intervenors *did* bring a state-law mandamus action during the litigation over St. Isidore, rather than intervene in the proceedings there. *See OKPLAC, Inc. v. Statewide Virtual Charter Sch. Bd.*, No. CV-2023-1857 (Okla. Cnty. Dist. Ct. July 31, 2023).

discovery beyond what is already in the administrative record (i.e., what was actually before the Board when it made its decision) is appropriate in this case.

**II. At minimum, this Court for efficiency reasons should stay discovery pending resolution of Plaintiffs' motion for preliminary injunction.**

Courts stay discovery when a stay would (1) "promote judicial economy"; (2) "avoid confusion and inconsistent results"; and (3) "unduly prejudice the parties or create undue hardship." *Alzheimer's Inst. of Am.*, 2010 WL 11508734, at *2 (citing *Evergreen Holdings, Inc. v. Sequoia Global, Inc.,* No. 08-cv-776, 2008 WL 4723008, at *2 (W.D. Okla. Oct. 23, 2008)). Such a stay is warranted here.

*Staying discovery promotes judicial economy.* Trial courts have "broad discretion and inherent power to stay discovery until preliminary questions that may dispose of the case are determined." *Petrus v. Bowen*, 833 F.2d 581, 583 (5th Cir. 1987). Indeed, courts regularly look to the "*probability* that both judicial and attorney resources will be conserved by clarifying and resolving disputed legal issues" before engaging in discovery. *Samuels v. Baldwin*, No. 14-cv-2588, 2015 WL 232121, at *3 (D. Colo. Jan. 16, 2015). Staying discovery now will promote judicial economy by allowing the Court to resolve at least two preliminary legal issues, thereby narrowing the scope of discovery (and discovery related motions) over the course of the case.

First, Taxpayer Intervenors' argument that discovery must proceed *now* rests on their theory that Plaintiffs lack standing. Standing is a "threshold issue," and its absence is "fatal" to any claim. *Hutchinson v. Pfeil*, 211 F.3d 515, 523 (10th Cir. 2000). And if the

Court determines that Plaintiffs do, indeed, lack standing, then it would simply dismiss this case, making all discovery conducted up to that point a waste of time and resources.

Second, the Court can resolve the question concerning the legal status of Oklahoma charter schools. If the Court determines that Oklahoma charter schools are state actors or governmental entities, then Plaintiffs' claims would fail—again rendering discovery a complete waste.

Contrary to Taxpayer Intervenors' newest position,[3] neither of these issues requires discovery to be conducted prior to deciding the motion for preliminary injunction. All of the evidence that Plaintiffs believe supports their claims is already in the administrative record and before this Court. Taxpayer Intervenors identified no factual gaps in the record when responding to Plaintiffs' motion. Thus, delaying a resolution of those legal issues to conduct discovery would only delay the relief Plaintiffs seek—or else a prompt resolution of this case under either of Taxpayer Intervenors' theories.

*Staying discovery avoids confusion and inconsistent results.* Both Plaintiffs and the Board oppose the scope of discovery from the outset. Just the first of Taxpayer Intervenors' requests for production include demands for the personal contact information for: all of Plaintiff National Ben Gamla Jewish Charter School Foundation's past and current board

---

[3] Taxpayer Intervenors never made a request for pre-hearing discovery when they filed their response to Plaintiffs' initial preliminary injunction motion. In their response they raised standing, but did not argue that discovery was necessary at this stage. Dkt. 62. It's clear why: if they had, they would have been expanding the scope of litigation beyond its original issues, and would have had to justify their *own* standing under *Hollingsworth v. Perry*, 570 U.S. 693, 707-08 (2013).

members (not just those of the Ben Gamla school); all persons involved in the decision to create Ben Gamla; and all donors who have or intend to provide more than $5,000 to Ben Gamla. For each of these individuals, Taxpayer Intervenors demand last known home and business mailing addresses, personal and business email addresses, and home, business, and mobile telephone numbers.

These requests for production expand the scope of the case by embroiling the Court in an effort to second-guess a state agency's decision via new documents that were not before the agency when that decision was made. *See supra* pp. 8-10. Additionally, Taxpayer Intervenors' requests for donor lists and internal communications raise serious First Amendment concerns. *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1122-24 (2026) (forcing disclosure of nonprofit's donor information is a First Amendment injury); *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 611 (2021) (forced disclosure of nonprofit's donor information is "facially unconstitutional"). And bringing to the fore irrelevant information risks confusing the dispositive legal issue of whether Oklahoma charter schools are state actors. The proposed discovery is not warranted at all, and certainly not at this stage in the litigation.

*Staying discovery does not prejudice or cause undue hardship to any parties.* No party would be harmed by a brief stay of discovery. Indeed, the stay will benefit the parties by narrowing the scope (and thus the burdens and cost) of discovery. The only parties pushing for immediate discovery—Taxpayer Intervenors—haven't identified any way in which a stay would burden them. Indeed, in opposing Plaintiffs' motion for preliminary injunction, Taxpayer Intervenors never even suggested that discovery into standing was necessary to

decide that question. The Court does not need any additional discovery before the preliminary injunction is decided, and—even if discovery were somehow relevant—all of the information Taxpayer Intervenors seek will still be available after the preliminary injunction motion is resolved. There is no reason that Taxpayer Intervenors need immediate and sweeping discovery.

Plaintiffs and the Board, on the other hand, would be prejudiced by being required to begin immediate discovery, particularly if the Court were to delay the resolution of Plaintiffs' motion for a preliminary injunction. The drag-out nine-month discovery window that Taxpayer Intervenors suggest obliterates Plaintiffs' goal of actually opening a charter school within a reasonable time frame. *See Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) ("Loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

The Court can spare the parties this hardship, at the very least, until it decides the motion for preliminary injunction, while along the way conserving judicial economy, avoiding confusing the issues, and preventing undue hardship to the parties.

## CONCLUSION

The Court should hold that no discovery is necessary or, in the alternative, stay discovery in this case pending the resolution of Plaintiffs' motion for a preliminary injunction and any related interlocutory appeals.

Dated: July 24, 2026

Respectfully submitted,

<u>*/s/ Daniel L. Chen*</u>

Robert G. McCampbell
OBA No. 10390
David A. Herber
OBA No. 33527
GABLEGOTWALS
499 W. Sheridan Ave., Suite 2200
Oklahoma City, OK 73102
Tel 405-235-5500
*RMcCampbell@Gablelaw.com*

Daniel L. Chen
DC Bar No. 1781783
Eric S. Baxter
DC Bar No. 479221
Eric C. Rassbach
TX Bar No. 24013375
Benjamin A. Fleshman
DC Bar No. 1781280
Phillip J. Allevato*
CA Bar No. 362581
Siena A. Marcelle
DC Bar No. 90043763
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
(202) 955-0095
*ebaxter@becketfund.org*

**Not a member of the DC Bar; admitted in California. Practice limited to cases in federal court.*

*Attorneys for Plaintiffs*

# Kaiman Intervenors' Opposition to Ben Gamla's and the Board's Motions to Stay Discovery, filed below on July 31, 2026, as ECF No. 113

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., et al.,<br><br>*Plaintiffs*,<br><br>-against-<br><br>BRIAN T. SHELLEM, in his official capacity as Chairman of the Statewide Charter School Board, et al.,<br><br>*Defendants*, | Case No. 5:26-cv-00582-R |
| RABBI DANIEL KAIMAN, et al.,<br><br>*Intervenors*. | |
| CRICKET MOORE, et al.,<br><br>*Intervenors*. | |

**BRIEF IN OPPOSITION**
**BY INTERVENORS RABBI DANIEL KAIMAN, ET AL.,**
**TO PLAINTIFFS' AND STATEWIDE CHARTER SCHOOL BOARD DEFENDANTS' MOTIONS TO STAY DISCOVERY**

## TABLE OF CONTENTS

INTRODUCTION ........ 1
LEGAL STANDARD ........ 2
ARGUMENT ........ 3
I. Discovery is needed and relevant in this important constitutional case ........ 3
A. This case raises important constitutional questions that warrant a fully developed record ........ 3
B. Kaiman Intervenors need discovery relevant to both jurisdictional and merits issues ........ 5
C. Plaintiffs wrongly cast this case as presenting one sterile legal question ........ 7
D. Plaintiffs and the Charter Board rely on inapplicable administrative-law doctrines ........ 10
II. The Court should not stay discovery until resolution of Plaintiffs' motion for a preliminary injunction and any appeal thereof ........ 14
III. Plaintiffs' and the Charter Board's concerns about particular discovery requests do not support a stay of all discovery ........ 17
IV. The Charter Board's concern about attorneys' fees should not affect the scope of discovery ........ 18
CONCLUSION ........ 19

# TABLE OF AUTHORITIES

**Cases**

*Alvarado v. J.C. Penney Co.*,
997 F.2d 803 (10th Cir. 1993) .......... 12

*Arapahoe Cnty. Pub. Airport Auth. v. FAA*,
242 F.3d 1213 (10th Cir. 2001) .......... 12

*Bender v. Williamsport Area Sch. Dist.*,
475 U.S. 534 (1986) .......... 3, 4, 8, 13

*Bigby v. City of Chicago*,
927 F.2d 1426 (7th Cir. 1991) .......... 19

*Binta B. ex rel. S.A. v. Gordon*,
710 F.3d 608 (6th Cir. 2013) .......... 19

*Brat v. Personhuballah*,
883 F.3d 475 (4th Cir. 2018) .......... 19

*Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*,
605 U.S. 238 (2025) .......... 7

*Cent. Kan. Credit Union v. Mut. Guar. Corp.*,
102 F.3d 1097 (10th Cir. 1996) .......... 10

*Century Martial Art Supply, L.L.C. v. Dynamics World, Inc.*,
No. CIV-17-1194-M, 2018 WL 4390752 (W.D. Okla. Sept. 14, 2018) .......... 2

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984) .......... 10

*Clinton v. Jones*,
520 U.S. 681 (1997) .......... 2

*Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*,
974 F.2d 450 (4th Cir. 1992) .......... 13

*Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.*,
713 F.2d 1477 (10th Cir. 1983) .......... 2

*Day v. Bond*,
500 F.3d 1127 (10th Cir. 2007) .......... 9

*De Baca v. United States*,
403 F. Supp. 3d 1098 (D.N.M. 2019) .......... 2

*Democratic Party of Wash. State v. Reed*,
388 F.3d 1281 (9th Cir. 2004) .......... 19

*Free Speech v. Fed. Election Comm'n*,
720 F.3d 788 (10th Cir. 2013) .......... 16

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) .......... 15

*Grill v. Quinn*,
No. CIV S-10-0757 GEB, 2012 WL 174873 (E.D. Cal. Jan. 20, 2012) .......... 11

*Hopwood v. Texas*,
236 F.3d 256 (5th Cir. 2000) .......... 19

*In re Church of Jesus Christ of Latter-Day Saints Tithing Litig.*,
No. 2:24-MD-03102-RJS-DAO, 2024 WL 4349160
(D. Utah Sept. 30, 2024) .......... 2

*Indep. Fed. of Flight Attendants v. Zipes*,
491 U.S. 754 (1989) .......... 19

*Kane County v. United States*,
94 F.4th 1017 (10th Cir. 2024) .......... 12

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) .......... 7

*Lemon v. Kurtzman*,
403 U.S. 602 (1971) .......... 7

*Loper Bright Enter. v. Raimondo*,
603 U.S. 369 (2024) .......... 10

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 8

*Macias v. N.M. Dep't of Lab.*,
21 F.3d 366 (10th Cir. 1994) .......... 10, 11

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) .......... 7, 15

*Marshall v. Bramer*,
828 F.2d 355 (6th Cir. 1987) .......... 18

*Mfrs. All. Ins. Co. v. Baker*,
No. CIV-23-1007-SLP, 2024 WL 4112782 (W.D. Okla. Sept. 6, 2024) .......... 3

*Miccosukee Tribe of Indians of Fla. v. United States*,
No. 08-23001-CIV, 2010 WL 337653 (S.D. Fla. Jan. 22, 2010) .......... 11

*N.M. Pharm. Ass'n v. State*,
738 P.2d 1318 (N.M. 1987) .......... 10

*Okla. Statewide Charter Sch. Bd. v. Drummond*,
605 U.S. 165 (2025) .......... 3

*Phila. Indem. Ins. Co. v. Chi. Title Ins. Co.*,
771 F.3d 391 (7th Cir. 2014) .......... 14

*Ross v. Bernhard*,
396 U.S. 531 (1970) .......... 12

*Rum Creek Coal Sales, Inc. v. Caperton*,
31 F.3d 169 (4th Cir. 1994) .......... 19

*Rydeen v. Quigg*,
748 F. Supp. 900 (D.D.C. 1990), *aff'd*, 937 F.2d 623 (Fed. Cir. 1991) .......... 11

*Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*,
993 F.3d 802 (10th Cir. 2021) .......... 4, 14

*Scott v. Allen*,
153 F.4th 1088 (10th Cir. 2025) .......... 4

*Soc'y of Separationists v. Pleasant Grove City*,
416 F.3d 1239 (10th Cir. 2005) .......... 7

*Spangler v. United States*,
415 F.2d 1242 (9th Cir. 1969) .......... 13

*Stewart-Warner Corp. v. Westinghouse Elec. Corp.*,
325 F.2d 822 (2d Cir. 1963) .......... 13

*Tandon v. Newsom*,
593 U.S. 61 (2021) .......... 15

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......... 15

*United States v. Windsor*,
570 U.S. 744 (2013) .......... 13

*Vinson v. Wash. Gas Light Co.*,
321 U.S. 489 (1944) .......... 12

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025) .......... 13

*W. Refin. Sw., Inc. v. U.S. Dep't of Interior*,
No. 16-442 JH/GBW, 2016 WL 9447761 (D.N.M. Nov. 29, 2016) .......... 12

*Webster v. Doe*,
486 U.S. 592 (1988) .......... 11

*Wilson v. Glenwood Intermountain Props., Inc.*,
98 F.3d 590 (10th Cir. 1996) .......... 9

**Statutes**

Okla. Stat. tit. 70, § 3-134 .......... 5, 9

Okla. Stat. tit. 75, § 318 .......... 10

**Regulations**

43 Okla. Reg. 2369 (July 15, 2026) .......... 8

Okla. Admin. Code § 777:10-3-3 .......... 9, 16

**Other Authorities**

4 Moore's Federal Practice, Par. 24.16(4) (2d ed. 1968) .......... 13

7C Wright & Miller's Federal Practice & Procedure § 1920 (3d ed. 1998) .......... 13

Interview with Peter Deutsch, *Should the Supreme Court Permit Public Funding for Jewish Charter Schools? Yes*, Moment (Apr. 8, 2026), https://perma.cc/V5UK-9TW5 .......... 3–4

Mark Walsh, *Religious Charter Schools Push New Cases Toward Supreme Court*, EducationWeek (Feb. 6, 2026), https://perma.cc/U897-W84Z.......................... 4

## INTRODUCTION

In a high-stakes constitutional case like this one, a fully developed factual record is critical. Courts have an obligation to ensure that constitutional questions are only answered in the context of an actual case or controversy, with all relevant facts on the table. Plaintiffs and the Statewide Charter School Board have made clear that this case is a candidate for U.S. Supreme Court review. It could set nationwide precedent that would drastically change the nature of public education in this country. But there are serious, fact-based reasons to doubt Plaintiffs' standing in this case, and the merits raise factual questions too. So the Court should decline Plaintiffs' and the Charter Board's invitations to treat this potentially high-impact case as a merely academic matter.

Discovery now would develop a helpful, relevant factual record without improperly expanding the scope of the case. Kaiman Intervenors are full parties and have the right to raise defenses not raised by others. A rule to the contrary would be absurd: When the original defendant raises no defense, the intervenor-defendant must sit idly by and hope for the best? Such a rule would be particularly problematic with respect to standing issues, because courts *must* satisfy themselves of standing before moving on to the merits.

Staying discovery—even temporarily until resolution of Plaintiffs' preliminary-injunction motion—would hinder this Court's (and appellate courts') ability to properly resolve the issues presented. Allowing discovery to proceed would aid resolution of the preliminary-injunction motion by providing the Court with information relevant to whether Plaintiffs have standing, as well as facts that go to whether they are likely to

succeed on the merits. Proceeding with discovery now will also help ensure a timely final resolution of the case. And any concerns about specific discovery requests do not warrant a stay of all discovery and can be resolved in due course.

The Court should therefore deny the motions to stay.

**LEGAL STANDARD**

"The party seeking a [discovery] stay generally faces a difficult burden." *De Baca v. United States*, 403 F. Supp. 3d 1098, 1112 (D.N.M. 2019) (citing *Clinton v. Jones*, 520 U.S. 681, 708 (1997)). Discovery stays "are not routinely granted by courts," and "'[t]he underlying principle clearly is that the right to proceed in court should not be denied except under the most extreme circumstances.'" *Century Martial Art Supply, L.L.C. v. Dynamics World, Inc.*, No. CIV-17-1194-M, 2018 WL 4390752, at *1 (W.D. Okla. Sept. 14, 2018) (quoting *Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.*, 713 F.2d 1477, 1484 (10th Cir. 1983)).

To obtain a discovery stay, "the movant must make out a clear case of hardship or inequity in being required to go forward." *Id.* at *1 (citing *Chilcott*, 713 F.2d at 1484). The Charter Board cites *In re Church of Jesus Christ of Latter-Day Saints Tithing Litigation*, No. 2:24-MD-03102-RJS-DAO, 2024 WL 4349160, at *2 n.23 (D. Utah Sept. 30, 2024), for the opposite proposition. (Charter Bd.'s Mot. Stay Disc. 3–4, ECF No. 110.) But that case's discussion of the issue is far from clear, and the court there did conclude that the parties seeking a stay faced significant hardship from discovery before it granted the stay. *See In re Church of Jesus Christ of Latter-Day Saints*, 2024 WL 4349160, at *2–3 & n.23.

Additional factors sometimes considered by courts in this district include: "(1) the interest of the non-moving party in proceeding expeditiously with discovery and the potential prejudice to the party of a delay; (2) the burden on the moving party of proceeding with discovery; (3) the convenience to the court of staying discovery; (4) the interests of nonparties in either staying or proceeding with discovery; and (5) the public interest in proceeding with discovery." *Mfrs. All. Ins. Co. v. Baker*, No. CIV-23-1007-SLP, 2024 WL 4112782, at *1 (W.D. Okla. Sept. 6, 2024) (citation modified).

## ARGUMENT

### I. Discovery is needed and relevant in this important constitutional case.

#### A. This case raises important constitutional questions that warrant a fully developed record.

The Supreme Court has "frequently recognized the importance of the facts and the factfinding process" in high-stakes constitutional cases. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 542 n.5 (1986). This is certainly such a case. Plaintiffs' lawsuit seeks to establish high-level federal-court precedent that would drastically change the nature of this country's public-school system. Indeed, Plaintiffs seek to legalize something that no court or legislature has ever allowed: a religious public charter school. Plaintiffs' complaint emphasizes the 4–4 U.S. Supreme Court split on this issue in *Oklahoma Statewide Charter School Board v. Drummond*, 605 U.S. 165 (2025) (Compl. ¶ 51, ECF No. 1), and it is clear from Plaintiffs' public statements that this case is aimed at returning the issue to the Supreme Court (Interview with Peter Deutsch, *Should the Supreme Court Permit Public Funding for Jewish Charter Schools? Yes*, Moment (Apr.

8, 2026), https://perma.cc/V5UK-9TW5; Mark Walsh, *Religious Charter Schools Push New Cases Toward Supreme Court*, EducationWeek (Feb. 6, 2026), https://perma.cc/U897-W84Z). Defendant Charter Board Chair Shellem has likewise stated that "he hopes the issue makes it back to the U.S. Supreme Court." (ECF No. 1-3 at 3.) Given the stakes, a fully developed record is of the utmost importance.

Developing a factual record is particularly critical to determining whether this Court (and any appellate court to which this case may be taken) has jurisdiction. A "district court . . . *must*" address standing before it can turn to the merits. *Scott v. Allen*, 153 F.4th 1088, 1093 (10th Cir. 2025); *accord Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 813 n.5 (10th Cir. 2021). And the "obligation to notice defects in a [court's] subject-matter jurisdiction assumes a special importance when a constitutional question is presented. In such cases [courts] have strictly adhered to the standing requirements to ensure that [their] deliberations will have the benefit of adversary presentation and a full development of the relevant facts." *Bender*, 475 U.S. at 541–42.

The discovery sought by Kaiman Intervenors is thus in the interests of both the Court and the public. Discovery would ensure that this Court—and any higher courts that may consider the case—have a developed record on both the merits and whether there is jurisdiction.

**B. Kaiman Intervenors need discovery relevant to both jurisdictional and merits issues.**

With respect to standing and ripeness, discovery is necessary to develop a record on whether Ben Gamla intends to and can satisfy legal requirements—that are separate from the statute that Plaintiffs challenge—for operating a charter school. The existing record casts serious doubt on Ben Gamla's ability and intent to do so. Statements in Ben Gamla's charter-school application indicate that the school plans to follow discriminatory policies and practices that would violate the Oklahoma Charter Schools Act. (*See* Kaiman Intervenors' Br. Opp. Prelim. Inj. 3–4, 6, ECF No. 62-1.) These include discriminatory admissions practices, practices that discriminate based on sexual orientation and gender identity, failure to adequately serve students with disabilities, and discrimination in employment. (*See id.* at 3, 6 (citing ECF No. 1-2 at 3, 38, 53, 59, 63).) Ben Gamla's application also did not include proposed governing bylaws or documentation showing completion of the Charter Board's pre-application training (ECF No. 1-2; ECF No. 62-2), both of which are required by the Charter Schools Act (Okla. Stat. tit. 70, § 3-134(A), (B)(9), (B)(22)).

Kaiman Intervenors argue that the foregoing deficiencies make it unlawful for Ben Gamla to operate a charter school and that Plaintiffs therefore cannot show an injury that would be redressed by a favorable decision. (Kaiman Opp. Prelim. Inj. 5–7.) Plaintiffs disagree and contend that their "second application resolved all issues except the requirement to be nonsectarian" or that they are not "incapable of curing any supposed

issues." (Pls.' Reply Taxpayer Intervenors' Opp. Prelim. Inj. 2, 4, ECF No. 99.) This disagreement presents a factual dispute that calls for discovery.

Therefore, Kaiman Intervenors seek discovery on whether Ben Gamla would discriminate in student admissions, student discipline, or employment based on religion, sexual orientation, gender identity, or other protected grounds; whether Ben Gamla would adequately serve students with disabilities; and whether Ben Gamla has complied or will comply with various other requirements for applying for charter-school authorization and operating a charter school. Kaiman Intervenors also seek other discovery relating to standing, including on whether Ben Gamla has sufficient financial capacity to commence operation of a public charter school; whether Ben Gamla would have sufficient enrollment to render operating the school viable (as Ben Gamla's application materials contained substantial discrepancies in enrollment projections (Kaiman Opp. Prelim. Inj. 4) and a Charter Board member expressed concern about a lack of community interest in the proposed school (ECF No. 15-1 at 4)); and whether the Charter Board treated various deficiencies in Ben Gamla's application the same way that it treated similar deficiencies in past applications (which would undermine any argument that the deficiencies in Ben Gamla's application are immaterial). (Kaiman Intervenors' Discovery Requests, Exs. 1–5 hereto.)

With respect to the merits, Kaiman Intervenors seek discovery on the nature of Ben Gamla's planned curriculum and noncurricular requirements and activities, including how religiously coercive the school's programming will be. (Exs. 1–2.) These requests are relevant to Kaiman Intervenors' Establishment Clause defense (Kaiman Opp. Prelim.

Inj. 22–24), in part because religious coercion is "among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment" (*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 537 (2022)). In addition, Kaiman Intervenors seek discovery on the extent to which the Charter Board's evaluation of charter-school applications involves discretion. (Exs. 3–4.) These requests are relevant to determining whether allowing religious charter schools would pose risks of governmental favoritism toward particular religions, which is also prohibited by the Establishment Clause. *See Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 247–48 (2025).

**C. Plaintiffs wrongly cast this case as presenting one sterile legal question.**

Plaintiffs contend that the only issue in this case is whether charter schools are governmental entities or other state actors. (Pls.' Mot. Stay Disc. 5, ECF No. 111.) While that is certainly an important issue here, it is not the only one. Kaiman Intervenors argue that operation of Ben Gamla as a religious public charter school would violate the Establishment Clause even if charter schools were *not* state actors. (Kaiman Opp. Prelim. Inj. 23–24.) Establishment Clause analysis has long been particularly fact-sensitive. *See, e.g.*, *Soc'y of Separationists v. Pleasant Grove City*, 416 F.3d 1239, 1240–41 (10th Cir. 2005). And the past decade has seen substantial changes to the Supreme Court's Religion Clause jurisprudence that have increased the need to develop a detailed factual record in church-state cases. *See, e.g.*, *Kennedy*, 597 U.S. at 534 (abandoning *Lemon* [*v. Kurtzman*, 403 U.S. 602 (1971)] and endorsement tests previously used to decide Establishment Clause cases); *Mahmoud v. Taylor*, 606 U.S. 522, 593 (2025) (Sotomayor,

J., dissenting) (Court's decision "[c]ast[] aside longstanding precedent"). This landscape, together with the potential for this case to set high-level precedent, further heightens "the importance of the facts and the factfinding process" inherent in constitutional litigation. *Bender*, 475 U.S. at 542 n.5.

Plaintiffs also argue that the standing-related discovery sought by Kaiman Intervenors pertains only to "Phase 2" of the charter-application process, which Ben Gamla has not yet reached, and that the discovery is therefore irrelevant. (Pls.' Mot. Stay Disc. 7.) They are wrong. As an initial matter, standing is determined by examining the facts that existed when the complaint was filed (*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992)), but the "newest regulations" that divided the application process into "Phase 1" and "Phase 2" were not "the ones Plaintiffs were subject to" (Pls.' Mot. Stay Disc. 7) when they filed the case but rather were approved by the legislature on May 20, 2026, and formally took effect on July 25, 2026 (43 Okla. Reg. 2369–70 (July 15, 2026)). Furthermore, even under the new regulations, most of the discovery would relate to what Plaintiffs describe as "Phase 1." During this initial phase, the applicant must submit detailed information about various topics, including "[c]omplete and attainable plans for the execution of the proposed school's implementation process"; the proposed school's "educational model"; its "governing board and founding team"; "the importance of the educational model to the community and its support"; the school's "financial plan," which must cover "the resources, fiscal planning and expertise necessary to carry out effective budgeting, financial management, and oversight"; its "contingency plan," which must "ensure[] and include[] services to *all students*"; its "organizational design," which

must "support[] the fulfillment of the commitments and responsibilities of a public school"; and the school's commitment to follow applicable laws, including antidiscrimination laws. Okla. Admin. Code § 777:10-3-3(b) (emphasis added). These regulations reflect mandatory application requirements specified by the Charter Schools Act. *See* Okla. Stat. tit. 70, § 3-134(B). And Phase 2 is not an opportunity for mulligans, because the Charter Board "shall . . . [d]ecline to approve weak or inadequate charter applications" in Phase 1. *Id.* § 3-134(I)(4).

So if, for example, Ben Gamla does not plan to follow antidiscrimination laws or fully serve students with disabilities, its application cannot lawfully proceed past Phase 1. And if Ben Gamla cannot demonstrate financial capacity or that it would have sufficient enrollment, it likewise cannot survive Phase 1. But even if some discovery were only relevant to Phase 2, it would still be relevant to standing—if Plaintiffs will inevitably be rejected at Phase 2, a favorable ruling from this Court would not redress Plaintiffs' alleged injury.

Nor are Plaintiffs correct in contending (Pls.' Mot. Stay Disc. 8) that they would have standing even if discovery shows that Ben Gamla cannot satisfy religion-neutral requirements for operating a charter school. As Kaiman Intervenors explained in their opposition to Plaintiffs' preliminary-injunction motion (ECF No. 62-1 at 5), "a person who fails to satisfy lawful, nondiscriminatory requirements or qualifications for [a] benefit lacks standing to raise claims of discrimination in the denial of the benefit" (*Wilson v. Glenwood Intermountain Props., Inc.*, 98 F.3d 590, 593 (10th Cir. 1996); *accord Day v. Bond*, 500 F.3d 1127, 1135 (10th Cir. 2007)).

**D. Plaintiffs and the Charter Board rely on inapplicable administrative-law doctrines.**

Relying on *Macias v. New Mexico Department of Labor*, 21 F.3d 366, 369 (10th Cir. 1994), and *Central Kansas Credit Union v. Mutual Guaranty Corp.*, 102 F.3d 1097, 1105 (10th Cir. 1996), Plaintiffs assert that this Court must defer to the Charter Board's failure to find any reasons for denying Ben Gamla's application other than the school's religious nature, and that the Court therefore cannot consider any evidence that may be obtained through discovery of other defects in Ben Gamla's application. (Pls.' Mot. Stay Disc. 8–9.) But *Macias* is no longer good law, and *Central Kansas Credit Union*'s relevant language was drawn exclusively from *Macias*. *Macias* relied in part (*see* 21 F.3d at 369) on the administrative-deference doctrine of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844–45 (1984), which the Supreme Court overruled in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 411–12 (2024). *Macias* also relied on New Mexico's version of *Chevron* deference, from which it drew the rule that "the interpretation of a state statute by a state agency charged with the administration of a statute is persuasive and should not be overturned unless 'clearly incorrect.'" 21 F.3d at 369–70 (quoting *N.M. Pharm. Ass'n v. State*, 738 P.2d 1318, 1320 (N.M. 1987)). But Oklahoma recently enacted a statute that nullified the state's prior *Chevron*-like administrative-deference doctrine and essentially codified *Loper Bright*. *See* Okla. Stat. tit. 75, § 318(E).

Even if any aspect of *Macias* survives, the case does not apply because there is no evidence that the Charter Board was actually "interpret[ing] . . . a state statute" (21 F.3d

at 369) as opposed to simply ignoring violations of the law. And even under *Macias*'s rule, the Charter Board was "clearly incorrect" (*id.*) to disregard the many deficiencies in Ben Gamla's application materials that are unrelated to the school's religious curriculum.

Plaintiffs assert that declining to defer to the Charter Board here "would preclude Plaintiffs and every other proponent of a religious charter school from ever challenging the OCSA's religious exclusion." (Pls.' Mot. Stay Disc. 9.) Not so. A proposed religious charter school that did not plan to violate other provisions of the Charter Schools Act could have standing to challenge the Act's prohibition on religious charter schools.

Relatedly, Plaintiffs contend that it would be improper for the Court to consider evidence that was not part of the administrative record before the Charter Board and that discovery aimed at unearthing such evidence should thus be disallowed. (Pls.' Mot. Stay Disc. 8–9.) While that would generally be the case in an action brought under the Administrative Procedure Act (or Oklahoma's version of the APA), this rule does not apply in lawsuits brought under the Constitution, as this case was. *See Rydeen v. Quigg*, 748 F. Supp. 900, 904, 906 (D.D.C. 1990), *aff'd*, 937 F.2d 623 (Fed. Cir. 1991). Discovery about matters outside the administrative record is therefore permissible in constitutional challenges, including ones involving administrative agencies. *See Webster v. Doe*, 486 U.S. 592, 604 (1988); *Grill v. Quinn*, No. CIV S-10-0757 GEB, 2012 WL 174873, at *2 (E.D. Cal. Jan. 20, 2012); *Miccosukee Tribe of Indians of Fla. v. United States*, No. 08-23001-CIV, 2010 WL 337653, at *2 (S.D. Fla. Jan. 22, 2010).

Plaintiffs and the Charter Board further argue that the discovery sought by Kaiman Intervenors would improperly "expand the scope of this case, which," they assert, "an intervenor is not allowed to do." (Pls.' Mot. Stay Disc. 9; *accord* Charter Bd.'s Mot. Stay Disc. 7.) But the cases Plaintiffs and the Charter Board cite for this proposition were all appeals from administrative proceedings, which are governed by the Federal Rules of Appellate Procedure (even when brought in district court). *See Vinson v. Wash. Gas Light Co.*, 321 U.S. 489, 491 (1944); *Arapahoe Cnty. Pub. Airport Auth. v. FAA*, 242 F.3d 1213, 1216–17 (10th Cir. 2001); *W. Refin. Sw., Inc. v. U.S. Dep't of Interior*, No. 16-442 JH/GBW, 2016 WL 9447761, at *1–3 (D.N.M. Nov. 29, 2016). It is true that, when a party intervenes in an administrative appeal under Federal Rule of Appellate Procedure 15, they must confine their arguments to the issues already on appeal. *Arapahoe Cnty.*, 242 F.3d at 1217 & n.4. But when a party intervenes in an ordinary district-court case under Federal Rule of Civil Procedure 24(a)(2), "it becomes a full participant in the lawsuit and is treated just as if it were an original party." *Kane County v. United States*, 94 F.4th 1017, 1022 n.4 (10th Cir. 2024) (citation modified).

Thus, "where [an] intervenor claims an interest adverse to both plaintiff and defendant he or she is entitled to have the issues raised thereby tried and determined." *Alvarado v. J.C. Penney Co.*, 997 F.2d 803, 805 (10th Cir. 1993) (citation modified); *see also Ross v. Bernhard*, 396 U.S. 531, 541 n.15 (1970) ("[W]hen intervention is permitted generally, the intervenor has a right to a jury trial on any legal issues he presents."). After all, "[i]t would be meaningless to give [an intervenor of right] an absolute right to intervene in order to protect his interests, if once in the proceedings he was barred from

raising questions necessary for his own protection." *Spangler v. United States*, 415 F.2d 1242, 1245 (9th Cir. 1969) (quoting 4 Moore's Federal Practice, Par. 24.16(4), p. 117 (2d ed. 1968)); *see also Stewart-Warner Corp. v. Westinghouse Elec. Corp.*, 325 F.2d 822, 827 (2d Cir. 1963) ("The whole tenor and framework of the Rules of Civil Procedure preclude application of a standard which strictly limits the intervenor to those defenses . . . which the original defendant could himself have interposed."). Consider the implications for cases like this one: If defendant-intervenors were not allowed to raise defenses in cases in which the original defendants do not raise any defenses of their own, courts would be deprived of the adversarial presentation of issues that is necessary in constitutional cases. *See United States v. Windsor*, 570 U.S. 744, 760 (2013); *Bender*, 475 U.S. at 541–42.

It follows, then, that intervenors must be allowed to seek discovery to support their defenses, even if no other party raises those defenses. *See, e.g.*, *Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 470 (4th Cir. 1992). This is especially true with respect to standing arguments. *See* 7C Wright & Miller's Federal Practice & Procedure § 1920 (3d ed. 1998). For "[s]tanding is a prerequisite to a federal court's subject matter jurisdiction, and thus *any party*, including the court sua sponte, can raise the issue of standing for the first time at any stage of the litigation, including on appeal." *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1077 (10th Cir. 2025) (emphasis added) (citation modified).

Contrary to what Plaintiffs argue (Pls.' Mot. Stay Disc. 10), to challenge Plaintiffs' standing, Kaiman Intervenors need not bring a separate lawsuit or a cross-

claim or intervene in Attorney General Drummond's state-court lawsuit (which, at any rate, does *not* raise most of the grounds on which Kaiman Intervenors attack Plaintiffs' standing (*see* Pet. Writ Mand., *Drummond v. Okla. Statewide Charter Sch. Bd.*, No. CV-2026-649 (Okla. Dist. Ct. Mar. 11, 2026), https://perma.cc/769E-AQBP)). That's because Kaiman Intervenors' standing argument—like all of their other defenses—does not seek any affirmative relief but rather seeks the denial of any relief to Plaintiffs. *See, e.g.*, *Phila. Indem. Ins. Co. v. Chi. Title Ins. Co.*, 771 F.3d 391, 401 (7th Cir. 2014) ("A counterclaim is used when seeking affirmative relief, while an answer or affirmative defense seeks to defeat a plaintiff's claim." (citation modified)); *cf. Santa Fe All.*, 993 F.3d at 813 n.5 (holding that an appellee need not file a cross-appeal to raise standing arguments, which courts are obligated to address and may be raised at any time).

## II. The Court should not stay discovery until resolution of Plaintiffs' motion for a preliminary injunction and any appeal thereof.

Plaintiffs request that, as an alternative to permanently prohibiting discovery, the Court stay discovery until resolution of Plaintiffs' preliminary-injunction motion and any appeals thereof. (Pls.' Mot. Stay Disc. 2; *accord* Charter Bd.'s Mot. Stay. Disc. 1.) This request should be denied as well. Discovery would aid resolution of Plaintiffs' preliminary-injunction motion. As discussed above, discovery would help the Court decide whether Plaintiffs have standing. A fuller record on standing would also benefit any appellate court(s) that may hear any preliminary-injunction appeal in this case. In addition, the merits discovery that Kaiman Intervenors seek would inform this Court's (or a higher court's) merits analysis at the preliminary-injunction stage should this Court (or

a higher court) conclude that standing exists. And it is especially important to allow discovery at the preliminary-injunction stage in a case such as this one because the Supreme Court has regularly issued major precedential decisions in church-state cases on appeals of preliminary-injunction decisions in recent years. *See, e.g.*, *Mahmoud*, 606 U.S. at 530, 544; *Fulton v. City of Philadelphia*, 593 U.S. 522, 531–32 (2021); *Tandon v. Newsom*, 593 U.S. 61, 62 (2021); *Trump v. Hawaii*, 585 U.S. 667, 711 (2018).

What's more, Kaiman Intervenors have acted diligently in seeking discovery that could be relevant to the preliminary-injunction motion. Kaiman Intervenors served their discovery requests just one week after Plaintiffs submitted their proposed preliminary-injunction reply—which made clear that there was a factual dispute concerning standing (*see* ECF No. 96-1 at 2, 4)—and just two days after the Rule 26(f) conference that allowed discovery to proceed. (Joint Status Report & Disc. Plan 1, 6, 8, ECF No. 107.) And these requests were served before the Court set a hearing on the preliminary-injunction motion. (Order, ECF No. 106.)

Plaintiffs' past representations to the Court belie their contention (Pls.' Mot. Stay Disc. 14) that allowing discovery before a decision on the preliminary-injunction motion would delay the possible opening of their school. Plaintiffs initially sought a ruling on their preliminary-injunction motion by May 22, 2026, representing that a ruling by that date would have permitted Ben Gamla to open for the 2026–27 schoolyear. (Pls.' Mot. Prelim. Inj. 1, ECF No. 10.) But Plaintiffs apparently did not realize that Ben Gamla could not legally open before July 2027, because it submitted its charter-school application in December 2025 (Compl. ¶ 65), and a Charter Board regulation prohibits

schools from opening less than eighteen months after application submission (Okla. Admin. Code § 777:10-3-3(a)(4)). Plaintiffs' own view of how little time they would need to open their school upon obtaining a preliminary injunction establishes that there is plenty of time to conduct discovery and decide the preliminary-injunction motion in time to permit Ben Gamla to open in July 2027 if the school prevails.

In all events, delaying discovery now would only delay the ultimate resolution of this case. Even if this Court decides the preliminary-injunction motion prior to receiving the results of discovery, a full record would still be necessary for a final decision on the merits, whether by this Court or by an appellate court. Nor would a preliminary-injunction ruling conclusively answer legal issues pertinent to what may be relevant in discovery. The ruling would not be binding on appellate courts (or indeed on this Court at a later litigation stage). And higher courts could view the relevance of particular facts differently than this Court does.

Plaintiffs' arguments seem to assume that this entire case should and will be stayed in the event of a preliminary-injunction appeal. But it is premature to decide whether to issue a stay pending appeal. For one thing, doing so would assume that there *will* be an appeal. For another, district courts can and do proceed on the merits of cases during the pendency of preliminary-injunction appeals. *E.g.*, *Free Speech v. Fed. Election Comm'n*, 720 F.3d 788, 791 (10th Cir. 2013). Indeed, if there is an appeal, Kaiman Intervenors would urge the Court *not* to stay the case so that a full record can be developed to inform any ultimate appellate decision.

The Charter Board's discussion (Charter Bd.'s Mot. Stay Disc. 8–10) of an agreement by some of Kaiman Intervenors' counsel to a stay of an entire case in the St. Isidore litigation is wholly irrelevant. In that case, counsel agreed to a stay of a state trial-court case challenging the approval of a proposed religious charter school only after the Oklahoma Supreme Court blocked the school from opening in a separate case that was ahead of the trial-court case and was likely to control its ultimate resolution. Moreover, counsel only agreed to the stay in exchange for agreements to further delay opening of the school long enough to enable completion of discovery and a decision on a preliminary-injunction motion before school opening. *See* Agreed Order to Stay Litigation, *OKPLAC, Inc. v. Statewide Virtual Charter Sch. Bd.*, No. CV-2023-1857 (Okla. Cnty. Dist. Ct. June 27, 2024), https://perma.cc/8LWN-XVWB; Agreed Order Extending Stay of Litigation, *OKPLAC, Inc.*, No. CV-2023-1857 (Feb. 20, 2025), https://perma.cc/E5DZ-9W2T. Here, there is no case that is ahead of this one and likely to control it, and nothing would stop Ben Gamla from opening soon after a ruling by this Court or by an appellate court granting the school injunctive relief.

**III. Plaintiffs' and the Charter Board's concerns about particular discovery requests do not support a stay of all discovery.**

Plaintiffs raise specific concerns about a small portion of Kaiman Intervenors' desired discovery, but those concerns can be resolved through the meet-and-confer process. For example, Plaintiffs complain about requests for the contact information of certain individuals with knowledge pertinent to the case, including donors to the school. (Pls.' Mot. Stay Disc. 12–13.) But such concerns could be addressed through a protective

order or an attorney-negotiated agreement to narrow the scope of the requests. *See, e.g.*, *Marshall v. Bramer*, 828 F.2d 355, 360 (6th Cir. 1987).

Plaintiffs also complain about a discovery request that allegedly "prob[es] their religious practices" (Pls.' Mot. Stay Disc. 2), but the request they seemingly refer to (Ex. 1, at 5, Request No. 9) is aimed at obtaining clarity about a Ben Gamla policy that Ben Gamla's own application states will incorporate certain religious teachings (ECF No. 1-2 at 38). Again, Kaiman Intervenors are willing to work with Plaintiffs in good faith to attempt to reach an amicable resolution of Plaintiffs' concerns about this request.

The Charter Board notes that some Board documents are available online. (Charter Bd.'s Mot. Stay Disc. 8.) But Kaiman Intervenors' discovery requests seek information that is *not* available online—for example, Board member communications and internal policies and reports. (Ex. 3, at 4–5.) Indeed, the requests specifically exclude certain information that is available online. (*Id.* at 4, Request No. 5.) And to the extent that the requests may be unclear on this point, Kaiman Intervenors agree that the Charter Board need not produce anything that is available on its website or YouTube channel.

**IV. The Charter Board's concern about attorneys' fees should not affect the scope of discovery.**

Finally, the Charter Board's concern about attorneys' fees (Charter Bd.'s Mot. Stay Disc. 4–5) is misplaced because the Board is unlikely to be liable for fees that Plaintiffs incur as a result of actions by intervenors. Most courts to consider the issue have determined that a defendant is not liable for fees that a plaintiff incurs as a result of

intervention—at least where the defendant does not support the intervenor's position—and that plaintiffs cannot recover those fees. *See Brat v. Personhuballah*, 883 F.3d 475, 484 (4th Cir. 2018); *Binta B. ex rel. S.A. v. Gordon*, 710 F.3d 608, 635 (6th Cir. 2013); *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 178 (4th Cir. 1994); *Bigby v. City of Chicago*, 927 F.2d 1426, 1428–29 (7th Cir. 1991); *Hopwood v. Texas*, 236 F.3d 256, 280 (5th Cir. 2000).[1] In addition, the Board's concern is speculative: it assumes that Plaintiffs will win, that they will move for fees, and that they will request fees for work done in response to intervenors' actions.

## CONCLUSION

For the foregoing reasons, the motions to stay discovery should be denied.

[1] Losing intervenors are not subject to attorneys' fees under 42 U.S.C. § 1988 when the intervenors did not commit the challenged constitutional violation. *See Indep. Fed. of Flight Attendants v. Zipes*, 491 U.S. 754, 758 n.2, 763 (1989); *Brat*, 883 F.3d at 482; *Democratic Party of Wash. State v. Reed*, 388 F.3d 1281, 1288 (9th Cir. 2004).

Respectfully submitted on July 31, 2026.

s/ Alex J. Luchenitser

Brent Rowland, OBA No. 13415
Morgan Bandy, WI Bar No. 1130673*
Oklahoma Appleseed Center for
Law & Justice
624 S. Denver Ave., Suite 400
Tulsa, OK 74119
Telephone: (918) 519-5750
brent@okappleseed.org /
morgan@okappleseed.org

Daniel Mach, DC Bar No. 461652*
Heather L. Weaver, DC Bar No. 495582*
American Civil Liberties Union
Foundation
915 15th Street, NW, Suite 600
Washington, DC 20005
Telephone: (202) 675-2330
dmach@aclu.org / hweaver@aclu.org

Nancy A. Noet, WI Bar No. 1023106*
Samuel T. Grover, WI Bar No. 1096047*
Freedom From Religion Foundation
PO Box 750
Madison, WI 53701
Telephone: (608) 256-8900
noetn@ffrf.org / sgrover@ffrf.org

Alex J. Luchenitser,
DC Bar No. 473393*
Luke Anderson, DC Bar No. 90042004*
Americans United for Separation of
Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 466-7306 /
(202) 898-2134
luchenitser@au.org / anderson@au.org

Jessica Levin, CA Bar No. 338240*
Wendy Lecker, NY Bar No. 2283125*
Patrick Cremin, CA Bar No. 345406*
Katrina Reichert, CA Bar No. 357984*
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102
Telephone: (973) 624-1815
JLevin@edlawcenter.org /
WLecker@edlawcenter.org /
PCremin@edlawcenter.org /
KReichert@edlawcenter.org

*Attorneys for Proposed Intervenors*
* Admitted *pro hac vice.*

# Kaiman Intervenors' First Set of Requests for Production of Documents to Ben Gamla, filed below on July 31, 2026, as ECF No. 113-1 (Exhibit 1 to Kaiman Intervenors' Opposition to Ben Gamla's and the Board's Motions to Stay Discovery)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., et al.,<br><br>*Plaintiffs*,<br><br>-against-<br><br>BRIAN T. SHELLEM, in his official capacity as Chairman of the Statewide Charter School Board, et al.,<br><br>*Defendants*, | Case No. 5:26-cv-00582-R |
| RABBI DANIEL KAIMAN, et al.,<br><br>*Intervenors.* | |
| CRICKET MOORE, et al.,<br><br>*Intervenors.* | |

**KAIMAN INTERVENORS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO ALL PLAINTIFFS**

Pursuant to Federal Rule of Civil Procedure 34, intervenors Rabbi Daniel Kaiman, Bradley Archer, Erika DuBose, Sydney Gebhardt, Kara Joy McKee, Michele Medley, and Gene Perry submit this first set of requests for production of documents to plaintiffs The National Ben Gamla Jewish Charter School Foundation, Inc. and Peter Deutsch. As

required by Federal Rule of Civil Procedure 34(b)(2)(A), please respond to these requests and produce responsive documents by July 29, 2026.

**Definitions and Instructions**

1. As used in these Requests, please interpret the following **bold-faced** terms in accordance with the following definitions:

a. **Communication**: The term "**communication**" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes email.

b. **Document**: The term "**document**" has the meaning set forth in Federal Rule of Civil Procedure 34(a)(1)(A) and includes electronically stored information.

c. **Relating to**: The term "**relating to**" means relating to, referring to, reflecting, describing, being evidence of, constituting, memorializing, or concerning in any way.

d. **Ben Gamla School**: The term "**Ben Gamla School**" means Ben Gamla Jewish Charter School.

e. **You / your**: The term "**you**" means The National Ben Gamla Jewish Charter School Foundation, Inc., and all of its board members, officials, employees, agents, attorneys, and representatives; Ben Gamla School and all of its board members, officials, employees, agents, attorneys, and representatives; and Peter Deutsch. The term "**your**" refers to all entities and persons encompassed within the definition of "**you**."

f. **Including**: The term "**including**" means "including but not limited to."

2. Please produce the **documents** requested herein by July 29, 2026, by emailing copies thereof or transmitting such copies through an internet file-sharing system to Kaiman Intervenors' counsel Alex J. Luchenitser (*luchenitser@au.org*) and Luke Anderson (*anderson@au.org*). Alternatively, you may produce the **documents** by making them available by the same date on electronic media at the offices of GableGotwals, 499 W. Sheridan Ave., Ste. 2200, Oklahoma City, OK 73102 or the offices of The Becket Fund for Religious Liberty, 1919 Pennsylvania Ave. NW, Ste. 400, Washington, DC 20006.

3. Please produce all electronically stored information in PDF format.

4. Please produce all responsive **documents** that are in **your** possession, custody, or control.

5. If **you** withhold any **documents** responsive to these Requests based on a claim of privilege (including a claim of protection under the attorney-work-product doctrine), please produce a privilege log containing at least the following information about each **document** so withheld: (a) the type of **document**; (b) its title, if any; (c) its subject matter; (d) its date; (e) its author(s) and preparer(s); (f) its addressee(s) and recipient(s); and (g) the nature of the privilege claimed.

6. If a **document** responsive to these Requests contains both privileged and nonprivileged material, please produce the nonprivileged portions to the fullest extent possible without disclosing the privileged material.

**Document Requests**

1. All governing **documents** of **Ben Gamla School** and The National Ben Gamla Jewish Charter School Foundation, Inc., including articles and certificates of incorporation and bylaws.

2. All **communications** and other **documents relating to Ben Gamla School** recruitment and admission of students, **including** promotional and informational materials that have been or would be provided to prospective students, parents, or guardians; admissions policies and procedures; and application forms.

3. All **communications** and other **documents relating to** policies, procedures, or rules that would be applicable to prospective or enrolled **Ben Gamla School** students or their parents or guardians, **including** student or parent handbooks; agreements that students, parents, or guardians would be required to sign; discipline procedures and policies; and all **documents** identifying the "beliefs, expectations, policies, and procedures of the school" referenced on page 59 of the application for charter authorization of **Ben Gamla School**.

4. All **communications** and other **documents relating to Ben Gamla School's** curriculum, **including** curriculum or course catalogs or guidebooks; listings of classes; class syllabi; listings of curricular materials; and curricular materials.

5. All **communications** and other **documents relating to** activities other than classroom instruction that would be required for or offered to **Ben Gamla School** students, **including** descriptions of such activities and daily, weekly, monthly, and other schedules and calendars that would apply to **Ben Gamla School** students.

6. All **communications** and other **documents relating to** how **Ben Gamla School** would serve students with disabilities or English language learners, including handbooks, policies, and procedures.

7. All **communications** and other **documents relating to** employment at **Ben Gamla School**, **including** promotional and informational materials that have been or would be provided to prospective employees; job descriptions and advertisements; applications for employment; agreements that prospective or hired employees have been or would be required to sign; employee handbooks; and conduct, discipline, discharge, and other policies and procedures that would apply to employees.

8. All **communications** and other **documents relating to** how **Ben Gamla School** would treat prospective or actual students or employees who (or whose parents) (a) identify as lesbian, gay, bisexual, transgender, or queer; (b) express through words, actions, or clothing a sexual orientation other than heterosexual or a gender identity other than cisgender; or (c) engage in sexual activity outside of marriage or become pregnant outside of marriage.

9. All **communications** and other **documents relating to** the "core Jewish teachings related to modesty, the sanctity of life, the sanctity of marriage, human dignity, and the ethical guidance our tradition offers regarding sexuality and gender" referenced on page 38 of the application for charter authorization of **Ben Gamla School**, **including** all **documents** identifying or explaining what those teachings and that ethical guidance are, as well as all **documents relating to** how those teachings and that ethical guidance would be incorporated in **Ben Gamla School**'s curriculum, policies, or procedures.

10. All **communications** and other **documents relating to** how many students **Ben Gamla School** would enroll, including **communications** with parents or students who expressed interest in enrolling; and projections, estimates, and analyses of potential enrollment.

11. All **communications** and other **documents relating to** how **Ben Gamla School** would be funded in its startup phase, including **documents** evincing the sources and amounts of startup funding.

12. All **communications** to or from the Oklahoma Statewide Charter School Board, the Oklahoma Statewide Virtual Charter School Board, the Oklahoma State Department of Education, the Oklahoma State Board of Education, or any board member, official, employee, agent, attorney, or representative of any of the foregoing entities.

13. All **communications** to or from any prospective or confirmed educational management organization for **Ben Gamla School**, and all **communications** and other **documents relating to** the selection of an educational management organization for **Ben Gamla School**, **including** signed or draft agreements with an educational management organization.

14. All **communications** and other **documents—including** any **document** evincing compliance—**relating to** whether and how **you** complied with respect to **Ben Gamla School** with the requirement in Okla. Stat. tit. 70, § 3-134(A), that "prior to submission of the application . . . to the Statewide Charter School Board to establish a virtual charter school, the applicant shall be required to complete training which shall not

exceed ten (10) hours provided by the Statewide Charter School Board on the process and requirements for establishing a charter school or virtual charter school."

15. All **communications** and other **documents relating to** how **Ben Gamla School** would comply with Okla. Admin. Code 777:10-1-3(c)(3), which requires that at least one Board member of the school "shall be a parent, grandparent, or guardian of currently or previously enrolled student(s)."

16. All drafts of applications for charter-school authorization for **Ben Gamla School**, of addenda to such an application, and of letters of intent to submit such an application.

17. All **documents relating to** board meetings of **Ben Gamla School** or of The National Ben Gamla Jewish Charter School Foundation, Inc., including meeting agendas, agenda packets, minutes, recordings, and transcripts, as well as all **documents** provided to board members at or in conjunction with board meetings.

18. All **documents** that **you** are required to describe by Federal Rule of Civil Procedure 26(a)(1)(A)(ii) that **you** do not produce prior to July 29, 2026.

19. All **communications** (that are not produced in response to the requests above) **relating to Ben Gamla School** to or from Peter Deutsch or any board member, official, employee, agent, attorney, or representative of **Ben Gamla School** or of The National Ben Gamla Jewish Charter School Foundation, Inc.

Date: June 25, 2026.

Alex J. Luchenitser,
DC Bar No. 473393*
Luke Anderson, DC Bar No. 90042004*
Americans United for Separation of
Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 466-7306 /
(202) 898-2134
luchenitser@au.org / anderson@au.org

Brent Rowland, OBA No. 13415
Morgan Bandy, WI Bar No. 1130673*
Oklahoma Appleseed Center for
Law & Justice
624 S. Denver Ave., Suite 400
Tulsa, OK 74119
Telephone: (918) 519-5750
brent@okappleseed.org /
morgan@okappleseed.org

Daniel Mach, DC Bar No. 461652*
Heather L. Weaver, DC Bar No. 495582*
American Civil Liberties Union
Foundation
915 15th Street, NW, Suite 600
Washington, DC 20005
Telephone: (202) 675-2330
dmach@aclu.org / hweaver@aclu.org

Nancy A. Noet, WI Bar No. 1023106*
Samuel T. Grover, WI Bar No. 1096047*
Freedom From Religion Foundation
PO Box 750
Madison, WI 53701
Telephone: (608) 256-8900
noetn@ffrf.org / sgrover@ffrf.org

Jessica Levin, CA Bar No. 338240*
Wendy Lecker, NY Bar No. 2283125*
Patrick Cremin, CA Bar No. 345406*
Katrina Reichert, CA Bar No. 357984*
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102
Telephone: (973) 624-1815
JLevin@edlawcenter.org /
WLecker@edlawcenter.org /
PCremin@edlawcenter.org /
KReichert@edlawcenter.org

*Attorneys for Intervenors Rabbi Daniel Kaiman, et al.*
*Admitted *pro hac vice*.

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2026, I caused copies of the foregoing document to be served on all parties to this action by mail and email at the addresses below:

*Counsel for Plaintiffs:*

Eric S. Baxter (*ebaxter@becketfund.org*)
Eric C. Rassbach (*erassbach@becketfund.org*)
Daniel L. Chen (*dchen@becketfund.org*)
Benjamin A. Fleshman (*bfleshman@becketfund.org*)
Phillip J. Allevato (*pallevato@becketfund.org*)
Siena A. Marcelle (*smarcelle@becketfund.org*)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006

Robert G. McCampbell (*RMcCampbell@Gablelaw.com*)
David A. Herber (*DHerber@Gablelaw.com*)
GableGotwals
499 W. Sheridan Ave., Ste. 2200
Oklahoma City, OK 73102

*Counsel for defendant members of the Oklahoma Statewide Charter School Board (served by email per written consent dated April 8, 2026):*

Anthony J. Ferate (*ajferate@spencerfane.com*)
Spencer Fane LLP
9400 North Broadway Extension, Suite 600
Oklahoma City, Oklahoma 73114

Hiram S. Sasser, III (*hsasser@firstliberty.org*)
Holly M. Randall (*hrandall@firstliberty.org*)
Erin E. Smith (*esmith@firstliberty.org*)
First Liberty Institute
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075

*Counsel for intervenors Cricket Moore, et al.:*

Ryan Leonard (*rleonard@llc-attorneys.com*)
Heidi J. Long (*hlong@llc-attorneys.com*)
Heather Hendricks (*hhendricks@llc-attorneys.com*)
Leonard, Long & Cassil, PLLC
6301 N. Western, Suite 250
Oklahoma City, OK 73102

Alex J. Luchenitser
DC Bar No. 473393*
Luke Anderson, DC Bar No. 90042004*
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 466-7306 /
(202) 898-2134
luchenitser@au.org / anderson@au.org
*Admitted *pro hac vice*.

# Kaiman Intervenors' First Set of Interrogatories to Ben Gamla, filed below on July 31, 2026, as ECF No. 113-2 (Exhibit 2 to Kaiman Intervenors' Opposition to Ben Gamla's and the Board's Motions to Stay Discovery)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., et al.,

*Plaintiffs*,

-against-

BRIAN T. SHELLEM, in his official capacity as Chairman of the Statewide Charter School Board, et al.,

*Defendants*,

RABBI DANIEL KAIMAN, et al.,

*Intervenors.*

CRICKET MOORE, et al.,

*Intervenors.*

Case No. 5:26-cv-00582-R

**KAIMAN INTERVENORS' FIRST SET OF INTERROGATORIES TO ALL PLAINTIFFS**

Pursuant to Federal Rule of Civil Procedure 33, intervenors Rabbi Daniel Kaiman, Bradley Archer, Erika DuBose, Sydney Gebhardt, Kara Joy McKee, Michele Medley, and Gene Perry request that plaintiffs The National Ben Gamla Jewish Charter School Foundation, Inc. and Peter Deutsch answer by July 29, 2026, each of the following Interrogatories separately and fully, in writing and under oath.

1. Identify each current and former board member, officer, official, and employee of Ben Gamla Jewish Charter School and each current and former board member, officer, official, and employee of The National Ben Gamla Jewish Charter School Foundation, Inc., by stating their name; stating the title or position they held or hold; stating the date they started serving in the position; stating the date when they stopped serving in the position if they no longer do so; describing the duties they had or have; and stating their last known home and business mailing addresses, personal and business email addresses, and home, business, and mobile telephone numbers.

2. Identify each person who participated in the decision to create Ben Gamla Jewish Charter School and pursue authorization of it as a public charter school by stating their name; stating the name of any entity that employed them in connection with that decision; stating the title or position they held while participating in the decision; stating the date they started serving in the position; stating the date when they stopped serving in the position if they no longer do so; describing the role they played in the making of the decision; and stating their last known home and business mailing addresses, personal and business email addresses, and home, business, and mobile telephone numbers.

3. Identify each person who participated in the preparation of the application for charter-school authorization of Ben Gamla Jewish Charter School, the addendum to that application, or the letter of intent to submit the application by stating their name; stating the name of any entity that employed them in connection with the preparation of any of these documents; stating the title or position they held while preparing any of the

documents; stating the date they started serving in the position; stating the date when they stopped serving in the position if they no longer do so; describing the role they played in the preparation of the documents; and stating their last known home and business mailing addresses, personal and business email addresses, and home, business, and mobile telephone numbers.

4. Identify each person and entity that has provided or intends to provide more than $5,000 in funding (including through in-kind contributions or loans) for Ben Gamla Jewish Charter School or The National Ben Gamla Jewish Charter School Foundation, Inc., by stating their name; stating the amount or estimated amount they have provided and which Ben Gamla entity received that amount; stating the amount or estimated amount they plan to provide in the future and which Ben Gamla entity is expected to receive that amount; and stating their last known home and business mailing addresses, personal and business email addresses, and home, business, and mobile telephone numbers.

5. Identify each curricular item that would be used at Ben Gamla Jewish Charter School by stating the title, author, publisher, and year of publication of the item and the grade and class in which the item would be used.

6. If you withhold any documents responsive to Kaiman Intervenors' First Set of Requests for Production of Documents to All Plaintiffs based on any objection other than privilege/attorney-work-product, describe the documents so withheld by category, giving the nature and subject matter of each document category and the total volume (in approximate number of pages) of documents in each category.

Date: June 25, 2026.

Brent Rowland, OBA No. 13415
Morgan Bandy, WI Bar No. 1130673*
Oklahoma Appleseed Center for
Law & Justice
624 S. Denver Ave., Suite 400
Tulsa, OK 74119
Telephone: (918) 519-5750
brent@okappleseed.org /
morgan@okappleseed.org

Daniel Mach, DC Bar No. 461652*
Heather L. Weaver, DC Bar No. 495582*
American Civil Liberties Union
Foundation
915 15th Street, NW, Suite 600
Washington, DC 20005
Telephone: (202) 675-2330
dmach@aclu.org / hweaver@aclu.org

Nancy A. Noet, WI Bar No. 1023106*
Samuel T. Grover, WI Bar No. 1096047*
Freedom From Religion Foundation
PO Box 750
Madison, WI 53701
Telephone: (608) 256-8900
noetn@ffrf.org / sgrover@ffrf.org

Alex J. Luchenitser,
DC Bar No. 473393*
Luke Anderson, DC Bar No. 90042004*
Americans United for Separation of
Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 466-7306 /
(202) 898-2134
luchenitser@au.org / anderson@au.org

Jessica Levin, CA Bar No. 338240*
Wendy Lecker, NY Bar No. 2283125*
Patrick Cremin, CA Bar No. 345406*
Katrina Reichert, CA Bar No. 357984*
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102
Telephone: (973) 624-1815
JLevin@edlawcenter.org /
WLecker@edlawcenter.org /
PCremin@edlawcenter.org /
KReichert@edlawcenter.org

*Attorneys for Intervenors Rabbi Daniel Kaiman, et al.*
*Admitted *pro hac vice*.

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2026, I caused copies of the foregoing document to be served on all parties to this action by mail and email at the addresses below:

*Counsel for Plaintiffs:*

Eric S. Baxter (*ebaxter@becketfund.org*)
Eric C. Rassbach (*erassbach@becketfund.org*)
Daniel L. Chen (*dchen@becketfund.org*)
Benjamin A. Fleshman (*bfleshman@becketfund.org*)
Phillip J. Allevato (*pallevato@becketfund.org*)
Siena A. Marcelle (*smarcelle@becketfund.org*)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006

Robert G. McCampbell (*RMcCampbell@Gablelaw.com*)
David A. Herber (*DHerber@Gablelaw.com*)
GableGotwals
499 W. Sheridan Ave., Ste. 2200
Oklahoma City, OK 73102

*Counsel for defendant members of the Oklahoma Statewide Charter School Board (served by email per written consent dated April 8, 2026):*

Anthony J. Ferate (*ajferate@spencerfane.com*)
Spencer Fane LLP
9400 North Broadway Extension, Suite 600
Oklahoma City, Oklahoma 73114

Hiram S. Sasser, III (*hsasser@firstliberty.org*)
Holly M. Randall (*hrandall@firstliberty.org*)
Erin E. Smith (*esmith@firstliberty.org*)
First Liberty Institute
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075

*Counsel for intervenors Cricket Moore, et al.:*

Ryan Leonard (*rleonard@llc-attorneys.com*)
Heidi J. Long (*hlong@llc-attorneys.com*)
Heather Hendricks (*hhendricks@llc-attorneys.com*)
Leonard, Long & Cassil, PLLC
6301 N. Western, Suite 250
Oklahoma City, OK 73102

Alex J. Luchenitser
DC Bar No. 473393*
Luke Anderson, DC Bar No. 90042004*
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 466-7306 /
(202) 898-2134
luchenitser@au.org / anderson@au.org
*Admitted *pro hac vice*.

# Kaiman Intervenors' First Set of Requests for Production of Documents to the Board, filed below on July 31, 2026, as ECF No. 113-3 (Exhibit 3 to Kaiman Intervenors' Opposition to Ben Gamla's and the Board's Motions to Stay Discovery)

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., et al.,<br><br>*Plaintiffs*,<br><br>-against-<br><br>BRIAN T. SHELLEM, in his official capacity as Chairman of the Statewide Charter School Board, et al.,<br><br>*Defendants*, | Case No. 5:26-cv-00582-R |
| RABBI DANIEL KAIMAN, et al.,<br><br>*Intervenors*. | |
| CRICKET MOORE, et al.,<br><br>*Intervenors*. | |

**KAIMAN INTERVENORS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO THE CHARTER SCHOOL BOARD DEFENDANTS**

Pursuant to Federal Rule of Civil Procedure 34, intervenors Rabbi Daniel Kaiman, Bradley Archer, Erika DuBose, Sydney Gebhardt, Kara Joy McKee, Michele Medley, and Gene Perry submit this first set of requests for production of documents to defendant members of the Oklahoma Statewide Charter School Board (Brian Shellem, Amber Wise, Marshall Baker, Damon Gardenhire, Stephanie Savage, Kitty Campbell, Jared Buswell,

Lindel Fields, and William Pearson, in their official capacities). As required by Federal Rule of Civil Procedure 34(b)(2)(A), please respond to these requests and produce responsive documents by July 26, 2026.

**Definitions and Instructions**

1. As used in these Requests, please interpret the following **bold-faced** terms in accordance with the following definitions:

a. **Communication**: The term "**communication**" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes email.

b. **Document**: The term "**document**" has the meaning set forth in Federal Rule of Civil Procedure 34(a)(1)(A) and includes electronically stored information.

c. **Relating to**: The term "**relating to**" means relating to, referring to, reflecting, describing, being evidence of, constituting, memorializing, or concerning in any way.

d. **Ben Gamla**: The term "**Ben Gamla**" includes The National Ben Gamla Jewish Charter School Foundation, Inc.; Ben Gamla Jewish Charter School; Ben Gamla Charter School Foundation, Inc.; and all board members, officials, employees, agents, attorneys, and representatives of the foregoing entities.

e. **Charter Board**: The term "**Charter Board**" includes the Oklahoma Statewide Charter School Board; its predecessor the Oklahoma Statewide Virtual

Charter School Board; and all board members, officials, employees, agents, attorneys, and representatives of the foregoing entities.

f. **You** / **your**: The term "**you**" means the **Charter Board** and all members of the **Charter Board**, in their official capacities. The term "**your**" refers to all entities and persons encompassed within the definition of "**you**."

g. **Including**: The term "**including**" means "including but not limited to."

2. Please produce the **documents** requested herein by July 26, 2026, by emailing copies thereof or transmitting such copies through an internet file-sharing system to Kaiman Intervenors' counsel Alex J. Luchenitser (*luchenitser@au.org*) and Luke Anderson (*anderson@au.org*). Alternatively, you may produce the **documents** by making them available by the same date on electronic media at the offices of Spencer Fane LLP, 9400 North Broadway Extension, Suite 600, Oklahoma City, Oklahoma 73114.

3. Please produce all electronically stored information in PDF format.

4. Please produce all responsive **documents** that are in **your** possession, custody, or control, including all responsive **documents** in the possession, custody, or control of any board member, official, employee, agent, attorney, or representative of the **Charter Board**, as well as any responsive **communications** that were sent to or from the personal email accounts or other personal accounts or devices of any board member.

5. If **you** withhold any **documents** responsive to these Requests based on a claim of privilege (including a claim of protection under the attorney-work-product doctrine), please produce a privilege log containing at least the following information about each

**document** so withheld: (a) the type of **document**; (b) its title, if any; (c) its subject matter; (d) its date; (e) its author(s) and preparer(s); (f) its addressee(s) and recipient(s); and (g) the nature of the privilege claimed.

6. If a **document** responsive to these Requests contains both privileged and nonprivileged material, please produce the nonprivileged portions to the fullest extent possible without disclosing the privileged material.

**Document Requests**

1. All **communications** to or from **Ben Gamla** or Peter Deutsch that were made after October 1, 2022.

2. All **communications relating to Ben Gamla** sent to, from, or within the **Charter Board**, **including** all external and internal **communications** sent to or from any of the **Charter Board's** members, officials, employees, agents, attorneys, or representatives.

3. All **documents**—**including** staff reports—analyzing or evaluating applications for charter authorization submitted by **Ben Gamla**, addenda to such applications, or letters of intent to submit such applications.

4. All other **documents relating to Ben Gamla**.

5. All **documents** (not including documents that are available on the **Charter Board**'s website) constituting or containing **Charter Board** policies or procedures.

6. All letters and other **documents** sent by the **Charter Board** after January 1, 2022, to applicants for initial authorization of a charter school that set forth the reasons for an initial or a final denial of an application.

7. All minutes of meetings of the Oklahoma Statewide Virtual Charter School Board that occurred between January 1, 2022, and June 30, 2024.

8. All **documents** that **you** are required to describe by Federal Rule of Civil Procedure 26(a)(1)(A)(ii) that **you** do not produce prior to July 26, 2026.

Date: June 25, 2026.

Brent Rowland, OBA No. 13415
Morgan Bandy, WI Bar No. 1130673*
Oklahoma Appleseed Center for
Law & Justice
624 S. Denver Ave., Suite 400
Tulsa, OK 74119
Telephone: (918) 519-5750
brent@okappleseed.org /
morgan@okappleseed.org

Daniel Mach, DC Bar No. 461652*
Heather L. Weaver, DC Bar No. 495582*
American Civil Liberties Union
Foundation
915 15th Street, NW, Suite 600
Washington, DC 20005
Telephone: (202) 675-2330
dmach@aclu.org / hweaver@aclu.org

Nancy A. Noet, WI Bar No. 1023106*
Samuel T. Grover, WI Bar No. 1096047*
Freedom From Religion Foundation
PO Box 750
Madison, WI 53701
Telephone: (608) 256-8900
noetn@ffrf.org / sgrover@ffrf.org

Alex J. Luchenitser,
DC Bar No. 473393*
Luke Anderson, DC Bar No. 90042004*
Americans United for Separation of
Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 466-7306 /
(202) 898-2134
luchenitser@au.org / anderson@au.org

Jessica Levin, CA Bar No. 338240*
Wendy Lecker, NY Bar No. 2283125*
Patrick Cremin, CA Bar No. 345406*
Katrina Reichert, CA Bar No. 357984*
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102
Telephone: (973) 624-1815
JLevin@edlawcenter.org /
WLecker@edlawcenter.org /
PCremin@edlawcenter.org /
KReichert@edlawcenter.org

*Attorneys for Intervenors Rabbi Daniel Kaiman, et al.*
*Admitted *pro hac vice*.

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2026, I caused copies of the foregoing document to be served on all parties to this action by mail and email at the addresses below:

*Counsel for Plaintiffs:*

Eric S. Baxter (*ebaxter@becketfund.org*)
Eric C. Rassbach (*erassbach@becketfund.org*)
Daniel L. Chen (*dchen@becketfund.org*)
Benjamin A. Fleshman (*bfleshman@becketfund.org*)
Phillip J. Allevato (*pallevato@becketfund.org*)
Siena A. Marcelle (*smarcelle@becketfund.org*)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006

Robert G. McCampbell (*RMcCampbell@Gablelaw.com*)
David A. Herber (*DHerber@Gablelaw.com*)
GableGotwals
499 W. Sheridan Ave., Ste. 2200
Oklahoma City, OK 73102

*Counsel for defendant members of the Oklahoma Statewide Charter School Board (served by email per written consent dated April 8, 2026):*

Anthony J. Ferate (*ajferate@spencerfane.com*)
Spencer Fane LLP
9400 North Broadway Extension, Suite 600
Oklahoma City, Oklahoma 73114

Hiram S. Sasser, III (*hsasser@firstliberty.org*)
Holly M. Randall (*hrandall@firstliberty.org*)
Erin E. Smith (*esmith@firstliberty.org*)
First Liberty Institute
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075

*Counsel for intervenors Cricket Moore, et al.:*

Ryan Leonard (*rleonard@llc-attorneys.com*)
Heidi J. Long (*hlong@llc-attorneys.com*)
Heather Hendricks (*hhendricks@llc-attorneys.com*)
Leonard, Long & Cassil, PLLC
6301 N. Western, Suite 250
Oklahoma City, OK 73102

Alex J. Luchenitser
DC Bar No. 473393*
Luke Anderson, DC Bar No. 90042004*
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 466-7306 /
(202) 898-2134
luchenitser@au.org / anderson@au.org
*Admitted *pro hac vice*.

# Kaiman Intervenors' First Set of Interrogatories to the Board, filed below on July 31, 2026, as ECF No. 113-4 (Exhibit 4 to Kaiman Intervenors' Opposition to Ben Gamla's and the Board's Motions to Stay Discovery)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., et al.,<br><br>*Plaintiffs*,<br><br>-against-<br><br>BRIAN T. SHELLEM, in his official capacity as Chairman of the Statewide Charter School Board, et al.,<br><br>*Defendants*, | Case No. 5:26-cv-00582-R |
| RABBI DANIEL KAIMAN, et al.,<br><br>*Intervenors.* | |
| CRICKET MOORE, et al.,<br><br>*Intervenors.* | |

**KAIMAN INTERVENORS' FIRST SET OF INTERROGATORIES TO THE CHARTER SCHOOL BOARD DEFENDANTS**

Pursuant to Federal Rule of Civil Procedure 33, intervenors Rabbi Daniel Kaiman, Bradley Archer, Erika DuBose, Sydney Gebhardt, Kara Joy McKee, Michele Medley, and Gene Perry request that defendant members of the Oklahoma Statewide Charter School Board (Brian Shellem, Amber Wise, Marshall Baker, Damon Gardenhire, Stephanie Savage, Kitty Campbell, Jared Buswell, Lindel Fields, and William Pearson, in

their official capacities) answer by July 26, 2026, each of the following Interrogatories separately and fully, in writing and under oath.

1. Identify each current and former employee of the Oklahoma Statewide Charter School Board who participated in analyzing or evaluating the application for charter-school authorization of Ben Gamla Jewish Charter School, the addendum to that application, or the letter of intent to submit the application by stating their name; stating the title or position they held while doing so; stating the date they started serving in the position; stating the date when they stopped serving in the position if they no longer do so; describing the role they played in the analysis or evaluation of the documents; and stating their last known home and business mailing addresses, personal and business email addresses, and home, business, and mobile telephone numbers.

2. State the last known home and business mailing addresses, personal and business email addresses, and home, business, and mobile telephone numbers of each current member of the Oklahoma Statewide Charter School Board and of former members David Rutkauskas and Britni Tomcho.

3. Of the applications for initial charter-school authorization submitted to the Oklahoma Statewide Charter School Board since July 1, 2024, what percentage were granted without being initially denied, what percentage were granted after being amended following an initial denial, and what percentage were never granted?

4. Of the applications for initial charter-school authorization submitted to the Oklahoma Statewide Virtual Charter School Board between January 1, 2022, and June 30, 2024, what percentage were granted without being initially denied, what percentage

were granted after being amended following an initial denial, and what percentage were never granted?

5. If you withhold any documents responsive to Kaiman Intervenors' First Set of Requests for Production of Documents to the Charter School Board Defendants based on any objection other than privilege/attorney-work-product, describe the documents so withheld by category, giving the nature and subject matter of each document category and the total volume (in approximate number of pages) of documents in each category.

Date: June 25, 2026.

Alex J. Luchenitser,
DC Bar No. 473393*
Luke Anderson, DC Bar No. 90042004*
Americans United for Separation of
Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 466-7306 /
(202) 898-2134
luchenitser@au.org / anderson@au.org

Brent Rowland, OBA No. 13415
Morgan Bandy, WI Bar No. 1130673*
Oklahoma Appleseed Center for
Law & Justice
624 S. Denver Ave., Suite 400
Tulsa, OK 74119
Telephone: (918) 519-5750
brent@okappleseed.org /
morgan@okappleseed.org

Daniel Mach, DC Bar No. 461652*
Heather L. Weaver, DC Bar No. 495582*
American Civil Liberties Union
Foundation
915 15th Street, NW, Suite 600
Washington, DC 20005
Telephone: (202) 675-2330
dmach@aclu.org / hweaver@aclu.org

Nancy A. Noet, WI Bar No. 1023106*
Samuel T. Grover, WI Bar No. 1096047*
Freedom From Religion Foundation
PO Box 750
Madison, WI 53701
Telephone: (608) 256-8900
noetn@ffrf.org / sgrover@ffrf.org

Jessica Levin, CA Bar No. 338240*
Wendy Lecker, NY Bar No. 2283125*
Patrick Cremin, CA Bar No. 345406*
Katrina Reichert, CA Bar No. 357984*
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102
Telephone: (973) 624-1815
JLevin@edlawcenter.org /
WLecker@edlawcenter.org /
PCremin@edlawcenter.org /
KReichert@edlawcenter.org

*Attorneys for Intervenors Rabbi Daniel Kaiman, et al.*
*Admitted *pro hac vice*.

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2026, I caused copies of the foregoing document to be served on all parties to this action by mail and email at the addresses below:

*Counsel for Plaintiffs:*

Eric S. Baxter (*ebaxter@becketfund.org*)
Eric C. Rassbach (*erassbach@becketfund.org*)
Daniel L. Chen (*dchen@becketfund.org*)
Benjamin A. Fleshman (*bfleshman@becketfund.org*)
Phillip J. Allevato (*pallevato@becketfund.org*)
Siena A. Marcelle (*smarcelle@becketfund.org*)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006

Robert G. McCampbell (*RMcCampbell@Gablelaw.com*)
David A. Herber (*DHerber@Gablelaw.com*)
GableGotwals
499 W. Sheridan Ave., Ste. 2200
Oklahoma City, OK 73102

*Counsel for defendant members of the Oklahoma Statewide Charter School Board (served by email per written consent dated April 8, 2026):*

Anthony J. Ferate (*ajferate@spencerfane.com*)
Spencer Fane LLP
9400 North Broadway Extension, Suite 600
Oklahoma City, Oklahoma 73114

Hiram S. Sasser, III (*hsasser@firstliberty.org*)
Holly M. Randall (*hrandall@firstliberty.org*)
Erin E. Smith (*esmith@firstliberty.org*)
First Liberty Institute
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075

*Counsel for intervenors Cricket Moore, et al.:*

Ryan Leonard (*rleonard@llc-attorneys.com*)
Heidi J. Long (*hlong@llc-attorneys.com*)
Heather Hendricks (*hhendricks@llc-attorneys.com*)
Leonard, Long & Cassil, PLLC
6301 N. Western, Suite 250
Oklahoma City, OK 73102

Alex J. Luchenitser
DC Bar No. 473393*
Luke Anderson, DC Bar No. 90042004*
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 466-7306 /
(202) 898-2134
luchenitser@au.org / anderson@au.org
*Admitted *pro hac vice*.

# Kaiman Intervenors' Subpoena for Production of Documents to the Board and its Executive Director, filed below on July 31, 2026, as ECF No. 113-5 (Exhibit 5 to Kaiman Intervenors' Opposition to Ben Gamla's and the Board's Motions to Stay Discovery)

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

The National Ben Gamla Jewish Charter School Foundation, Inc., et al., *Plaintiff*

v.

Brian T. Shellem, in his official capacity as Chairman of the Oklahoma Statewide Charter School Board, et al., *Defendant*

Civil Action No. 5:26-cv-00582-R

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Oklahoma Statewide Charter School Board; Dr. Rebecca Wilkinson, in her official capacity as Executive Director of the Oklahoma Statewide Charter School Board

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Please see attachment.

| Place: Electronically to luchenitser@au.org; or on electronic media at Spencer Fane LLP, 9400 North Broadway Extension, Suite 600, Oklahoma City, Oklahoma 73114. | Date and Time: 07/26/2026 9:00 am |
|---|---|

❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 06/25/2026

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

OR

*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Intervenors Rabbi Daniel Kaiman, et al. , who issues or requests this subpoena, are:

Alex J. Luchenitser, 1310 L St. NW, Suite 200, Washington, DC 20005, 202-466-7306, luchenitser@au.org.

**Notice to the person who issues or requests this subpoena**

A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

# AFFIDAVIT OF SERVICE

| **Case:** 5:26-cv-00582-R | **Court:** United States District Court for the Western District of Oklahoma | **County:** | **Job:** 16282686 |
|---|---|---|---|
| **Plaintiff / Petitioner:** The National Ben Gamla Jewish Charter School Foundation, Inc., et al. | | **Defendant / Respondent:** Brian T. Shellem, in his official capacity as Chairman of the Oklahoma Statewide Charter School Board, et al. | |
| **Received by:** Hidden Truth Investigations | | **For:** Oklahoma Appleseed | |
| **To be served upon:** Dr. Rebecca Wilkinson - Oklahoma Statewide Charter School Board | | | |

I, Kelly Goldstein, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** Emily Whitmer, Authorized: 2501 NORTH LINCOLN BOULEVARD, OKLAHOMA CITY, OK 73105

**Manner of Service:** Authorized, Jul 6, 2026, 9:50 am CDT

**Documents:** SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

**Additional Comments:**
1) Unsuccessful Attempt: Jul 2, 2026, 3:55 pm CDT at Government Agency: 2501 NORTH LINCOLN BOULEVARD, OKLAHOMA CITY, OK 73105
I spoke with the front desk of the building when I walked in and he told me I would need to call to see if someone was available and he wasn't sure if they were in the building or not, he gave me a list of numbers, and the Oklahoma statewide charter School board was inside the building, however no one was answering the phone. The front desk advised me that that they had probably left for the day and would be closed tomorrow.

2) Successful Attempt: Jul 6, 2026, 9:50 am CDT at Government Agency: 2501 NORTH LINCOLN BOULEVARD, OKLAHOMA CITY, OK 73105 received by Emily Whitmer. Age: 27; Ethnicity: Caucasian; Gender: Female; Weight: 125; Height: 5'7"; Hair: Red; Other: Legal compliance officer;

[signature] 07/06/2026

Kelly Goldstein — **Date**
PPS-2024-19

Hidden Truth Investigations
201 Nelson Park Place
Moore, OK 73160
405-219-0599

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., et al.,<br><br>*Plaintiffs*,<br><br>-against-<br><br>BRIAN T. SHELLEM, in his official capacity as Chairman of the Statewide Charter School Board, et al.,<br><br>*Defendants*, | Case No. 5:26-cv-00582-R |
| RABBI DANIEL KAIMAN, et al.,<br><br>*Intervenors.* | |
| CRICKET MOORE, et al.,<br><br>*Intervenors.* | |

**ATTACHMENT TO SUBPOENA FOR PRODUCTION OF DOCUMENTS TO THE OKLAHOMA STATEWIDE CHARTER SCHOOL BOARD AND ITS EXECUTIVE DIRECTOR, DR. REBECCA WILKINSON**

Pursuant to Federal Rule of Civil Procedure 45, intervenors Rabbi Daniel Kaiman, Bradley Archer, Erika DuBose, Sydney Gebhardt, Kara Joy McKee, Michele Medley, and Gene Perry submit this attachment to subpoena to produce documents to the Oklahoma Statewide Charter School Board and its Executive Director, Dr. Rebecca Wilkinson, in her official capacity.

## Definitions and Instructions

1. As used herein, please interpret the following **bold-faced** terms in accordance with the following definitions:

a. **Communication**: The term "**communication**" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes email.

b. **Document**: The term "**document**" has the meaning set forth in Federal Rule of Civil Procedure 34(a)(1)(A) and includes electronically stored information.

c. **Relating to**: The term "**relating to**" means relating to, referring to, reflecting, describing, being evidence of, constituting, memorializing, or concerning in any way.

d. **Ben Gamla**: The term "**Ben Gamla**" includes The National Ben Gamla Jewish Charter School Foundation, Inc.; Ben Gamla Jewish Charter School; Ben Gamla Charter School Foundation, Inc.; and all board members, officials, employees, agents, attorneys, and representatives of the foregoing entities.

e. **Charter Board**: The term "**Charter Board**" includes the Oklahoma Statewide Charter School Board; its predecessor the Oklahoma Statewide Virtual Charter School Board; and all board members, officials, employees, agents, attorneys, and representatives of the foregoing entities.

f. **You** / **your**: The term "**you**" means the **Charter Board**. The term "**your**" refers to all entities and persons encompassed within the definition of "**you**."

g. **Including**: The term "**including**" means "including but not limited to."

2. Please produce the **documents** requested herein by July 26, 2026, by emailing copies thereof or transmitting such copies through an internet file-sharing system to Kaiman Intervenors' counsel Alex J. Luchenitser (*luchenitser@au.org*) and Luke Anderson (*anderson@au.org*). Alternatively, you may produce the **documents** by making them available by 9:00 a.m. on the same date on electronic media at the offices of Spencer Fane LLP, 9400 North Broadway Extension, Suite 600, Oklahoma City, Oklahoma 73114.

3. Please produce all electronically stored information in PDF format.

4. Please produce all responsive **documents** that are in **your** possession, custody, or control, including all responsive **documents** in the possession, custody, or control of any board member, official, employee, agent, attorney, or representative of the **Charter Board**, as well as any responsive **communications** that were sent to or from the personal email accounts or other personal accounts or devices of any board member.

5. If **you** withhold any **documents** responsive to this subpoena based on a claim of privilege (including a claim of protection under the attorney-work-product doctrine), please produce a privilege log containing at least the following information about each **document** so withheld: (a) the type of **document**; (b) its title, if any; (c) its subject

matter; (d) its date; (e) its author(s) and preparer(s); (f) its addressee(s) and recipient(s); and (g) the nature of the privilege claimed.

6. If a **document** responsive to this subpoena contains both privileged and nonprivileged material, please produce the nonprivileged portions to the fullest extent possible without disclosing the privileged material.

**Document Requests**

1. All **communications** to or from **Ben Gamla** or Peter Deutsch that were made after October 1, 2022.

2. All **communications relating to Ben Gamla** sent to, from, or within the **Charter Board**, **including** all external and internal **communications** sent to or from any of the **Charter Board's** members, officials, employees, agents, attorneys, or representatives.

3. All **documents**—**including** staff reports—analyzing or evaluating applications for charter authorization submitted by **Ben Gamla**, addenda to such applications, or letters of intent to submit such applications.

4. All other **documents relating to Ben Gamla**.

5. All **documents** (not including documents that are available on the **Charter Board**'s website) constituting or containing **Charter Board** policies or procedures.

6. All letters and other **documents** sent by the **Charter Board** after January 1, 2022, to applicants for initial authorization of a charter school that set forth the reasons for an initial or a final denial of an application.

7. All minutes of meetings of the Oklahoma Statewide Virtual Charter School Board that occurred between January 1, 2022, and June 30, 2024.

Date: June 25, 2026.

Brent Rowland, OBA No. 13415
Morgan Bandy, WI Bar No. 1130673*
Oklahoma Appleseed Center for
Law & Justice
624 S. Denver Ave., Suite 400
Tulsa, OK 74119
Telephone: (918) 519-5750
brent@okappleseed.org /
morgan@okappleseed.org

Daniel Mach, DC Bar No. 461652*
Heather L. Weaver, DC Bar No. 495582*
American Civil Liberties Union
Foundation
915 15th Street, NW, Suite 600
Washington, DC 20005
Telephone: (202) 675-2330
dmach@aclu.org / hweaver@aclu.org

Nancy A. Noet, WI Bar No. 1023106*
Samuel T. Grover, WI Bar No. 1096047*
Freedom From Religion Foundation
PO Box 750
Madison, WI 53701
Telephone: (608) 256-8900
noetn@ffrf.org / sgrover@ffrf.org

Alex J. Luchenitser,
DC Bar No. 473393*
Luke Anderson, DC Bar No. 90042004*
Americans United for Separation of
Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 466-7306 /
(202) 898-2134
luchenitser@au.org / anderson@au.org

Jessica Levin, CA Bar No. 338240*
Wendy Lecker, NY Bar No. 2283125*
Patrick Cremin, CA Bar No. 345406*
Katrina Reichert, CA Bar No. 357984*
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102
Telephone: (973) 624-1815
JLevin@edlawcenter.org /
WLecker@edlawcenter.org /
PCremin@edlawcenter.org /
KReichert@edlawcenter.org

*Attorneys for Intervenors Rabbi Daniel Kaiman, et al.*
*Admitted *pro hac vice*.

# Transcript of District Court oral argument regarding Motion for Preliminary Injunction and Motions to Stay Discovery, held on August 5, 2026

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., et al., | ) | |
| Plaintiffs, | ) | CASE NO. CIV-26-582-R |
| vs. | ) | |
| BRIAN T. SHELLEM, in his official capacity as Chairman of the Oklahoma Statewide Charter School Board, et al., | ) | |
| RABBI DANIEL KAIMAN, et al., | ) | |
| Defendant-Intervenors, | ) | |
| CRICKET MOORE, et al., | ) | |
| Defendant-Intervenors | ) | |

TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE DAVID L. RUSSELL

UNITED STATES DISTRICT JUDGE

AUGUST 5, 2026 at 9:00 a.m.

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

**APPEARANCES**

ON BEHALF OF THE PLAINTIFFS:

Mr. Daniel Chen
Mr. Eric S. Baxter
Ms. Siena A. Marcelle
Mr. Benjamin A. Fleshman
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
Suite 400
Washington, DC 20006

Mr. David R. Herber
GABLE & GOTWALS
BOK Park Plaza
499 W. Sheridan
Suite 2200
Oklahoma City, Oklahoma 73102

ON BEHALF OF THE OKLAHOMA CHARTER SCHOOL BOARD:

Mr. A.J. Ferate
SPENCER FANE
9400 North Broadway Extension, Suite 600
Oklahoma City, Oklahoma 73114

Mr. Hiram S. Sasser, III
Ms. Holly Mischelle Randall
Ms. Erin Smith
LIBERTY INSTITUTE
2001 W. Plano Parkway
Suite 1600
Plano, Texas 73105

ON BEHALF OF THE INTERVENERS RABBI DANIEL KAIMAN, ET AL:

Mr. Alexander Joseph Luchenitser
Mr. Luke Anderson
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE
1310 L. Street NW
Suite 200
Washington, DC 20005

Mr. Brent Rowland
OKLAHOMA APPLESEED CENTER FOR LAW AND JUSTICE
624 S. Denver Ave.
Suite 400
Tulsa, Oklahoma 74119

ON BEHALF OF THE INTERVENOR CRICKET MOORE, ET AL:

Ms. Heidi J. Long
Mr. Ryan T. Leonard
Ms. Heather N. Hendricks
LEONARD, LONG & CASSIL, PLLC
6301 North Western Avenue
Suite 250
Oklahoma City, Oklahoma 73118

(The following proceedings were held August 5, 2026, with Court and counsel present.)

THE COURT: All right. This is the National Gamla Jewish Charter School Foundation, et al., vs. The Oklahoma Statewide Charter School Board, as defendant; Rabbi Kaiman, et al., as intervenor; and Cricket Moore, et al., as intervenors.

If the parties would make appearances for the record, please.

MR. CHEN: Daniel Chen on behalf of plaintiffs.

THE COURT: Stand up.

MR. CHEN: Daniel Chen on behalf of plaintiffs, Your Honor.

MR. BAXTER: Eric Baxter on behalf of plaintiffs.

MR. FLESHMAN: Ben Fleshman on behalf of plaintiffs.

MS. MARCELLE: Siena Marcelle on behalf of plaintiffs.

MR. HERBER: David Herber on behalf of plaintiffs.

MR. FERATE: Your Honor, on behalf of the Oklahoma State Charter School Board, I have Erin Smith, Holly Randall, Hiram Sasser, and I'm A.J. Ferate.

MR. LUCHENITSER: Your Honor, on behalf of Intervenors Daniel Kaiman, et al., I am Alex Luchenitser. I have Luke Anderson, and we have Brent Rowland.

THE COURT: Did you get that, Emily?
THE REPORTER: Yes, I did.
MS. LONG: Your Honor, on behalf of the Oklahoma Family Intervenors, I'm Heidi Long; Ryan Leonard; and Heather Hendricks.
THE COURT: We have plenty of legal talent here today, I'd say.
All right. Plaintiffs ready to proceed?
MR. CHEN: Yes, Your Honor.
THE COURT: Let me begin by asking you a question.
MR. CHEN: Yes, sir.
THE COURT: What is the National Ben Gamla Jewish Charter School? What is it? By that I mean, is it a nonprofit? Tell me about what, if any, kind of board -- is it in existence right now? Does somebody own it? Where is it incorporated? Tell me about that.
MR. CHEN: Yes. It's a nonprofit Oklahoma corporation. It's incorporated in the state. It has its board, and it's the sponsoring entity for the Ben Gamla Jewish Charter School.
THE COURT: So there is an existing board?
MR. CHEN: For the Ben Gamla National Jewish Charter School Foundation, yes.
THE COURT: All right.
MR. CHEN: Thank you, Your Honor. May it please

the Court --

THE COURT: Really, another question.

MR. CHEN: Yes?

THE COURT: What does it want to do? I know it wants to have a charter school in Oklahoma, but is that, like, from K through 12? What will they do?

MR. CHEN: Yes. It wants to set up a charter school, and the charter school wants to provide an education for primary school, from K to 12, that unites the Jewish faith and academic excellence.

So one of my clients, Peter Deutsch, he runs a set of charter schools in Florida that are some of the best charter schools in that state, and he wants to bring his expertise to the state of Oklahoma to open up a charter school here because he believes that the Oklahoma charter school program is an excellent one.

THE COURT: But, now, they're not religious schools in Florida?

MR. CHEN: That's correct, Your Honor. The schools in Florida are not religious. They have wraparound programs and release time to provide aspects of the Jewish faith, but it's not integrated into the curriculum. But my client believes that this integrated curriculum is really the best way to offer the type of education that he wants to offer, and he's hoping to do that in Oklahoma.

THE COURT: So in a nonprofit, there's not stockholders; is that right?

MR. CHEN: That -- I believe that's correct, yes.

THE COURT: And would all the funding come from the state?

MR. CHEN: I believe that all or most of the funding will come from the state.

THE COURT: All right. Go ahead.

MR. CHEN: Thank you, Your Honor.

I would like to begin by discussing the motion for preliminary injunction first, and then turning to the motion for stay.

And, Your Honor, this case presents really pure legal questions. The free exercise question and the establishment clause question are inextricably bound up with the logically prior question of whether or not Oklahoma charter schools are part of the government, or if they're indeed private actors. Because, if they are part of the government, then they don't have free exercise rights. But if, instead, Oklahoma charter schools are private actors, then the free exercise protects them, and they cannot be categorically excluded because of their religion.

So I would like to grapple with this question of whether or not Oklahoma charter schools are part of the

government. The two most relevant tests here, I think as the parties agree, are the governmental entities test and the State Action Doctrine.

For governmental entities, from Supreme Court cases like *Lebron* and *Biden* --

THE COURT: Kind of slow down just a bit, if you would.

MR. CHEN: Yes, sir.

THE COURT: She's already tearing her hair out.

MR. CHEN: Yes, sir. I'll try and slow down. I'm a quick talker. My apologies.

The government entities tests asks two questions of an entity: Is there government creation and is there government control?

And government creation is the government creating by -- an entity by special statute. So Amtrak was created by Congress. In *Biden vs. Nebraska, MOHELA*, or the Missouri Higher Education Loan Authority, was created by the Missouri legislature by special statute.

And here, Your Honor, no Oklahoma statute creates charter schools out of nothing. Oklahoma has opened up a charter school program, invited private applicants to apply. Without that private action and without that private initiative, no charter school exists.

THE COURT: Let me interrupt again. Are there

cases in which -- right now Gamla is private, it's not a public -- we know that. The question is, will it become public by becoming a charter school here in Oklahoma?

Are there cases where there is a private entity that courts have said, by government action they have all of a sudden become a government entity? Are you following my question?

MR. CHEN: I am following your question. So this is an argument that the intervenors raised, right? That getting charter approval means that you are created by the government. And so I think that argument is actually foreclosed by Supreme Court precedent from the *Rendell-Baker* case, from the *Halleck* case, and most prominently in the *U.S. Olympic Committee* case. And in the *U.S. Olympic Committee* case, from the Supreme Court, the Court said that the fact that Congress granted a charter to the U.S. Olympic Committee doesn't mean that it is a government entity.

And the Court went on to explain that corporations of all kinds are granted charters by the government, typically by a state. They can even be dissolved by a state. But it can't be the fact that every corporation is, therefore, somehow created by the government.

And , Your Honor, what -- what I think is another -- another situation to look at is the case of private foster

care and adoption agencies. Right? A private foster care and adoption agency --

THE COURT: What?

MR. CHEN: Sorry. Private foster care and adoption agencies, they are not able to operate without state approval, without a license from the state, without having a contract with the state. They are also heavily and pervasively regulated, as they should be when you think about all the requirements for them. But no Court has found that private foster homes or foster care agencies are part of the government or engaged in state action.

In the Supreme Court decision in *Fulton vs. City of Philadelphia*, the government never argued that -- that Catholic Social Services was part of the government, but they said, "Oh, because we're contracting with them, we get to manage them." And the Supreme Court rejected that argument.

So if you can't even -- you can't even impose a requirement that would violate the free exercise clause as part of a public contract, then it's an a priori case when you talk about whether or not they're actually part of the government.

So the fact that you need a charter school approval or you need approval from the government to operate cannot be enough for government creation. And government creation

isn't the only requirement, Your Honor. You also have to show government control.

So in *Biden*, that looked like the fact that -- *MOHELA's* board was entirely appointed by the Missouri governor upon the advice and consent of the senate, and the governor retained removal authority over the board members. In *Lebron*, Amtrak was also -- the board was appointed by the senate.

And here, for Oklahoma charter schools, there are no board -- there are no government appointees to the Board. They're entirely private. So there's no government control either. So those two factors aren't met in this case.

Now, moving on from the governmental entities test to the state action test, there are really three tests that are at issue here: the entwinement theory under *Brentwood;* whether or not there's an exclusive and traditional government function; and, third, whether or not Oklahoma's outsourced or delegated a constitutional duty. None of those state action theories apply.

First, entwinement, the most relevant case is *Brentwood*, from the Supreme Court. And in that case the Supreme Court said that an interscholastic athletic association was part of the government, but the reason for that was that public schools dominated the membership of the association, something like 84 percent of its members

were public schools.

Those schools were the ones to select who controlled the organization, and then the board itself was entirely staffed by public employees. Not only that, the government came in on the back end and authorized and ratified the challenge rule there. Nothing like that is present in our case, so there's no entwinement.

I'm sorry, Your Honor, did you have a question? I wasn't sure if I was cutting you off.

Thank you.

So there is no entwinement.

And then, second, there is no exclusive and traditional public function. Decision after decision has said this in the context of education. *Halleck* says that -- from the Supreme Court -- says that there are very few categories that fall within an exclusive and traditional government function.

And in the *Rendell-Baker* case, they found -- the Court there found that education is not an exclusive and traditional public function. And court after court, following the Supreme Court, like in *Logiodice* from the First Circuit and *Caviness* from the Ninth Circuit, have said the same.

So what the taxpayer -- what the intervenors attempt to do is say, "Well, the right, exclusive, and public function

is not education writ large, or primary or K through 12 education even, it is providing a free education at public cost to all comers."

Now, the Supreme Court rejected that precise argument in cases like *Carson* and *Hallock*, and in *Rendell-Baker* itself because in *Rendell-Baker*, Your Honor, the education provided there was free and it was publicly funded, but the Court didn't find any need to include those modifiers in its definition of an exclusive and traditional public function. And that's why circuit court opinions following *Rendell-Baker*, interpreting it, have rejected that argument.

*Caviness* from the Ninth Circuit said that this argument, this precise argument, is foreclosed by *Rendell-Baker*. And *Logiodice* from the First Circuit had that memorable phrase that this is mere, quote unquote, "tailoring by adjectives." That's true here as well, Your Honor. So there is no exclusive and public function because education -- or K through 12 education, has never been traditionally and exclusively done by the government. In fact, private schools have existed longer than public schools in this country.

So the final State Action Doctrine to discuss is whether or not Oklahoma has outsourced or delegated a constitutional obligation. The intervenors say that it has

because it's delegated its responsibility to provide a public education, but that's just simply not the case here, Your Honor.

Oklahoma still runs its own traditional government-run public schools. And no child and no family is required or compelled to attend Ben Gamla or any charter school, in fact -- any charter school. So there's no delegation of a constitutional obligation here as well; so none of the state action theories apply here. There's no governmental entity under the governmental entities test.

So the question then goes to whether or not there's a free exercise violation. And in that sense, this case really is on all fours with *Carson* because, in *Carson*, you can't open up a public benefit program, invite private actors to apply, but then discriminate on the basis of religion. That's the lesson from *Carson*, and that applies here as well. There's a free exercise clause violation --

THE COURT: Slow down.

MR. CHEN: Sorry.

There's a free exercise clause violation, and the establishment clause provides no reason to justify this infringement on free exercise; so we would ask that you grant our preliminary injunction.

I'll also just briefly mention the motion to stay discovery, Your Honor.

So taxpayer intervenors are not entitled to discovery as a matter of law. They say that they can get discovery mainly into standing to probe whether or not my clients would have actually obtained approval for their charter schools. But the Supreme Court and other courts have rejected that precise theory of standing.

In *City of Jacksonville*, Your Honor, the Supreme Court said that a plaintiff challenging a discriminatory barrier does not have to show that he or she would have ultimately obtained the benefit or ultimately gotten the contract, and that's because the injury, in fact, in cases like this is the imposition of the discriminatory barrier itself, not any ultimate inability to get approval or to get a contract.

So here, my clients, because of the nonsectarian requirement, have been cut out from the program. They are unable to compete at all. And under cases like *City of Jacksonville* or *Roe No. 2 vs. Ogden* from the Tenth Circuit, or *Carson* from the First Circuit, or *Loffman* from the Ninth Circuit -- all cases we have cited; so I won't explain them too much for you and waste your time -- but all those cases hold that we have more than enough to show standing. And for that reason, any discovery into those issues is legally irrelevant.

And as a final point, Your Honor, I just want to

mention that the taxpayer intervenor standing argument is really a catch-22 for my clients, and that's based on how the charter application process works. Whereas, before there used to be a unified process maybe of how the process worked, the new regulations at 777 - sorry -- 777:10-3-3 say that the process is now really broken into discrete phases.

THE COURT: You're losing me now.

MR. CHEN: So the way that the process works is, at phase one -- there's now phase one and phase two -- at phase one, we send in an application. We generally describe our mission, curriculum, and personnel, and the Board approves or denies our application. But that approval is, in many senses, contingent and preliminary because the process doesn't end there. We still have to go and negotiate and execute the charter contract, and then we still have to go to phase two.

Phase two is called the ready-to-open requirement, and at that phase that's where you really hash out things like academics, curriculum, personnel policies, creation and approval of bylaws, operational and organizational capacity. All the things that the taxpayer intervenors are seeking discovery on really is fully fleshed out in phase two.

And if you don't get final approval at phase two, Your

Honor, you cannot open up a charter school, even if you pass through phase one.

The catch-22 is this: The taxpayer intervenors are saying that my clients don't have standing to challenge the nonsectarian requirement at phase one because they haven't shown that they would have actually gotten their charter school approved at phase two.

But, Your Honor, my clients can never get to phase two because they will always categorically be disqualified at phase one. That's the catch-22. And, if they're right about standing, then my clients will never have it to challenge the nonsectarian requirement, and indeed no plaintiff can really challenge the nonsectarian requirement. So that simply can't be right.

And for those reasons, we have standing as a matter of law, and this Court can easily grant our motion to stay discovery because discovery is irrelevant.

THE COURT: Thank you.

MR. CHEN: Thank you very much, Your Honor.

THE COURT: Who wants to be heard next?

Introduce yourself again for the record, and who you're representing.

MS. RANDALL: Good morning, Your Honor. My name is Holly Randall, and I represent the Oklahoma Statewide Charter School Board.

Earlier this year, the Charter School Board found itself in a difficult position. The Oklahoma Supreme Court's decision in *Drummond vs. Oklahoma Statewide Charter School Board* required the Board to deny Ben Gamla's application solely because of its religious character. But the Board believes and it has argued in court before that the free exercise of the United States Constitution prohibits excluding religious organizations from publicly available benefits simply because of their religious character.

The Board's denial of Ben Gamla's application was not a reflection of the merits of that application, but, rather, it was a demonstration of the Board's commitment to follow the law, the Oklahoma Statewide Charter School Act's religious exclusion.

The Board members take an oath to support, defend, and obey both the United States Constitution and the Oklahoma constitution. However, so long as the Drummond decision binds and the religious exclusion in the Charter School Act constrains the Board, Board members are unable to uphold that oath.

The Board respectfully requests that this Court answer the legal question before it, whether the religious exclusion violates the United States Constitution.

By granting the preliminary injunction, this Court will

not only protect the plaintiffs' constitutional rights, but it will relieve the Board of this irreconcilable conflict between two competing legal mandates and their oath.

The Board doesn't need to repeat what plaintiffs just aptly argued, but they want to emphasize a few brief points for the Court.

First, the Board is seeking an efficient resolution to this legal question presented in this case. What's true is that four justices of the Supreme Court likely side on one side of this issue, and four justices of the United States Supreme Court likely side on the other. What remains to be seen is that swing vote.

THE COURT: Be interesting to know whom, wouldn't it?

MS. RANDALL: That's right. That's right, Your Honor.

What's also true is that the Oklahoma Statewide Charter School Board has been sued four times in three years over this issue. That's the *OKPLAC* case in the district court of Oklahoma County over the *Saint Isidore* lawsuit; that's the *Drummond vs. Statewide Charter School Board* that we just referenced about the four justices; that's the case we're here for today for denying the application; and then that's the case regarding how the application was denied in Oklahoma district court that's referenced in our

motion-to-stay briefing. So the Board simply wants an efficient answer, and that's been its position throughout this litigation.

Second, precedent supports a finding that the religious exclusion violates the Constitution. Plaintiff aptly laid this point out for you. The Board just seeks to emphasize that this case can be decided in three precedential steps; first, under *Rendell-Baker*, Oklahoma charter schools are not state actors. That matches the cases you asked about in *Caviness*, *Logiodice*, *Robert S*.

And a case to note is the *Peltier* decision out of the Fourth Circuit. The dissent in that case notes that, while the majority found that charter schools are state actors, the dissent referenced that that splits with every other decision of the circuit courts that's considered the issue about these privately operated but publicly funded schools.

Second, because there's no state action, the plaintiffs retain their free exercise rights. And *Carson* cautions courts that it's an unremarkable notion under our constitution that excluding a private entity from a benefit solely because of its religious character is a violation of the free exercise clause, so it has to be able to survive strict scrutiny, but the religious exclusion cannot survive strict scrutiny.

Plaintiffs referenced *Carson*, but the Board wants to

direct the Court as well to *Kennedy*, which abandoned the *Lemon* test -- that's something that the intervenors acknowledge in their briefing -- and says that a government entity's concerns about phantom establishment clause violations cannot justify free exercise violations of a private party.

We also want to point to the *Zelman* decision of the Supreme Court, which says that there's no establishment clause violation when money flows to a religious entity as a result of private choice. In this case, charter schools are funded under the statutes by per-pupil funding. So money is flowing to those charter schools as a result of parental or familial choice for a student to attend.

And, finally, the *Espinoza* decision, which says that a constitution's no-aid clause -- a state constitution, that is -- no-aid clause is not a justification for withholding money from a religious entity.

Lastly, the Oklahoma Supreme Court's decision in *Drummond* is incorrect, and it leaves the Board members unable to fulfill their oath of office. *Drummond* is wrong, and this Court is free to ignore its reasoning for the reasons stated in our brief. However, what this Court cannot ignore is the requirement that the *Drummond* decision imposes on Board members; that is, enforce the acts of religious exclusion or face jail time for contempt of court

of a decision.

The Board members are public servants that are simply committed to following the law, but the *Drummond* decision requires them to engage in religious discrimination under the free exercise clause, until a federal court says otherwise.

So preliminary injunctive relief is necessary to free the Board from this conflicting legal mandate and allow them to support and obey and defend both the constitution of the United States and the state of Oklahoma.

So for these reasons, the Board respectfully requests that the Court grant the plaintiffs' motion for preliminary injunction.

If Your Honor will give me a moment, I will let my co-counsel come up and explain briefly our position on the motion to stay.

THE COURT: That's fine.

MS. SMITH: Good morning, Your Honor. Erin Smith on behalf of the Oklahoma Statewide Charter School Board.

On the motion to stay, the Board's -- the Board's request is both narrow and practical. We only ask that you stay discovery pending the decision on the preliminary injunction motion and any interlocutory appeal taken. Staying discovery temporarily maintains an orderly path that balances the needs of the Court, the parties, and the

public interest.

Contrary to taxpayers' assertions, staying discovery does not avoid the merits of the case, but rather keeps discovery tied to the case as it exists.

The Board's actual decision is not in dispute. The Board readily admits that it denied Ben Gamla's revised application because the act requires it to, as interpreted by the Oklahoma Supreme Court.

In support of this temporary stay of discovery, the Board would just like to highlight a few practical considerations.

First, allowing discovery now drives up litigation costs unnecessarily. The Board --

THE COURT: Let me interrupt. When you say "temporarily stop it," when would you suggest that "temporary" would become "active" and discovery would proceed?

MS. SMITH: So we would imagine that -- what we're asking is that this Court decide the preliminary injunction motion while discovery is stayed.

Should either party decide to take an appeal from that preliminary injunction motion, the Court would remain staying discovery. And then, when a complete and total decision on the preliminary injunction, any appeal after that comes back to district court, that's when we think

discovery would be appropriate.

THE COURT: Go ahead.

MS. SMITH: The Board's a public body, so every unnecessary document request and interrogatory response consumes public interests; time and energy that the Board and its staff can spend to further educational outcomes for Oklahoma kids.

And should plaintiffs ultimately prevail and ask for attorneys' fees, the Board is potentially liable for those fees. So we have been seeking at every turn to mitigate the costs of this case because we -- we really can't win. We seem to get sued no matter the decision that we make, so we are looking for the most efficient and just resolution.

The general public's primary interest in this case, just like in the *Church of Jesus Christ of Latter-Day Saints* investigation is an efficient and just resolution. We would like to help avoid wasteful efforts by this Court and of the litigants to this case.

The point really is that avoidable agency and attorney work on collateral issues shouldn't be imposed now before the Court decides a fully briefed preliminary injunction motion that may narrow what remains. A temporary stay prevents the unnecessary fee escalation and preserves the Court's ability to tailor any later discovery to issues that actually matter after the ruling.

Second, the discovery sought by intervenors is irrelevant to the legal question. The legal question is whether the -- whether the prohibition and the act violates the United States Constitution. No fact discovery is going to change the answer to the legal question.

Regardless of whether Ben Gamla met every other requirement, the Board is still required to deny their application because of their religious character. Taxpayers' discovery goes somewhere else. It's seeking to litigate alternative state law and regulatory issues, like employment policies, Board composition and funding, among others. But what's -- what's interesting and important to note is that the taxpayers were able to fully respond to Ben Gamla's preliminary injunction motion. They raised standing and establishment clause issues, taxpayers could have requested pre-PI discovery on an expedited basis from this Court, but they did not. They can't now complain about their litigation strategy.

This shows that there were other means available for the taxpayers to get the information that they sought, whether it's from the record of this case or public resources, the Board's decision, Ben Gamla's application, Board meeting minutes and recordings are all available to intervenors.

THE COURT: You know whether in *Saint Isidore* --

if I am pronouncing that correctly -- was there discovery in that case? Do you know?

MS. SMITH: Your Honor, there was a district court case -- so there was a district court case going on, that was the *OKPLAC* case in Oklahoma County district court, that actually ended up -- the parties agreed to stay discovery pending the resolution of the *Drummond* case, which was original jurisdiction in the Oklahoma Supreme Court, which really shows that in a very similar case --

THE COURT: I'm talking about the Saint -- the case that went to the Supreme Court.

MS. SMITH: Yes, Your Honor.

THE COURT: That's what I'm talking about. Do you know if there was discovery in that case?

MS. SMITH: I don't know, but I -- but at the end of the day, any discovery that would have happened would have been irrelevant to the legal question that the attorney general was asking, which was whether or not the religious prohibition in the act required the board to deny Saint Isidore's application. So any discovery would have had no bearing on the Oklahoma Supreme Court's decision.

So, finally, really what -- what we're -- what we're asking is that this stay only affects timing, not ultimate access. If discovery is later needed, the Court can tailor it after the legal issues are narrowed and we see whether

any discovery is necessary and what kind. That is the practical and proportional course. It protects public resources, avoids the unnecessary attorneys' fees, prevents the intervenor discovery from improperly expanding the case beyond the legal issue that's been presented to this Court, and allows the Court to decide the pending motion on the record and the issues before it, which we believe the record is complete at this point.

Valuable public resources should not be spent on those collateral issues while a fully briefed threshold motion is positioned for decision.

For these reasons, the Board asks this Court to temporarily stay discovery until ultimate resolution of the preliminary injunction motion.

THE COURT: Thank you.

Who's next?

MR. FARATE: Your Honor, A.J. Ferate for the State Board of Charter -- State Charter School Board.

I just wanted to clarify one comment from Ms. Smith's comments to you. The *OKPLAC* case was a district court case on *Saint Isidore*. There was two *Saint Isidore* cases, one in the state district court; one in the U.S. Supreme Court brought by attorney general *Drummond*.

So what Ms. Smith was addressing to the Court was that there was a stay in that district court case pending the

Oklahoma Supreme Court appeal. The Oklahoma Supreme Court appeal was the one that went up to the U.S. Supreme Court, while the one in the district court remained stayed the entire time with counsel for intervenors agreeing to that stay in the district court. Thank you.

THE COURT: Thank you.

MR. LUCHENITSER: Thank you, Your Honor. Alex Luchenitser for intervenors Daniel Kaiman, et al.

So I'm going to cover the discovery issue first, then talk about the merits, and then Ms. Long is going to present some argument for the Oklahoma family intervenors on the merits and...

Okay. So with respect to the discovery motion, the motion to -- the motions to stay discovery should be denied. This case could have a major impact on public school systems all across the country.

In the litigation -- as you know, in the *Saint Isidore* case, that case went all the way up to the Supreme Court, it was a four-four tie. It left the issue unresolved.

And the case that's before Your Honor today appears to be aimed squarely at returning the issue to the Supreme Court so that at least the -- the plaintiffs and the Board are hoping that there will be nine justices and the ninth justice will break the tie, and it seemed like the Board's counsel pretty much seemed to admit that that's where we're

going. And I think that's why you see there's, like, 20 lawyers in this room, because people know --

THE COURT: Is it known why Justice Barrett recused from the case?

MR. LUCHENITSER: There's been a lot of speculation online. She didn't say why. She -- a lot of the commentators believe that she had a close friendship with one of the attorneys who advised *Saint Isidore* in the preparation of their application at Notre Dame University Law School. So that's the speculation, but I don't know, you know, what actually happened.

So any -- the importance of this case makes it critical that this case be fully developed and decided on a full record with the benefit of discovery.

In the *Saint Isidore* case that went up to the Supreme Court, there was no discovery at all because it was an original jurisdiction action that was filed in the state Supreme Court and you can't do discovery in a case like that.

So -- and like one of -- Your Honor asked about the board's structure, like whether -- like whether the school exists, whether the foundation that's applying to create the school and the school are the same thing. That was one of the issues in the Supreme Court arguments and briefing in the *Saint Isidore* case. Are these two separate

entities? Does, like, one entity become another entity? Is there a private entity that then becomes a public entity, or is there -- or does the school come into being when the charter is approved, and does it start out being a public entity in the first place?

So there was no clear record in the *Saint Isidore* case in that, and there's not really a clear record of that here. There's no, like, hidden discovery. We asked for the articles of incorporation, the bylaws of the school or the applicant that's applying to create the school. And, you know, that's one of the things that they're not producing and that's not in the record. So that's one reason to -- to get discovery.

And another thing I want to emphasize is that the Court's decision on a preliminary injunction motion, that decision could go all the way up to the Supreme Court because you can appeal a PI, and then you can -- that can go to the Tenth Circuit, then that can go to the Supreme Court. And Supreme Court often decides these big cases on preliminary injunction appeal, so that's another reason why it's really important to allow discovery here, so if you're going to have a major precedent-setting case --

THE COURT: We need to break the tie. Is that --

MR. LUCHENITSER: Yeah. You need a -- you need a clear record.

So it's particularly important for discovery to proceed on the issue of standing because it's improper for a court to decide the merits of a case if there's no jurisdiction. And in our opposition to Ben Gamla's preliminary injunction motion, we challenged Ben Gamla's standing on the grounds that Ben Gamla's own application materials cast doubt on whether the school can comply and intends to comply with legal requirements for operating a charter school that are separate from the statute that Ben Gamla challenges.

So -- and then in its reply brief in support of its preliminary injunction, Ben Gamla asserted that there are no such defects, or if there are any, that they are curable. So, again, there's a factual dispute over that issue that requires discovery to be resolved.

THE COURT: What about their suggestion that they're dead at this first stage because of there being religious nature?

MR. LUCHENITSER: I don't think that's correct. We're not -- so they're arguing -- they're pointing to some cases that say that just because an applicant could be denied doesn't mean they don't have standing to challenge a facially discriminatory classification. But we cited cases in our brief from the Tenth Circuit that say that, you know, if it's clear that the applicant would be denied, based on other reasons, from the classification that they

challenged, then they do not have standing to challenge that classification. So the difference is between could and maybe or would and definitely -- I'm sorry -- would and definitely be denied.

So we think we have -- what we have already put in the record creates a very substantial doubt as to whether they could meet the nondiscriminatory requirements, but we think, if we can get discovery, then we can make a much stronger case than that and make it even clearer that they would be disqualified.

And, again, it's not --

THE COURT: And why do you think they would be disqualified otherwise?

MR. LUCHENITSER: The main problem is their discriminatory policies. There is a -- you know, strong evidence of discriminatory policies and practices on the basis of religion, sexual orientation, gender identity, both with respect to employees and students. And the Oklahoma Charter Schools Act requires charter schools to be completely nondiscriminatory. They cannot discriminate on admission or other treatment of students. They have to be equally open to all students.

So we want to -- you know, we want to conduct discovery to flesh -- flesh those issues out.

Let's see.

So they -- they say -- the plaintiffs say that the Court needs to defer to the Charter Board's assessment of whether there are other defects in Ben Gamla's application, but that argument relies on administrative deference case law that was recently abrogated by the Supreme Court's decision in the *Loper Bright* case, and also by an Oklahoma statute.

In the reply brief that the plaintiffs filed a couple days ago, they argue that factual determinations of administrative bodies are still owed deference, but here the Board did not even address most of the defects in Ben Gamla's application that we have pointed to, so the Board didn't make any factual findings about them.

Indeed, when the Board ultimately denied Ben Gamla's application because the school's curriculum would be religious, the Board never affirmatively concluded that there were no other defects in Ben Gamla's application. In other words, they didn't take a vote and vote, "Hey, we agree there's nothing else wrong with this application." They just voted and said, "Hey, we're going to deny this because it's a -- they're going to have a religious curriculum." But they didn't -- there wasn't, like, a majority Board vote on whether or not there were other defects.

And so there's really no -- there's no factual findings

to which the Court can defer to. And even -- even if there were -- or, like, even if the Board had concluded that there were no other defects, it's not clear whether that would have been a legal or a factual conclusion, so -- because, again, there's no clear record on that. So there's no way to tell whether you defer to it or not.

Okay. Let me see.

And then -- okay. Also, the plaintiffs contend that the Court should only consider what was in the administrative record before the Charter Board, but that rule only applies in cases brought under the Administrative Procedure Act, not in constitutional challenges.

Let's see.

They also made this argument, that the discovery we seek would improperly expand the scope of the case. But, again, the plaintiffs rely on case law concerning appeals from administrative proceedings, not standard lawsuits in district court like this one. And in a standard district court case like this one, an intervenor is free to raise defenses that the initial defendants did not raise, and to conduct discovery on those defenses.

Plaintiffs also -- contrary to what plaintiffs argue, we do not need to bring a separate lawsuit or to file a cross-claim or to intervene in the attorney general's lawsuit to challenge Ben Gamla's standing because we do not

seek any affirmative relief; we just seek the denial of any relief to the plaintiffs.

Also, the -- Ben Gamla and the Board raised some concerns about specific discovery requests, but we're -- we would be happy to work in good faith with the other parties to, you know, address those concerns through the meet-and-confer process.

The Board raised a concern about attorneys' fees. Again, that's not a good reason to stay discovery because, as we explained in our brief, under the relevant case law, the Board is unlikely to be liable for fees that plaintiffs incur in responding to intervenors' actions.

As far as the timing of our request, we diligently pursued discovery relevant to the preliminary injunction motion. We served our discovery requests just one week after plaintiffs submitted the reply brief that made clear that there were factual disputes on issues going to standing, and just two days after we were allowed to serve discovery requests under the applicable federal and local rules, and nearly two weeks before the Court even set a hearing on the preliminary injunction motion.

And, you know, we did the best we could in the preliminary injunction motion; based on what was in the -- you know, in the attachments to the PI motion, to try to oppose it, but we think we can make a much stronger case

with the benefit of discovery.

Okay. There's also an argument that the plaintiffs made in their reply brief that they filed a couple days ago. They're arguing that a lot of discovery, before the Court resolves the preliminary injunction motion, would make it infeasible for them to open by fall of 2027, but that contradicts what they initially told the Court in their preliminary injunction motion. There they said that, if the Court had granted them a preliminary injunction motion by May 22, 2026, so a couple of months ago, that would have been sufficient enough to allow them to open by this school year, so I guess it would have allowed them to open this month.

So they also complain that, hey, that we asked for nine months to conduct discovery in our status -- in the status report. And the reason we proposed nine months was they -- just they seemed -- the other party seemed so opposed to discovery that we anticipated a lot of disputes about it that would take time to resolve.

You know, if the plaintiffs and the Board would cooperate, then we think discovery could be done a lot faster, it could be completed in time, you know, for the Court to consider it before deciding the preliminary injunction motion. And then, if the Court grants the motion, there would still be enough time for the school to

open for fall of 2027.

Finally, with respect to the discovery motion, Ben Gamla and the Board argue that staying discovery until after the Court's resolution of the preliminary injunction motion and any appeals of that decision would help clarify what facts are relevant, but, as we have emphasized, discovery is relevant to deciding the preliminary injunction motion itself, and the case could go all the way up to the Supreme Court on a preliminary injunction appeal. So it's critical that the preliminary injunction decision be made on a full record, especially on the issue of standing, which must be established before a Court can properly reach the merits.

Plaintiffs and the Board are essentially trying to get the court system to do things backwards. They want the Tenth Circuit and the Supreme Court to resolve legal questions concerning the merits of the case first, and then send the case back to this Court to resolve the factual questions that determine whether there was jurisdiction to reach those legal questions, as well as factual questions that go to how the merits of the case should properly be resolved, and that doesn't make sense.

So we urge the Court to allow discovery to proceed now and to hold off on deciding the preliminary injunction motion until we can present the results of the discovery to

the Court.

Does Your Honor have any questions about discovery before I go on to the merits?

THE COURT: Thank you.

MR. LUCHENITSER: Okay. So now let me -- let me go on to the -- to the merits, the preliminary injunction motion.

I will discuss the issue of standing first. I think I already covered the basic standing argument in the -- arguing the discovery motion, that, you know, because the -- Ben Gamla's application raises serious, very serious questions as to whether they would be disqualified under provisions of the Charter Schools Act, that they do not challenge, they -- they lack standing.

That -- there's no injury. And even if they could show an injury, it would not be redressable because they -- their application -- they could not legally operate a charter school even if religious charter schools were allowed.

Let's see. So they -- so they cite -- they relied on -- they mention several cases in their argument. So they mention this case *Roe No. 2 vs. Ogden*. So there, the Tenth Circuit held that the fact that a law student could possibly flunk the bar exam did not preclude him from challenging allegedly improper questions on the bar

application.

So this was not a case where the law student could not satisfy legal requirements for bar membership that were separate from the one he was challenging. And our -- our argument here is that there are separate requirements from the -- what they call the religious exclusion that they will not be able to satisfy no matter what, and we also think that discovery would bolster our case on that.

They -- in their reply brief and in their oral argument they cited the First Circuit's decision in *Carson vs. Makin*. So there, the Court allowed parents to challenge a school funding program's prohibition on religious education. Even though it was unclear whether the schools, the parents were interested in would comply with the programs anti-discrimination rules. But in that case, it was not established that the schools would not have agreed to comply with the anti-discrimination requirements at issue. In other words, the record was not clear as to whether the defects at issue were curable or disqualified. And here, we seek discovery on exactly that question, to establish a clear record, which did not exist in *Carson*.

In addition, the plaintiffs in *Carson* were parents and it was possible that the parents could have found another religious school to send their children to even if the specific schools they named were disqualified. And the

district court explained that in that case in its opinion, that's 401 F.Supp 3rd at 210, Note 11.

And here, the plaintiff is the school. So, if the school cannot meet religion-neutral requirements for being a charter school, that is the end of the matter for standing.

And the last standing-related case the plaintiffs mentioned in their argument and their reply brief is a Ninth Circuit decision in a case called *Loffman vs. California Department of Education*.

So there, the Court held that parents who wanted to send their children with disabilities to religious schools had standing to challenge a California statute prohibiting the state from contracting with religious schools to serve students with disabilities. But in that case, there was no evidence that the plaintiff parents could not qualify for placement in a nonpublic school. And the Court held that two religious schools lacked standing to challenge the statute at issue because they intended to violate other requirements of the relevant program that they did not challenge.

So Ben Gamla is more like the schools in *Loffman* than the parents. You know, we have submitted substantial that Ben Gamla cannot meet religion-neutral requirements of the charter school program, and Ben Gamla's attempts to

facially dispute the issue only support allowing discovery.

Let me go on to ripeness. This case is unripe for similar reasons that the plaintiffs have a problem with standing. The ripeness inquiry considers both the fitness of the issues for judicial decision and the hardship to the parties of withholding Court consideration.

Here, fitness is not satisfied because Ben Gamla has not completed all necessary steps of applying for charter school authorization, including submitting the school's proposed bylaws and documenting that they completed required pre-application training. And that needs to be submitted in phase one, not phase two, of the application process under the state -- state statute.

THE COURT: Let me ask you this, the -- the state Board is here defending what they would like to do and indicating that they believe the plaintiffs are qualified other than the -- for the religious nature of it. Should not your challenge arise before the Board as opposed to this Court?

MR. LUCHENITSER: No, Your Honor, because we can't -- we can't get any relief from the Board because they already -- they denied the application. So we don't think it would make any sense to, like, to try to go file a separate lawsuit or start some sort of administrative proceeding asking them to do something they already did for

a different reason from the reason they -- they gave.

Yeah, let me -- let me go on to, if Your Honor -- does Your Honor have any more questions on standing and ripeness?

Let me go on to the -- to the merits, the preliminary injunction motion.

First, let me discuss the governmental entity issue. When an organization is a governmental entity, that is sufficient to render it a state actor, and courts do not need to consider state action tests that apply to private entities.

And here, you know, we'll show that the -- the school, once -- at least once it's created and receives a charter, will be a governmental entity, and, therefore, it will not have any rights under the free exercise clause, and it will also be barred by the establishment clause from teaching a religious curriculum.

THE COURT: I asked the plaintiffs this question. Are there cases where -- like the plaintiffs in this instance, right now I think that they're a -- they're a Board and a nonprofit. They're private right now. Would you agree with that?

MR. LUCHENITSER: There's a private entity that has submitted an application to create a charter school, but our position --

THE COURT: Right, but right now they don't have that charter. Are they a private entity?

MR. LUCHENITSER: The entity right now that's applied to create a charter school is a private entity as far as the best -- best we can tell.

THE COURT: Are there cases where a private entity became a governmental entity by action of the government?

MR. LUCHENITSER: Yes. I mean, there's the Tenth Circuit case, the *Ackerman* case that we cited in our briefs that was -- the opinion was written by Justice Gorsuch when he was a judge on the Tenth Circuit.

THE COURT: I have heard of him.

MR. LUCHENITSER: He said there that, yes, a private entity can become a governmental one. And the -- you know, that's in our brief where we cite the case.

Another point I would make here is that we believe -- and again, discovery would help with this, but we believe that, if -- if the application is ultimately approved and a charter is issued, the -- the school itself will be a separate entity from the entity that's submitting the application.

So, when the school is formed, when it actually comes into existence, it will be a governmental entity from the beginning. And its board members, once they take office, will be governmental officials from the beginning.

And the -- one other thing that's not clear is whether the board of the school and the board of the foundation that's applying to create the school, whether that's the same board or a different board. Is it the same people? And that's another thing I think that discovery would help with.

So anyway, so we -- so in our brief we listed eight factors that the court -- that the courts consider in deciding whether an entity is governmental, and we explained how, with respect to all eight factors, all eight factors point to the Ben Gamla Charter School being a governmental entity.

So I'm going to try to, like, mostly focus -- just so kind of you know what I'm doing, I'm going to try to mostly focus on addressing, like, new stuff that's in their reply brief that, you know, isn't already covered in our brief.

So in the -- in their reply brief, Ben Gamla cited a case decided in 1983 called *First National City Bank* for the proposition that the Court -- the Supreme Court focused on a narrower set of factors in assessing what constitutes a governmental entity than the eight factors that we have listed. But that case did not purport to announce a test for what constitutes a governmental entity and, instead, noted that the organization and control of these entities vary considerably; that's 462 U.S. at 624, in that case.

And that case was decided before the *Amtrak* cases and the *Biden v. Nebraska* cases that are cited in our brief, before those cases fleshed out the analysis for what a governmental entity is.

Then -- okay. I think we -- we talked about the -- so they argue that the -- that their proposed religious charter school would not be created by governmental action because at least the entity that's applied to create the school was founded by private actors. But, again, those private individuals only created the entity that is applying for approval of Ben Gamla's new charter school, and the Oklahoma Charter School Board must act to create the charter school itself by approving the Ben Gamla application and entering into a charter contract with the school. So the -- the Board is actually the creator of the school through those actions. And also, charter schools themselves were created by state action through legislation.

So both in their reply brief and in oral argument, the -- Ben Gamla relied on the *San Francisco Arts and Athletics vs. U.S. Olympic Committee* case for the proposition that the issuance of a charter by government is insufficient to render the recipient part of the government. But the charter issued in that case was a corporate charter to create a private corporation, and here the charter is

issued by the Charter Board to create public schools, which have long been understood to be parts of the government, as the Supreme Court recently noted in the *Lindke vs. Freed* case that's cited in our brief.

Then, some -- some of what I have already covered, Ben Gamla also argues that the Board members of the Ben Gamla charter school would be private individuals, but under Oklahoma law, board members of charter schools are government officials, as explained in the supporting citations on Page 14 of our brief.

So even if those people are private citizens now, they would become public officials once Ben Gamla's application and charter are approved.

THE COURT: Now, what makes them public officials? Run that by me.

MR. LUCHENITSER: There's a case, like a -- I think it's a Judicial Ethics Committee case in Oklahoma state that specifically states that board members of charter schools are governmental officials, and that's -- that's cited in our brief.

So -- so once Ben Gamla's application and charter are approved, the Board members would become public officials just as any private citizen becomes a public official upon being sworn into their office.

Let's see.

So one of the other major arguments that the plaintiffs make is that Oklahoma charter schools are not governmental entities because they are exempt from some rules that govern traditional public schools, but those exemptions do not change any of the numerous characteristics described in our brief that render Oklahoma charter schools governmental entities.

Indeed, in the *Lebron* case that we emphasize in our brief, the Supreme Court ruled that *Amtrak* was a governmental entity, even though *Amtrak* was exempt from various legal requirements ordinarily applicable to governmental bodies. And in its reply brief, Ben Gamla greatly exaggerates the extent to which charter schools are exempted from requirements that govern other public schools. For --

THE COURT: Back to the Board members a minute.

MR. LUCHENITSER: Sure.

THE COURT: Is there anything indicating, after a charter is granted, or was granted, could be granted, that -- who would be able to discharge a member of the Board?

MR. LUCHENITSER: That's -- I don't think that's in the record. Like, we don't have their bylaws or articles of incorporation, so we don't -- we don't know how the Board members are selected.

THE COURT: Anything in the state law that says

that, once you become a public official, which you're contending they are, that the state would be able to discharge them? Are you following me?

MR. LUCHENITSER: Yes. Yes. We don't think there's anything that directly allows the state to terminate individual board members, but the state is allowed to terminate the whole charter. The Charter Board can terminate the charter if the school is performing poorly or doing something else wrong. The State Board of Education also has some authority that could be used to shut down the whole school.

So -- and I mean, there's a process that the boards -- with -- the state boards would go through to do that. So if -- you know, if a school is doing really badly and they think they might be -- about to be shut down, that might be a sign to them that they need to change who their board is.

So let's see. Where was I? So do you have more questions on that or no?

Okay. So Ben Gamla, like I said, they greatly exaggerate the extent to which charter schools are exempted from requirements that govern other public schools in their reply brief. They -- so, for example, while charter schools have some leeway to determine the content of their curriculum, the curriculum must still be aligned with state standards and must adhere to various other specific

curriculum requirements, which are covered in our brief on Page 11 at Footnote 3.

And while it's true that charter schools can develop specific recruitment and enrollment procedures, they are prohibited from discriminating in admissions on any basis, and they must use a lottery to select which students may enroll if the number of students applying exceeds the number of spaces available.

And while charter schools have some leeway to set student discipline policies, they must comply with the state statute that comprehensively governs student suspension procedures, and that's -- all that is covered on Pages 10 and 11 of our brief.

In response to one of the things that we just discussed, which is that the Charter Board has authority to close charter schools, the Board points out in its reply brief that the Charter Board must have good cause for doing so and must follow certain procedures for doing so. But in the -- in the *Biden vs. Nebraska* case, the -- no administrative officials had any leeway at all to close *MOHELA*, which was the body that the U.S. Supreme Court held was a governmental entity in that case. *MOHELA* could only be closed by legislative action. And here, the Oklahoma legislature could abolish all charter schools by legislative action.

And then, in its reply brief Ben Gamla attempts to distinguish the *MOHELA* case and the *Amtrak* cases we rely on, contending that the entities in those cases were created by statutes and that statutes controlled certain aspects of the operations of those entities, but the same thing is true here. Charter schools were created by a statute, and that statute substantially controls their operations.

So the -- one of the major points that Ben Gamla emphasizes in its reply brief is what we talked about, so the board members of *Amtrak* and *MOHELA* were appointed by governmental officials, or were governmental officials themselves. And as I have already explained, here, charter school Board members are government officials themselves.

And in addition, superior governmental officials exercise significant control over Oklahoma charter schools. For example, the Charter Board must approve charter school application contracts. The Charter Board can revoke charter contracts or decide not to renew them, and the Charter Board provides close oversight of charter schools, as detailed in our briefing on Page 7.

Let's see.

So, finally, on the governmental entity question -- actually, I think I'll just wrap up the governmental entity argument right now.

And I'm going to turn -- as I mentioned in chambers, I want to turn the podium over to my colleague, Luke Anderson. And he's going to cover the arguments for why, even if Ben Gamla is not a governmental entity, why it is a state actor under the state action test applicable to private entities, then I'll come back and briefly wrap up with the free exercise and establishment clause issues.

Thank you, Your Honor.

MR. ANDERSON: Good morning, Your Honor. Luke Anderson representing the Kaiman intervenors. I'll now be discussing our point that, even if Oklahoma charter schools are private entities, they are still state actors under the tests that apply to private entities.

Charter schools are state actors under at least three of those state action tests. First, charter schools are state actors because they perform a function traditionally and exclusively performed by the government, that is, they provide education that is free and open to all.

Second, charter schools are state actors because Oklahoma has outsourced to charter schools its duty under the Oklahoma constitution to provide free education open to all.

And, third, charter schools are state actors because they are entwined in governmental policies, and the

government is entwined in their management and control. And I'll focus my argument on the points plaintiffs make in their reply brief with respect to each of those tests in turn.

Plaintiffs do not contest that the provision of education that is free and open to all is a traditional and exclusive public function. Rather, they argue that we have framed the function at issue too narrowly and that the Court should, instead, focus on whether education in general is a traditional and exclusive public function.

But the Supreme Court has made clear that the state action inquiry begins by identifying the specific conduct at issue.

THE REPORTER: I need you to slow down.

THE COURT: Yeah. Slow down.

MR. ANDERSON: Apologies. I will.

The Supreme Court has made clear that the state action inquiry begins by focusing on the -- begins by identifying the specific conduct at issue, and that's the *Sullivan* case cited on Page 15 of plaintiff's brief in support of the preliminary injunction.

The importance of specificity has been illustrated by the Supreme Court's public function cases. For example, as we explained in our brief, the Court has treated running elections for public office as a traditional and exclusive

governmental public function, even though, of course, private bodies can hold elections for their offices.

And, similarly, the court has treated the operation of a public park as a traditional and exclusive public function even though, of course, there are private parks.

Indeed, in the Supreme Court's decision in *Rendell-Baker*, which plaintiffs rely on, the court treated the relevant function as "the education of maladjusted high school students," and not education in general.

And in the Court's most recent public function case, *Hallock*, the court seems to prefer a narrower framing to a broader one, indicating that the proper function to look at was the operation of public access channels on a cable system instead of the operation of a public forum for speech.

The language in the *Logiodice* case from the First Circuit, on which plaintiffs rely, is contrary to the Supreme Court's approach on this matter. And, in any event, that case is inapplicable here because it involved a private school that charged tuition and used selective admissions policies, at least with respect to some of its students.

THE COURT: Let me interrupt and ask you a question, and it may be an unfair question. But we have private prisons in Oklahoma. Do you know how they're

treated?

MR. ANDERSON: Well, at least with respect to medical care, which we see in the *West* case, they're treated as state actors because there is a constitutional obligation to provide medical care to prisoners, and that goes to my next point on the delegation test.

Now, I'm not sure if private prisons are subject to -- are considered state actors more broadly than that. That's a question that I really know in the context of this *West* case.

THE COURT: So it was an unfair question.

MR. ANDERSON: It was a fine question, Your Honor. And I -- you know, I think this does segue into my next point about the outsource constitutional obligation test where *West v. Atkins* is the leading case for that test. And I think what that case shows is that, even if, in general, private prisons may not be state actors for every single purpose, they are when the state is outsourcing a constitutional obligation to them, which the state did in *West*.

Now, plaintiffs contend that *West* should be confined to situations in which a constitutional obligation has been fully delegated to one entity, such that no alternatives exist, but that isn't the legal principle that was announced by *West*, and that's made clear by how the Supreme

Court has restated the *West* rule recently.

In the 2019 *Hallock* case, the court phrased *West's* rule as follows: "This Court has recognized that a private entity may, under certain circumstances, be deemed a state actor when the government has outsourced one of its constitutional obligations to a private entity. In *West v. Atkins*, for example, the state was constitutionally obligated to provide medical care to prison inmates."

No mention of alternatives, no mention of some total delegation.

Still, plaintiffs latch onto this fact that in *West* there was -- the prison inmate there had no alternatives for medical care, and that fact was certainly relevant to the Court's analysis, but not for the reasons that plaintiffs suggest.

*West* teaches that the outsourced constitutional obligation test requires two steps. At step one, the Court asks, does the government have an obligation to provide the function at issue? And at step two the Court asks, has the government delegated that function to a private entity?

In *West*, the lack of alternatives mattered for step one because of the unique circumstances there. As we explain in our brief on Pages 18 through 19, the government does not have a general obligation to provide medical care to its citizens, but it does have an obligation to provide

medical care to prison inmates because, by virtue of their confinement, those people must rely on prison officials for care.

So this lack-of-alternatives point in *West* was relevant to the existence of a constitutional obligation in the first place, in other words step one, but not to whether the state had delegated that function.

Education is different from medical care. Under the Oklahoma constitution, the state does have a general duty to provide education that is free and open to all, regardless of any alternatives that may exist, so step one is easily satisfied.

And because Oklahoma charter schools are statutorily created to perform this duty, step two is satisfied as well.

Plaintiffs argued that this case is controlled by -- that the state action analysis here is controlled by *Carson*, but *Carson* didn't address state action at all. It didn't include any state action analysis. And, in any event, the schools in *Carson* are distinguishable because those were private schools to which parents were sending voucher money. Those were schools that charged tuition, that's what the vouchers were for, they were not free and open to all. And at least in Oklahoma, voucher schools are allowed to follow selective admissions practices.

Plaintiffs also raised this policy argument that, if charter schools are state actors under our delegation theory, then foster agencies would also be state actors, but plaintiffs don't explain why that would be so. And, indeed, there is no Oklahoma constitutional provision that specifically requires the state to provide foster care.

At any rate, *Fulton*, which plaintiffs cite for this point and brought up again today, similarly did not include any state action analysis. So it's not controlling on this state action point.

Finally, Oklahoma virtual charter schools are state actors because they're entwined with governmental policies and the government is entwined with their management and control -- or control.

Plaintiffs argue that all we have shown is that charter schools are regulated, that they receive public funding, and that they perform important functions, and that those things alone are not enough to establish state action under the entwinement test. But we have shown more than just those three things. For example, virtual charter schools, as my colleague pointed out, only can come into existence if they're approved by the State Charter Board, and they can be dissolved by the board of the legislature. Superior governmental officials thus exercise an existential level of control over charter schools, which goes to this control

point emphasized by *Brentwood*.

Moreover, the statutory and regulatory requirements for charter schools are specifically relevant to management and control because -- which are the relevant factors under *Brentwood*. For example, under Oklahoma statutes, Title 70 Section 3-134(I), the State Charter Board must provide oversight of the operations of virtual charter schools with respect to performance and legal compliance. And we have identified additional statutes and regulations that go to governmental control over charter schools on Page 10 of our brief.

So just because regulation, funding, and the performance of important functions may not be sufficient on their own to show state action, that doesn't mean they're not relevant to the analysis. And that's particularly true whereas here the regulations establish management and control, the relevant factors under *Brentwood*.

Viewed in its totality, the relationship between the state of Oklahoma and its charter schools is clearly one of closely entwined management and control.

So unless Your Honor has any additional questions, I will now pass the podium back over to my colleague, Mr. Luchenitser.

THE COURT: Thank you.

MR. LUCHENITSER: Okay. Thank you, Your Honor.

So I'm just going to briefly wrap up by discussing the free exercise clause and the establishment clause.

So because Oklahoma charter schools are governmental entities and state actors, they have no right to challenge Oklahoma's prohibition against religious charter schools under the free exercise clause, and Ben Gamla actually concedes this on Page 5 of their motion to stay discovery. They agree that, if they're state actors, they do not have a free exercise clause claim.

But even if Oklahoma charter schools were private entities, allowing them to teach religion would still violate the establishment clause. While some of our establishment clause arguments depend on charter schools being state actors, others do not, including the following arguments made on Pages 22 through 23 of our brief:

The first, that the establishment clause prohibits a fusion of government -- governmental and religious functions. Here, Ben Gamla is asking the Charter Board to establish a religious public school.

Second, the establishment clause prohibits delegation of governmental power to religious institutions, that we use that power to serve religious goals. Yet here, the Charter Board would be delegating the governmental function of providing public education to a religious institution that would impose religious doctrine in carrying out that

public function.

The establishment clause also prohibits direct public funding of institutions that use those funds to support religious activities. Yet here, the Charter Board would be doing just that if it approves the school. And I believe the Board argued that, while this rule doesn't apply to private choice programs where the money is like voucher -- voucher-type programs, school voucher programs, but that exception only applies where the money reaches religious schools solely as a result of the private choices of parents that receive the -- the vouchers or other aid. And here, the funding goes directly from the government to the schools. The -- the Board makes decisions what schools to approve, and the funding formula isn't based solely on the number of students attending. There is other factors and there's also startup funding that's given out without regard to how many students are attending, and that's all covered in our -- in our brief.

The Board's counsel mentioned the *Kennedy vs. Bremerton* case that was decided in 2022 or 2023. That case did substantially change establishment clause law, and it's also left some uncertainty about how lower courts should interpret the establishment clause. And we would submit that that uncertainty only supports allowing discovery with respect to the establishment clause claims, especially

because this case could go all the way up to the Supreme Court, as I mentioned. Because the Court keeps changing what the precedent is, they keep overruling their own precedent. So we don't even know what they're going to say the law's going to be, and we don't know what facts they might think are going to be relevant.

So in all these cases, we just try to get as detailed a factual record as we can because we don't know what the Supreme Court is going to say the law is going to be and what facts the Supreme Court is going to think are relevant.

So anyway -- so to conclude, for the reasons we have stated, we ask the Court not to issue a preliminary injunction, and to instead allow discovery on the preliminary injunction motion before deciding it.

And I will now turn the podium over to Ms. Long for the Oklahoma family intervenors.

THE COURT: Actually, let's take a 15-minute recess at this time.

Court will be in recess.

(Break taken.)

THE COURT: Who's next?

MS. LONG: Heidi Long, Your Honor.

And I'm honored to represent the Oklahoma family intervenors.

The Oklahoma families are five parents just trying to raise their kids and make the best decisions that they can. And one of the decisions they have made is to enroll at least one child into an Oklahoma charter school. They chose that option as the best public school option for their children. They're receiving public benefits as a result of that choice. They have no religious animus. In fact, several of them have very strong, closely held religious beliefs.

The interest of the Oklahoma families is solely in making sure that public charter schools remain public. Each one of the parents that I represent believes they are sending their children to a public school.

It's not just my clients. There are tens of thousands of Oklahoma students right now enrolled in public charter schools. Not just the students, we have teachers, we have administrators, we have the communities that support those charter schools, and we have the state of Oklahoma. They have all consistently treated charter schools as public schools for over a quarter of a century. And now, for the first time, the plaintiffs want to form a charter school and they are labeling it as a "publicly funded private charter school."

And I'm going to trip over that every time I say it because the words "private" and "charter school" have never

been used together, not in Oklahoma and not anywhere in the United States. There are 46 other states that have charter schools, and none of them treat them as publicly funded private schools.

How the charter schools are treated by the state of Oklahoma is important, and how those charter schools are fused into their public school system. Because recently, in 2022, in *Carson v. Makin*, the U.S. Supreme Court stated that the state of Maine may provide a strictly secular education in its public schools. And so, likewise, then Oklahoma is able to provide a strictly secular education in its public schools.

And that is why the plaintiffs are straining to cram charter schools into this box of publicly funded private charter schools. And today I hope to show why charter schools are public, and why they must remain that way.

So let's start by talking about the U.S. Supreme Court decision in *Carson*. There are a couple of important things about *Carson*. The Kaiman intervenors already told you *Carson* was a private school, undisputedly private school.

U.S. Supreme Court was not being asked to determine whether it was a public or a private school. The Court was simply deciding whether Maine could provide tuition assistance for all students attending private schools except religious private schools. That was the issue in

*Carson*.

Another thing about *Carson*, the Oklahoma families are not claiming that *Carson* has created a test or that *Carson* has constitutionalized a test. That is the plaintiffs raising an overly simplistic rebuttal to the Oklahoma family's reliance on that case.

Here's what the Oklahoma families are saying, and this is what is significant about *Carson*, is the U.S. Supreme Court spent time in its *Carson* decision noting the differences between public schools and private schools, and the U.S. Supreme Court said these differences are numerous and important. And today, this Court is being asked to determine whether a charter school is public or private. And the U.S. Supreme Court has spoken and told us the characteristics of a public school.

Oklahoma charter schools closely track those characteristics in *Carson*. So *Carson* says public schools have to accept all students. Oklahoma charter schools accept all students.

*Carson* says public schools are free. Oklahoma charter schools do not provide tuition.

*Carson* says public schools are subject to academic standards set by the state. Oklahoma charter schools are subject to Oklahoma's academic standards, and they also are subject to Oklahoma's testing requirements to make sure

that those standards are being taught in the charter schools.

*Carson* says public schools must hire certified teachers. Oklahoma charter schools do not have to have certified teachers, but they are subject to Oklahoma's teacher retirement system. They're eligible for state health insurance and other state benefits. And, if a public schoolteacher goes to teach at an Oklahoma charter school, those years apply to their retirement and seniority.

In *Carson*, the private entity wanted to be treated equally with other private entities relative to tuition assistance. But importantly here, the plaintiffs do not want to create a charter school that's going to be treated equally with other private entities. They want to be a private charter school that's treated equally with other public charter schools.

The taxpayer Kaiman intervenors have talked to you a lot about government entity tests and state actor tests, and I'm not going to rehash that. I'm not going to go through those qualifications. It's also in our briefing, but what I will say is the Court's statement in *Carson vs. Makin*, that Oklahoma is able to provide a strictly secular education in its public schools, those tests must be applied in light of *Carson*.

So how Oklahoma treats its charter schools and how they're integrated into the public school system is relevant for constitutional purposes. And under Oklahoma's constitution there's a mandate to the legislature to establish and maintain a system of free public schools. The Oklahoma legislature established the school code, and it defines what a public school is. And that's Title 70, Section 1-106. "The public schools of Oklahoma shall consist of all free schools supported by public taxation."

In 1999, the Oklahoma legislature expanded public school offerings when it enacted the Oklahoma Charter School Act, also in Title 70. The act provides that charter schools must be equally free and open to all students as traditional public schools.

The plaintiffs tried to distinguish themselves from public schools in their briefing by claiming that charter schools are exempt from statutes and rules that govern public schools. It's Page 2 of their reply. Plaintiffs are relying on language in Title 70, Section 3-136. And I would just like to read the very first sentence of that statute.

"Except as provided for in the Oklahoma Charter School Act, a charter school and a virtual charter school shall be exempt from all statutes and rules relating to schools, boards of education, and school districts. However, a

charter school or a virtual charter school shall comply with all federal regulations and state and local rules relating to health, safety, civil rights, and insurance."

So in one sentence, Your Honor, we have the exemption from all rules and statutes that apply to public schools, but we have five exceptions to that exemption.

We have the exception for health, safety, civil rights, and insurance. But I think the most important exception is in the very first phrase of the statute, "except as provided for in the Oklahoma Charter School Act." And in that very statute there are about 15 different requirements that charter schools must comply with.

I'm not going to go through all of them, but those requirements are things like charter schools will comply with all federal and state laws relating to education of children with disabilities in the same manner as public schools, they will comply with state due process requirements when disciplining students.

Charter school boards have to comply with the same sorts of conflict of interest and continuing education requirements that public school board members have to comply with.

And Your Honor asked whether board members of charter schools can be removed. Well, they certainly are evaluated every year by the sponsor.

And the plaintiffs misspoke earlier. The sponsor is not the plaintiffs. The plaintiffs are applying to open a school; the sponsor is the state entity, the Oklahoma State Charter School Board. These are all statutory requirements for public schools --

THE COURT: Let me interrupt you a minute and ask you, in regards to private schools in Oklahoma, like Casady and Heritage, are they regulated by the state with various requirements like what you're talking about here? I don't know. Do you know?

MS. LONG: I do. They're not.

THE COURT: They're not regulated at all?

MS. LONG: No. I think recently they -- a few private schools have tried to be accredited by the state just so they can make that representation in their marketing, but there's no regulations by statute for private schools.

There are statutory requirements for public schools, and in this one statute we see that those same statutes and regulations apply to charter schools. And that's just one statute in the Charter School Act. There are other statutes that have other requirements that apply to both public schools and charter schools. But all the plaintiffs say in their brief -- in their reply brief is that they're exempt from statutes and rules for public schools, but they

never tell us exactly what they're exempt from. And to try to detract from this, the plaintiffs pick these characteristics one at a time. They say, for example, we have a private entity and they comply with the Open Meetings Act and they're private, so that should end the fact finding here.

But, Your Honor, the Oklahoma families are not saying that they're public schools based on one characteristic. They're looking at all of the characteristics that define them. And when the plaintiffs can find a school that meets all of those characteristics, well, then the plaintiffs will have found themselves a public school.

Now, importantly here, how Oklahoma treats its public schools is entitled to deference because even the plaintiffs concede, under federalism principles, states have primary authority over public schools, and that's at Page 4 of their reply.

And I have talked solely about how the legislature treats public schools. How has the Oklahoma judicial branch treated them? Well, we have *Drummond vs. Oklahoma Statewide Virtual School Board*, a 2024 decision from the Oklahoma Supreme Court. And that court held, under Oklahoma law, a charter school is a public school. And, as such, a charter school cannot be sectarian in its programs, admission policies, employment practices, and operations.

How does Oklahoma's executive branch treat charter schools? In our briefing we have listed several different attorneys' general opinion, from multiple attorneys over several years, and they all consistently say that charter schools are public schools.

Oklahoma has exercised its sovereign prerogative to treat charter schools as public schools, and this prerogative is relevant under the U.S. Supreme Court's announcement in *Carson v. Makin*.

As we conclude here today, I don't want us to forget why we're here. The plaintiffs are seeking the extraordinary remedy of a preliminary injunction. And because the plaintiffs seek a disfavored injunction, they're seeking to change the status quo, the Tenth Circuit has said these types of disfavored injunctions must be even more heavily scrutinized by this Court. It's the *O Centro* case in our briefing.

An injunction is an equitable remedy, so we need to look at the equities and the public interest. If this Court finds charter schools are private schools, this turns over a quarter of century of charter schools in Oklahoma on its head.

The plaintiffs are here complaining that its constitutional rights have been violated. What about the constitutional rights of all the students and the Oklahoma

families that they enjoy right now in their charter schools because those schools are being operated as public schools? Those constitutional rights disappear if charter schools are private entities.

And, likewise, federal disability protections the families enjoy are at risk. The plaintiffs say they will abide by those laws in their school. That statement has no teeth because the Rehabilitation Act applies in a different way to private entities.

So, if the plaintiffs create a publicly funded private charter school and then they change their mind and they don't want to follow those laws, Oklahoma families can do nothing to enforce the promise that was made.

But most important, there's an immediate funding issue. Charter schools do not exist without government funding. Right now charter schools are part of the state aid formula for public schools. And the Oklahoma constitution provides that that money shall never be appropriated for or used for a sectarian institution, that's Article II, Section 5.

Charter schools are also LEAs, a Local Educational Agency. And the significance of an LEA is they receive federal public education dollars directly. An LEA, by the way, is defined under federal law as a public board of education or other public authority. So this district -- so this direct federal funding ceases as well.

And all of this becomes extremely disruptive, not only to the thousands -- tens of thousands of charter school students, but all of the administrators and teachers.

Do those students find some other place to be educated? Probably. But it's not their parents' choice. It's not the choice that their parents felt was the best fit for their family.

And when you look at the plaintiffs' briefing, they gloss over this. They don't want to look at the equities because they have no answer for the impact that a finding that charter schools are private will have on Oklahoma's public education system.

Thank you.

THE COURT: Thank you.

Have we heard from all of the intervenors and -- I believe we have.

Plaintiffs wish to respond?

MR. CHEN: Thank you, Your Honor.

I would like to begin first with your unfair question about private prisons, Your Honor. Private prisons -- for private prisons, incarceration is an exclusive and traditional public function, but education is not. That's why private prisons are different.

And on the issue of public functions generally, Your Honor, I would just point out that my friend on the other

side, when discussing the *Hallock* case and what it said, mischaracterized the holding there. The Court there said that operating a public forum is not the right way to define a public function because you're building in the challenged condition. The right way to think about it is whether or not you are operating a forum more generally. So, again, at the higher level of generality. That's the right way to define an exclusive and public function.

There's also a lot of back and forth, Your Honor, about, you know, when granting a charter does that make you part of the government. And the taxpayer intervenors again say that, oh, look at this judicial ethics opinion. And, Your Honor, I would encourage you to read it. It's a four sentence -- it's a four-sentence opinion that says the -- that says the state law labels what controls to find that a charter school Board is -- is a public body.

And, Your Honor, we know state law labels can control. And even in *Lebron*, Congress said that *Amtrak* is a private actor, not a governmental agency. But the Supreme Court said, for interpreting the federal constitution, that's not enough. And if it's not enough for Congress to say so in enacted legislation, I'm skeptical that an advisory, nonbinding judicial ethics opinion is enough.

There is also a lot of discussion, Your Honor, about my clients and -- and discrimination, and I just want to point

out that the record is clear about this. We filed statements, affidavits notarized from every member of our board saying that we will comply with all Oklahoma and federal law, including nondiscrimination law.

What the taxpayer intervenors are attempting to do is to second-guess my client's religious beliefs. They're saying, well, we actually don't think that you wouldn't discriminate because we think that your religious beliefs require you to.

This Court can't answer those types of questions, and we're clear that we would comply with the law. And we have also, in our addendum, said that we will fully comply with all of the requirements under the IDEA and the Rehabilitation Act. Those are not just stand-alone statutory provisions. They're written into the contracts and you have to agree to abide by them.

Your Honor, there is also -- the -- my friends on the other side brought up the *Ackerman* decision from then Judge Gorsuch on the Tenth Circuit and whether or not that impacts the issue of government creation. And I want to just discuss some of the facts in the *Ackerman* case that involved the National Center For Missing and Exploited Children.

The case was a Fourth Amendment case. But the Tenth Circuit found that the National Center For Missing and

Exploited Children was a governmental entity because it had exclusive public law enforcement functions that no other body in the United States had. It was -- they, for example, were able to receive otherwise illegal sexual content, view it knowingly, without incurring criminal liability. Private organizations could be compelled under force of law to cooperate with them.

And they also had to forward every single report that they received to federal law enforcement. And not only that, their board composed of government appointees and they were heavily enmeshed with the government. There were government agents at every level, from DHS, from the Department of Defense, from the U.S. marshals, that operated within the organization.

The FBI had supervisory and intelligent -- intelligence analysts working full-time at the NCMEC. There's nothing like that here, Your Honor, with respect to charter schools.

Your Honor also brought up the idea of whether or not these issues are rightly raised in a separate lawsuit from the taxpayer intervenors. And they said, oh, we're not sure we'd have -- you know, the decision's been already made, we can't do it.

They could, or they at minimum could have pled a cross claim and then Your Honor would have -- because when they

sought intervention, they sought intervention to defend the Board's decision, but here they're not defending it, they're collaterally attacking it.

At a minimum, that requires pleading a cross-claim. And it's not too late because later, down the line, if it comes out that, you know, maybe we couldn't meet our requirements or they think any malfeasance happened -- none will happen -- they can always bring a lawsuit down the line, like they did in the *OKPLAC St. Isidore* case. So they should still be held to that standard, Your Honor.

And, finally, again, my friend on the other side talked a lot about why discovery is needed for all these facts, but he couldn't point really to any fact that would bear on the core central legal issues that isn't already present in this case.

Again, in all the -- in all the briefing on the preliminary injunction, Your Honor, the citations are repeatedly to Title 70 of the Oklahoma statutes because what matters here is how Oklahoma has organized its charter school program. No additional facts are needed. It's an issue of law.

That's both true for the standing arguments, that's also true of the free exercise and the establishment clause arguments. My friends on -- at the Charter School Board have explained why *Zelman* and *Carson* apply so that the

establishment clause argument, as a legal matter, fails.

I would also note that under *Kennedy*, you look at historical traditions and practices. And in the *Espinoza* case at the Supreme Court, the Court noted that, since the time of the founding onward, public funding has flown -- has gone to denominational religious schools, including things like land grants, even. And this practice here of funding -- of providing funds to a private organization fit comfortably within the historical tradition and practice.

The final note is the argument that the taxpayer intervenors are putting forward here has been noted by the Supreme Court in recent decisions, but that decision was Justice Sotomayor's dissent in *Trinity Lutheran*. It's been rejected.

So for those reasons, Your Honor, we would ask that you would grant our preliminary injunction.

THE COURT: Thank you.

All right. I appreciate your presentation. We'll take it under advisement. Court will be in recess.

(Court adjourned.)

REPORTER'S CERTIFICATION

I, Emily Cripe, Federal Official Court Reporter, in and for the United States District Court for the Western District of Oklahoma, do hereby certify that, pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 29th day of September, 2026.

**/S/ Emily Cripe**
EMILY CRIPE, CSR
Federal Official Court Reporter

# District Court Order granting Ben Gamla's Motion for Preliminary Injunction, filed below on September 24, 2026, as ECF No. 121

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., et al.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. CIV-26-582-R** |
| **BRIAN T. SHELLEM, in his official capacity as Chairman of the Oklahoma Statewide Charter School Board, et al.,** | ) | |
| **Defendants.** | ) | |

**ORDER**

Now pending for resolution is Plaintiffs' Motion for Preliminary Injunction [Doc. Nos. 10, 11] seeking to prohibit the Oklahoma Statewide Charter School Board from enforcing a provision of the Oklahoma Charter Schools Act that requires a charter school to be "nonsectarian." Plaintiffs allege the nonsectarian requirement violates their rights under the Free Exercise Clause of the First Amendment. Also before the Court are two Motions to Stay Discovery [Doc. Nos. 110, 111] filed by Plaintiffs and the Oklahoma Statewide Charter School Board seeking to stay discovery pending resolution of the Motion for Preliminary Injunction and any related appeals. Each motion is fully briefed [Doc. Nos. 62, 63, 64, 79, 94, 99, 100, 113, 114, 115] and a hearing was held on August 5, 2026 where the parties presented oral argument [Doc. No. 116].

### *Introduction*

This case concerns the interplay between the Establishment Clause and the Free Exercise Clause of the First Amendment. These provisions, applicable to the states through the Fourteenth Amendment, provide that the legislature "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Although these provisions can sometimes "exert conflicting pressures," they in fact "express complementary values," *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005), working together "to promote and assure the fullest possible scope of religious liberty and tolerance for all." *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 305 (1963) (Goldberg, J. concurring). Still, in practice, delineating "the boundaries of permissible government activity in this sensitive area" can be a demanding task. *Tilton v. Richardson*, 403 U.S. 672, 678 (1971). That is particularly true in this case, which not only involves the relationship between religion and schools, but also whether a charter school is engaged in state action.[1]

Mindful of the significant issues raised in this case, the Court will first set out the relevant factual and procedural background. Next, the Court will determine whether Plaintiffs have standing to proceed and whether their claim is ripe for review. Last, the Court will address whether Plaintiffs have established that they are entitled to a preliminary injunction.

[1] *See Schempp*, 374 U.S. at 230 (1963) (Brennan, J. concurring) (noting that there are "few issues more intricate or more demanding than that of the relationship between religion and the public schools"); *Mitchell v. Helms*, 530 U.S. 793, 807 (2000) (plurality) (acknowledging that "we have consistently struggled to apply these simple words in the context of governmental aid to religious schools"); *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (explaining that the criteria for finding state action "lack[s] rigid simplicity").

### *Background*

The Oklahoma Charter Schools Act, Okla. Stat. tit. 70, § 3-130 et seq., governs the establishment and operation of charter schools in Oklahoma. For purposes of the Act, a charter school means "a public school established by contract" with a school district board of education, an accredited public or private institution of higher education, a federally recognized Indian tribe, or the Statewide Charter School Board. Okla. Stat. tit. 70, §§ 3-132(A); 3-132.2(C)(1)(b); 3-134(D). Any of these "sponsor" entities may contract with a "board of education of a public school district, public body, public or private college or university, private person, or private organization" to establish a charter school. *Id.* at § 3-134(C).[2] For a virtual charter school, like the one involved here, the Statewide Charter School Board has the sole authority to act as the sponsor. *Id.* at § 3-132.1(I). An applicant seeking to establish a charter school submits a detailed application to the proposed sponsor, who then accepts or rejects the application. *Id.* at § 3-134. If accepted, the governing board of the charter school and the sponsor enter a written charter contract. *Id.* at § 3-136. Put more plainly, the OCSA provides a means by which public or private parties may contract with a public or private sponsor for the establishment and operation of a "public charter school." *See id.* at § 3-134(I).

Charter schools resemble traditional public schools in several ways. Chief among these is that charter schools are supported by public taxation and are "as equally free and open to all students as traditional public schools." *Id.* at §§ 3-136(A)(9); 3-142; 1-106

[2] Private schools are not eligible to contract for a charter school. Okla. Stat. tit. 70 § 3-134(C).

("The public schools of Oklahoma shall consist of all free schools supported by public taxation…."). Charter schools are also subject to many of the same rules and requirements as public schools. For example, charter schools must comply with the same financial audits, student testing requirements, and state sunshine laws as a school district. *Id.* at §§ 3-136(A)(4), 3-136(A)(5), 3-136(A)(15).[3] Further, the sponsoring entity retains some measure of oversight and control over the charter school, including the authority to terminate a charter contract for good cause. *Id.* at § 3-137(F).[4]

But a charter school differs from a traditional public school in a few key respects. Perhaps most significantly, a charter school, unlike a traditional public school, may be "established by contract" with a private person or organization. Rather than being subject to the local school board, a charter school has its own governing board which is "responsible for the policies and operational decisions of the charter school[.]" *Id.* at § 3-136(A)(7). A charter school is granted additional flexibility and authority in the development of its curriculum, personnel policies, and school governance. *Id.* at §§ 3-136(A)(3); 3-136(C). And, subject to some of the exceptions noted above, charter schools

[3] *See also* Okla. Stat. tit. 70 § 3-136(A)(1) (requiring compliance "with all federal regulations and state and local rules and statutes relating to health, safety, civil rights, and insurance"); § 3-136(A)(6) (requiring compliance with "with all federal and state laws relating to the education of children with disabilities in the same manner as a school district"); § 3-136(A)(7) (subjecting governing board to same conflict of interest and continuing education requirements as a school district board); § 3-136(A)(11) (requiring compliance with student suspension requirements); § 136(A)(12) (treating charter schools as a school district for purposes of tort liability under The Governmental Tort Claims Act); § 3-136(A)(13)-(14) (allowing employees to participate in the retirement, health, and insurance programs offered to employees of a public school district).

[4] *See also* Okla. Stat. tit 70, § 3-134(I) (empowering sponsor to exercise oversight over school operations, approve or deny certain contracts, and monitor the performance and legal compliance of the charter school); § 3-136(A)(17) (requiring charter schools to provide financial statements in compliance with State Board of Education rules); § 3-136(A)(18) (requiring sponsor to annually evaluate charter school based on specific performance framework); § 3-136(D) (requiring sponsor to approve any amendments to a school's charter).

are "exempt from all statutes and rules relating to schools, boards of education, and school districts." *Id.* § 3-136(A)(1).

Overall, the OCSA grants the charter school's governing board significant autonomy in its day-to-day operations. This structure makes sense in light of the Act's purposes, which include encouraging the use of different and innovative teaching methods, increasing learning opportunities for students, providing additional academic choices, and creating new professional opportunities for teachers. *Id.* at § 3-131(A)(4). However, the OCSA categorically excludes charter schools that are religious in character or affiliation:

> A charter school shall be nonsectarian in its programs, admission policies, employment practices, and all other operations. A sponsor may not authorize a charter school or program that is affiliated with a nonpublic sectarian school or religious institution[.]

*Id.* § 3-136(A)(2).

The constitutionality of this nonsectarian requirement was recently challenged in *Drummond ex rel. State v. Oklahoma Statewide Virtual Charter Sch. Bd*., 558 P.3d 1 (Okla. 2024). In *Drummond,* the Oklahoma Supreme Court considered whether a contract with a religious institution to establish a religious virtual charter school violated state and federal law. *Id.* at 6. Highly summarized, the Oklahoma Supreme Court concluded that the establishment of a religious charter school violates the Oklahoma Constitution, state law, and the Establishment Clause of the First Amendment. *Id.* at 7-10. The Oklahoma Supreme Court further concluded that the Free Exercise Clause of the First Amendment is not implicated because a charter school is a governmental entity and state actor. *Id.* at 14-15.[5]

---

[5] *Drummond* was affirmed on appeal by an equally divided Supreme Court. *See Oklahoma Statewide Charter Sch. Bd. v. Drummond*, 605 U.S. 165 (2025). However, "[a]n unexplained affirmance by an equally

Now, to the specific dispute in this case. Plaintiffs are the National Ben Gamla Jewish Charter School Foundation, Inc. and its founder, Peter Deutsch. In December 2025, Ben Gamla submitted an application to the Oklahoma Statewide Charter School Board to sponsor the establishment of a virtual religious charter school called The Ben Gamla Jewish Charter School. Compl. [Doc. No. 1] ¶ 65. As Plaintiffs describe it, the proposed charter school would provide a "rigorous academic education" alongside "instruction in Jewish religion, culture, values, rituals, texts, holidays, and practices." *Id.* ¶¶ 66, 75. They readily acknowledge that "the transmission of Jewish religious beliefs and practices to children is a core aspect of Ben Gamla's religious mission." *Id.* ¶ 71. The Statewide Charter School Board, relying on *Drummond* and the nonsectarian requirement, denied Ben Gamla's application based on the proposed school's religious character. *See id.* at Ex. 6 [Doc. No. 1-6]; Answer [Doc. No. 59] ¶ 103.

This action followed. In their present motion, Plaintiffs contend that the nonsectarian requirement violates the Free Exercise Clause of the First Amendment by discriminating against religious institutions. They further contend that the Establishment Clause is not implicated because a charter school is a privately-run entity and not a state actor. They seek a preliminary injunction preventing the Statewide Charter School Board

divided court is not entitled to any precedential weight." *Martin v. Franklin Cap. Corp.*, 251 F.3d 1284, 1294 n.9 (10th Cir. 2001), abrogated on other grounds by *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81 (2014).

from enforcing the nonsectarian requirement or otherwise denying Ben Gamla the ability to participate in the charter school program because of its religious identity.[6]

Notably, the Statewide Charter School Board does not oppose Plaintiffs' requested relief.[7] But two separate groups, who were previously permitted to intervene as defendants, do. *See* Order of June 3, 2026 [Doc. No. 89]. The Kaiman Intervenors (a group of taxpayers attending or with children attending public schools) contend that Oklahoma charter schools are state actors that may not assert a Free Exercise challenge and, even if they could, the Establishment Clause prohibits charter schools from promoting religion. The Moore Intervenors (a group of families with children attending charter schools) reiterate these arguments while emphasizing that charter schools are, in law and fact, public schools that may not promote religion.

## *Discussion*

### A. Preliminary Injunction Standard

Plaintiffs seek the "extraordinary remedy" of a preliminary injunction and their right to relief must therefore "be clear and unequivocal." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).[8] To obtain a preliminary

---

[6] Plaintiffs' Complaint also includes a separate claim under the Equal Protection Clause of the Fourteenth Amendment. However, their request for a preliminary injunction is premised only on their First Amendment claim.

[7] Although the Board does not oppose Plaintiffs' request, its refusal to grant Ben Gamla's application suffices to preserve a justiciable dispute. *See United States v. Windsor*, 570 U.S. 744, 756 (2013) ("The Government's position—agreeing with Windsor's legal contention but refusing to give it effect—meant that there was a justiciable controversy between the parties[.]").

[8] Defendant-intervenors suggest that Plaintiffs are seeking a disfavored preliminary injunction that requires a heightened showing. *See Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1259 (10th Cir. 2005) (identifying three types of disfavored injunctions). The Court need not resolve which standard might apply because Plaintiffs have met their burden even under the heightened standard.

injunction, the movant must generally establish four factors: "(1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the party opposing the preliminary injunction; and (4) the injunction would not be adverse to the public interest." *Id.* "[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (internal quotation marks and citation omitted).

**B. Standing and Ripeness**

Initially, the Kaimon Intervenors argue that there is no need to reach the merits of the constitutional issues because the claims are not justiciable. "To satisfy Article III's justiciability requirements, (1) a plaintiff must have standing, (2) their claims must not have become moot, and (3) their case must be ripe for review." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 108 (10th Cir. 2024). The Kaimon Intervenors challenge the first and third requirements, contending that Plaintiffs lacks standing because Ben Gamla's charter school application contains several disqualifying deficiencies apart from its religious character and the claims are not ripe because there are ongoing disputes over the reasons for rejecting the application. Neither the factual record nor the governing legal standard supports these arguments.

Start with standing. To establish standing, the

> party seeking to invoke a federal court's jurisdiction must demonstrate three things: (1) injury in fact, by which we mean an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical, (2) a causal relationship between the injury and the challenged conduct, by which we mean that the injury fairly can be traced

> to the challenged action of the defendant, and has not resulted from the independent action of some third party not before the court, and (3) a likelihood that the injury will be redressed by a favorable decision, by which we mean that the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative.

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663–64 (1993) (internal quotation marks and citations omitted). At the preliminary injunction stage, "the plaintiff must make a clear showing that she is likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (internal quotation marks omitted).

Plaintiffs have made that showing here. The Statewide Charter School Board indisputably denied Ben Gamla's charter school application based on the proposed school's religious character. *See* Compl., Ex. 6; Answer ¶ 103. The denial of Ben Gamla's application suffices to establish a concrete, particularized, and actual injury. The cause of the injury is the nonsectarian requirement, and it necessarily follows that a judicial decree precluding the enforcement of the nonsectarian requirement would redress this injury. *See Northeastern Florida,* 508 U.S. at 666 n. 5.

The Kaimon Intervenors disagree, arguing that Plaintiffs cannot establish causation or redressability because their application contains other, material deficiencies that disqualify the proposed school from obtaining a charter contract. But this misconstrues the underlying injury in fact. "Plaintiffs claiming discrimination in the denial of a benefit need not show they would have obtained the benefit in the absence of the discrimination to establish standing; it is enough to show the discrimination deprived them of the ability to compete for the benefit on an equal footing." *Wilson v. Glenwood Intermountain Props.,*

*Inc*., 98 F.3d 590, 593 (10th Cir. 1996) (citing *Northeastern Florida*, 508 U.S. at 666–68). In other words, "[t]he 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Northeastern Florida*, 508 U.S. at 666.

Here, Ben Gamla is "able and ready" to apply for a charter school contract – indeed, it has already gone through the process of submitting and revising its application – but Ben Gamla is categorically denied the opportunity to obtain a contract based on the nonsectarian requirement. That is sufficient for standing purposes. *Id.* at 666; *see also Carson v. Makin,* 596 U.S. 767, 781 fn. (2022) (explaining that the state "rightly does not attempt to defend" its law by pointing to other reasons not to extend the benefit "because the law rigidly excludes any and all sectarian schools regardless of particular characteristics"); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017) ("The express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church—solely because it is a church—to compete with secular organizations for a grant."). Although the Kaimon Intervenors identify other, alleged deficiencies in Ben Gamla's application, they have not identified any noncurable conditions or nondiscriminatory eligibility criteria that entirely disqualify Ben Gamla from receiving a charter contract. *Day v. Bond*, 500 F.3d 1127, 1134 n.5 (10th Cir. 2007).

Next, the Kaimon Intervenors contend the claims are not ripe for review because Plaintiffs have not completed every application step and there are ongoing disputes over the reasons for rejecting the application. "The ripeness doctrine aims to prevent courts from entangling themselves in abstract disagreements by avoiding premature adjudication."

*Awad v. Ziriax*, 670 F.3d 1111, 1124 (10th Cir. 2012) (internal quotation marks omitted). "If a threatened injury is sufficiently imminent to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Id.* (quotation marks and brackets omitted). But prudential limitations may still advise against judicial review. *Id.* Prudential ripeness analyzes both the fitness of the issues raised, i.e. "whether determination of the merits turns upon strictly legal issues or requires facts that may not yet be sufficiently developed[,]" and the hardship to the parties from withholding review. *Id.* (quotation marks and citations omitted).

Here, Ben Gamla's application has already been denied based on the proposed school's religious character. The disputed issues – the facial constitutionality of the nonsectarian requirement and the presence or absence of state action – turns primarily on legal questions that do not, at this stage, require further factual development. *See id.* Moreover, Defendant-intervenors have not shown that they would face any hardship from withholding review. On the contrary, both Plaintiffs and the Statewide Charter School Board seek a prompt judicial determination as to the constitutionality of the nonsectarian requirement.

**C. Likelihood of Success on the Merits**

Turning to the merits, Plaintiffs argue that Ben Gamla's exclusion from the charter school program on the basis of its religious character violates their rights under the Free Exercise Clause of the First Amendment. A long line of Supreme Court precedent supports Plaintiffs' position.

"The Free Exercise Clause protects religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status." *Trinity Lutheran*, 582 U.S. at 458 (internal quotation marks and brackets omitted). "Applying that basic principle," *id.*, the Supreme Court has "repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson*, 596 U.S. at 778. This principle applies with equal force to state benefit programs that subsidize or support education. *See, e.g., Everson v. Board of Education of Ewing*, 330 U.S. 1 (1947) (upholding a state law that reimbursed parents for the bus fare associated with sending their children to public and private schools, including religious schools); *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002) (upholding a state program that provided tuition assistance to attend public or private schools, including religious schools); *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464 (2020) (holding that a state scholarship program that expressly prohibited aid from going to religious schools violated the First Amendment).

The leading case is *Carson*, 596 U.S. at 767, which involved a Free Exercise challenge to Maine's tuition assistance program. The Maine program was implemented because, although the state constitution mandates the opportunity to receive a public education, a majority of the local school districts do not operate public secondary schools. *Id.* at 773. To account for that gap, families without access to a public secondary school may designate the public or private school they would like their child to attend, and the school district will transmit tuition payments to the designated school. *Id.* at 772-73. However, "[t]o be 'approved' to receive these payments, a private school must meet certain

basic requirements under Maine's compulsory education law" and it must be "a nonsectarian school." *Id.* at 774.

Two families that lived in school districts without their own secondary school challenged the nonsectarian requirement as violating the Free Exercise Clause. *Id.* at 775-76. The Supreme Court agreed the law was unconstitutional. The Supreme Court first explained that "Maine offers its citizens a benefit: tuition assistance payments for any family whose school district does not provide a public secondary school." *Id.* at 780. The nonsectarian requirement, by disqualifying an otherwise eligible recipient on the basis of its religious character, "'effectively penalizes the free exercise' of religion[,]" and subjects the law to strict scrutiny. *Id.* (quoting *Trinity Lutheran*, 582 U.S. at 459). And this, the Supreme Court went on, was not one of the "rare cases" where a law that facially targets religious conduct for distinctive treatment would survive strict scrutiny. *Id.* at 781 (quotation marks omitted). That is because "[a] State's antiestablishment interest does not justify enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." *Id.*

Here, like in *Carson*, the state created a generally available benefit: the opportunity to apply for and contract with a sponsor to establish a charter school. But the state categorically excludes religious institutions from participating. As *Carson* plainly stated, "[t]hat is discrimination against religion." *Carson*, 596 U.S. at 781. The nonsectarian requirement "expressly discriminates against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character" and in doing so, violates the Free Exercise Clause of the First Amendment. *Trinity Lutheran*, 582 U.S. at

462. Oklahoma's purported interest in a "greater separation of church and State than is already ensured under" the federal constitution "cannot qualify as compelling" in the face of a free exercise violation. *Id.* at 466 (quotation marks omitted).

The Defendant-intervenors have a rejoinder to *Carson* and its forerunners. They argue that this line of authority does not apply because charter schools are either governmental entities, engaged in state action, and/or public schools, and it would plainly violate the Establishment Clause for a state actor or public school to promote religion. These arguments are not without force.[9] But a district court is obliged to follow Supreme Court precedent and the Court is persuaded that the relevant cases support Plaintiffs' position.

Defendant-intervenors first argue that a charter school, like a traditional public school, is a governmental entity that cannot assert a Free Exercise claim. "The problem of drawing a line between public and private entities is an old and difficult one." *United States v. Ackerman*, 831 F.3d 1292, 1295 (10th Cir. 2016). Fortunately, the Supreme Court has identified several relevant factors that guide the inquiry. *See Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 486 (10th Cir. 1998) (collecting cases). Distilled to its

[9] The circuit courts that have confronted these issues are not in agreement. In *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806 (9th Cir. 2010), the Ninth Circuit concluded that a plaintiff had not plausibly alleged that a private non-profit corporation that runs an Arizona charter school was functioning as state actor when it terminated a teacher. More recently, in *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104 (4th Cir. 2022), the Fourth Circuit, sitting en banc and over multiple dissents, concluded that a North Carolina charter school was functioning as a state actor when it implemented a dress code that was a central component of its educational philosophy and mission. Although not dealing specifically with charter schools, the First Circuit and the Third Circuit have both concluded that private schools that received state funding and provided educational services for the state were not engaged in state action in their treatment of students. *Logiodice v. Trs. of Maine Cent. Inst.*, 296 F.3d 22, 25 (1st Cir. 2002); *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 166 (3d Cir. 2001).

essence, the inquiry considers whether the entity "was created by the Government, is controlled by the Government, and operates for the Government's benefit." *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 53 (2015). *See also Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995) ("We hold that where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment."). These key factors are absent from Plaintiffs' proposed school.

When the Supreme Court has found government creation, the entity was typically named and established through special legislation. *See id.* at 397 ("Amtrak was created by a special statute"); *Biden v. Nebraska*, 600 U.S. 477, 489 (2023) ("Missouri created MOHELA as a nonprofit government corporation to participate in the student loan market."). Here, in contrast, the Oklahoma Charter Schools Act does not create any specific charter school. Instead, a charter school only comes into existence because a private actor (or other applicant) initiates the process. Although the OCSA authorizes the Statewide Charter School Board (or another sponsor) to approve an application, an otherwise private actor is not transformed into a government entity merely because it has been awarded a government contract, received a license, or granted some specific authority by state law. *See San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.,* 483 U.S. 522, 542-43 (1987) (concluding that United States Olympic Committee was a not a government agent even though it was "established under Federal law," granted a corporate charter by a specific legislative act, subject to specific government regulation and oversight, and

permitted to receive government funding) (quotation marks omitted); *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 814-15 (2019) (explaining that obtaining a government license, government contract, or government-granted monopoly does not transform a private entity into a state actor); *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974) ("Respondent's exercise of the choice allowed by state law where the initiative comes from it and not from the State, does not make its action in doing so 'state action' for purposes of the Fourteenth Amendment.").

Government control is also lacking. A charter school is controlled by a governing board and, critically, the board is comprised of private individuals rather than government appointees or government officials.[10] *Compare Lebron*, 513 U.S. at 397-98 (noting that six of the nine board members are appointed directly by the President); *Biden*, 600 U.S. at 490-91 (noting that the board consists of two state officials and five members appointed by the governor); *Ackerman*, 831 F.3d at 1298 (noting that government officials or agencies "enjoy a sizeable presence on its board").

Further, and contrary to Defendant-intervenor's description, the state does not have unfettered discretion to close a charter school and does not exercise "'day-to-day' statutory control" over a charter school's operations. *Id.* at 1298. True, the sponsor is statutorily empowered to exercise "oversight" and monitor the "performance" of the charter school.

[10] In arguing otherwise, Defendant-intervenors cite to an Oklahoma Judicial Ethics advisory opinion that considered whether a sitting judge could serve on the board of a charter school. Jud. Ethics Opinion 2023-3, 538 P.3d 572 (Okla. Jud. Eth. 2023). Relying solely on the Oklahoma Charter Schools Act's definition of a charter school as a "public school established by contract[,]" the opinion summarily concluded that service on the board would be considered appointment to a "governmental committee." *Id.* Suffice it to say that this advisory opinion, which contains no analysis, is not binding on this Court.

But the OCSA explicitly provides that the charter school's governing board – not the state – is "responsible for the policies and operational decisions" of the school. Okla. Stat. tit. 70, § 3-136(A)(7). The Act also grants a charter school the authority to develop a specialized curriculum, generally exempts it from the regulations that apply to traditional public schools, and details specific circumstances under which a charter school can be closed, including the requirement that the charter school be given notice and an opportunity to challenge the closure. *Id.* at §§ 3-136(A)(1); 3-136(A)(3); 3-136(C); 3-137. If anything, these statutory provisions suggest a desire to eschew government control of the charter school's day-to-day operations, not maintain it. Although a charter school is undoubtedly subject to government regulation, "the mere existence of a regulatory scheme—even if extensive and detailed—[does] not" render an otherwise private entity a state actor. *Halleck*, 587 U.S. at 815 (quotation marks omitted).

The remaining considerations do not alter the conclusion. Defendant-intervenors emphasize that charter schools serve important state objectives and they are almost entirely funded via the same State Aid allocation used for public schools. They also rely heavily on the fact that charter schools are defined as public schools and considered to be a local education agency as a matter of state law. *See* Okla. Stat. tit. 70 §§ 1-106; 3-142(D); *Drummond*, 558 P.3d at 10-11. While these may be relevant to the analysis, they are not enough, in the absence of government creation and control, to qualify a charter school as a governmental entity.

As to the fact that a charter school is publicly funded, the Supreme Court has repeatedly held that "[t]he Government may subsidize private entities without assuming

constitutional responsibility for their actions." *U.S. Olympic Comm.*, 483 U.S. at 544. *See also Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982) ("Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts."); *Blum*, 457 U.S. 991, 1011 (1982) ("That programs undertaken by the State result in substantial funding of the activities of a private entity is no more persuasive than the fact of regulation of such an entity in demonstrating that the State is responsible for decisions made by the entity in the course of its business.").

As to a charter school being defined in state law as a "public school established by contract," simply labeling something as "public" does not necessarily mean that it is created, operated, or controlled by the government. *See Lindke v. Freed,* 601 U.S. 187, 197 (2024) ("The distinction between private conduct and state action turns on substance, not labels[.]"); *Lebron*, 513 U.S. at 392 ("But it is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions."); *Halleck*, 587 U.S. at 818-89 (private entity that operates "public access channels" is not a state actor); *Polk Cnty. v. Dodson*, 454 U.S. 312, 319 (1981) ("Public defender" was not acting under color of state law when representing client). In a similar vein, the Oklahoma Supreme Court's conclusion that charter schools are public schools as a matter of state law is not dispositive of whether a charter school is a governmental entity or state actor as a matter of federal law.[11] *See TMJ*

[11] Although this Court has come to a different conclusion than the Oklahoma Supreme Court, the key issues are exceedingly close, as evidenced by the Supreme Court's 4-4 split in *Oklahoma Statewide Charter Sch. Bd. v. Drummond*, 605 U.S. 165.

*Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1181 (10th Cir. 2007) (a federal court "owes no deference to state-court interpretation of the United States Constitution"); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 864 (1982) ("[T]he discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment.").

Unable to establish that charter schools are governmental entities, Defendant-intervenors next argue that charter schools are nevertheless engaged in state action.[12] This concept recognizes that "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'"" *Brentwood Acad. v. Tennessee Secondary Sch.*, 531 U.S. 288, 295 (2001) (quoting *Jackson*, 419 U.S. at 351). There is a "range of circumstances that could point toward" state action and "no one fact" is necessarily sufficient. *Id.* at 295-96. Even so, the Supreme Court has articulated several circumstances under which "acts by a nominally private entity may comprise state action" and these doctrines provide the "framework for the analysis." *Logiodice v. Trs. of Maine Cent. Inst.*, 296 F.3d 22, 26 (1st Cir. 2002). Defendant-intervenors invoke three of these doctrines here – performing an exclusive public function, performing an outsourced constitutional obligation, and entwinement. Each is addressed in turn.

[12] The Supreme Court has "frequently emphasized that the state-action doctrine demands a fact-intensive inquiry." *Lindke*, 601 U.S. at 197. Although the Court is not persuaded that an Oklahoma charter school is necessarily engaged in state action, other charter school programs with different facts may warrant a different outcome.

The exclusive public function doctrine recognizes that state action can be "present in the exercise by a private entity of powers traditionally exclusively reserved to the State." *Jackson*, 419 U.S. at 352. Very few functions meet this demanding standard:

> It is not enough that the federal, state, or local government exercised the function in the past, or still does. And it is not enough that the function serves the public good or the public interest in some way. Rather, to qualify as a traditional, exclusive public function within the meaning of our state-action precedents, the government must have traditionally *and* exclusively performed the function.

*Halleck*, 587 U.S. at 809.

"Obviously, education is not and never has been a function reserved to the state." *Logiodice*, 296 F.3d at 26. Wise to this impediment, Defendant-intervenors attempt to narrowly define the function at issue as the provision of a free public education rather than simply the provision of an education. The Supreme Court rejected a similar tactic in *Carson.* There, Maine argued that the nonsectarian requirement in its tuition assistance program was constitutional because the benefit was properly viewed "as funding for the rough equivalent of the public school education that Maine may permissibly require to be secular." *Carson*, 569 U.S. 782 (internal quotation marks omitted). The Supreme Court disagreed with this narrow framing:

> Saying that Maine offers a benefit limited to private secular education is just another way of saying that Maine does not extend tuition assistance payments to parents who choose to educate their children at religious schools. But "the definition of a particular program can always be manipulated to subsume the challenged condition," and to allow States to "recast a condition on funding" in this manner would be to see "the First Amendment ... reduced to a simple semantic exercise."

*Id.* at 784 (quoting *Agency for Int'l Development v. Alliance for Open Society Int'l, Inc*., 570 U.S. 205, 215 (2013).

Similarly, here, the state cannot avoid the First Amendment's free exercise protections by defining the benefit offered as limited to the provision of a "public" or "secular" education. *See Carson*, 596 U.S. at 784-85. The benefit here is the ability to contract with a sponsor, specifically the Statewide Charter School Board, for the establishment of a virtual charter school. But the operation of a school, even one that provides a free education, is not a function that has been "traditionally the exclusive prerogative of the State." *Jackson*, 419 U.S. at 353; *see also Rendell-Baker,* 457 U.S. at 842 (explaining that a "legislative policy choice" to provide educational services for certain students at public expense "in no way makes these services the exclusive province of the State"); *Caviness*, 590 F.3d at 816 (concluding that the "provision of educational services is not a function that is traditionally and exclusively the prerogative of the state, and therefore is not a basis for holding that [an Arizona charter school] acted under color of state law in taking the alleged actions relating to Caviness's employment"); *Logiodice*, 296 F.3d at 26-27 (private school that contracted with state, received public funds, and was the only public high school option in that district was not performing an exclusive public function).

Next, the Supreme Court "has recognized that a private entity may, under certain circumstances, be deemed a state actor when the government has outsourced one of its constitutional obligations to a private entity." *Halleck*, 587 U.S. at 810 n.1. This doctrine has its genesis in *West v. Atkins*, 487 U.S. 42 (1988), which involved a § 1983 claim

asserted by a state prisoner against a physician that contracted with the state to provide medical services. Although the physician was employed pursuant to a contract, rather than as a member of the state's prison staff, the Supreme Court concluded that the physician's "delivery of medical treatment to West was state action fairly attributable to the State." *Id.* at 55-57. In reaching this conclusion, the Supreme Court explained that "the State has a constitutional obligation, under the Eighth Amendment, to provide adequate medical care to those whom it has incarcerated[,]" the state fulfills this obligation by contracting with physicians, and "the only medical care West could receive for his injury was that provided by the State." *Id.* at 54-55. Ultimately, "[t]he State bore an affirmative obligation to provide adequate medical care to West" and it could not avoid that constitutional duty by contracting out its prison medical care. *Id.* at 56.

Defendant-intervenors argue that *West* controls here because the Oklahoma Constitution obligates the state to provide free education to all students and charter schools were created to fulfill that obligation. But the critical features present in *West* are simply not present here. To start, Defendant-intervenors have not identified any federal constitutional obligation to provide an education. *See Logiodice*, 296 F.3d at 29. Further, Oklahoma continues to fulfill its state constitutional duty to provide free, universal education by operating its own traditional public schools. The charter school program provides "[i]ncrease[d] learning opportunity[ies] for students" and "additional academic choices[,]" but it does not displace the traditional public school system. Okla. Stat. tit. 70 § 3-131(A). Last, and in stark contrast to the prisoner in *West*, students have the option of

attending a charter school but are not required to do so. For all these reasons, *West* does not suggest that an Oklahoma charter school is a state actor.

That leaves the entwinement doctrine. In *Brentwood Acad*, 531 U.S. at 299, the Supreme Court held that the "nominally private character" of an entity may be "overborne by the pervasive entwinement of public institutions and public officials in its composition and workings[.]" Such entwinement was present in *Brentwood* because the defendant athletic association was "overwhelmingly composed of public school officials who select representatives (all of them public officials at the time in question here), who in turn adopt and enforce the rules that make the system work" and "who do not merely control but overwhelmingly perform all but the purely ministerial acts by which the Association exists and functions in practical terms." *Id.* at 299-300. Moreover, members of a state board were assigned to serve in the association and the association's ministerial employees were "treated as state employees to the extent of being eligible for membership in the state retirement system." *Id.* at 300.

Other than permitting charter school employees to participate in the state retirement system, the pervasive entwinement described in *Brentwood* is not present here. Unlike the athletic association in *Brentwood*, a governing board, selected by and composed of private individuals, is responsible for a charter school's policies and operational decisions.

Of course, there is a connection between a charter school and the state. Under the OCSA, a charter school is subject to certain regulations, the sponsor entity must approve the charter contract, and the sponsor entity retains oversight of charter school operations. A similar connection exists between many private entities that contract with the

government, receive public funding, or are subject to state regulation. But government oversight, financial audits, compliance monitoring, detailed regulations, or the need to seek governmental approval of certain practices does not transform a private entity's conduct into state action. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 54 (1999) (State's "role in creating, supervising, and setting standards" for insurance review scheme and requirement that private insurers obtain "authorization" from state agency before withholding certain payments is not state action); *Jackson,* 419 U.S. at 357 (state regulatory scheme that requires utility to obtain approval from state commission before instituting certain practices does not amount to state action); *Rendell-Baker*, 457 U.S. at 843 (private school's "fiscal relationship with the State is not different from that of many contractors performing services for the governments"). Were it otherwise, a host of private contractors and regulated entities would become state actors, a move that would "significantly endanger individual liberty and private enterprise." *Halleck*, 587 U.S. at 816.

Ultimately, the three doctrines Defendant-intervenors rely on to show state action are not met. But before moving on from the state action analysis, one final point. The Supreme Court has consistently emphasized that the state's exercise of coercive power over a private entity, although not necessarily a prerequisite to finding state action, is often a significant factor in the analysis. *See Rendell-Baker,* 457 U.S. at 841; *Blum*, 457 U.S. at 1004. But that factor, too, is absent. The operational and pedagogical choices of the charter school are made by the charter school's governing board, not compelled, coerced, or even encouraged by the state. And to the extent the state can be said to have "approved" of those choices by approving a charter school contract, it has long been the case that "[m]ere

approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives[.]" *Blum*, 457 U.S. at 1004-05. Additionally, and importantly, the state in no way compels or coerces any student to attend a charter school.[13] Charter schools are intended to provide families with an additional academic choice, and their public funding is largely contingent on the number of students that choose to enroll in the school.[14]

Perhaps recognizing that the government entity tests and state action doctrines do not map neatly onto the present circumstances, Defendant-intervenors make one additional argument. They contend that charter schools are public schools in all the ways that matter and if the Establishment Clause means anything, it surely means that a public school cannot evangelize religion. As support for this argument, Defendant-intervenors' turn to *Carson*, 596 U.S. at 789, where, as previously explained, the Supreme Court struck down the nonsectarian requirement in Maine's tuition assistance program as violating the Free Exercise Clause of the First Amendment. In rejecting Maine's attempt to recharacterize the benefit being offered as a "free public education," the Court stated that "Maine may provide a strictly secular education in its public schools" and "[t]he differences between private schools eligible to receive tuition assistance under Maine's program and a Maine public

[13] This fact distinguishes this case from *Milonas v. Williams*, 691 F.2d 931 (10th Cir. 1982). In *Milonas*, the Tenth Circuit concluded that a private school that operated as a detention, mental health, and educational facility for boys with special needs was acting under color of state law when it instituted certain "behavioral modification" practices, such as placing boys in isolation or using physical force. In reaching this conclusion, the Tenth Circuit found it significant that many class members were "involuntarily placed in the school by state officials who were aware of, and approved of, certain of the practices[.]" *Id.* at 940.

[14] The OCSA provides that "[a] charter school shall receive the State Aid allocation, federal funds to which it is eligible and qualifies for, and any other state-appropriated revenue generated by its students for the applicable year." Okla. Stat. tit. 70, § 3-142(A). The State Aid allocation is tied to the number of students enrolled at the school. *See* Okla. Stat. tit. 70, § 18-200.1, § 18-201.1.

school are numerous and important." *Id.* at 782-85. The Court then noted some of those differences, such as the fact that the private schools did not have to accept all students, the private school education was not always free, the private schools were exempt from certain curricular and testing requirements, the private schools did not need to hire state-certified teachers, and private schools could be single-sex. *Id.*

Defendant-intervenors contend that, unlike the private schools in *Carson*, Oklahoma charter schools have all the key characteristics of a public school. This argument has some initial appeal but upon closer inspection, there are several flaws. Most obviously, *Carson* did not purport to conclusively define a public school or create a constitutional standard for determining when a school is offering a public education. Additionally, the factors identified in *Carson* do not unequivocally support Defendant-intervenors' position. For example, charter schools, unlike public schools, do not need to employ standard state certified teachers. Further, although charter schools participate in state assessments and comply with certain academic standards, they are given leeway to fashion certain aspects of their curriculum and are exempt from numerous regulations that apply to public schools.

At first blush, the remaining features appear to support Defendant-intervenors' argument. After all, no one disputes that charter schools, like traditional public schools, are free, publicly funded, and open to all. But the Supreme Court's decision in *Rendall-Baker*, 457 U.S. at 830, suggests that sharing these particular characteristics does not necessarily mean that a school is part of the public school system.

The issue in *Rendall-Baker* was whether a private school that specialized in educating children with special needs was acting under color of state law when it

discharged certain employees. *Id*. at 831. Several critical facts in *Rendall-Baker* resemble those presented here. A state statute provided "that all students with special needs are entitled to a suitable publicly funded education under the supervision of the state and local governments." *Id.* at 845 (Marshall, J., dissenting). To satisfy this requirement, the local school committees were empowered to contract with private schools and refer children to those schools. *Id.* When children were placed at a private school, the school committee paid all expenses associated with the placement. *Id.* The specific school involved in *Rendall-Baker* was a private institution, operated by a board of directors, that had an agreement with the local school committee and a state agency to provide special education for students. *Id.* at 832. The students placed in the school did not pay tuition, the school was almost entirely publicly funded, and the school was subject to "detailed regulations concerning matters ranging from recordkeeping to student-teacher ratios." *Id.* at 832-833.

Although the school in *Rendall-Baker* offered a free, publicly funded education, pursuant to a contract with the government, and as a means of fulfilling the state's statutory duty to provide a public education, the school was not considered to be a state actor with respect to its personnel decisions and no one so much as suggested that it was part of the public school system. Similarly, here, the fact that a charter school, in accordance with its charter contract, offers a free, publicly funded education does not necessarily suffice to show that a charter school is a public school.

As *Carson* acknowledged, Oklahoma may provide a strictly secular education in its public schools. This ruling is in complete agreement with that statement. But charter

schools are not the equivalent of a traditional public school.[15] There are critical differences that cannot be overlooked, namely that a charter school is established by contract and, much like the private school in *Rendall-Baker*, is "founded as a private institution and is operated by a board of directors, none of whom are public officials or are chosen by public officials." *Rendall-Baker*, 457 U.S. at 832.[16]

Oklahoma has opted to establish a program where private applicants can contract with a sponsor to establish a publicly funded charter school. Oklahoma is not required to have such a program, but having done so, Oklahoma cannot then "'expressly discriminate[] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character.'" *Carson*, 596 U.S. at 779 (quoting *Trinity Lutheran*, 582 U.S. at 462). Because the nonsectarian provision in the Oklahoma Charter Schools Act

[15] Defendant-intervenors cite three Tenth Circuit cases in support of their assertion that charter schools are public schools. First, *Coleman v. Utah State Charter Sch. Bd*., 673 F. App'x 822, 833 (10th Cir. 2016), where the Tenth Circuit observed that "charter schools are public schools using public funds to educate school children." The Tenth Circuit made this statement in the context of considering whether a state board member made a defamatory statement by sharing findings from an investigation with the school's governing board. The Tenth Circuit concluded that the findings had not been "published" because "[m]eetings between government officials and those who oversee a charter school, especially concerning the application and enforcement of the regulations that bind the two groups together, retain the fundamental character of intra-governmental meetings." *Id.* at 830. Second, *Brammer-Hoelter v. Twin Peaks Charter Acad*., 602 F.3d 1175, 1188 (10th Cir. 2010), where the Tenth Circuit stated that "principles of municipal liability apply" to a charter school "[b]ecause it is a public charter school" and a "local government entity[.]" Last, *Dillon v. Twin Peaks Charter Acad.*, 241 F. App'x 490 (10th Cir. 2007), which involved a § 1983 claim against a charter school. For several reasons, these cases are not dispositive of the issues here. Two of the cases are unpublished, none deal specifically with Oklahoma's charter school system, and, most significantly, the cases largely assumed that charter schools are public without squarely addressing whether they are governmental entities or engaged in state action.

[16] Defendant-intervenors also stress that charter schools will suffer negative financial and legal consequences if they lose their status as public schools. The Court is not convinced that rejecting a charter school's status as a governmental entity or state actor for the purposes of resolving Plaintiffs' First Amendment claim will necessarily jeopardize a charter school's status as a public school for purposes of federal or state funding.

expressly discriminates against otherwise eligible recipients solely because of their religious character, it violates the Free Exercise Clause of the First Amendment.

Further, neutrally administering the charter school program, to neither favor nor disfavor religion, does not offend the Establishment Clause. The First Amendment "requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary." *Everson*, 330 U.S. at 18. Additionally, the link between the state and the public funds that flow to a charter school is primarily the result of private choices by both the applicant and the families that choose to enroll their children at a charter school. *See Espinoza*, 591 U.S. at 485 ("As noted, this Court has repeatedly upheld government programs that spend taxpayer funds on equal aid to religious observers and organizations, particularly when the link between government and religion is attenuated by private choices."); *Mitchell*, 530 U.S. at 829 ("In short, nothing in the Establishment Clause requires the exclusion of pervasively sectarian schools from otherwise permissible aid programs, and other doctrines of this Court bar it.").

The Court therefore concludes that Plaintiffs are likely to succeed on the merits of their Free Exercise claim.

**D. Remaining Preliminary Injunction Factors**

The remaining preliminary injunction factors also weigh in favor of granting Plaintiffs' request for a preliminary injunction. The Statewide Charter School Board's enforcement of the nonsectarian requirement likely violates Plaintiffs' Free Exercise rights, and "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 606 U.S. 522, 569

(2025) (internal quotation marks and citations omitted). Further, when a law is likely unconstitutional, the movant's interest in protecting its constitutional rights generally outweighs the interests of the party opposing preliminary relief. *See Awad*, 670 F.3d at 1131-32. Last, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (internal quotation marks omitted).

Accordingly, Plaintiffs are entitled to a preliminary injunction precluding the Oklahoma Statewide Charter School Board from enforcing the nonsectarian requirement or otherwise excluding Plaintiffs from participating in the charter school program on account of their religious character.

**E. Stay of Discovery**

One final item remains for resolution. Plaintiffs and the Statewide Charter School Board request a stay of all discovery because the case raises purely legal issues that do not require further factual development. The Kaiman Intervenors object, contending that discovery is necessary and relevant to jurisdictional and merits issues. The Moore Intervenors state they do not need immediate discovery for resolution of the preliminary injunction motion but likely will in the future.

"The district court has the power to stay proceedings pending before it and to control its docket for the purpose of 'economy of time and effort for itself, for counsel, and for litigants.'" *Alzheimer's Inst. of Am. v. Comentis, Inc.*, No. CIV-09-1366-F, 2010 WL 11508734, at *2 (W.D. Okla. Dec. 17, 2010) (quoting *Landis v. North American Co.*, 299 U.S. 248, 254 (1936)). In particular, district courts enjoy "broad discretion and authority in controlling and managing pretrial discovery matters to ensure that cases move to a timely

and orderly conclusion." *J White, L.C. v. Wiseman*, No. 2:16-CV-01179-CW-JCB, 2020 WL 3667493, at *2 (D. Utah July 6, 2020) (citing *Smith v. Ford Motor Co*., 626 F.2d 784, 794 (10th Cir. 1980)). Still, a stay of discovery is generally disfavored and the moving party bears the burden of showing that the circumstances justify a stay. *Alzheimer's Inst*. 2010 WL 11508734, at *2.

Movants have met that burden here. As the preceding discussion makes clear, the issues presented for resolution are largely legal in nature and do not require any further factual development at this stage. Staying discovery will ensure that the significant issues raised in this case are resolved in an expeditious and efficient manner. Further, there is no prejudice to the intervenors given that the pertinent facts are either not in dispute or already available to the parties. *See Columbian Fin. Corp. v. Bowman*, 768 F. App'x 847, 853-54 (10th Cir. 2019) (unpublished) (affirming district court's decision to stay "because the facts that Plaintiff sought to develop in discovery were not essential to answering" the question presented and "[d]iscovery would not have altered the district court's analysis").

For those reasons, a stay of discovery pending the resolution of any appeal of this order is warranted. If an appeal is not taken, the Court sees no reason why discovery, subject to the usual limits on relevance and proportionality, cannot proceed in the ordinary course.

***Conclusion***

The Court again emphasizes that by this opinion it does not express a judgment on the wisdom of the State of Oklahoma opening up its coffers to charter schools of disparate

philosophical or educational persuasions.[17] However, having done so, it cannot, pursuant to the Free Exercise Clause, single out religious schools for exclusion solely because of their religious character.

As set out above, Plaintiffs' Motion for Preliminary Injunction [Doc. Nos. 10, 11] is GRANTED and the Motions to Stay Discovery [Doc. No. 110, 111] are GRANTED.

IT IS SO ORDERED this 24th day of September, 2026.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE

[17] *See Espinoza*, 591 U.S. at 484 ("The protections of the Free Exercise Clause do not depend on a 'judgment-by-judgment analysis' regarding whether discrimination against religious adherents would somehow serve ill-defined interests.")

# Peter Deutsch email to Intervenor Rabbi Daniel Kaiman, sent on September 30, 2026

**From:** peter deutsch <p[redacted]@gmail.com>
**Sent:** Wednesday, September 30, 2026 4:51 AM
**To:** Dan Kaiman <[redacted]>
**Subject:** Founding Leadership Opportunity - First Religious Charter School in the United States

Dear Rabbi Kaiman,

I am reaching out because you know the Tulsa Jewish community and its joint high-school Jewish-education program. I am looking for an exceptional person to help launch and lead a new Jewish high school, and I thought you might either be interested yourself or know someone outstanding whom I should speak with.

We are preparing to open the Ben Gamla Jewish Charter School of Oklahoma in September 2027. As a result of the recent preliminary injunction decision, Ben Gamla Jewish Charter School is entitled to open and will be the first religious charter school in the United States.

The school will initially be an online Jewish high school serving students in Oklahoma. Our aspirational enrollment goal for the first year is intentionally modest: 10 students. The purpose of the first year is to establish an excellent school, demonstrate that the model works, and create the foundation for substantial future growth.

Our goal, however, is much larger than opening a single school in Oklahoma.

We believe Ben Gamla Jewish Charter School can become a national model and potentially create a paradigm shift in Jewish education in the United States. Although our initial school in Oklahoma will be an online high school, our long-term vision is much broader: to establish Jewish religious charter schools serving students from kindergarten through 12th grade in communities throughout the country. We envision that the vast majority of these future schools will be traditional brick-and-mortar schools, providing both an outstanding secular education and a serious Jewish education, without charging tuition. If successful, this model could ultimately increase Jewish-school enrollment in the United States by hundreds of thousands of students.

There are several major reasons why so many Jewish parents today do not send their children to Jewish schools. Cost is obviously one. Geographic availability is another. But an equally important concern for many parents is the perception—or reality in some communities—that the available Jewish-school option does not provide the level of academic excellence they want for their children.

Our objective is therefore not simply to create a tuition-free Jewish

educational option. We want to demonstrate that a religious charter school can provide both serious Jewish education and outstanding secular academics. The long-term vision is to create a model compelling enough that Jewish-school participation in the United States could ultimately increase by hundreds of thousands of students.

We are looking for an exceptional founding principal and educational leader. During the school's initial stage, one of the principal's most important responsibilities will be recruiting high-school-aged students in Oklahoma and convincing their parents that Ben Gamla Jewish Charter School offers an outstanding educational opportunity.

Would you personally have any interest in discussing the position?

If the position is not something you would consider, I would be extremely grateful for your advice. Who are the best people you know who have been exceptionally successful recruiting Jewish high-school-aged students and who might be excited by the opportunity to build something from its very beginning that could ultimately have a major impact on Jewish education throughout the United States?

I would particularly value an introduction to anyone you believe I should speak with.

I would also very much appreciate the opportunity to speak with you briefly by telephone about what we are building, the position, and the people you think I should be talking to.

Please feel free to call or text me directly at 954-232-[redacted], or let me know a convenient time for me to call you.

Thank you very much.

Peter Deutsch
954-232-[redacted]

# Kaiman Intervenors' letter to the Board regarding Deutsch email, sent on October 8, 2026

AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE | ACLU | ELC EDUCATION LAW CENTER | FREEDOM FROM RELIGION foundation | OKLAHOMA APPLESEED CENTER FOR LAW & JUSTICE

October 8, 2026

*Via email*

Anthony J. Ferate (*AJ@ferate.us*)
4308 Echohollow Trail
Edmond, Oklahoma 73025

Hiram S. Sasser, III (*hsasser@firstliberty.org*)
Holly M. Randall (*hrandall@firstliberty.org*)
Erin E. Smith (*esmith@firstliberty.org*)
First Liberty Institute
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075

Re: Ben Gamla Jewish Charter School application

Dear counsel for the Oklahoma Statewide Charter School Board:

We have learned that Ben Gamla Jewish Charter School founder Peter Deutsch last week sent emails to Jewish leaders in Oklahoma asking for assistance in recruiting students to attend Ben Gamla and finding a principal for the school. In the emails, Mr. Deutsch states, “Our aspirational enrollment goal for the first year [of the school’s operation] is intentionally modest: 10 students.” The emails also state that Ben Gamla will be “an online high school.” Attached is a copy of one such email, which Mr. Deutsch sent to one of our clients, a defendant-intervenor in the federal-court lawsuit filed by Ben Gamla.

The information in the email is diametrically different from the representations set forth in Ben Gamla’s application for charter-school sponsorship. In the application, Ben Gamla projected an enrollment of 335 to

495 students.[1] And the application represented that Ben Gamla would be a K–12 school.[2]

The miniscule "aspirational enrollment" set forth in Mr. Deutsch's emails and the severe contradictions with the application demonstrate that Ben Gamla lacks community support, that the school cannot be financially or operationally viable, that its application is fatally deficient, and that the school lacks credibility. We therefore urge the Statewide Charter School Board to reaffirm on these grounds its past denials of Ben Gamla's application.

***Ben Gamla lacks community support.*** A charter-school application must include "[i]nformation related to the proposed school's community, including the importance of the educational model to the community and its support."[3] To be approved, charter applications must "meet identified educational needs."[4] Ben Gamla's admission that it will struggle to enroll as few as ten students shows that the proposed school lacks community support and will not fulfill an unmet educational need.

***Ben Gamla is not financially or operationally viable.*** A charter high school that admits that it will struggle to enroll as few as ten students cannot possibly be financially or operationally viable. The school will need to hire, for each grade level, teachers who are qualified to teach the numerous classes across many subject areas that Oklahoma high-school students must pass to satisfy graduation requirements.[5] The school must also be prepared and able to serve students with disabilities, English-language learners, and students who are academically behind.[6] The costs of hiring sufficient administrators, teachers, and staff to satisfy all these requirements will far exceed the

---

[1] Ben Gamla Jewish Charter School, *2025 Oklahoma Statewide Charter School Board Initial Authorization Application*, at 121, 141, 142. A version of Ben Gamla's application with page numbers, added by us and used for the page citations here, is at http://bit.ly/4qNAfmF.

[2] *Id.* at 141–42.

[3] OAC § 777:10-3-3(b)(4)(F).

[4] 70 O.S. § 3-134(I)(3).

[5] *See id.* §§ 3-134(B)(12), 11-103.6; OAC § 777:10-3-3(c)(1)(E).

[6] *See* 70 O.S. §§ 3-134(B)(15), 3-136(A)(6); OAC § 777:10-3-3(c)(1)(C).

revenue that the school will receive from the state, which will be very low under the state's funding formula due to the miniscule enrollment.[7]

***Ben Gamla's application is fatally deficient.*** A charter-school application must include detailed financial plans, including budgets and cash-flow projections for its start-up phase and first five years.[8] Ben Gamla's application contained such information, but it was based on a projected enrollment of 425 students in the school's first year, and on the assumption that the school would serve students in grades K–12.[9] Now that Ben Gamla has an "aspirational enrollment" of ten students and plans to only be a high school, the financial and budget projections in the application are utterly meaningless.

***Ben Gamla lacks any credibility.*** In the November 3, 2025 letter of intent that Ben Gamla sent the Board, Ben Gamla stated that it would be a high school and projected "an initial enrollment of approximately 40 students across grades 9–12."[10] In its application, Ben Gamla represented that it would be a K–12 school with enrollment of 335 to 495 students in its first year.[11] Now, Ben Gamla says that it will be a high school and is seeking help to meet an "aspirational enrollment goal" of ten students in its first year. These wild swings in how many students and what grades the school hopes to serve demonstrate that the Board should not give credence to any representations made by Ben Gamla about its planned operations.

***The Board has a duty to deny Ben Gamla's application.*** The Board has authority to approve only "quality charter applications" and is obligated to "[d]ecline to approve weak or inadequate charter applications."[12] The preliminary ruling in the litigation filed by Ben Gamla prohibits the Board only (and temporarily) from continuing to deny Ben Gamla's application based on its religious character; the Board's authority to deny the application

---

[7] *See* 70 O.S. §§ 3-142(A), 3-142(C), 18-200.1, 18-201.1.

[8] *See id.* §§ 3-134(B)(3), (27), (29), (30); OAC § 777:10-3-3(b)(4)(H).

[9] Application at 141–42.

[10] Letter from Peter Deutsch to Oklahoma Statewide Charter School Board, at 1 (Nov. 3, 2025), https://bit.ly/4i9zly3.

[11] Application at 121, 141–42.

[12] 70 O.S. § 3-134(I)(3)–(4); *accord* OAC § 777:10-3-3(b).

on other grounds is unaffected.[13] As the disclosure of Ben Gamla's miniscule "aspirational enrollment" demonstrates that the school lacks community support, that the school is not financially or operationally viable, that its application materials are woefully deficient, and that the school lacks credibility, the Board is statutorily obligated to deny Ben Gamla's application.

We request that the Board's counsel share this correspondence with the Board's members and staff. Thank you for your attention and consideration.

---

[13] *Nat'l Ben Gamla Jewish Charter Sch. Found., Inc. v. Shellem*, No. CIV-26-582-R, 2026 WL 2882202, at *14 (W.D. Okla. Sept. 24, 2026) ("Accordingly, Plaintiffs are entitled to a preliminary injunction precluding the Oklahoma Statewide Charter School Board from enforcing the nonsectarian requirement or otherwise excluding Plaintiffs from participating in the charter school program *on account of their religious character*." (emphasis added)).

Very truly yours,


Alex J. Luchenitser
Lauren Schoen*
Americans United for
Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
*luchenitser@au.org*
*schoen@au.org*
* Member, State Bar of Texas. Not admitted in D.C. Practicing under supervision of D.C. Bar members.

Daniel Mach
Heather L. Weaver
American Civil Liberties Foundation
915 15th Street, NW, Suite 600
Washington, DC 20005
*dmach@aclu.org*
*hweaver@aclu.org*

Jessica Levin
Wendy Lecker
Patrick Cremin
Katrina Reichert
Education Law Center
60 Park Place, Suite 300
Newark, NJ 07102
*jlevin@edlawcenter.org*
*wlecker@edlawcenter.org*
*pcremin@edlawcenter.org*
*kreichert@edlawcenter.org*

Brent L. Rowland
Kira Benton
Morgan Bandy
Oklahoma Appleseed Center for Law & Justice
624 S. Denver Ave., Suite 400
Tulsa, OK 74119
*brent@okappleseed.org*
*kira@okappleseed.org*
*morgan@okappleseed.org*

Nancy A. Noet
Samuel T. Grover
Freedom From Religion Foundation
P.O. Box 750
Madison, WI 53701
*noetn@ffrf.org*
*sgrover@ffrf.org*


Cc:
Gentner Drummond, Attorney General (*gentner.drummond@oag.ok.gov*)
Garry M. Gaskins, II, Solicitor General (*garry.gaskins@oag.ok.gov)*
Bradley Clark, General Counsel, Office of the Attorney General (*bradley.clark@oag.ok.gov*)
Thomas Schneider, Deputy Attorney General (*thomas.schneider@oag.ok.gov*)
John Hadden, Assistant Attorney General (*john.hadden@oag.ok.gov*)
Eric S. Baxter (*ebaxter@becketfund.org*)
Eric C. Rassbach (*erassbach@becketfund.org*)

Daniel L. Chen (*dchen@becketfund.org*)
Benjamin A. Fleshman (*bfleshman@becketfund.org*)
Robert G. McCampbell (*RMcCampbell@Gablelaw.com*)
David A. Herber (*DHerber@Gablelaw.com*)
Ryan Leonard (*rleonard@llc-attorneys.com*)
Heidi J. Long (*hlong@llc-attorneys.com*)
Heather Hendricks (*hhendricks@llc-attorneys.com*)

Enclosure: September 30, 2026, 4:51 a.m. email from Peter Deutsch to Rabbi Daniel Kaiman

**From:** peter deutsch <p[redacted]@gmail.com>
**Sent:** Wednesday, September 30, 2026 4:51 AM
**To:** Dan Kaiman <[redacted]>
**Subject:** Founding Leadership Opportunity - First Religious Charter School in the United States

Dear Rabbi Kaiman,

I am reaching out because you know the Tulsa Jewish community and its joint high-school Jewish-education program. I am looking for an exceptional person to help launch and lead a new Jewish high school, and I thought you might either be interested yourself or know someone outstanding whom I should speak with.

We are preparing to open the Ben Gamla Jewish Charter School of Oklahoma in September 2027. As a result of the recent preliminary injunction decision, Ben Gamla Jewish Charter School is entitled to open and will be the first religious charter school in the United States.

The school will initially be an online Jewish high school serving students in Oklahoma. Our aspirational enrollment goal for the first year is intentionally modest: 10 students. The purpose of the first year is to establish an excellent school, demonstrate that the model works, and create the foundation for substantial future growth.

Our goal, however, is much larger than opening a single school in Oklahoma.

We believe Ben Gamla Jewish Charter School can become a national model and potentially create a paradigm shift in Jewish education in the United States. Although our initial school in Oklahoma will be an online high school, our long-term vision is much broader: to establish Jewish religious charter schools serving students from kindergarten through 12th grade in communities throughout the country. We envision that the vast majority of these future schools will be traditional brick-and-mortar schools, providing both an outstanding secular education and a serious Jewish education, without charging tuition. If successful, this model could ultimately increase Jewish-school enrollment in the United States by hundreds of thousands of students.

There are several major reasons why so many Jewish parents today do not send their children to Jewish schools. Cost is obviously one. Geographic availability is another. But an equally important concern for many parents is the perception—or reality in some communities—that the available Jewish-school option does not provide the level of academic excellence they want for their children.

Our objective is therefore not simply to create a tuition-free Jewish

educational option. We want to demonstrate that a religious charter school can provide both serious Jewish education and outstanding secular academics. The long-term vision is to create a model compelling enough that Jewish-school participation in the United States could ultimately increase by hundreds of thousands of students.

We are looking for an exceptional founding principal and educational leader. During the school's initial stage, one of the principal's most important responsibilities will be recruiting high-school-aged students in Oklahoma and convincing their parents that Ben Gamla Jewish Charter School offers an outstanding educational opportunity.

Would you personally have any interest in discussing the position?

If the position is not something you would consider, I would be extremely grateful for your advice. Who are the best people you know who have been exceptionally successful recruiting Jewish high-school-aged students and who might be excited by the opportunity to build something from its very beginning that could ultimately have a major impact on Jewish education throughout the United States?

I would particularly value an introduction to anyone you believe I should speak with.

I would also very much appreciate the opportunity to speak with you briefly by telephone about what we are building, the position, and the people you think I should be talking to.

Please feel free to call or text me directly at 954-232-[redacted], or let me know a convenient time for me to call you.

Thank you very much.

Peter Deutsch
954-232-[redacted]

# Board meeting agenda for October 12, 2026

**REGULAR MEETING OF THE**
**STATEWIDE CHARTER SCHOOL BOARD**
**OKLAHOMA HISTORY CENTER**
**800 NAZIH ZUHDI DR**
**OKLAHOMA CITY, OK 73105**
**AGENDA**

**October 12, 2026 @ 1:00 P.M.**

Note: Public Comment only allowed in person at regularly scheduled board meetings.

Public view access: https://oklahoma.gov/scsb/about-us/board-meetings
A link will be posted approximately 15 minutes prior to the meeting.

1. **Call to Order and Roll Call**

2. **Invocation, Pledge of Allegiance, Salute to the Oklahoma Flag, and A Moment of Silence**

3. **(Action) Discussion and possible action regarding minutes of the September 14, 2026, Regular Board Meeting**

4. **Executive Session –** (Action) Proposed Executive Session pursuant to 25 O.S.2021, § 307(B)(4), consistent with 2005 OK AG 29, for the purpose of discussing pending litigation against Board Members in *The National Ben Gamla Jewish Charter School Foundation, Inc. v. Shellem, et al.*, No. 5:26-cv-00582 in the U.S. District Court for the Western District of Oklahoma
   a. Vote to enter Executive Session;
   b. EXECUTIVE SESSION pursuant to 25 O.S. 2021, § 307(B)(4);
   c. Vote to exit Executive Session; and
   d. Discussion and possible action on the matters discussed in Executive Session.

5. **(Action) Discussion and possible action regarding The National Ben Gamla Jewish Charter School Foundation Inc. Revised Application for Initial Authorization in light of pending litigation against Board Members, *The National Ben Gamla Jewish Charter School Foundation, Inc. v. Shellem, et al.*, No. 5:26-cv-00582 in the U.S. District Court for the Western District of Oklahoma**

6. **Chairman's Opening Comments**

7. **Public Comment**

   *The Statewide Charter School Board (SCSB) shall hear public comments related only to subject matters pertaining to the work of the Board. Public comment will not be heard on issues related to: (1) pending litigation against the SCSB, its members, or agency employees; (2) an individual employee complaint; or (3) disciplinary actions, suspension, or termination of an SCSB employee. A sign-up sheet for public comment will be posted at least fifteen (15) minutes prior to the scheduled meeting start time and sign-up must be completed prior to the scheduled start time of the meeting. Only individuals who have signed up to speak will be recognized during the comment period and will be recognized in the order in which they have signed. Each speaker will be allocated three (3) minutes for presentation. The Chairperson may interrupt and/or terminate any presentation during public comment which does not conform to the procedures outlined under this Section. The Chairperson reserves and retains the right to limit the comment time available to ensure efficiency of the meeting and to interrupt, terminate, or postpone public comment as necessary to effectuate the management of the public meeting. Board members will not respond to public comments at this time.*

8. **Board Spotlight – Santa Fe South Superintendent Chris Brewster receiving the 2026 Ohtli Award from the Consulate of Mexico**

9. **Presentation and possible discussion regarding the 2026 Annual Oklahoma Charter Schools Conference**

10. **Presentation and possible discussion regarding the Statewide Charter School Board Working Groups: Budget and Governance**

11. **Administration**

   a. (Action) Review, discussion, and possible action regarding the request to amend the charter contracts for the following virtual charter schools to expand the students served to include students over the age of twenty-one (21) and under the age of thirty (30):
      i. Insight School of Oklahoma
      ii. Epic Charter Schools
      iii. ThrivePoint Academy of Oklahoma

   b. (Action) Presentation, discussion, and possible action regarding the draft charter school Performance Framework

   c. (Action) Presentation, discussion, and possible action to initiate the administrative rulemaking process, regarding proposed amendments and additions to title 777, Chapters 1, 10, 15, and 20 of the Oklahoma Administrative Code as set forth below:

   Title 777. STATEWIDE CHARTER SCHOOL BOARD
   CHAPTER 1: Administrative Operations
   Subchapter 1. General Provisions
   777:1-1-4. Organization (Amended)
   777:1-1-6. Records requests (Amended)
   777:1-1-7. Procedures for declaratory rulings (Amended)
   777:1-1-8. Petitions for adoption, amendment, or repeal of a rule (Amended)
   777:1-1-9. Individual proceedings (Amended)

   Title 777. STATEWIDE CHARTER SCHOOL BOARD
   CHAPTER 10: Charter Schools and Statewide Virtual Charter Schools
   Subchapter 1. General Provisions
   777:10-1-2. Definitions (Amended)
   777:10-1-3. School establishment requirements (Amended)
   777:10-1-4. Educational Management Organizations (Amended)
   Subchapter 3. Charter School and Virtual Charter School Sponsorship
   777:10-3-3. Applications to sponsor charter schools and virtual charter schools; renewal and termination of contracts for sponsorship of charter schools and virtual charter schools (Amended)
   777:10-3-4. Oversight and evaluation of charter schools and virtual charter schools by the Statewide Charter School Board (Amended)
   777:10-3-5. Full-time charter schools – succession of contractual rights and reversion of property to Statewide Charter School Board (Amended)
   777:10-3-6. Charter Schools Incentive and Closure Reimbursement Fund (New)

Title 777. STATEWIDE CHARTER SCHOOL BOARD
CHAPTER 15: Horizon: Digitally Enhanced Campus
Subchapter 1. Oklahoma Supplemental Online Course Certification
777:15-1-6. Course review and certification process (Amended)
777:15-1-7. Certified courses remaining in good standing (Amended)
Subchapter 3. Horizon Online Learning Platform and Courses
777:15-3-2. Online Courses (Amended)
777:15-3-3. Receiver district roles and responsibilities (Amended)
777:15-3-4. Online instructor responsibilities (Amended)
Subchapter 5. Horizon Consortium
777:15-5-1. Purpose (Amended)
777:15-5-2. Horizon responsibilities (Amended)
777:15-5-3. District responsibilities (Amended)

Title 777. STATEWIDE CHARTER SCHOOL BOARD
CHAPTER 20: Charter School Facilities Financing (New)
Subchapter 1. General Provisions (New)
777:20-1-1. Definitions (New)
777:20-1-2. Purpose and scope (New)
777:20-1-3. Statutory roles and general procedures (New)
777:20-1-4. Access and available funding (New)
Subchapter 3. Application and Eligibility (New)
777:20-3-1. Intake and application stages (New)
777:20-3-2. Eligible recipients and property arrangements (New)
777:20-3-3. Eligible uses (New)
777:20-3-4. Benefiting school eligibility and remediation (New)
777:20-3-5. Allocation of limited capital (New)
Subchapter 5. Underwriting and Board Action (New)
777:20-5-1. Standards and professional review (New)
777:20-5-2. Financing terms and guarantees (New)
777:20-5-3. Recommendation to the Board and Board Action (New)
777:20-5-4. Changes before closing (New)
Subchapter 7. Closing and Servicing (New)
777:20-7-1. Closing and disbursement (New)
777:20-7-2. Servicing and assistance (New)
777:20-7-3. Default, closure, and property disposition (New)
777:20-7-4. Modifications (New)
Subchapter 9. Administrator Accountability (New)
777:20-9-1. Selection and responsibility (New)
777:20-9-2. Conflicts and related-party transactions (New)
777:20-9-3. Compensation and transaction costs (New)
777:20-9-4. Public procedures, forms, guidance, records, reporting, and continuity (New)

d. Presentation and possible discussion regarding the closure status of Proud to Partner Leadership Academy

e. Presentation and possible discussion regarding the date and location of the Statewide Charter School Board November board meeting

**12. New Business**

*Discussion and possible action of any item that could not have been known or reasonably foreseen prior to time of posting agenda (As defined in Oklahoma Statutes Title 25, Section 311 (A)(9)).*

**13. Adjournment**

*The Board may take agenda items in any order it determines necessary or convenient. "Possible action" includes, but is not limited to, approval, authorization, adoption, rejection, denial, amendment, taking no action, or tabling an item for disposition at a later time or meeting. "(Action)" serves as only a prompt for the Board and in no way impairs the Board from taking action if any agenda item provides for possible action to be taken.*

# Transcript of portions of Board meeting held on October 12, 2026

**[00:42:33]**

**CHAIRMAN:** Moving on, we are going to jump back to item 4, Executive Session, action proposed at executive session pursuant to -- all that lingo, jumbo -- consistent with the law for the purpose of discussing pending litigation against the board members and the National Ben Gamla Jewish Charter School Foundation Inc versus Shellum in the U.S. District Court of Western District of Columbia. The Chair would entertain a motion to move into executive session.

**MALE 1:** Move that we move into executive session.

**MALE 2:** Second.

**FEMALE 1:** Dr. Campbell?

**DR. CAMPBELL:** Yes.

**FEMALE 1:** Mr. Peterson?

**MR. PETERSON:** Yes.

**FEMALE 1:** Ms. Anderson?

**MS. ANDERSON:** Yes.

**FEMALE 1:** Ms. Wise? Mr. Shellum?

**MR. SHELLUM:** Yes.

**FEMALE 1:** Dr. Baker?

**DR. BAKER:** Yes.

**FEMALE 1:** Mr. Buswell?

**MR. BUSWELL:** Yes.

**FEMALE 1:** Ms. Savage?

**MS. SAVAGE:** Yes.

**FEMALE 1:** Mr. Chairman, motion carries.

**CHAIRMAN:** Motion carries. We'll go up to the third-floor conference room, and that's where we're going to meet with the attorneys.

**[00:43:27]**

**[02:06:37]**

**MR. CHAIRMAN:** Okay, alright, now that we have our board members here, if the chair would entertain a motion to leave executive session and reconvene in our regular session.

**MALE 1:** Move that we move out of the executive session.

**FEMALE 1:** Second.

**MR. CHAIRMAN:** Okay. Call for a vote.

**FEMALE 2:** Dr. Campbell?

**DR. CAMPBELL:** Yes.

**FEMALE 2:** Mr. Pearson?

**MR. PEARSON:** Yes.

**FEMALE 2:** Ms. Anderson?

**MS. ANDERSON:** Yes.

**FEMALE 2:** Ms. Wise? Mr. Shellum?

**MR. SHELLUM:** Yes.

**FEMALE 2:** Dr. Baker?

**DR. BAKER:** Yes.

**FEMALE 2:** Mr. Buswell?

**MR. BUSWELL:** Yes.

**FEMALE 2:** Ms. Savage?

**MS. SAVAGE:** Yes.

**FEMALE 2:** Mr. Chairman, motion carries at 2:30.

**MR. CHAIRMAN:** 2:30, okay. We're back in session. Thank you, guys. And thank you for those who are here, for your patience. We had a number of different things to discuss with our attorneys. Moving forward, we are going to take Item 5, Action, Discussion, and Possible Action regarding The National Ben Gamla Jewish Charter School Foundation Inc. revised application for initial authorization in light of pending litigation against board members. So as we discussed earlier, and we heard from our counsel, we can have further discussion, or we can entertain a motion to approve the authorization of the Ben Gamla Charter School or accept a motion to deny the application.

**MALE 1:** I make a motion to approve the authorization of the application.

**MR. CHAIRMAN:** Is there a second?

**FEMALE 1:** Second.

**MR. CHAIRMAN:** Second. Further discussion? Anybody want to chime in? Okay. Seeing no further discussion, we'll call for a vote.

**FEMALE 2:** Dr. Campbell?

**DR. CAMPBELL:** Yes.

**FEMALE 2:** Mr. Pearson?

**MR. PEARSON:** No.

**FEMALE 2:** Ms. Anderson?

**MS. ANDERSON:** No.

**FEMALE 2:** Ms. Wise? Mr. Shellum?

**MR. SHELLUM:** Yes.

**FEMALE 2:** Dr. Baker?

**DR. BAKER:** No.

**FEMALE 2:** Mr. Buswell?

**MR. BUSWELL:** Yes.

**FEMALE 2:** Ms. Savage?

**MS. SAVAGE:** Yes.

**FEMALE 2:** Mr. Chairman, motion carries.

**MR. CHAIRMAN:** I don't think it carries. Does it? Do we have five?

**FEMALE 2:** Oh, we have four, sorry. Fails.

**MR. CHAIRMAN:** Okay. Yeah. Two no's and one absent. Recall the vote, please.

**FEMALE 2:** Dr. Campbell, yes; Mr. Pearson, no; Ms. Anderson, no; Ms. Wise, absent; Mr. Shellum, yes; Dr. Baker, no; Mr. Buswell, yes; Ms. Savage, yes.

**MR. CHAIRMAN:** We had three no's and four yes's. It does not carry. We have to have five. Yeah. That's not a majority. If he was here, we need five votes. Okay. So we're aware, welcome to the rollercoaster ride. Unfortunately, that's where we stand. Okay. Moving on. We will consider how that needs to be proceeded. Those in the press, if you guys would like to interview our counsel, they're going to be leaving shortly. You guys are welcome to do that outside, if you'd like. I'll be able to answer questions after the board meeting as well. So moving on.

**[02:09:59]**

**[02:11:46]**

**MR. CHAIRMAN:** In addition to the items that we just discussed in my opening comments, obviously we all have different opinions, and I respect those who have a differing opinion. I think we made a mistake as a board. We are opening ourselves up to a truckload of litigation by just not even authorizing. Again, that's neither here nor there, but now we've put ourselves in, I would say, in a bit of a quagmire. If you guys want to reconsider that, then we can consider that later on. But again, regardless of the religious aspects, the issues of where we're faced, so-- and I respect that people can have difference of opinions. I very much like the contrast, and how we can sharpen one another.

**MALE 2:** For clarification, do we have eight or nine appointed board members present?

**MR. CHAIRMAN:** There's nine board members on this board. You need five to have a vote pass.

**MALE 2:** So we have two absent today.

**MR. CHAIRMAN:** We have…

**MALE 2:** We have Amber absent.

**MR. CHAIRMAN:** Amber is absent.

**FEMALE 2:** One absent and one empty slot.

**MALE 2:** That's what I mean is--

**FEMALE 2:** Her spot has not yet been appointed.

**MR. CHAIRMAN:** Yeah.

**MALE 2:** So I just wondered what that means legally.

**MR. CHAIRMAN:** Legally, we need five votes for something to carry.

**MALE 2:** Okay. Even if-- so if somebody is not appointed, still need the fifth vote, okay.

**MR. CHAIRMAN:** Correct. Yeah. So legally that's where we stand. John, maybe you can add clarity. Is that correct? We need five votes for any issue to pass?

**JOHN:** When you have eight members, yes.

**MR. CHAIRMAN:** What's that?

**JOHN:** Yeah. When you have eight members-- well, I guess also would be at nine.

**MR. CHAIRMAN:** Even if we had six members. If we had five members, we need five members-- we need five affirmative votes for something to pass.

**JOHN:** Yes. As long as you have a quorum sitting out.

**MR. CHAIRMAN:** Yeah.

**MALE 2:** I know like in a corporate world, if you have eight board members, seven are present, then four is a majority vote.

**MR. CHAIRMAN:** No. That's not how it works here.

**MALE 2:** According to its bylaws. But that's what I was checking.

**MR. CHAIRMAN:** Yeah. That's not how it works here.

**MALE 2:** Yep.

**MR. CHAIRMAN:** So okay, moving forward.

**[02:13:48]**

TRANSPERFECT
LEGAL SOLUTIONS

I hereby certify that "OKSCSB Meeting 101226" is, to the best of my knowledge and belief, a true and accurate transcription from English to English.

Anders Nelson
Anders Nelson (Nov 4, 2026 14:36:33 PST)

Anders Nelson
TransPerfect Legal Solutions

November 4, 2026

216 EAST 45TH STREET, 9TH FLOOR, NEW YORK, NY 10017 T +1 212.400.8845 F +1.212.867.3106
LEGAL.TRANSPERFECT.COM

# Attorney General Drummond's Notice of Dismissal of state-court Petition, *Drummond v. Oklahoma Statewide Charter School Board* (Okla. Dist. Ct. Oct. 15, 2026)

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

**FILED**
DISTRICT COURT
OKLAHOMA COUNTY, OKLAHOMA
October 15, 2026 11:08 AM
RICK WARREN, COURT CLERK
Case Number CV-2026-649

| | | |
|---|---|---|
| GENTNER DRUMMOND, in his official capacity as ATTORNEY GENERAL OF THE STATE OF OKLAHOMA, | ) | |
| Petitioner, | ) | Case No. CV-2026-649 |
| v. | ) | |
| OKLAHOMA STATEWIDE CHARTER SCHOOL BOARD, et al., | ) | |
| Respondents. | ) | |

**NOTICE OF DISMISSAL WITHOUT PREJUDICE**

Pursuant to 12 O.S. § 684(A), Petitioner Gentner Drummond, Attorney General of the State of Oklahoma, gives notice that he dismisses this action without prejudice. Because the Attorney General brought this action in the public interest, he sets out below why he filed it and why events since then make continued prosecution unnecessary.

The Attorney General filed this Petition on March 11, 2026, after the Oklahoma Statewide Charter School Board (the "Board") rejected the revised application (the "Revised Application") of the Ben Gamla Jewish Charter School Foundation, Inc. ("Ben Gamla") on a single stated ground, the nonsectarian requirement of 70 O.S. § 3-136(A)(2), while deliberately omitting from its March 10, 2026, rejection letter the independent, non-constitutional grounds that were developed on the record at its March 9, 2026, meeting. Those grounds included the unexplained tenfold increase in projected enrollment between Ben Gamla's letter of intent and its initial application (the "Initial Application"), the corresponding expansion from four grades to thirteen, and the resulting failure to demonstrate community demand and financial viability. The Petition asked the Court to direct the Board to discharge its duty under 70 O.S. § 3-134(E)(3) to notify the applicant in writing of the reasons for the rejection, and its duty under 70 O.S. § 3-134(I)(4) to

decline weak or inadequate applications, by issuing a complete statement of the grounds for its March 9, 2026, action. The Attorney General took no position in this proceeding on the constitutional questions resolved in *Drummond v. Oklahoma Statewide Virtual Charter School Board*, 2024 OK 53, 558 P.3d 1, and he takes none now.

Three developments since the Petition was filed have overtaken the relief it sought.

*First*, on March 24, 2026, Ben Gamla sued in the United States District Court for the Western District of Oklahoma, challenging the nonsectarian requirement under the Free Exercise Clause. *See Nat'l Ben Gamla Jewish Charter Sch. Found., Inc. v. Shellem*, No. CIV-26-582-R (W.D. Okla.). Ben Gamla also named the Attorney General as a defendant. On June 9, 2026, the federal court dismissed him from the action, holding that he has no role in enforcing the nonsectarian requirement and is not a proper defendant under *Ex parte Young*. Order (Doc. 90). The Board did not oppose Ben Gamla's request for a preliminary injunction. On September 24, 2026, the federal court granted that request and enjoined the Board "from enforcing the nonsectarian requirement or otherwise excluding Plaintiffs from participating in the charter school program on account of their religious character." Order at 30 (Doc. 121). The federal court's order does not disturb the Board's authority, or its duty, to reject an application on grounds unrelated to religion. The court observed only that the intervening defendants had "not identified any noncurable conditions or nondiscriminatory eligibility criteria that entirely disqualify Ben Gamla from receiving a charter contract," *id.* at 10, which is precisely the gap in the record that the Board's March 10, 2026, letter created and that this Petition sought to close.

*Second*, the enrollment concerns the Attorney General raised at the March 9, 2026, meeting have since been confirmed by Ben Gamla itself. On September 30, 2026, Ben Gamla's founder wrote to Oklahoma Jewish leaders seeking help recruiting students and a principal. He stated that the school "will initially be an online Jewish high school" and that its "aspirational enrollment goal

for the first year is intentionally modest: 10 students." *See* Ex. 1 (letter of October 8, 2026, from counsel for the intervening defendants to counsel for the Board, with enclosure). Ben Gamla's letter of intent proposed a school of forty students in grades 9–12. Its Initial Application then proposed a K–12 school of 335 to 400 students, and the budgets and cash-flow projections in the Revised Application were built on that assumption. Pet. ¶¶ 7–8, 10–12. An applicant that now hopes to enroll ten students in a high school it described to the Board as a K–12 school of 335 to 400 students has not demonstrated the educational need or financial viability that the Oklahoma Charter Schools Act (the "Act") requires, *see* 70 O.S. § 3-134(B)(3), (10), (29)–(30), (I)(3)–(4), or the community support the Board's own rules require, *see* OAC § 777:10-3-3(b)(4)(F).

*Third*, on October 12, 2026, the Board reconsidered Ben Gamla's Revised Application in light of the federal court's order. Four members voted to approve the application and three voted against it. Under the Act, "an affirmative vote of at least five members shall be required for the Board to take any final action." 70 O.S. § 3-132.1(H). The motion to approve therefore failed, and the application stands rejected.[1] Because the Board is enjoined from excluding Ben Gamla on account of its religious character, the October 12, 2026, rejection necessarily rests on grounds other than the nonsectarian requirement. The public record confirms as much. One of the members who voted against approval explained that the absence of parent support and the opposition of Oklahoma's Jewish community "played mostly in my mind," and Ben Gamla's

[1] *See* Nuria Martinez-Keel, *Oklahoma state board again rejects Jewish charter school in 'shocking' vote*, Oklahoma Voice (Oct. 12, 2026), https://oklahomavoice.com/2026/10/12/oklahoma-state-board-again-rejects-jewish-charter-school-in-shocking-vote/ (reporting the 4-3 vote, that the motion "fell one vote short of the five needed for the Statewide Charter School Board to approve Ben Gamla Jewish Charter School," and that one member was absent and one seat was vacant); *Denied: Jewish Charter School Application Fails By One Vote*, Oklahoma Watch (Oct. 13, 2026), https://oklahomawatch.org/2026/10/13/denied-jewish-charter-school-application-fails-by-one-vote/; Samantha Rupe & Micah Wilson, *Ben Gamla Jewish charter school application fails to win approval*, News 9 (Oct. 12, 2026), https://www.news9.com/oklahoma-city-education/ben-gamla-jewish-charter-school-application-fails (quoting Board counsel: "The threshold is five votes," and "as of this moment, the board doesn't meet the threshold for that.").

founder has acknowledged that he expects only ten students to enroll in the first year.[2] Those are the same deficiencies the Attorney General's representative placed before the Board on March 9, 2026, and that the Board declined to include in its rejection letter the following day.

These developments make the writ sought in the Petition unnecessary. The Petition asked the Court to compel the Board to amend its March 10, 2026, rejection letter or to issue a complete one in its place. The March 10, 2026, letter is no longer the operative Board action. The Board has since acted again on the same application, and the premise of this Petition has now been borne out by the Board's own vote: the application suffered from independent, non-constitutional deficiencies that the Board could not lawfully ignore. Mandamus lies to compel the performance of a present duty, not to correct a record that subsequent events have superseded. *See* 12 O.S. § 1451; *Chandler (U.S.A.), Inc. v. Tyree*, 2004 OK 16, ¶ 24, 87 P.3d 598, 604.

The October 12, 2026, vote has a further consequence. Section 3-134(E)(3) prescribes a single sequence for a virtual charter application: an application, a written rejection stating the reasons, a revised application, and acceptance or rejection of the revised application within thirty days. The statute provides no procedure for a third vote. That omission is deliberate. Earlier versions of the Act allowed a rejected applicant, including an applicant denied by the Statewide Virtual Charter School Board, to appeal to the State Board of Education. *See* 70 O.S. Supp. 2022, § 3-134(E); 70 O.S.2021, § 3-145.3(K). In 2023, the Legislature eliminated both appeals and provided no further step. *See* 2023 Okla. Sess. Laws ch. 323, §§ 6, 22 (S.B. 516). Ben Gamla's application has now been rejected on grounds that have nothing to do with religion, and the Act provides for no further Board action on it. Under the Board's own rules, a new virtual charter

---

[2] Martinez-Keel, *supra* note 1 (quoting Board Member William Pearson: "We saw none of that [parent support] with the Ben Gamla issue, and that's what played mostly in my mind," and reporting that "[f]ounder Peter Deutsch has acknowledged he expects only 10 students to enroll in its first year"); *see also* Ex. 1 (Sept. 30, 2026, email from Mr. Deutsch: "Our aspirational enrollment goal for the first year is intentionally modest: 10 students.").

application may be submitted only in January, eighteen months before July of the proposed opening year. OAC § 777:10-3-3(a)(6)(A). Any further application by Ben Gamla would therefore be a new application, on a new record, for a later school year. The federal action challenged the Board's rejection of this application on account of Ben Gamla's religious character. That rejection has been superseded by one resting on non-religious grounds, no application by Ben Gamla is pending before the Board, and the Board is applying no religious criterion to Ben Gamla. The action is therefore moot. A case is moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (internal quotation omitted). An injunction against the nonsectarian requirement can no longer redress Ben Gamla's claimed injury, because that requirement is no longer what stands between Ben Gamla and a charter. The Attorney General expects the federal action to be dismissed on that basis.

When it is, the federal court's preliminary ruling will carry no continuing legal force. A preliminary injunction is not an adjudication on the merits. "[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *accord Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009). Such a ruling is not binding precedent, and because it is not a final judgment, it has no res judicata or collateral estoppel effect in any other proceeding. *See Camenisch*, 451 U.S. at 395–96. Once the federal action is dismissed, the only binding precedent on the question whether an Oklahoma charter school may be sectarian will be what it was before that action was filed: the Oklahoma Supreme Court's decision in *Drummond*, 2024 OK 53, 558 P.3d 1, as affirmed by the Supreme Court of the United States in *Oklahoma Statewide Charter School Board v. Drummond*, 605 U.S. 165 (2025). That decision remains the law of this State, and the Board remains bound by it.

The dismissal is without prejudice for a reason. Whatever the procedural footing of the Board's October 12, 2026, action, that action was a rejection, and the statute's command attaches to it. If the Board rejects an application, it "shall notify the applicant in writing of the reasons for the rejection." 70 O.S. § 3-134(E)(3). The Board's duty under § 3-134(I)(4) to decline weak or inadequate applications likewise remains in force. The Attorney General expects the Board to discharge both duties with respect to its October 12, 2026, action by stating, completely and accurately, the non-constitutional grounds on which the application failed. He reserves the right to seek relief from this Court should the Board again issue a rejection that omits the grounds on which it actually acted, or should the Board take further action on this application that disregards the deficiencies now established on the public record.

The Attorney General brought this action to protect the integrity of Oklahoma's charter school authorization process and the completeness of the administrative record on which courts, the public, and the applicant are entitled to rely. That interest has not diminished. But the Board's October 12, 2026, vote, together with Ben Gamla's own admissions, has accomplished what the Petition set out to secure: an acknowledgment that this application fails on grounds having nothing to do with religion. Further litigation over the form of a superseded letter would serve no purpose. This action is accordingly dismissed without prejudice.

Respectfully submitted,

GENTNER F. DRUMMOND, OBA No. 16645
Attorney General
OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Telephone: (405) 521-3921
Gentner.Drummond@oag.ok.gov

*Attorney for Petitioner*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of October, 2026, a true and correct copy of the foregoing was served by United States mail, first-class postage prepaid, on the following:

Anthony J. Ferate
Spencer Fane LLP
9400 North Broadway Extension, Suite 600
Oklahoma City, Oklahoma 73114

Hiram Sasser
Holly M. Randall
Erin E. Smith
First Liberty Institute
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075

*Attorneys for Respondents*

GENTNER F. DRUMMOND

# Peter Deutsch letter to the Board, sent on October 20, 2026

October 20, 2026

*VIA EMAIL* (brian.shellem@svcsb.ok.gov)

Brian Shellem, Chairman
Oklahoma Statewide Charter School Board
M.C. Connors Building
2501 N. Lincoln Blvd., Ste 201
Oklahoma City, OK 73105

Dear Mr. Shellem,

I write this open letter to request immediate Board action concerning the National Ben Gamla Jewish Charter School Foundation's pending application for a charter to operate a virtual Jewish charter school in Oklahoma.

As you are aware, on September 24, 2026, Judge David L. Russell of the United States District Court for the Western District of Oklahoma ruled that the requirement in the Oklahoma Charter Schools Act that charter schools be "nonsectarian" likely violates the First Amendment's Free Exercise Clause. The Board's earlier denial of Ben Gamla's application because it proposed a religious charter school was thus unlawful.

In response, the Board met on October 12, 2026, to review Ben Gamla's application a second time. In gross violation of the Court's order, however, the Board again failed to grant the application. If the Board does not take immediate action to remedy the situation, Ben Gamla will be forced to seek further judicial relief, which may include seeking contempt of court and amending its complaint to secure personal liability against defiant Board members.

Even more troubling, however, is the Board's recent statement to Ben Gamla that it has no intent to seek appellate review of Judge Russell's decision. Failure to appeal will have the effect of thwarting Ben Gamla and other religious charter schools from serving Oklahoma students.

I have spent two decades developing and building charter schools from the ground up, and I currently operate four charter schools in Florida, which are among the best ranked charter schools in the state. I have now also spent more than a year and significant resources to bring my educational model to students in Oklahoma. I have deep experience with the costs and risks of starting charter schools.

Oklahoma's charter-school program is an excellent one, and that is why I have sought to open a Jewish charter school in this state. But the program also poses a unique challenge. In 2024, the Oklahoma Supreme Court, in *Drummond v. Oklahoma Statewide Virtual Charter School Board*, upheld and enforced the charter statute's "nonsectarian" requirement. With Judge Russell on the federal bench having now reached the opposite conclusion, even if the Board grants Ben Gamla's charter, it would be akin to a clouded title. Challengers could sue in state court, potentially tying

Ben Gamla in months or years of civil litigation—including extensive discovery of the Board's handling of the application—before handing it a loss in the Oklahoma Supreme Court.

No charter school can long survive such a risk. While I remain confident about the long-term success of Ben Gamla in Oklahoma, I have already been forced to reduce Ben Gamla's anticipated opening enrollment to 10 students due to parental concerns about whether the school could be shuttered due to outside litigation. Parents generally settle early on where their children will attend school the next year. Practically speaking, very few parents will commit to sending their child to a charter school that cannot guarantee it will be open the next year—even if that school would be the best fit for their family's and children's needs. While 10 students is enough for an inaugural class, the absence of further clarification of Ben Gamla's rights means we cannot guarantee continuity and stability to parents, which will hamper Ben Gamla's future growth. To put it simply, the split decision between the state and federal courts already creates a challenging environment. The Board's inexplicable refusal to appeal—thereby leaving *Drummond* unchallenged—would make it impossible.

For these reasons, if—at its next meeting—the Board fails to both grant Ben Gamla's charter and authorize an appeal (which must be filed no later than October 26, 2026), those decisions would effectively force Ben Gamla to withdraw its application. No other Oklahoma charter school is forced to endure these types of existential risks. And based on my experience, I'm confident that a Board decision here to leave the *Drummond* decision intact would dissuade other potential religious charter schools from opening in Oklahoma.

I thus plead with the Board to exercise its constitutional and prudential duties by voting to grant Ben Gamla's charter and immediately seeking to clarify the legal situation by filing a notice of appeal to the Tenth Circuit Court of Appeals. Without such an appeal, school choice in Oklahoma will be set back for years to come.

Sincerely,

Peter Deutsch

cc: Rebecca Wilkinson, Executive Director
rebecca.wilkinson@svcsb.ok.gov

# Oklahoma Attorney General Opinion 2026-17, filed on October 22, 2026

OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA

**ATTORNEY GENERAL OPINION**
**2026-17**

The Honorable Ronny Johns
Oklahoma House of Representatives, District 25
2300 N. Lincoln Boulevard, Room 248
Oklahoma City, OK 73105
Ronny.Johns@okhouse.gov

October 22, 2026

The Honorable Ellen Pogemiller
Oklahoma House of Representatives, District 88
2300 N. Lincoln Boulevard, Room 511
Oklahoma City, OK 73105
Ellen.Pogemiller@okhouse.gov

Dear Representative Johns and Representative Pogemiller:

This office has received your request for an Attorney General Opinion in which you ask, in effect, the following question:

> **Under Oklahoma law, may the Statewide Charter School Board ("Board") reconsider or rescind its rejection of the Ben Gamla Jewish Charter School Foundation's ("Foundation") revised application ("Revised Application"), or vote on it again, after most recently rejecting it on October 12, 2026?**

## I.
## SUMMARY

It may not. The Board is a creature of statute and has only powers expressly granted by the Legislature or necessarily or fairly implied by those grants; it cannot expand its authority through its own actions. *Marley v. Cannon*, 1980 OK 147, ¶ 10, 618 P.2d 401, 405. Title 70, section 3-134(E) of the Oklahoma Statutes establishes a closed, two-step application process: the Board accepts or rejects an application, then accepts or rejects one timely revised application. It authorizes no third vote, rehearing, reconsideration, or rescission. This omission is deliberate: in 2023, the Legislature restructured the Oklahoma Charter Schools Act (the "Act"), abolished the former Statewide Virtual Charter School Board, and eliminated the administrative appeals that formerly followed a rejection, leaving a rejected applicant one statutory remedy, binding arbitration at the applicant's expense. 70 O.S.Supp.2024, §§ 3-132.1, 3-134(G). When a statute prescribes agency action but omits a further step, the omission is presumed intentional, and the

Board cannot add that step. *See Fowler v. Stitt*, 2026 OK 68, ¶ 13, ___ P.3d ____, 2026 WL 2920124.

The Board therefore cannot reconsider or rescind its decision or hold another vote on the Revised Application. As explained below, its authority was exhausted when it rejected that application on March 9, 2026. The October 12, 2026, proceeding does not change that result. The federal court's preliminary injunction enjoined the Board from enforcing the nonsectarian requirement; the court did not direct the Board to vote again, and it could not enlarge the Board's statutory authority. Whether the injunction obligated the Board to take any further action is a question for the federal court, and this Opinion does not address it. In any event, the motion to approve received only four of the five affirmative votes required for final action, so the application remains rejected. 70 O.S.Supp.2024, § 3-132.1(H). After rejection, the Act permits binding arbitration—not another vote on this application. *Id.* § 3-134(E)(3), (G).

## II.
## Background

The Legislature established the Board, effective July 1, 2024, and gave it "the sole authority to sponsor statewide virtual charter schools in this state" and discretionary authority to "sponsor charter schools in this state." 70 O.S.Supp.2024, § 3-132.1(A). The same enactment abolished the former Statewide Virtual Charter School Board and transferred its authority to the new Board. *Id.* § 3-132.1(I). The Board has nine voting members, and "an affirmative vote of at least five members shall be required for the Board to take any final action." *Id.* § 3-132.1(H).

The Act sets out the Board's powers in specific terms. It directs the Board to "establish a procedure for accepting, approving, and disapproving" applications "which meet the procedures set forth in the Oklahoma Charter Schools Act." *Id.* § 3-132.2(A)(3). The Board's enumerated powers and duties include "solicit[ing] and evaluat[ing] charter applications"; "[a]pprov[ing] quality charter applications"; "[d]eclin[ing] to approve weak or inadequate charter applications"; "negotiat[ing] and execut[ing] ***sound*** charter contracts"; monitoring compliance; and determining "whether each charter contract merits renewal, nonrenewal, or revocation." *Id.* § 3-134(I)(2)–(5), (7)–(8) (emphasis added).

Section 3-134(E) sets out a uniform, two-step process for reviewing applications. For a virtual charter application submitted to the Board, the Board "shall either accept or reject sponsorship" within ninety days. If it rejects the application, it "shall notify the applicant in writing of the reasons for the rejection"; the applicant "may submit a revised application for reconsideration" within thirty days; and the Board "shall accept or reject the revised application within thirty (30) days of its receipt." *Id.* § 3-134(E)(3). That is the only "reconsideration" that the Act permits, and it refers to the Board's consideration of a revised application. After rejecting a revised application, the statute provides only one further avenue: the applicant "may, upon rejection of a revised application, proceed to binding arbitration," at the applicant's cost. *Id.* § 3-134(G).

The application at issue followed that process. The Foundation submitted its initial application ("Initial Application") on December 30, 2025. On February 9, 2026, the Board voted 8–0 to reject

the Initial Application. Its February 13, 2026, letter set forth ten reasons for the rejection, nine of which did not implicate the Constitution.[1]

The Foundation submitted the Revised Application on February 17, 2026. The Board rejected that application on March 9, 2026. By letter dated March 10, 2026, it identified a single ground—the nonsectarian requirement of title 70, section 3-136(A)(2) (Supp.2024)—although other independent, nonconstitutional grounds had been developed on the record at its March 9, 2026, meeting.[2]

On September 24, 2026, a federal court preliminarily enjoined the Board "from enforcing the nonsectarian requirement or otherwise excluding [the Foundation] from participating in the charter school program on account of their religious character." *See Nat'l Ben Gamla Jewish Charter Sch. Found., Inc. v. Shellem*, No. CIV-26-582-R (W.D. Okla. Sept. 24, 2026) (Doc. 121).[3] On October 12, 2026, the Board took up the Revised Application again in light of that order. Four members voted to approve, and three voted against; one member was absent, and one seat was vacant.[4] Because "an affirmative vote of at least five members shall be required for the Board to take any final action," the motion to approve failed, leaving the Revised Application rejected. 70 O.S.Supp.2024, § 3-132.1(H). Because the Board was enjoined from applying the nonsectarian

[1] The constitutional basis identified in the February 13 correspondence was title 70, section 3-136(A)(2) (Supp.2024), which provides: "A charter school shall be nonsectarian in its programs, admission policies, employment practices, and all other operations. A sponsor may not authorize a charter school or program that is affiliated with a nonpublic sectarian school or religious institution." The Oklahoma Supreme Court issued an opinion in 2024, *Drummond v. Okla. Statewide Virtual Charter Sch. Bd.*, 2024 OK 53, 558 P.3d 1, holding, "Under Oklahoma law, a charter school is a public school. As such, a charter school must be nonsectarian." *Id.* ¶ 45, 558 P.3d at 15. Finally, the U.S. Supreme Court, in consolidated cases Nos. 24-394 and 24-396, affirmed the judgment of the Supreme Court of Oklahoma by an equally divided Court. *Okla. Statewide Charter Sch. Bd. v. Drummond*, 605 U.S. 165, 166 (2025) (per curiam).

[2] The nonconstitutional grounds identified at the March 9 meeting included the following: (1) enrollment discrepancies between the Foundation's letter of intent and the Initial Application, and even enrollment discrepancies within the Initial Application; and (2) lack of support within the community. Additionally, the minutes of the March 9 meeting, which the Board approved at its April 13, 2026, meeting, state that the Board denied the Revised Application "based on the ***reasons*** stated on the record by board staff, the mandamus order from the courts, and the secular clause contained within Title 70, state law for schools." https://oklahoma.gov/scsb/about-us/board-meetings.html (emphasis added).

[3] The Attorney General was named as a defendant in the federal action and was dismissed from it on June 9, 2026. Order (Doc. 90). Separately, on March 11, 2026, the Attorney General petitioned the District Court of Oklahoma County for a writ of mandamus directing the Board to state all of the grounds for its March 9, 2026, rejection. *Drummond v. Okla. Statewide Charter Sch. Bd.*, No. CV-2026-649 (Okla. Cnty. Dist. Ct. filed Mar. 11, 2026). He dismissed that petition without prejudice on October 15, 2026, after the October 12 vote left the Revised Application rejected. Neither action bears on the question addressed here, which concerns only the Board's authority under the Act.

[4] OKLAHOMA STATEWIDE CHARTER SCHOOL BOARD, *OKSCSB Meeting: 10/12/2026* (YouTube, Oct. 12, 2026), https://www.youtube.com/watch?v=Z3whZ2HIofs (on file with the Oklahoma Office of the Attorney General).

requirement, the October 12 vote could not lawfully have rested on it.[5] In light of these events, you ask whether the Board may now reconsider, rescind, or vote again on that Revised Application.

## III.
## Discussion

### A. The Board May Exercise Only Those Powers the Legislature Has Granted Expressly or by Necessary Implication.

The governing principle is settled: boards may exercise only powers granted to them by the Legislature. More specifically,

> an officer or agency has, by implication and in addition to the powers expressly given by statute, such powers as are necessary for the due and efficient exercise of the powers expressly granted, or such as may be fairly implied from the statute granting the express powers. However, an agency created by statute may only exercise the powers granted by statute and it cannot expand those powers by its own authority.

*Marley*, 1980 OK 147, ¶ 10, 618 P.2d at 405.

Implied authority is narrow. An unexpressed power "must be necessarily implied from the nature of the duty given." *Okla. Pub. Emps. Ass'n v. Okla. Dep't of Cent. Servs.*, 2002 OK 71, ¶ 36, 55 P.3d 1072, 1087. Implied powers extend only to what is required to exercise and discharge expressly conferred powers and duties effectively; necessity, not convenience or past custom, sets the limit. *Id.* ¶ 38, 55 P.3d at 1087–88. When the Legislature enumerates an agency's duties, the agency cannot add duties the Legislature omitted. An agency is "without statutory authority" to act on a subject beyond the reach of its enabling act, *Farmacy, LLC v. Kirkpatrick*, 2017 OK 37, ¶ 20, 394 P.3d 1256, 1261, and that authority "cannot be fairly implied." *Marley*, 1980 OK 147, ¶ 13, 618 P.2d at 406.

### B. Section 3-134 Establishes a Closed, Two-Step Sequence and Authorizes No Third Board Vote.

Section 3-134 identifies only two occasions on which the Board acts on a charter application: it accepts or rejects the application, then accepts or rejects one revised application. 70 O.S.Supp.2024, § 3-134(E)(3). The statute prescribes in detail how and when each decision must be made and stops there. It contains no provision for a third vote, a rehearing, reconsideration of a completed decision, or rescission of a vote already cast. *Id.* The Legislature is presumed to have deliberately omitted the power to vote again from a statute that otherwise comprehensively prescribes how the Board acts on an application. *See Fowler*, 2026 OK 68, ¶ 13 ("[W]hen a statute

---

[5] *See* Nuria Martinez-Keel, *Oklahoma State Board Again Rejects Jewish Charter School in 'Shocking' Vote*, Oklahoma Voice (Oct. 12, 2026), https://oklahomavoice.com/2026/10/12/oklahoma-state-board-again-rejects-jewish-charter-school-in-shocking-vote/ (quoting Board Member William Pearson, who voted against approval: "We saw none of that [parent support] with the Ben Gamla issue, and that's what played mostly in my mind").

prescribes the mode of doing a particular thing, other modes are excluded. . . . We presume that statutory omissions are intentional, and we do not 'fill the gap.'").

The Act's structure confirms that this omission is deliberate. The Legislature knew how to provide further review and chose not to. Indeed, until 2023, the Act permitted a rejected applicant, including an applicant denied twice by the Statewide Virtual Charter School Board, to appeal to the State Board of Education. 70 O.S.Supp.2022, § 3-134(E); 70 O.S.2021, § 3-145.3(K). In 2023, the Legislature eliminated those appeals. *See* Senate Bill 516, 2023 Okla. Sess. Laws ch. 323, §§ 6, 22. The Legislature also knows how to authorize reconsideration when it wishes to. *See, e.g.*, 75 O.S.2021, § 317(A) (rehearing of a final agency order on an aggrieved party's application within ten days); 70 O.S.Supp.2024, § 3-134(E)(3) (one revised application "for reconsideration"). Here, it provided for one revised application and nothing more.

Another vote also cannot be justified as a necessary implication of the Board's express powers. A renewed vote is not necessary to exercise and discharge effectively the Board's duties to approve quality applications and decline inadequate ones. The Board fulfills those duties by acting once on the application and once on the revised application, as the statute directs. 70 O.S.Supp.2024, § 3-134(I)(3)–(4); *see also Okla. Pub. Emps. Ass'n*, 2002 OK 71, ¶ 27, 55 P.3d at 1084. Nor does the Board's authority to "[e]stablish a procedure for accepting, approving, and disapproving" applications supply that power because the authority is expressly limited to procedures "which meet the procedures set forth in the Oklahoma Charter Schools Act." 70 O.S.Supp.2024, § 3-132.2(A)(3). A reconsideration procedure that the Act does not authorize would not "meet" the Act's procedures; it would add to them, which is precisely what an agency "cannot" do "by its own authority." *Marley*, 1980 OK 147, ¶¶ 10, 13, 618 P.2d at 405–06.

The Legislature has since made the same point in express terms. Effective November 1, 2026, an agency may promulgate rules "only to the extent that the agency has been specifically and explicitly granted rulemaking authority by state law," and general statements of authority, such as authority to act "as necessary and proper," do not suffice. H.B. 4319, §§ 1(A)–(B), 4, 60th Leg., 2d Reg. Sess. (Okla. 2026) (to be codified at 75 O.S. § 250.2a(A)–(B)). *See also* 2023 OK AG 3, ¶¶ 5–7 (rule promulgated without a specific grant of authority is invalid; an agency "may not under the guise of its rule making power exceed the scope of its authority and act contrary to the statute which is the source of its authority" (quoting *Adams v. Pro. Pracs. Comm'n*, 1974 OK 88, ¶ 11, 524 P.2d 932, 934)).

The Board's own rules confirm the point. The Act separately requires every sponsor, including the Board, to "establish a procedure for accepting, approving, and disapproving charter school applications in accordance with subsection E of this section." 70 O.S.Supp.2024, § 3-134(J). The reference to subsection E is a direct tie to the two-step sequence of accepting or rejecting the Initial Application and accepting or rejecting the Revised Application. *Id.* § 3-134(E)(3), (J). The Board satisfied the Act's mandate by promulgating administrative rules governing sponsorship applications. OKLA. ADMIN. CODE § 777:10-3-3(a). Those rules provide that the Board "will render a decision on the application"; that, if the application is rejected, the applicant may submit an amended application within thirty days; that the Board will decide the amended application within

thirty days; and that, if the amended application is rejected, "the application may proceed according to statute." *Id.* § 777:10-3-3(a)(8)(B)–(G).[6]

The events of October 12, 2026, illustrate the issue. The Board rejected the Initial Application on February 9, 2026, and sent written notice of the rejection to the Foundation on February 13, 2026. The Board then rejected the Revised Application on March 9, 2026. Accordingly, the Board completed the statutory process to accept or reject the application seven months before October 12. 70 O.S.Supp.2024, § 3-134(E)(3).

The Board convened again in response to the federal court's preliminary injunction, which enjoined it from enforcing the nonsectarian requirement "or otherwise excluding [the Foundation] from participating in the charter school program on account of their religious character." *Nat'l Ben Gamla Jewish Charter Sch. Found.*, No. CIV-26-582-R, Order at 30 (Doc. 121). The injunction did not direct the Board to vote again. A federal injunction may forbid the Board to act on a particular ground; it does not confer a power the Legislature withheld. Whether the injunction required the Board to take any further action is a question for the federal court, and this Opinion does not address it. The Board's decision to convene again does not establish its authority to do so because "[a]dministrative construction of a statute will not override the plain statutory language," and "[n]o longstanding agency practice can alter the statute's plain text or effectively rewrite what the Legislature enacted." *Fowler*, 2026 OK 68, ¶ 23 (quoting *Shellem v. Gruneweld*, 2023 OK 26, ¶ 20, 535 P.3d 1208, 1214); *see also* 75 O.S.Supp.2025, § 318(E) (in reviewing agency action, a court "shall not defer to the interpretation of a state agency and shall interpret the meaning and effect de novo," and shall resolve "any remaining doubt in favor of a reasonable interpretation which limits agency power"). Either way, the Board may not vote on this Revised Application a third time.

The Legislature also prescribed the only step that follows the rejection of a revised application: the applicant "may, upon rejection of a revised application, proceed to binding arbitration." 70 O.S.Supp.2024, § 3-134(G). That choice confirms that the Board's own role ends with its vote on the revised application. Had the Legislature intended the Board to have the option of revisiting its decision, it would have said so, as it did for the revised application. Instead, it placed the further decision in other hands.

The arbitration remedy in subsection G does not imply a power to reconsider. It might be argued that a body that can be required to arbitrate must have authority to resolve the arbitration by agreement, and that a Board able to approve an application in settlement of an arbitration could as easily approve it by a third vote. The argument fails on its own terms. Subsection G confers a remedy on the applicant, not a power on the Board. Arbitration under subsection G occurs only if the rejected applicant invokes it, and the Foundation has not requested arbitration here. Whatever authority the Board may have to resolve a proceeding the applicant commences is an incident of that proceeding and does not exist before it. This Opinion does not address the conduct or resolution of an arbitration that has not been requested.

---

[6] The phrase "may proceed according to statute" refers to the option for the applicant to proceed to binding arbitration under the American Arbitration Association's commercial rules.

### C. The Administrative Procedures Act ("APA") Supplies No Independent Reconsideration Authority.

The APA does not fill the gap. It is a statute of general application that supplements an agency's enabling act and yields to the specific procedures the Legislature has prescribed there. *See Okla. State Bd. of Equalization v. Craig*, 1988 OK 7, ¶ 5, 749 P.2d 1132, 1133 (section 318 of the APA is "a general statute" that yields to a specific statutory avenue of review); *Brown v. Banking Bd.*, 1973 OK 76, ¶ 3, 512 P.2d 166, 168 (agency governed by the APA "where the same is not in express conflict with" its own code); 1979 OK AG 3, ¶¶ 1–3 (agency with general rulemaking power could not alter by rule a fee its enabling act fixed). The APA's provisions governing individual proceedings, including the rehearing provision in section 317, apply to the issuance or denial of a license only when some other law requires an individual proceeding: "Except as otherwise specifically provided by law, the issuance or denial of a new license shall not require an individual proceeding." 75 O.S.2021, § 314(A). A charter is a "license" under the APA, 75 O.S.Supp.2025, § 250.3(11), but the APA itself does not require an individual proceeding to issue or deny one.

Construing the predecessor of section 314(A), the Oklahoma Supreme Court held that the APA "was not itself a mandate" for individual proceedings on license applications; such proceedings are required "if, and only if, another source of law" requires that the decision be preceded by notice and an opportunity for hearing. *Stewart v. Rood*, 1990 OK 69, ¶¶ 10, 14, 796 P.2d 321, 327–28. The 1992 amendment made the point explicit, and the courts have applied the current text the same way. *Boyer v. State Bd. of Exam'rs of Psychologists*, 1992 OK CIV APP 80, ¶ 5, 834 P.2d 450, 452 ("§ 314 does not require an individual proceeding until some independent authority requires such a hearing."); *Bird v. Willis*, 1996 OK 116, ¶ 4, 927 P.2d 547, 547–48; *Cavett v. State ex rel. State Bd. of Exam'rs of Psychologists*, 2013 OK CIV APP 11, ¶ 6, 295 P.3d 610, 612.

Nothing in the Act requires an individual proceeding on an application. Section 3-134(E)(3) prescribes what the Board must do: vote within ninety days, state its reasons in writing if it rejects an application, receive one revised application, and vote on that application within thirty days. It does not call for notice and a trial-type hearing, findings of fact and conclusions of law, or a final order. The contrast with the Act's treatment of existing charters is telling. Before a charter contract may be revoked or nonrenewed, the Act requires timely notice of the reasons, an opportunity to respond, "a public hearing" at which the school may submit documents and give testimony, representation by counsel, a record, and a written final determination. 70 O.S.Supp.2024, § 3-137(J). The Board's rules draw the same line. OKLA. ADMIN. CODE § 777:1-1-9 governs individual proceedings before the Board—requiring petitions, notice complying with 75 O.S.2021, § 309, hearings, and final orders complying with 75 O.S.2021, § 312, while OKLA. ADMIN. CODE § 777:10-3-3 governs sponsorship applications and contains none of those features.

The Court of Civil Appeals has rejected the argument that a board's decision to take an application up again converts the matter into an individual proceeding. In *Cavett*, the applicant argued that the licensing board had converted his request for reconsideration into an individual proceeding by agreeing to reconsider his application. The court disagreed. As the court recounted, the board had issued no notice of an individual proceeding, held no trial-type hearing, made no findings of fact or conclusions of law, and entered no final order; the application "was only set as an agenda item

at regular meetings." 2013 OK CIV APP 11, ¶¶ 4–7, 295 P.3d at 611–12. Therefore, the applicant had no individual proceeding and no right to judicial review. *Id.* ¶ 7, 295 P.3d at 612. Neither *Boyer* nor *Cavett* addressed whether the licensing board had authority to reconsider; the question in each case was judicial review, and the licensing statutes there, unlike section 3-134(E)(3), prescribed no procedure for the board's action on an application.

The same is true here of the Board's action on the Revised Application. Its March 10, 2026, letter stated a reason for rejection, as section 3-134(E)(3) requires; it is not a final agency order containing findings of fact and conclusions of law under section 312, and the Board's decision to place the application on its October 12 agenda did not convert the matter into an individual proceeding. This office reached the same conclusion under section 314 more than forty years ago, advising that where the licensing statute did not require a hearing before a license was denied, the APA's provisions "dealing with individual proceedings, including appeal from those proceedings, do not apply." 1982 OK AG 74, ¶ 10.

The APA's definitions confirm the point. The APA defines a "final agency order" as an order that includes findings of fact and conclusions of law under section 312 and disposes of an individual proceeding. 75 O.S.Supp.2025, § 250.3(6). It defines an "individual proceeding" as "the formal process employed by an agency having jurisdiction by law to resolve issues of law or fact between parties and which results in the exercise of discretion of a judicial nature[.]" *Id.* § 250.3(9). A vote to accept or reject an application is not that kind of adjudicative, adversarial process. The Legislature has recognized that agencies take actions and make decisions outside individual proceedings, which Article II does not cover. 75 O.S.2021, § 308a. When "the process out of which the final order is made is not an individual proceeding," the APA's review provisions do not apply. *Double LL Contractors, Inc. v. State ex rel. Okla. Dep't of Transp.*, 1996 OK 30, ¶ 5, 918 P.2d 34, 37. Because the Board's action on the Revised Application was not a final agency order in an individual proceeding, section 317 does not apply to it. 75 O.S.2021, § 317(A).

Section 317 would not supply the authority even if it applied. Rehearing, reopening, or reconsideration under that section is available only on the application of "any party aggrieved by the final agency order," made "within ten (10) days from the date of the entry of such final agency order," and only on one of five enumerated grounds. 75 O.S.2021, § 317(A). The Board is not a party aggrieved by its own decision; the ten-day period following the March 9, 2026, rejection expired in March; and the section confers no authority on an agency to reopen a decision on its own motion. This office has advised that, absent specific authority in an agency's own statutes, the ten-day period marks the limit of the agency's power to reconsider a final order, 1998 OK AG 39, ¶¶ 5, 9, and that an official who has denied an application may not simply reverse course but must follow the reconsideration procedure the Legislature prescribed, 2019 OK AG 2, ¶¶ 10–12. The Oklahoma Supreme Court has likewise held that an agency rule purporting to permit modification of an order outside the statutory period is "unauthorized by law." *Turpen v. Okla. Corp. Comm'n*, 1988 OK 126, ¶ 20, 769 P.2d 1309, 1318–19. Section 317(C) preserves reconsideration "in accordance with other statutory provisions applicable to such agency," but the only such provision here, section 3-134(E)(3), provides for one revised application and nothing more.

Nor does the absence of an individual proceeding leave the Board free to revisit its decision at will. This office has observed that when an agency's action is "something less than final agency action" under the APA, "there are a few apparent limitations on an agency's power to modify an interim or interlocutory order, or to correct a ministerial error in the recording of a member's credited service." 1988 OK AG 112, ¶ 5. That opinion addressed a retirement system's certification of service credit under statutes that prescribed no procedure for the certification, and it recognized that the agency's discretion remained bounded by section 317 and by the agency's own statutes. *Id.* ¶¶ 8, 12. The question here is different. It is not whether the Board may correct a clerical error in an interlocutory order, but whether it may take a vote that the Act does not provide for. When the Legislature prescribes the mode of agency action, other modes are excluded, *Fowler*, 2026 OK 68, ¶ 13, and an agency that wishes to reconsider a decision "must proceed in the manner authorized by statute." *Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 329 (1961) (quoted in 1998 OK AG 39, ¶ 7).

**D. Internal Procedure and Past Practice Cannot Enlarge the Board's Authority.**

Even if the Board had adopted internal parliamentary procedures, they could not supply authority withheld by statute.[7] A motion to reconsider under general parliamentary rules governs internal order. It cannot enlarge the Board's statutory powers, which the Board "cannot expand . . . by its own authority." *Marley*, 1980 OK 147, ¶ 10, 618 P.2d at 405; *see Oldham v. Drummond Bd. of Educ.*, 1975 OK 147, ¶ 7, 542 P.2d 1309, 1311 (statute governing a school board's vote "makes no mention of Robert's Rules of Order and is not controlled thereby"). Nor could a practice of revoting override the statute. Administrative construction and longstanding practice cannot rewrite plain statutory text. *Fowler*, 2026 OK 68, ¶ 23. Oklahoma recognizes no inherent authority in an administrative body beyond that granted or necessarily implied by law. *Okla. Pub. Emps. Ass'n*, 2002 OK 71, ¶ 27, 55 P.3d at 1084. Accordingly, the Board is prohibited from voting a third or fourth time on an application that the Act permits it to decide once in its original form and once as revised. 70 O.S.Supp.2024, § 3-134(E)(3).[8]

---

[7] For instance, unlike the State Board of Education, the Board has not adopted rules providing that its parliamentary procedures will follow Robert's Rules of Order. *See* OKLA. ADMIN. CODE § 777:1-1-3; *cf.* OKLA. ADMIN. CODE § 210:1-1-6.

[8] This Opinion addresses only the Revised Application; it does not address an application submitted in a future application cycle under the Act and the Board's rules. *See* OKLA. ADMIN. CODE § 777:10-3-3(a)(6). After rejection of a revised application, the Legislature authorizes a rejected applicant, except an applicant rejected by a school district, to proceed to binding arbitration under the commercial rules of the American Arbitration Association. 70 O.S.Supp.2024, § 3-134(G). This Opinion does not address the enforceability of that provision. *Cf. Pentagon Acad., Inc. v. Indep. Sch. Dist. No. 1 of Tulsa Cnty.*, 2003 OK 98, ¶¶ 17–18, 82 P.3d 587, 591 (holding that binding arbitration under an earlier version of section 3-134, which incorporated the Dispute Resolution Act, was "legally impossible" because no arbitration rules had been promulgated under that Act). The Legislature replaced that language in 2015 with a reference to the commercial rules of the American Arbitration Association, 2015 Okla. Sess. Laws ch. 170, § 2, and in 2023 extended the remedy to applicants rejected by the Board and placed its cost on the applicant, 2023 Okla. Sess. Laws ch. 323, § 6.

**It is, therefore, the official Opinion of the Attorney General that:** [9]

1. **The Statewide Charter School Board may exercise only those powers the Legislature has conferred expressly or by necessary implication, and it cannot enlarge its authority by its own act. *Marley v. Cannon*, 1980 OK 147, ¶ 10, 618 P.2d 401, 405.**

2. **Title 70, section 3-134 of the Oklahoma Statutes prescribes a closed, two-step sequence—acceptance or rejection of a charter application, followed by acceptance or rejection of one revised application—and confers no authority to reconsider, rescind, rehear, or hold a further vote on a revised application the Board has acted upon. The Legislature's omission of any further step is deliberate; in 2023 it eliminated the administrative appeals that formerly followed a rejection and left applicant-funded binding arbitration as the only further step. *Fowler v. Stitt*, 2026 OK 68, ¶ 13; 70 O.S.Supp.2024, § 3-134(E)(3), (G).**

3. **The Board accordingly lacks statutory authority to reconsider, rescind, or hold a further vote on the Ben Gamla Jewish Charter School Foundation's revised application. Its authority over that application ended with its decision on the revised application, and the October 12, 2026, proceeding, whatever its procedural footing, left the application rejected when the motion to approve failed to secure the five votes required for final action. 70 O.S.Supp.2024, § 3-132.1(H); 70 O.S.Supp.2024, § 3-134(E)(3).**

4. **Nothing in this Opinion relieves the Board of its continuing statutory duties to state the reasons for its rejection and to decline weak or inadequate applications, or precludes an application submitted in a future application cycle under the Act and the Board's rules. 70 O.S.Supp.2024, § 3-134(E)(3), (I)(4).**

---

[9] The Attorney General is the State's chief law officer and is charged with advising public officers on questions of law relating to their official duties. 74 O.S.Supp.2025, § 18b(A)(5). This Opinion construes the Oklahoma Charter Schools Act and the Administrative Procedures Act. It does not address the constitutionality of any statute, and nothing in it depends on the resolution of the constitutional question pending in the federal action. It is therefore not advisory. *Cf. State ex rel. York v. Turpen*, 1984 OK 26, ¶¶ 10–12, 681 P.2d 763, 766–67 (an opinion that a statute is unconstitutional is advisory because that determination belongs to the courts). Opinions of this office are binding on the state officers they affect, who must follow them unless and until judicially relieved of compliance. *Id.* ¶ 5, 681 P.2d at 765; *Hendrick v. Walters*, 1993 OK 162, ¶ 20, 865 P.2d 1232, 1243; *Rasure v. Sparks*, 1919 OK 231, ¶ 7, 183 P. 495, 498. The Statewide Charter School Board is a state agency created by statute, 70 O.S.Supp.2024, § 3-132.1(A), and this Opinion binds the Board and its members. A public officer who acts in conformity with an opinion of this office is protected from civil liability and from forfeiture of office. *Rasure*, 1919 OK 231, ¶ 7, 183 P. at 498. *See also* 2023 OK AG 3, ¶ 7 (except where it declares a statute unconstitutional, an opinion of this office "is binding upon the state official affected by it").

GENTNER DRUMMOND
ATTORNEY GENERAL

GARRY M. GASKINS, II
SOLICITOR GENERAL

BRADLEY CLARK
GENERAL COUNSEL

OPINION APPROVED FOR ISSUANCE
OFFICE OF THE ATTORNEY GENERAL
OKLAHOMA
OFFICIAL COPY

# Special Board meeting agenda for October 23, 2026

**SPECIAL MEETING OF THE**
**STATEWIDE CHARTER SCHOOL BOARD**
**OKLAHOMA STATE CAPITOL**
**2300 N. LINCOLN BLVD., SUITE 212**
**OKLAHOMA CITY, OK 73105**
**AGENDA**

**October 23, 2026 @ 12:00 P.M.**

Note: Public Comment only allowed in person at regularly scheduled board meetings.

Public view access: https://oklahoma.gov/scsb/about-us/board-meetings
A link will be posted approximately 15 minutes prior to the meeting.

1. **Call to Order and Roll Call**

2. **Executive Session** – (Action) Proposed Executive Session pursuant to 25 O.S. 2021, § 307(B)(4), consistent with 2005 OK AG 29, for the purpose of discussing pending litigation against Board Members in *The National Ben Gamla Jewish Charter School Foundation, Inc. v. Shellem, et al.*, No. 5:26-cv-00582 in the U.S. District Court for the Western District of Oklahoma
   a. Vote to enter Executive Session;
   b. EXECUTIVE SESSION pursuant to 25 O.S. 2021, § 307(B)(4);
   c. Vote to exit Executive Session; and
   d. Discussion and possible action on the matters discussed in Executive Session.

3. **(Action)** Discussion and possible action regarding The National Ben Gamla Jewish Charter School Foundation Inc. Revised Application for Initial Authorization in light of pending litigation against Board Members, The National Ben Gamla Jewish Charter School Foundation, Inc. v. Shellem, et al., No. 5:26-cv-00582 in the U.S. District Court for the Western District of Oklahoma

4. **(Action)** Discussion and possible action to file Notice of Appeal in the U.S. Court of Appeals for the 10th Circuit in light of pending litigation against Board Members, The National Ben Gamla Jewish Charter School Foundation, Inc. v. Shellem, et al., No. 5:26-cv-00582 in the U.S. District Court for the Western District of Oklahoma

5. **Adjournment**

*The Board may take agenda items in any order it determines necessary or convenient. "Possible action" includes, but is not limited to, approval, authorization, adoption, rejection, denial, amendment, taking no action, or tabling an item for disposition at a later time or meeting. "(Action)" serves as only a prompt for the Board and in no way impairs the Board from taking action if any agenda item provides for possible action to be taken.*

# Transcript of portions of special Board meeting held on October 23, 2026

**[00:17:36]**

**MR. CHAIRMAN:** Take the role.

**FEMALE 1:** Mr. Shellum?

**MR. SHELLUM:** Here.

**FEMALE 1:** Mr. Pearson?

**MR. PEARSON:** Here.

**FEMALE 1:** Ms. Wise?

**MS. WISE:** Here.

**FEMALE 1:** Mr. Buswell?

**MR. BUSWELL:** Here.

**FEMALE 1:** Dr. Baker? Dr. Campbell?

**DR. CAMPBELL:** Here.

**FEMALE 1:** Superintendent Fields?

**SUPERINTENDENT FIELDS:** Here.

**FEMALE 1:** And Ms. Savage?

**MS. SAVAGE:** Here.

**FEMALE 1:** Mr. Chairman, we have a quorum.

**MR. CHAIRMAN:** We have a quorum. Moving forward, we are going to take up Item 2, Executive Session. Action purposed executive session pursuant to 25 O.S. 2021, consistent with the 2025 OK AG 29. The purpose of discussion pending litigation against the board members and The National Ben Gamla Jewish Charter School Foundation Inc versus Shellum, Number 5:26. You see the rest there. The U.S. District Court Western District of Oklahoma. Chair would entertain a motion to go into executive session.

**MALE 1:** So move.

**FEMALE 2:** Second.

**MR. CHAIRMAN:** Call for a vote.

**FEMALE 1:** Dr. Campbell?

**DR. CAMPBELL:** Yes.

**FEMALE 1:** Mr. Pearson?

**MR. PEARSON:** No.

**FEMALE 1:** Superintendent Fields?

**SUPERINTENDENT FIELDS:** Yes.

**FEMALE 1:** Ms. Wise?

**MS. WISE:** Yes.

**FEMALE 1:** Mr. Shellum?

**MR. SHELLUM:** Yes.

**FEMALE 1:** Dr. Baker? Mr. Buswell?

**MR. BUSWELL:** Yes.

**FEMALE 1:** And Ms. Savage?

**MS. SAVAGE:** Yes.

**MR. CHAIRMAN:** Okay. Motion carries. At this time, I'm going to invite everyone who's not a board member to exit the room. We will come back into session, and we'll notify you, and we'll wait to get started because it might take a couple of minutes for us to get the AV up and going. So we'll be patient as that happens.

**[00:19:09]**

**[00:01:38]**

**MR. CHAIRMAN:** Are we good? Okay. Chair would consider a motion to exit executive session and reconvene our special meeting.

**MALE 1:** So vote.

**MALE 2:** Second.

**MR. CHAIRMAN:** Call for a vote.

**FEMALE 1:** Dr. Baker? Mr. Pearson?

**MR. PEARSON:** Yes.

**FEMALE 1:** Ms. Wise?

**MS. WISE:** Yes.

**FEMALE 1:** Mr. Shellum?

**MR. SHELLUM:** Yes.

**FEMALE 1:** Mr. Buswell?

**MR. BUSWELL:** Yes.

**FEMALE 1:** Superintendent Fields?

**SUPERINTENDENT FIELDS:** Yes.

**FEMALE 1:** Ms. Savage?

**MS. SAVAGE:** Yes.

**FEMALE 1:** And Dr. Campbell?

**DR. CAMPBELL:** Yes.

**FEMALE 1:** Motion carries.

**MR. CHAIRMAN:** All right. Motion carries. We are back in session here. Considering our-- the opinion from our attorney general yesterday, we are going to skip over Item 3. We think we have a very clear opinion, and we will not be taking action on Item 3 on our agenda. Before moving to-- or as part of Item 4, Action Discussion, Possible Action to file notice of appeal to

the U.S. Court of Appeals for the 10th Circuit, in light of the pending litigation against board members, The National Ben Gamla Jewish Charter School Foundation Inc. versus Shellum in the U.S. District Court in the Western District of Oklahoma. I want to just read a few things, and I also want to provide just my gratitude for every board member here because I do want to say that every board member that is serving on this board is mission aligned, regardless of their opinion or differing of opinion. Everyone is working to expand and support excellent charter schools throughout the state of Oklahoma. And I believe every person in their heart, in their actions is carrying that mission forward. So even if we have absence those who have served in the past, I want to say thank you for them. As we move forward, I want to remind us of a few things in the Oklahoma Constitution. Section 1, Article 1, Section 1, Supreme Law of the Land. The state of Oklahoma is an inseparable part of the Federal Union. And the Constitution of the United States is the supreme law of the land. So I know there's been lots of debate what law are we going to follow. I've also made public comment that this board will always act in compliance with the court order, even if we disagree with it. We have seen that action before and we've always been in compliance with the Oklahoma Supreme Court. We have acted in good faith to do that. We have been issued an order. This board always wants to be in compliance with the federal order as well. Considering where we're at today, we are bound not to be able to take a vote based on the attorney general's opinion. So with that, we are left with one option left here today. So at this time, the Chair would like to consider from board members a motion, if there is one.

**MALE 1:** I move that we direct counsel to file a notice of appeal with the U.S. Court of Appeals for the 10th Circuit by the Monday deadline in order to preserve all of our options and that we have further discussion with counsel at a future meeting to determine how and whether to pursue the appeal further.

**MR. CHAIRMAN:** Is there a second?

**MALE 2:** Second.

**MR. CHAIRMAN:** Is there further discussion? Seeing no further discussion, call for the vote.

**FEMALE 1:** Ms. Wise?

**MS. WISE:** Yes.

**FEMALE 1:** Ms. Savage?

**MS. SAVAGE:** Yes.

**FEMALE 1:** Mr. Buswell?

**MR. BUSWELL:** Yes.

**FEMALE 1:** And Dr. Campbell?

**DR. CAMPBELL:** Yes.

**FEMALE 1:** Superintendent Fields?

**SUPERINTENDENT FIELDS:** Yes.

**FEMALE 1:** Dr. Baker? Mr. Pearson?

**MR. PEARSON:** Yes.

**FEMALE 1:** Mr. Shellum?

**MR. SHELLUM:** Yes.

**FEMALE 1:** Motion carries.

**MR. CHAIRMAN:** Motion carries.

**[00:05:04]**

TRANSPERFECT
LEGAL SOLUTIONS

I hereby certify that "OKSCSB Meeting 102326" is, to the best of my knowledge and belief, a true and accurate transcription from English to English.

Anders Nelson
Anders Nelson (Nov 4, 2026 14:39:13 PST)

_______________________
Anders Nelson
TransPerfect Legal Solutions

November 4, 2026

216 EAST 45TH STREET, 9TH FLOOR, NEW YORK, NY 10017 T +1 212.400.8845 F +1.212.867.3106
LEGAL.TRANSPERFECT.COM

TRANSPERFECT
LEGAL SOLUTIONS

I hereby certify that "OKSCSB Meeting 102326 - Part 2" is, to the best of my knowledge and belief, a true and accurate transcription from English to English.

Anders Nelson
Anders Nelson (Nov 4, 2026 14:37:17 PST)

Anders Nelson
TransPerfect Legal Solutions

November 4, 2026

216 EAST 45TH STREET, 9TH FLOOR, NEW YORK, NY 10017 T +1 212.400.8845 F +1.212.867.3106
LEGAL.TRANSPERFECT.COM

# Board Notice of Appeal, filed below on October 23, 2026, as ECF No. 125

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., *et al.*,

*Plaintiffs*,

v.

BRIAN T. SHELLEM, in his official capacity as Chairman of the Oklahoma Statewide Charter School Board, *et al.*,

*Defendants*.

Case No. 5:26-cv-00582-R

**NOTICE OF APPEAL**

Please take notice that the Oklahoma Statewide Charter School Board Defendants appeal to the United States Court of Appeals for the Tenth Circuit from the order granting Plaintiffs' request for a preliminary injunction entered on September 24, 2026. ECF No. 121.

Respectfully submitted this 23rd day of October, 2026.

*/s/ Anthony J. Ferate*
Anthony J. Ferate, OBA No. 21171
FERATE PLLC
4308 Echohollow Trail
Edmond, Oklahoma 73025
(202) 486-7211
aj@ferate.us

Hiram S. Sasser, III, OBA No. 19557
Holly M. Randall,* OBA No. 34763
Erin E. Smith,* OBA No. 35232

FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075
(972) 941-4444
hsasser@firstliberty.org
hrandall@firstliberty.org
esmith@firstliberty.org

**Admitted PHV.*

***Attorneys for Oklahoma Statewide Charter School Board Defendants***

# Special Board meeting agenda for November 5, 2026

**SPECIAL MEETING OF THE
STATEWIDE CHARTER SCHOOL BOARD
EMBASSY SUITES CONFERENCE CENTER
2501 CONFERENCE DRIVE
SOONER BOARDROOM
NORMAN, OK 73069
AGENDA**

**November 5, 2026 @ 2:15 P.M.**

Note: Public Comment only allowed in person at regularly scheduled board meetings.

Public view access: https://oklahoma.gov/scsb/about-us/board-meetings
A link will be posted approximately 15 minutes prior to the meeting.

1. **Call to Order and Roll Call**

2. **Invocation, Pledge of Allegiance, Salute to the Oklahoma Flag, and A Moment of Silence**

3. **(Action) Discussion and possible action regarding minutes of the October 12, 2026, Regular Board Meeting**

4. **Chairman's Opening Comments**

5. **Administration**

   a. (Action) Review, discussion, and possible action regarding the Le Monde International School charter contract

   b. (Action) Review, discussion, and possible action regarding the Tulsa Honor Academy charter contract

   c. (Action) Review, discussion, and possible action regarding acceptance of P3 Urban Montessori's grade bands to include admission of five-year old students during the 2026-2027 school year

   d. (Action) Review, discussion, and possible action regarding the 2027 Statewide Charter School Board Meeting Schedule

6. **Executive Session –** (Action) Proposed Executive Session pursuant to 25 O.S. 2021, § 307(B)(4), consistent with 2005 OK AG 29, for the purpose of discussing pending litigation against Board Members in *The National Ben Gamla Jewish Charter School Foundation, Inc. v. Shellem, et al.*, No. 5:26-cv-00582 in the U.S. District Court for the Western District of Oklahoma and No. 26-6166 in the United States Court of Appeals for the Tenth Circuit
   a. Vote to enter Executive Session;
   b. EXECUTIVE SESSION pursuant to 25 O.S. 2021, § 307(B)(4);
   c. Vote to exit Executive Session; and
   d. Discussion and possible action on the matters discussed in Executive Session

7. **(Action)** Discussion and possible action regarding the notice of appeal filed in *The National Ben Gamla Jewish Charter School Foundation, Inc. v. Shellem, et al.*, No. 5:26-cv-00582 in the U.S. District Court for the Western District of Oklahoma and docketed as No. 26-6166 in the United States Court of Appeals for the Tenth Circuit

8. **Adjournment**

*The Board may take agenda items in any order it determines necessary or convenient. "Possible action" includes, but is not limited to, approval, authorization, adoption, rejection, denial, amendment, taking no action, or tabling an item for disposition at a later time or meeting. "(Action)" serves as only a prompt for the Board and in no way impairs the Board from taking action if any agenda item provides for possible action to be taken.*

# Transcript of portions of special Board meeting held on November 5, 2026

**[00:30:50]**

**CHAIRMAN:** Item six, executive session. Action: Propose executive session pursuant to 25-OS-2021 [INDISCERNIBLE 00:30:58] 2005 OK AG 29 for the purpose of discussing pending litigation against board members and the National Ben Gamla Jewish Charter School Foundation Inc versus Shellum. In the District Court of the Western District of Columbia, the United States Court of Appeals in the Tenth Circuit. So Chairman would entertain a motion to move into executive session with our attorneys next door.

**MS. ANDERSON:** So moved.

**MALE 1:** Second.

**CHAIRMAN:** Call for a vote.

**FEMALE 1:** Dr. Campbell?

**DR. CAMPBELL:** Yes.

**FEMALE 1:** Mr. Pearson?

**MR. PEARSON:** Yes.

**FEMALE 1:** Ms. Anderson?

**MS. ANDERSON:** Yes.

**FEMALE 1:** Ms. Wise?

**MS. WISE:** Yes.

**FEMALE 1:** Mr. Shellum?

**MR. SHELLUM:** Yes.

**FEMALE 1:** Dr. Baker?

**DR. BAKER:** Yes.

**FEMALE 1:** Mr. Buswell?

**MR. BUSWELL:** Yes.

**FEMALE 1:** Ms. Savage?

**MS. SAVAGE:** Yes.

**FEMALE 1:** Mr. Chairman, motion carries.

**CHAIRMAN:** We move to the very next room next door.

**[00:31:47]**

**[01:29:24]**

**CHAIRMAN:** Moving on to 6(c), Chair would entertain a motion to exit the executive session and come back into session.

**DR. CAMPBELL:** So moved.

**MS. ANDERSON:** Second.

**CHAIRMAN:** Call a vote.

**FEMALE 1:** Dr. Campbell? Dr. Campbell?

**DR. CAMPBELL:** Yes.

**FEMALE 1:** Mr. Pearson?

**MR. PEARSON:** Yes.

**FEMALE 1:** Ms. Anderson?

**MS. ANDERSON:** Yes.

**FEMALE 1:** Ms. Wise?

**MS. WISE:** Yes.

**FEMALE 1:** Mr. Shellum?

**MR. SHELLUM:** Yes.

**FEMALE 1:** Dr. Baker?

**DR. BAKER:** Yes.

**FEMALE 1:** Mr. Buswell?

**MR. BUSWELL:** Yes.

**FEMALE 1:** Ms. Savage?

**MS. SAVAGE:** Yes.

**FEMALE 1:** Mr. Chairman, motion carries.

**CHAIRMAN:** Motion carries. All right. 6(d), discussion on possible action regarding matters discussed in executive session. I think it's important that we know that this board has been put in a very difficult position. And we would like to have clarity from federal court and the state court. And we seem to be kind of a ping pong ball getting flopped around. So what we are going to do is seek that action. And with that in mind, the Chair would entertain a motion for possible discussion before a motion is presented to move forward in the case. Is there any further discussion before I throw anything out? Would anybody like to make a motion?

**MR. BUSWELL:** I'd like to make a motion.

**CHAIRMAN:** Sure.

**MR. BUSWELL:** I move to authorize counsel to continue pursuing the Tenth Circuit appeal at the preliminary injunction Board in the National Ben Gamla Jewish Charter School Foundation v. Shellum.

**CHAIRMAN:** Is there a second?

**FEMALE 2:** Second.

**CHAIRMAN:** Any further discussion? Seeing none, call a vote.

**FEMALE 1:** Dr. Campbell?

**DR. CAMPBELL:** Yes.

**FEMALE 1:** Mr. Pearson?

**MR. PEARSON:** Yes.

**FEMALE 1:** Ms. Anderson?

**MS. ANDERSON:** Yes.

**FEMALE 1:** Ms. Wise?

**MS. WISE:** Yes.

**FEMALE 1:** Mr. Shellum?

**MR. SHELLUM:** Yes.

**FEMALE 1:** Dr. Baker?

**DR. BAKER:** Yes.

**FEMALE 1:** Mr. Buswell?

**MR. BUSWELL:** Yes.

**FEMALE 1:** Ms. Savage?

**MS. SAVAGE:** Yes.

**FEMALE 1:** Motion carries.

**CHAIRMAN:** Motion carries. Item 8, Chair would entertain a motion to adjourn our meeting.

**[01:31:26]**

TRANSPERFECT
LEGAL SOLUTIONS

I hereby certify that "●KSCSB Meeting 110526" is, to the best of my knowledge and belief, a true and accurate transcription from English to English.

Anders Nelson
Anders Nelson (Nov 6, 2026 06:24:22 PST)

Anders Nelson
TransPerfect Legal Solutions

November 6, 2026

216 EAST 45TH STREET, 9TH FLOOR, NEW YORK, NY 10017 T +1 212.400.8845 F +1.212.867.3106
LEGAL.TRANSPERFECT.COM

# Declaration of Alex J. Luchenitser

# DECLARATION OF ALEX J. LUCHENITSER

I, Alex J. Luchenitser, declare that, if called upon, I could and would competently testify to the following:

1. I am lead counsel for Intervenors-Defendants-Appellees Rabbi Daniel Kaiman, Bradley Archer, Erika DuBose, Sydney Gebhardt, Kara Joy McKee, Michele Medley, and Gene Perry ("Kaiman Intervenors") in this case, *National Ben Gamla Jewish Charter School Foundation, Inc. v. Shellem*, No 26-6166.

2. I certify that the Table of Contents of the Appendix that contains this declaration and the cover sheets that precede each document in the Appendix correctly describe what the documents in the Appendix are, and that the documents in the Appendix are true and correct copies of the originals or are themselves originals.

3. Kaiman Intervenors have never received any productions of documents, interrogatory answers, or other responsive information in response to the document requests, interrogatories, and document subpoena that are included in this Appendix at pages A623–66.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on November 6, 2026, in the State of Virginia.

s/ Alex J. Luchenitser
Alex J. Luchenitser
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7306
*luchenitser@au.org*